**BRIAN J. FOLEY, Attorney at Law**
BY:     **BRIAN J. FOLEY, ESQ.** (PA ID No. 68806)
6701 Germantown Avenue, Suite 200
Philadelphia, PA  19119
(267) 930-4425
*Attorney for Plaintiff Marilyn Gaye Piety Foley*

_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| **MARILYN GAYE PIETY FOLEY,** | : | |
| | : | |
| Plaintiff | : | |
| | : | **CIVIL ACTION NO. 22-cv-1777** |
| v. | : | |
| | : | |
| **DREXEL UNIVERSITY** | : | |
| 3141 Chestnut Street, | | |
| Philadelphia, PA 19104 | : | |
| | | |
| and | : | |
| | | |
| **ROGER KURTZ** | : | |
| 3141 Chestnut Street, | | |
| Philadelphia, PA 19104, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

_____

## <u>COMPLAINT</u>

### PRELIMINARY STATEMENT

1.      This is an action for an award of damages including punitive

damages, attorneys' fees, equitable relief, and any other available and

appropriate relief for Plaintiff Marilyn Gaye Piety Foley ("Piety"), a Professor of

Philosophy who is employed by Defendant Drexel University and supervised by Defendant Roger Kurtz. Dr. Piety has been harmed by Defendant's intentional illegal discrimination that resulted in harassment, discrimination, a hostile workplace, retaliation for protected activity, unequal pay, and breach of contract.

2.       This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), et seq., as amended ("Title VII"), Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"), the Pennsylvania Human Relations Act 43 P.S. §951 et seq. ("PHRA"), and Pennsylvania common law.

## JURISDICTION

3.       This Court has original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331, 1343, and 1391 and, under 28 U.S.C. § 1367, supplemental jurisdiction over state law claims.

4.       All conditions precedent to filing this suit have been fulfilled.

## VENUE

5.       This action properly lies in the Eastern District of Pennsylvania, pursuant to 28 U.S.C. § 1391(b), because the claims arose in this judicial district and Defendants conduct business in this judicial district.

**PARTIES**

6.    Plaintiff, Marilyn Gaye Piety Foley (hereinafter "Dr. Piety," "Piety"), is an adult female citizen and resident of Philadelphia, Pennsylvania. She is Drexel's only tenured full Professor of Philosophy.

7.    Defendant Drexel University ("Drexel") is a private research university in Philadelphia, Pennsylvania, one of the 10 largest employers in the city, with more than 10,000 faculty and professional staff, 24,000 students and an endowment of more than $1 billion. Drexel receives federal funding in various forms, including grants and federal student loans provided to Drexel by its students or given to Drexel by the federal government directly.

8.    At all relevant times, Defendant Drexel University ("Drexel") acted by and through its agents, servants, and employees, who were acting within the scope of their authority, course of employment, and under the direct control of Drexel.

9.    Drexel purports to have a "Discrimination, Harassment, and Bias Incident Prevention Policy," in which Drexel claims that it considers acts of discrimination, harassment and bias to be "unacceptable and counter to its core mission and values," and "encourages" women faculty members and others to report such discrimination to Drexel's Office of Equality and Diversity ("OED"), which Drexel says will apply Title IX and other laws and policies and investigate and address the discrimination reasonably and promptly. Drexel promises its employees that "Retaliation in any form will not be

tolerated against an individual who makes a report with the University or participates in an investigation of any such report."

10.     Defendant Roger Kurtz ("Dr. Kurtz") has served as Head of the Department of English and Philosophy at Drexel since Fall 2017.  He is a fully tenured Professor of English. His job duties include managing course offerings and assigning professors to teach courses, developing programs, resolving disputes, avoiding illegal discriminatory conduct by faculty, abiding by Drexel policies regarding discrimination and workplace harassment and retaliation, and helping faculty members develop a significant body of scholarly work in alignment with Drexel priorities.

11.     In addition, Dr. Kurtz has the power to hire and fire and appoint faculty to positions directing programs within the Department of English and Philosophy, participating in the promotion and tenure process, conducting performance reviews and assessments, and determining annual raises for faculty in the Department, allocating funds for travel and research, and participating in determining the annual salary of faculty members in the Department.  Kurtz, as a Department Head, is required to establish and external advisory committee but has not done so.

## FACTS

### Dr. Piety's 20-Year-Plus of Service to Defendant Drexel

12.     From on or about September 1, 1998, Dr. Piety has been employed by Drexel. Piety began as a visiting professor. She had just returned to the United States

from a position at DIS, Denmark's International Studies Program, then a division of the University of Copenhagen. Piety, American born, went to Denmark on a Fulbright Scholarship to complete the work on her Ph.D. dissertation on the philosophy of the 19th century Danish philosopher Soren Kierkegaard. Piety earned her B.A. from Earlham College, her M.A. from Bryn Mawr College, and her Ph.D. in Philosophy from McGill University.

13.     Drexel promoted/hired Dr. Piety to a position on Drexel's tenure track in 2001, as an Assistant Professor. In its "mid-tenure" review of Piety in 2005, Drexel's then-Dean of the College of Arts and Sciences Donna Murasko instructed Piety to focus on her work about, and become a highly recognized expert regarding, the philosophy of Kierkegaard, as she worked toward achieving tenure and promotion.

14.     In 2007, Drexel awarded Piety tenure and promoted her to Associate Professor.

15.     In 2016, Drexel promoted Piety to full Professor based on her exemplary teaching, service, and scholarship, primarily on Kierkegaard. Piety is one of the few full Professors in the Department of English and Philosophy, and is the only full Professor in Drexel's Philosophy Program ("the Program," "Philosophy Program"), which is within the Department of English and Philosophy ("the Department").

16.     Until Drexel promoted Piety to full Professor in 2016, there had been no full Professors of Philosophy at Drexel for about two decades.

17.     Piety is a scholar of the work of the 19th century Danish philosopher Soren Kierkegaard, who is considered the father of modern existentialism. Among other things, Piety has translated two of Kierkegaard's works for Oxford University Press (in one book) and written a book on Kierkegaard's epistemology published by Baylor University Press. Piety has published numerous articles about Kierkegaard's philosophy in scholarly journals and books. Her work about Kierkegaard has been anthologized and translated into other languages. Piety also maintains a blog on the philosophy of Soren Kierkegaard called *Piety on Kierkegaard*. To a lesser degree, Piety also teaches and writes about other areas of philosophy including Plato and Philosophy of Sport. Piety won an award for a paper she presented at a conference on Business Ethics.

18.     Piety earns highly positive teaching evaluations from her students and, although not required to do so by Drexel or the Department or Program, assigns her students numerous writing projects and provides extensive feedback as part of championing her students and helping them develop into better writers and thinkers.

19.     Piety has served on and/or chaired various faculty committees at Drexel.

**Background: Discrimination and Hostile Workplace Against Female Faculty**

*In the Department of English and Philosophy, Men Rule*

20.     Drexel informs its employees that discrimination against women and

minorities is "unacceptable and counter to [Drexel's] core mission and values," and assures its employees that it will not tolerate "retaliation in any form ... against an individual who makes a report [of discrimination] with the University or participates in an investigation of any such report."

21.     Drexel's Department of English and Philosophy, and the Philosophy Program, have long been a source of discrimination and hostility toward female faculty members. Retired Associate Dean Alexander Friedlander has described the Department as "an old-boys' club." Female faculty members, including Piety, have requested help from Drexel officials, who all have refused to stop the bullying and hostility.

