**BRIAN J. FOLEY, Attorney at Law**
BY:     **BRIAN J. FOLEY, ESQ.** (PA ID No. 68806)
6701 Germantown Avenue, Suite 200
Philadelphia, PA  19119
(267) 930-4425
*Attorney for Plaintiff Marilyn Gaye Piety Foley*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | | |
|---|---|---|
| **MARILYN GAYE PIETY FOLEY** | : | |
| | : | |
| Plaintiff | : | |
| | : | **CIVIL ACTION NO. 22-cv-1777** |
| v. | : | |
| | : | |
| **DREXEL UNIVERSITY** | : | |
| 3141 Chestnut Street, | | |
| Philadelphia, PA 19104 | : | |
| | | |
| and | : | |
| | | |
| **ROGER KURTZ** | : | |
| 3141 Chestnut Street, | | |
| Philadelphia, PA 19104, | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

---

## <u>VERIFIED AMENDED COMPLAINT</u>

### PRELIMINARY STATEMENT

1.      This is an action for an award of damages including punitive damages,

attorneys' fees, equitable relief, and any other available and appropriate relief for

Plaintiff Marilyn Gaye Piety Foley ("Piety," "Dr. Piety"), a Professor of Philosophy who

is employed by Defendant Drexel University and supervised by Defendant Roger

Kurtz. Dr. Piety has been harmed by Defendant's intentional illegal discrimination that

resulted in harassment, discrimination, a hostile workplace, retaliation for protected

activity, unequal pay, and breach of contract.

      2.      This action is brought under Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000(e), et seq., as amended ("Title VII"), Title IX of the Education Amendments

Act of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"), the Pennsylvania Human Relations Act

43 P.S. §951 et seq. ("PHRA"), and Pennsylvania common law. Plaintiff's Verification of

paragraphs 6 - 358 of this Verified Amended Complaint is attached as Exhibit A.

<b>JURISDICTION</b>

      3.      This Court has original jurisdiction over all civil actions arising under the

Constitution, laws, or treaties of the United States pursuant to 28 U.S.C. §§ 1331, 1343,

and 1391 and, under 28 U.S.C. § 1367, supplemental jurisdiction over state law claims.

      4.      All conditions precedent to filing this suit have been fulfilled. In addition

to filing complaints with Drexel University's Office of Equality and Diversity (OED) on

or about May 5, 2020, alleging discrimination and harassment by Drexel and multiple

individuals, including Defendant Kurtz, and on or about August 24, 2020 alleging

retaliation, and on or about August 16, 2021 alleging discrimination and harassment by

curriculum committee members, Piety also filed charges with the EEOC and dual filed

them with the Pennsylvania Commission on Human Rights. The first EEOC/PHRA

charge was filed on August 24, 2020, alleging violations of Title VII and the

Pennsylvania Human Rights Act for discrimination and hostile work environment and

retaliation by Drexel and Defendant Kurtz. The second EEOC/PHRA charge was filed

on December 27, 2020, also alleging violations of Title VII and the Pennsylvania

Human Rights Act for discrimination and hostile work environment and retaliation.

The EEOC issued Notice of Right to Sue letters on February 8, 2022 with respect to

these two charges. A third EEOC/PHRA charge was filed on April 17, 2022, alleging,

inter alia, further, violations of Title VII and the Pennsylvania Human Rights Act for

discrimination and hostile work environment and retaliation by Drexel and Defendant

Kurtz, which occurred while the first two charges were pending and under

investigation by the EEOC/PHRA, and which were related to the claims and events set

forth in the first two charges. Piety requested an immediate Right to Sue letter, which

was issued on April 27, 2022.

## VENUE

5.     This action properly lies in the Eastern District of Pennsylvania, pursuant

to 28 U.S.C. § 1391(b), because the claims arose in this judicial district and Defendants

conduct business in this judicial district.

**PARTIES**

6.      Plaintiff, Marilyn Gaye Piety Foley (hereinafter "Dr. Piety," "Piety"), is an adult female citizen and resident of Philadelphia, Pennsylvania. She is Drexel's only tenured full Professor of Philosophy.

7.      Defendant Drexel University ("Drexel") is a private research university in Philadelphia, Pennsylvania, one of the 10 largest employers in the city, with more than 10,000 faculty and professional staff, 24,000 students and an endowment of more than $1 billion. Drexel receives federal funding in various forms, including grants and federal student loans provided to Drexel by its students or given to Drexel by the federal government directly.

8.      At all relevant times, Defendant Drexel University ("Drexel") acted by and through its agents, servants, and employees, who were acting within the scope of their authority, course of employment, and under the direct control of Drexel.

9.      Drexel purports to have a "Discrimination, Harassment, and Bias Incident Prevention Policy," in which Drexel claims that it considers acts of discrimination, harassment and bias to be "unacceptable and counter to its core mission and values," and "encourages" women faculty members and others to report such discrimination to Drexel's Office of Equality and Diversity ("OED"), which Drexel says will apply Title IX and other laws and policies and investigate and address the discrimination reasonably and promptly. Drexel promises its employees that "Retaliation in any form will not be

tolerated against an individual who makes a report with the University or participates in an investigation of any such report."

10.     Defendant Roger Kurtz ("Dr. Kurtz") has served as Head of the Department of English and Philosophy at Drexel since Fall 2017.  He is a fully tenured Professor of English. His job duties include managing course offerings and assigning professors to teach courses, developing programs, resolving disputes, avoiding illegal discriminatory conduct by faculty, abiding by Drexel policies regarding discrimination and workplace harassment and retaliation, and helping faculty members develop a significant body of scholarly work in alignment with Drexel priorities.

11.     In addition, Dr. Kurtz has the power to hire and fire and appoint faculty to positions directing programs within the Department of English and Philosophy, participating in the promotion and tenure process, conducting performance reviews and assessments, and determining annual raises for faculty in the Department, allocating funds for travel and research, and participating in determining the annual salary of faculty members in the Department.  Kurtz, as a Department Head, is required to establish an external advisory committee but has not done so.

## FACTS

**Introduction: Dr. Piety's 20-Year-Plus of Service to Defendant Drexel**

12.     From on or about September 1, 1998, Dr. Piety has been employed by Drexel. Piety began as a visiting professor. She had just returned to the United States

from a position at DIS, Denmark's International Studies Program, then a division of the

University of Copenhagen. Piety, American born, went to Denmark on a Fulbright

Scholarship to complete the work on her Ph.D. dissertation on the philosophy of the

19th century Danish philosopher Soren Kierkegaard. Piety earned her B.A. from

Earlham College, her M.A. from Bryn Mawr College, and her Ph.D. in Philosophy from

McGill University.

13.     Drexel promoted/hired Dr. Piety to a position on Drexel's tenure track in

2001, as an Assistant Professor. In its "mid-tenure" review of Piety in 2005, Drexel's

then-Dean of the College of Arts and Sciences Donna Murasko instructed, in writing,

Piety to focus on her work about, and become a highly recognized expert regarding,

the philosophy of Kierkegaard, as she worked toward achieving tenure and

promotion.

14.     In 2007, Drexel awarded Piety tenure and promoted her to Associate

Professor, based primarily on her scholarship on Kierkegaard.

15.     In 2016, Drexel promoted Piety to full Professor based on her exemplary

teaching, service, and scholarship, again, based primarily on Kierkegaard. Piety is one

of the few full Professors in the Department of English and Philosophy, and is the only

full Professor in Drexel's Philosophy Program ("the Program," "Philosophy Program"),

which is within the Department of English and Philosophy ("the Department").

16.     Until Drexel promoted Piety to full Professor in 2016, there had been no

full Professors of Philosophy at Drexel for about two decades.

17.     Piety is a scholar of the work of the 19th century Danish philosopher

Soren Kierkegaard, who is considered the father of modern existentialism. Among

other things, Piety has translated two of Kierkegaard's works for Oxford University

Press (in one book) and written a book on Kierkegaard's epistemology published by

Baylor University Press. Piety has published numerous articles about Kierkegaard's

philosophy in scholarly journals and books. Her work about Kierkegaard has been

anthologized and translated into other languages.  Piety also maintains a blog on the

philosophy of Soren Kierkegaard called *Piety on Kierkegaard*. To a lesser degree, Piety

also teaches and writes about other areas of philosophy including Plato and

Philosophy of Sport. Piety won an award for a paper she presented at a conference on

Business Ethics.

18.     Piety earns highly positive teaching evaluations from her students and is

one of the few members of the faculty in the Department who gives multiple writing

assignments to her students and extensive feedback on those assignments. Such

assignments are rare, and faculty are not rewarded for giving them, because the

majority of the instruction in the Department is provided by poorly-paid contingent

faculty who are typically too overworked to have time to grade writing assignments.

19.     Piety has served on and/or chaired various faculty committees at Drexel.

**Piety Earns Tenure in a Hostile Workplace**

20.     Drexel informs its employees that discrimination against women and minorities is "unacceptable and counter to [Drexel's] core mission and values," and assures its employees that it will not tolerate "retaliation in any form ... against an individual who makes a report [of discrimination] with the University or participates in an investigation of any such report."

21.     Drexel's Department of English and Philosophy, and the Philosophy Program, have long been a source of discrimination and hostility toward female faculty members. Retired Associate Dean Alexander Friedlander has described the Department as "an old-boys' club." Female faculty members, including Piety, have requested help from Drexel officials, who all have refused to stop the bullying and hostility, as described in more detail below.

22.     Piety has suffered from this hostile work environment for more than a decade. As described in detail below, she has been retaliated against for trying to protect herself and other faculty members from it.

23.     Shortly after Piety was awarded tenure in 2007 and, and after she published, in rapid succession, the above-mentioned translations for Oxford University Press, published in 2009, and the book about Kierkegaard's epistemology for Baylor University Press, published in 2010, colleagues began to bully and harass and discriminate against her.

24.     For example, Dr. Piety applied for a sabbatical for the academic year 2008-09.  The then-Head of the English and Philosophy Department, Dr. Abioseh Porter "lost" her application. Despite her eligibility, Piety was forced to wait another year for a sabbatical.

25.     Department Head Porter engaged in a pattern of blaming Piety for purported failures for which she was not responsible.  For example, in February 2009, Porter assigned Piety, along with Dr. Scott Warnock, an English professor who was lower-ranking than Piety, to help Department faculty with a workshop regarding writing their curricula vitae. There was a scheduling delay for which Dr. Warnock was responsible. In an email that acknowledged the joint responsibility of Piety and Warnock for the scheduling of the event, Porter blamed Piety solely for this delay.

26.     For example, on or about this time, Porter assigned Piety to organize a series of faculty colloquia presentations. After just two Department colleagues volunteered to make a presentation, Porter blamed Piety for failing to get more faculty members to volunteer to make presentations, despite that the difficulty in getting faculty to do this was a widely acknowledged problem in the Department; despite that other faculty who had been tasked with this had also failed; and despite that Piety had repeatedly entreated her colleagues to volunteer.

27.     For example, after Piety was appointed to the International Area Studies (IAS) Advisory Board, Dr. Porter blamed her for what he deemed her failure to

advocate that certain English courses should be included in the revised IAS major

curriculum, notwithstanding that Piety, a Philosophy professor, was not aware of the

courses and that no one had instructed her to advocate that these courses be included.

In fact, no one had even bothered to explain to Piety the nature of her responsibilities

as a member of the IAS Advisory Board were. That is, Piety had been set up to fail in

her role as the department's representative on the Board.

28.     Dr. Jacques Catudal, an associate professor who was, at various times the

Director of the Philosophy Program, also began harassing Piety.  For example, in

February 2009, when Catudal was program director, Catudal falsely accused Piety of

trying to change her teaching schedule in such a way that she would have a term off

from teaching before she was actually due for it, when, in fact, Piety was overdue for a

term off.

29.     In Spring 2009, fellow members of the Greater Philadelphia Philosophy

Consortium (GPPC) elected Piety as Chair. When Piety asked Director Catudal for a

course release that GPPC Chairs traditionally received, Catudal refused and once again

accused Piety of seeking something he claimed she had not earned.

30.     Piety turned to Department Head Porter for help. Although Porter had

the authority to grant such a request even if there were no precedent for it, based on

the amount of extra work that constituted service to Drexel and the academic

community at large, Porter instead insisted that Piety write to the outgoing GPPC

Chair, a professor at Swarthmore College, and corroborate that such a course release

was standard for GPPC Chairs, on or about August 29, 2009.

