**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARILYN GAYE PIETY FOLEY,** **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **DREXEL UNIVERSITY, ROGER KURTZ** **Defendants.** | **NO.  22-1777** |

## OPINION

Marilyn Gaye Piety Foley, an academic philosopher, has sued her employer, Drexel University, and the head of her Department, Roger Kurtz, for hostile work environment and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000(e), *et seq.*, as amended; the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951;[1] and Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq*; and; for violations of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d)(I).[2]  Defendants have filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below, the Motion will be granted in part and denied in part.

## I.       FACTUAL BACKGROUND

### A.       The Factual Allegations Made in Plaintiff's Complaint are not Evidence

Before delving into the facts, some housekeeping: In both her response in opposition to the Motion and her counterstatement of facts, Piety Foley often cites to her Verified Second Amended Complaint ("Complaint") as "evidence."  She maintains that it is proper to do so because it is not "a mere pleading but is a ***verified*** Complaint, which is appropriate for opposing summary

---

[1] The claim under the Pennsylvania Human Relations Act against Roger Kurtz is for aiding and abetting.

[2] Piety Foley's Complaint also included a breach of contract claim, which she abandoned in her summary judgment briefing.

1

judgment."

There are potentially some very few instances where "[a] verified complaint may be treated as an affidavit with evidentiary value at the summary-judgment stage[,]" *McKay v. Krimmel*, No. 22-1302, 2023 WL 4231714, *2 n.4 (3d Cir. June 28, 2023), but these instances are carefully cabined.  Generally, they involve *pro se* plaintiffs, *see McCowan v. City of Philadelphia*, No. 19-3326, 2022 WL 742687, at *2 (E.D. Pa. March 10, 2020) (collecting cases), in coherence with the well-settled maxim that "*pro se* complaints are held 'to less stringent standards than formal pleadings drafted by lawyers.'" *See Wilson v. Maben*, 676 F. Supp. 581, 583 (M.D. Pa. 1987) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

But Piety Foley has not pointed to any cases in which a verified complaint submitted by a counseled plaintiff has been treated as providing facts sufficient to challenge a summary judgment motion.  Indeed, that would "seem to run afoul of the Third Circuit's requirement that '[a]t summary judgment, a plaintiff cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial.'" *McCowan*, 2022 WL 742687, at *2 (quoting *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000), *cf. id.* at *2 ("[D]iscovery . . . would be an incredible waste of clients' money, attorneys' time, and judicial resources if a counseled plaintiff could always rely on the allegations in her verified complaint at summary judgment.").  Accordingly, any allegations that are exclusively supported by "record cites" to the Complaint, including those allegations supported only by cites to paragraphs of her counterstatement of facts that simply refer back to the Complaint are not competent evidence and will not be considered in deciding this motion.

**B.**     **Piety Foley's Concerns of "Academic Bullying"**

Piety Foley is a scholar of the work of 19th century Danish philosopher Soren Kierkegaard

and is a tenured Professor of Philosophy in the Philosophy Program at Drexel University, which is housed in the Department of English and Philosophy, of which Defendant Kurtz is Head.  Piety Foley's work at Drexel began as a visiting professor in 1998.  She became an Assistant Professor in 2001, was promoted to Associate Professor (in 2007), and was promoted again to full Professor in 2016, making her the only tenured full Professor of Philosophy.[3]

According to Piety Foley, she has long been the target of gender-based bullying and harassment perpetrated by several of her colleagues, namely: (1) Pete Amato, who is a Teaching Professor and who has been the Director of the Philosophy Program since 2010; (2) Jacques Catudal, who was an Associate Professor and, at various times, was the Director of the Philosophy Program; (3) Kurtz, the Head of her Department since Fall 2017; (4) Andrew Smith, who is a tenured full Professor of Philosophy and the Associate Program Director; (5) Abioseh Porter, who is a Professor of English and was the Head of the Department until 2015; and (6) Ray Brebach, who is an English Professor.

Even though Plaintiff believes that her Department is a "boy's club" from which she has suffered for years, the Defendants believe quite to the contrary.  They say it is just an unpleasant place to work:  the personalities in the Department are "difficult," people who work there have "sharp elbows," and aren't always "civil to each other."  They maintain that the bad behavior of which Piety Foley complains was "not directed specifically at [her], or even at women in general, based on their gender."  Indeed, one of their colleagues stated that these patterns of behavior are patterns across the University: "it's almost the nature of academia."

But Piety Foley is not buying it.  She says that the bullying began after she published a translation of two of Kierkegaard's works for Oxford University Press and a book on

---

[3] Her colleague, Andrew Smith, was promoted to full professor after the events described in the Complaint.

Kierkegaard's epistemology for Baylor University Press in 2009 and 2010.  She believes that these publications made her "threatening" to her male colleagues, and thus a prime target for the "academic bullying" she contends is commonly perpetrated against productive female scholars. She describes the "academic bullying" as occurring across a period of more than thirteen years and taking many forms, as set forth more fully below.

Piety Foley filed several official and unofficial complaints regarding this behavior with Drexel's Office of Equality and Diversity ("OED").  But, she says, after she filed a formal OED complaint on May 5, 2020, the bullying did not stop.   In August of that year, she dual-filed the first of several complaints with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), in which she alleged Drexel and Kurtz  discriminated and retaliated against her based on her gender.  Then a few months later, she dual-filed a second charge with the EEOC and PHRC asserting more of the same.  The EEOC issued Notice of Right to Sue Letters on February 8, 2022, for both complaints.  Then, on April 17, 2022,  Piety Foley dual-filed a third charge, again alleging gender-based discrimination and retaliation by Drexel and Kurtz.  Ten days later, the EEOC issued a Notice of Right to Sue as to the third charge.  She subsequently filed this action.