22.     Piety has suffered from this hostile work environment. As described in detail below, she has been retaliated against for trying to protect herself and other faculty members from it.

23.     Shortly after Piety was awarded tenure in 2007 and published, in rapid succession, the above-mentioned translations for Oxford University Press, published in 2009, and the book about Kierkegaard's epistemology for Baylor University Press, published in 2010, colleagues began to bully and harass and discriminate against her.

24.     When Piety was promoted to full Professor in 2016, the personal attacks by colleagues increased. With this promotion, Piety became the highest-ranking professor in the Philosophy Program, and she now outranked a male associate

professor, Dr. Jacques Catudal now retired, who had served as the Philosophy

Program's first Director, from 1987 to 1991, from 1993 to 1997, and again from 2007 to

2010. Catudal often verbally attacked and ridiculed Piety and, including when he was

the program director, encouraged faculty members to join him in bullying Piety. He

assured junior faculty members that he would protect them from any consequences of

this harassment.

25.     A formal complaint of sex discrimination was made by a female faculty

member from the English Program in the Department, on or about 2015 to Drexel's

Office of Equality and Diversity (OED). Around this time, Piety made an informal

complaint to the OED but did not pursue it to the level of a formal complaint. OED

interviewed her a witness in the other professor's formal complaint.

26.     The result of this complaint, after a purported investigation by OED, was

that, on or about 2015, that the Department was declared a "hostile work environment."

27.     However, OED did not conclude that this hostility was grounded in sex

discrimination. Rather, OED turned the matter over to Drexel's Human Resources

Department (HR), which promised to conduct workshops on "civility."

28.     HR did *not* provide workshops but instead merely held meetings where

faculty were permitted to air grievances.

29.     The hostility toward female faculty members persisted.

30.     After the Department was deemed hostile, the Head stepped down. An

interim Head, Ira Taffer, a male chemistry professor, was appointed. There was also a co-Head, a male Professor of English, Richard Astro, who lived in Florida fulltime and would visit Drexel now and then to check in on the Department. A search for a new Department Head was announced.

31.     The Department continued to be managed by temporary leadership. In the 2016-2017 academic year, Drexel interviewed several candidates. After the process, Drexel hired Defendant Dr. Roger Kurtz, a Ph.D. in English, to serve as Head.

32.     Since then, the hostility and discrimination in the Department has continued unabated. Piety continued to suffer from it, including when it was perpetrated by colleagues allied with Catudal.  Some women faculty have continued to try to take action to address the discrimination, including by filing complaints with Drexel's OED.

### Women Hold Few Positions of Power in the Department of English and Philosophy -- and None at all in the Philosophy Program

33.     There has not been a female Head of the Department of English and Philosophy in more than 25 years.

34.     That is despite that, approximately half of the approximately 100 faculty in the department are women (precise figures cannot be given because the number of adjunct faculty varies from term to term).

35.     And that is despite that, there is a greater number of tenured/tenure-track

("tenure-line") professors who are women. Of that group, there are six male professors and eight female professors.

36.     However, the number of male *full* professors equals the number of female full professors -- there are four of each. Piety is the only full Professor of Philosophy. According to Department Bylaws, the Head of the Department must be a tenured full professor, but there has not been a female Head, or female interim Head, in more than 25 years, if ever.

37.     Male professors hold almost all of the important program director positions. In addition to Defendant Kurtz as Department Head, the Assistant Department Head is also a man. The First Year Writing Program is directed by a man. The University Writing Program is co-directed by a man and a woman. The Drexel Publishing Group is directed by a man.  The Philosophy Program is directed by a man. None of these program directors is a tenure-line professor, but rather are lower ranking professors with contracts for a period of years that may be renewed, without any possibility for tenure. There are other programs, primarily "certificate programs," that are either directed by women or co-directed by both a man and woman. Drexel and the Department deem these programs to be less important than the aforementioned programs, as they enroll fewer students and are less critical to the core curriculum.

38.     There are several female tenure-line professors in the Department that

are higher ranking than the directors of the programs.

39.     Shortly after assuming the role of Department Head, Kurtz replaced the woman who had served as the Assistant Department Head, Associate Professor Jennifer Yusin, with a man, Associate Professor Nathan Hanna.

40.     Shortly after assuming the role of Department Head, Kurtz removed the woman who was the director of the Drexel Publishing Group, Kathleen Volk-Miller, and replaced her with a man, Scott Stein.

41.     There has *never* been a female director of the Philosophy Program.

42.     Piety has requested numerous times to be appointed director of the Philosophy Program.  Her requests have always been rejected, first by former Department Head Dr. Abioseh Porter and then by Defendant Kurtz.

43.     On or about Spring 2018, Kurtz reported that the Philosophy Program Director, Dr. Peter Amato, was stepping down. Kurtz called for applications from philosophy faculty who would be interested in serving as Director.

44.     Piety applied. Kurtz rejected her application. He re-appointed Amato.

45.     Amato is below Piety in academic rank:  he is not a tenure-line professor but serves as a Teaching Professor, with a renewable contract for a period of years. Like Piety, Amato has worked at Drexel for more than 20 years. He has expressed at various times that the Program should be directed by a tenure-line faculty -- Amato is the only non-tenure-line Director to lead the Program.

## Drexel Makes Piety Use Her Married Name

46.     Piety took her husband's last name after marriage in 2001 for personal reasons. She immediately informed the Office of Payroll and Benefits of her new married name as she was required to do so for pay, benefits, and tax purposes, but explained at that time that she wanted to continue to use her maiden name, "Piety" for academic purposes.

47.     Piety made this request because by the time she got married, she already had already built a scholarly reputation under her maiden name Piety.

48.     Drexel refused Piety's request.

49.     In response, Piety explained that male faculty members usually do not need to make such a request. Her name was changed to Foley in Drexel's faculty directory, on her course listings, and she was required to use it in her syllabi and other teaching materials.

50.     Piety asked her colleagues to continue to refer to her as Marilyn Piety, but some of them, including Catudal, refused to honor Piety's request and began calling her "Marilyn Foley," intending to humiliate her.

51.     Piety made additional requests to Drexel to remedy the situation. She informed Drexel that she had missed out on various professional opportunities, because some faculty members from other universities and colleges had tried to locate her for publishing or scholarly presentation opportunities but did not find her, as she

was listed on Drexel's website only as Marilyn Foley.

52.    Drexel's refusal to make this change obscured Piety's professional accomplishments from colleagues and students, as those who did not know her professional name and Googled "Marilyn Foley" would not yield the result that searching for  "M.G. Piety" would yield.

53.    In response to Piety's repeated requests, Drexel claimed that making this change would be technologically impossible to do in Drexel's computer system, because, among other things, paychecks had to be issued to employees in their legal name.

54.    Piety accepted this explanation from Drexel officials until 2017. That year, she served as a Visiting Professor for a semester at Haverford College,  where she taught a seminar on Kierkegaard's philosophy. Haverford is a small, liberal arts college that does not focus on science and technology to the high level that Drexel does

55.    Haverford let Piety use M.G. Piety professionally, that is, in the course catalog and on the students' schedules, etc., and issued the paychecks to Marilyn Foley.

56.    On or about 2018, Piety reached out to Drexel's Office of Equality and Diversity ("OED") for help, asking that Drexel let her use her professional name as Haverford had.

57.    A solution was offered: Drexel would revert to using "Piety" in the entire Drexel system. This would mean, the OED explained to Piety, that even Piety's health

insurance cards would use her professional name, not her legal name.