31.     Even after Porter finally granted Piety's request, the course release was

less than most GPPC Chairs were provided by their institutions, as it was a release of

one course during each Drexel quarter, whereas previous GPPC Chairs had a release

from two courses during their semester. In addition, one of the two years of Piety's

service as GPPC Chair was during her sabbatical, so she was not teaching anyway, and

the service intruded on her sabbatical time intended for research and writing.

32.     Piety's experiencing such difficulty in getting a sabbatical and course

releases contrasts with the ease that Piety's lower-ranking male colleague, Dr. Andrew

Smith, has had in securing course releases and leave time -- not for the service of

chairing an organization but to help him pursue his academic research and writing in

his bid for tenure, help Drexel never provided Piety.

33.     Drexel has not provided the female tenure-line philosophy professors

such course releases in their bid for tenure as Drexel has provided for Andrew Smith.

34.     For example, after Piety was awarded tenure, a female philosophy

professor applied for tenure. Drexel had not provided her with course releases (as it

had provided male professor Smith) to help her produce sufficient scholarly work.

Instead of awarding her tenure, Drexel moved her to the category of Teaching

Professor, where this professor would be required to teach four courses per term

instead of two and would no longer be required to engage in academic research, writing, and publishing, or be rewarded for it.

35.   In addition, Drexel did not provide Dr. Flavia Padovani, the only other female tenure-line philosophy professor, such course releases (as it had provided male professor Smith) in her bid for tenure, which nevertheless was successful.

36.   Such hostility toward the women in Drexel's philosophy program, and impediments to their opportunities for advancement, is similar to hostility against women in philosophy programs and departments at other schools and universities.[1]

37.   In Spring 2011, Dr. Piety experienced further hostility from Dr. Catudal when Piety served as a member of a Mid-Tenure Review Committee for a female professor of English, Jennifer Yusin. (A Mid-Tenure Review is designed to evaluate a tenure-line professor's progress toward tenure and to identify any weaknesses that must be addressed. Even a mildly negative mid-tenure review can set up a professor for a denial of tenure a few years later.)  After Piety thwarted the effort of English Professor Doreen Saar, a friend and ally of Catudal, to surreptitiously and deliberately make changes to the final report that Piety understood would make the professor

---

[1] *See, e.g.*, "What is Philosophy's Problem with Women?" https://slate.com/human-interest/2013/09/philosophy-has-a-woman-problem-lets-try-to-figure-out-why.html  "Philosophy and Sexism" https://www.insidehighered.com/news/2007/09/10/philosophy-and-sexism  "What is it Like to be a Woman in Philosophy?" https://beingawomaninphilosophy.wordpress.com  "How can we end the male domination of philosophy?" https://www.theguardian.com/education/2013/nov/26/modern-philosophy-sexism-needs-more-women

under review appear to be less accomplished in her scholarly work, and to have

committee members sign off on the signature page of the report without showing them

the changes, Catudal attacked Piety in an email to the whole committee.

38.    Dr. Catudal falsely accused *Piety* of forging *his* signature on the signature

page. (Piety of course did not do so but believes Saar may have.)

39.    Saar's hostility toward the female professor whose midterm review is

referred to above was consistent with Saar's hostility toward other female professors,

whom she likely regarded as a threat, as Saar was the highest-ranking female professor

in the Department but, unlike her younger female colleagues, had published very little

and had achieved her status based primarily on her service on committees. Likewise,

Catudal's hostility toward this female professor was similar to his gender-based

hostility toward Piety, including that his hostility was grounded in part on the fact

these two younger women were more productive scholars than he was.


**Lower-Ranking Male Philosophy Program Director Perpetuates Sexist Hostility
Toward Piety**


40.    Subsequently, on or about 2010, Dr. Catudal stepped down as Director of

the Philosophy Program. Drexel appointed Dr. Pete Amato to fill the role -- despite

that Amato was a Teaching Professor and not tenure-line and thus was lower-ranking

than Piety.

41.     Dr. Amato was the first non tenure-line professor to assume the role.  At first, Piety supported his appointment.

42.     However, shortly afterward, Amato used his new authority to bully and harass Piety.

43.     For example, in Summer 2011, Amato falsely accused Piety of offending one of her students by making an allegedly derogatory comment about people with mental illness.  When Piety explained that she had merely made the well-known and uncontroversial point in philosophy that philosophers, when making generalizations about human nature (and the proverbial "reasonable person"), do not take mentally ill people into account, Amato, instead of accepting this explanation (which anyone with a Ph.D. in philosophy would accept), continued to accuse Piety of making this comment to intentionally offend people with mental illness. Amato continued to make this false and abusive accusation until at least late October 2011.

44.     Dr. Amato, as program director, began to harass Piety by canceling courses she was scheduled to teach, at the last minute. Such cancelation forced Piety to have to scramble to prepare to teach a different course on the eve of a term. Amato did so by assigning Piety to teach courses that he knew would not get a sufficient number of students, based on his knowledge as program director of the number of majors who would need to take the course that term, as well as on his knowledge, as course scheduler, of other courses that would be competing for students with Piety's course.

Amato also did so by refusing to use his discretion to lower the minimum number of students required for the course to run, such as from 15 to 12, or from 12 to 8.

45.     Amato's forcing Piety to scramble in this way put her at risk of being less well-prepared than she would have liked, which put her at risk of receiving lower student course evaluations than she would after teaching a course she had had months to prepare to teach. (Nevertheless, Piety has consistently earned strongly positive student course evaluations.)

46.     Amato has continued to abuse his authority regarding course assignments, including also to schedule Piety for back-to-back seminars where she must scurry from finishing up with one class, with little or no time to talk with students, to start teaching another class. Such scheduling is contrary to Piety's requests -- which are common in academia -- and is perpetrated by Amato intentionally, to harass Piety.

47.     Amato has also harassed Piety by tendentiously using obviously groundless student complaints against her. Amato does not engage in this hostility when the professor is male.

48.     For example, in February 2013, Amato reviewed an email exchange between Piety and one of her students and accused her of offending the student. (Amato tendentiously agreed with the student's complaint about being offended. Amato subsequently misrepresented the situation to the then-Department Head, Dr.

Abioseh Porter. Amato falsely communicated that Piety had said that most of her students were failing her course, which made Piety look like an incompetent or even malicious teacher.

49.    The same month, a student contacted Piety and claimed she was having difficulty uploading an assignment to "Blackboard," the teaching software Drexel was using, in the course she was taking from Piety. Piety did not know how to help the student and suggested she seek assistance from Drexel's Online Learning Team ("DOLT"), which was specifically designated to provide tech support to students using Blackboard.

50.    Amato insisted that Piety herself provide this computer help to the student. Piety explained that she did not have the expertise, and that DOLT was the appropriate entity. Amato forwarded the email to Dr. Porter.

51.    Instead of supporting Piety, Dr. Porter wrote back, on or about February 11, 2013, in ALL CAPS, the equivalent of shouting at and berating Piety, ordering her to provide the student with technical support.  Porter and Amato have never ordered male professors to play such a subservient, supporting role to a student.

52.    When Piety related this story to then-Associate Dean Alexander Friedlander in 2015, Dean Friedlander responded that Drexel professors are never required to serve as tech support for their students.  Such a command from Amato and Porter reflected Drexel's disdain for and diminution of female faculty members'

expertise and regarding them as secretaries and handmaidens for their students.

53.     Throughout his time as Program Director, Amato has repeatedly refused to add items to Program meeting agendas that Piety suggested.  Amato does not refuse to add items suggested by male professors.

54.     Throughout his time as Program Director, Amato has repeatedly deployed hostile language against Piety in emails, and he has routinely copied the Department Chair on correspondence with Piety. Amato does not treat male professors in this hostile manner.

55.     Throughout his time as Program Director, Amato has repeatedly said that he has experienced obstacles and difficulties as director because he is not a tenured professor, or even tenure-line. In response to such complaints, Piety has offered to serve as Director or even Co-Director. Piety even offered in an email to let Amato keep the full course load reduction and any extra money, even if he became "co-director."  Amato has steadfastly refused.

56.     Drexel, however, appointed Andrew Smith to the position of Associate Program Director, a position Drexel created shortly before Smith applied for tenure. Drexel made this appointment intending to help Smith in his bid for tenure, and to groom him to become the Program Director.  Drexel skipped over Piety to appoint a lower-ranking male to the position.

**Male Philosophy Faculty Bully and Harass Piety**

57.     Around this time, Dr. Catudal used his influence to encourage Dr. Smith to engage in hostility toward Piety.

58.     For example, in 2013, Catudal had extensive conversations with Smith and Amato about the direction of the Philosophy program -- and excluded Piety from these conversations.

59.     Smith, comfortable that Catudal would protect him, began treating Piety contemptuously at philosophy program faculty meetings. Smith would interrupt Piety and ridicule her contributions to discussions. Smith encouraged colleagues to engage in this hostility, and they did, interrupting and ridiculing Piety at program meetings, as is documented in an email from one professor "apologizing" for such behavior.

60.     Piety finally appealed to then-Provost Mark Greenberg to get Smith to stop bullying and harassing her.  Greenberg promised to talk to Smith about it and did so. Subsequently, Smith admitted to Piety that Catudal had encouraged him to engage in such hostility.  On or about November 18, 2013, Smith admitted in an email that he had used "brutish" and "rude" language against Piety.

61.     The hostility with which male colleagues Catudal, Amato, and Smith treated Piety caused other colleagues to treat Piety similarly.

62.     For example, Piety arranged for a prominent philosophy professor, Robert Audi, to speak at Drexel twice in one week, in March 2013. Dr. Audi is the John

A. O'Brien Professor of Philosophy at the University of Notre Dame and former

President of the American Philosophical Association and the author of more than a

dozen books, many published by Oxford University Press.

63.     Piety arranged dinners to follow each of Dr. Audi's two talks at Drexel

that week.

64.     Catudal, Smith, and Amato sabotaged both dinners. For the first dinner,

Catudal, Smith, and Amato and other philosophy professors said they would attend.

However, no philosophy faculty showed up to the restaurant for the March 6, 2013

dinner. None of them had canceled, which left Piety shocked and trying to explain in

front of Dr. Audi to the restaurant staff why several extra plates, glasses, and

silverware had to be removed.

65.     Dinner the following night, March 7, 2013, was even more humiliating for

Piety. Smith had confirmed earlier that he would attend, but that afternoon he emailed

Piety to say something had come up. When *hors d'oeuvres* were served after Audi's talk,

Amato approached Piety, introduced a friend to her, and asked if the friend could

attend the dinner, to which Piety said Yes.

66.     Immediately afterward, Smith approached Amato's friend and told him,

within earshot of Dr. Audi, that he had arranged an alternative dinner and asked

Amato's friend if he would like to join them, which he did.

67.     Only one philosophy professor, Nathan Hanna, attended this second

dinner.

68.     The efforts of Catudal, Amato, and Smith to humiliate Piety obviously took precedence over their taking this rare opportunity (especially at Drexel with its small philosophy program) for professional development and networking, and to create a positive impression of Drexel's philosophy program with a leader in the field.

69.     In contrast to the two dinnersPiety arranged for the distinguished professor Robert Audi, the dinner that Smith later arranged for a lesser-known scholar was attended by all full-time philosophy faculty, both tenure-line and teaching faculty.

### Piety Complains to Drexel Officials - But the Hostile Work Environment Persists

70.     Piety complained to Drexel about Smith's sexist bullying and harassment. Piety first notified Associate Dean Kelly Joyce on or about September 23, 2013. Piety then notified Associate Dean Alexander Friedlander on or about September 24, 2013. Piety notified Dean of the College of Arts and Sciences Donna Mursasko on or about October 3, 2013, who referred Piety to Drexel's Office of Equality and Diversity (OED).

71.     The bullying and harassment by the male professors Catudal, Smith, and Amato continued. For example, Catudal, Smith, and Amato and others treated Piety in a harassing and bullying manner during mandatory discussions held to shape the future of the philosophy program.

72.     On or about October 29, 2013, Piety begged then-Provost Marc Greenberg

to intervene on her behalf.

73.     Provost Greenberg at first declined. However, apparently upon seeing how distressed Piety was, Provost Greenberg agreed on or about November 11, 2013 to speak with Dr. Smith.

74.     A few days later, on or about November 14, 2013, and again on November 18, 2013, Smith emailed Piety. In the November 18 email, Smith apologized to Piety for his conduct, which he described as "brutish" and "rude."

75.     Smith did not copy anybody on the email. As a result, colleagues, especially male colleagues Catudal and Amato, continued to harass and bully Piety.