## II.       LEGAL STANDARDS

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A genuine dispute does not mean "the mere existence of *some* alleged factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis added).  Rather, "[a] genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*,

480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986)). A moving party is entitled to summary judgment where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323-24 ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]").

To defeat summary judgment, the non-moving party "may not merely deny the allegations in the moving party's pleadings; instead [she] must show where in the record there exists a genuine dispute over a material fact." *Doe*, 480 F.3d at 256. Thus, summary judgment is "put up or shut up" time for the non-moving party. *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citing *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109-10 (3d Cir. 1985)). While "the nonmoving party's *evidence* 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor[,]'" *Hunt v. Cormartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255) (emphasis added), "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berkeley*, 455 F.3d at 201 (3d Cir. 2006) (citing *Jersey Cent. Power & Light Co.*, 772 F.2d at 1109-10).

When reviewing the record, the Court must "view the facts and draw *reasonable* inferences" in favor of the nonmoving party," but "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007) (emphasis added). Further,"[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *United States ex. Rel. Greenfield v.*

*Medco Health Solutions, Inc.*, 880 F.3d 89, 93 (3d Cir. 2018) (quoting *Anderson*, 477 U.S. at 248).

## III.   DISCUSSION

### A.  Title VII and PHRA Hostile Work Environment

#### i.  *Hostile Work Environment*

To succeed on her Title VII/PHRA[4] hostile work environment claim Plaintiff must show: "(1) [she] suffered intentional discrimination because of [her] sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability."[5]  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *see also Celotex*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."). Defendants focus their challenge on elements one and two: they maintain that they are entitled to summary judgment on Piety Foley's hostile work environment claim because there is "absolutely nothing in the record that establishes" that she suffered any intentional, gender-based discrimination, or that the conduct described was sufficiently severe or pervasive.

It is important to note at the outset that "'petty slights, minor annoyances, and simple lack of good manners'. . . normally do not create an actionable Title VII violation," including for a hostile work environment.  *Yarnall v. Phila. Sch. Dist.*, 57 F. Supp.3d 410, 433 (E.D. Pa. 2014)

---

[4] "Claims under the PHRA are interpreted coextensively with Title VII claims."  *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

[5] The familiar burden-shifting framework from *McDonnell Douglas Corp. v.* Green, 411 U.S. 792 (1973) does not apply to hostile work environment claims because "there can be no legitimate justification for a hostile work environment."  *Moody v. Atlantic City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017) (citing *Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933, 943 (6th Cir. 2000)).

(quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  The statute "does not set forth 'a general civility code for the American workplace.'"  *Burlington N.*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  "[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," however objectionable, do not rise to the "extreme" level necessary to "change . . . the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotation omitted).  Third Circuit precedent is replete with examples of untoward, demeaning and/or insulting conduct that nonetheless did not—as a matter of law—create a hostile work environment.  *See, e.g.*, *Nitkin v. Main Line Health*, 67 F.4th 565, 572 (3d Cir. 2023).

a.   Intentional Sex-Based Discrimination

1.   *Legal Standard*

It is, under Title VII, "an unlawful employment practice for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex."[6]  42 U.S.C. § 2000e-2(a).  The first element of a hostile work environment claim—intentional discrimination "because of" sex— requires a "but for" causal relationship between the offensive treatment and membership in a protected class.  *Caver v. City of Trenton*, 420 F.3d 243, 263 (3d Cir. 2005).  The element is met if the record contains sufficient competent evidence from which a reasonable jury could conclude the plaintiff's sex was "a *substantial factor* in the harassment, and that if [she] had been [a man] she would have not been treated in the same manner."  *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1083 (3d Cir. 1996) (emphasis added).

---

[6] The 1991 amendment to the Act further specifies that, "[e]xcept as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice.'"  *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting 42 U.S.C. § 2000e-2(m)).  However, the provision applies only to "mixed-motive" discrimination cases, *Watson v. Se. Pa. Transp. Auth.*, 207 F.3d 207, 220 (3d Cir. 2000), and is not implicated in hostile work environment claims.

This does not, of course, mean that only overtly discriminatory behavior should be considered: "[T]he advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating" the claim. *Cardenas v. Massey*, 269 F.3d 251, 261-62 (3d Cir. 2001) (citations omitted).   A viable hostile work environment claim can be premised on a combination of overtly discriminatory conduct or comments and otherwise facially neutral conduct that, when analyzed alongside the discriminatory conduct, forms "a complex tapestry of discrimination." *Aman*, 85 F.3d at 1083.  It, accordingly, is "improper to isolate incidents of facially neutral harassment and conclude, one by one, that each lacks the required discriminatory animus."  *Jensen v. Potter*, 435 F.3d 444, 450 (3d Cir. 2006), *overruled in part on other grounds by Burlington N.*, 548 U.S. at 53.

At the same time, however, the Court cannot simply adopt Piety Foley's subjective belief about what happened. At her deposition, she regularly premised her gender discrimination contentions on her perception, opinion, assumptions, and speculations.  Standing alone, these beliefs do not suffice to defeat Defendants' Motion. *See Wood v. Univ. of Pittsburgh*, 395 F. App'x 810, 815 (3d Cir. 2010) (not precedential).