58.     Piety agreed, because she was assured that this would not be a problem. However, Piety has had at least one health insurance claim rejected because her legal name was not used. Drexel has continued to refuse to do anything further.

59.     Even after Piety's name was changed back to Piety in most of Drexel's system, several faculty members in the Department and the Program, rallied by Catudal, continued to refer to Piety as "Dr. Foley," and "Marilyn Foley," despite their awareness that Piety wished to be referred to as Piety, and despite her express requests that she be referred to as Piety.

60.     This harassment of Piety was grounded in animus toward Piety because of her sex, and was a deliberate attempt to obscure her professional accomplishments from her colleagues and hence to damage her standing in the Program, the Department, and at Drexel.

### Female Faculty Are Subjected to Disproportionate Teaching Assignments and Opportunities

61.     Drexel also discriminates against women in its Philosophy Program through a practice of disproportionately assigning female tenure-line professors to teach more "introductory" and lower-level courses than it assigns to male tenure-line professors.

62.     The expertise of women is devalued throughout Drexel, as is exemplified

in the salary discrepancies between male and female faculty.

63.     Piety, along with other female tenure-line philosophy professors, has been assigned to teach a disproportionate number of introductory courses.

64.     From the 2011-2012 academic year to the present, despite that, for much if not most of this time the number of male tenure-line philosophy professors has been *double* that of the female tenure-line professors, female professors have taught more of the introductory courses. Female tenure-line professors have taught 54 introductory, "100-level" courses. Male tenure-line professors have taught 47 .

65.     One of the female professors, Jennifer Yusin, included in these numbers and calculations, was hired by Drexel to fill an open position in the English Program, but because of the overlap between her research interests and philosophy, was appointed to teach both English and Philosophy.

66.     Although Yusin, who is a tenured associate professor, has been teaching philosophy courses since at least 2016, Kurtz, Amato and other male professors have dismissed her expertise in philosophy and have strongly opposed treating her as a full-fledged member of the Philosophy Program. For example, Kurtz and Amato refuse to allow Yusin to attend Philosophy Program meetings despite that policies that will affect her are debated and decided.

67.     Kurtz and Amato further discriminate against female faculty by assigning many of the advanced, upper-level philosophy courses -- usually relatively

small seminars -- to male professors instead of female professors even where the female professor outranks the male professor, and even when there is already a female professor who has more scholarly expertise  in the subject area than the male professor whom Kurtz and Amato choose to teach the course has.

68.     Likewise, many of the advanced, upper-level philosophy courses are assigned to adjunct and Teaching Professors, who do not have as part of their job description any requirement that they research, write, and publish scholarly work. These professors are outranked by tenure-line professors. Teaching Professors are routinely assigned to teach advanced courses, even when there are more expert female tenure-line professors willing and able to teach them. As a result, these higher-ranking female tenure-line professors toil away teaching large sections of introductory courses that do not dovetail with their research and thus detract from the time necessary to meet their job requirement of researching and writing and publishing scholarly work.

### Drexel Devalues Women's Expertise:  Kurtz and Amato Assign a Kierkegaard Course to a Teaching Professor Less Expert than Piety

69.     On or about February 26, 2020, Piety gained further insight regarding how little female faculty members' professional expertise is valued in the Philosophy program and at Drexel.

70.     At a meeting of the Philosophy program faculty, the Program director, Amato, announced that he was scheduling a Teaching Professor to teach a course on

Kierkegaard in the coming winter term, nine months from then.

71.    This news came as a surprise to Piety. The opportunity to teach a course in her specialty arises only rarely, given the small size of the Program.  In fact, in the past ten years, the Program has offered a course on Kierkegaard just four times.

72.    Opportunities to teach a course on Kierkegaard are so rare that Piety spent some of her research leave time in 2017 to teach a seminar on Kierkegaard as a Visiting Professor at Haverford College.

73.    The Teaching Professor whom Amato and Kurtz assigned to teach the course on Kierkegaard is less expert than Piety regarding Kierkegaard. Nor does this teaching professor have as part of her job description any requirement that she research, write, and publish scholarly work.[1]

74.    That this rare teaching assignment was given to a teaching professor instead of to a tenured, full professor who is a well-known expert in the subject matter is contrary to academic custom and practice, including at Drexel.

75.    It was also contrary to academic custom and practice, including at Drexel, that such an opportunity would be given to a teaching professor without the official who makes the course assignments first offering such opportunity to any higher-

_____

[1] Piety is *not* saying that all Tenure-Line Professors are more qualified or more expert than all Teaching Professors. Rather, expertise must be reviewed on a case-by-case basis. The main difference is that, unlike Tenure-Line Professors, Teaching Professors are not required, as part of their job, to research, write, and publish scholarly work.

ranking, more expert faculty members.

76.     Assigning courses to the faculty member most expert in the subject matter benefits students.

77.     It also benefits the faculty member, especially where the faculty member has, as part of her job description, the requirement that she research, write, and publish scholarly works in books and academic journals. Upper-level seminars provide scholars the opportunity to develop and refine their ideas as a step in the process toward publishing and sharing them with the wider scholarly community.

78.     Kurtz and Amato, however, never even told Piety of this rare opportunity.

79.     Instead, Amato used the announcement of the teaching assignment at the meeting of philosophy faculty on or about February 26, 2020 to deliberately shock, humiliate, and discriminate against Piety in front of colleagues, by devaluing and ignoring her expertise.

80.     Both Amato and Kurtz justified the course assignment on the grounds that it was part of an "historical sequence," such that it necessarily had to be taught during a term when Piety normally did not teach.

81.     However, that claim was false. The course, PHIL 485, that was purportedly "required" during this particular term was a "variable topics" course. That is, all that was required was a course on *any* "modern philosopher," not a course

on Kierkegaard. Also, Drexel students often take philosophy courses out of historical sequence, so there is not, in fact, any necessity to offer the variable topics course PHIL 485 during a particular term .

82.    Amato and Kurtz deliberately ignored Piety when she provided them with that explanation. That is because Amato intentionally selected the topic of Kierkegaard for this variable topics course so that he could assign it to the teaching professor, and Kurtz supported him in this act of discrimination and harassment.

83.    On the other hand, in the Philosophy program, such a devaluing of a *male* professor's expertise rarely occurs.

84.    In fact, the Philosophy Program *prioritizes* male professors and their expertise over that of female professors.

85.    For example, in 2010, Piety told Dr. Amato that she wanted to teach a course, "Philosophy of Mind." At that time, Piety was a tenured associate professor.

86.    Amato instructed Piety that she must first ask another faculty member, a male adjunct professor whom Amato said was expert in that area, if he would like to teach the course. If he did, Amato said, Amato would have that male professor teach the course instead of Piety.

87.    Unlike Piety, this male faculty member was not a tenure-line professor but was a part time, adjunct instructor. Unlike Piety, he did not have a Ph.D.

88.    Amato forced Piety to speak with the male instructor to deliberately

humiliate her, effectively making her seek a lower-ranking man's permission to teach a course she wanted to teach.

89.     Piety did not complain but did as Amato ordered. The male adjunct professor turned down the offer because, he said, he feared that such a specialized course in such a small program as Drexel's might not garner enough students and would be canceled at the last minute, leaving him having to scramble to prepare to teach a different course, or no course at all; he was not paid a salary but rather was paid per courses taught.

90.     After Amato deliberately humiliated Piety at the Philosophy Program meeting, Piety asked Defendant Kurtz to consider intervening in a non-confrontational way to let her teach the course, given that it was unlikely Drexel would offer a seminar on Kierkegaard again for several years.