76.     In late November 2013, Smith confided in Piety that he engaged in the bullying and harassment of Piety so that he would "not get on Jacques' [Catudal's] bad side.

77.     In 2014, Nathan Hanna announced in a committee meetig that he had stopped listening to Catudal, "after the stuff he was saying about Marilyn."  Hanna confided that Catudal called Piety "a traitor and things like that," but did not elaborate.

78.     During Fall 2013, Catudal approached Piety to ask if she would take over directing a Philosophy major's thesis. The student had been advised by a Teaching Professor, Stacey Ake, but Ake said she was dissatisfied with the student's work. Ake had stopped working with the student but never officially informed Drexel of this stoppage.

79.     Piety regarded this handing-off of the student very late in his work on this thesis as an effort by the male professors Catudal and Amato to set her up for failure and declined the request.

80.     Catudal responded by interpreting this declination as Piety's "refusal" to help the student. Catudal scheduled the student's thesis defense, but he did not send the November 27, 2013 email to invite the entire department, as he had with other philosophy majors' thesis defenses. Catudal explained in an email that he did so because he anticipated the thesis defense would not go well.  The student was allowed to graduate as a philosophy major despite his poor showing at his defense, however, because of the need to make the program appear to be successfully graduating majors.

81.     Philosophy faculty at Drexel, for as long as Piety had been a member, had sought to become independent of the Department of English and Philosophy.

82.     Piety had expressed to her colleagues that the program was too small for it to be independent, an opinion that was met with hostility, especially by Catudal, Smith, and Amato: It was not a woman's place to have an opinion on such an issue.

83.     In Spring 2015, Piety came up with a way of gaining more independence for the Philosophy Program: create a Department of Philosophy and Religion. Such departments are common at many universities and colleges.

84.     However, when Amato sent out the agenda for the next philosophy program meeting, he did not include Piety's proposal as an agenda item.

85.     When the issue was finally discussed later that term, Catudal led the charge against Piety, arguing that the philosophy faculty in the Program should reject the proposal, which they did.

86.     At or around this time, two tenure-line philosophy professors who were not yet tenured expressed concern that their mid-tenure reviews would be conducted by a committee comprising just one philosophy professor, Catudal, and several English professors. The professors were concerned that English professors might not understand that it is more difficult to get scholarly articles in philosophy published than it is to get scholarly English articles published and that the committee might regard them as being deficient in their scholarship, the most important criterion in the review.

87.     Nevertheless, Department Head Porter did not appoint Piety to the committee.

88.     On or about November 26, 2013, Catudal wrote to Piety unexpectedly, requesting her to write the official reviews of the two philosophy professors who were applying for tenure.

89.     This request placed Piety in the position of doing more work than any official member of the committee but with no authority and no vote.

90.     Piety notified Chair Porter of the situation. At first, Porter told Piety to accept the offer. Piety said she would not, and, finally, Porter appointed her to the

committee.

91.     When the committee met, the male faculty members were hostile to Piety. Catudal disputed every point Piety made. Piety suggested that the Department bylaws be amended to ensure that there would be adequate representation of the tenured philosophy professors on the committee when a philosophy professor was being reviewed.

92.     The male committee members responded with hostility. For example, then-associate professor of English Ray Brebach, now retired, shouted at Piety. He accused her of implying that he lacked expertise to evaluate a philosophy professor's work. He accused her, as he shouted, of believing he was "pond scum." Brebach refused to accept Piety's explanation that this was a legitimate concern expressed by colleagues and was no way an attack on Brebach's competence.

93.     In contrast, in the academic year 2015-16, when Smith was being considered for tenure by this committee (Tenure, Promotion, and Review), Catudal was not a member of the committee, but Piety was.  Smith wrote to Chair Porter and asked that Catudal be included, to ensure that there would be "adequate representation" on the committee.  Piety did not object and agreed with the concern, and Catudal became a committee member.  That a woman on the committee is regarded as not adequate representation, but a man is, is obvious.

94.     On or about January 2015, Catudal again marginalized Piety when the

two served as the only members of the Department's Election Committee. Although

the two had equal authority, Catudal made all the arrangements for the elections

himself. Piety awoke on morning on or about January 15, 2015 to find an email from

Catudal *and herself* to the entire Department about elections -- despite that Piety had no

part in writing the email. Piety explained to the faculty that she had not had any part in

writing the email, which infuriated Catudal.

95.     Smith's bullying and harassment of Piety ceased for a time after Provost

Greenberg spoke with him and he apologized in email to Piety. However, on or about

May 13, 2015, Smith reignited his bullying and harassment of Piety.  This was the same

day Department Head Porter had sent an email to the review committee announcing

he had appointed Catudal and a friend of Catudal (an English professor) to the

committee. As a result, Catudal could and did protect Smith, who could now continue

bullying and harassing Piety in order to avoid "getting on Jacques' [Catudal's] bad side

### Piety Notifies Drexel Officials Again, and Requests to Move to Another Department

96.     Piety notified Associate Dean Alexander Friedlander again, on or about

late May or early June, 2015; Dean Friedlander directed her to seek help from the OED.

97.     Piety met with then Director of OED Michelle Rovinsky-Mayer on or

about that same day. Mayer insisted that neither she nor her assistant could find any

record of Piety's contacting the office in 2013. (Piety has the emails, dated on or about

October 3, 2013.)

98.     Piety did not file a formal complaint because she was discouraged by how dismissively she had been treated by the OED; she was encouraged to learn that the Department was under investigation for a complaint filed by another female faculty member; and because she had come up with a solution: move to a different department.

99.     Piety asked Dean Mursasko to relocate her either to the Department of Global Studies or to Communications. The Chair of Communications told Piety in an email dated on or about June 2, 2015 that he would be "thrilled" to have her join his department and that he thought he and Piety could easily come up with courses she could teach.

100.    Dean Murasko, however, refused to let Piety move to Communications or any other department.  Instead, she insisted that Piety file a formal complaint with OED. She did not, however, agree that if the complaint resulted in a determination that the Department of English and Philosophy was creating and fostering a hostile work environment, Piety could move to a different department.

101.    Despairing, Piety requested help from then-Provost James Herbert and President James Fry. Provost Herbert wrote back to Piety on or about June 17, 2015, refusing to help her and telling her she must make a formal complaint to OED.

102.    The refusal of President Fry and Provost Herbert to help Piety by letting

her move to a different department to avoid more of the ongoing, documented hostile work environment contrasted sharply with the intervention these same male Drexel administrators had made to reappoint, earlier, a male Teaching Professor who had been falsely accused of and fired for allegedly sexually harassing a student. This refusal by Drexel's two highest ranking officials -- both, of course, male -- to help Piety increased Piety's distress and confirmed that the hostility she suffered from was severe and pervasive and based on her sex.

103.    Drexel's refusal to let Piety move out of her department also contrasted with Drexel's precedent of letting male faculty move to departments of their choice, regardless of the faculty member's Ph.D. discipline. For example, Drexel let a male professor, Dr. Doug Porpora, who has a Ph.D. in Sociology, to be a member of the Anthropology Department and later, when that department was eliminated, Drexel let Porpora move to the Department of Communications -- despite that there was a Department of Sociology all that time.

104.    Piety responded to Provost Herbert on or about June 17, 2015 that she would discuss her options with an attorney and requested, in the meantime, that she be allowed to move her office from its present location next to Catudal's to a safer location.

105.    Provost Herbert never replied.

106.    Drexel refused to let Piety move her office to a safer location. Until

Catudal retired, Piety experienced trepidation whenever she went to her office.

**Piety Applies for Promotion to Full Professor**

107.    Piety experienced further hostility that year, when she served on the

Tenure and Promotions Committee as it reviewed Andrew Smith's application for

tenure and promotion to associate professor.

108.    Dr. Ray Brebach, serving as chair, proclaimed to the committee, in front

of Piety, that he had never seen a stronger case for tenure than Smith's in all his time

serving on such committees.  Brebach's proclamation was a diminution of female

faculty expertise. Brebach had served on the committee that reviewed Piety's case for

tenure a few years earlier, and Piety's case was stronger than Smith's in that Piety had

already established an international reputation for herself as a scholar, whereas Smith,

while having made acceptable progress toward tenure, had not yet established a

national reputation.

109.    After Piety disagreed with the Committee on an issue, Brebach privately

emailed her on or about November 5, 2015 and threatened that her disagreement

would harm her own bid for promotion to full professor, which was being reviewed at

the same time by another review committee, comprised solely of full professors.

110.    Piety's promotion to full Professor, if achieved, would make Piety the

only female full Professor of Philosophy at Drexel since another female philosophy

professor had retired more than 15 years earlier, and the highest-ranking member of the Philosophy Program.

111.    Catudal, though he had been at Drexel several years longer than Piety, was not a full Professor.

112.    The promotion committee for Piety's promotion from associate to full professor had no philosophy professors on it, as there were no philosophy professors above the rank of associate professor, and only full professors can judge the candidacy of associate professors seeking such promotion. Catudal could not, according to Department bylaws, be part of this committee.

113.    The committee consisted of the Department's full professors, who were all Professors of English: Steve Mandel, Valeria Arms, Abioseh Porter, Richard Astro, Miriam Kotzin, and Doreen Saar.

114.    Piety, as is customary and required, assembled extensive materials to make the case that she qualified for promotion under the applicable Drexel rules based on her scholarship, teaching, and service to Drexel and the profession and the community.

115.    During this process, Piety learned from the committee chair, Dr. Richard Astro, a full professor of English, that the reviews of her scholarship by outside experts were "fantastic."

116.    However, late in this process, in December 2015, Astro told Piety and

said that he had halted the committee process. He explained that he did so because he

saw that the if the process continued, the committee would vote against her promotion.

117.   Astro confided that there were two problems. First, he said, it appeared

there had been a problem with *one* of the more than 70 courses Piety had taught at

Drexel over the past several years.  Second, he said, some of the *links* Piety had inserted

in the table of contents of the PDF of her materials did not work when clicked on --

meaning committee members had to scroll through the document to reach the desired

page.

118.   The first concern was already regarded by Astro as of no concern, and he

had told Piety that earlier.

119.   The second concern was, of course, pretextual. Candidates for tenure and

promotion are not even required to provide "links" within the table of contents in their

PDF.

120.   Piety went home from the meeting in tears. Later that day, she emailed

Dr. Astro that she would not withdraw her application, and that if she were denied

tenure, she would take all possible legal and internal action to right the wrong.

121.   A few days later, on or about December 8, 2015, Astro informed Piety

that the committee voted unanimously that she should be promoted. He said that she

had made the right choice not to withdraw. The recommendation was sent upward to

the full University committee and then to the Provost and beyond. Drexel officially

awarded Piety promotion to full Professor of Philosophy in Spring 2016.

122.    Since Piety's promotion, no female faculty in the Department of English and Philosophy, despite that some have been eligible, applied for promotion to full professor for the next six or seven years, until 2021.

123.    When Piety was promoted to full professor in 2016, the personal attacks by colleagues did not cease; they increased. With this promotion, Piety became the highest-ranking professor in the Philosophy Program, and she now outranked a male Associate Professor Catudal, who had served as the Philosophy Program's first Director, from 1987 to 1991, from 1993 to 1997, and again from 2007 to 2010.

### A Female English Professor Formally Complains About the Department's Hostile Work Environment

124.    A formal complaint of sex discrimination was made by a female faculty member from the English Program in the Department, on or about 2015 to Drexel's Office of Equality and Diversity (OED). Around this time, Piety made an informal complaint to the OED but did not pursue it to the level of a formal complaint, for the reasons stated above. The OED interviewed Piety as a witness in this other professor's formal complaint.

125.    The result of this complaint, after a purported investigation by OED, was that, on or about Fall 2015, the Department was declared a "hostile work environment."

126.    However, OED did not conclude that this hostility was grounded in sex

discrimination. Rather, OED turned the matter over to Drexel's Human Resources

Department (HR), which promised to conduct workshops on "civility."

127.    HR did *not* provide workshops but instead merely held meetings where

faculty were permitted to air grievances.

128.    The hostility toward female faculty members persisted.

129.    After the Department was deemed hostile, Department Head Porter

stepped down from that position. An interim Department Head, Ira Taffer, a male

chemistry professor, was appointed. There was also a co-Department Head, a male

Professor of English, Richard Astro, who lived in Florida fulltime and would visit

Drexel now and then to check in on the Department. Drexel announced a search for a

new Department Head. The Department thus continued to be managed by temporary

faculty -- two men.