To be actionable, conduct the Plaintiff  "subjectively perceive[s]" as hostile or abusive must also "create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21; *see Schwartz v. Nicomatic, Inc.*, No. 17-2516, 2017 WL 6606888, at *9 (E.D. Pa. Dec. 27, 2017) (granting summary judgment on a hostile work environment claim where the plaintiff "offer[ed] no evidence [her colleagues'] comments were based on her gender besides her own perception it was because she was a woman").  Without more, an "inference based upon a speculation or conjecture does not

create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990); *see also Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) ("[T]he non-movant may not rest on speculation and conjecture in opposing a motion for summary judgment.") (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

### 2.  *Incidents Underlying Piety Foley's Claim*

The first step in evaluating Piety Foley's hostile work environment claim, then, is to "identif[y] the conduct that a reasonable jury could label" discriminatory. *Jensen*, 435 F.3d at 451.[7] Piety Foley points to the following incidents[8] as evidence of widespread sex discrimination in the Department of English and Philosophy, which she argues illustrate how she has suffered intentional discrimination because of her sex.[9]

### i.  Another Professor's OED Complaints

Piety Foley raises two OED complaints alleging discrimination, which were filed by

---

[7] To buttress her claim of intentional, gender-based discrimination, Piety Foley references scholarly articles on "academic bullying" that she contends "describe[] in detail that [the harassment she suffered] are the kinds of behaviors that female academics are subjected to that males are generally not subjected to." Although she referred to such articles in her deposition, neither she nor the Defendants included any of them in the evidentiary record docketed in connection with the summary judgment briefing. This is in contravention of Federal Rule of Civil Procedure 56, which requires record evidence in support of factual assertions made in the briefs. Fed. R. Civ. P. 56(c). And the rule makes admirable sense: if the evidence is not in the record, then the Court cannot determine its admissibility, its relevancy, or how, if at all, it bears on the matters to be decided. Accordingly, these academic articles will not be considered in deciding the motion.

[8] In her briefing, Piety Foley does not address each of the instances set forth in her Complaint which she alleges support her hostile work environment claim. Rather, she invites the Court to take a look at the Complaint for other discriminatory "events in the record." Leaving aside that allegations contained in her Complaint are not "events in the record," it is not the Court's responsibility to do Plaintiff's work for her by combing through the record to find sufficiently supported evidence reflecting intentional, sex-based discrimination. On the contrary, it is expressly Piety Foley's job to "designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 266 (3d Cir. 2007) (citing *In re Ikon Office Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002)).

[9] Although these incidents are discussed separately, their contribution to a hostile work environment are analyzed *ut totum*. *Cardenas*, 269 F.3d at 261-62.

another female professor in the Department in 2015 and in 2022.  An internal investigation of the 2015 complaint concluded that the Department was a "hostile work environment."  Nevertheless, outside counsel, hired to investigate the 2022 complaint, concluded there was no sex discrimination and, according to Piety Foley, that the professor's complaints were "all in her head."[10]  Piety Foley argues that these complaints are evidence of "[w]idespread [d]iscrimination in the Department."  "[W]hether evidence of discrimination against other employees by other supervisors is relevant is fact based and depends on several factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."  *Mandel*, 706 F.3d at 167 (citation omitted).  Such evidence is especially helpful "in determining whether facially neutral conduct on the part of [a defendant] was actually based on" the plaintiff's protected status.  *Caver*, 420 F.3d at 264 (citations omitted).  In short, these OED complaints are relevant to Plaintiff's hostile work environment claims in that a rational factfinder could look to them to determine whether, in this case, Piety Foley suffered intentional sex discrimination.  *See Tourtellote*, 636 F. App'x at 847; *Caver*, 420 F.3d at 264.

### ii.    Gender-Based Course Assignments

Piety Foley argues that intentional discrimination can be found in the "dramatic, documented disparity between male and female tenure-line philosophy professors in the assignment of introductory courses as well as upper-level courses."  Indeed, in the years 2011-2023, women professors taught sixty-two introductory courses, while men taught forty-three. Those disparities grow when comparing tenure-line, "research active" faculty members: the two such women who taught those sixty-two introductory courses were both tenure-line, "research active" faculty members; the two men who fit the bill, *i.e.,* are actively publishing, taught only

---

[10] Piety Foley, in essence, asks the Court to take a second look to reconsider the resolution of this second complaint, which the Court declines to do.

thirteen such courses.[11]  Piety Foley argues that assignment of introductory courses can materially impact one's career in that teaching introductory courses pulls one away from research in one's area of expertise, which makes it harder to publish, which—in the dog eat dog world of contemporary academia—is likely to have a negative impact on one's career prospects.

Defendants argue that drawing any inference of sex discrimination from this disparity is unreasonable because, per Kurtz's testimony,[12] courses are "not being scheduled according to gender[,]" but are instead "done according to . . . faculty preferences. . . .  We look at first at what courses we need for any given term.  We lay out what those courses are.  We give faculty [sic] opportunity to tell us what courses they want to teach.  We assign them as much as possible according to their preferences."  Moreover, Amato, the Director of the Philosophy Program who was deeply involved in, if not primarily responsible for, scheduling, testified that the teaching assignments reflect the individual teaching preferences of the professors, the needs of the program, and the needs of the students.  There is also record evidence reflecting that in situations where an upper-level course is not filling fast enough, the assigned professor is asked (or volunteers) to take on an introductory section that is filling.