91.     In response, Kurtz dismissed Piety and her argument that his and Amato's assigning of this class to a less expert teaching professor who did not have any requirement to write and publish scholarship was contrary to academic custom, including at Drexel.

92.     When Piety sought help from then-Dean of the College of Arts and Sciences, Norma Bouchard, Bouchard likewise dismissed her and tried to gaslight her that no such academic custom exists.

93.     Piety suffered the same treatment when she sought help from Vice

Provost Erin Horvat, who responded in a patently sexist manner. Horvat wrote in an email dated March 17, 2020: "I am sorry to learn of your distress upon seeing that another faculty member in your department is scheduled to teach a course that you would prefer to teach and for which you *feel* more qualified"(emphasis added).

94.     Notwithstanding that the particular teaching professor Kurtz and Amato assigned to teach the course has published scholarly work about Kierkegaard, the comparison is not a matter of feminine "feelings." Rather, there is, objectively, no comparison between the two professors when it comes to academic rank, and scholarly achievement and reputation in the field of Kierkegaard scholarship. (This comparison says, and is intended to say, more about Piety than about this teaching professor, who has published work on Kierkegaard.) In fact, this teaching professor teaches *all* of the Program's courses on the philosopher in whose work she is expert, Charles Sanders Peirce.

95.     Dean Horvat, and subsequently Drexel's Provost Jensen and President Fry all ignored Piety's request and explanation that academic custom dictates that the most expert professor is assigned to teach the course or at least is first offered such an opportunity, especially where, as here, such an opportunity so rarely arises.

96.     All the Drexel officials Piety appealed to, including Defendant Kurtz, ignored that Piety was being deprived of a significant opportunity to meet her job requirement of researching, writing and publishing by being denied this rare

opportunity to teach a course in her area of specialization.

97.    All the Drexel officials Piety appealed to, including Defendant Kurtz, ignored that having Piety teach the course would benefit Drexel students. The opportunity for a Drexel student to take a course on Kierkegaard from an expert as accomplished as Piety arises four times in a decade -- four times in 40 Drexel academic terms.

98.    All the Drexel officials Piety appealed to, including Defendant Kurtz, ignored Piety's explanation that the course in question was a "variable topics" course and hence did not need to be a course on Kierkegaard.

99.    All the Drexel officials Piety appealed to, including Defendant Kurtz, ignored that Dr. Piety told them that such devaluing of expertise at Drexel does not happen when the expert is male. Instead, they said that because the course was assigned to a woman, the assignment could not possibly be sex discrimination.[2]

100.    Instead of taking any of Piety's concerns seriously, all the Drexel officials Piety appealed to, including Defendant Kurtz, treated Piety as if she were a prima donna demanding that she, and only she, be allowed to teach courses on Kierkegaard, and that she, and only she, somehow "owned" all Kierkegaard courses at Drexel and

---

[2] The fatuousness of this argument becomes even more obvious if the context is changed to one with which lawyers and judges are more familiar: a law firm. What Piety suffered is akin to a female law partner with noted expertise in a particular area of law learning that her partners are assigning incoming cases in her area of expertise to associates instead of to her.

believed she was entitled to a "monopoly" on them.

101.    Piety responded to this obtuse, sexist effort to twist her arguments and falsely portray her according to a negative stereotype of women by explaining that she was in no way making such a demand. Indeed, Piety had not complained when, earlier, this teaching professor taught a course on Kierkegaard. (This professor has taught two of the four courses offered on Kierkegaard in the last 10 years.)

102.    Kurtz told Piety that he would let her teach a Kierkegaard course the term immediately following the scheduled Kierkegaard course, and, contrary to Department practice, scheduled her to teach the course without first consulting her. However, Kurtz's offer was an empty gesture, and Kurtz knew it was. Drexel's philosophy program has so few majors that a second course on the same subject would almost certainly have been cancelled at the last minute due to low enrollment.  Kurtz was aware that student interest was such that the Philosophy Program has offered just four Kierkegaard courses in the last decade, despite that at least two professors wanted to teach such courses.

103.    In addition, Kurtz's offer was not merely an empty gesture but a punitive, bullying tactic. Kurtz and Amato have often bullied Piety by scheduling her, without her permission, to teach a course that would almost certainly fail to meet the minimum enrollment requirement, and which Kurtz and Amato would then cancel on the eve of the term. This bullying has repeatedly forced  Piety to scramble at the last

minute to, suddenly and unexpectedly, prepare and teach a course other than the one she had prepared to teach.

104.     The dismissive, bullying, sexist, disingenuous, and gaslighting responses of Kurtz, Bouchard, Horvat, and Jensen to Piety's request to teach the Kierkegaard course, which sought to portray Piety as seeking to "monopolize" a particular subject, ignored an elephant in the room -- that in Drexel's Philosophy Program, there *is* a professor who obviously "owns" courses in a particular subject matter: male tenured Associate Professor Andrew Smith.

105.     Smith is an expert on issues concerning philosophy and the environment. In the period from academic year 2011-present, the philosophy courses "Philosophy of the Environment," "Environmental Ethics," and "Philosophy of Sustainability," have been offered a total of 23 times.

106.     Smith has been assigned to teach these courses 21 of the 23 times they were offered.

107.     The only times any of these 23 courses were not taught by Smith was when Smith was on a leave term. A male adjunct professor who has a scholarly interest in the subject matter temporarily took over.

108.     Generally, however, none of these courses is ever taught during a term when Smith does not teach.  *The offerings are scheduled around Smith's expertise and availability.*

109.     Smith has always been accorded more respect and better treatment than Piety despite that he is younger than Piety, has at all times during his employment at Drexel been junior to her in rank, and has not yet earned the status in his field that Piety has earned in hers. For example, after Piety was tenured, Catudal announced at a Philosophy program meeting that Smith, then a junior assistant professor, was "the face of the Philosophy program." Smith was likewise appointed Assistant Director of the Philosophy Program when he was junior to Piety. Catudal and others described Smith as being "groomed" to lead the Program. Drexel made this appointment despite that Smith, unlike Piety, is on record as having no interest in directing the philosophy program.

110.     Piety has already suffered harm to her reputation as a result of Kurtz's and Amato's decision to deprive her of the rare opportunity to teach a course about Kierkegaard's philosophy. After the assignment was given to the teaching professor, a graduate student at another institution contacted Piety to ask if she and Drexel would let him audit any Kierkegaard course she might teach. Piety had to tell the graduate student, who was studying at a prestigious university, that she was not scheduled to teach a course on Kierkegaard. She feared what his reaction would be when he learned that someone *else*, someone less known in the field and not a tenure-line professor, was scheduled to teach such a course. Piety worried that the graduate student would wonder if Drexel officials believed there was some problem with Piety's teaching, or

that she was unpopular with students and colleagues.

### Dr. Piety Formally Reports the Discrimination and Hostile Work Environment to Drexel's Office of Equality and Diversity ("OED")

111.     Drexel's causing Piety to lose the rare opportunity to teach the Kierkegaard course, and Drexel's dismissive and sexist responses to her complaints about it, all contravened Drexel's promise to faculty that sex discrimination is "unacceptable and counter to [Drexel's] core mission and values,"

112.     It also contravened the instructions then-Dean Muarsko gave Piety in her mid-tenure review in 2005 to focus on developing herself as a Kierkegaard scholar to secure tenure.