### Meet the New (Temporary) Boss ... Taffer Perpetuates Drexel's Bullying and Harassing of Piety

130.    Taffer continued the hostility toward Piety, working with Amato to

perpetrate it.

131.    For example, one of Piety's students asked for special treatment -- that

she be allowed to do "extra credit" work, and, if necessary, let the student have a grade

of "Incomplete" so she could complete the work, so that she could get a higher grade

than she would otherwise.

132.     On or about November 16, 2016, Piety explained that she could not provide such special treatment, as doing so would be unfair to all of her other students, unless the student had a documented disability or a personal crisis such as death of a close family member.

133.     The student did not meet either or those conditions but insisted on being given special treatment. The student then complained to Taffer.

134.     On or about November 17, 2016, Taffer told Piety that he was providing the student with this special treatment and that the student would be allowed to complete work for Piety's course under the supervision of Dr. Amato, who would decide her grade. Piety would submit the grade herself, however, which would create the fraudulent impression that she had calculated it. Drexel policy does not let instructors give an individual student the opportunity to raise her grades relative to the grades of other students unless the student can document either a learning disability or that the student's work has been graded unfairly relative to that of other students in the same course.

135.     Piety responded that she would not violate Drexel's rules in this way, that she would not give a student a grade when another professor had decided the grade.  Piety suggested that the student be given a "late withdrawal" from her course and be allowed to enroll in the same course with another instructor.  Taffer rejected Piety's proposed solution.

136.    Dr. Amato graded the student. Taffer then ordered Piety to give the student the grade that Amato had calculated.  Piety refused to participate in the perpetration of this fraud. Taffer refused to respect Piety's ethical qualms both about violating official Drexel policy and participating in the perpetration of a fraud. As Department Head, he was able to go into Drexel's electronic grade book and submit the student's grade as if he were Piety, so that is what he did.

137.    This decision by Taffer and Amato was not only sexist but also was grossly unfair to the other students in the course.

### Piety Is Harassed as She Chairs Two Promotion Committees - and Dean Murasko Breaks Her Promise

138.    The following Spring, 2017, Drexel continued the hostility toward Piety based on her gender.

139.    Piety was elected by colleagues to chair two tenure and promotion committees, both for professors of English. The first was a male professor applying for tenure and promotion to associate professor. The second was for a male professor applying for promotion to full professor, Scott Warnock.

140.    Piety did not "run" for such a position. She told colleagues that she did not feel qualified to chair either committee, as she is a philosophy professor, and the two applicants for promotion were professors of English. Her colleagues assured her that she was qualified to run the committees.

141.    Piety reached out to and met with Dean Murasko, to discuss her new roles and expressed that she might have difficulty getting members of the committees to respect her authority as chair, given the gender discrimination she had suffered for the past decade or so. Dean Murasko promised Piety that she would support her and told Piety to contact her if she encountered hostility. In reliance on Dean Murasko's promise, Piety agreed to chair both review committees.

142.    The review committee for the male professor applying to become a tenured associate professor proceeded smoothly, and at least one colleague complimented Piety for her work as chair, via email. However, co-chair of the Department, Richard Astro, did not respect Piety's authority and did not bother to attend a single meeting, as is documented in the email exchange between the other committee members.

143.    The committee reviewing the application of Scott Warnock to be promoted to full professor did not go smoothly -- because of interference by Doreen Saar. (Saar was not on the other committee.)

144.    Saar challenged Piety's authority as chair and harassed her almost immediately.  For example, Saar insisted that the committee should meet in person over the summer, despite that half of the committee would be unavailable to meet in person until Fall, and despite the fact that Piety had already received approval from Dean Murasko for her plan to conduct the committee business via email until the entire

committee would be available to meet in person at the start of the Fall term. Piety

believed Saar made this demand so that Saar could bully Piety the way she had done

in the past, and as Saar did to other female faculty members, including Saar's efforts to

sabotage the mid-tenure review of Dr. Yusin.

145.    When Warnock provided the names of possible outside faculty

reviewers, Piety noticed, on or about April 2017, that several of these scholars could

not serve as reviewers under Drexel's rules, which required that such reviewers be full

professors at colleges or universities that are ranked similarly to or higher than Drexel.

146.    When Piety brought this up to the committee and said that Warnock

would need to provide the names of professors fitting the criteria under Drexel's rules,

Saar bullied Piety in emails copied to the whole committee in an attempt to get her to

break the Provost's Office rules concerning external reviewers. This bullying was

similar to the bullying and hostility Saar had perpetrated against Piety when Piety had

thwarted Saar's efforts to sabotage Dr. Yusin's mid-tenure review in 2011, as well as

bullying and harassment Saar perpetrated against Piety when Piety chaired the

Department curriculum committee in 2014.

147.    Remembering Dean Murasko's promise to support her if such difficulties

arose, Piety notified Dean Murasko of this bullying and harassment.

148.    Dean Murasko arranged a meeting between her, Piety, and Dr. Taffer,

interim co-chair of the Department. Instead of supporting Piety, Dean Murasko and

interim co-chair Taffer ordered Piety to submit to Saar's demands.

149.    Shortly after this meeting, on or about May 25, 2017, Taffer emailed Piety to inform her that he and Dean Murasko were removing her as chair of the review committee for Dr. Warnock.  Taffer falsely said the removal was because it was "unfair" to have a faculty member chair two review committees simultaneously, a concern neither had voiced when Piety had protested her initial appointment as chair of both committees.

150.    Drexel has permitted male professors to chair two promotion reviews simultaneously.

151.    In addition, this violation of Drexel rules by the committee regarding the promotion of Warnock, a male, to full professor, contrasts with the conduct that the review committee for Piety's promotion to full professor perpetrated against her. That committee -- composed of the same people except for Piety, now a full professor -- tried to prevent Piety from being promoted based on some "links" that the committee purported did not work in the table of contents in the PDF Piety created out of her materials for the committee to consider. In effect, these same colleagues tried to prevent Piety from being promoted based on an alleged lack of skills that could be considered "secretarial."

152.    Taffer and Dean Murasko humiliated Piety and undermined her authority within the review committee and in the Department. Taffer and Murasko's

removal of Piety sent another message to women in the Department and at Drexel that their authority and expertise were regarded as less worthy of respect than that of male faculty.

### Drexel Hires a New Department Head - Roger Kurtz - and Women Continue to Hold Few Positions of Power in the Department

153.    Approximately half of the approximately 100 faculty in the Department are women. (Precise figures cannot be given because the number of adjunct faculty varies from term to term).

154.    Among the tenured/tenure-track ("tenure-line") professors, there are more women than men: there are eight women and six men.

155.    The number of male *full* professors equals the number of female full professors -- there are four of each. According to Department bylaws, the  Department Head must be a tenured full professor.

156.    In the 2016-2017 academic year, Drexel, while under temporary (male) leadership, interviewed several candidates for Department Head.

157.    Despite that the Department of English and Philosophy had not had a female department head in more than twenty years, and despite that one of the two short-listed candidates for the position of Department Head was a South Asian woman with excellent scholarly and administrative credentials, the position was offered to a middle-age white male, Roger Kurtz.

158.    Shortly after assuming the role of Department Head, Kurtz replaced the woman who had served as the Assistant Department Head, Associate Professor Jennifer Yusin, with a man, Associate Professor of Philosophy Nathan Hanna.

159.    In March 2019, Kurtz forced the woman who had been the director of the Drexel Publishing Group, Kathleen Volk-Miller, to resign her position and then replaced her with a man, Scott Stein.

160.    Male professors now hold almost all of the important positions in the Department. In addition to Defendant Kurtz as Department Head, the Assistant Department Head is a man. The First Year Writing Program is directed by a man. The University Writing Program is co-directed by a man and a woman. The Drexel Publishing Group is directed by a man.  The Philosophy Program is directed by a man.

161.    None of these Program directors is a tenure-line professor, but rather are lower ranking professors with contracts for a period of years that may be renewed, without any possibility for tenure. There are other programs, primarily "certificate programs," that are either directed by women or co-directed by a man and woman. Drexel and the Department deem these programs to be less important than the aforementioned programs, as they enroll fewer students and are less critical to the core curriculum.

162.    There are several female tenure-line professors in the Department of English and Philosophy that are higher-ranking than the male Program directors.

163.    There has *never* been a female director of the Philosophy Program.

164.    Piety has requested numerous times, beginning in 2013, to be appointed director of the Philosophy Program.

165.    On or about Spring 2018, Kurtz reported that the Philosophy Program Director, Dr. Amato, was stepping down. Kurtz called for applications from philosophy faculty who would be interested in serving as Director, and Piety applied.

166.    Kurtz rejected Piety's application. He re-appointed Amato. Amato is below Piety in academic rank: he is not a tenure-line professor but serves as a Teaching Professor, with a renewable contract for a period of years. Like Piety, Amato has worked at Drexel for more than 20 years.

167.    Although Amato has expressed at various times that the Program should be directed by a tenure-line faculty and knew that Piety had applied, he did not withdraw his application.

**Kurtz Perpetuates Drexel's Sexist Hostility Toward Piety**

168.    In Spring 2018, Kurtz met with Piety for her annual review, her first under his rule as Department Chair.

169.    Kurtz had rated Piety's teaching a "4" out of a possible "5." Kurtz explained that the problem was that Piety had made "participation" too high of a percentage of students' grades.

170.    During the meeting to discuss the review, Piety explained that "participation" was, in fact, defined in her syllabus (the same syllabus Kurtz had relied on in coming up with his score) to include weekly writing assignments on which Piety provides students with extensive feedback.

171.    Kurtz admitted that he had not realized this fact when he calculated Piety's teaching score. Nevertheless, Kurtz refused to change this score. Rather, he merely removed from his evaluation the part where he had faulted Piety for placing too high of a value on "participation."

172.    The resulting evaluation form for Piety's performance for academic year 2018-19 therefore falsely gives the impression that Kurtz had calculated the teaching score with full knowledge of how Piety calculated her grades and ran her course. Kurtz did this intentionally to harm Piety's standing in the department.

173.    In Fall 2018, Piety once again had the opportunity to bring the eminent scholar Robert Audi, the John A. O'Brien Professor of Philosophy at the University of Notre Dame and former President of the American Philosophical Association, to speak at Drexel.

174.    When Piety brought this up at a Philosophy Program meeting, Dr. Amato immediately resisted. Amato stated that Audi was "too specialized" to appeal to Drexel students.

175.    This objection by Amato was disingenuous, as Dr. Audi was written

about a wide breadth of topics -- unlike many philosophy professors. For example, Audi has published on topics including epistemology, theories of rationality, democratic theory, and philosophy of religion.

176.    Piety was teaching a course on the philosophy of religion and told Amato that she wanted to have a lunch with these students and Audi. Amato resisted and responded that he did not believe that what he called a "private" event would be a suitable way to use Program resources. Several other male philosophy faculty members echoed and agreed with Amato's position.

177.    Piety explained that the lunch would not be "private" but rather would be open to any interested students. The male colleagues continued to resist Piety's suggestion.

178.    Piety is not aware of any male professors who have been refused Program funds when they have brought in guest speakers, or who have even met with resistance to such use of funds.

179.    Piety then approached Department Head Kurtz with the proposal and asked if she could use *Department* funds to pay for the lunches of students who would be interested in having lunch with the famous esteemed scholar Robert Audi. (Piety explained that faculty who attended would be expected to pay for their own lunches.)

180.    Despite that Drexel students pay upwards of $70,000 per year to attend Drexel, and money from this tuition funds the Department, and despite that the lunch

would provide an extraordinary opportunity for the students to talk informally with an esteemed philosophy professor and former President of the American Philosophical Association, Kurtz said No.

181.     In doing so, Kurtz used the same -- erroneous -- language as Amato had used, saying he did not think that a "private" event should be funded with Department (read: student tuition) money.

182.     Piety has related this story to philosophy professors outside of Drexel. All of them were surprised at Drexel's deviation from academic and pedagogical custom.

### Drexel Forces Piety to Use Her Married Name

183.     Piety took her husband's last name after marriage in 2001 for personal reasons. She immediately informed the Office of Payroll and Benefits of her new married name as she was required to do so for pay, benefits, and tax purposes, but explained at that time that she wanted to continue to use her maiden name, "Piety" for academic purposes.

184.     Piety made this request because by the time she got married, she already had already built a scholarly reputation under her maiden name Piety.