At trial, a jury could very well credit these sex-neutral explanations for the disparity in introductory teaching assignments. But it may conclude to the contrary that: (1) the appropriate comparison is between tenure-line, "research active" faculty; and, (2) considering the nearly five-to-one disparity in introductory courses taught by women versus men in that category, Kurtz's and

---

[11] During this period, Jacques Catudal, who was no longer "research active," taught thirty introductory courses.

[12] Piety Foley cites *Hill v. City of Scranton*, 411 F.3d 118 (3d Cir. 2005) for the proposition that the Court may not consider Kurtz's testimony at summary judgment because he is a named defendant, and therefore an "interested witness." However, *Hill* does not preclude "a party from presenting his own testimony on a summary judgment motion." *DeFlaminis*, 480 F.3d at 271-72.  Rather, "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness." *Id.* at 272.

Amato's ostensibly neutral behavior is better thought of "as part of a complex tapestry of discrimination." *Aman*, 85 F.3d at 1083.  In this way, the assignment of introductory courses is "evidence from which a jury could conclude" that Defendants "set [Piety Foley] up to fail." *Cardenas*, 269 F.3d at 262 (citing *Harris*, 510 U.S. at 23).  The disparities in teaching introductory courses thus informs the Court's analysis of Piety Foley's hostile work environment claim as well.

### iii.    Cancellation of Courses

Piety Foley next draws attention to the lopsided cancellation of courses on the eve of term (fifteen of the seventeen courses cancelled were assigned to female faculty).  Although she provides sufficient factual support for the proposition that most of the courses canceled in the years 2017-22 were assigned to women, she does not provide *any* evidence that Kurtz and Amato cancelled courses because of the gender of the assigned professor, or that they targeted Piety Foley in course cancellations.[13]  Her belief that this was the case is speculation:

> Q. You are not the only professor who has had classes cancel, right?
>
> A. No, but I'll get you anything, I don't have those statistics, that I've more courses canceled on me than anyone else.
>
> Q. And that is gender discrimination, is that your testimony?
>
> A. I believe that is the primary reason, yes.

Putting speculation aside, the record evidence demonstrates that low student enrollment drives class cancellations, *e.g.,* email exchange between Piety Foley and Amato about impending cancellation of one of her 300-level classes due to low enrollment and her decision to teach a more popular 100-level instead.  In other words, unlike the assignment of introductory courses, which

---

[13] Piety Foley also contends that Amato purposefully scheduled her to teach courses that he knew would get cancelled, including by scheduling two professors to teach classes on the same subject during the same term.  She does not, however, provide any factual support for this beyond her own speculative deposition testimony.

is controlled by Defendants, courses are cancelled when not enough students sign up.  Cancellation of classes—albeit that the numbers skew to female taught classes—is not, then, something that supports Piety Foley's contention that there was widespread, sex-based discrimination in her Department.  *See Nesmith v. Catalent USA Packaging, LLC*, No. 21-5594, 2023 WL 3997955, at *4 (E.D. Pa. June 14, 2023).

ii.    Kierkegaard Course Assignment

Piety Foley also takes issue with how Amato and Kurtz assigned a 400-level course on Kierkegaard to a non-tenured female professor, Stacy Ake, in 2020, without first consulting her. Not only, she says, was the assignment in violation of Department policy that "[t]enure-line faculty are given priority in teaching/scheduling preferences," but, more importantly, there is evidence that it was applied differentially according to sex.  Specifically, when she sought to teach a course on the Philosophy of Mind, Amato told her that she would have to check with a non-tenure line male adjunct professor who did not even have a PhD.  Piety Foley, on the other hand, "was not extended the same courtesy with respect to the Kierkegaard course."

Whatever the exact nature of the Department's policy—the parties differ as to whether the policy applied to her and, if it did, how it applied to her—there is a material dispute that could lead a rational factfinder to conclude that it was applied differentially based on gender.  In that when Piety Foley wanted to teach Philosophy of Mind, Amato directed her to run the idea by a non-tenured male colleague, but when Amato approached Ake about teaching the Kierkegaard course, he did not direct her to consult with Piety Foley—her tenured female colleague.  A rational factfinder could conclude in this circumstance that Piety Foley was intentionally treated less well than her non-tenured male colleague on account of her gender.

iii.    Who Holds Power in the Department

Next, Piety Foley maintains that "men disproportionately hold power in the Department" which, she says, is "material fact" sufficient to defeat summary judgment.  But even if she had properly supported this contention with citations to documents other than her Complaint, which she did not, absent more it would not be reasonable under present law for a jury to infer from the fact that a woman has never been Department Head or Philosophy Program Director while Piety Foley has worked at Drexel, that she was subjected to intentional discrimination because of her sex.  Any such inference would implicitly rely on the premise that people from social groups that historically have held power necessarily discriminate against those who have not.  Because the Supreme Court has rejected the "presum[ption] that individuals will act a certain way based on their membership in a protected class," that inference would be improper.  *LaVeglia v. TD Bank, N.A.*, No. 2:19-cv-01917, 2020 WL 2512802, at *3 (E.D. Pa. May 15, 2020) (citing *Oncale*, 523 U.S. at 78 ([T]his Court has rejected any conclusive presumption that an employer will not discriminate against members of his own race")); *cf. Castaneda v. Partida*, 430 U.S. 482, 499 (1977).