113.     Piety regarded this bullying and harassment and humiliation and gaslighting as the last straw.  On or about May 5, 2020, Piety formally complained to Drexel's OED about this discrimination, as well other discrimination she had suffered spanning her career at Drexel. Piety reported discrimination and harassment and bullying by Kurtz, Amato, Catudal, and Professor of English Doreen Saar. She formally named all of them as Respondents except for Amato, because Amato at all times acted under Kurtz's authority and direction, and Piety feared Drexel might simply scapegoat Amato, who is not tenured, for the discrimination by Kurtz and the others.

**Retaliation, and Further Discrimination and Hostility Against Piety**

114.    Since complaining about the Kierkegaard course assignment to Kurtz and upper-level officials, and then filing her formal OED complaint on May 5, 2020, Dr. Piety has suffered retaliation -- and further hostility -- from Defendant Kurtz and others. (Piety filed additional complaints about the various retaliations. )

115.    For example, on or about May 2020, Kurtz and Amato retaliated against Piety by first scheduling her to teach a 400-level "variable topics" course on Kierkegaard right after the Kierkegaard course by the Teaching Professor, despite Piety's objection that such a course would likely be canceled given that an insufficient number of students from the small program would take a second offering of Kierkegaard so soon, such that the course would likely be canceled at the last minute.

116.    When Piety turned it down and explained her reasoning, Kurtz and Amato did not simply let her teach a different 400-level "variable topics" course on a subject of her choosing but instead scheduled her to teach a 200-level course. This reduction was intended to further humiliate Piety and diminish colleagues' and students' perceptions of her.

117.    Catudal and Amato retaliated against Piety. On or about May 2020, Amato scheduled Piety and Catudal to teach a course on the dialogues of Plato during the same academic term. Catudal and Amato knew that such a course would be in competition with Piety's. There is no question that the philosophy program is too small

to support two courses on the same specialized topic during the same term. One of the courses most likely would have to be cancelled at the last minute due to low enrollment.

118.    The course that would most likely be canceled at the last minute was Piety's, and that was Catudal's and Amato's intention.  Piety's course, a 400-level course, had prerequisites that Catudal's 200-level course did not require. Prerequisites can be waived, but students are likely to be deterred from taking a course at such a high level, particularly when there is a lower-level course available on the same subject without the prerequisites.

119.    Indeed, Drexel's philosophy program has had great difficulty in the past filling upper-level philosophy seminars, even when other courses were not scheduled to compete with them. For that reason, this scheduling of two courses on precisely the same, highly specialized subject, in the same term, has occurred rarely, if ever, in Drexel's philosophy program.

120.    Also, Catudal has defamed Piety to students throughout the years, which would harm enrollment in her course competing with his. Catudal, who despite having taught at Drexel far longer than Piety (and is now retired), was an associate professor, not a full professor as Piety is. He also, by his own admission, is not an "active scholar," meaning he had published very little since gaining tenure.  Catudal began attacking Piety shortly after she gained tenure and published two books in rapid

succession, the first with Oxford in 2009, and the second with Baylor in 2010.

121.    In Spring 2020, Kurtz further retaliated against Piety regarding the scheduling of Department faculty computer upgrades.  Despite being the only full professor in Philosophy and one of the few full professors in the Department, Piety was *the very last person* in her Department to receive an upgrade.

122.    In Spring of 2020, Kurtz further retaliated against Piety by repeatedly ignoring requests by her and another female professor to discuss the effects of the COVID-19 pandemic on women in higher education, and in the Department in particular, before the Department members continued their discussions on issues such as setting the criteria for evaluating teaching effectiveness. It is well documented that COVID-19 has disproportionately negatively affected *female* faculty. *See, e.g.,* Ruomeng Cui, Hao Ding, & Feng Zhu, MANUFACTURING & SERVICE OPERATIONS MANAGEMENT 24, no. 2 (March-April 2022); 707-726, "[Gender Inequality in Research Productivity During the COVID-19 Pandemic](#)," (last accessed May 5, 2022); Colleen Flaherty, "[No Room of One's Own: Early journal submission data suggest COVID-19 is tanking women's research productivity](#)," INSIDE HIGHER EDUCATION, April 21, 2020 (last accessed May 5, 2022).

123.    Kurtz's ignoring these issues was not only retaliation against Piety but also evinced his hostility toward women, women in academia, and his disregard for the documented gender inequality affecting female professors as a result of the

COVID-19 pandemic.

124.     On May 26, 2020, Catudal retaliated against Piety by disparaging her teaching in an email to all the philosophy faculty. The university had shifted all teaching for the spring 2020 term online in response to the pandemic. Catudal disparaged the quality of the instruction in the online philosophy courses.  He said that the "so-called 'instruction'" that students were receiving "would make you sick." He continued: "That goes for those fortunate among us who already had courses ready to go because they had previously taught online. In fact, a few of the complaints I have heard from students are specifically about such courses."

125.     Piety, though unnamed, was obviously Catudal's target. That is because she was the only instructor who had announced at the philosophy program meeting at the beginning of that term that she was "fortunate" because, for the upcoming term, she "already had a course ready to go," because she had previously taught it online.

126.     On August 24, 2020, Piety filed an additional complaint with OED concerning the retaliation.

127.     On or about September 2020, Amato retaliated against Piety by deliberately scheduling, over her requests not to, an event for philosophy majors and students interested in becoming philosophy majors for a time when he knew Piety was generally unavailable.

128.     When Piety informed Kurtz about this retaliation and discrimination by

Amato, she said that she merely wanted her schedule to be considered so that students would benefit from meeting the highest number of faculty possible, including the Program's only full professor.

129. Kurtz did not support Piety. He twisted her complaint to accuse her, in an email dated September 11, 2020, of making "demands for preferential treatment on the basis of rank," and describing her behavior as "improper and uncollegial at the very best."

130. However, it was obvious that Piety had not requested "preferential treatment." She had merely requested a courtesy generally extended to faculty but which Amato had repeatedly failed to extend to her.

131. The event ended up being rescheduled for reasons that had nothing to do with Piety's concerns. Piety was able to attend the event on the new date. Except for Amato, Piety was the *only* member of the philosophy faculty who attended.

132. On or about September 17, 2020, Kurtz further retaliated against Piety. During a department meeting held via Zoom, Catudal, then the Chair of the Department bylaws committee, insisted there should be a full Professor on the bylaws committee, as there was not one. Piety volunteered to serve, via the chat function. Kurtz responded, via chat, "You got it."

133. The next day, however, Kurtz emailed all the full professors in the Department and asked that one of them please volunteer to serve on the bylaws

committee.

134.     Piety was surprised and wrote an email to Kurtz reminding him that she had volunteered during the meeting and that he had said she could serve on the committee.  Kurtz responded that he regretted having made the hasty appointment, that he felt he should give all the full professors in the department an opportunity to volunteer.

135.     Piety responded that all the full professors had been present at the department meeting and hence already had a chance to volunteer.

136.     Kurtz ignored this email. Several days later, Kurtz emailed the Department informing everyone that a full professor had volunteered to serve on the committee, and that he was appointing her.

137.     The full professor Kurtz appointed was Doreen Saar, a female, who was one of the people against whom Piety had filed her OED complaint for sex discrimination on May 5, 2020. Saar is known in the Department to have been the subject of at least one other complaint for perpetrating sex discrimination against another female professor.

138.     Kurtz appointed Saar to retaliate against Piety for the complaints she had made against him and Saar.

139.     Kurtz's refusal to appoint Piety to the bylaws committee threatened to harm her annual review for service to the Department and University, as such

committee work counts in these reviews.