185.     Drexel refused Piety's request.

186.     In response, Piety explained that male faculty members usually do not need to make such a request. Her name was changed to Foley in Drexel's faculty

directory, on her course listings, and she was required to use it in her syllabi and other teaching materials.

187.    Piety asked her colleagues to continue to refer to her as Marilyn Piety, but some of them, including Catudal, refused to honor Piety's request and began calling her "Marilyn Foley," intending to humiliate her.

188.    Piety made additional requests to Drexel to remedy the situation. She informed Drexel that she had missed out on various professional opportunities, because some faculty members from other universities and colleges had tried to locate her for publishing or scholarly presentation opportunities but did not find her, as she was listed on Drexel's website only as Marilyn Foley.

189.    Drexel's refusal to make this change obscured Piety's professional accomplishments from colleagues and students, as those who did not know her professional name and Googled "Marilyn Foley" would not yield the result that searching for  "M.G. Piety" would yield.

190.    In response to Piety's repeated requests, Drexel claimed that making this change would be technologically impossible to do in Drexel's computer system, because, among other things, paychecks had to be issued to employees in their legal name.

191.    Piety accepted this explanation from Drexel officials until 2017. That year, she served as a Visiting Professor for a semester at Haverford College,  where she

taught a seminar on Kierkegaard's philosophy. Haverford is a small, liberal arts college

that does not focus on science and technology to the high level that Drexel does

192.    Haverford let Piety use M.G. Piety professionally, that is, in the course

catalog and on the students' schedules, etc., and issued the paychecks to Marilyn Foley.

193.    On or about 2018, Piety reached out to Drexel's Office of Equality and

Diversity ("OED") for help, asking that Drexel let her use her professional name as

Haverford had.

194.    A solution was offered: Drexel would revert to using "Piety" in the entire

Drexel system. This would mean, the OED explained to Piety, that even Piety's health

insurance cards would use her professional name, not her legal name.

195.    Piety agreed, because she was assured that this would not be a problem.

However, Piety has had at least one health insurance claim rejected because her legal

name was not used. Drexel has continued to refuse to do anything further.

196.    Even after Piety's name was changed back to Piety in most of Drexel's

system, several faculty members in the Department and the Program, rallied by

Catudal, continued to refer to Piety as "Dr. Foley," and "Marilyn Foley," despite their

awareness that Piety wished to be referred to as Piety, and despite her express requests

that she be referred to as Piety.

197.    During a meeting Piety had with Kurtz on or about March 12, 2020, Kurt

began the meeting by asking Piety why she used "two names" at Drexel.

198.    Kurtz did so intending to harass and humiliate Piety on the basis of her sex, as she had never used "Foley" in communicating with him.

199.    This harassment of Piety was grounded in animus toward Piety because of her sex, and was a deliberate attempt to obscure her professional accomplishments from her colleagues and hence to damage her standing in the Program, the Department, and at Drexel.

### Drexel Subjects Female Faculty to Disproportionate Teaching Assignments and Opportunities

200.    Drexel also discriminates against women in its Philosophy Program through a practice of disproportionately assigning female tenure-line professors to teach more "introductory" and lower-level courses than it assigns to male tenure-line professors.

201.    The expertise of women is devalued throughout Drexel, as is exemplified in the salary discrepancies between male and female faculty.

202.    Piety, along with other female tenure-line philosophy professors, has been assigned to teach a disproportionate number of introductory courses.

203.    From the 2011-2012 academic year to the present, despite that, for much if not most of this time the number of male tenure-line philosophy professors has been *double* that of the female tenure-line professors, female professors have taught more of the introductory courses. Female tenure-line professors have taught 54 introductory,

"100-level" courses. Male tenure-line professors have taught 47.

204.    One of the female professors, Jennifer Yusin, included in these numbers and calculations, was hired by Drexel to fill an open position in the English Program, but because of the overlap between her research interests and philosophy, was appointed to teach both English and Philosophy.

205.    Although Yusin, who is a tenured associate professor, has been teaching philosophy courses since at least 2016, Kurtz, Amato and other male professors have dismissed her expertise in philosophy and have strongly opposed treating her as a full-fledged member of the Philosophy Program. For example, Kurtz and Amato refuse to allow Yusin to attend Philosophy Program meetings despite that policies that will affect her are debated and decided.

206.    Kurtz and Amato further discriminate against female faculty by assigning many of the advanced, upper-level philosophy courses -- usually relatively small seminars -- to male professors instead of female professors even where the female professor outranks the male professor, and even when there is already a female professor who has more scholarly expertise  in the subject area than the male professor whom Kurtz and Amato choose to teach the course has.

207.    Likewise, many of the advanced, upper-level philosophy courses are assigned to adjunct and Teaching Professors, who do not have as part of their job description any requirement that they research, write, and publish scholarly work.

These professors are outranked by tenure-line professors. Teaching Professors are routinely assigned to teach advanced courses, even when there are more expert female tenure-line professors willing and able to teach them. As a result, these higher-ranking female tenure-line professors toil away teaching large sections of introductory courses that do not dovetail with their research and thus detract from the time necessary to meet their job requirement of researching and writing and publishing scholarly work.

### Drexel Devalues Women's Expertise:  Kurtz and Amato Assign a Kierkegaard Course to a Teaching Professor Less Expert than Piety

208.    On or about February 26, 2020, Piety gained further insight regarding how little female faculty members' professional expertise is valued in the Philosophy program and at Drexel.

209.    At a meeting of the Philosophy program faculty, the Program director, Amato, announced that he was scheduling a Teaching Professor to teach a course on Kierkegaard in the coming winter term, nine months from then.

210.    This news came as a surprise to Piety. The opportunity to teach a course in her specialty arises only rarely, given the small size of the Program.  In fact, in the past ten years, the Program has offered a course on Kierkegaard just four times.

211.    Opportunities to teach a course on Kierkegaard are so rare that Piety spent some of her research leave time in 2017 to teach a seminar on Kierkegaard as a Visiting Professor at Haverford College.

212.     The Teaching Professor whom Amato and Kurtz assigned to teach the course on Kierkegaard is less expert than Piety regarding Kierkegaard. Nor does this teaching professor have as part of her job description any requirement that she research, write, and publish scholarly work.[2]

213.     That this rare teaching assignment was given to a teaching professor instead of to a tenured, full professor who is a well-known expert in the subject matter is contrary to academic custom and practice, including at Drexel.

214.     It was also contrary to academic custom and practice, including at Drexel, that such an opportunity would be given to a teaching professor without the official who makes the course assignments first offering such opportunity to any higher-ranking, more expert faculty members.

215.     Assigning courses to the faculty member most expert in the subject matter benefits students.

216.     Assigning courses to the faculty member most expert in the subject also benefits the faculty member, especially where the faculty member has, as part of her job description, the requirement that she research, write, and publish scholarly works in books and academic journals. Upper-level seminars provide scholars the

_____

[2] Piety is *not* saying that all Tenure-Line Professors are more qualified or more expert than all Teaching Professors. Rather, expertise must be reviewed on a case-by-case basis. The main difference is that, unlike Tenure-Line Professors, Teaching Professors are not required, as part of their job, to research, write, and publish scholarly work.

opportunity to develop and refine their ideas as a step in the process toward

publishing and sharing them with the wider scholarly community.

217.    Kurtz and Amato, however, never even told Piety of this rare

opportunity.

218.    Instead, Amato used the announcement of the teaching assignment at the

meeting of philosophy faculty on or about February 26, 2020 to deliberately shock,

humiliate, and discriminate against Piety in front of colleagues, by devaluing and

ignoring her expertise.

219.    Both Amato and Kurtz justified the course assignment on the grounds

that it was part of an "historical sequence," such that it necessarily had to be taught

during a term when Piety normally did not teach.

220.    However, that claim was false. The course, PHIL 485, that was

purportedly "required" during this particular term was a "variable topics" course.

That is, all that was required was a course on *any* "modern philosopher," not a course

on Kierkegaard. Also, Drexel students often take philosophy courses out of historical

sequence, so there is not, in fact, any necessity to offer the variable topics course PHIL

485 during a particular term.

221.    Amato and Kurtz deliberately ignored Piety when she provided them

with that explanation.  That is because Amato intentionally selected the topic of

Kierkegaard for this variable topics course so that he could assign it to the teaching

professor, and Kurtz supported him in this act of discrimination and harassment.

222.    On the other hand, in the Philosophy program, such a devaluing of a *male* professor's expertise rarely occurs.

223.    In fact, the Philosophy Program *prioritizes* male professors and their expertise over that of female professors.

224.    For example, in 2010, Piety told Dr. Amato that she wanted to teach a course, "Philosophy of Mind." At that time, Piety was a tenured associate professor.

225.    Amato instructed Piety that she must first ask another faculty member, a male adjunct professor whom Amato said was expert in that area, if he would like to teach the course. If he did, Amato said, Amato would have that male professor teach the course instead of Piety.

226.    Unlike Piety, this male faculty member was not a tenure-line professor but was a part time, adjunct instructor.  Unlike Piety, he did not have a Ph.D.

227.    Amato forced Piety to speak with the male instructor to deliberately humiliate her, effectively making her seek a lower-ranking man's permission to teach a course she wanted to teach.

228.    Piety did not complain but did as Amato ordered. The male adjunct professor turned down the offer because, he said, he feared that such a specialized course in such a small program as Drexel's might not garner enough students and would be canceled at the last minute, leaving him having to scramble to prepare to

teach a different course, or no course at all; he was not paid a salary but rather was paid per courses taught.

229.     After Amato deliberately humiliated Piety at the Philosophy Program meeting, Piety asked Defendant Kurtz to consider intervening in a non-confrontational way to let her teach the course, given that it was unlikely Drexel would offer a seminar on Kierkegaard again for several years.

230.     In response, Kurtz dismissed Piety and her argument that his and Amato's assigning of this class to a less expert teaching professor who did not have any requirement to write and publish scholarship was contrary to academic custom, including at Drexel.

231.     When Piety sought help from then-Dean of the College of Arts and Sciences, Norma Bouchard, Bouchard likewise dismissed her and tried to gaslight her that no such academic custom exists.

232.     Piety suffered the same treatment when she sought help from Vice Provost Erin Horvat, who responded in a patently sexist manner. Horvat wrote in an email dated March 17, 2020: "I am sorry to learn of your distress upon seeing that another faculty member in your department is scheduled to teach a course that you would prefer to teach and for which you *feel* more qualified"(emphasis added).

233.     Notwithstanding that the particular teaching professor Kurtz and Amato assigned to teach the course has published scholarly work about Kierkegaard, the

comparison is not a matter of feminine "feelings." Rather, there is, objectively, no

comparison between the two professors when it comes to academic rank, and scholarly

achievement and reputation in the field of Kierkegaard scholarship. (This comparison

says, and is intended to say, more about Piety than about this teaching professor.) In

fact, this teaching professor teaches *all* of the Program's courses on the philosopher in

whose work she is expert, Charles Sanders Peirce, a thinker roughly contemporary

with Kierkegaard and therefore appropriate as a subject for PHIL 485.

234.    Dean Horvat, and subsequently Drexel's Provost Jensen and President

Fry all ignored Piety's request and explanation that academic custom dictates that the

most expert professor is assigned to teach the course or at least is first offered such an

opportunity, especially where, as here, such an opportunity so rarely arises.

235.    All the Drexel officials Piety appealed to, including Defendant Kurtz,

ignored that Piety was being deprived of a significant opportunity to meet her job

requirement of researching, writing and publishing by being denied this rare

opportunity to teach a course in her area of specialization.

236.    All the Drexel officials Piety appealed to, including Defendant Kurtz,

ignored that having Piety teach the course would benefit Drexel students. The

opportunity for a Drexel student to take a course on Kierkegaard from an expert as

accomplished as Piety arises four times in a decade -- four times in 40 Drexel academic

terms.

237.   All the Drexel officials Piety appealed to, including Defendant Kurtz, ignored Piety's explanation that the course in question was a "variable topics" course and hence did not need to be a course on Kierkegaard.

238.   All the Drexel officials Piety appealed to, including Defendant Kurtz, ignored that Dr. Piety told them that such devaluing of expertise at Drexel does not happen when the expert is male. Instead, they said that because the course was assigned to a woman, the assignment could not possibly be sex discrimination.[3]

239.   Instead of taking any of Piety's concerns seriously, all the Drexel officials Piety appealed to, including Defendant Kurtz, treated Piety as if she were a *prima donna* demanding that she, and only she, be allowed to teach courses on Kierkegaard, and that she, and only she, somehow "owned" all Kierkegaard courses at Drexel and believed she was entitled to a "monopoly" on them.