iv.    Piety Foley's Promotion to Full Professor

Next, even though Piety Foley was promoted to full professor in 2015, she contends that her promotion was "almost thwarted by sex discrimination,"  in that, as her promotion committee chair Richard Astro explained, her promotion process was briefly stalled because: (1) there were questions about one of the more than seventy courses she had taught at Drexel; and, (2) some of the links she had inserted into the table of contents of her application materials did not work efficiently.  The Defendants point to evidence that the promotion committee had other, more substantive concerns about Piety Foley's application, including concerns about her teaching and

publishing record.[14]  That there were some small glitches in a promotion process that eventually lead to her promotion is not on the record here evidence that she suffered intentional, sex-based discrimination.  *See Nesmith*, 2023 WL 3997955, at *4.

v.    The Audi Visit

Piety Foley also maintains that intentional discrimination is illustrated by incidents in which several of her colleagues—Amato, Smith, and Catudal in particular—boycotted dinners she had arranged for a visiting scholar, Robert Audi, "one of the most prominent philosophers in the country."  At the first such dinner, no other philosophy faculty members attended, and none let Piety Foley know that they would be absent; it became clear to Piety Foley that her colleagues "had organized an alternative to [another] Audi dinner."  Attendance was sparse at Audi's subsequent visits.  A reasonable jury could point to both: (1) the overall contentious relationship that Piety Foley had with her male colleagues, *see Cardenas*, 269 F.3d at 261-62; and, (2) the repeated poor attendance at Audi's talks despite his prominence in the field to conclude that, in fact, they had intentionally refused to attend Piety Foley's dinners as "part of a complex tapestry of discrimination,"  *Aman*, 85 F.3d at 1083.

Piety Foley also says Kurtz and Amato showed "hostility" toward her when she requested Departmental monies to take Audi and some students to lunch.  Amato rejected the request on the grounds that Audi's scholarship was too specialized for Drexel students and because the request was for a "private lunch."  Piety Foley submits that her funding request was refused because she

---

[14] Piety Foley argues that the Defendants may not support their version of the facts nor contradict Piety Foley's recitation by using various emails and other documents because they are "hearsay statements that would be inadmissible at trial."  But so long as the authors of the emails or the notes are available to testify at trial regarding the matters discussed—which Defendants have indicated they are, *see Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238-39 (3d Cir. 2016), they may be considered at summary judgment.  *Id.* at 238 ("The proponent need only 'explain the admissible form that is anticipated.'") (quoting Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment).

was a woman.  First, she avers in her Complaint that no male colleagues have been refused Department funds to take students out to lunch.  But there is nothing in the record to support that contention, so it will not be considered in determining this summary judgment motion.  *See Reynolds*, 128 F.3d at 178.  Second, she says that when she went to Kurtz to request the funds, he accused her of attempting to "misappropriate" department funds.  There is some back and forth between the parties as to whether Kurtz actually used the word "misappropriate" when they discussed whether she could use funds for this lunch.  But even if a rational jury could conclude from the evidence presented by the parties on this issue that Kurtz had in fact used the word, it would not be reasonable to conclude on the record facts here that its use in this context suggests that Kurtz's initial refusal to fund the lunch stemmed from "sexist hostility."

vi.     Use of Piety Foley's Married Name Against her Wishes

Finally, Piety Foley complains that although she expressed her desire to use her maiden name (Piety) professionally and her married name (Piety Foley) in her personal life,  Catudal and others—out of a sexist desire to humiliate her—used her married name.  When she registered that name with Drexel's Office of Payroll and Benefits, "as she was required to do so for pay, benefits, and tax purposes," she requested that she continue to be referred to by her maiden name professionally, *i.e.,* on her syllabi and on course lists, but was told that it could not be done.  She tried to change her name to Piety on her University e-mail, but her e-mails kept coming from "Marilyn Foley." And, when she asked her colleagues to continue to refer to her by her maiden name, "some of them, including Catudal, refused to honor [the] request."

Defendants respond with citations to the record that illustrate, they say, that she was far from clear as to what surname she wanted them to use.  They cite to a November 29, 2021, email from one professor in which he notes that Piety Foley "appears to have input her name in an intra-

departmental survey as 'Marilyn Piety Foley,' which is apparently not how she wants her name listed for official purposes." They note that she made contributions to a publication "Kierkegaard's God and the Good Life" in her married name—"Marilyn Gaye Piety Foley". And, that she referred to herself in her professional blog and in commenting on students' assignments as "Marilyn Foley". Further, she requested that her name be listed in Drexel's Directory as both "Marilyn Foley" and either "Marilyn Piety" or "M.G. Piety" (although she indicated her preference to be listed in the Directory under "Piety").

Thus, the record evidence suggests that Catudal and others use of her married rather than her maiden name stems from confusion rather than discriminatory intent.

******

In sum, only some of the incidents that form the basis of Piety Foley's claim are both: (1) supported by the record; and, (2) took place in circumstances in which a rational jury could conclude that Defendants subjected her to intentional discrimination based on her sex. The next question is whether these incidents, taken as a whole, were either severe or pervasive.

b.  Severe or Pervasive Discrimination.

To prevail on her hostile work environment claim, Piety Foley must show that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment . . . ." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (internal quotation marks omitted). "Severe" and "pervasive" harassment are two distinct types of hostile work environments. "[S]ome harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive." *Castleberry v. STI Grp.*, 863 F.3d 259, 264 (3d Cir. 2017).