140.     Kurtz further retaliated against Piety. On or about October 20, 2020, he falsified Piety's annual review.

141.     Kurtz did so by deliberately omitting in his report that Piety had taught an entirely new course, PHIL 385: Philosophy of Law, despite that the review process provides special consideration to faculty who teach new courses. Kurtz also deliberately omitted that Piety achieved outstanding student reviews for this new course. (Achieving strong student reviews for a new course is rarer than for a course the professor has already taught and refined.)

142.     Kurtz also did so by deliberately omitting in his report that Piety is a member of the Kierkegaard, Religion, and Culture Advisory Board of the American Academy of Religion, despite that this is a significant service to the profession.

143.     Kurtz obviously went out of his way to perpetrate these misleading omissions, because the information he omitted had been included by Piety in the form she had to fill out and send to Kurtz so that he could write the annual review. Also, such accomplishments were routinely included in the official annual reviews of Piety in previous years.

144.     Kurtz also falsified the review by characterizing Piety's scholarship for the past year. He indicated that Piety had merely met the standard when in fact Piety had exceeded it, by publishing, in just one year, the total number of articles she is

required to publish over a three-year period. Scholarship is the main criterion for reviewing tenure-line faculty, also known as "research faculty," as opposed to "teaching faculty." So Kurtz emphasized Piety's teaching evaluations, which he (accurately) described as "well above average."

145.     Kurtz's refusal to give Piety an accurate rating for scholarship and emphasize her teaching instead was part of his effort to harm her reputation with the upper-level administrators, to reduce the likelihood of her receiving an appropriate merit pay increase, and to increase the likelihood that if she could not keep up her high level of scholarly productivity, she might be required to take on extra teaching duties. The Department has made such increase in teaching duties the "remedy" for dealing with research faculty who are not sufficiently active as scholars to merit the light teaching load that goes with the research (tenure-line) positions.

146.     On October 21, 2020, OED investigator Zoe Reilly emailed Piety saying that she understood Piety was planning to file a complaint of retaliation. Surprised, Piety responded the next day, October 22, 2020, by forwarding her August 24, 2020 email with the retaliation complaint attached. (At various times after that, through the Spring of 2021, Piety emailed OED to add various incidents of retaliation to that complaint.)

147.     Catudal and Kurtz further retaliated against Piety. On or about November 2020, Piety announced that she would give a presentation to junior faculty

about the tenure and promotion process via Zoom on November 12. Piety had recently been through the process of promotion to full professor. One reason Piety decided to give the talk was to assuage concerns of associate professors considering applying for promotion to full professor after Associate Professor Catudal had claimed that there were "issues with the process of promotion to full professor."

148.     Before Piety gave the talk, Catudal engaged in further retaliation against her by emailing all tenure-line faculty who were not yet full professors and suggesting that Piety's talk would, somehow, violate the Provost's policy that the tenure and promotion process for any individual professor be kept confidential.

149.     In response, Piety obtained clearance from the University's Office of General Counsel to give the talk.

150.     Catudal attended the talk and heckled Piety throughout.

151.     Kurtz did not attend the talk, nor did he ever thank Piety for giving it. Instead, he ordered her to provide him with access so that he could view a recording of it.  His tone and lack of approval indicated that he wanted to view the recording to try to ferret out some violation of the Provost's confidentiality policy by Piety so that he could subject Piety to discipline.

152.     On or about June 23, 2021, Kurtz continued to retaliate against Piety. When another faculty member, Rogelio Miñana, indicated he wanted to move the Religious Studies Program from Global Studies to another department, Kurtz turned

down the opportunity to house this program in the Department of English and Philosophy.

153.    Including this program in Drexel's Philosophy Program would be the most natural home for it, given how closely it is related to philosophy and given that there are numerous Departments of Religion and Philosophy at institutions of higher education across the country.

154.    In addition, Piety, who teaches in the Religious Studies program and also is one of its founding members, had told Kurtz that she supported such a move.

155.    Moving the Religious Studies Program to the Department of English and Philosophy would have enhanced Piety's status in both the Department and the Program. Kurtz disregarded the obvious fact that such a move would have benefitted the Department more generally by expanding its reach, and the array of disciplines it encompassed.

156.    Kurtz retaliated again by emailing Piety on or about June 23, 2021, informing her that he wanted to meet with her and a representative from HR to address some discussions among the curriculum committee that Piety had copied him on, along with an appeal to him to intervene to stop the mobbing of her by the other members of the committee. The mobbing occurred after Piety told the committee that it was refusing to follow Drexel College of Arts and Sciences policy in creating a new course.

157. Piety suspected this meeting was more retaliation and asked HR if her attorney could attend. HR denied Piety's request.

158. HR told Piety she could have a representative from the OED attend. Piety made such request to OED and also reported to OED that Kurtz was planning to retaliate against her.

159. During the meeting with OED and HR, which was held on June 30, 2021, Kurtz twisted Piety's complaint around and accused *her* of being "uncivil" to the committee members.

160. Kurtz also demanded that Piety not make a complaint to OED against himself and the members of the committee, about whom Piety had said she would complain formally for their bullying and harassment of her - part of the retaliation against her - regarding her refusing to go along with flouting Drexel policy regarding the requirements for creating a new course.

161. During this Zoom meeting, Kurtz also threatened Piety, using his supervisory authority as Department Head to demand that she retract the complaint she had made to OED against him.

162. Piety did file a complaint against committee members. And she did not withdraw her complaints against Kurtz.

163. On or about October 25, 2021, Kurtz retaliated against Piety again, by encouraging her to seek a Drexel research "co-op" where a student could gain work

experience through Drexel's renowned innovative experiential and cooperative learning program.

164.     Piety did the footwork of creating the coop and selecting a student.

165.     On or about December 21, 2021, Piety told Kurtz the good news that she had created a co-op and found a student who would benefit from working in it. Kurtz refused, however, to provide the matching funds ordinarily provided by the recipient's department.

166.     Kurtz gave no reason for his refusal.

167.     Ultimately, Piety obtained matching funds from the same Drexel center that had awarded her the grant.

168.     On or about March 7, 2022 Piety was the victim of yet more retaliatory scheduling practices on the part of Amato and Kurtz when her popular course "Judaism and Christianity: Two Religions or One?" which had originally been scheduled to run during Drexel's spring 2022 term, was prematurely cancelled due to purported "low enrollment" three (3) full weeks before the start of the term.

169.     Amato and Kurtz knew that Drexel students do not enroll in courses until about two (2) weeks before the term starts and that many wait until one (1) week before.

170.     Amato and Kurtz knew that Piety's course on Judaism and Christianity was a popular course that had not suffered from low enrollment.

171.     Moreover, the course should have been protected from cancellation because it was taught pursuant to a generous grant Drexel had received from the philanthropist Laurie Wagman for its development and maintenance, along with the development and maintenance of several other courses that would form part of a new "Interfaith Certificate Program."

172.     Amato and Kurtz canceled the course not only to force Piety to, once again, scramble at the last minute to prepare to teach a course she had not planned to teach, but also because they knew Piety had received the highest teaching evaluations of her career so far for the course.

173.     Kurtz and Amato assigned Piety to teach one of the overflow sections of an introductory course. They did so knowing that the reassignment would likely guarantee Piety she would receive a lower aggregate teaching effectiveness score for her upcoming annual review.

### The Office of Equality and Diversity "Investigation" of Piety's Complaints Conclude There Was "No Discrimination"

174.     After an "investigation" of Piety's original complaint from May 2020, the OED announced, on or about March 1, 2021, that it did not find any illegal discrimination in the Department.