240.   Piety responded to this obtuse, sexist effort to twist her arguments and falsely portray her according to a negative stereotype of women by explaining that she was in no way making such a demand. Indeed, Piety had not complained when, earlier, this teaching professor taught a course on Kierkegaard. (This professor has taught two of the four courses offered on Kierkegaard in the last 10 years.)

---

[3] The fatuousness of this argument becomes even more obvious if the context is changed to one with which lawyers and judges are more familiar: a law firm. What Piety suffered is akin to a female law partner with noted expertise in a particular area of law learning that her partners are assigning incoming cases in her area of expertise to associates instead of to her.

241.    Kurtz told Piety that he would let her teach a Kierkegaard course the term immediately following the scheduled Kierkegaard course, and, contrary to Department practice, scheduled her to teach the course without first consulting her. However, Kurtz's offer was an empty gesture, and Kurtz knew it was. Drexel's philosophy program has so few majors that a second course on the same subject would almost certainly have been cancelled at the last minute due to low enrollment.  Kurtz was aware that student interest was such that the Philosophy Program has offered just four Kierkegaard courses in the last decade, despite that at least two professors wanted to teach such courses.

242.    In addition, Kurtz's offer was not merely an empty gesture but a punitive, bullying tactic. Kurtz and Amato have often bullied Piety by scheduling her, without her permission, to teach a course that would almost certainly fail to meet the minimum enrollment requirement, and which Kurtz and Amato would then cancel on the eve of the term. This bullying has repeatedly forced  Piety to scramble at the last minute to, suddenly and unexpectedly, prepare and teach a course other than the one she had prepared to teach.

243.    The dismissive, bullying, sexist, disinguous, and gaslighting responses of Kurtz, Bouchard, Horvat, and Jensen to Piety's request to teach the Kierkegaard course, which sought to portray Piety as seeking to "monopolize" a particular subject, ignored an elephant in the room -- that in Drexel's Philosophy Program, there *is* a

professor who obviously "owns" courses in a particular subject matter: male tenured Associate Professor Andrew Smith.

244.   Smith is an expert on issues concerning philosophy and the environment. In the period from academic year 2011-present, the philosophy courses "Philosophy of the Environment," "Environmental Ethics," and "Philosophy of Sustainability," have been offered a total of 23 times.

245.   Smith has been assigned to teach these courses 21 of the 23 times they were offered.

246.   The only times any of these 23 courses were not taught by Smith was when Smith was on a leave term. A male adjunct professor who has a scholarly interest in the subject matter temporarily took over.

247.   Generally, however, none of these courses is ever taught during a term when Smith does not teach. *The offerings are scheduled around Smith's expertise and availability.*

248.   Smith has always been accorded more respect and better treatment than Piety despite that he is younger than Piety, has at all times during his employment at Drexel been junior to her in rank, and has not yet earned the status in his field that Piety has earned in hers. For example, after Piety was tenured, Catudal announced at a Philosophy program meeting that Smith, then a junior assistant professor, was "the face of the Philosophy program." Smith was likewise appointed Assistant Director of

the Philosophy Program when he was junior to Piety. Catudal and others described Smith as being "groomed" to lead the Program. Drexel made this appointment despite that Smith, unlike Piety, is on record as having no interest in directing the philosophy program.

249.    Piety has already suffered harm to her reputation as a result of Kurtz's and Amato's decision to deprive her of the rare opportunity to teach a course about Kierkegaard's philosophy. After the assignment was given to the teaching professor, a graduate student at another institution contacted Piety to ask if she and Drexel would let him audit any Kierkegaard course she might teach. Piety had to tell the graduate student, who was studying at a prestigious university, that she was not scheduled to teach a course on Kierkegaard. She feared what his reaction would be when he learned that someone *else*, someone less known in the field and not a tenure-line professor, was scheduled to teach such a course. Piety worried that the graduate student would wonder if Drexel officials believed there was some problem with Piety's teaching, or that she was unpopular with students and colleagues.

### Dr. Piety Formally Reports the Discrimination and Hostile Work Environment to Drexel's Office of Equality and Diversity ("OED")

250.    Drexel's causing Piety to lose the rare opportunity to teach the Kierkegaard course, and Drexel's dismissive and sexist responses to her complaints about it, all contravened Drexel's promise to faculty that sex discrimination is

"unacceptable and counter to [Drexel's] core mission and values,"

251.    It also contravened the instructions then-Dean Muarsko gave Piety in her mid-tenure review in 2005 to focus on developing herself as a Kierkegaard scholar to secure tenure.

252.    Piety regarded this bullying and harassment and humiliation and gaslighting as the last straw.  On or about May 5, 2020, Piety formally complained to Drexel's OED about this discrimination, as well other discrimination she had suffered spanning her career at Drexel. Piety reported discrimination and harassment and bullying by Kurtz, Amato, Catudal, and Professor of English Doreen Saar. She formally named all of them as Respondents except for Amato, because Amato at all times acted under Kurtz's authority and direction, and Piety feared Drexel might simply scapegoat Amato, who is not tenured, for the discrimination by Kurtz and the others.

**Retaliation -- and Further Sexist Hostility Against Piety**

253.    Since complaining about the Kierkegaard course assignment to Kurtz and upper-level officials, and then filing her formal OED complaint on May 5, 2020, Dr. Piety has suffered retaliation -- and further hostility -- from Defendant Kurtz and others. (Piety filed additional complaints about the various retaliations. )

254.    For example, on or about May 2020, Kurtz and Amato retaliated against Piety by first scheduling her to teach a 400-level "variable topics" course on

Kierkegaard right after the Kierkegaard course by the Teaching Professor, despite Piety's objection that such a course would likely be canceled given that an insufficient number of students from the small program would take a second offering of Kierkegaard so soon, such that the course would likely be canceled at the last minute.

255.     When Piety turned it down and explained her reasoning, Kurtz and Amato did not simply let her teach a different 400-level "variable topics" course on a subject of her choosing but instead scheduled her to teach a 200-level course. This reduction was intended to further humiliate Piety and diminish colleagues' and students' perceptions of her.

256.     Catudal and Amato retaliated against Piety. On or about May 2020, Amato scheduled Piety and Catudal to teach a course on the dialogues of Plato during the same academic term. Catudal and Amato knew that such a course would be in competition with Piety's. There is no question that the philosophy program is too small to support two courses on the same specialized topic during the same term. One of the courses most likely would have to be cancelled at the last minute due to low enrollment.

257.     The course that would most likely be canceled at the last minute was Piety's, and that was Catudal's and Amato's intention.  Piety's course, a 400-level course, had prerequisites that Catudal's 200-level course did not require. Prerequisites can be waived, but students are likely to be deterred from taking a course at such a

high level, particularly when there is a lower-level course available on the same subject without the prerequisites.

258.    Indeed, Drexel's philosophy program has had great difficulty in the past filling upper-level philosophy seminars, even when other courses were not scheduled to compete with them. For that reason, this scheduling of two courses on precisely the same, highly specialized subject, in the same term, has occurred rarely, if ever, in Drexel's philosophy program.

259.    Also, Catudal has defamed Piety to students throughout the years, which would harm enrollment in her course competing with his. Catudal, who despite having taught at Drexel far longer than Piety (and is now retired), was an associate professor, not a full professor as Piety is. He also, by his own admission, is not an "active scholar," meaning he had published very little since gaining tenure.  Catudal began attacking Piety shortly after she gained tenure and published two books in rapid succession, the first with Oxford in 2009, and the second with Baylor in 2010.

260.    In Spring 2020, Kurtz further retaliated against Piety regarding the scheduling of Department faculty computer upgrades.  Despite being the only full professor in Philosophy and one of the few full professors in the Department, Piety was *the very last person* in her Department to receive an upgrade.

261.    In Spring of 2020, Kurtz further retaliated against Piety by repeatedly ignoring requests by her and another female professor to discuss the effects of the

COVID-19 pandemic on women in higher education, and in the Department in particular, before the Department members continued their discussions on issues such as setting the criteria for evaluating teaching effectiveness. It is well documented that COVID-19 has disproportionately negatively affected *female* faculty. *See, e.g.,* Ruomeng Cui, Hao Ding, & Feng Zhu, MANUFACTURING & SERVICE OPERATIONS MANAGEMENT 24, no. 2 (March-April 2022); 707-726, "Gender Inequality in Research Productivity During the COVID-19 Pandemic," (last accessed May 5, 2022); Colleen Flaherty, "No Room of One's Own: Early journal submission data suggest COVID-19 is tanking women's research productivity," INSIDE HIGHER EDUCATION, April 21, 2020 (last accessed May 5, 2022).

262. Kurtz's ignoring these issues was not only retaliation against Piety but also evinced his hostility toward women, women in academia, and his disregard for the documented gender inequality affecting female professors as a result of the COVID-19 pandemic.

263. On May 26, 2020, Catudal retaliated against Piety by disparaging her teaching in an email to all the philosophy faculty. The university had shifted all teaching for the spring 2020 term online in response to the pandemic. Catudal disparaged the quality of the instruction in the online philosophy courses. He said that the "so-called 'instruction'" that students were receiving "would make you sick." He continued: "That goes for those fortunate among us who already had courses ready to

go because they had previously taught online. In fact, a few of the complaints I have heard from students are specifically about such courses."

264.    Piety, though unnamed, was obviously Catudal's target. That is because she was the only instructor who had announced at the philosophy program meeting at the beginning of that term that she was "fortunate" because, for the upcoming term, she "already had a course ready to go," because she had previously taught it online.

265.    On August 24, 2020, Piety filed an additional complaint with OED concerning the retaliation.

266.    The same day, Piety filed dual filed a Charge with the EEOC and PHRA, alleging violations of Title VII and the Pennsylvania Human Rights Act for discrimination and hostile work environment and retaliation by Drexel and Defendant Kurtz.

267.    On or about September 2020, Amato retaliated against Piety by deliberately scheduling, over her requests not to, an event for philosophy majors and students interested in becoming philosophy majors for a time when he knew Piety was generally unavailable.

268.    When Piety informed Kurtz about this retaliation and discrimination by Amato, she said that she merely wanted her schedule to be considered so that students would benefit from meeting the highest number of faculty possible, including the Program's only full professor.

269.     Kurtz did not support Piety. He twisted her complaint to accuse her, in an email dated September 11, 2020, of making "demands for preferential treatment on the basis of rank," and describing her behavior as "improper and uncollegial at the very best."

270.     However, it was obvious that Piety had not requested "preferential treatment." She had merely requested a courtesy generally extended to faculty but which Amato had repeatedly failed to extend to her.

271.     The event ended up being rescheduled for reasons that had nothing to do with Piety's concerns. Piety was able to attend the event on the new date. Except for Amato, Piety was the *only* member of the philosophy faculty who attended.

272.     On or about September 17, 2020, Kurtz further retaliated against Piety. During a department meeting held via Zoom, Catudal, then the Chair of the Department bylaws committee, insisted there should be a full Professor on the bylaws committee, as there was not one.  Piety volunteered to serve, via the chat function. Kurtz responded, via chat, "You got it."

273.     The next day, however, Kurtz emailed all the full professors in the Department and asked that one of them please volunteer to serve on the bylaws committee.

274.     Piety was surprised and wrote an email to Kurtz reminding him that she had volunteered during the meeting and that he had said she could serve on the

committee. Kurtz responded that he regretted having made the hasty appointment, that he felt he should give all the full professors in the department an opportunity to volunteer.

275.    Piety responded that all the full professors had been present at the department meeting and hence already had a chance to volunteer.

276.    Kurtz ignored this email. Several days later, Kurtz emailed the Department informing everyone that a full professor had volunteered to serve on the committee, and that he was appointing her.

277.    The full professor Kurtz appointed was Doreen Saar, a female, who was one of the people against whom Piety had filed her OED complaint for sex discrimination on May 5, 2020. Saar is known in the Department to have been the subject of at least one other complaint for perpetrating sex discrimination against another female professor.

278.    Kurtz appointed Saar to retaliate against Piety for the complaints she had made against him and Saar.

279.    Kurtz's refusal to appoint Piety to the bylaws committee threatened to harm her annual review for service to the Department and University, as such committee work counts in these reviews.

280.    Kurtz further retaliated against Piety. On or about October 20, 2020, he falsified Piety's annual review.

281.    Kurtz did so by deliberately omitting in his report that Piety had taught an entirely new course, PHIL 385: Philosophy of Law, despite that the review process provides special consideration to faculty who teach new courses. Kurtz also deliberately omitted that Piety achieved outstanding student reviews for this new course. (Achieving strong student reviews for a new course is rarer than for a course the professor has already taught and refined.)