"[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citation omitted) (internal quotation marks omitted).  Moreover, it is not enough that "the employee subjectively perceives [the work environment] as abusive or hostile[.]"  *Ullrich v. U.S. Sec'y of Veterans Affairs.*, 457 F. App'x 132, 140 (3d Cir. 2012) (not precedential) (citing *Harris*, 510 U.S. at 21).  The conduct must be severe or pervasive enough "to create an *objectively* hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive[.]"  *Harris*, 510 U.S. at 21-22 (emphasis added).

The Defendants contend that none of the conduct of which she complains is sufficiently severe and that the incidents of which she complains "are spread out over a span of more than 13 years, sometimes with years between claims."

Turning first to the question of whether the  events here, taken as a whole, constitute severe harassment. The Third Circuit has vindicated hostile work environment claims predicated on severe harassment only in cases involving substantially more serious misconduct, such as the use of racial slurs or sexual harassment and assault.  *See, e.g.*, *Starnes v. Butler Cnty. Ct. of Com. Pl., 50th Jud. Dist.*, 971 F.3d 416, 428 (3d Cir. 2020); *Moody*, 870 F.3d at 215; *Castleberry*, 863 F.3d at 265-66; *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 146-47 (3d Cir. 1999).  The events underlying Piety Foley's claim share little in common with these cases.  Indeed, many can only reasonably be treated as "isolated incidents" that are not "extremely serious" as "sufficient to sustain a hostile work environment claim."  *Caver*, 420 F.3d at 262 (quotation omitted).

Second, the events supported by the record are too spread out temporally to constitute pervasive harassment.  In cases alleging pervasive harassment, plaintiffs seek to remedy "the cumulative effect of a thousand cuts," and acts "which are not individually actionable" but "may

18

be aggregated to make out a . . . claim." *O'Connor v. City of Newark*, 440 F.3d 125, 127-28 (3d Cir. 2006). Such claims "must demonstrate a continuous period of harassment." *Drinkwater v. Union Carbide Corp.*, 904 F.22d 853, 863 (3d Cir. 1990). At the summary judgment stage, the plaintiff cannot rest on "general, unsubstantiated allegations that the alleged conduct occurred 'regularly' or 'all the time.'" *Nitkin*, 67 F.4th at 571.

Although Piety Foley's Department was far from a model workplace, a rational factfinder could not conclude that these incidents, which took place over the course of more than a decade, amounted to the sort of "steady barrage of opprobrious . . . comments" that characterize claims of pervasive harassment. *Al-Salem v. Bucks Cnty. Water & Sewer Auth.*, No. 97-6843, 1999 WL 167729, at *5 (E.D. Pa. Mar. 25, 1999) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110-11 (2d Cir. 1997)). Hostile work environment claims require discrimination to take place with far greater frequency to be sustained. *See, e.g.*, *Cardenas*, 269 F.3d at 258-59, 263 (holding that a rational factfinder could find a hostile work environment where, over the course of about three years, the plaintiff, a Hispanic man: (1) had been called "the boy from the *barrio*" and "an affirmative-action hire;" was asked "why he had anglicized his name" and "whether [he] intended to pull out a switchblade" to resolve workplace disagreements; (3) had his cubicle regularly defaced with "derogatory" messages, including one that called him a "wetback"; (4) had his performance ratings systematically lowered compared to his White colleagues'; and, (5) had been given "knowingly contradictory instructions and assignments incompatible with his staff resources" to damage his career); *Durham*, 166 F.3d at 145-46, 155 (affirming the finding of pervasive harassment where, within two years, the plaintiff, a female insurance agent: (1) was told that she "made too much money for a goddamn woman;" (2) was propositioned by her manager who "reminded her that he had the power to fire her if she did not behave as he wished;" (3) was

ignored at an awards dinner despite being the top salesperson; (4) was deprived of support resources that her male colleagues were given; (5) was "grabbed on the buttocks from behind;" (6) was assigned a "heavy load" of less lucrative accounts that she did not have experience handling; and, (7) had her office taken away along with the documents necessary to carry out her job).  Indeed, hostile work environment claims involving significantly more frequent instances of discrimination have been rejected.  *See, e.g.*, *Ali v. Woodbridge Twp. Sch. Dist.*, 957 F.3d 174, 182 (3d Cir. 2020) (holding that an Egyptian-American Muslim was not subjected to pervasive harassment when, over about a year, he was twice greeted as "Arabia Nights" and "Big Egypt," was asked if "they had computers in Egypt," and was called "Mufasa" in reference to the character from "The Lion King"); *Sherrod v. Phila. Gas Works*, 57 F. App'x 68, 7576 (3d Cir. 2003) (not precedential) (holding that two racist comments in six months did not constitute a hostile work environment).

In that a rational factfinder could not find that Piety Foley was subjected to severe or pervasive harassment, Defendants are entitled to summary judgment on her hostile work environment claims under Title VII and the PHRA.