175.     Piety appealed the OED's decision on or about March 15, 2021.

176.     Drexel still has rendered no decision on this appeal and indeed has not

responded to Piety's repeated requests for updates.

177.     On April 22, 2022, the OED informed Piety that its investigation of her complaint for retaliation, which Piety originally filed on or about August 24, 2020, had resulted in a finding of "no discrimination." (This is the complaint that Piety had to send the OED again on October 22, 2020 when OED's Zoe Reilly claimed not to have received it.) Piety is appealing.

178.     To date, OED has ignored the complaint Piety made against the other members of the curriculum committee for their bullying and harassment of her for her insistence that they respect Drexel policy concerning the addition of new courses to the permanent curriculum. (When Piety inquired about the progress on the investigation of this complaint in an email to Apicella dated May 4, 2022, Apicella replied in an email dated May 6, 2022 that this official complaint by Piety may have "inadvertently" "slipped through the cracks.")

179.     OED's "investigations" of reports of discrimination are chimerical, designed to give Drexel female members the illusion that Drexel's OED will take their complaints of illegal discrimination seriously and will investigate them according to best practices; that Drexel will not tolerate any retaliation against these women for making a complaint; that Drexel will deal with offenders appropriately; and that Drexel will ameliorate the discrimination and improve the overall atmosphere for women faculty.

180. However, OED appears to avoid, deliberately, making any investigative finding that there was illegal discrimination against a female faculty member. Instead, OED generally says there was no illegal discrimination -- there was merely "incivility." Then, OED turns the matter over to HR. OED in fact responded in this way to the above-described 2015 complaint a female faculty made about the Department of English & Philosophy, described above.

### The OED Deliberately Does Not Follow Investigative Best Practices and Distorts Facts to Avoid Finding Discrimination

181. OED investigators deliberately refuse to follow investigative best practices. The OED "investigates" matters by "interviewing" witnesses and writing a report. However, the OED investigators *refuse to record any of the interviews accurately* either by audio, video, or by having a court reporter/stenographer present, claiming that the OED has a "policy" to not record interviews. (OED refused to record its interviews of Piety, even when Piety requested such recording.)

182. Rather, the OED investigators claim to rely on their "notes" and "memories" of the interviews when, months after such interviews, the investigators sit down to write their reports. Such intellectual effort to remember, and to reconstruct and interpret "notes," however, is wholly unnecessary. Recording an interview merely requires pressing a few buttons on a smartphone or, in remote interviews, clicking a button on Zoom.

183.     Recording an interview is a best practice for investigators who purport to make factual findings, as OED does, given that even a diligent investigator acting in good faith might miss something that was said, or how it was said, or misinterpret or mishear a statement. In addition, the relevance of a particular bit of information might not be obvious or knowable at one point in an investigation. But when the investigator learns more information, the relevance of this earlier information might become evident. If the earlier information was not written down, or not written down accurately, or not remembered by an investigator because it seemed irrelevant at the time, it may be lost, which diminishes the accuracy of the investigation.[4]

184.     As a result of OED's refusal to follow this best practice, the OED investigators guards their ability to pick and choose among statements by witnesses, use statements tendentiously, or invent statements out of whole cloth.

185.     Even when the OED investigator allows a witness to "review" a "draft" report of an investigation, the OED investigator retains the power and ability to ignore any corrections, make "credibility determinations," ignore available empirical and documentary evidence, and lie about what was said and/or invent facts and statements.

186.     The OED, when it allows a faculty member to review a draft report,

---

[4] For this reason, of course, lawyers routinely read the transcripts and/or review videos of prior depositions in a case to prepare for upcoming depositions.

prohibits any copying of such report. After OED "investigated" Piety's report of discrimination in 2020, Piety received an email from the OED with a link that allowed her to view the OED's draft report on their investigation. The report contained testimony from witnesses that Piety knew supported her complaint. She was unable to print out the report, however, and OED ignored her repeated email requests for instructions on how to do so.

187.    To ensure an accurate record of the investigation, Piety made a copy of the report for herself by taking screen shots of each of its 63 pages. She included extended quotations from this draft report in her appeal of the OED's finding of "no discrimination."

188.    When on March 18, 2022 Piety received an email with a link to the draft of the report of OED's investigation of a subsequent complaint of retaliation that she made to the OED on August 24, 2020 (and had to send OED again on October 22, 2020), the OED, this time, included a warning at the top of the screen informing her that she did not have permission to download or print out the report.

189.    The OED investigatory reports are the products of policies and practices that are biased against female faculty. The reports are unreliable and tendentious and protective of Drexel's administrators, and of Drexel as an institution. The reports and the biased policies and practices used to create them are deployed to gaslight female faculty, to lull them into a belief that their complaints are being taken seriously while

the clock runs out on the statute of limitations for seeking recourse outside of Drexel (such as by reporting the discrimination to the EEOC). The reports and the biased policies and practices used to create them are deployed to keep complaints "confidential." All of these OED practices serve to help deter lawsuits against Drexel that would discredit Drexel's claims that Drexel opposes discrimination against female faculty.

190. For example, Piety discovered, when reviewing the "draft" OED report of OED's investigation of her original May 5, 2020 complaint, that the OED "investigator" had omitted or misinterpreted many of her allegations and engaged in "fact-finding" that defied logic, common sense, and the documentary evidence.

191. For example, the OED investigation report credited Catudal's obviously dishonest claims that he had continued to call Piety "Foley" because she had asked colleagues to do so and published scholarly work under the name "Foley." All the OED investigator had to do was Google, or follow up with Piety, to discredit Catudal's claim.

192. For example, the OED investigation report twisted the facts and contrived to follow the lead of Defendant Kurtz, Dean Bouchard, Vice Provost Horvath to portray Dr. Piety as a prima donna who was intemperately demanding that she, and only she, "owned" a "monopoly" on courses about Kierkegaard.

193. For example, Drexel officials have done nothing to remedy Kurtz and

Amato's disproportionate treatment of female faculty in course teaching assignments

194.    For example, the OED typically takes many months to investigate a complaint hence running down the clock on the statute of limitations for a lawsuit. Regarding Piety's initial complaint to OED, filed in May 2020, there was no decision by OED until on or about March 1, 2021.  Regarding Piety's complaint for retaliation first filed on or about August 24, 2020, and which Piety sent again on October 22, 2020, there was no decision until on or about April 22, 2022.  Regarding Piety's complaint for discrimination and harassment and bullying by some members of the curriculum committee, which Piety filed on or about August 16, 2021, there has been no action whatsoever -- on May 6, 2022, Apicella told Piety it  "inadvertently" "slipped through the cracks."

195.    Had Piety not known to preserve her right to sue by filing a complaint with the EEOC, Drexel's OED would have deprived her of her right to sue as a direct result of its policies and procedures.

196.    Drexel has failed to remedy the Department of English and Philosophy's hostile work environment against female faculty, and unequal opportunities for advancement, despite that women make up about fifty percent of the Department's faculty.

**Piety Requests Information the Office of Equality and Diversity is Required to Maintain Under Title IX"**

197.    On or about March 9, 2021, Dr. Piety asked the head of OED, Paul Apicella, Esq., for data from the OED regarding how many female faculty filed complaints based on sex discrimination, and how many of those complaints ever resulted in a finding of discrimination.

198.    Dr. Piety did so under the belief that such data is required to be kept by OED under applicable federal law such as Title IX.