282.    Kurtz also did so by deliberately omitting in his report that Piety is a member of the Kierkegaard, Religion, and Culture Advisory Board of the American Academy of Religion, despite that this is a significant service to the profession.

283.    Kurtz obviously went out of his way to perpetrate these misleading omissions, because the information he omitted had been included by Piety in the required form she had filled out and sent to Kurtz so that he could write the annual review. Also, such accomplishments were routinely included in the official annual reviews of Piety in previous years.

284.    Kurtz also falsified the review by characterizing Piety's scholarship for the past year. He indicated that Piety had merely met the standard when in fact Piety had exceeded it, by publishing, in just one year, the total number of articles she is required to publish over a three-year period. Scholarship is the main criterion for reviewing tenure-line faculty, also known as "research faculty," as opposed to "teaching faculty." So Kurtz emphasized Piety's teaching evaluations, which he

(accurately) described as "well above average."

285.   Kurtz's refusal to give Piety an accurate rating for scholarship and emphasize her teaching instead was part of his effort to harm her reputation with the upper-level administrators, to reduce the likelihood of her receiving an appropriate merit pay increase, and to increase the likelihood that if she could not keep up her high level of scholarly productivity, she might be required to take on extra teaching duties. The Department has made such increase in teaching duties the "remedy" for dealing with research faculty who are not sufficiently active as scholars to merit the light teaching load that goes with the research (tenure-line) positions.

286.   On October 21, 2020, OED investigator Zoe Reilly emailed Piety saying that she understood Piety was planning to file a complaint of retaliation. Surprised, Piety responded the next day, October 22, 2020, by forwarding her August 24, 2020 email with the retaliation complaint attached. (At various times after that, through the Spring of 2021, Piety emailed OED to add various incidents of retaliation to that complaint.)

287.   Catudal and Kurtz further retaliated against Piety. On or about November 2020, Piety announced that she would give a presentation to junior faculty about the tenure and promotion process via Zoom on November 12. Piety had recently been through the process of promotion to full professor. One reason Piety decided to give the talk was to assuage concerns of associate professors considering applying for

promotion to full professor after Associate Professor Catudal had claimed that there were "issues with the process of promotion to full professor."

288.    Before Piety gave the talk, Catudal engaged in further retaliation against her by emailing all tenure-line faculty who were not yet full professors and suggesting that Piety's talk would, somehow, violate the Provost's policy that the tenure and promotion process for any individual professor be kept confidential.

289.    In response, Piety obtained clearance from the University's Office of General Counsel to give the talk.

290.    Catudal attended the talk and heckled Piety throughout.

291.    Kurtz did not attend the talk, nor did he ever thank Piety for giving it. Instead, he ordered her to provide him with access so that he could view a recording of it.  His tone and lack of approval indicated that he wanted to view the recording to try to ferret out some violation of the Provost's confidentiality policy by Piety so that he could subject Piety to discipline.

292.    On December 27, 2020, Piety dual filed a second Charge with the EEOC and PHRA, alleging further related violations of Title VII and the Pennsylvania Human Rights Act for discrimination and hostile work environment and retaliation.

293.    On or about June 23, 2021, Kurtz continued to retaliate against Piety. When another faculty member, Rogelio Miñana, indicated he wanted to move the Religious Studies Program from Global Studies to another department, Kurtz turned

down the opportunity to house this program in the Department of English and Philosophy.

294.    Including this program in Drexel's Philosophy Program would be the most natural home for it, given how closely it is related to philosophy and given that there are numerous Departments of Religion and Philosophy at institutions of higher education across the country.

295.    In addition, Piety, who teaches in the Religious Studies program and also is one of its founding members, had told Kurtz that she supported such a move.

296.    Moving the Religious Studies Program to the Department of English and Philosophy would have enhanced Piety's status in both the Department and the Program. Kurtz disregarded the obvious fact that such a move would have benefitted the Department more generally by expanding its reach, and the array of disciplines it encompassed.

297.    Kurtz retaliated again by emailing Piety on or about June 23, 2021, informing her that he wanted to meet with her and a representative from HR to address some discussions among the curriculum committee on which he had been copied as an *ex officio* member of the committee, along with Piety's appeal to him to intervene to stop the mobbing of her by the other members of the committee. The mobbing occurred after Piety told the committee that it was refusing to follow Drexel College of Arts and Sciences policy in creating a new course.

298.    Piety suspected this meeting was more retaliation and asked HR if her attorney could attend. HR denied Piety's request.

299.    HR told Piety she could have a representative from the OED attend. Piety made such request to OED and also reported to OED that Kurtz was planning to retaliate against her.

300.    During the meeting with OED and HR, which was held on June 30, 2021, Kurtz twisted Piety's complaint that she had been bullied and harassed by the other members of the committee around and accused *her* of being "uncivil" to the committee members.

301.    Kurtz also demanded that Piety not make a complaint to OED against himself and the members of the committee, about whom Piety had said she would complain formally for their bullying and harassment of her - part of the retaliation against her - regarding her refusing to go along with flouting Drexel policy regarding the requirements for creating a new course.

302.    During this Zoom meeting, Kurtz also threatened Piety, using his supervisory authority as Department Head to demand that she retract the complaint that he believed she had already made to OED against him.

303.    Piety did subsequently file an OED complaint against committee members, on or about August 16, 2021. And she did not withdraw her complaints against Kurtz.

304.    On or about October 25, 2021, Kurtz retaliated against Piety again, by encouraging her to seek funding for a Drexel research "co-op" where a student could gain work experience through Drexel's renowned innovative experiential and cooperative learning program.

305.    Piety did the footwork of creating the co-op and selecting a student.

306.    On or about December 21, 2021, Piety told Kurtz the good news that she had created a co-op and found a student who would benefit from working in it. Kurtz refused, however, to provide the matching funds ordinarily provided by the recipient's department.

307.    Kurtz gave no reason for his refusal.

308.    Ultimately, Piety obtained matching funds from the same Drexel center that had awarded her the grant.

309.    Piety received a Notice of Right to Sue Letter dated Feburary 8, 2022, from the EEOC concerning her two charges.

310.    On or about March 7, 2022 Piety was the victim of yet more retaliatory scheduling practices on the part of Amato and Kurtz when her popular course "Judaism and Christianity: Two Religions or One?" which had originally been scheduled to run during Drexel's spring 2022 term, was prematurely cancelled due to purported "low enrollment" three (3) full weeks before the start of the term.

311.    Amato and Kurtz knew that Drexel students do not enroll in courses

until about two (2) weeks before the term starts and that many wait until one (1) week before.

312.    Amato and Kurtz knew that Piety's course on Judaism and Christianity was a popular course that had not suffered from low enrollment.

313.    Moreover, the course should have been protected from cancellation because it was taught pursuant to a generous grant Drexel had received from the philanthropist Laurie Wagman for its development and maintenance, along with the development and maintenance of several other courses that would form part of a new "Interfaith Certificate Program."

314.    Amato and Kurtz canceled the course not only to force Piety to, once again, scramble at the last minute to prepare to teach a course she had not planned to teach, but also because they knew Piety had received the highest teaching evaluations of her career so far for the course.

315.    Kurtz and Amato assigned Piety to teach one of the overflow sections of an introductory course. They did so knowing that the reassignment would likely guarantee Piety she would receive a lower aggregate teaching effectiveness score for her upcoming annual review.

316.    Piety filed dual-filed a third Charge with the EEOC and PHRA on April 17, 2022, alleging, inter alia, further related violations of Title VII and the Pennsylvania Human Rights Act for discrimination and hostile work environment and retaliation by

Drexel and Defendant Kurtz, which occurred while the first two charges were pending and under investigation by the EEOC/PHRA. Piety requested an immediate Right to Sue letter, which was issued on April 27, 2022.

### The Office of Equality and Diversity "Investigation" of Piety's Complaints Concludes There Was "No Discrimination"

317.    After an "investigation" of Piety's original complaint from May 5, 2020, the OED announced, on or about March 1, 2021, that it did not find any illegal discrimination in the Department.

318.    Piety appealed the OED's decision on or about March 15, 2021.

319.    Drexel still has rendered no decision on this appeal and indeed has not responded to Piety's repeated requests for updates.

320.    On April 22, 2022, the OED informed Piety that its investigation of her complaint for retaliation, which Piety originally filed on or about August 24, 2020, had resulted in a finding of "no discrimination." (This is the complaint that Piety had to send the OED again on October 22, 2020 when OED's Zoe Reilly claimed not to have received it.) However, the complaint was for *retaliation*, not discrimination, which OED did not address. Piety is appealing.

321.    To date, OED has ignored the complaint Piety made against the other members of the curriculum committee for their bullying and harassment of her for her insistence that they respect Drexel policy concerning the addition of new courses to the

permanent curriculum. (When Piety inquired about the progress on the investigation of this complaint in an email to Apicella dated May 4, 2022, Apicella replied in an email dated May 6, 2022 that this official complaint by Piety may have "inadvertently" "slipped through the cracks.")

322.    OED's "investigations" of reports of discrimination are chimerical, designed to give Drexel female members the illusion that Drexel's OED will take their complaints of illegal discrimination seriously and will investigate them according to best practices; that Drexel will not tolerate any retaliation against these women for making a complaint; that Drexel will deal with offenders appropriately; and that Drexel will ameliorate the discrimination and improve the overall atmosphere for women faculty.

323.    However, OED appears to avoid, deliberately, making any investigative finding that there was illegal discrimination against a female faculty member. Instead, OED generally says there was no illegal discrimination -- there was merely "incivility." Then, OED turns the matter over to HR.  OED in fact responded in this way to the above-described 2015 complaint a female faculty made about the Department of English & Philosophy, described above.

**The OED Deliberately Does Not Follow Investigative Best Practices and Distorts Facts to Cover Up Discrimination**

324.   OED investigators deliberately refuse to follow investigative best practices. The OED "investigates" matters by "interviewing" witnesses and writing a report. However, the OED investigators *refuse to record any of the interviews accurately* either by audio, video, or by having a court reporter/stenographer present, claiming that the OED has a "policy" to not record interviews. (OED refused to record its interviews of Piety, even when Piety requested such recording.)

325.   Rather, the OED investigators claim to rely on their "notes" and "memories" of the interviews when, months after such interviews, the investigators sit down to write their reports. Such intellectual effort to remember, and to reconstruct and interpret "notes," however, is wholly unnecessary. Recording an interview merely requires pressing a few buttons on a smartphone or, in remote interviews, clicking a button on Zoom.

326.   Recording an interview is a best practice for investigators who purport to make factual findings, as OED does, given that even a diligent investigator acting in good faith might miss something that was said, or how it was said, or misinterpret or mishear a statement. In addition, the relevance of a particular bit of information might not be obvious or knowable at one point in an investigation. But when the investigator learns more information, the relevance of this earlier information might become evident. If the earlier information was not written down, or not written down

accurately, or not remembered by an investigator because it seemed irrelevant at the time, it may be lost, which diminishes the accuracy of the investigation.[5]

327.    As a result of OED's refusal to follow this best practice, the OED investigators guard their ability to pick and choose among statements by witnesses, use statements tendentiously, or invent statements out of whole cloth.

328.    Even when the OED investigator allows a witness to "review" a "draft" report of an investigation, the OED investigator retains the power and ability to ignore any corrections, make "credibility determinations," ignore available empirical and documentary evidence, and lie about what was said and/or invent facts and statements.

329.    The OED, when it allows a faculty member to review a draft report, prohibits any copying of such report. After OED "investigated" Piety's report of discrimination in 2020, Piety received an email from the OED with a link that allowed her to view the OED's draft report on their investigation. The report contained testimony from witnesses that Piety knew supported her complaint. She was unable to print out the report, however, and OED ignored her repeated email requests for instructions on how to do so.

330.    To ensure an accurate record of the investigation, Piety made a copy of

---

[5] For this reason, of course, lawyers routinely read the transcripts and/or review videos of prior depositions in a case to prepare for upcoming depositions.

the report for herself by taking screen shots of each of its 63 pages. She included

extended quotations from this draft report in her appeal of the OED's finding of "no

discrimination."

331.    When on March 18, 2022 Piety received an email with a link to the draft

of the report of OED's investigation of a subsequent complaint of retaliation that she

made to the OED on August 24, 2020 (and had to send OED again on October 22, 2020),

the OED, this time, included a warning at the top of the screen informing her that she

did not have permission to download or print out the report.