### ii.  Hostile Work Environment – Title IX

To succeed on her hostile work environment claim brought under Title IX, Piety Foley must demonstrate: (1) a sexually hostile educational environment; (2) that she provided actual notice to "an appropriate person" who had the authority to pursue corrective measures; and, (3) that the institution's response to the abuse amounted to deliberate indifference.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291–92 (1998).  Piety Foley must establish "that she suffered intentional discrimination because of her sex, the discrimination was pervasive and regular, the discrimination detrimentally affected her, and the discrimination would have detrimentally affected a reasonable person of her sex in her position."  *Bennet v. Pa. Hosp. Sch. of Nurse*

*Anesthesia*, No. 01-CV-4098, 2002 WL 32341792, at *3 (E.D. Pa. Oct. 29, 2002) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)).  In short, with the exception of notice and deliberate indifference, "the operative elements" of a hostile work environment claim under Title VII and Title IX are "essentially the same." *Colavecchia v. S. Side Area Sch. Dist.*, No. 2:22-CV-01804, 2023 WL 3034777, at *4 (W.D. Pa. Apr. 21, 2023).  Accordingly, for the reasons set forth above, Piety Foley has likewise failed to present sufficient evidence in support of her hostile work environment claim under Title IX.

### B.    Title VII and PHRA Retaliation

To establish a *prima facie* case of retaliation under Title VII, Piety Foley must "tender evidence that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 341-40 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). If Piety Foley establishes a *prima facie* case of retaliation, the *McDonnell Douglas* burden-shifting framework requires the Defendants to provide a legitimate non-retaliatory reason for its conduct. *Id.* at 340–41.  If the Defendants carry this burden, Piety Foley must "convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* at 342.  "The onus is on [Piety Foley] to establish causation at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case, and at the final stage of the *McDonnell Douglas* framework to satisfy her ultimate burden of persuasion by proving pretext." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).

Although the briefing on Piety Foley's claim of retaliation is muddled, it appears that the

parties dispute: (1) whether any of the retaliatory actions of which she complains are materially adverse; and, (2) whether Piety Foley has established a causal connection between those actions and her protected activity.

Piety Foley argues that the following actions were retaliation for having filed her first OED complaint in May 2020: (1) Kurtz and Amato scheduling her to teach a 400-level course on Kierkegaard in the term immediately following the Kierkegaard course taught by Stacy Ake; (2) Kurtz and Amato scheduling her to teach a 200-level course after she refused to teach the 400-level course on Kierkegaard; (3) Amato scheduling her and Catudal to teach courses on the dialogues of Plato during the same semester; (4) that she was the last professor in the department to receive a computer upgrade; (5) Kurtz ignoring her requests to discuss the effects of the COVID-19 pandemic on women in higher education; (6) Catudal sending an email to all philosophy faculty that Piety Foley interpreted as "disparaging" her teaching; (7) Amato refusing to reschedule an event for philosophy majors after she asked him to do so; (8) Kurtz appointing a different professor to a committee even though she had volunteered for the position; (9) Kurtz not specifying in her 2020 annual review that one of the courses she taught was new and stated that she was an "active scholar" rather than that she exceeded the number of publications necessary to be an "active scholar"; (10) Catudal heckling her during a talk she gave on tenure and promotion, and Kurtz asking to view the recording of the talk; (12) Kurtz turning down the opportunity to house the Religious Studies Program in the Department; and, (13) Kurtz demanding that she retract her OED complaint against him.

Many of these issues remain allegations not supported by record evidence: Piety Foley cites to her complaint but nothing more. Her allegation that Kurtz ignored her requests to discuss the effects of the COVID-19 pandemic on women in higher education; her allegation that Catudal

heckled her during a talk she gave on tenure and promotion; her allegation that Kurtz asked to view the recording of that talk to intimidate her; and her allegation that Kurtz demanded she rescind her OED complaint against him are all improperly supported.  Similarly, her claim that Kurtz conspired with Catudal to appoint another professor to serve on the bylaws committee is supported only by citations to her complaint and her own speculative deposition testimony.

Other complained-of actions were not in the control of the Defendants.  The fact that the Religious Studies Program did not merge into the philosophy Department was a "dean-level decision" not a decision made by Kurtz.  That Piety Foley purportedly received her computer upgrade late has nothing to do with Kurtz (or any other professor in the Department) because the process of upgrading the faculty computers was under the control of Drexel's IT Department.  And the only "evidence" Piety Foley has submitted that the delayed computer upgrade was retaliatory or rooted in discriminatory animus is her own conjecture:

> Q. Do you have any information or knowledge – do you actually know of Doctor Kurtz putting you on some kind of low-priority list with respect to your computer upgrade?
>
> A. Epistemology, which is the study of knowledge, is one of my specializations. The only thing you can know with certainty [are] mathematical truths.  Everything else is probabilistic.  . . . I cannot prove that that's the case . . . . I have the pattern that suggests that that might have been the case.

But her speculation is unsupported by the record evidence: she did not immediately receive her upgraded computer because the supplying company did not initially ship the full quantity of the requested computers, and Piety Foley's specified model and color was not included in the initial shipment.

As for the remaining concerns raised by Piety Foley—that Kurtz and Amato scheduled Piety Foley to teach a 400-level course on Kierkegaard in the term immediately following the Kierkegaard course taught by Stacy Ake; that Kurtz and Amato scheduled Piety Foley to teach a