199.    Apicella responded the following day, March 9, 2021, saying he could not provide a "reliable answer," but that, once he had one, he would be happy to let her know. However, to date, he has not provided any of these data, despite that Piety has renewed her request for it several times. Apicella's most recent response was May 6, 2022 in which he repeated that he was still unable to provide the information.

**Unequal Pay**

200.    Along with other female faculty members, Dr. Piety has long suffered discrimination by the University, the Department, and the Program.

201.    On or about 2014, female faculty members received pay increases. On information and belief, this increase prompted by a complaint that female faculty were being paid less than male faculty for the same work.

202.    Despite this pay increase, however, Drexel continues to pay women faculty, and in particular female full professors, significantly less than their male

counterparts, according to a recent survey by the American Association of University Professors.

203.    Piety is paid less than lower-ranking male philosophy professors (associate professors) who are doing substantially the same work, both in degree and kind, including teaching, research, writing, and committee work. Piety has met or exceeded the Department standards in all categories (teaching, scholarship, and service) in all of her annual reviews..

204.    On or about March 21, 2022, Piety learned that Drexel pays Associate Professor Nathan Hanna, who arrived at Drexel after Piety and is lower ranking than Piety, a salary that is higher than what Drexel pays Piety.

205.    Discovery will show that Drexel similarly pays Associate Professor Andrew Smith significantly more than it pays Piety.

206.    On or about March 21, 2022, Piety learned that Drexel is paying a male tenured full professor in a different but similar department, with similar accomplishments to hers, approximately fifty percent more than Drexel pays Piety.

207.    Discovery will show that Drexel is paying other male faculty of similar, and even lesser, rank and scholarly achievement than Piety and who are doing the same job and same work as Piety significantly more money that Drexel pays Piety.

208.    Such discrepancy is the result of intentional sex discrimination, a hostile work environment, and retaliation against Piety for complaining of such

discrimination.

## Pattern and Practice

209.    Along with other female faculty, Piety has long suffered discrimination in the Department of English and Philosophy from colleagues, department heads including Defendant Kurtz, and program directors.

210.    The actions of Defendants are systematic and ongoing, representing a pattern and practice of illegal discrimination and retaliation against Piety.

211.    At all relevant times, Defendants knew or should have known of such pattern and practice.

212.    Piety brings this action to remedy past and ongoing discrimination and retaliation by Defendants.

## Hostile Work Environment

213.    The aforementioned conduct by Defendants has created a hostile work environment for Piety and indeed other women in the Department of English and Philosophy, and, upon information and belief, in departments throughout Drexel.

214.    At all relevant times, Defendants knew or should have known of the severe and pervasive conduct by Drexel employees that has created this hostile work environment for female faculty and has failed to remedy it.

**Piety Was Injured by Defendants' Conduct**

215.     As a direct and proximate result of the above-described conduct of Defendants, Piety has suffered damages including, monetary loss, wage loss, loss of opportunities for advancement, medical expenses, loss of self-esteem, embarrassment, humiliation, and emotional distress.

## COUNT I
**Title VII - Hostile Work Environment, Retaliation**
*Piety v. Drexel University*

216.     Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

217.     The above-described conduct by Defendant Drexel has created, fostered, and fueled a hostile workplace in violation of Title VII.

218.     The above-described conduct by Defendant Drexel constitutes retaliation against Piety in violation of Title VII.

219.     Defendant Drexel's actions and failures to act were and are deliberate and willful and were intended to harm Piety based on her sex, and to retaliate against Piety for her protected activity under Title VII.

220.     Defendant Drexel has acted in the absence of good faith and reasonable grounds. Its actions and were and are outrageous, egregious, malicious, intentional, willful, wanton, and in reckless disregard of Piety's rights.

## COUNT II
### PHRA - Hostile Work Environment, Retaliation
### *Piety v. Drexel University and Kurtz*

221.    Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

222.    The above-described conduct by Defendants have created, fostered, and fueled a hostile workplace in violation of the PHRA.

223.    The above-described conduct by Defendants constitutes retaliation against Piety in violation of the PHRA.

224.    Defendant Kurtz, a supervisor of Piety, has aided and abetted this discrimination, hostility, and retaliation.

225.    Defendants' actions and failures to act were and are deliberate and willful and intended to harm Piety based on her sex, and to retaliate against Piety for her protected activity under the PHRA.

226.    Defendants have acted in the absence of good faith and reasonable grounds. Its actions and were and are outrageous, egregious, malicious, intentional, willful, wanton, and in reckless disregard of Piety's rights.

## COUNT III
### Title IX - Hostile Work Environment, Retaliation
### *Piety v. Drexel University*

227.    Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

228.     The above-described conduct by Defendant Drexel have created, fostered, and fueled a hostile workplace in violation of Title IX.

229.     The above-described conduct by Defendant Drexel constitutes retaliation against Piety in violation of Title IX.

230.     Defendant Drexel's actions and failures to act were and are deliberate and willful and  intended to harm Piety based on her sex, and to retaliate against Piety for her protected activity under the Title IX.

231.     Defendant Drexel has been deliberately indifferent to Piety's rights and has acted in the absence of good faith and reasonable grounds. Its actions were and are outrageous, egregious, malicious, intentional, willful, wanton, and in reckless disregard of Piety's rights.

**COUNT IV**
**Equal Pay Act**
*Piety v. Drexel University*

232.     Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

233.     At all relevant times, Defendant Drexel has paid Piety less than it pays male professors who are doing the same or similar work, including male professors who are junior to Piety in rank with less experience.

234.     Defendant Drexel's above-described actions were and are intentional and constitute a willful violation of the Equal Pay Act.

## COUNT IV
### Breach of Contract
### *Piety v. Drexel University*

235.    Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

236.    At all relevant times, a contractual relationship has existed between Plaintiff Piety and Defendant Drexel through the various faculty handbook policies and anti-discrimination policies, including Drexel's policies to reasonably and promptly investigate and remediate sex discrimination, hostile workplace, retaliation, and unequal pay.

237.    As a direct result of Drexel's numerous breaches desrcibed above, Piety has sustained significant damages, including loss of income and opportunity and various expenses.

238.    Piety is entitled to recover damages for Drexel's breach of its contractual obligations and duties.

### PRAYER FOR RELIEF

107. Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against the Defendants:

a. Declaring that the acts and practices complained of herein are in violation of Title VII, the PHRA, Title IX, the Equal Pay Act, and constitute breach of contract by Drexel;

b. Enjoining and restraining permanently the acts and practices complained of herein;

c. Ordering appropriate training for Defendants concerning policies and practices and related dispute resolution;

d. Ordering that Defendants address the related workplace bullying and provide anti-workplace bullying training to employees, and especially employees in the Department of English and Philosophy;

e. Awarding compensatory damages to Plaintiff to make Plaintiff whole for all past and future lost earnings, benefits, earnings capacity, interest, and other financial losses which Plaintiff has suffered and will continue to suffer as a result of Defendants' conduct;

f. Awarding liquidated damages to Plaintiff;

g. Awarding punitive damages to Plaintiff;

h. Awarding attorneys' fees and costs to Plaintiff;

i. Molding any verdict/award in Plaintiff's favor to provide Plaintiff the maximum financial recovery allowed by applicable damage caps; and

i. Any and all other relief deemed just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all issues so triable.

**BRIAN J. FOLEY, ATTORNEY AT LAW**

BY:_____

**BRIAN J. FOLEY, ESQUIRE**
Attorney for Plaintiff

Date:  May 8, 2022