332.    The OED investigatory reports are the products of policies and practices

that are biased against female faculty. The reports are unreliable and tendentious and

protective of Drexel's administrators, and of Drexel as an institution. The reports and

the biased policies and practices used to create them are deployed to gaslight female

faculty, to lull them into a belief that their complaints are being taken seriously while

the clock runs out on the statute of limitations for seeking recourse outside of Drexel

(such as by reporting the discrimination to the EEOC).  The reports and the biased

policies and practices used to create them are deployed to keep complaints

"confidential." All of these OED practices serve to help deter lawsuits against Drexel

that would discredit Drexel's claims that Drexel opposes discrimination against female

faculty.

333.    For example, Piety discovered, when reviewing the "draft" OED report of

OED's investigation of her original May 5, 2020 complaint, that the OED "investigator" had omitted or misinterpreted many of her allegations and engaged in "fact-finding" that defied logic, common sense, and the documentary evidence.

334.    For example, the OED investigation report credited Catudal's obviously dishonest claims that he had continued to call Piety "Foley" because she had asked colleagues to do so and published scholarly work under the name "Foley." All the OED investigator had to do was Google, or follow up with Piety, to discredit Catudal's claim.

335.    For example, the OED investigation report twisted the facts and contrived to follow the lead of Defendant Kurtz, Dean Bouchard, Vice Provost Horvath to portray Dr. Piety as a prima donna who was intemperately demanding that she, and only she, "owned" a "monopoly" on courses about Kierkegaard.

336.    For example, Drexel officials have done nothing to remedy Kurtz and Amato's disproportionate treatment of female faculty in course teaching assignments.

337.    For example, the OED typically takes many months to investigate a complaint hence running down the clock on the statute of limitations for a lawsuit. Regarding Piety's initial complaint to OED, filed in May 2020, there was no decision by OED until on or about March 1, 2021.  Regarding Piety's complaint for retaliation first filed on or about August 24, 2020, and which Piety sent again on October 22, 2020, there was no decision until on or about April 22, 2022.  Regarding Piety's complaint for

discrimination and harassment and bullying by some members of the curriculum committee, which Piety filed on or about August 16, 2021, there has been no action whatsoever -- on May 6, 2022, Apicella told Piety that it "inadvertently" "slipped through the cracks."

338.    Had Piety not known to preserve her right to sue by filing a complaint with the EEOC, Drexel's OED would have deprived her of her right to sue as a direct result of its policies and procedures.

339.    Drexel has failed to remedy the Department of English and Philosophy's hostile work environment against female faculty, and unequal opportunities for advancement, despite that women make up about fifty percent of the Department's faculty.

### Piety Requests Information the Office of Equality and Diversity (OED) is Required to Maintain Under Title IX -- and OED Refuses to Provide It

340.    On or about March 9, 2021, Dr. Piety asked the head of OED, Paul Apicella, Esq., for data from the OED regarding how many female faculty filed complaints based on sex discrimination, and how many of those complaints ever resulted in a finding of discrimination.

341.    Dr. Piety did so under the belief that such data is required to be kept by OED under applicable federal law such as Title IX.

342.    Apicella responded the following day, March 9, 2021, saying he could not

provide a "reliable answer," but that, once he had one, he would be happy to let her

know. However, to date, he has not provided any of these data, despite that Piety has

renewed her request for it several times. Apicella's most recent response was May 6,

2022 in which he repeated that he was still unable to provide the information.

**Unequal Pay**

343.    Along with other female faculty members, Dr. Piety has long suffered

discrimination by the University, the Department, and the Program.

344.    On or about 2014, female faculty members received pay increases. On

information and belief, this increase prompted by a complaint that female faculty were

being paid less than male faculty for the same work.

345.    Despite this pay increase, however, Drexel continues to pay women

faculty, and in particular female full professors, significantly less than their male

counterparts, according to a recent survey by the American Association of University

Professors.

346.    Piety is paid less than lower-ranking male philosophy professors

(associate professors) who are doing substantially the same work, both in degree and

kind, including teaching, research, writing, and committee work. Piety has met or

exceeded the Department standards in all categories (teaching, scholarship, and

service) in all of her annual reviews..

347.    On or about March 21, 2022, Piety learned that Drexel pays Associate

Professor Nathan Hanna, who arrived at Drexel after Piety and is lower ranking than Piety, a salary that is higher than what Drexel pays Piety.

348.    Discovery will show that Drexel similarly pays Associate Professor Andrew Smith significantly more than it pays Piety.

349.    On or about March 21, 2022, Piety learned that Drexel is paying a male tenured full professor in a different but similar department, with similar accomplishments to hers, approximately fifty percent more than Drexel pays Piety.

350.    Discovery will show that Drexel is paying other male faculty of similar, and even lesser, rank and scholarly achievement than Piety and who are doing the same job and same work as Piety significantly more money that Drexel pays Piety.

351.    Such discrepancy is the result of intentional sex discrimination, a hostile work environment, and retaliation against Piety for complaining of such discrimination.

### Pattern and Practice

352.    Along with other female faculty, Piety has long suffered discrimination in the Department of English and Philosophy from colleagues, department heads including Defendant Kurtz, and program directors.

353.    The actions of Defendants are systematic and ongoing, representing a pattern and practice of illegal discrimination and retaliation against Piety.

354.    At all relevant times, Defendants knew or should have known of such

pattern and practice.

355.   Piety brings this action to remedy past and ongoing discrimination and retaliation by Defendants.

## Hostile Work Environment

356.   The aforementioned conduct by Defendants has created a hostile work environment for Piety and indeed other women in the Department of English and Philosophy, and, upon information and belief, in departments throughout Drexel.

357.   At all relevant times, Defendants knew or should have known of the severe and pervasive conduct by Drexel employees that has created this hostile work environment for female faculty and has failed to remedy it.

## Piety Was Injured by Defendants' Conduct

358.   As a direct and proximate result of the above-described conduct of Defendants, Piety has suffered damages including monetary loss, wage loss, loss of opportunities for advancement, medical expenses, loss of self-esteem, loss of enjoyment of life, embarrassment, humiliation, frustration, and emotional distress.

<u>**COUNT I**</u>
**Title VII - Hostile Work Environment, Retaliation**
*Piety v. Drexel University*

359.   Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

360.   The above-described conduct by Defendant Drexel has created, fostered, and fueled a hostile workplace in violation of Title VII, a continuing violation for more than two decades.

361.   The above-described conduct by Defendant Drexel constitutes retaliation against Piety in violation of Title VII.

362.   Defendant Drexel's actions and failures to act were and are deliberate and willful and were intended to harm Piety based on her sex, and to retaliate against Piety for her protected activity under Title VII.

363.   Defendant Drexel has acted in the absence of good faith and reasonable grounds. Its actions and were and are outrageous, egregious, malicious, intentional, willful, wanton, and in reckless disregard of Piety's rights and warrant the imposition of all available damages including punitive damages.

<u>**COUNT II**</u>
**PHRA - Hostile Work Environment, Retaliation**
*Piety v. Drexel University and Kurtz*

364.   Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

365.     The above-described conduct by Defendants has created, fostered, and fueled a hostile workplace in violation of the PHRA, a continuing violation for more than two decades.

366.     The above-described conduct by Defendants constitutes retaliation against Piety in violation of the PHRA.

367.     Defendant Kurtz, a supervisor of Piety, has aided and abetted this discrimination, hostility, and retaliation.

368.     Defendants' actions and failures to act were and are deliberate and willful and intended to harm Piety based on her sex, and to retaliate against Piety for her protected activity under the PHRA.

369.     Defendants have acted in the absence of good faith and reasonable grounds. Their actions and were and are outrageous, egregious, malicious, intentional, willful, wanton, and in reckless disregard of Piety's rights and warrant the imposition of all available damages.

## COUNT III
### Title IX - Hostile Work Environment, Retaliation
### *Piety v. Drexel University*

370.     Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

371.    The above-described conduct by Defendant Drexel has created, fostered, and fueled a hostile workplace in violation of Title IX, a continuing violation for more than two decades.

372.    The above-described conduct by Defendant Drexel constitutes retaliation against Piety in violation of Title IX.

373.    Defendant Drexel's actions and failures to act were and are deliberate and willful and intended to harm Piety based on her sex, and to retaliate against Piety for her protected activity under the Title IX.

374.    Defendant Drexel has been deliberately indifferent to Piety's rights and has acted in the absence of good faith and reasonable grounds. Its actions were and are outrageous, egregious, malicious, intentional, willful, wanton, and in reckless disregard of Piety's rights and warrant the imposition of all available damages.

## COUNT IV
### Equal Pay Act
### *Piety v. Drexel University*

375.    Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

376.    At all relevant times, Defendant Drexel has paid Piety less than it pays male professors who are doing the same or similar work, including male professors who are junior to Piety in rank with less experience.

377.    Defendant Drexel's above-described actions were and are intentional and constitute a willful violation of the Equal Pay Act and warrant the imposition of all available damages including liquidated damages and a period of recovery for the maximum amount of time allowable under this Act.

## COUNT V
### Breach of Contract
### *Piety v. Drexel University*

378.    Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

379.    At all relevant times, a contractual relationship has existed between Plaintiff Piety and Defendant Drexel through the various faculty handbook policies and anti-discrimination policies, including Drexel's policies to reasonably and promptly investigate and remediate sex discrimination, hostile workplace, retaliation, and unequal pay.

380.    As a direct result of Drexel's numerous breaches described above, Piety has sustained significant damages, including loss of income and opportunity and various expenses.

381.    Piety is entitled to recover all available damages for Drexel's breach of its contractual obligations and duties.

**PRAYER FOR RELIEF**

382.   Plaintiff repeats and incorporates by reference herein the preceding paragraphs of this complaint.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against the Defendants:

a. Declaring that the acts and practices complained of herein are in violation of Title VII, the PHRA, Title IX, the Equal Pay Act, and constitute breach of contract by Drexel;

b. Enjoining and restraining permanently the acts and practices complained of herein;

c. Ordering appropriate training for Defendants concerning policies and practices and related dispute resolution;

d. Ordering that Defendants address the related workplace bullying and provide anti-workplace bullying training to employees, especially employees in the Department of English and Philosophy;

e. Awarding compensatory damages on all claims to Plaintiff to make Plaintiff whole for all past and future lost earnings, benefits, earnings capacity, interest, and other financial losses which Plaintiff has suffered and will continue to suffer as a result of Defendants' conduct;

f. Awarding emotional distress damages to Plaintiff pursuant to her claims under Title VII and the PHRA;

g. Awarding punitive damages to Plaintiff pursuant to her claims under Title VII;

h. Awarding liquidated damages to Plaintiff pursuant to her claims under the Equal Pay Act;

i. Awarding attorneys' fees and costs to Plaintiff pursuant to her claims under Title VII, the PHRA, Title IX, and the Equal Pay Act;

j. Molding any verdict/award in Plaintiff's favor to provide Plaintiff the maximum financial recovery allowed by applicable damage caps; and

k. Any and all other relief deemed just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury as to all issues so triable.

**BRIAN J. FOLEY, ATTORNEY AT LAW**

BY:_____
   **BRIAN J. FOLEY, ESQUIRE**
   Attorney for Plaintiff

Date:  July 29, 2022

**Exhibit A**

**Plaintiff's Verification of Amended Complaint ¶¶ 6 - 358**

## <u>VERIFICATION</u>

I certify under penalty of perjury (pursuant to 28 U.S.C. § 1746) that the facts in paragraphs 6 through 358 of this Verified Amended Complaint are true and correct.


Executed on this 29th day of July, 2022


Marilyn Gaye Piety Foley

## CERTIFICATE OF SERVICE

I, BRIAN J. FOLEY, ESQ., attorney for Plaintiff, Marilyn Gaye Piety Foley, hereby certify that on the date below that a true and correct copy of the foregoing *Verified Amended Complaint* was filed electronically and is available for viewing and downloading from the Court's ECF system and was served upon the following counsel of record through the Court's ECF system:

Joe H. Tucker, Esquire
jtucker@tlgattorneys.com

Leslie Greenspan, Esquire
lgreenspan@tlgattorneys.com

Tucker Law Group
1801 Market Street, Ste 2500
Philadelphia, PA  19103
Phone: (215) 875-0609

_____
Brian J. Foley, Esq.
*Attorney for Dr. Marilyn Gaye Piety Foley*

**Page 90** of 90