200-level course after she refused to teach the 400-level course on Kierkegaard; that Amato scheduled Piety Foley and Catudal to teach courses on the dialogues of Plato during the same semester; that Catudal sent an email to all philosophy faculty that Piety Foley interpreted as "disparaging" her teaching; that Amato refused to reschedule an event for philosophy majors after Piety Foley asked him to do so; and, that Kurtz did not specify in Piety Foley's 2020 annual review that one of the courses she taught was new and stated that she was an "active scholar" rather than that she exceeded the number of publications necessary to be an "active scholar"—Piety Foley must show that "a reasonable employee would have found [the alleged conduct] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 195 (3d Cir. 2015) (internal quotation marks and citation omitted). None of these allegations describe materially adverse employment actions—Piety Foley has not established that this conduct resulted in any economic loss, change to the terms of her employment, or really any injury or harm beyond feelings of insult, annoyance, or frustration. *See Morrison v. Carpenter Tech. Corp.*, 193 Fed. App'x 148, 154 (3d Cir. 2006) (not precedential); *Lecadre v. Att'y Gen. of Pa.*, No. 23-2898, 2024 WL 2763829, at *3 (3d Cir. May 30, 2024) (finding "satisfactory" rating in performance review not adverse employment action); *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003) (declining to find adverse actions where the "alleged retaliatory acts were criticism, false accusations or verbal reprimands."). The Court must "remain mindful that it is important to separate significant from trivial harms because an employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N.*, 548 U.S. at 68. Thus, even with all reasonable inferences drawn in favor of Piety Foley, a rational jury could not conclude

that she has established a *prima facie* case of retaliation against the Defendants.[15]

### C.    Equal Pay Act

To prevail on her claim under the Equal Pay Act, Piety Foley must "first establish a prima facia case by demonstrating that employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort, and responsibility, under similar working conditions." *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000) (quoting *E.E.O.C. v. Del. Dep't of Health and Soc. Servs.*, 865 F.2d 1408, 1413-14 (3d Cir. 1989)).

If she so succeeds, then the Defendants must "demonstrate the applicability of one of the four affirmative defenses specified in the Act." *Id.* ("The Equal Pay Act prohibits differential pay for men and women when performing work 'except where such payment *is made pursuant to*' one of the four affirmative defenses.  We read the highlighted language of the statute as requiring that the employer submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity.") (internal citation omitted).  These four defenses are: "(i) a bona fide seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex." *Frintner v. TruePosition*, 892 F. Supp.2d 699, 708 (E.D. Pa. 2012) (citing 29 U.S.C. § 206(d)(1); *Stanziale*, 200 F.3d at 107 n.6).  Because the Defendants would bear the burden of proof at trial as to these affirmative defenses, here they must "prove at least one affirmative defense 'so clearly that no

---

[15] To establish a *prima facie* case of retaliation under Title IX, Piety Foley must "prove she engaged in activity protected by Title IX, she suffered an adverse action, and there was a causal connection between the two."  *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017) (citing *Moore*, 461 F.3d at 340-42).  Courts in the Third Circuit "apply the same standard for a retaliation claim whether raised under Title VII, Title IX, or the PHRA." *Williams v. Pennridge Sch. Dist.*, 782 Fed. App'x 120, 125 (3d Cir. 2019) (not precedential) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997)).  Thus, for the same reasons provided, Defendants' motion for summary judgment on Piety Foley's Title IX claim will be granted.

rational jury could find to the contrary.'" *Id.* at 107 (quoting *Del. Depot of Health*, 865 F.2d 1408, 1414 (3d Cir. 1989).

The Defendants argue that Piety Foley's claim falters at the jump because there is no wage disparity. She, they say, was the highest-paid and highest-ranking member of the Philosophy program at the time she filed this lawsuit. The second highest paid member of the Philosophy program is Flavia Padovani, who is also female.[16] Piety Foley counters by pointing out that from 2018 through 2021, Catudal—who is a "lower-ranking" male professor—was paid more than she was. When asked about this discrepancy, Drexel's 30(b)(6) witness explained that Catudal started working at Drexel 20 years prior to Piety Foley's arrival and had served in several administrative roles, including Department Head and Vice Provost: Thus, Catudal would have received annual raises in the form or either cost of living increases or merit increases for those additional 20 years, and he would have received a salary bump for his work as Department Head and Vice Provost— as contrasted with Piety Foley who has not served in any administrative capacity associated with an increase in salary. Although these factors *could* explain the wage disparity, even the Defendants recognize that there is not sufficient evidence in the record to establish that these facts do *in fact* explain the wage disparity. As Kurtz, testifying in his capacity as a Rule 30(b)(6) witness stated: "[T]hat would *possibly* be another reason for the discrepancy here." Thus, there is a disputed issue of material fact as to whether that reason may be gender and Piety Foley's Equal Pay Act claim must go to trial.

---

[16] Piety Foley argues that the salary charts provided by the Defendants are hearsay documents that cannot be used at summary judgment. The Defendants counter, with citation to *United States v. Bansal*, 663 F.3d 634, 667 (3d Cir. 2011), that the salary charts would be admissible at trial under Federal Rule of Evidence 1006, which permits the use of a summary of voluminous records that are otherwise admissible. Such explanation is sufficient under *Fraternal Order*, 842 F.3d at 238, for the Court to consider these records at summary judgment.

## IV.     CONCLUSION

For the reasons set forth above, the Defendants' Motion will be granted as to Piety Foley's Title VII, Title IX, and PHRA hostile work environment and retaliation claims,[17] and summary judgment will be denied as to Piety Foley's claim under the Equal Pay Act.

An appropriate order follows.

**BY THE COURT:**

*/s/Wendy Beetlestone, J.*

_____

**WENDY BEETLESTONE, J**

---

[17] "[I]ndividual employees cannot be held liable [under the PHRA] if the employer is not liable for a discriminatory practice." *Deans v. Kennedy House, Inc.*, 998 F. Supp. 2d 393, 414 n.20 (E.D. Pa. 2014), *aff'd*, 587 F. App'x 731 (3d Cir. 2014).