# EXHIBIT A

1
                IN THE UNITED STATES DISTRICT COURT
2              FOR THE EASTERN DISTRICT OF PENNSYLVANIA
                            -   -   -
3
   MARILYN GAYE PIETY FOLEY          :   CIVIL ACTION NO.
4                                    :   22-1777
        v.                           :
5                                    :   JURY TRIAL
   DREXEL UNIVERSITY                 :   DAY ONE
6                                    :
                                     :
7  _____

8                                    James A. Byrne U.S. Courthouse
                                     601 Market Street
9                                    Philadelphia, PA 19106
                                     January 27, 2025
10                                   Commencing at 9:00
   _____
11
                BEFORE THE HONORABLE WENDY BEETLESTONE
12                             AND JURY
        _____
13

14 APPEARANCES:

15 FOR THE                JOHN F. FOLEY, III
   PLAINTIFF:             BY:  J.F. FOLEY, P.C., ESQUIRE
16                        14 LYNDE STREET
                          SALEM, MA 01970
17

18                               -   -   -
19
                        Kim L. Haley, CRR, RPR
20                      Official Court Reporter
                   Kim_Haley@paed.uscourts.gov
21

22 Proceedings taken stenographically and prepared utilizing
   computer-aided transcription
23

24

25

                    *United States District Court*

```
 1   APPEARANCES CONTINUED:

 2
     FOR THE              THE TUCKER LAW GROUP
 3   DEFENDANT:           BY:  LESLIE MILLER GREENSPAN,
                          ESQUIRE
 4                        Two Penn Center
                          Suite 2500
 5                        801 Market Street
                          Philadelphia, PA 19103
 6

 7

 8

 9                              -  -  -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
            1              (THE DEPUTY CLERK OPENS COURT)
09:05:13    2              THE COURT:  Good morning.  Have a seat.
09:05:17    3              This is Foley versus Drexel University, 22-01777.  I
09:05:24    4   understand that the parties have some things that they want to
09:05:27    5   put on the record.  If we could first just introduce the
09:05:31    6   parties and the folks here in the courtroom.
09:05:34    7              MR. FOLEY:  My name is Brian Foley.  I am attorney for
09:05:37    8   the plaintiff Marilyn Gaye Piety Foley who will go by her
09:05:44    9   professional name MG Piety, Marilyn Piety, Professor Piety.
09:05:51   10              MS. FOLEY:  I am the plaintiff, Marilyn Gaye Piety
09:05:55   11   Foley.
09:05:56   12              THE COURT:  Thank you.
09:05:57   13              MS. GREENSPAN:  Good morning, Your Honor.  Leslie
09:05:59   14   Greenspan on behalf of the defendant, Drexel University.  I
09:06:02   15   will let my team introduce themselves.
09:06:05   16              MR. KURTZ:  Roger Kurtz.  John Roger Kurtz.  I go by
09:06:10   17   Roger.  And I am a professor of English and head of the
09:06:13   18   department of English and Philosophy at Drexel University.
09:06:13   19              THE COURT:  Thank you.
09:06:19   20              MR. LEE:  Good morning, Your Honor. JuHwon Lee.  I'm
09:06:19   21   associate general counsel of Drexel University and chief of
09:06:20   22   litigation fund.  I'm here with the client.
09:06:25   23              THE COURT:  Great.  Thank you very much.
09:06:27   24              MS. LOPEZ:  Good morning.  My name is Holly Lopez.  I
09:06:30   25   am Ms. Greenspan's paralegal.
```

*United States District Court*

| 09:06:30 | 1 | THE COURT: Okay. What is it that we want to put on |
| 09:06:30 | 2 | the record? |
| 09:06:30 | 3 | Here is our court reporter. |
| 09:06:30 | 4 | THE COURT REPORTER: Kim Haley. |
| 09:06:39 | 5 | MS. GREENSPAN: Your Honor, would you prefer that I be |
| 09:06:42 | 6 | at the podium? |
| 09:06:43 | 7 | THE COURT: Wherever you want to be right now. |
| 09:06:43 | 8 | MS. GREENSPAN: Your Honor, with respect to the |
| 09:06:46 | 9 | verdict sheet, we except the verdict sheet that the Court |
| 09:06:49 | 10 | provided at the final pretrial conference on Friday. |
| 09:06:53 | 11 | We just would like to make a record on just a few |
| 09:06:56 | 12 | points of it. |
| 09:06:57 | 13 | We object specifically to -- again, just for purposes |
| 09:07:01 | 14 | of the record, in question number two the Court directing the |
| 09:07:06 | 15 | jury that they must select at least one person as a comparator, |
| 09:07:14 | 16 | we accept the Court's decision to enter judgment on liability |
| 09:07:17 | 17 | from September 23rd, 2024. But I note for the record that |
| 09:07:23 | 18 | there was no trial at that time. There was no actual finding |
| 09:07:29 | 19 | of violation other than as a sanction. It was a sanction that |
| 09:07:34 | 20 | Your Honor entered. |
| 09:07:36 | 21 | We have made a record of our objections of that entry |
| 09:07:39 | 22 | of judgment in our two motions for reconsideration which were |
| 09:07:43 | 23 | filed on September 30th, 2024, and January 14th, 2025. Those |
| 09:07:48 | 24 | are docket entries 225 and 236. |
| 09:07:54 | 25 | By the Court instructing the jury that they must |

09:07:57 1 select at least one male comparator on the verdict sheet and in
09:08:01 2 the jury charges it -- we submit it remains the province of the
09:08:07 3 jury that it creates a fiction that there was a trial, that
09:08:10 4 there was a factual finding, that the plaintiff had established
09:08:14 5 her case by proving that there was at least one male comparator
09:08:18 6 for equal pay purposes.

09:08:21 7 We submit the jury should be able to decide that there
09:08:24 8 are no comparators and that plaintiff is entitled to no
09:08:28 9 damages.

09:08:29 10 To the extent Drexel agrees to the verdict sheet, jury
09:08:34 11 instructions, or any of the other documents in this case, we
09:08:37 12 just want to make clear for the record, behind the scenes,
09:08:41 13 obviously not in front of the jury, that this should not be
09:08:44 14 construed as any sort of admission, concession or waiver of our
09:08:49 15 challenge of the Court's entry of the judgment on liability.

09:08:54 16 Your Honor, I also just want to revisit very briefly
09:08:59 17 if I may --

09:08:59 18 THE COURT: Let me talk about that one first. You can
09:08:59 19 go to the next one later.

09:09:03 20 I am very concerned, Miss Greenspan, that you have not
09:09:06 21 been adequately explaining to your clients what exactly
09:09:09 22 happened prior to -- you can have a seat if you wish -- prior
09:09:13 23 to the sanction.

09:09:14 24 The sanction was because there were numerous discovery
09:09:20 25 defalcations on specific issues by your clients -- the sanction

*United States District Court*

09:09:24  1  was that liability was found against your client.

09:09:29  2          And as I told you in the final pretrial, there was a
09:09:33  3  liability determination.  Understand that.  There was a
09:09:37  4  liability determination.

09:09:40  5          What that means, if you look at the requirements for
09:09:45  6  proving the Equal Protection -- the Equal Pay Act claim, you
09:09:51  7  have to have an employee of the opposite sex, they were paid
09:09:54  8  differently for performing equal work of substantially equal
09:09:58  9  skill effort and responsibility under similar working
09:10:03  10  conditions.

09:10:03  11         That was proved.  That is what the sanction is.  The
09:10:07  12  sanction wasn't wrap on the knuckles you naughty defendants.
09:10:07  13  It was that is a sanction and that has been proved.

09:10:17  14         And I say this to you because perhaps Miss Greenspan
09:10:21  15  has not been clearly stating what I said and how judicial anger
09:10:29  16  is different than general anger.

09:10:34  17         But it was because of your actions, your being the
09:10:39  18  defendant's actions in the discovery defalcations that that
09:10:46  19  determination was made.

09:10:47  20         In addition, because liability has available to it in
09:10:51  21  this context affirmative defenses, the finding of liability was
09:10:58  22  also a determination that those affirmative defenses, had they
09:11:04  23  been put on, are no longer available, so therefore it is no
09:11:09  24  longer available to Drexel to claim that the differential was
09:11:15  25  because of a bona fide seniority system, because of a merit

09:11:20   1   system, because of a system which measures earnings by quantity

09:11:26   2   or quality of production or differential based on any other

09:11:27   3   factor other than sex.

09:11:29   4        That is what I told the parties on Friday. And I had

09:11:32   5   thought that Miss Greenspan understood it. And she said that

09:11:36   6   she's saying it for the record but what she is saying on the

09:11:39   7   record is not what has happened in this case.

09:11:42   8        We went further during the final pretrial conference

09:11:48   9   to discuss what that meant for the comparator issue and also

09:11:55   10  for the willful issue. And I determined that there was room to

09:12:01   11  argue that comparator information should be available, one for

09:12:07   12  damages and one also for the willful determination.

09:12:12   13       With respect to damages, I assumed, obviously I do not

09:12:15   14  know because I haven't seen the evidence, that there were

09:12:19   15  differentials between the various comparators that had been

09:12:24   16  identified. And those comparators were Catudal, Astro, Kurtz,

09:12:31   17  Porter, Smith, Warnock and Greenberg.

09:12:32   18       The argument that Miss Greenspan made was that there

09:12:37   19  was some information with respect to those differentials that

09:12:40   20  would go to willfulness and also to damages. I accepted that.

09:12:44   21  So that is why we are having testimony with respect to those

09:12:50   22  individuals at trial, only for the willfulness issue and only

09:12:56   23  because those differentials may play into the willfulness

09:13:01   24  issues, not because there may be an issue that none of them are

09:13:07   25  comparators.

09:13:08    1         As I said earlier, the liability determination that

09:13:11    2    was a sanction on Drexel for failing to abide by I think it was

09:13:17    3    3 judicial orders precluded any determination that there was --

09:13:24    4    that there were no comparators.

09:13:27    5         There is at least one comparator.  The question here,

09:13:31    6    at least goes to damages, and I don't know how you worked it

09:13:35    7    out over the weekend, but that is the purpose of the testimony.

09:13:38    8         So I hope -- we will get to the witness that you told

09:13:42    9    me may not be here.  I hope that these defalcations of Drexel

09:13:46   10    does not continue throughout this trial.

09:13:49   11         I cannot tell you how astonished I have been at some

09:13:53   12    of the positions that Miss Greenspan has taken.

09:13:56   13         And I'm assuming she has taken them because in-house

09:14:00   14    counsel or someone else at Drexel has told her to do that.

09:14:04   15         What's next?

09:14:05   16         MS. GREENSPAN:  Your Honor, again I am not here to the

09:14:09   17    relitigate or challenge that.

09:14:11   18         THE COURT:  We're over it.  We're done with that.

09:14:13   19    Move on.

09:14:14   20         MS. GREENSPAN:  With respect to what Your Honor just

09:14:16   21    read about what the finding is, I just want to make sure that

09:14:21   22    when plaintiff's counsel describes to the jury what that

09:14:26   23    finding was, that it's consistent with what Your Honor just

09:14:29   24    read from the joint statement of the case.

09:14:32   25         THE COURT:  So what are you trying to do by telling me

*United States District Court*

09:14:37    1    that now?  He's going to do it and then if he does, you are

09:14:38    2    going to object.  Why are we talking about it?

09:14:39    3         MS. GREENSPAN:  Because I'm trying to prevent him

09:14:42    4    from --

09:14:42    5         THE COURT:  We're not doing preventative stuff here.

09:14:42    6    You're telling me what you want to do.  Move on.  What next?

09:14:49    7         MS. GREENSPAN:  Your Honor, with respect to the

09:14:51    8    finding of the Court on Friday, the determination about the

09:14:55    9    dispute over discovery issues and whether they can or cannot

09:15:00   10    come in, we understand the Court's ruling on those issues, we

09:15:04   11    just want to make sure that when plaintiff's counsel presents

09:15:08   12    them to the jury that they do not go farther than what this

09:15:13   13    Court --

09:15:14   14         THE COURT:  You're doing it again.  We have the final

09:15:16   15    pretrial.  Plaintiff's counsel was in the wrong.  You were in

09:15:20   16    the wrong.

09:15:21   17         Is there anything that you want to put on the record

09:15:23   18    that is a stipulation between the two parties or agreed between

09:15:28   19    the two parties?  If he oversteps his boundary, you're going to

09:15:31   20    object and I am going to make a ruling.  What next?

09:15:34   21         MS. GREENSPAN:  That's all I have, Your Honor.  Thank

09:15:37   22    you.

09:15:37   23         THE COURT:  Anything from you?

09:15:39   24         MR. FOLEY:  Yes, Your Honor.  I just wanted to -- and

09:15:42   25    it may not be something for the record.  Maybe it's

09:15:45  1  housekeeping.  But I did want to just be clear as to how I will

09:15:50  2  refer to what happened on September 23rd.

09:15:54  3       Can I call at trial there was a finding of liability

09:15:57  4  against Drexel for violating the Equal Pay Act?

09:16:00  5       THE COURT:  You know what, you know what -- you have

09:16:02  6  been in the room.  You're going to do what you're going to do.

09:16:07  7  You're going to do it within the parameters.  If you don't

09:16:09  8  understand what I have said over on Friday and before the last

09:16:17  9  effort of the trial, that's not my concern.

09:16:21  10       I expect you both -- unfortunately, you know, I may

09:16:24  11  not be able to expect you both.  I expect you to both be able

09:16:28  12  to behave like officers of the Court.  I am not babysitting

09:16:33  13  you.  This is not a babysitting function.  Understood?

09:16:37  14       MR. FOLEY:  Understood, Your Honor.

09:16:38  15       THE COURT:  Now can we talk about issues that we

09:16:40  16  talked about on Friday that we do need to make a determination

09:16:44  17  about.

09:16:44  18       MR. FOLEY:  Yes, Your Honor.

09:16:45  19       THE COURT:  With respect to the calculation damages,

09:16:49  20  there was some thought that I would do the calculation of

09:16:53  21  damages, not the jury.

09:16:55  22       Do the parties agree that I am going to do the

09:16:57  23  calculation damages?

09:16:58  24       MR. FOLEY:  Yes, Your Honor.

09:16:59  25       MS. GREENSPAN:  Yes, we do, Your Honor.

*United States District Court*

09:17:01    1          THE COURT:  Have you stipulated how that would occur?

09:17:05    2          MS. GREENSPAN:  We have conferred with one another.

09:17:09    3  We have a chart.  What I believe we envision, Your Honor, is

09:17:16    4  that once the jury decides who the comparators are, that

09:17:19    5  counsel and I will put our heads together to provide the Court

09:17:22    6  with those numbers.

09:17:25    7          THE COURT:  We are about to go into the trial.  If you

09:17:28    8  have not agreed how that's going to happen, what will happen at

09:17:32    9  the end of the trial is that there will be some discussion,

09:17:37   10  right, we are working on charts, you told me that you would

09:17:42   11  have completed that working.

09:17:44   12         I need you to put on the record now what that method

09:17:48   13  of calculation is.

09:17:49   14         MS. GREENSPAN:  Your Honor, the only open question --

09:17:51   15  the only reason it's not as simple as just handing you a piece

09:17:55   16  of paper is because we do not yet know if the jury is going to

09:17:59   17  select one person or if they're going to select multiple

09:17:59   18  people.

09:18:02   19         If they select multiple people, then we will average

09:18:06   20  those individual's salaries.

09:18:07   21         THE COURT:  What I'm asking for -- I am not asking for

09:18:10   22  a number.  I'm asking for a process.  And you have been

09:18:13   23  calculating or figuring out that process.

09:18:15   24         Before I bring in that jury and before I select that

09:18:19   25  jury and before we select this case you are going to put on the

09:18:22   1   record how I calculate those damages.  Because if you do not,

09:18:26   2   then you're going to start fighting after, and I am not I am

09:18:31   3   not interested in that.

09:18:33   4        You have been working very closely in trying to figure

09:18:36   5   out a process.  When I leave the bench you're going to figure

09:18:40   6   out that process and you are going to put that exact process on

09:18:44   7   the record.

09:18:44   8        And if you can give me a printed version of that exact

09:18:48   9   process, all the better.  Because I am not going to engage in

09:18:52   10  bickering over how that process works, once the jury comes in

09:18:57   11  with a verdict that is obviously against one or the other of

09:19:00   12  you.  Understood?

09:19:01   13       MS. GREENSPAN:  Yes, Your Honor.

09:19:02   14       MR. FOLEY:  Yes, Your Honor.

09:19:03   15       THE COURT:  What about the witness that was subpoenaed

09:19:05   16  and Drexel had told me was on vacation, what is going on with

09:19:10   17  that person?

09:19:10   18       MR. FOLEY:  Your Honor, I agreed to inject

09:19:17   19  collegiality into the case, to let her testify via zoom today

09:19:20   20  with the requirement that Drexel setup the zoom connection and

09:19:25   21  take care of that technology.

09:19:28   22       THE COURT:  I think it's -- I think we neat to involve

09:19:32   23  our IT folks so when Nelson comes in we will make that happen.

09:19:36   24       When is that going to happen?

09:19:37   25       MR. FOLEY:  I am going to put her on first.  So I hope

*United States District Court*

09:19:41   1   that will happen soon.

09:19:44   2         THE COURT: Anything else?

09:19:46   3         MS. GREENSPAN: No, Your Honor.

09:19:49   4         THE COURT: Call me or get Nelson to call me when you

09:19:52   5   figure out that process.

09:19:54   6         MS. GREENSPAN: Thank you, Your Honor.

09:19:55   7         MR. FOLEY: Thank you, Your Honor.

09:26:10   8     (Brief recess)

09:58:10   9         THE COURT: I understand that there has been an

09:58:13  10   agreement on the method of calculation.

09:58:15  11         MR. FOLEY: Yes, Your Honor.

09:58:15  12         THE COURT: Okay. I have an e-mail. Why don't you --

09:58:19  13   I'm looking at the e-mail. I'm not sure I understand it fully.

09:58:23  14   So why don't you put it on the record. One of you can do it

09:58:26  15   and the other one can respond whether that is in fact what you

09:58:31  16   are doing.

09:58:32  17         MR. FOLEY: Okay. Should I read the e-mail or just

09:58:44  18   explain it?

09:58:45  19         THE COURT: Well, I think you need to tell -- from

09:58:47  20   looking at this are you looking at averages? You need to give

09:58:52  21   me some context because the numbers alone don't help me. Just

09:58:56  22   give me the high level process and then we'll dive into what

09:59:01  23   you put down here.

09:59:02  24         MR. FOLEY: Okay. Your Honor, we're assuming for the

09:59:06  25   sake of this calculation that we will be averaging comparators.

*United States District Court*

09:59:10  1  So we understand Your Honor's interest in the issue, which I
09:59:16  2  share, of having the highest comparator be the sole comparator
09:59:22  3  that we will brief that.
09:59:22  4       THE COURT:  Okay.  So let me make sure I've got this
09:59:28  5  right.  In specific periods, and we are going to discuss what
09:59:32  6  those specific periods are, you're going to take all the people
09:59:38  7  that the jury has determined are appropriate comparators and
09:59:43  8  you are going to take their salary and average it out and
09:59:50  9  compare it to the plaintiff's salary, and the differential will
09:59:54  10  be the damages, which will obviously change, with respect to
10:00:01  11  whether the jury has decided willfulness or non-willfulness.
10:00:06  12       MR. FOLEY:  Yes, Your Honor.
10:00:07  13       And the willfulness really reflects the period.  So if
10:00:15  14  I'm willful we would have one discrete period of time from May
10:00:20  15  9th 2019 through August 31st 2019, which is the until Mark
10:00:26  16  Greenburg, if he's a comparator, retired, or left the
10:00:31  17  department.  And then it would pick up from September 1, 2019
10:00:35  18  all the way to August 31, 2021, when Catudal out, if he is a
10:00:43  19  comparator, retired.  And then it would pick up from September
10:00:48  20  1, 2021 up until August 31, 2023, because that's the time Smith
10:00:59  21  on September 1, if he is a comparator, got a promotion or a
10:01:04  22  raise, and then the final time period would be September 1,
10:01:09  23  2023 up until the verdict.
10:01:12  24       THE COURT:  Up to the verdict.  I see.
10:01:14  25       MR. FOLEY:  Correct.

*United States District Court*

10:01:15  1          THE COURT:  I was reading that September 1, 2023 was

10:01:18  2   the verdict.

10:01:19  3          Okay.  So why is non-willful different?

10:01:22  4          MR. FOLEY:  So non-willful is different because

10:01:24  5   Greenburg is out of the picture.  Greenburg was -- Greenburg

10:01:29  6   was not working with Professor Piety in the department before

10:01:35  7   -- he was not working with her after May 9th 2020 which is the

10:01:42  8   two years before the filing of the lawsuit.

10:01:44  9          So Greenburg is out of the picture so the --

10:01:48  10         THE COURT:  Hold on.  So Greenburg is the only person

10:01:51  11  who would be -- in that list of comparators who was there May

10:01:57  12  9th 2019 through May 9th 2020?  Are you saying there are no

10:02:03  13  comparators in that time period prior to May 9th 2020?

10:02:07  14         MR. FOLEY:  Oh, no, Your Honor.  May 9th 2020 -- I

10:02:11  15  just thought it came out a little bit differently because May

10:02:18  16  9th 2020, all of the comparators other than Greenburg, and

10:02:25  17  other than Smith, because he's not yet promoted, are working in

10:02:29  18  the department.  It would be, if chosen as comparators, working

10:02:34  19  with -- would be averaged if we do averaging and compared to

10:02:38  20  Piety.

10:02:39  21         THE COURT:  Wait a minute.  So stop.

10:02:41  22         You don't have anyone in the non-willful category from

10:02:46  23  May 9th 2019 through May 9th 2020.  So are you telling me there

10:02:53  24  will be no calculation in that time period?  Because right now

10:02:56  25  there's none listed under the nonwillful.

*United States District Court*

10:02:59　　1　　　　MR. FOLEY:  No, Your Honor.  Every single comparator

10:03:03　　2　except Smith would be included in the willful period up until

10:03:11　　3　August 31, 2019.

10:03:13　　4　　　　THE COURT:  I am talking about the non-willful right

10:03:16　　5　now.

10:03:16　　6　　　　MR. FOLEY:  The non-willful would be everybody but

10:03:19　　7　Greenburg until Catudal retires if he's there.

10:03:25　　8　　　　THE COURT:  So let me just make this clear for the

10:03:27　　9　record.  Although on this e-mail you have not got anyone listed

10:03:31　10　on the non-willful category from May 9th 2020, what you're

10:03:35　11　saying is that everybody who was working in the department

10:03:37　12　would be included and identified by the jury as a comparator

10:03:42　13　would be included in that calculation that time period.

10:03:45　14　　　　MR. FOLEY:  Yes.

10:03:46　15　　　　THE COURT:  Is that right?

10:03:47　16　　　　MS. GREENSPAN:  Yes.  So long as they overlap with

10:03:49　17　plaintiff.  We're trying to compare apples to apples so it's

10:03:53　18　all the time period that were to overlap with plaintiff her.

10:03:56　19　　　　THE COURT:  So I need you to update this e-mail.  You

10:03:59　20　need to tell me what's going on on that May 9th 2019 through

10:04:06　21　May 9th 2020 non-willful time period because otherwise I don't

10:04:09　22　have anything there.

10:04:09　23　　　　You're telling me that everyone who was there who is

10:04:11　24　the jury determines as a comparator would be a part of that

10:04:14　25　calculation, right?

*United States District Court*

10:04:15    1           MR. FOLEY:  Yes.  I'm sorry.  It's my fault.  I'm

10:04:18    2    confuse in the sense that I think the non-willful time period

10:04:21    3    just starts on May 9th 020 so there would be -- nothing is

10:04:28    4    relevant before that.

10:04:29    5           THE COURT:  And why is that?

10:04:30    6           MR. FOLEY:  Just because that's two years before the

10:04:33    7    filing of the lawsuit.

10:04:34    8           THE COURT:  And that is the statute of limitations

10:04:37    9    with respect to non-willful?

10:04:38   10           MR. FOLEY:  Yes, Your Honor.

10:04:39   11           THE COURT:  And there is a different state of

10:04:41   12    limitations with respect to willful?

10:04:43   13           MR. FOLEY:  Yes, Your Honor.  Which is going back

10:04:43   14    three years.

10:04:43   15           THE COURT:  That's what I need to have for the record.

10:04:46   16           MR. FOLEY:  Yes, Your Honor.

10:04:47   17           THE COURT:  So then have you gone through everyone at

10:04:49   18    this point you got on the record.

10:04:51   19           MR. FOLEY:  I believe we have.  And I added to this

10:04:54   20    just an example at the end if just Richard Astro were chosen as

10:05:00   21    the comparator -- this is very simple.  He's worked in the

10:05:04   22    department the entire time as Miss Piety.  So from willful it

10:05:08   23    would be comparing Richard Astro's salary from May 9th 2019 up

10:05:15   24    to the verdict, differential with Piety.  And then if it's

10:05:20   25    non-willful, it would be comparing his salary alone from May

*United States District Court*

10:05:24  1  9th 2020 to the verdict to Piety's.

10:05:26  2          THE COURT:  Okay.  There's also, as I understand it,

10:05:29  3  some question about base salary and administrative supplements.

10:05:35  4          MR. FOLEY:  Yes, Your Honor.

10:05:35  5          THE COURT:  How are you dealing with that in terms of

10:05:38  6  the calculation?

10:05:39  7          MR. FOLEY:  Your Honor, our view is the base

10:05:42  8  salaries -- in our understanding we only find out about them

10:05:45  9  after the verdict.  But the -- we only found out about the

10:05:49  10  supplements after the verdict, but the base --

10:05:51  11          THE COURT:  After the verdict?

10:05:52  12          MR. FOLEY:  Yes.  After the judgment.  I'm sorry,

10:05:55  13  Your Honor.

10:05:56  14          THE COURT:  You mean the judgment in which I found

10:05:59  15  liability against the defendants?

10:06:00  16          MR. FOLEY:  Yes, Your Honor.  Up until then we did not

10:06:02  17  know that there were any administrative supplements.  But after

10:06:06  18  that now we know that there is a base salary for every

10:06:11  19  professor that we assume that is for the professor's work as a

10:06:14  20  professor in the department, and if the professor serves as,

10:06:18  21  for example, a dean or director of a writing program or

10:06:23  22  Department Head, as Dr. Kurtz here does, they get an additional

10:06:29  23  supplement for that, and we received charts after the judgment

10:06:33  24  of liability that gave those additional break-outs of

10:06:40  25  administrative supplements.

*United States District Court*

10:06:42    1      So the salaries that we had before only -- we didn't

10:06:47    2  know this, but they only covered the base salary of the

10:06:51    3  professors.

10:06:52    4      THE COURT:  So my question was much simpler than

10:06:56    5  required that answer.

10:06:57    6      It's just are you going to use the base salary or are

10:07:01    7  you going to include the administrative supplements?  At

10:07:02    8  misdemeanor or the have if supplements.

10:07:03    9      MR. FOLEY:  We were only using the base salary for the

10:07:06   10  comparisons with Piety because Piety did not have any

10:07:09   11  administrative job or supplement.

10:07:11   12      THE COURT:  What about Catudal who had that

10:07:13   13  administrative supplement but I think that initially there was

10:07:15   14  not an understanding that he had it?  And I thought that he

10:07:19   15  continued to have it after he stepped down from his

10:07:21   16  administrative position.

10:07:23   17      MR. FOLEY:  That is an interesting issue, Your Honor,

10:07:25   18  because his salary does not -- his salary on the chart does not

10:07:31   19  have any administrative supplement.  And when I took deposition

10:07:36   20  of Drexel itself and asked if his prior work 20 years earlier

10:07:43   21  as provost had an effect on the salary that we were presented

10:07:47   22  of him, the answer was, hey, I don't know.

10:07:51   23      THE COURT:  Okay.  So then we need to know whether, in

10:07:54   24  looking at the Catudal basic salary, are we subtracting an

10:08:01   25  administrative supplement or are we not subtracting an

10:08:05    1    administrative supplement in looking at the average?

10:08:07    2         MR. FOLEY: Our position, Your Honor, is that we are

10:08:09    3    not because no such supplement has been shown where as other

10:08:14    4    professor who are going administrative work have supplements.

10:08:18    5    And when the particular administrative position ends, the chart

10:08:23    6    shows the supplement ends.

10:08:25    7         THE COURT: Okay. So this is one of the things we

10:08:27    8    need to work out before the jury makes their determination. So

10:08:31    9    what is Drexel's position with respect to whether Catudal's

10:08:38   10    basic salary -- should there be a deduction for administrative

10:08:43   11    supplement or not.

10:08:44   12         MS. GREENSPAN: No, Your Honor. His base salary is

10:08:46   13    the only number that is in play here.

10:08:47   14         THE COURT: Okay. So he gets an administrative

10:08:51   15    position, he gets a bump, the bump is never taken away but

10:08:54   16    everyone agrees that whatever that salary is, with the bump not

10:08:58   17    taken away, is the base salary that will be used for

10:09:01   18    calculation purposes.

10:09:02   19         MS. GREENSPAN: For the calculation purposes, yes.

10:09:05   20         THE COURT: The way you said it you thought there was

10:09:08   21    some other issue that might pertain to that administrative

10:09:14   22    supplement?

10:09:15   23         MS. GREENSPAN: Well, we intend to put on evidence --

10:09:18   24    Your Honor, base salary is the base salary. That's the numbers

10:09:22   25    we've agreed that's what we're using. But there is no the

10:09:25   1   question that the base salary takes into consideration what his

10:09:29   2   prior role was.

10:09:30   3         THE COURT:  Okay.  So you're going to be arguing is

10:09:32   4   that it takes into consideration and plaintiff is going to be

10:09:35   5   arguing, well, everybody else has it taken away.

10:09:39   6         Okay.  Got it.  And that is going to go to

10:09:42   7   willfulness.

10:09:43   8         MR. FOLEY:  Exactly, Your Honor.

10:09:44   9         THE COURT:  Okay.  So I think we got that.

10:09:47  10         Do we think that there is anything else that has not

10:09:50  11   been addressed by the parties that will be relevant to my

10:09:54  12   determination or my calculation of damages once the jury had

10:09:59  13   determined the appropriate comparators?  Anything else?

10:10:02  14         MR. FOLEY:  No, Your Honor.

10:10:04  15         MS. GREENSPAN:  No, Your Honor.  We discussed, as Mr.

10:10:07  16   Foley said, someone like Richard Astro, it is a very simple

10:10:12  17   calculation.  If it is somebody a little more nuanced like Dr.

10:10:19  18   Catudal who retired at a certain moment in time, it just

10:10:19  19   requires a little more nuance but we have agreed upon on how

10:10:22  20   that would he calculated.

10:10:25  21         THE COURT:  So essentially what I am going to be

10:10:27  22   looking at is in given periods of time I am going to be looking

10:10:30  23   at all the people into that period that the jury tells me are

10:10:34  24   comparators and you're going to give me the salaries at that

10:10:39  25   point and I'm just going to say, okay, well this is the

| | | |
|---|---|---|
| 10:10:41 | 1 | average -- or you're going to tell me.  I will check your |
| 10:10:44 | 2 | numbers.  I am going to say in this time period this is the |
| 10:10:47 | 3 | number we are looking at and then that next time period this is |
| 10:10:51 | 4 | what we're looking at and then I am going to calculate all |
| 10:10:54 | 5 | differentials and that will be the number that you get. |
| 10:10:57 | 6 | MR. FOLEY:  Yes, Your Honor. |
| 10:10:58 | 7 | MS. GREENSPAN:  Yes, Your Honor. |
| 10:10:59 | 8 | THE COURT:  It will change if willful, right? |
| 10:11:01 | 9 | MR. FOLEY:  Yes, Your Honor. |
| 10:11:02 | 10 | THE COURT:  Okay.  Mr. Malave, do we have our jury? |
| 10:11:10 | 11 | THE DEPUTY CLERK:  Yes, they're outside. |
| 10:11:12 | 12 | THE COURT:  I am going to go off the bench for a |
| 10:11:18 | 13 | second.  Okay.  Mr. Malave is going to bring them in and then |
| 10:11:22 | 14 | we will get them in as well. |
| 10:11:22 | 15 | (Brief Recess.) |
| 10:14:05 | 16 | (Prospective jurors enter.) |
| 10:14:05 | 17 | THE DEPUTY CLERK:  Jury panel, sworn. |
| 10:14:58 | 18 | THE COURT:  Good morning.  Have a seat.  You have all |
| 10:15:02 | 19 | been summon for jury service and have been selected to be |
| 10:15:05 | 20 | considered to serve on a jury panel for a case that is about to |
| 10:15:09 | 21 | be tried.  It is a civil case which is likely to take less than |
| 10:15:12 | 22 | one week. |
| 10:15:12 | 23 | Let me provide you with a brief description of the |
| 10:15:15 | 24 | case. |
| 10:15:16 | 25 | The plaintiff, Dr. Marilyn Gaye Piety Foley is a |

*United States District Court*

10:15:19   1   female professor of Philosophy at Drexel University.  She has

10:15:24   2   sued her employer, Drexel University, alleging that she was

10:15:28   3   paid less than her male counter parts in violation of the Equal

10:15:33   4   Pay Act.

10:15:34   5       Jurors perform a vital role in the American system of

10:15:37   6   justice.  The jury is an essential  foundation of our justice

10:15:42   7   system and our Democracy.  It is a necessary check on

10:15:45   8   Governmental power, a fundamental safeguard of individual

10:15:47   9   liberty.

10:15:48   10      The protection of our rights and liberties is largely

10:15:51   11  achieved through the teamwork of judge and jury who working

10:15:55   12  together in a common effort put into practice the principles of

10:15:59   13  our great heritage of freedom.

10:16:02   14      The judge determines the law to be applied in the case

10:16:06   15  while the jury decides the facts.  Thus, in a very important

10:16:10   16  way jurors become a part of the Court itself.

10:16:14   17      Jurors must be men and women possessed of sound

10:16:17   18  judgment, absolute honesty and a complete sense of fairness.

10:16:22   19      Jury services is a high duty of citizenship.

10:16:26   20      Juries aid in the maintenance of law and order and

10:16:29   21  uphold justice among their fellow citizens.  The greatest

10:16:33   22  reward is the knowledge that they have discharged this duty

10:16:38   23  faithfully, honorably and well.  In a very real sense therefore

10:16:41   24  the people must rely upon jurors for the protection of life,

10:16:44   25  liberty and the pursuit of happiness.

| | |
|---|---|
| 10:16:47 | 1 |
| 10:16:49 | 2 |
| 10:16:54 | 3 |
| 10:16:56 | 4 |
| 10:17:05 | 5 |

10:16:47    1      I will shortly be asking you a series of questions.

10:16:49    2    You each have been assigned a number and you should have in

10:16:54    3    your possession a card that that number.  Could you all hold it

10:16:56    4    up.  Put it down.  Does anyone not have a number?  Why are

10:17:05    5    you -- you're in the 12 position.  Are you in the second row?

10:17:08    6      THE DEPUTY CLERK:  No.  She's in the front.

10:17:13    7      THE COURT:  You sat backwards.  Okay.  I got it.  One

10:17:16    8    on this end and 12 on that end.  Okay.

10:17:20    9      When I ask those questions, if you answered the

10:17:22    10    question as yes, you're going to hold up your chart.  I am

10:17:26    11    going to then call out the numbers.  And once I call out the

10:17:30    12    numbers you can put your card down.

10:17:32    13      Do not respond verbally to any question unless I ask

10:17:36    14    you to do so.  Once I have completed my questions, you may be

10:17:39    15    called up to sidebar to answer some other questions.  Once that

10:17:42    16    is done, the lawyers will select which of you will serve.

10:17:48    17      First question, are you personally acquainted with the

10:17:55    18    plaintiff Marilyn Gaye Piety Foley who also uses the names MG

10:18:01    19    Piety, Marilyn Gaye Piety and Marilyn Piety, or do you, any

10:18:03    20    member of your family or any friend have any connection of any

10:18:06    21    kind with them?  I see no answer.

10:18:10    22      Do you or any member of your family or any friend have

10:18:13    23    any connection of any kind with the defendant Drexel University

10:18:17    24    including as a student or employee?

10:18:23    25      Number 9, number 10, number 12, number 18, number 21

*United States District Court*

10:18:35    1    and number 22.

10:18:39    2         Are you personally acquainted with or do you or any

10:18:42    3    member of your family or any friend have any connection of any

10:18:45    4    kind with any of the lawyers in this case?  And those lawyers

10:18:49    5    are Brian J. Foley, John F.  Jack Foley, Lorrie McKinley, the

10:18:57    6    Tucker Law Group, LLC, Leslie Miller Greenspan, Joe H. Tucker,

10:19:03    7    Jr., Hillary Weinstein.  I see no answer.

10:19:08    8         Now I am going to go through a list of people who are

10:19:10    9    somehow connected to this case.  If your answered yes to any

10:19:16   10    just put your hand up and keep your hand up until I come to the

10:19:17   11    end of the list and called your number.

10:19:18   12         Do you know any of the following people:  Peter Amato,

10:19:23   13    Richard Astro,

10:19:26   14    Andre Carrington,

10:19:26   15    Jakeya Caruthers,

10:19:30   16    Jacques Catudal,

10:19:30   17    Nomi Eve,

10:19:33   18    Rose Flavin,

10:19:35   19    John Fry,

10:19:35   20    Mark Greenberg,

10:19:40   21    Nathan Hanna,

10:19:40   22    Gabriella Ibieta,

10:19:44   23    Paul Jensen,

10:19:44   24    Keyanah Jones,

10:19:44   25    Elizbeth Kimball,

| | | |
|---|---|---|
| 10:19:50 | 1 | Adam Knowles, |
| 10:19:50 | 2 | Miriam Kotzin, |
| 10:19:54 | 3 | Roger Kurtz, also known as John Kurtz and J. Roger Kurtz, |
| 10:19:59 | 4 | Stephen Mandell, |
| 10:19:59 | 5 | Donna Murasko, |
| 10:19:59 | 6 | Flavia Padovani, |
| 10:20:06 | 7 | Abioseh Porter, |
| 10:20:08 | 8 | Doreen Saar, |
| 10:20:09 | 9 | Andrew Smith, |
| 10:20:09 | 10 | Eva Thury, |
| 10:20:13 | 11 | Scott Warnock, |
| 10:20:15 | 12 | Megan Weyler, also known as Megan Van Horn, |
| 10:20:19 | 13 | Jennifer Yusin. |
| 10:20:22 | 14 | I see no answer. |
| 10:20:24 | 15 | Now look around the room apart from the people I have |
| 10:20:26 | 16 | mentioned.  Do you know anyone else in this courtroom? |
| 10:20:31 | 17 | I see no answer. |
| 10:20:32 | 18 | Have you heard anything about this case in the media |
| 10:20:34 | 19 | or any in other way? |
| 10:20:37 | 20 | No answer. |
| 10:20:38 | 21 | Have you or someone else close to you ever been |
| 10:20:42 | 22 | employed as a teacher? |
| 10:20:50 | 23 | Number 2, number 3, number 4, number 8, number 12, number 15, |
| 10:21:02 | 24 | number 18, number 21, number 22. |
| 10:21:07 | 25 | Have you or someone close to you ever been employed by |

*United States District Court*

10:21:11    1   any University or college?

10:21:16    2   Number 1, number 3, number 7, number 8, number 12, number 19.

10:21:32    3        Have you ever had a job where you were responsibile

10:21:35    4   for setting the amount of money that other employees are paid

10:21:38    5   for their work?

10:21:42    6        Number 8, number 13, number 14, number 15, number 17,

10:21:54    7   number 22.

10:21:57    8        Have you ever worked as part of a human relations, HR

10:22:01    9   or personnel office?

10:22:03    10        I see no answer.

10:22:04    11        Have you ever supervised other employees at work?

10:22:13    12        Number 4, number 5, number 6, number 7, number 8,

10:22:20    13   number 10, number 12, number 13, number 14, number 15, number

10:22:32    14   17, number 19, number 20, number 21, and number 22.

10:22:41    15        Do you believe that you, a family member or a close

10:22:43    16   friend have been subject to discrimination at work?

10:22:50    17        Number 8.

10:22:53    18        Do you believe that your employer has treated you

10:22:55    19   unfairly because of your sex or gender?

10:23:01    20        No answer.

10:23:01    21        Have you ever witnessed someone at the job being

10:23:05    22   treated unfairly because of their sex or gender?

10:23:09    23        Number 19, number 8, number 17.

10:23:22    24        Do you believe that because an employee is female her

10:23:26    25   employer should treat her less favorably than someone who is

10:23:31  1  male?  I see no answer.

10:23:33  2        Do you believe that because an employee is female her

10:23:36  3  employer should treat her more favorably than someone who is

10:23:39  4  male?  I see no answer.

10:23:41  5        Do you believe that somebody at your job was paid more

10:23:43  6  money than you because that person was a different sex or

10:23:46  7  gender?  I see no answer.

10:23:51  8        Do you have the view that men and women should not be

10:23:53  9  paid the same for the same work?  I see no answer.

10:23:57  10        Have you or someone close to you ever been accused of

10:24:01  11  discriminating against somebody at your workplace because of

10:24:04  12  their sex or gender?

10:24:06  13        I see no answer.

10:24:11  14        I'm sorry.  Number 10, you were answering have you or

10:24:15  15  someone close to you ever been accused of discrimination

10:24:20  16  against someone at the workplace?

10:24:22  17        POTENTIAL JUROR:  Yes.

10:24:22  18        THE COURT:  Okay.  That was number 11.

10:24:24  19        Question number 20, Have you ever had any training in

10:24:27  20  connection with compliance with antidiscrimination laws?

10:24:31  21        Number 1, number 5, number 8, number 14, number 15,

10:24:43  22  number 17, number 21, and number 22.

10:24:49  23        Have you or any member of your family or close

10:24:53  24  personal friend have been trained as a lawyer or been employed

10:24:53  25  in a law office?

*United States District Court*

10:24:59    1          Number 17, number 22, number 4, number 12.

10:25:13    2          Have you ever served as a juror in a criminal or civil

10:25:17    3    case or as a member of a Grand Jury in either a federal or

10:25:20    4    state Court?

10:25:24    5          5, 6, 10, 11, 13, 14.

10:25:39    6          Have you or has anyone in your immediate family ever

10:25:42    7    participated in a lawsuit as a party or in any other capacity?

10:25:50    8          Number 9, number 10, number 13, number 17, number 20,

10:26:02    9    and number 21.

10:26:05   10          If you are selected to sit on this case will you be

10:26:09   11    able to render a verdict solely on the evidence presented at

10:26:12   12    trial and in the context of the law as I will give it to you in

10:26:16   13    my instructions disregarding any other ideas notions or beliefs

10:26:20   14    about the law that you may have encountered in reaching your

10:26:25   15    verdict?

10:26:28   16          Let me ask that the question -- well, everyone else

10:26:32   17    put your hands down.  Anyone who did not answer that question

10:26:35   18    in the affirmative put your number up.

10:26:39   19          8 and 17.

10:26:42   20          Is there any member of the panel who has any special

10:26:50   21    disability or problem that would make serving as a members of

10:26:54   22    the jury difficult or impossible?

10:26:57   23          I see no answer.

10:26:59   24          Okay.  What we are going to do now is those have of

10:27:03   25    you who have answered a question I am going to bring you up to

*United States District Court*

10:27:08 1    sidebar.  I am going to ask you some questions to get some more

10:27:11 2    information about the question that you answered yes to.

10:27:14 3            You may have the option to also have questions asked

10:27:18 4    by the attorneys.  We are going to do this one at a time.

10:27:22 5            While we're doing this, we are going to have white

10:27:25 6    noise so you can't hear what's going on at sidebar.

10:27:29 7            If you want to chat among yourself, that is fine.

10:27:31 8            However, you cannot chat about this case, any case

10:27:35 9    like it, anything to do with the issues in this case, or

10:27:40 10   generally the issues in this case.

10:27:43 11           You cannot talk about people who are in this courtroom

10:27:45 12   or any of the names that you've heard or any of the questions

10:27:48 13   that you were asked.

10:27:50 14           You can, however, talk about the weather, you can talk

10:27:54 15   about the Eagles.  If you're a Commanders fan I think maybe you

10:28:02 16   should not talk, but that is up to you.

10:28:05 17           But in essence you can chat about your family, the

10:28:11 18   weather, what have you, things that do not pertain to this case

10:28:14 19   while we are going through the process.  Thank you very much.

10:29:00 20           (Sidebar.)

10:29:00 21           THE COURT:  The magic number is 14.  That is because

10:29:02 22   we are going to have 8 members of the jury and you each have 3

10:29:02 23   preemptories.

10:29:02 24           What that means is on the sheet which I have which is

10:29:08 25   the judge's list, we have to get to 14 before we can stop

*United States District Court*

10:29:15  1   talking to people.

10:29:16  2        After we've talked to each individual, I will ask

10:29:20  3   whether there are any motions of cause, and I will rule on that

10:29:23  4   motion for cause immediately.

10:29:25  5        So if, for example, I rule on the motion for cause

10:29:28  6   with respect to juror number 4, then the number will go up to

10:29:33  7   15.  As I strike people we will have to push the number.

10:29:37  8        Understood?

10:29:38  9        MS. GREENSPAN:  Yes.

10:29:46  10       Juror number 1.

10:29:58  11       THE COURT:  Good morning, Mr. Hardy.   How are you?

10:30:01  12       THE PROSPECTIVE JUROR:  I'm doing well.

10:30:02  13       THE COURT:  Okay.  You answered yes to 2 questions.

10:30:04  14   The first one was, have you or someone else close to you ever

10:30:09  15   been employed by a University or college?

10:30:12  16       THE PROSPECTIVE JUROR:  Correct.

10:30:12  17       THE COURT:  Tell me about it.

10:30:14  18       THE PROSPECTIVE JUROR:  I used to work at children's

10:30:16  19   hospital of Philadelphia.  I was there for four, five years in

10:30:20  20   the research institute over there working with investigators

10:30:26  21   with administration.

10:30:27  22       THE COURT:  Okay.  Give me more details.  What kind of

10:30:32  23   research were you working?

10:30:32  24       THE PROSPECTIVE JUROR:  I was involved as a temp

10:30:37  25   transfer.  So what that is what happens in license is I work

*United States District Court*

| 10:30:38 | 1 | with the investigators to understand what their science and |
| 10:30:41 | 2 | technology was and I work with companies to license those |
| 10:30:44 | 3 | technologies. |
| 10:30:45 | 4 | THE COURT:  Did you ever work with anyone from the |
| 10:30:47 | 5 | hospital University of Pennsylvania? |
| 10:30:48 | 6 | THE POTENTIAL JUROR:  I did, yes. |
| 10:30:50 | 7 | THE COURT:  I ask because my husband works at the |
| 10:30:53 | 8 | Hospital of the University of Pennsylvania.  And if he does, |
| 10:30:54 | 9 | then we have an issue. |
| 10:30:57 | 10 | John Detre.  Do you know him? Urology. |
| 10:30:57 | 11 | THE PROSPECTIVE JUROR:  No. |
| 10:31:02 | 12 | THE COURT:  Any follow-up questions? |
| 10:31:08 | 13 | MS. GREENSPAN:  No, Your Honor. |
| 10:31:08 | 14 | MR. FOLEY:  No, Your Honor. |
| 10:31:10 | 15 | THE COURT:  Okay.  So then we answer yes to question |
| 10:31:13 | 16 | 20.  And question 20 is, Have you ever had any training in |
| 10:31:19 | 17 | connection with compliance with antidiscrimination laws?  Tell |
| 10:31:23 | 18 | me about that. |
| 10:31:24 | 19 | THE PROSPECTIVE JUROR:  I worked at a company CSL, it |
| 10:31:27 | 20 | is a global company.  We have lots of trainings and mandatory |
| 10:31:30 | 21 | course I have to go through to stay compliant. |
| 10:31:34 | 22 | Have you had any training in the Equal Pay Act? |
| 10:31:34 | 23 | THE PROSPECTIVE JUROR:  No. |
| 10:31:39 | 24 | THE COURT:  Would your experience in those trainings |
| 10:31:40 | 25 | impact on your ability to decide this case fairly and |

*United States District Court*

10:31:40   1   impartially?

10:31:46   2            THE PROSPECTIVE JUROR:  No.

10:31:46   3            THE COURT:  Questions?

10:31:48   4            MS. GREENSPAN:  Good morning.  Has your training in

10:31:51   5   any way impacted how you potentially view a case, plaintiff,

10:31:58   6   defendant or anything like that?

10:32:00   7            THE PROSPECTIVE JUROR:  I don't see it having any

10:32:00   8   impact.

10:32:00   9            MS. GREENSPAN:  Thank you.

10:32:05   10           MR. FOLEY:  I have no questions.

10:32:06   11           THE COURT:  Thank you very much.

10:32:10   12           You just went beyond the scope.  You asked a question

10:32:13   13   that I specifically struck.

10:32:16   14           It was your view of plaintiffs given your training.

10:32:20   15           MS. GREENSPAN:  I'm sorry, Your Honor.  I didn't mean

10:32:22   16   to do that.

10:32:23   17           THE COURT:  Okay.  Next time you do it I will just

10:32:27   18   tell you and I will explain to you why.

10:32:28   19           MS. GREENSPAN:  I'm sorry.  I apologize.  So we should

10:32:32   20   only ask questions within the scope of what you just asked.

10:32:36   21           THE COURT:  Correct.  Within the scope of questions

10:32:39   22   that they have answered.

10:32:39   23           And bear in mind the questions that you asked me ask

10:32:43   24   and I did not ask, so we are not going to move into that

10:32:46   25   questions.

*United States District Court*

| | | |
|---|---|---|
| 10:32:47 | 1 | MS. GREENSPAN: Your Honor, I apologize. I thought I |
| 10:32:48 | 2 | was asking within the scope of the training. I apologize, |
| 10:32:51 | 3 | Your Honor. |
| 10:32:54 | 4 | THE COURT: Any motion to strike? |
| 10:32:57 | 5 | MS. GREENSPAN: No motion to strike. |
| 10:32:58 | 6 | MR. FOLEY: No. |
| 10:32:58 | 7 | THE COURT: Juror number 2. |
| 10:32:58 | 8 | Hi, Mr. Lee. |
| 10:33:15 | 9 | THE PROSPECTIVE JUROR: Hi. Good morning. |
| 10:33:16 | 10 | THE COURT: You answered one question. Have the you |
| 10:33:17 | 11 | or someone close to you ever been employed as a teacher? |
| 10:33:21 | 12 | THE PROSPECTIVE JUROR: Yes. My the son is a 7th 8th |
| 10:33:24 | 13 | grade Science teacher out in Los Angeles. |
| 10:33:27 | 14 | THE COURT: You've heard what this case is about. |
| 10:33:29 | 15 | THE PROSPECTIVE JUROR: Yes. |
| 10:33:30 | 16 | THE COURT: Would your experience with him impact on |
| 10:33:31 | 17 | your ability to decide this case fairly and impartially? |
| 10:33:35 | 18 | THE PROSPECTIVE JUROR: Not at all. |
| 10:33:36 | 19 | THE COURT: Any follow-up? |
| 10:33:37 | 20 | MS. GREENSPAN: No, Your Honor. |
| 10:33:37 | 21 | MR. FOLEY: No, Your Honor. |
| 10:33:39 | 22 | THE COURT: Thank you very much. |
| 10:33:43 | 23 | Juror number 3. |
| 10:34:00 | 24 | Hi, Miss Winters. |
| 10:34:01 | 25 | THE PROSPECTIVE JUROR: Hello. |

*United States District Court*

10:34:02    1           THE COURT:  Good to meet you.

10:34:04    2           THE PROSPECTIVE JUROR:  You as well.

10:34:05    3           THE COURT:  So I am going to ask you what you answered

10:34:06    4  yes to, question 7 and 8.

10:34:08    5           And first one is have you or someone close to you ever

10:34:11    6  been employed as a teacher?

10:34:13    7           THE JUROR:  Yes.

10:34:14    8           THE COURT:  Who is that?

10:34:15    9           THE PROSPECTIVE JUROR:  My best friend is a teacher.

10:34:17   10           THE COURT:  What do they teach?

10:34:19   11           THE PROSPECTIVE JUROR:  She is a teacher and now a

10:34:22   12  principal.

10:34:23   13           THE COURT:  This is high school?

10:34:23   14

10:34:26   15           THE PROSPECTIVE JUROR:  She is elementary.

10:34:27   16           THE COURT:  And where is that?

10:34:29   17           THE PROSPECTIVE JUROR:  Samuel Township.

10:34:32   18           THE COURT:  Would you relationship with her impact

10:34:34   19  your ability to decide this case fairly and impartially?

10:34:38   20           THE PROSPECTIVE JUROR:  No.

10:34:38   21           THE COURT:  Follow-up?

10:34:40   22           MR. FOLEY:  Quick clarification.  You said she is your

10:34:44   23  old principal?

10:34:46   24           THE PROSPECTIVE JUROR:  No, no.  She is one of my best

10:34:47   25  friend.

*United States District Court*

| 10:34:49 | 1 | MR. FOLEY: Okay. And she is a principal? |
| 10:34:49 | 2 | THE PROSPECTIVE JUROR: She teaches but she is also a |
| 10:34:51 | 3 | principal at the elementary school. |
| 10:34:51 | 4 | MR. FOLEY: Okay. Thank you. I couldn't hear. That |
| 10:34:56 | 5 | white noise is blurring things. |
| 10:34:56 | 6 | THE COURT: Then you said have you someone close to |
| 10:34:59 | 7 | you ever been employed by any University or college. |
| 10:35:02 | 8 | THE PROSPECTIVE JUROR: Yes. My sister-in-law. |
| 10:35:04 | 9 | THE COURT: What does she do? |
| 10:35:05 | 10 | THE PROSPECTIVE JUROR: She taught at the University. |
| 10:35:09 | 11 | THE COURT: Which University? |
| 10:35:09 | 12 | THE PROSPECTIVE JUROR: Eastern. |
| 10:35:10 | 13 | THE COURT: And what did she teach? |
| 10:35:13 | 14 | THE PROSPECTIVE JUROR: Gosh. I forget. I'm sorry. |
| 10:35:15 | 15 | THE COURT: How long ago was this? |
| 10:35:19 | 16 | THE PROSPECTIVE JUROR: Maybe like five years ago. |
| 10:35:20 | 17 | THE COURT: Did you have conversations with her about |
| 10:35:23 | 18 | her work? |
| 10:35:23 | 19 | THE PROSPECTIVE JUROR: No. |
| 10:35:25 | 20 | THE COURT: Would your relationship with her and what |
| 10:35:28 | 21 | she did impact on your ability to decide this case fairly and |
| 10:35:32 | 22 | impartially? |
| 10:35:33 | 23 | THE PROSPECTIVE JUROR: No. |
| 10:35:33 | 24 | THE COURT: Any follow-up? |
| 10:35:35 | 25 | MS. GREENSPAN: No. |

*United States District Court*

| | | |
|---|---|---|
| 10:35:36 | 1 | MR. FOLEY: No follow-up. |
| 10:35:37 | 2 | THE COURT: Thank you very much. |
| 10:35:38 | 3 | Any motions to strike? |
| 10:35:41 | 4 | MR. FOLEY: No. |
| 10:35:42 | 5 | MS. GREENSPAN: Not at this time. |
| 10:35:43 | 6 | THE COURT: This is your only chance. So you can do |
| 10:35:47 | 7 | preemptory but a motion to strike for cause is now. |
| 10:35:54 | 8 | MS. GREENSPAN: Your Honor, given that her sister is |
| 10:35:57 | 9 | -- we would move to strike for cause given that her sister is a |
| 10:36:01 | 10 | teacher and given how closely aligned she will be to the facts |
| 10:36:05 | 11 | of this case, we think that it will be very difficult for her |
| 10:36:08 | 12 | to be fair and neutral and we would ask that she be stricken. |
| 10:36:12 | 13 | MR. FOLEY: Your Honor, my response is that it's her |
| 10:36:14 | 14 | sister-in-law and she said she hasn't really -- if I remember |
| 10:36:18 | 15 | correctly, she said she hasn't really discussed the work with |
| 10:36:21 | 16 | her. |
| 10:36:21 | 17 | THE COURT: And she also said it would not impact on |
| 10:36:25 | 18 | her ability to decide this case fairly and impartially. |
| 10:36:29 | 19 | MR. FOLEY: Correct. |
| 10:36:30 | 20 | THE COURT: So your motion is denied. |
| 10:36:33 | 21 | Juror number 4. |
| 10:36:46 | 22 | THE COURT: Good morning, Ms. Katartynick. |
| 10:36:47 | 23 | THE PROSPECTIVE JUROR: Good morning, Your Honor. |
| 10:36:48 | 24 | THE COURT: So you answered a few questions. I am |
| 10:36:51 | 25 | just going to go through those. |

*United States District Court*

10:36:53    1              The first one is have you or someone close to you ever

10:36:55    2    been employed as a teacher?  Tell me about that.

10:36:59    3              THE PROSPECTIVE JUROR:  I am a teacher.

10:37:00    4              THE COURT:  What do you teach?

10:37:01    5              THE PROSPECTIVE JUROR:  Pre-K through 8th grade.  I am

10:37:04    6    an art teacher.

10:37:04    7              THE COURT:  Where do you teach?

10:37:08    8              THE PROSPECTIVE JUROR:  Wyndcroft School in Pottstown,

10:37:08    9    Pennsylvania.

10:37:10   10              THE COURT:  This case is about higher education.

10:37:12   11    Would you experience as a teacher impact your ability to decide

10:37:16   12    this case fairly and impartially?

10:37:18   13              THE PROSPECTIVE JUROR:  Yes.

10:37:18   14              THE COURT:  It would --

10:37:18   15              THE PROSPECTIVE JUROR:  Oh, no, no.

10:37:20   16              THE COURT:  Okay.  It would not impact your ability to

10:37:22   17    decide the case fairly and impartially.

10:37:23   18              THE PROSPECTIVE JUROR:  It would not.

10:37:25   19              THE COURT:  Any follow-up on that question.

10:37:29   20              MS. GREENSPAN:  No, Your Honor.

10:37:29   21              MR. FOLEY:  No, Your Honor.

10:37:30   22              THE COURT:  Next question is, Have you ever supervised

10:37:33   23    other employees at work.  Tell me about that.

10:37:37   24              THE PROSPECTIVE JUROR:  I had a number of interns that

10:37:39   25    I would supervise.

*United States District Court*

10:37:43    1         THE COURT:  Okay.  As interns were they paid?

10:37:46    2         THE PROSPECTIVE JUROR:  They weren't paid, no.

10:37:47    3         THE COURT:  So you wouldn't -- did you deal with HR in

10:37:52    4    supervising them at all?

10:37:55    5         THE PROSPECTIVE JUROR:  No.  It was a small

10:37:55    6    organization.

10:37:57    7         THE COURT:  Would your work with those interns impact

10:38:00    8    your ability to decide this case fairly and impartially?

10:38:00    9         THE PROSPECTIVE JUROR:  No.

10:38:03   10         THE COURT:  Questions?

10:38:10   11         MR. FOLEY:  I have no questions.

10:38:10   12         MS. GREENSPAN:  No, questions, Your Honor.

10:38:12   13         THE COURT:  The next one is have you or any of your

10:38:22   14    family or a close personal friend been trained a lawyer or been

10:38:25   15    employed in a law office?  Tell me about that.

10:38:29   16         THE PROSPECTIVE JUROR:  I have a friend who is a

10:38:30   17    public defender in Philadelphia and I have ex-the boyfriend who

10:38:36   18    is a Deputy Attorney General in Delaware.

10:38:39   19         THE COURT:  Did you talk to them about their work?

10:38:41   20         THE PROSPECTIVE JUROR:  Occasionally but not in depth.

10:38:43   21         THE COURT:  Have any of them done civil side work?

10:38:46   22         THE PROSPECTIVE JUROR:  I don't know that.

10:38:48   23         THE COURT:  Okay.  Would you conversations with them

10:38:50   24    or your relationships with them impact on your ability to

10:38:54   25    decide this case fairly and impartially?

*United States District Court*

| | | |
|---|---|---|
| 10:38:54 | 1 | THE PROSPECTIVE JUROR:  No. |
| 10:38:56 | 2 | THE COURT:  Follow-up? |
| 10:38:57 | 3 | MS. GREENSPAN:  No follow-up. |
| 10:38:58 | 4 | THE COURT:  Follow-up? |
| 10:38:59 | 5 | MR. FOLEY:  None. |
| 10:39:00 | 6 | THE COURT:  Thank you very much. |
| 10:39:02 | 7 | Any motions? |
| 10:39:05 | 8 | MS. GREENSPAN:  No motions. |
| 10:39:06 | 9 | MR. FOLEY:  None, Your Honor. |
| 10:39:07 | 10 | THE COURT:  Juror number 5. |
| 10:39:33 | 11 | Good morning, Mr. Moors.  How are you? |
| 10:39:36 | 12 | THE PROSPECTIVE JUROR:  Good.  How are you? |
| 10:39:37 | 13 | THE COURT:  You answered a few questions. I am going |
| 10:39:39 | 14 | to go through them. |
| 10:39:39 | 15 | THE PROSPECTIVE JUROR:  Okay. |
| 10:39:41 | 16 | THE COURT:  First of all, have you ever  supervised |
| 10:39:44 | 17 | other employees at work? |
| 10:39:45 | 18 | THE PROSPECTIVE JUROR:  Yes. |
| 10:39:45 | 19 | THE COURT:  Tell me about that. |
| 10:39:47 | 20 | THE PROSPECTIVE JUROR:  I was a sales manager in |
| 10:39:50 | 21 | mid-2000s a couple of years. |
| 10:39:52 | 22 | THE COURT:  How many people? |
| 10:39:52 | 23 | THE PROSPECTIVE JUROR:  Two. |
| 10:39:55 | 24 | THE COURT:  And did you deal with their pay? |
| 10:39:55 | 25 | THE PROSPECTIVE JUROR:  No. |

*United States District Court*

10:39:58　1　　　　THE COURT:  Anything about that supervisory

10:40:01　2　responsibility that would impact on your ability to decide this

10:40:04　3　case fairly and impartially?

10:40:07　4　　　　THE PROSPECTIVE JUROR:  No.

10:40:07　5　　　　MS. GREENSPAN:  No follow-up.

10:40:08　6　　　　MR. FOLEY:  You said you supervised two people.

10:40:08　7　　　　THE PROSPECTIVE JUROR:  Yes.

10:40:12　8　　　　MR. FOLEY:  What gender were they?

10:40:14　9　　　　THE PROSPECTIVE JUROR:  Female.

10:40:15　10　　　　MR. FOLEY:  Both of them?

10:40:17　11　　　　THE PROSPECTIVE JUROR:  (Indicating).

10:40:17　12　　　　THE COURT:  Okay.  Next question is, Have you ever had

10:40:24　13　any training in connection with compliance with

10:40:27　14　antidiscrimination laws?

10:40:29　15　　　　THE PROSPECTIVE JUROR:  Yes.

10:40:29　16　　　　THE COURT:  Tell me about that.

10:40:29　17　　　　THE PROSPECTIVE JUROR:  In our company it was probably

10:40:38　18　2008, 2009, somewhere in there.  Manager training.  It was just

10:40:41　19　a week-long training that we took.  And we had follow-up

10:40:45　20　meetings like once a month after that.  It was just our regular

10:40:50　21　managers training, antitrust laws, that sort of thing.

10:40:54　22　　　　THE COURT:  Did you have any training on the Equal Pay

10:40:54　23　Act?

10:40:57　24　　　　THE PROSPECTIVE JUROR:  Not very much, no.  It was

10:40:59　25　more about discrimination.  Not discriminating against people

*United States District Court*

| | | |
|---|---|---|
| 10:41:04 | 1 | of race, not gender.  It wasn't really about gender at all. |
| 10:41:10 | 2 | THE COURT:  Okay.  Was it about pay? |
| 10:41:10 | 3 | THE PROSPECTIVE JUROR:  No. |
| 10:41:15 | 4 | THE COURT:  Okay.  Anything about those trainings that |
| 10:41:18 | 5 | would impact your ability to decide this case fairly and |
| 10:41:18 | 6 | impartially? |
| 10:41:20 | 7 | THE PROSPECTIVE JUROR:  I don't think so. |
| 10:41:22 | 8 | THE COURT:  Follow-up? |
| 10:41:23 | 9 | MS. GREENSPAN:  No. |
| 10:41:23 | 10 | THE COURT:  Follow-up? |
| 10:41:24 | 11 | MR. FOLEY:  None. |
| 10:41:25 | 12 | THE COURT:  And then you answered yes to -- |
| 10:41:30 | 13 | THE PROSPECTIVE JUROR:  Civil case. |
| 10:41:31 | 14 | THE COURT:  Yes.  Jury service. |
| 10:41:35 | 15 | THE PROSPECTIVE JUROR:  Lansdale.  It was about 5 to |
| 10:41:37 | 16 | 7 years ago.  It was a civil case.  Spray foam in the attic |
| 10:41:42 | 17 | went bad.  Came to decision.  That was it. |
| 10:41:47 | 18 | THE COURT:  You did come to a decision. |
| 10:41:47 | 19 | THE PROSPECTIVE JUROR:  Yes. |
| 10:41:50 | 20 | THE COURT:  And was it for plaintiff or for |
| 10:41:52 | 21 | defendants? |
| 10:41:53 | 22 | THE PROSPECTIVE JUROR:  Pro plaintiff but he wasn't |
| 10:41:55 | 23 | happy with the outcome.  It wasn't as much as he wanted. |
| 10:41:59 | 24 | THE COURT:  Okay.  And in the course of that were you |
| 10:42:05 | 25 | jury foreperson? |

10:42:05    1          THE PROSPECTIVE JUROR:  No.

10:42:07    2          THE COURT:  Anything about that experience that would

10:42:08    3    impact your ability to decide this case fairly and impartially?

10:42:12    4          THE PROSPECTIVE JUROR:  I wouldn't mind doing it.

10:42:14    5          THE COURT:  You wouldn't mind doing this case.  Okay.

10:42:18    6    I like a person who wants to do jury service.

10:42:21    7          THE PROSPECTIVE JUROR:  The first time it was very

10:42:23    8    crazy, very disorienting.  Now it's a little easier.

10:42:27    9          THE COURT:  Any follow-up questions?

10:42:31    10          MS. GREENSPAN:  No, Your Honor.

10:42:33    11          MR. FOLEY:  No, Your Honor.

10:42:34    12          THE COURT:  Any motions?

10:42:36    13          MS. GREENSPAN:  No motion.

10:42:37    14          MR. FOLEY:  None.

10:42:38    15          THE COURT:  Juror number 6.

10:42:38    16          Hi, Miss Stevens.

10:42:38    17          THE PROSPECTIVE JUROR:  Good morning.

10:42:38    18          THE COURT:  Good to meet you.

10:42:38    19          THE PROSPECTIVE JUROR:  You as well.

10:42:56    20          I am going to go through the questions that you

10:42:58    21    answered yes to.

10:42:58    22          THE PROSPECTIVE JUROR:  Okay.

10:42:59    23          THE COURT:  First of all, you said you supervise other

10:43:02    24    employees at work.

10:43:03    25          THE PROSPECTIVE JUROR:  Yes, I do.

*United States District Court*

10:43:04   1        I am selling supervisor at the Hermes in Princeton.

10:43:11   2   So really more of an internship thing, not make anything, doing

10:43:15   3   business decisions on hiring people.  More overseeing the

10:43:18   4   function on the floor and just helping my less tenured

10:43:23   5   colleagues basically.

10:43:24   6        THE COURT:  So when you help them, give me an idea.

10:43:27   7        THE PROSPECTIVE JUROR:  Like if they need processing a

10:43:30   8   return or mentorship of an sale with a client.  I am not making

10:43:35   9   business decisions.

10:43:36  10        THE COURT:  Do you determine how much they get paid?

10:43:36  11        THE PROSPECTIVE JUROR:  No.

10:43:38  12        THE COURT:  Are you their boss?

10:43:40  13        THE PROSPECTIVE JUROR:  I am technically more tenured

10:43:43  14   than they are.  I am not making business decisions as far as

10:43:46  15   salary goes, benefits or any of that or scheduling.

10:43:50  16        THE COURT:  Anything about that experience that would

10:43:51  17   impact your ability to decide this case fairly and impartially?

10:43:56  18        THE PROSPECTIVE JUROR:  No.

10:43:56  19        THE COURT:  Follow-up?

10:43:57  20        MS. GREENSPAN:  No follow-up.

10:43:59  21        THE COURT:  Follow-up?

10:44:00  22        MR. FOLEY:  Do you do formal evaluations of employees?

10:44:03  23        THE PROSPECTIVE JUROR:  No.

10:44:03  24        MR. FOLEY:  Do you supervise men and women?

10:44:05  25        THE PROSPECTIVE JUROR:  Yes.

| | | |
|---|---|---|
| 10:44:06 | 1 | MR. FOLEY:  About how many? |
| 10:44:06 | 2 | THE PROSPECTIVE JUROR:  There's 13 of us. |
| 10:44:08 | 3 | MR. FOLEY:  How is it divided between men and women? |
| 10:44:11 | 4 | THE PROSPECTIVE JUROR:  We have two gentlemen, the |
| 10:44:13 | 5 | rest are female. |
| 10:44:15 | 6 | THE COURT:  And then you said you served as a juror. |
| 10:44:18 | 7 | THE PROSPECTIVE JUROR:  Yes. |
| 10:44:18 | 8 | THE COURT:  Tell he about that. |
| 10:44:19 | 9 | THE PROSPECTIVE JUROR:  It was a couple years ago. |
| 10:44:22 | 10 | West Chester, PA.  If it was a civil case.  West Chester.  It |
| 10:44:28 | 11 | was about fire suppression system not functioning in a |
| 10:44:31 | 12 | restaurant.  It was about 3 weeks.  Very long.  And the bacon |
| 10:44:37 | 13 | basically went on the grill the fire suppression went over |
| 10:44:41 | 14 | that.  But everything, that grill, burnt to the ground.  Crazy. |
| 10:44:47 | 15 | Never look at bacon quite the same way. |
| 10:44:50 | 16 | THE COURT:  Did you come to a verdict? |
| 10:44:50 | 17 | THE PROSPECTIVE JUROR:  Yes. |
| 10:44:51 | 18 | THE COURT:  Was it plaintiff or defense? |
| 10:44:53 | 19 | THE PROSPECTIVE JUROR:  It was for the defense. |
| 10:44:57 | 20 | THE COURT:  Were you the foreperson on that? |
| 10:44:58 | 21 | THE PROSPECTIVE JUROR:  No, I was not. |
| 10:44:59 | 22 | THE COURT:  Anything about that experience that would |
| 10:45:01 | 23 | impact your ability to decide this case fairly and impartially? |
| 10:45:04 | 24 | THE PROSPECTIVE JUROR:  No.  I try to be object with |
| 10:45:05 | 25 | everything. |

*United States District Court*

10:45:06     1        THE COURT:  Follow-up?

10:45:08     2        MS. GREENSPAN:  No.

10:45:08     3        THE COURT:  Follow-up?

10:45:09     4        MR. FOLEY:  No.

10:45:10     5        THE COURT:  I think that is it for the questions you

10:45:13     6 answered yes.  Thank you very much.

10:45:18     7        Any motions?

10:45:20     8        MS. GREENSPAN:  No.

10:45:21     9        MR. FOLEY:  No.

10:45:22    10        THE COURT:  Juror number 7.

10:45:22    11        Good morning Ms. Petro.

10:45:22    12        THE PROSPECTIVE JUROR:  Good morning.

10:45:48    13        THE COURT:  I am going to follow-up on the questions

10:45:50    14 that you answered yes to.

10:45:51    15        And initially was have you or someone else close to

10:45:55    16 you ever been employed by a University or college.

10:45:58    17        THE PROSPECTIVE JUROR:  Yes.  So I work at the

10:45:59    18 University book store for Princeton.  We are not owned by them

10:46:03    19 but I know a lot of faculty and staff there.  I would say

10:46:06    20 they're more acquaintances but some of my co-workers have gone

10:46:11    21 on to become staff.

10:46:14    22        THE COURT:  In working in the book store were you

10:46:18    23 selling?

10:46:18    24        THE PROSPECTIVE JUROR:  Selling textbooks.

10:46:20    25        THE COURT:  Did you ever talk to any of them about

10:46:22  1  their working conditions?

10:46:22  2            THE PROSPECTIVE JUROR:  No.

10:46:25  3            THE COURT:  Whether they thought they were being

10:46:27  4  treated fairly?

10:46:30  5            THE PROSPECTIVE JUROR:  No.  It was mostly students.

10:46:31  6  But I do talk to faculty there a lot but not about their

10:46:35  7  working conditions.

10:46:36  8            THE COURT:  Anything about that job that would impact

10:46:36  9  your ability to decide this case fairly and impartially?

10:46:41  10            THE PROSPECTIVE JUROR:  I don't think so.

10:46:43  11            THE COURT:  When you say I don't think that's just a

10:46:45  12  way people talk but I need a definite one way or the other.

10:46:47  13            THE PROSPECTIVE JUROR:  Can you say that question

10:46:47  14  again?

10:46:48  15            THE COURT:  Is there anything about that experience

10:46:50  16  working at the book store that would impact your ability to

10:46:53  17  decide this case fairly and impartially?

10:46:53  18            THE PROSPECTIVE JUROR:  No.

10:46:55  19            THE COURT:  Follow-up?

10:46:56  20            MS. GREENSPAN:  No follow-up.

10:46:57  21            THE COURT:  Follow-up?

10:46:58  22            MR. FOLEY:  I may have missed it.  Do you still work

10:47:02  23  at the book store?

10:47:03  24            THE PROSPECTIVE JUROR:  I do.

10:47:05  25            THE COURT:  Okay.  Then you also answered question 11,

10:47:09  1  have you ever supervised other employees.

10:47:12  2          THE PROSPECTIVE JUROR:  Yes.  I am a manager at the

10:47:14  3  book store.

10:47:16  4          THE COURT:  Do you set the salary?

10:47:16  5          THE PROSPECTIVE JUROR:  No.

10:47:21  6          THE COURT:  Has anyone ever talked to you about their

10:47:23  7  sense of whether the salary is unfair?

10:47:29  8          THE PROSPECTIVE JUROR:  Not to me directly but they

10:47:33  9  are employees there negotiating a contract to unionize.  I am

10:47:39 10  not involved in that meeting.

10:47:40 11          It is relatively small book store but the owner of the

10:47:43 12  book store is the only one negotiating.  There is no contract

10:47:47 13  yet.

10:47:48 14          THE COURT:  Okay.  And part of the contract

10:47:50 15  negotiations is pay?

10:47:52 16          THE PROSPECTIVE JUROR:  Yes.

10:47:52 17          THE COURT:  Essentially is it -- do you know anything

10:47:57 18  about the pay negotiations at all?

10:48:00 19          THE PROSPECTIVE JUROR:  No.  The owner will give us

10:48:02 20  updates.  Like whether -- they're only floor managers that are

10:48:06 21  not involved in the negotiations but they will update us about

10:48:10 22  the details of the contract, but I don't have any say in it.

10:48:17 23          THE COURT:  Okay.  Has the owner talked to you at all

10:48:22 24  about the pay negotiations?

10:48:24 25          THE PROSPECTIVE JUROR:  Yes.

| | | |
|---|---|---|
| 10:48:24 | 1 | THE COURT:  And what has he said, she said? |
| 10:48:29 | 2 | THE PROSPECTIVE JUROR:  Just that he will detail what |
| 10:48:31 | 3 | the workers have asked for in the negotiations and whether they |
| 10:48:37 | 4 | are agreeing or not about wages and benefits so I know the |
| 10:48:43 | 5 | numbers involved in the wages. |
| 10:48:46 | 6 | THE COURT:  And is there anything about those |
| 10:48:48 | 7 | negotiations what you heard from the owner or heard from the |
| 10:48:51 | 8 | people you supervise that you think would impact on your |
| 10:48:55 | 9 | ability to decide this case fairly and impartially? |
| 10:48:55 | 10 | THE PROSPECTIVE JUROR:  No. |
| 10:49:00 | 11 | THE COURT:  Okay.  Follow-up? |
| 10:49:01 | 12 | MS. GREENSPAN:  Briefly. |
| 10:49:02 | 13 | You said you supervise individuals at the book store. |
| 10:49:05 | 14 | How many people do you supervise? |
| 10:49:05 | 15 | THE PROSPECTIVE JUROR:  Four. |
| 10:49:08 | 16 | MS. GREENSPAN:  Are they men and women? |
| 10:49:11 | 17 | THE PROSPECTIVE JUROR:  All men. |
| 10:49:13 | 18 | THE COURT:  Follow-up? |
| 10:49:15 | 19 | MS. GREENSPAN:  That's all I have.  Thank you. |
| 10:49:17 | 20 | MR. FOLEY:  Just to make sure I understand, you're not |
| 10:49:21 | 21 | in the union, right. |
| 10:49:23 | 22 | THE PROSPECTIVE JUROR:  Right.  Manager. |
| 10:49:26 | 23 | MS. GREENSPAN:  And I don't know if I'm allowed to ask |
| 10:49:29 | 24 | this, Your Honor. |
| 10:49:29 | 25 | THE COURT:  I will tell you. |

*United States District Court*

10:49:30    1        MR. FOLEY:  Thank you.

10:49:31    2        Do you have an opinion on whether the pay of the

10:49:34    3    employees should be higher as part of the negotiation?

10:49:40    4        THE COURT:  I think it's on the line but go ahead.

10:49:40    5        MR. FOLEY:  Thank you, Your Honor.

10:49:44    6        THE PROSPECTIVE JUROR:  Do I have an opinion?  Yes, I

10:49:49    7    have an opinion that it is fair.

10:49:52    8        MR. FOLEY:  That the desired salary is fair or the

10:49:56    9    current salary is fair?

10:49:58   10        THE PROSPECTIVE JUROR:  The current is fair.

10:50:02   11        THE COURT:  Ms. Greenspan, do you want to follow-up on

10:50:03   12    that particular answer?

10:50:05   13        MS. GREENSPAN:  No, Your Honor.

10:50:10   14        THE COURT:  Okay.  And I think those are the two

10:50:13   15    questions you answered.  Great.  Thank you very much.

10:50:18   16        Any motions?

10:50:20   17        MS. GREENSPAN:  No, Your Honor.

10:50:21   18        MR. FOLEY:  I would like a motion to strike,

10:50:25   19    Your Honor, because even though she is not involved in the

10:50:28   20    negotiation she has an opinion on it, and union matters are

10:50:33   21    often very hotly contested and people get in very people get

10:50:39   22    very backed into their positions.

10:50:42   23        THE COURT:  Okay.  And she indicated to me that she

10:50:44   24    could be fair regardless of the position she is in with respect

10:50:48   25    to that so your motion is denied.

*United States District Court*

10:50:51   1            Juror number 8.

10:50:51   2            Mr. Mayer.  Very excited to be here.

10:50:58   3            You answered a lot of questions.  We are going to go

10:51:01   4    through them one at a time.  Have you or someone else been

10:51:05   5    employed as a teacher?

10:51:07   6            THE PROSPECTIVE JUROR:  Yes.

10:51:07   7            THE COURT:  Tell me about it.

10:51:09   8            THE PROSPECTIVE JUROR:  As a graduate student in

10:51:13   9    academia part of my responsibilities included teaching.

10:51:17   10           THE COURT:  What were you graduate student in?

10:51:19   11           THE PROSPECTIVE JUROR:  Bio chemistry.

10:51:21   12           THE COURT:  Who did you teach?

10:51:23   13           THE PROSPECTIVE JUROR:  Usually freshmen and sophomore

10:51:26   14   level classes.

10:51:27   15           THE COURT:  Is there anything about your experience as

10:51:34   16   a teacher, as a graduate student that would impact your ability

10:51:37   17   to decide this case fairly and impartially?

10:51:39   18           THE PROSPECTIVE JUROR:  Very much.  My advisor was

10:51:42   19   denied tenure as one of only two women in the department.  It

10:51:47   20   was ultimately overturned because it was so biased.

10:51:51   21           THE COURT:  So given that experience -- what have you

10:51:54   22   taken from that experience?

10:51:56   23           THE PROSPECTIVE JUROR:  I think that experience and

10:51:58   24   just my general experience in academia as well as multiple

10:52:04   25   American institutions, institutions are highly biased against

*United States District Court*

10:52:08    1   female professor.

10:52:10    2           THE COURT:  Follow-up on that one?

10:52:15    3           Miss Greenspan?

10:52:20    4           MS. GREENSPAN:  Your Honor has already asked so no.

10:52:22    5           THE COURT:  The next question was, have you or someone

10:52:26    6   else close to you ever been employed by any University or

10:52:30    7   college.  Is that the same thing?

10:52:31    8           THE PROSPECTIVE JUROR:  Yes.

10:52:32    9           THE COURT:  Then the next was have you ever had a job

10:52:35   10   where you were responsibile for setting the amount of money

10:52:38   11   that other employees were paid for their work?

10:52:41   12           THE PROSPECTIVE JUROR:  My current role, yes.

10:52:43   13           THE COURT:  What do you do in your current role?

10:52:45   14           THE PROSPECTIVE JUROR:  I am a manager.

10:52:46   15           THE COURT:  At a university or somewhere else?

10:52:48   16           THE PROSPECTIVE JUROR:  I work for Merck.

10:52:49   17           THE COURT:  So you manage which department in Merck?

10:52:55   18           THE PROSPECTIVE JUROR:  How do I describe that?  A

10:52:57   19   group of scientists.

10:53:01   20           THE COURT:  Scientists working on what?

10:53:05   21           THE PROSPECTIVE JUROR:  Vaccine testing.

10:53:07   22           THE COURT:  Do you know a person called Pricilla

10:53:10   23   Robinson?

10:53:12   24           THE PROSPECTIVE JUROR:  I do.

10:53:14   25           THE COURT:  Okay.  Thank you very much.  Have a seat.

| | | |
|---|---|---|
| 10:53:16 | 1 | I am very good friends with Pricilla Robinson with |
| 10:53:20 | 2 | whom he works.  I assume there is a motion to strike. |
| 10:53:23 | 3 | MS. GREENSPAN:  There is. |
| 10:53:25 | 4 | MR. FOLEY:  Yes. |
| 10:53:27 | 5 | THE COURT:  Struck.  He was Michael Mayer, right? |
| 10:53:32 | 6 | THE LAW CLERK:  Yes. |
| 10:53:32 | 7 | THE COURT:  Strike. |
| 10:53:37 | 8 | Number 9.  Juror number 9. |
| 10:53:49 | 9 | So you answered two questions.  The first was do you |
| 10:53:53 | 10 | or any member of your family or any friend have any connection |
| 10:53:56 | 11 | of any kind with the defendant Drexel University. |
| 10:53:59 | 12 | THE PROSPECTIVE JUROR:  Yes.  My neighbor's son went |
| 10:54:01 | 13 | to Drexel and then my boyfriend's dad also went to Drexel. |
| 10:54:06 | 14 | THE COURT:  So what did your neighbor's son do at |
| 10:54:06 | 15 | Drexel? |
| 10:54:11 | 16 | THE PROSPECTIVE JUROR:  Engineering.  We know them but |
| 10:54:12 | 17 | we are not super close. |
| 10:54:14 | 18 | THE COURT:  Do you talk to the son about his time at |
| 10:54:16 | 19 | Drexel? |
| 10:54:17 | 20 | THE PROSPECTIVE JUROR:  Not really. |
| 10:54:18 | 21 | THE COURT:  Then you said your dad? |
| 10:54:20 | 22 | THE PROSPECTIVE JUROR:  My boyfriend's dad. |
| 10:54:21 | 23 | THE COURT:  So what did your boyfriend's do at Drexel? |
| 10:54:25 | 24 | THE PROSPECTIVE JUROR:  I don't know what he like |
| 10:54:26 | 25 | studied but he was an accountant. |

*United States District Court*

| 10:54:29 | 1 | THE COURT: Have you talked to him about his time at |
|---|---|---|
| 10:54:30 | 2 | Drexel? |
| 10:54:30 | 3 | THE PROSPECTIVE JUROR: No. |
| 10:54:32 | 4 | THE COURT: Anything about your relationship with |
| 10:54:33 | 5 | either of those two that would impact your ability to decide |
| 10:54:36 | 6 | this case fairly and impartially? |
| 10:54:36 | 7 | THE PROSPECTIVE JUROR: No. |
| 10:54:38 | 8 | THE COURT: Follow-up? |
| 10:54:39 | 9 | MS. GREENSPAN: None. |
| 10:54:42 | 10 | THE COURT: Follow-up? |
| 10:54:43 | 11 | MR. FOLEY: Do you know how long ago your boyfriend's |
| 10:54:47 | 12 | dad, how long ago did he graduate from Drexel? |
| 10:54:54 | 13 | THE PROSPECTIVE JUROR: He is 62 -- 63 now. 18 to 22. |
| 10:55:01 | 14 | THE COURT: A while back. |
| 10:55:02 | 15 | THE PROSPECTIVE JUROR: Yeah. |
| 10:55:03 | 16 | THE COURT: Let's move on to the next question. Have |
| 10:55:08 | 17 | you or anyone in your immediate family ever participated in a |
| 10:55:11 | 18 | lawsuit as a party or in any other capacity. |
| 10:55:11 | 19 | THE PROSPECTIVE JUROR: Yes. |
| 10:55:11 | 20 | THE COURT: Tell me about that. |
| 10:55:16 | 21 | THE PROSPECTIVE JUROR: My parents when they built our |
| 10:55:19 | 22 | house. It was like when I was 8. It was a while ago so I am |
| 10:55:23 | 23 | not very clear on the details. But my parents said that they |
| 10:55:27 | 24 | purposefully didn't include like a lawyer in our house and it |
| 10:55:31 | 25 | caused a lot of leakage and my parents had to pay a lot of |

*United States District Court*

10:55:34    1    money to fix the walls and stuff.

10:55:38    2            THE COURT:  Do you know whether they -- did they go to

10:55:38    3    trial?

10:55:44    4            THE PROSPECTIVE JUROR:  I don't know.  I know the

10:55:46    5    company that they sued went bankrupt, so I think it kind of

10:55:49    6    settled maybe.  I don't know the correct term.

10:55:52    7            THE COURT:  Do you remember -- during that time period

10:55:54    8    you were 8?

10:55:55    9            THE PROSPECTIVE JUROR:  Yes.

10:55:55   10            THE COURT:  Did you talk to your parents about that?

10:55:57   11            THE PROSPECTIVE JUROR:  Not really.

10:55:58   12            THE COURT:  Do you remember any details about the

10:56:00   13    dispute?

10:56:01   14            THE PROSPECTIVE JUROR:  I just know that they said

10:56:03   15    they had pay to make it happen.  I don't know if there was a

10:56:10   16    trial.  The whole suing.

10:56:14   17            THE COURT:  Fair to say you don't remember a whole lot

10:56:17   18    of details?

10:56:18   19            THE PROSPECTIVE JUROR:  I do not.

10:56:19   20            THE COURT:  Anything about that experience that would

10:56:20   21    impact your ability to decide this case fairly and impartially?

10:56:24   22            THE PROSPECTIVE JUROR:  No.

10:56:24   23            THE COURT:  Follow-up?

10:56:26   24            MS. GREENSPAN:  No.

10:56:26   25            THE COURT:  Any follow-up?

*United States District Court*

10:56:27    1           MR. FOLEY:  (Indicating).

10:56:29    2           THE COURT:  Next question which is have you or anyone

10:56:36    3    in your immediate -- that's the question.  You answered two

10:56:36    4    questions.

10:56:44    5           THE PROSPECTIVE JUROR:  Yes.

10:56:44    6           MS. GREENSPAN:  Your Honor, if I may just ask you,

10:56:47    7    juror number 9's column is blank.

10:56:50    8           THE COURT:  Juror number 9.  Come on back.

10:56:57    9           MS. GREENSPAN:  There is no profession.

10:57:04   10           THE COURT:  Sorry about that.

10:57:04   11           We have a sheet which shows where you work.  Where do

10:57:10   12    you work?

10:57:10   13           THE PROSPECTIVE JUROR:  I work in New York City.

10:57:12   14           THE COURT:  As a what?

10:57:13   15           THE PROSPECTIVE JUROR:  I am a literary agent

10:57:15   16    assistant.

10:57:17   17           THE COURT:  Okay.  What kind of books do you assist

10:57:19   18    with?

10:57:20   19           THE PROSPECTIVE JUROR:  She does mostly kids books,

10:57:24   20    picture books.

10:57:25   21           THE COURT:  Do any Philosophy books?

10:57:25   22           THE PROSPECTIVE JUROR:  No.

10:57:26   23           THE COURT:  Anything about that work that would impact

10:57:29   24    your ability to decide this case fairly and impartially?

10:57:33   25           THE PROSPECTIVE JUROR:  No.

*United States District Court*

| | | |
|---|---|---|
| 10:57:33 | 1 | MR. FOLEY:  Follow-up? |
| 10:57:35 | 2 | MS. GREENSPAN:  No follow-up. |
| 10:57:36 | 3 | THE COURT:  Follow-up? |
| 10:57:37 | 4 | MR. FOLEY:  Are you involved in any of the contracts |
| 10:57:40 | 5 | setting pay for royalties or anything for the writers? |
| 10:57:44 | 6 | THE PROSPECTIVE JUROR:  I see them all but I don't |
| 10:57:46 | 7 | have any decision-making or anything like that. |
| 10:57:51 | 8 | THE COURT:  Okay. |
| 10:57:53 | 9 | MR. FOLEY:  Do you have any opinion on whether the |
| 10:57:55 | 10 | contracts are fair? |
| 10:57:56 | 11 | THE COURT:  Okay.  That's beyond.  Thank you very |
| 10:57:58 | 12 | much. |
| 10:58:01 | 13 | It's a business relationship.  It is not an employment |
| 10:58:05 | 14 | issue. |
| 10:58:06 | 15 | MR. FOLEY:  Okay.  Thanks. |
| 10:58:07 | 16 | THE COURT:  Juror number 10.  Good morning, Mr. |
| 10:58:34 | 17 | Zassick. |
| 10:58:34 | 18 | THE PROSPECTIVE JUROR:  Good morning, Your Honor. |
| 10:58:34 | 19 | THE COURT:  How are you? |
| 10:58:34 | 20 | THE PROSPECTIVE JUROR:  Good.  Good. |
| 10:58:36 | 21 | THE COURT:  I am going to go through those questions |
| 10:58:37 | 22 | that you answered. |
| 10:58:38 | 23 | First of all, do you or any member of your family or |
| 10:58:41 | 24 | friend have any connection of any kind with the defendant |
| 10:58:43 | 25 | Drexel University including student or employee? |

*United States District Court*

10:58:46   1         THE PROSPECTIVE JUROR: Me daughter, she's an RN with

10:58:52   2   CHOP so she's involved in their nurse practitioner program

10:58:54   3   online. She's currently a student with Drexel.

10:58:55   4         THE COURT: So you said she's with CHOP. She works at

10:58:58   5   CHOP but goes to Drexel?

10:59:00   6         THE PROSPECTIVE JUROR: Yeah, yeah. A lot of folks

10:59:02   7   do. She's a full-time but it's on-line. They have a program

10:59:07   8   there, end of school nursing.

10:59:10   9         THE COURT: Do you talk to her about her work?

10:59:14   10         THE PROSPECTIVE JUROR: Yeah. I know about her work.

10:59:16   11   Yeah. She's a nurse stuff so stuff about CHOP. She will tell

10:59:19   12   me about Drexel, the program that she's in.

10:59:22   13         THE COURT: Is she paid by Drexel or by CHOP?

10:59:26   14         THE PROSPECTIVE JUROR: She is employed by CHOP but

10:59:29   15   she has student loans, you know.

10:59:32   16         THE COURT: Okay. Does she get paid?

10:59:34   17         THE PROSPECTIVE JUROR: To go to Drexel? No. Oh,

10:59:38   18   yeah, she's a full-time RN.

10:59:41   19         THE COURT: And does she talk to you -- has she ever

10:59:44   20   talked to you about pay at Drexel?

10:59:47   21         THE PROSPECTIVE JUROR: No, not at all.

10:59:48   22         THE COURT: Anything about your relationship with her

10:59:49   23   or anything that you said to her that would impact your ability

10:59:53   24   to decide this case fairly and impartially?

10:59:53   25         THE PROSPECTIVE JUROR: No.

10:59:56   1            THE COURT:  Follow-up on that one?

10:59:59   2            MS. GREENSPAN:  No, Your Honor.

11:00:00   3            MR. FOLEY:  So I just want to clarify.  Is she a

11:00:05   4    student at Drexel, paying Drexel.

11:00:09   5            THE COURT:  Yes, she's in their school of nursing,

11:00:13   6    nurse practitioner program.  She pays tuition.

11:00:16   7            MR. FOLEY:  How long has she been there?

11:00:19   8            THE COURT:  She's about half way through the program.

11:00:22   9    It's about a two year program.  She graduates in '26.

11:00:24  10            MS. GREENSPAN:  Thank you.

11:00:24  11            THE COURT:  Is there anything about your -- I am not

11:00:27  12    sure if I asked this.  Anything about your relationship with

11:00:29  13    her and her being a student at Drexel that would impact your

11:00:32  14    ability to decide this case fairly and impartially?

11:00:32  15            THE PROSPECTIVE JUROR:  No.

11:00:35  16            THE COURT:  Let's move to the next one.  Have you ever

11:00:37  17    supervised other employees at work?

11:00:40  18            THE PROSPECTIVE JUROR:  Yeah.  I am a supervisor for

11:00:42  19    the defense logistics agency, which is up in Philadelphia,

11:00:45  20    headquartered.  It's part of DOD, so I am a manager.

11:00:49  21            THE COURT:  When you manage, do you also set people's

11:00:52  22    pay?

11:00:53  23            THE PROSPECTIVE JUROR:  No, I do not.

11:00:54  24            THE COURT:  It's set by the Government but I know that

11:00:57  25    our supervisor here will make the recommendations, step

11:01:01   1   increased or merit increases.  Do you to do that?

11:01:04   2        THE PROSPECTIVE JUROR:  What I do decide is -- not

11:01:06   3   step increases.  They are automatic.  I am part of -- when you

11:01:10   4   say merit, that's merit promotions.  I am a part of, you know,

11:01:14   5   boards with hire promotions.  So I am on hiring boards.  And

11:01:17   6   the only thing that I do now -- we changed.  But in the past

11:01:23   7   what I would do is I would recommend -- we get a yearly bonus.

11:01:26   8   So who are my A people, B people, C people.  I don't decide the

11:01:31   9   money.  That is decided by the higher ups but I would designate

11:01:37  10   like an outstanding and then they would get money.

11:01:38  11        Right now we don't do it.  It is a pool of money.  But

11:01:41  12   I can still decide -- say something is excellent, they get a

11:01:46  13   little bit more.  Somebody that's lets, they get a little less.

11:01:48  14   So I have the determination to decide if someone gets a little

11:01:52  15   bit higher based on numbers.

11:01:54  16        THE COURT:  Have you heard or been faced  any

11:01:58  17   complaints about the process that he you engaged in in

11:02:00  18   determining whether people should get those extra months?

11:02:03  19        THE PROSPECTIVE JUROR:  No, not usually people.

11:02:05  20   Don't -- you know, every now and then.  Never personally to me

11:02:09  21   because I believe I am a fair supervisor.  But I never had an

11:02:15  22   issue with that.

11:02:16  23        THE COURT:  Is there anything about that job that

11:02:19  24   would impact your ability to decide this case fairly and

11:02:19  25   impartially?

*United States District Court*

11:02:23   1        THE PROSPECTIVE JUROR:  No, no.

11:02:24   2        THE COURT:  Follow up?

11:02:25   3        MS. GREENSPAN:  Not on that, Your Honor.  I was trying

11:02:27   4  to interject on a follow-up about that and I apologize I didn't

11:02:30   5  get in there quick number.

11:02:33   6        THE COURT:  Which question --

11:02:33   7        THE PROSPECTIVE JUROR:  The question about his

11:02:33   8  daughter's works at Drexel.

11:02:33   9        THE COURT:  Okay.

11:02:35  10        MS. GREENSPAN:  You had said that your daughter talks

11:02:38  11  to you about Drexel.  When she talks to you about Drexel, is

11:02:41  12  she talking --

11:02:43  13        THE PROSPECTIVE JUROR:  Just specific about her

11:02:44  14  program, like, hey, my professors when she's on-line.  This is

11:02:49  15  good.  It is a good program.  She's accepted in quite a few so

11:02:53  16  she's like I like it, certain things.  She's down there.  She

11:02:59  17  works right there.  Goes to the library sometimes.  Just

11:03:05  18  endemic as in how she's doing in the program she is in.  We

11:03:09  19  don't talk often.  But in this class, dad.  She did well.

11:03:15  20  She's progressing through is so...

11:03:18  21        THE COURT:  You served as a juror before?

11:03:20  22        THE PROSPECTIVE JUROR:  Yes, I have.

11:03:20  23        THE COURT:  Tell me about that.

11:03:21  24        THE PROSPECTIVE JUROR:  I served two times.  I was an

11:03:22  25  alternate in an assault case in North Philadelphia.  I was an

11:03:30   1   alternate.  So I sat through everything, didn't make a

11:03:33   2   decision.

11:03:33   3           THE COURT:  That sucks, doesn't it?

11:03:37   4           THE PROSPECTIVE JUROR:  Yeah.  Well, yeah, right.

11:03:39   5   However, I was part of a murder case and it was when we were in

11:03:47   6   voir dire, right here, it was -- as far as we knew it was a

11:03:53   7   death penalty case.  So I served on that case.  The defendant

11:03:56   8   was found guilty and the judge at that time brought us in and

11:04:00   9   he said because there was an aggravating circumstances he was

11:04:03   10  going to give him life imprisoned.  So he wasn't sentenced to

11:04:06   11  death.  But I was part of that jury so we determined, the jury,

11:04:11   12  that he was guilty of that.

11:04:14   13          THE COURT:  In that second case were you the

11:04:17   14  foreperson?

11:04:18   15          THE PROSPECTIVE JUROR:  No.

11:04:19   16          THE COURT:  Was there anything in either of the cases

11:04:21   17  that would impact your ability to decide  this case fairly and

11:04:21   18  impartially?

11:04:21   19          THE PROSPECTIVE JUROR:  No.

11:04:26   20          THE COURT:  Follow-up on that question.

11:04:28   21          MS. GREENSPAN:  No, Your Honor.

11:04:30   22          MR. FOLEY:  Did you like being on the jury?

11:04:34   23          THE PROSPECTIVE JUROR:  The only thing about it is if

11:04:35   24  you ask me when you're in common law court or state Court you

11:04:40   25  have the families there, it is a little more pressure because

11:04:44    1   it's somebody's life.  When the verdict was read there is gasps

11:04:47    2   in the courtroom.  It is a little more dramatic so it is

11:04:50    3   uncomfortable to some degree where the judge actually took to

11:04:54    4   us to a special elevator down to Broad Street.  So part of it,

11:05:02    5   it's a little bit, you know.

11:05:02    6           THE COURT:  Let me ask the final question.  Have you

11:05:04    7   or anyone in your immediate family ever participated in a

11:05:08    8   lawsuit as a party or in any other capacity?

11:05:08    9           THE PROSPECTIVE JUROR:  The only thing is am with the

11:05:13    10  county but I work as a federal supervisor for the DOD.  I was

11:05:16    11  in a hiring action for a promotion.  The end of this a certain

11:05:21    12  individuals went through our equal employment opportunity.  And

11:05:25    13  I was part of -- they brought up not a formal lawsuit but I was

11:05:29    14  accused of  being discriminatory.

11:05:32    15          The individual was missing an arm.  They said the

11:05:33    16  reason that we didn't hire him and I was part of the panel.

11:05:40    17  And he was handicapped.

11:05:41    18          THE COURT:  Disability discrimination?

11:05:44    19          THE PROSPECTIVE JUROR:  Right.  And it wasn't the

11:05:45    20  case.  We just hired the best individuals.

11:05:47    21          THE COURT:  What happened in that case?

11:05:48    22          THE PROSPECTIVE JUROR:  He ended up getting the

11:05:50    23  promotion anyway.  So he got the promotion.  Investigator comes

11:05:53    24  from DOD, he will say if, hey, was it determined on just -- he

11:05:59    25  was the most qualified.

11:06:00    1    We hired the most qualified individuals.  He brought a

11:06:02    2    case.  The case was decided however it was and he ended up --

11:06:08    3    our senior leader said just give him the promotion, make it go

11:06:13    4    away.

11:06:13    5         THE COURT:  How long ago was that?

11:06:15    6         THE PROSPECTIVE JUROR:  That was probably two and a

11:06:18    7    half, three years ago.

11:06:19    8         THE COURT:  How was that impacted your thinking on

11:06:25    9    disability discrimination?

11:06:27    10        THE PROSPECTIVE JUROR:  I know the individual before.

11:06:28    11   I would absolutely never discriminate.  It wasn't at all

11:06:32    12   because of his handicap.  And I see him to this day and I know

11:06:38    13   him.  No hard feelings.  I say hi to him.

11:06:42    14        If you work in my position sometimes employees bring

11:06:45    15   those EEO complaints and as managers as long as we are on firm

11:06:50    16   footing and make decisions based on the criteria we work it

11:06:50    17   out.

11:06:55    18        THE COURT:  Anything about that case or your work in

11:06:58    19   this capacity would impact your ability to decide this case

11:07:01    20   fairly and impartially?

11:07:02    21        THE PROSPECTIVE JUROR:  No.

11:07:02    22        THE COURT:  Follow-up?

11:07:03    23        MS. GREENSPAN:  No, Your Honor.

11:07:04    24        THE COURT:  Follow-up?

11:07:05    25        MR. FOLEY:  In that case did you agree with the claims

*United States District Court*

11:07:16   1   by the disabled person?

11:07:20   2   THE PROSPECTIVE JUROR:  No, absolutely not.

11:07:21   3   THE COURT:  That's beyond the scope.

11:07:23   4   Okay.  Thank you very much.

11:07:28   5   Any motions?

11:07:29   6   MS. GREENSPAN:  No.

11:07:29   7   MR. FOLEY:  Yes, Your Honor.  I think that the

11:07:32   8   relationship with Drexel and that he has a daughter who's

11:07:36   9   paying tuition there now any decision that he know could

11:07:41   10  effect, could cause Drexel to pay money, and I believe that

11:07:47   11  that could have some kind of effect on his daughter's tuition

11:07:50   12  or program.

11:07:50   13  THE COURT:  Any response?

11:07:51   14  MS. GREENSPAN:  Your Honor, we asked him questions

11:07:54   15  about whether he talked with her about her work at Drexel.  He

11:07:58   16  said they do not talk about pay.  He also said there is nothing

11:08:01   17  about that experience or his relationship with her that would

11:08:04   18  make it so he couldn't be fair and impartial in this case.  We

11:08:08   19  would suggest the motion be denied.

11:08:08   20  THE COURT:  Motion denied.

11:08:14   21  MS. GREENSPAN:  Thank you.

11:08:14   22  Juror number 11.

11:08:39   23  THE COURT:  Hello, Ms. Baylis.  You answered two

11:08:42   24  questions and I just want to follow-up on them.

11:08:45   25  The first one have you or someone else close to you

*United States District Court*

11:08:47   1   ever been accused of discriminating against somebody at your

11:08:51   2   work place because of their sex or gender.

11:08:52   3            THE PROSPECTIVE JUROR:  I said no.

11:08:53   4            THE COURT:  That was no to that question?

11:08:55   5            THE PROSPECTIVE JUROR:  Yeah.

11:08:56   6            THE COURT:  Okay.  Well, I have you also answered

11:08:59   7   question 22.  Does anyone else on their paper have anything

11:09:06   8   else?

11:09:06   9            THE DEPUTY CLERK:  No.

11:09:07   10           THE COURT:  So 22 was have you ever served as a juror.

11:09:10   11           THE PROSPECTIVE JUROR:  Yes.

11:09:11   12           THE COURT:  Tell we about that.

11:09:12   13           THE PROSPECTIVE JUROR:  So it was City.  It was civil

11:09:13   14   case.  But they settled.

11:09:23   15           THE COURT:  So you as a jury did not get to deliberate

11:09:26   16   at all?

11:09:26   17           THE PROSPECTIVE JUROR:  No.

11:09:27   18           THE COURT:  Anything about your experience there that

11:09:28   19   would impact your ability to decide this case fairly and

11:09:28   20   impartially?

11:09:28   21           THE PROSPECTIVE JUROR:  No.

11:09:33   22           THE COURT:  Any follow-up?

11:09:34   23           MS. GREENSPAN:  No, Your Honor.

11:09:35   24           MR. FOLEY:  No, Your Honor.

11:09:37   25           THE COURT:  That was it.  You can have a seat.  Thank

*United States District Court*

11:09:41    1    you.

11:09:42    2           MS. GREENSPAN:  Your Honor, on the jury sheet she says

11:09:47    3    retired.  Maybe ask her what she did do before she was retired.

11:09:55    4           THE COURT:  Okay.

11:09:58    5           Juror number 11, come on back.  Just one more

11:10:02    6    question.

11:10:03    7           MS. GREENSPAN:  Your Honor, just as a head's up, the

11:10:03    8    next one also as a blank there.

11:10:03    9           THE COURT:  Okay.

11:10:14   10           So you're retired, right?

11:10:15   11           THE PROSPECTIVE JUROR:  Yes.

11:10:15   12           THE COURT:  What did you retire from?

11:10:18   13           THE PROSPECTIVE JUROR:  A nanny.

11:10:18   14           THE COURT:  Good.

11:10:21   15           MS. GREENSPAN:  Yes.

11:10:21   16           THE COURT:  Thank you very much.

11:10:22   17           MR. FOLEY:  Your Honor, sorry.  A process question,

11:10:25   18    are preemptory challenges after?

11:10:27   19           THE COURT:  After.

11:10:28   20           Any motion to strike?

11:10:29   21           MS. GREENSPAN:  No, Your Honor.

11:10:30   22           MR. FOLEY:  No, Your Honor.

11:10:32   23           THE COURT:  Juror number 12.

11:10:47   24           Good morning.  Lija.

11:10:52   25           You answered a few questions.  I am just going to go

11:10:53   1   through them.  And the first one is, Do you or any of your

11:10:59   2   family or friend have any connection of any kind with the

11:11:01   3   defendant, Drexel University as a student or employer.

11:11:05   4           THE PROSPECTIVE JUROR:  Student.

11:11:05   5           THE COURT:  Are you a student now?

11:11:07   6           THE PROSPECTIVE JUROR:  I am not a student.  My niece.

11:11:11   7           THE COURT:  What department is she is?

11:11:12   8           THE PROSPECTIVE JUROR:  One in nursing.  One in

11:11:14   9   history.

11:11:15  10           THE COURT:  Are they right now at Drexel?

11:11:18  11           THE PROSPECTIVE JUROR:  Yes.

11:11:19  12           THE COURT:  Do you talk to them about being students

11:11:21  13   at Drexel?

11:11:23  14           THE PROSPECTIVE JUROR:  Just a little bit, you know.

11:11:26  15   They come over and they talk about their college life and all.

11:11:31  16           THE COURT:  Do they talk to you about their

11:11:31  17   professors?

11:11:31  18           THE PROSPECTIVE JUROR:  No.

11:11:35  19           THE COURT:  Anything about your relationship with them

11:11:37  20   that would impact your ability to decide this case?

11:11:42  21           THE PROSPECTIVE JUROR:  I think so.  Maybe.  But I

11:11:45  22   don't know.  I can sometimes express what happened.

11:11:52  23           THE COURT:  You talk about what?

11:11:54  24           THE PROSPECTIVE JUROR:  I mean like a decision like

11:11:57  25   the college.  Maybe.  Probably not, you know.  Bring up this

*United States District Court*

11:12:04    1    happened.

11:12:05    2        THE COURT:  No, I am not talking about what you would

11:12:08    3    do if you hear about this case and you talk to them after this.

11:12:11    4    I am talking about up to now.  They don't know you're here.

11:12:11    5    They don't know about this case.

11:12:11    6        THE PROSPECTIVE JUROR:  No, no.

11:12:17    7        THE COURT:  So looking at that time period which is

11:12:19    8    before today, is there anything that would impact your ability

11:12:23    9    to decide this case fairly and impartially?

11:12:30    10        THE PROSPECTIVE JUROR:  Hard to make decision.

11:12:32    11        THE COURT:  Why?

11:12:34    12        THE PROSPECTIVE JUROR:  I mean, you know knowing all

11:12:37    13    these things.  I don't know this is.

11:12:41    14        THE COURT:  Help me understand a bit more.

11:12:46    15        THE PROSPECTIVE JUROR:  I was like, the same situation

11:12:47    16    actually happened to me also my previous job because I feel

11:12:51    17    like I didn't answer that question yes but now it's coming back

11:12:56    18    to me, you know, because I feel like I was a victim because I

11:13:05    19    was doing two job and then I realize that they are because it

11:13:15    20    was D 33 and D 37, they were paying me D 33 they are supposed

11:13:20    21    to give me 37, but when I question them they say, they are like

11:13:26    22    you just joined the job it's kind of like.  Then I noticed that

11:13:31    23    people who work my position in other building the same was

11:13:37    24    making more money.

11:13:38    25        THE COURT:  Where were you working when this happened?

*United States District Court*

11:13:39    1    THE PROSPECTIVE JUROR:  This is nursing field.  It was

11:13:45    2    in Genesis.  Now I'm no longer with Genesis.

11:13:51    3    THE COURT:  Would that impact that thing you just

11:13:52    4    talked about, would that impact ability to decide this case

11:13:52    5    fairly and impartially?

11:13:56    6    THE PROSPECTIVE JUROR:  It is.

11:13:57    7    THE COURT:  Follow-up on that?

11:13:58    8    MS. GREENSPAN:  No, Your Honor.

11:14:01    9    MR. FOLEY:  No, Your Honor.

11:14:02    10    THE COURT:  Okay.  So then you also answered yes to

11:14:06    11    the question have you or someone close to you ever been

11:14:13    12    employed as a teacher.

11:14:16    13    THE PROSPECTIVE JUROR:  My family friend, U Penn.  He

11:14:21    14    was a math professor.

11:14:23    15    THE COURT:  Did you talk to him about that?

11:14:23    16    THE PROSPECTIVE JUROR:  No.

11:14:28    17    THE COURT:  Did you talk to him about his pay?

11:14:28    18    THE PROSPECTIVE JUROR:  No.

11:14:30    19    THE COURT:  Anything about that that would impact your

11:14:30    20    ability to decide this case fairly and impartially?

11:14:35    21    THE PROSPECTIVE JUROR:  No.  That is in the family.  I

11:14:36    22    don't talk about that.

11:14:37    23    THE COURT:  Any follow-up?

11:14:37    24    MS. GREENSPAN:  I didn't hear.  Who was the math

11:14:39    25    professor?

*United States District Court*

11:14:40    1          THE COURT:  It' her uncle.  Right?

11:14:43    2          THE PROSPECTIVE JUROR:  Yeah it's a family member.

11:14:45    3          THE COURT:  University of Pennsylvania.  Any

11:14:49    4 follow-up?

11:14:49    5          MR. FOLEY:  Is he still a math professor there?

11:14:52    6          THE PROSPECTIVE JUROR:  I think so.  I am not close to

11:14:54    7 him.

11:14:54    8          THE COURT:  The next question you answered yes to have

11:14:59    9 you or a close family member ever been employed by a University

11:14:59   10 or college.

11:15:02   11          THE PROSPECTIVE JUROR:  Yes, same one.

11:15:03   12          THE COURT:  Finally, have you ever supervised other

11:15:10   13 employees at work.

11:15:12   14          THE PROSPECTIVE JUROR:  Yes.  Part of my job that is

11:15:15   15 to a supervise.  I am currently assistant director of nursing.

11:15:22   16          THE COURT:  Any follow-up?

11:15:23   17          MS. GREENSPAN:  I didn't hear.

11:15:23   18          THE COURT:  She supervises other people at work.  She

11:15:26   19 is the assistant director.

11:15:28   20          THE PROSPECTIVE JUROR:  Yes.

11:15:29   21          MS. GREENSPAN:  How many individuals is it that you

11:15:33   22 supervise?

11:15:34   23          THE PROSPECTIVE JUROR:  Like a hundred.

11:15:37   24          MS. GREENSPAN:  Of the 100 people that you

11:15:38   25 supervise --

| 11:15:40 | 1 | THE PROSPECTIVE JUROR: In the shift might be like 50. |

11:15:40　1　THE PROSPECTIVE JUROR: In the shift might be like 50.

11:15:46　2　MS. GREENSPAN: Is it a mix of men and women?

11:15:49　3　THE PROSPECTIVE JUROR: Yes.

11:15:50　4　MS. GREENSPAN: Thank you.

11:15:51　5　THE COURT: Any follow-up for you?

11:15:52　6　MR. FOLEY: No.

11:16:00　7　THE COURT: Okay. Thank you very much. You can have

11:16:02　8　a seat.

11:16:05　9　Any motions?

11:16:05　10　MS. GREENSPAN: Yes, Your Honor. We move to strike,

11:16:07　11　specifically with regard to the fact she said the exact same

11:16:11　12　thing happened to me in my previous job, she was underpaid, she

11:16:15　13　questioned it, she does not think she can be fair. She thinks

11:16:18　14　it can impact what she's doing here. We move to strike.

11:16:24　15　MR. FOLEY: I have no objection.

11:16:25　16　THE COURT: Struck.

11:16:31　17　Juror number 13.

11:16:50　18　I am just going to go through the questions that you

11:16:52　19　answered yes to. First of all you answered yes to a question

11:16:55　20　of have you ever had a job where you were responsibile for

11:16:58　21　setting the amount of money that other employees were paid for

11:17:00　22　their work.

11:17:01　23　THE PROSPECTIVE JUROR: Yes.

11:17:01　24　THE COURT: Tell me about that.

11:17:03　25　THE PROSPECTIVE JUROR: I own a shop. I hire people,

*United States District Court*

11:17:06  1  fire people.  I managed another shop later, set rates and so

11:17:09  2  on.

11:17:10  3          THE COURT:  What kind of shop?

11:17:11  4          THE PROSPECTIVE JUROR:  Automotive restoration.

11:17:14  5          THE COURT:  Did you employee both men and women?

11:17:17  6          THE PROSPECTIVE JUROR:  Yes.  Women are a little more

11:17:19  7  rare in that field but we did have a few.

11:17:21  8          THE COURT:  Did any woman ever complain to you about

11:17:23  9  their wages?

11:17:23  10          THE PROSPECTIVE JUROR:  No.

11:17:28  11          THE COURT:  Did you set peoples' wages?

11:17:30  12          THE PROSPECTIVE JUROR:  Yeah.  I set the starting wage

11:17:34  13  and the owner when he gave raises out he would go from there.

11:17:39  14          THE COURT:  The starting wages were they always the

11:17:42  15  same for any given job?

11:17:44  16          THE PROSPECTIVE JUROR:  No they vary very based on

11:17:45  17  their experience and jobs and so on.  Do you want me to get

11:17:49  18  into that a little might more with the two women that I hired?

11:17:49  19          THE COURT:  Go ahead.

11:17:52  20          THE PROSPECTIVE JUROR:  The one was more of a trainee

11:17:55  21  so she had a training wages.  The other one was a much more

11:17:59  22  experienced person, came in and she was a higher wage.

11:18:02  23          THE COURT:  Did either of them complain to you by

11:18:06  24  their wages?

11:18:06  25          THE PROSPECTIVE JUROR:  No.

*United States District Court*

11:18:07  1    THE COURT:  Anything about that experience that would

11:18:09  2  impact your ability to decide this case fairly and impartially?

11:18:15  3    THE PROSPECTIVE JUROR:  No.

11:18:15  4    MR. FOLEY:  Follow-up?

11:18:16  5    MS. GREENSPAN:  No, Your Honor.

11:18:17  6    THE COURT:  Follow-up?

11:18:18  7    MR. FOLEY:  No.

11:18:18  8    THE COURT:  Okay.  Then you answered yes to the

11:18:21  9  question have you ever supervised other employees at work.  Is

11:18:25  10  that the same thing?

11:18:26  11    THE PROSPECTIVE JUROR:  Yes.

11:18:26  12    THE COURT:  And then you also answered yes to the

11:18:29  13  question have you ever served as a juror?

11:18:33  14    THE PROSPECTIVE JUROR:  That one I think I misheard.

11:18:36  15  I was a witness of a Grand Jury trial, I was not on a jury.

11:18:41  16    THE COURT:  I think you answered yes to 23, which is,

11:18:43  17  have you or anyone in your immediate family ever participated

11:18:47  18  in a lawsuit.

11:18:48  19    THE PROSPECTIVE JUROR:  Yes.  I have participated.

11:18:52  20    THE COURT:  So I have got two things.  You sued people

11:18:57  21  and you participated in a grand jury, right?

11:18:58  22    THE PROSPECTIVE JUROR:  I was a witness, not a juror.

11:19:01  23  I think I heard I wrong.

11:19:04  24    THE COURT:  Let's talk about you suing people.  Who

11:19:06  25  have you sued?

*United States District Court*

11:19:09   1          THE PROSPECTIVE JUROR:  A guy who took my money from

11:19:12   2   doing my bathroom and never finished it.

11:19:14   3          THE COURT:  What happened in that lawsuit?

11:19:17   4          THE PROSPECTIVE JUROR:  He never showed up.  It was

11:19:18   5   that simple.  I got a judgment but I never got any money.

11:19:23   6          THE COURT:  When was that process?

11:19:26   7          THE PROSPECTIVE JUROR:  Three years about.  About

11:19:27   8   three years ago.

11:19:28   9          THE COURT:  Anything about that process that would

11:19:31  10   impact your ability to decide this case fairly and impartially?

11:19:33  11          THE PROSPECTIVE JUROR:  No.  I understand it's I got

11:19:35  12   to get the money from him.  I got justice as far as legal is

11:19:40  13   concerned.

11:19:41  14          THE COURT:  So you think that the judgment was

11:19:45  15   justice.  You just couldn't get the money?

11:19:48  16          THE PROSPECTIVE JUROR:  Yeah.  The Court can't.  I'd

11:19:50  17   have to go and get the money.

11:19:53  18          THE COURT:  What about you were witness to a Grand

11:19:56  19   Jury, tell me about that to the extent you can.

11:20:02  20          THE PROSPECTIVE JUROR:  It was so long ago.

11:20:02  21          THE COURT:  How long ago was it?

11:20:04  22          THE PROSPECTIVE JUROR:  30, 35 years ago.

11:20:06  23          THE COURT:  Tell me about it.

11:20:08  24          THE PROSPECTIVE JUROR:  It was a drug dealer.  The

11:20:08  25   whole thing was five minutes at most.

*United States District Court*

| 11:20:21 | 1 | THE COURT:  Do you know whether he was indicted? |
| 11:20:23 | 2 | THE PROSPECTIVE JUROR:  Yeah.  He was guilty. |
| 11:20:24 | 3 | THE COURT:  Do you know whether he went to jail? |
| 11:20:27 | 4 | THE PROSPECTIVE JUROR:  Yeah. |
| 11:20:27 | 5 | THE COURT:  Anything about that experience that would |
| 11:20:30 | 6 | impact your ability to decide this case fairly and impartially? |
| 11:20:33 | 7 | THE PROSPECTIVE JUROR:  Not that I know of. |
| 11:20:34 | 8 | THE COURT:  Not that you know of. |
| 11:20:36 | 9 | THE PROSPECTIVE JUROR:  I mean nothing happened in |
| 11:20:38 | 10 | that.  I was younger kid and more scared to death than anything |
| 11:20:42 | 11 | because he was a power figure what I understand and all that |
| 11:20:44 | 12 | other stuff.  But I lived this long, so... |
| 11:20:48 | 13 | THE COURT:  There were no effects of that testimony? |
| 11:20:51 | 14 | THE PROSPECTIVE JUROR:  No. |
| 11:20:51 | 15 | THE COURT:  Follow-up? |
| 11:20:52 | 16 | MS. GREENSPAN:  No. |
| 11:20:52 | 17 | THE COURT:  Follow-up? |
| 11:20:53 | 18 | MR. FOLEY:  No. |
| 11:21:01 | 19 | THE COURT:  That's it.  Thank you. |
| 11:21:03 | 20 | Any motions? |
| 11:21:08 | 21 | MS. GREENSPAN:  Nothing. |
| 11:21:08 | 22 | THE COURT:  Any motions, plaintiff? |
| 11:21:09 | 23 | MR. FOLEY:  Yes.  Just in the sense that he supervised |
| 11:21:18 | 24 | women in an industry where there were very few women working |
| 11:21:23 | 25 | there and Drexel's been known as an engineer school that's |

*United States District Court*

11:21:29    1    mostly male dominated, I wonder if that might have some effect.

11:21:34    2        MS. GREENSPAN:  He testified that the women are more

11:21:37    3    rare in the field but that he has hired two women and it would

11:21:41    4    have no impact on his decision here.

11:21:43    5        THE COURT:  Both denied.

11:21:48    6        Juror number 14.

11:21:48    7        THE COURT:  Hello, Ms. Gasho.

11:21:48    8        THE PROSPECTIVE JUROR:  I'm Jennifer Gasho.

11:22:09    9        THE COURT:  I am just going to go through the

11:22:10   10    questions that you answered yes to and let's first turn to you.

11:22:17   11    You've had a job where you were responsibile for setting the

11:22:19   12    amount of money that other employees were getting paid.

11:22:19   13        THE PROSPECTIVE JUROR:  Yes.

11:22:23   14        THE COURT:  Tell me about that.

11:22:24   15        THE PROSPECTIVE JUROR:  I am a service manger.  I

11:22:25   16    first was a general manager for my family-owned company, so my

11:22:29   17    brother and I decided what  the salary of the employees was and

11:22:33   18    the raises they would get.

11:22:35   19        We sold that company and I work for another company

11:22:37   20    right now.  I am ready retire in 6 months.  I have a group of

11:22:40   21    people that work for me under my service repair department that

11:22:44   22    I do have a say on what they get paid.

11:22:47   23        THE COURT:  So let's talk about -- what business do

11:22:49   24    you work in?

11:22:52   25        THE PROSPECTIVE JUROR:  Industrial pumps and blowers.

*United States District Court*

| 11:22:53 | 1 | THE COURT: That was also your family business? |
| 11:22:54 | 2 | THE WITNESS: It was. We did the air side. This |
| 11:22:57 | 3 | company does the liquid side. We sold. |
| 11:23:00 | 4 | THE COURT: You sold to that company? |
| 11:23:02 | 5 | THE PROSPECTIVE JUROR: Yes. |
| 11:23:03 | 6 | THE COURT: So let's talk about the first your family |
| 11:23:07 | 7 | company. You set salaries. |
| 11:23:07 | 8 | THE PROSPECTIVE JUROR: Yes, we did. |
| 11:23:12 | 9 | THE COURT: Did you have both male and female |
| 11:23:15 | 10 | employees. |
| 11:23:15 | 11 | THE PROSPECTIVE JUROR: Yes. |
| 11:23:16 | 12 | THE COURT: Was there any complaint from any men or |
| 11:23:19 | 13 | women about salary differentials? |
| 11:23:19 | 14 | THE PROSPECTIVE JUROR: No. |
| 11:23:22 | 15 | THE COURT: What about when you moved to being an |
| 11:23:25 | 16 | employee at this next company? |
| 11:23:25 | 17 | THE PROSPECTIVE JUROR: No. |
| 11:23:28 | 18 | THE COURT: And both men and women were there? |
| 11:23:31 | 19 | THE PROSPECTIVE JUROR: Yeah. Mostly men. |
| 11:23:33 | 20 | THE COURT: Would your work in your own family company |
| 11:23:36 | 21 | and in this new company impact your ability to decide this case |
| 11:23:40 | 22 | fairly and impartially? |
| 11:23:43 | 23 | THE PROSPECTIVE JUROR: No. |
| 11:23:43 | 24 | THE COURT: Follow-up? |
| 11:23:44 | 25 | MS. GREENSPAN: You mentioned there were no complaints |

*United States District Court*

11:23:46   1   about salaries.  Were there ever any lawsuits?

11:23:46   2              THE PROSPECTIVE JUROR:  No.

11:23:52   3              THE COURT:  Follow-up?

11:23:52   4              MR. FOLEY:  Were the men paid more than the women?

11:23:58   5              THE COURT:  Beyond the scope.

11:24:01   6        Next you said, the question was have you ever

11:24:06   7   supervised other employees.  Is that saying the same thing?

11:24:09   8              THE PROSPECTIVE JUROR:  Yes.

11:24:12   9              THE COURT:  Any follow-up on that?

11:24:13   10             MS. GREENSPAN:  No, Your Honor.

11:24:14   11             THE COURT:  Okay.  Then have ever had any training in

11:24:21   12  connection with compliance with antidiscrimination laws?

11:24:26   13             THE PROSPECTIVE JUROR:  Yes.  In my previous positions

11:24:28   14  I was manager of a retail store and they did that.

11:24:32   15             THE COURT:  How long ago was that?

11:24:34   16             THE PROSPECTIVE JUROR:  That was a long time ago.

11:24:36   17             THE COURT:  10, 15, 20?

11:24:36   18             THE PROSPECTIVE JUROR:  40.

11:24:40   19             THE COURT:  And do you recall anything about the

11:24:43   20  discrimination training you received.

11:24:46   21             THE PROSPECTIVE JUROR:  No.  But we did do extensive

11:24:49   22  training.

11:24:49   23             THE COURT:  Any discussion about pay, equal pay?

11:24:53   24             THE PROSPECTIVE JUROR:  Yeah.  Here was always a part

11:24:55   25  of equal pay.

*United States District Court*

11:24:55   1      THE COURT:  In that time period when you were working

11:24:57   2  in retail, any complaints about women getting paid differently

11:24:57   3  than men?

11:24:57   4      THE PROSPECTIVE JUROR:  No.

11:25:02   5      THE COURT:  Would that impact on your ability to

11:25:05   6  decide this case fairly and impartially?

11:25:07   7      THE PROSPECTIVE JUROR:  No.

11:25:07   8      THE COURT:  Follow-up?

11:25:08   9      MS. GREENSPAN:  No, Your Honor.

11:25:09  10      MR. FOLEY:  I just didn't hear your answer.  Is it

11:25:12  11  discussions about pay.  Was that it?  Discussion about equal

11:25:16  12  pay.

11:25:18  13      THE COURT:  She said there were discussions in the

11:25:21  14  training about equal pay.

11:25:22  15      THE PROSPECTIVE JUROR:  Yes, there was.

11:25:24  16      Always equal opportunity.  That was always important

11:25:27  17  in any position I was in.

11:25:29  18      THE COURT:  Then you served as a juror.

11:25:31  19      THE PROSPECTIVE JUROR:  Yes, I did.

11:25:32  20      THE COURT:  Tell me about that.

11:25:34  21      THE PROSPECTIVE JUROR:  It was in court in Chester

11:25:36  22  County.  It was -- I was an alternate.  So I sat on the jury.

11:25:42  23  It was a case of slip and fall and then I got dismissed because

11:25:48  24  I was an alternate.

11:25:51  25      THE COURT:  Anything about that experience would that

11:25:53  1  impact your ability to decide this case fairly and impartially?

11:25:58  2          THE PROSPECTIVE JUROR:  No.

11:25:58  3          THE COURT:  Follow-up?

11:25:59  4          MS. GREENSPAN:  No.

11:26:00  5          THE COURT:  Follow-up?

11:26:01  6          MR. FOLEY:  No, Your Honor.

11:26:03  7          THE COURT:  Okay.  Thank you.

11:26:05  8          Any motions?

11:26:05  9          MS. GREENSPAN:  No, Your Honor.

11:26:06  10         MR. FOLEY:  No, Your Honor.

11:26:08  11         THE COURT:  Juror number 15.

11:26:08  12         Good morning.

11:26:32  13         I am just going to follow up on a few of the questions

11:26:35  14  you answered yes to.  And the first was, have you or someone

11:26:39  15  else close to you ever been employed as a teacher.

11:26:42  16         THE PROSPECTIVE JUROR:  Yes.

11:26:42  17         THE COURT:  Tell me about that.

11:26:43  18         THE PROSPECTIVE JUROR:  So my brother-in-law was a in

11:26:45  19  physics for Southern Valley School District.  His father was a

11:26:51  20  professor at Le high University.  And my friend Jessica Sommer

11:26:57  21  she is a teacher at Allentown school district.

11:26:59  22         THE COURT:  The father of your friend, what subject

11:27:02  23  matter did he teach?

11:27:03  24         THE PROSPECTIVE JUROR:  Physics.  Both of them

11:27:06  25  physics.  And my friend Jessica, she teaches middle school.

11:27:14    1       THE COURT:  Do you talk to them about their work?

11:27:18    2       THE PROSPECTIVE JUROR:  Very rarely if at all.

11:27:22    3       THE COURT:  To you talk to them about pay?

11:27:24    4       THE PROSPECTIVE JUROR:  No.  No.  I think the only

11:27:25    5  time we talked was when they went through arbitration for a new

11:27:31    6  contract.  That was my brother-in-law.  I guess you would

11:27:37    7  consider that pay.

11:27:39    8       THE COURT:  Did he talk to you about the arbitration

11:27:40    9  itself?

11:27:41   10       THE PROSPECTIVE JUROR:  No, not specifically.

11:27:43   11       THE COURT:  Did you have any discussions was him about

11:27:45   12  the pay issues that were raised in the arbitration?

11:27:49   13       THE PROSPECTIVE JUROR:  Not specifically.  Just

11:27:50   14  basically about what the contract they were looking for as far

11:27:57   15  as pay raises.  They went to the union.  But nothing

11:28:00   16  specifically about how much he was getting or anything like

11:28:00   17  that.

11:28:05   18       THE COURT:  Anything about those discussions that

11:28:07   19  would impact your ability to decide this case fairly and

11:28:07   20  impartially?

11:28:07   21       THE PROSPECTIVE JUROR:  No.

11:28:11   22       THE COURT:  Follow-up?

11:28:12   23       MS. GREENSPAN:  Just to follow-up, the arbitration,

11:28:14   24  are you talking about a union event?

11:28:16   25       THE PROSPECTIVE JUROR:  Union arbitration, yes.  Union

*United States District Court*

11:28:18　　1　contract was up so they had to go to arbitration to try to

11:28:22　　2　figure out, you know, because actually they went on strike.

11:28:27　　3　They did go on strike.

11:28:29　　4　　　　　THE COURT:  Mr. Foley, follow-up?

11:28:31　　5　　　　　MR. FOLEY:  No follow-up.

11:28:32　　6　　　　　THE COURT:  Next question.  You had a job where you

11:28:35　　7　were responsibile for setting the amount of money that other

11:28:39　　8　employees were paid.

11:28:40　　9　　　　　THE PROSPECTIVE JUROR:  Yes.

11:28:41　　10　　　　　THE COURT:  Tell me about that.

11:28:42　　11　　　　　THE PROSPECTIVE JUROR:  I was in the process over

11:28:44　　12　hiring people and also determining the rate of pay.

11:28:48　　13　　　　　In my previous job, not the one I am in now, I

11:28:52　　14　determined the rate of pay for truck drivers.  Those were class

11:28:58　　15　A and B.  I would be in the interview process with them.  I

11:29:05　　16　would determine their pay depending on experience.

11:29:10　　17　　　　　THE COURT:  So these were truck drivers.

11:29:13　　18　　　　　THE PROSPECTIVE JUROR:  Truck drivers, yup.

11:29:14　　19　　　　　THE COURT:  Did you hire both male and female truck

11:29:17　　20　drivers?

11:29:17　　21　　　　　THE PROSPECTIVE JUROR:  We didn't have any female

11:29:19　　22　truck drivers, just all male.

11:29:21　　23　　　　　THE COURT:  And if you had female truck drivers would

11:29:23　　24　the process have been the same?

11:29:25　　25　　　　　THE PROSPECTIVE JUROR:  The process would be exactly

11:29:26   1    the same, yes.

11:29:28   2              THE COURT:  Anything about that experience that would

11:29:30   3    impact your ability to decide this case?

11:29:34   4              THE PROSPECTIVE JUROR:  No.

11:29:34   5              THE COURT:  Any follow-up?

11:29:35   6              MS. GREENSPAN:  I couldn't hear.  You said something

11:29:37   7    about doing reviews.

11:29:40   8              THE PROSPECTIVE JUROR:  Interviews for hiring process.

11:29:43   9              MS. GREENSPAN:  Did you say that HR was involved with

11:29:46  10    that?

11:29:46  11              THE PROSPECTIVE JUROR:  We didn't necessarily have HR

11:29:48  12    in hand.  So I wasn't in human resource but we would look over

11:29:54  13    the resumes and applications and we determine who we would

11:29:58  14    interview determined on the experience.

11:30:01  15              MS. GREENSPAN:  Thank you.

11:30:02  16              THE COURT:  Mr. Foley.

11:30:03  17              MR. FOLEY:  No follow-up.

11:30:04  18              THE COURT:  Then we have the next question, which is,

11:30:09  19    have you ever supervised other employees at work.

11:30:12  20              THE PROSPECTIVE JUROR:  Yes.

11:30:12  21              THE COURT:  The same issue or different issue?

11:30:14  22              THE PROSPECTIVE JUROR:  Supervised other employees?

11:30:16  23    Yeah, so my teams range anywhere from one to over in 40 people.

11:30:25  24              THE COURT:  Remind me what it is you do again?

11:30:28  25              THE PROSPECTIVE JUROR:  Currently I work for

*United States District Court*

11:30:28  1  fellowship community as a central supply manager.

11:30:36  2           THE COURT:  Tell me about that work.

11:30:41  3           THE PROSPECTIVE JUROR:  Central supply.  I do

11:30:41  4  procurement, inventory for the school and nursing and personal

11:30:46  5  care of the facility.

11:30:47  6           THE COURT:  Do you work with the individual employees

11:30:49  7  on pay?

11:30:51  8           THE PROSPECTIVE JUROR:  No, not at all.

11:30:51  9           THE COURT:  Any follow-up?

11:30:52  10          MS. GREENSPAN:  No, Your Honor.

11:30:53  11          MR. FOLEY:  No, Your Honor.

11:30:55  12          THE COURT:  The final question you answered yes to was

11:30:58  13  have you had any training in connection with antidiscrimination

11:31:02  14  laws.

11:31:03  15          THE PROSPECTIVE JUROR:  Yes.  Yes, every year.

11:31:05  16          THE COURT:  Okay.  And when you say every year, how

11:31:09  17  long are those training sessions?

11:31:11  18          THE PROSPECTIVE JUROR:  Training sessions, most of the

11:31:13  19  training sessions are on-line actually.  We submit them

11:31:17  20  on-line, complete the questionnaires, pass or fail.

11:31:22  21          THE COURT:  Have you been trained on the Equal Pay

11:31:22  22  Act.

11:31:29  23          THE PROSPECTIVE JUROR:  That one doesn't sound

11:31:31  24  familiar.

11:31:34  25          THE COURT:  Did you receive any training on

*United States District Court*

11:31:35  1  differentials or lack thereof between men and women and pay.

11:31:45  2       THE PROSPECTIVE JUROR:  No.  We just -- I remember the

11:31:47  3  training basically was just equal rights.  It doesn't matter

11:31:53  4  who they are or how they are.  You can't take them into

11:31:58  5  consideration when you're in the interview process or hiring

11:32:03  6  process.

11:32:03  7       THE COURT:  And would your work there impact your

11:32:05  8  ability to decide this case fairly and impartially?

11:32:08  9       THE PROSPECTIVE JUROR:  No.

11:32:08  10       THE COURT:  Follow-up?

11:32:09  11       MR. FOLEY:  No, Your Honor.

11:32:10  12       THE COURT:  Follow-up?

11:32:11  13       MR. FOLEY:  No, Your Honor.

11:32:11  14       THE COURT:  Thank you very much.  You may have a seat.

11:32:13  15       Any motions?

11:32:15  16       MS. GREENSPAN:  None.

11:32:16  17       MR. FOLEY:  No.

11:32:17  18       THE COURT:  Magic number was what?

11:32:20  19       THE LAW CLERK:  It was 14.  Now it will be 16.  We had

11:32:25  20  2 strikes.

11:32:26  21       THE COURT:  Juror number 16.

11:32:37  22       Juror number 16, hold on.

11:32:37  23       You didn't answer nay questions, right?

11:32:46  24       THE PROSPECTIVE JUROR:  No, not at all.

11:32:46  25       THE COURT:  So 16 is out.

*United States District Court*

| 11:32:54 | 1 | The number is 14.  8 plus 6, that's 14.  We have 2 |
| 11:32:55 | 2 | strikes.  So now we put a line under 16 and that is our group |
| 11:33:00 | 3 | to choose from. |
| 11:33:00 | 4 | Everyone agree that is the case? |
| 11:33:08 | 5 | MS. GREENSPAN:  I believes so, Your Honor.  I just |
| 11:33:10 | 6 | want to double check first. |
| 11:33:12 | 7 | Only two that were struck. |
| 11:33:16 | 8 | THE COURT:  We struck 8 and we struck 12.  8 jurors. |
| 11:33:25 | 9 | 3 preemptories each. |
| 11:33:27 | 10 | That takes us to 14.  So the line is under 16, right? |
| 11:33:31 | 11 | MS. GREENSPAN:  Yes. |
| 11:33:31 | 12 | THE COURT:  Confirm please. |
| 11:33:33 | 13 | MR. FOLEY:  I believe that's correct. |
| 11:33:37 | 14 | He was number 15, right? |
| 11:33:40 | 15 | THE COURT:  He was number 15.  Number 16 answered no |
| 11:33:43 | 16 | questions. |
| 11:33:44 | 17 | MR. FOLEY:  Okay. |
| 11:33:45 | 18 | THE COURT:  So I am giving you this list.  As I said I |
| 11:33:50 | 19 | was going to do it at 12.  So we will break a little bit before |
| 11:33:53 | 20 | 12, but obviously if you can get it done before then, I am not |
| 11:33:56 | 21 | saying you have to, but we can maybe we can move straight into |
| 11:33:56 | 22 | it afterwards. |
| 11:34:01 | 23 | You strike alternatively one then the other.  Pass it |
| 11:34:05 | 24 | between yourselves. |
| 11:34:07 | 25 | MS. GREENSPAN:  May we have -- I am not familiar with |

11:34:08  1  Your Honor's procedures.  May we have a few minutes.

11:34:13  2        THE COURT:  You can do what you like.  I am going to

11:34:16  3  tell them you are going to be picking them and they can talk

11:34:19  4  while you're doing it.  And I am going to explain what your's

11:34:21  5  doing.  And if you need to take 5 minutes to think, then you're

11:34:25  6  going to take 5 minutes to think.

11:34:25  7        MS. GREENSPAN:  Thank you.

11:34:59  8        (Sidebar concluded.)

11:34:59  9        THE COURT:  Members of the panel, we are now moving

11:35:00  10  into the next phase of jury selection.  What the lawyers are

11:35:03  11  now going to do is to evaluate the information that they have

11:35:08  12  received and determine who is on the panel.

11:35:10  13        The same rules continue to apply.  They will be

11:35:13  14  passing documents between them.  You can continue to have any

11:35:18  15  conversation that you wish as long as it has nothing to do with

11:35:21  16  this case, nothing to do with the people here, nothing to do

11:35:23  17  with these type of cases.

11:35:26  18        I have something to do at 12 so we may break about

11:35:30  19  5 minutes before 12.  At that point we will have lunch for an

11:35:34  20  hour.  I will tell you right now that it's critical during the

11:35:40  21  lunch period that you talk to no one about this case, not your

11:35:46  22  family, not your employer, and also you must not communicate

11:35:51  23  about this case on any kind of the social media.  You must not

11:35:55  24  do any kind of research on social media.  It is critical that

11:35:59  25  the only thing you learn about this case is in the 4 walls of

11:36:02  1  this court.

11:36:16  2       If you see anyone in the corridor that you see here
11:36:19  3  today, any of the parties, any of the lawyers, they are not
11:36:23  4  allowed to talk to you.  So if they walk the other way, do not
11:36:27  5  think they are rude.  They are just doing what they have to do.

11:36:30  6       And similarly if you are walking around the courthouse
11:36:34  7  or outside, if anyone tries to stop you and talk to you about
11:36:38  8  this case, you are absolutely not allowed to talk.

11:36:41  9       So with that I am going to stop talking, the lawyers
11:36:43  10 will start selecting and you can have your conversations as you
11:36:47  11 wish.  Thank you.

11:53:07  12      THE COURT:  Counsel, come to sidebar.

11:53:07  13      (Sidebar).

11:53:35  14      THE COURT:  So as I said I have to break for my noon
11:53:38  15 meeting.  How are you doing in selection?  Where are you?  How
11:53:42  16 many strikes, exercises so forth.

11:53:44  17      MR. FOLEY:  I'm just finishing up I think.

11:53:48  18      MS. GREENSPAN:  We haven't received the paper to make
11:53:49  19 any strikes yet.

11:53:55  20      THE COURT:  Oh.

11:53:58  21      MS. GREENSPAN:  We are waiting for plaintiff to strike
11:54:00  22 and then to us.

11:54:00  23      THE COURT:  Plaintiff strikes then goes back.

11:54:05  24      MR. FOLEY:  Oh.  Okay.

11:54:05  25      THE COURT:  Why don't you talk about that over lunch.

*United States District Court*

11:54:08   1    Also you have to think about stipulations over lunch.  I think

11:54:12   2    you were going to provide me with stipulations.

11:54:15   3          MS. GREENSPAN:  We filed those yesterday, Your Honor.

11:54:17   4    They are identical to what you had before except for the date

11:54:21   5    and number of students.

11:54:22   6          THE COURT:  Then you are going to tell me do you want

11:54:24   7    to read them, you want me to read them, when do you want me to

11:54:27   8    read them, when do you want to read them, all that kind of

11:54:28   9    stuff, just decide that.

11:54:29  10          And then also you are going provide me with an exhibit

11:54:32  11    list with all the authentications, foundations, stips.  You got

11:54:35  12    that?

11:54:36  13          MS. GREENSPAN:  Yes.  We will provide you with a copy.

11:54:38  14          THE COURT:  Just get to it to Nelson.

11:54:40  15          MS. GREENSPAN:  Yes.

11:54:40  16          THE COURT:  Okay.  Great.

11:54:43  17          (Sidebar concluded.)

11:54:43  18          Members of the panel, as I said I am going to have to

11:54:52  19    get off the bench now.  We will be back at one and start the

11:54:56  20    process.  And I think the process will be completed shortly

11:55:00  21    thereafter at which point we will seat the jury, at which point

11:55:05  22    we will go into jury instructions and then openings.  But I

11:55:10  23    will see you in an hour.  Thank you very much.

11:55:10  24          (Lunch recess.)

01:11:20  25          THE COURT:  So you finished your preemptories?  Yes,

01:11:23    1    Your Honor.

01:11:23    2            MS. GREENSPAN:  Yes, Your Honor.

01:11:24    3            THE COURT:  I am going to go through and mark the

01:11:28    4    juror numbers and you are going to tell me when I do it with

01:11:33    5    respect to each one whether in fact I am correct.

01:11:37    6            Panel number one is juror number one, correct?

01:11:40    7            MS. GREENSPAN:  Correct.

01:11:42    8            MR. FOLEY:  Yes.

01:11:42    9            THE COURT:  Panel number 2 is juror number 2?

01:11:49   10            MS. GREENSPAN:  Correct.

01:11:51   11            MR. FOLEY:  Yes.

01:11:52   12            THE COURT:  Panel number 3 is juror number 3?

01:11:55   13            MS. GREENSPAN:  Correct.

01:11:55   14            MR. FOLEY:  Yes.

01:11:56   15            THE COURT:  Panel number 4 is juror number 4?

01:11:58   16            MS. GREENSPAN:  Correct.

01:11:59   17            MR. FOLEY:  Yes.

01:12:00   18            THE COURT:  Panel number 5 is juror number 5?

01:12:04   19            MS. GREENSPAN:  Correct.

01:12:04   20            MR. FOLEY:  Yes.

01:12:05   21            THE COURT:  Panel number 6 is juror number 6?

01:12:08   22            MS. GREENSPAN:  Correct.

01:12:09   23            MR. FOLEY:  Yes.

01:12:10   24            THE COURT:  Panel number 7 is juror number 10, right

01:12:22   25    or?

*United States District Court*

01:12:22　1　　　　MS. GREENSPAN:  No, 10 was struck.

01:12:25　2　　　　THE COURT:  14 is number 7, right?

01:12:27　3　　　　MS. GREENSPAN:  Yes.

01:12:27　4　　　　THE COURT:  And 15 is 8, correct?

01:12:30　5　　　　MS. GREENSPAN:  Yes.

01:12:31　6　　　　THE COURT:  Okay.  So we have a panel.

01:12:35　7　　　　1, 2, 3, 4, 5, 6, 14 and 15.

01:12:41　8　　　　Parties agree that is in fact the jury?

01:12:43　9　　　　MS. GREENSPAN:  Yes.

01:12:44　10　　　THE COURT:  Okay.  Anything else before I seat them.

01:12:47　11　　　MS. GREENSPAN:  No, Your Honor.

01:13:12　12　　　THE COURT:  If I call your number you will rise and

01:13:14　13　Mr. Malave will seat you in the jury box.

01:13:19　14　　　Juror number 1, juror number 2, juror number 3, juror

01:13:53　15　number 4, juror number 5, juror number 6, juror number 14,

01:14:34　16　juror number 15.

01:15:02　17　　　Those of you who are remaining in the pews, you have

01:15:05　18　not been selected for this trial.  I want to thank you however

01:15:08　19　for the service that you have done.  Just by being here and

01:15:12　20　being part of the voir dire panel you have helped us in doing

01:15:16　21　justice and appreciate that and appreciate your time, also

01:15:19　22　appreciation your focus and your commitment as we went through

01:15:22　23　the process.

01:15:23　24　　　Do they went everyone back down?

01:15:26　25　　　THE DEPUTY CLERK:  No.  They are free to go and you

*United States District Court*

01:15:29   1   don't have to call in tomorrow.

01:15:36   2       THE PROSPECTIVE JUROR:  We have to come back?

01:15:36   3       THE COURT:  No.  You are dismissed.  You've done your

01:15:38   4   job.  Thank you.

01:16:14   5       (Prospective jurors exit.)

01:16:14   6       THE COURT:  Mr. Malave, can you swear the panel.

01:16:19   7       THE DEPUTY CLERK:  Panel please rise and raise your

01:16:22   8   right hand.

01:16:46   9       (Jury, sworn.)

01:16:46  10       THE COURT:  Thank you.  What we're going to do now is

01:16:50  11   you're going to go back into the jury room and Mr. Malave will

01:16:54  12   get your contact information.

01:16:55  13       The lawyers are going to switch so that they are

01:16:59  14   facing toward the bench.  Then the moment you come back I will

01:17:02  15   give you preliminary jury instructions and then the plaintiff

01:17:05  16   will give you his opening and then the defense will give their

01:17:09  17   opening.

01:17:38  18       (Jury exits.)

01:17:38  19       THE COURT:  See you in 5.

01:26:03  20       Bring in the jury.

01:26:03  21       (Jury enters.)

01:16:20  22       THE DEPUTY CLERK:  Panel, please rise and raise your

01:16:22  23   right hand.

01:16:46  24       (Jury, sworn.)

01:16:46  25       THE COURT:  Thank you.  What we're going to do now is

01:16:50   1   you're going to go back into the jury room and Mr. Malave will

01:16:54   2   get your contact information.  The lawyers are going to switch

01:16:57   3   so that they are facing towards the bench.  And then the moment

01:17:01   4   you come back I will give you preliminary jury instructions,

01:17:05   5   and then the plaintiff will give you his opening and then the

01:17:07   6   defense will give their opening.

01:17:38   7            THE DEPUTY CLERK:  All rise.  Please follow me.

01:17:38   8            (Jury exits the courtroom.)

01:17:38   9            THE COURT:  See you in five.

01:26:02   10           (Brief recess.)

01:26:02   11           THE COURT:  Bring in the jury.

01:26:02   12           THE DEPUTY CLERK:  All rise for the jury.

01:27:37   13           (Jury enters the courtroom.)

01:27:37   14           THE COURT:  Be seated.  Members of the jury, now that

01:27:39   15   you have been selected and sworn, I have the following

01:27:42   16   preliminary instructions for your guidance as jurors in this

01:27:45   17   case:

01:27:45   18           You will hear the evidence, decide what the facts are,

01:27:49   19   and then apply those facts to the law that I will give to you.

01:27:53   20   You and only you will be the judges of the facts.  You will

01:27:58   21   have to decide what happened.  I play no part in judging the

01:28:03   22   facts.

01:28:03   23           You should not take anything I may say or do during

01:28:06   24   the trial as indicating what I think of the evidence or what

01:28:11   25   your verdict should be.  My role is to be judge of the law.  I

01:28:15   1   make whatever legal decisions have to be made during the course

01:28:18   2   of the trial, and I will explain to you the legal principles

01:28:21   3   that must guide you in your decisions.  You must follow that

01:28:24   4   law whether you agree with it or not.

01:28:27   5        Now, this case is brought under a federal law called

01:28:31   6   the Equal Pay Act, which is 29 U.S.C. 206(d)(1).  This law,

01:28:38   7   which was enacted to remedy pay discrimination based on sex, is

01:28:44   8   meant to provide a remedy for plaintiffs who can demonstrate

01:28:47   9   that they have been paid less than a similarly situated

01:28:52   10  colleague of a different sex.

01:28:54   11       In this case, prior to this trial, the Court

01:28:59   12  determined that Drexel was liable for having violated the Equal

01:29:04   13  Pay Act.  This means that the plaintiff, Professor Piety, has

01:29:09   14  demonstrated that at least one male employee was paid more than

01:29:12   15  her for performing equal work, which is work of substantially

01:29:17   16  equal skill, effort and responsibility performed under similar

01:29:19   17  working conditions.

01:29:21   18       It also means that Drexel failed to demonstrate that

01:29:24   19  these differences in pay were explained by a bona fide

01:29:27   20  seniority system, merit system, a system which measures

01:29:32   21  earnings by quantity or quality of production or a differential

01:29:36   22  based on any factor other than sex.

01:29:39   23       Therefore, the only questions remaining for trial, the

01:29:43   24  only questions remaining for you are, one, whether Drexel

01:29:48   25  willfully violated the equal protection -- or the Equal Pay

*United States District Court*

01:29:52   1   Act, and which male employees should be considered as

01:29:55   2   comparators in determining the damages Professor Piety is owed.

01:30:01   3   Professor Piety for her part, argues that Drexel willfully

01:30:06   4   violated the Equal Pay Act, which Drexel denies.

01:30:09   5        Now a few words about your conduct as jurors.  First,

01:30:13   6   I instruct you that during the trial and until you have heard

01:30:16   7   all of the evidence and retire to the jury room to deliberate,

01:30:19   8   you are not to discuss the case with anyone, not even among

01:30:23   9   yourselves.  If anyone should try to talk to you about the

01:30:26  10   case, including a fellow juror, bring to it my attention

01:30:27  11   immediately through Mr. Malave.

01:30:30  12        There are good reasons for bans on discussions, the

01:30:34  13   most important being the need for you to keep an open mind

01:30:37  14   throughout the presentation of evidence.  I know that many of

01:30:40  15   you use cell phones, smart phones and other portable electronic

01:30:45  16   devices, laptops, netbooks and other computers both portable

01:30:50  17   and fixed, and other tools of technology to access the internet

01:30:55  18   and communicate with others.  You also must not talk to anyone

01:30:58  19   about this case or use these tools to communicate

01:31:01  20   electronically with anyone about the case.  This includes your

01:31:05  21   family and your friends.

01:31:07  22        You may not communicate orally with anyone about the

01:31:10  23   case on your cell phone, your smartphone or portable or fixed

01:31:15  24   computer or device of any kind or use these devices to

01:31:18  25   communicate electronically by messages or posting of any kind,

*United States District Court*

01:31:22    1    including e-mail, instant messages, text messages, text or

01:31:24    2    instant messaging services such as WhatsApp or Facebook

01:31:29    3    Messenger or through any blog, website, internet chat room or

01:31:32    4    by way of any other social networking website or services,

01:31:35    5    including but not limited to Facebook, X, Instagram, LinkedIn,

01:31:35    6    Snap

01:31:41    7    Chat and Tik Tok.

01:31:42    8         Now, if any lawyer or party or witness does not speak

01:31:46    9    to you when you pass in the hall, ride the elevator or the

01:31:50    10   like, remember it is because they are not supposed to talk or

01:31:53    11   visit with you either.  That's why I'm asking that you wear

01:31:56    12   your juror tags that shows that you are someone who is not to

01:31:59    13   be approached in any way.

01:32:01    14        Second, do not read or listen to anything related to

01:32:03    15   this case that is not admitted into evidence.  By that I mean

01:32:07    16   if there is a newspaper article or radio or television report

01:32:11    17   relating to this case, do not read the article.  Do not watch

01:32:14    18   or listen to the report.  In addition, do not try to do any

01:32:19    19   independent research or investigation on your own on matters

01:32:23    20   relating to the case or this type of case.  Do not do any

01:32:27    21   research on the internet, for example.  You are to decide the

01:32:31    22   case upon the evidence presented at trial.

01:32:34    23        In other words, you should not consult dictionaries or

01:32:37    24   reference materials, search the internet, websites, blogs or

01:32:42    25   any other -- or use any electronic tools to obtain information

01:32:45 1 about this case or to help you decide the case. Please do not

01:32:48 2 try to find out information from any source outside the

01:32:52 3 confines of this courtroom.

01:32:54 4 Again, do not reach any conclusion on claims or

01:32:58 5 defenses until all of the evidence is in. Keep an open mind

01:33:00 6 until you start your deliberations at the end of the case.

01:33:03 7 Now, during the trial it may be necessary for me to

01:33:05 8 talk to the lawyers out of your hearing by having a bench

01:33:09 9 conference. If that happens, please be patient. We are not

01:33:13 10 trying to keep important information from you. Those

01:33:13 11 conferences are necessary for me to fulfill my responsibility,

01:33:17 12 which is to be sure that evidence is presented to you correctly

01:33:20 13 under the law. We will, of course, do what we can to keep the

01:33:24 14 number of and length of these conferences to a minimum. I may

01:33:28 15 not always grant an attorney's request for a conference. Do

01:33:31 16 not consider my granting or denying a request for a conference

01:33:34 17 as any indication of my opinion of the case or of what your

01:33:38 18 verdict should be.

01:33:39 19 Let's talk about evidence. The evidence from which

01:33:44 20 you are going to find the facts consists of the following: The

01:33:48 21 testimony of the witnesses, documents and other things received

01:33:52 22 as exhibits, any facts that are stipulated, that is formally

01:33:57 23 agreed to by the parties, and any facts that I judicially

01:34:02 24 notice. That is facts I say you must accept as true even

01:34:05 25 without other evidence.

*United States District Court*

01:34:07   1      Now, the following things are not evidence:

01:34:10   2  Statements, arguments, and questions of the lawyers for the

01:34:13   3  parties in this case.  Objections by lawyers.  Any testimony I

01:34:18   4  tell you to disregard.  And anything you may see or hear about

01:34:21   5  this case outside of the courtroom.  You must make your

01:34:24   6  decision based only on the evidence that you see and hear in

01:34:28   7  Court.  Do not let rumors, suspicions or anything else that you

01:34:32   8  may see or hear outside of the courtroom influence your

01:34:35   9  decision in any way.

01:34:37  10      You should use your common sense too in weighing the

01:34:41  11  evidence.  Consider it in the light of your everyday experience

01:34:43  12  with people and events, and give it whatever weight you believe

01:34:47  13  it deserves.  If your experience tells you that certain

01:34:51  14  evidence reasonably leads to a conclusion, you are free to

01:34:55  15  reach that conclusion.

01:34:56  16      There are rules that control what can be received into

01:34:59  17  evidence.  When a lawyer asks a question or offers an exhibit

01:35:04  18  into evidence and a lawyer on the other side thinks that it is

01:35:08  19  not permitted by the rules of evidence, that lawyer may object.

01:35:12  20  This simply means that the lawyer is requesting that I make a

01:35:15  21  decision on a particular rule of evidence.

01:35:19  22      You should not be influenced by the fact that an

01:35:22  23  objection is made.  Objections to questions are not evidence.

01:35:26  24  Lawyers have an obligation to their clients to make objections

01:35:30  25  when they believe that evidence being offered is improper under

*United States District Court*

01:35:34  1   the rules of evidence.  You should not be influenced by the

01:35:37  2   objection or by the Court's ruling on it.  If the objection is

01:35:41  3   sustained, ignore the question.  If it is overruled, treat the

01:35:46  4   answer like any other.  If you are instructed that some item of

01:35:50  5   evidence is received for a limited purpose only, you must

01:35:54  6   follow that instruction.

01:35:56  7        Also, certain testimony or other evidence may be

01:35:59  8   ordered struck from the record and you will be instructed to

01:36:02  9   disregard this evidence.  Do not consider any testimony or

01:36:05  10  other evidence that gets struck or excluded.  Do not speculate

01:36:11  11  about what a witness might have said or what an exhibit might

01:36:14  12  have shown.

01:36:15  13       There are two types of evidence that you may use in

01:36:19  14  reaching your verdict.  One type of evidence is called direct

01:36:23  15  evidence.  An example of direct evidence is when a witness

01:36:28  16  testifies about something that the witness knows through his or

01:36:32  17  her own senses, something the witness has seen, felt, touched

01:36:36  18  or heard or did.  If a witness, for example, testified that

01:36:41  19  they saw it raining outside and you believe them, that would be

01:36:45  20  direct evidence that it was raining.  Now, another form of a

01:36:50  21  direct evidence is an exhibit where the facts to be proved is

01:36:53  22  its existence or current condition.

01:36:55  23       The other type of evidence is circumstantial evidence.

01:36:59  24  Circumstantial evidence is proof of one or more facts from

01:37:02  25  which you could find another fact.  So, for example, if someone

*United States District Court*

01:37:06  1  walked into the courtroom wearing a rain coat covered with

01:37:08  2  drops of water and carrying a wet umbrella, that would be

01:37:12  3  circumstantial evidence from which you could conclude that it

01:37:15  4  was raining.

01:37:16  5       You should consider both kinds of evidence that are

01:37:20  6  presented to you.  The law makes no distinction in the weight

01:37:24  7  to be given to either direct or circumstantial evidence.  You

01:37:27  8  are to decide how much weight to give any evidence.

01:37:30  9       Now, in deciding what the facts are, you may have to

01:37:35  10  decide which testimony you believe and which testimony you do

01:37:40  11  not believe.  You are the sole judges of credibility of the

01:37:44  12  witnesses.

01:37:45  13       Credibility means whether a witness is worthy of

01:37:50  14  belief.  You may believe everything a witness says or only part

01:37:55  15  of it or none of it.  In deciding what to believe, you may

01:38:00  16  consider a number of factors including the following:  The

01:38:03  17  opportunity and ability of the witness to see or hear or know

01:38:06  18  the things the witness testifies to, the quality of the

01:38:10  19  witness's understanding and memory, the witness's manner while

01:38:14  20  testifying, whether the witness has an interest in the outcome

01:38:18  21  of the case or any motive, bias or prejudice, whether the

01:38:21  22  witness is contradicted by anything the witness said or wrote

01:38:26  23  before trial or by other evidence, how reasonable the witness's

01:38:30  24  testimony is when considered in the light of other evidence

01:38:33  25  that you believe, and any other factors that bear on

*United States District Court*

01:38:37    1    believability.

01:38:38    2         The weight of the evidence to prove a fact does not

01:38:41    3    necessarily depend on the number of witnesses who testify.

01:38:45    4    What is more important is how believable the witnesses were,

01:38:49    5    and how much weight you think that their testimony deserves.

01:38:55    6    Only the lawyers and I are allowed to ask questions of

01:38:58    7    witnesses.  You are not permitted to ask questions of

01:39:01    8    witnesses.

01:39:02    9         As you will see, we will be recording the testimony.

01:39:04   10    The stenographer here will be taking down the testimony during

01:39:08   11    the course of the trial, but you should not assume that the

01:39:13   12    transcript will be available for your review during your

01:39:15   13    deliberations.  You must pay close attention to the testimony

01:39:19   14    as it is given.

01:39:21   15         You may not take notes during the course of the trial.

01:39:23   16    Let me tell you why.  It's difficult to take notes and at the

01:39:29   17    same time try and pay attention to what a witness is saying and

01:39:31   18    the witness's manner while testifying.  One of the reasons for

01:39:36   19    having a number of persons on the jury is to gain the advantage

01:39:40   20    of your individual and collective memories so that you can then

01:39:43   21    deliberate together at the end of the trial, and reach

01:39:45   22    agreements on the facts.  While some of you might feel

01:39:49   23    comfortable taking notes, other members of the jury might not

01:39:52   24    feel as comfortable and may not wish to do so.  Notes might be

01:39:57   25    given too much weight over memories.  Especially, the memories

*United States District Court*

01:40:00 1  of those who do not take notes.  So for those reasons, I ask

01:40:04 2  that you not take notes during the trial.

01:40:07 3      We are now going to talk about preponderance of the

01:40:11 4  evidence.  This is a civil case.  Plaintiff is the party who

01:40:13 5  brought this lawsuit.  Defendant is the party against which the

01:40:16 6  lawsuit was filed.  Plaintiff has the burden of proving her

01:40:20 7  case by what is called the preponderance of the evidence.  That

01:40:24 8  means plaintiff has to prove to you, in light of all of the

01:40:28 9  evidence, that what she claims is more likely so than not so.

01:40:33 10 To say it differently, if you were to put the evidence

01:40:37 11 favorable to the plaintiff and the evidence favorable to the

01:40:41 12 defendant on opposite sides of scales, plaintiff would have to

01:40:44 13 make the scales tip somewhat on their side.  If plaintiff fails

01:40:49 14 to meet this burden, the verdict must be for defendant.  If you

01:40:53 15 find after considering all the evidence, that a claim or fact

01:40:57 16 is more likely so than not so, then the claim or fact has been

01:41:02 17 proved by a preponderance of the evidence.

01:41:03 18     In determining whether any fact has been proved by a

01:41:07 19 preponderance of the evidence in the case you may, unless

01:41:10 20 otherwise instructed, consider the testimony of all of the

01:41:12 21 witnesses regardless who of may have called them and all of the

01:41:18 22 exhibits received in evidence regardless of who may have

01:41:20 23 produced them.

01:41:21 24     Now, you may have heard of the term proof beyond a

01:41:25 25 reasonable doubt.  That is the strictest standard of proof and

01:41:31 1 applies only to criminal cases. It does not apply in civil
01:41:34 2 cases such as this, so you should put it out of your mind.

01:41:37 3 Let me tell you how the trial will proceed. First,
01:41:42 4 plaintiffs attorney will make an opening statement to you.
01:41:45 5 Next, attorneys for the defendant may make an opening
01:41:47 6 statement. What is said in the opening statements is not
01:41:50 7 evidence, but is simply an outline to help you understand what
01:41:53 8 each party expects the evidence to show.

01:41:55 9 A party is not required to make an opening statement.
01:41:59 10 Plaintiff goes first because, as I told you, plaintiff has the
01:42:03 11 burden of proof. Plaintiff will present witnesses, and counsel
01:42:06 12 for defendant may cross-examine, and plaintiff may also present
01:42:09 13 evidence. Following plaintiff's case, defendant may present
01:42:13 14 evidence and counsel for plaintiff may cross-examine witnesses
01:42:15 15 for the defense, and after the parties' main case is presented,
01:42:18 16 it is possible that they may be permitted to present what is
01:42:22 17 called rebuttal evidence.

01:42:24 18 Now, after all the evidence has been presented I will
01:42:26 19 instruct you on the law, and then the attorneys will present to
01:42:29 20 you closing arguments to summarize and interpret the evidence
01:42:33 21 in a way that is helpful to their clients' position. As with
01:42:36 22 opening statements, closing arguments are not evidence.

01:42:40 23 After that, you will retire to the jury room to
01:42:43 24 deliberate on your verdict in this case. I will present to you
01:42:46 25 a computer. It's a blank computer. It can't access anything

*United States District Court*

01:42:50  1  except the thumb drive that I will give to you, which will have

01:42:54  2  all of the exhibits that I've admitted into evidence.

01:42:56  3      In terms of how things generally will go today, it's a

01:43:00  4  little different because it's the first day of the trial.

01:43:03  5  Generally, we'll start at 9:00, well go for an hour and a half,

01:43:04  6  we'll take a 10-minute break, go for another hour and a half,

01:43:06  7  take lunch, come back, hour and a half, break, come back until

01:43:09  8  the end of the day at 5:00.

01:43:11  9      But there may be instances where we end a little early

01:43:14  10  but we have ended a witness and it doesn't make sense to start

01:43:18  11  one.  There may be cases where we're just a few minutes after

01:43:21  12  5:00.  I will ask if it's okay to finish that witness because

01:43:24  13  otherwise they will have to come in in the morning for just a

01:43:28  14  few minutes.  So we will work together on this, but the lawyers

01:43:33  15  tell me that it will be less than a week, but it will be more

01:43:39  16  than a few days.

01:43:40  17      So with that, plaintiff.

01:43:50  18      MR. FOLEY:  Good afternoon.  My name is Brian Foley

01:44:12  19  and I represent the plaintiff in this case, Marilyn Gaye Piety

01:44:17  20  Foley.  So there is no mystery here, we are married.  She's my

01:44:21  21  wife.  And you heard from the judge already that she is suing

01:44:26  22  Drexel University, her current employer, for violation of the

01:44:31  23  Equal Pay Act.

01:44:32  24      And as the Judge told you, it has already been

01:44:35  25  determined that Drexel violated the Equal Pay Act, that Drexel

01:44:39  1  has been found to be paying male professors, as Professor Piety

01:44:47  2  is, more money for doing -- more money for doing substantially

01:44:53  3  equal work.  Doesn't have to be the same exact work, but it's

01:44:57  4  got to be substantially equal and that Drexel does not have any

01:45:02  5  defenses that the difference in pay is somehow not based on

01:45:10  6  difference in sex.

01:45:12  7       So what are we doing here?  We are here because Drexel

01:45:17  8  is trying to limit damages.  We are here to prove to you two

01:45:23  9  things, and we believe the evidence will show this:  That the

01:45:29  10  male professors in the department of English and Philosophy

01:45:33  11  where Professor Piety works as a philosophy professor, they are

01:45:39  12  being paid substant -- they are being paid more to do

01:45:43  13  substantially equal work, and we are going to show you which

01:45:49  14  professors those are.

01:45:51  15       And we are going to -- we will have the names spelled

01:45:55  16  out for you later, but it's professors Richard Astro, Professor

01:46:00  17  Jacques Catudal.  Professor Astro teaches English.  Professor

01:46:04  18  Jacques Catudal taught Philosophy.  Professor Mark Greenberg,

01:46:13  19  who has since -- or who has since left the department, but you

01:46:18  20  will hear about him.  Professor Abioseh Porter, Professor Roger

01:46:24  21  Kurtz, who is over there.  He is the current Department Head

01:46:28  22  but he is also a professor, and he gets a base salary for being

01:46:33  23  a professor in the department and that base salary is much

01:46:37  24  higher than Professor Piety's base salary.

01:46:41  25       And you will also hear about Andrew Smith, who is a

*United States District Court*

01:46:45  1  professor in the department as well as in another department.

01:46:49  2  And, finally, you will hear about Professor Scott Warnock who

01:46:54  3  also serves some administrative role, but he gets a base salary

01:46:59  4  for being a professor in the department.

01:47:02  5        And the evidence will show that that base salary is

01:47:06  6  paid to professors in the department for substantially equal

01:47:10  7  work, work of the same skill, work of the same responsibility,

01:47:17  8  work of the same effort and work that's done under

01:47:21  9  substantially the same working conditions.

01:47:24  10        You will see the evidence will show that this is a

01:47:28  11  department where all of the professors have the same teaching

01:47:34  12  load, all of the professors have the same requirements of how

01:47:39  13  much scholarship to publish.  All the professors have the same

01:47:42  14  requirement regarding service to the University or even to

01:47:47  15  their profession at large.

01:47:49  16        And the evidence will show that all of the professors

01:47:53  17  in the department who are paid a base salary for being

01:47:58  18  professors in the department are evaluated according to the

01:48:02  19  same criteria, teaching, service, scholarship, same amount of

01:48:07  20  work and they're all evaluated by the same man and, again, that

01:48:11  21  is Department Head Roger Kurtz, who's also a professor in the

01:48:15  22  department.

01:48:16  23        So we will be showing you that these other professors,

01:48:22  24  seven other professors tenured professors in the department, as

01:48:25  25  is Professor Piety, they're all being paid much more than she

*United States District Court*

01:48:31    1    is for the same work.

01:48:35    2        The second thing that we're going to -- that we are

01:48:38    3    here to prove and that we believe the evidence will show is

01:48:42    4    that Drexel's violation of the Equal Pay Act, which is already

01:48:46    5    established, that that violation was what the law calls

01:48:52    6    willful.  And what does that mean?  That means that the

01:48:56    7    evidence will show that Drexel knew or was reckless,

01:49:04    8    substantially reckless about whether it was violating the Equal

01:49:10    9    Pay Act, that is, paying male professors more for the same work

01:49:16    10   than a female professor, and here that is Professor Piety.  The

01:49:21    11   evidence will show that, of course, Drexel knew this.

01:49:25    12       The evidence will show even that Drexel, throughout

01:49:31    13   this case, tried to hide that and to keep that -- keep that a

01:49:38    14   secret in the case.  You will hear evidence that Drexel did not

01:49:46    15   present until after the Court found the liability for violation

01:49:54    16   of the Equal Pay Act.  You will see evidence that only then,

01:49:58    17   only after that did Drexel present evidence that oh, the base

01:50:04    18   salaries are paid to professors, and any professor who is doing

01:50:10    19   administrative work on top of that is actually paid an

01:50:14    20   administrative stipend.

01:50:16    21       So you will see that Dr. Kurtz, who is the Department

01:50:20    22   Head, before the -- before the judgment of liability, his base

01:50:25    23   salary seemed hard to compare to professor Piety's base salary

01:50:32    24   because it -- it seemed as if, well, he is a Department Head as

01:50:38    25   well, and he is a professor and a Department Head and he is

*United States District Court*

01:50:41  1  getting that.  But after the judgment of liability that Drexel
01:50:45  2  had violated the Equal Pay Act, after that we learn that there
01:50:49  3  is that base salary.

01:50:51  4  But on top of that, for being the Department Head,
01:50:56  5  Dr. Kurtz receives $ ███ extra a year.  So, in fact, his base
01:51:02  6  salary, which is much higher than Dr. Piety's, can indeed be
01:51:07  7  compared to it, and it is much higher.  So we will show you
01:51:12  8  evidence of that.  And the idea is when people hide things,
01:51:16  9  they hide them because they know them.  If you're hiding
01:51:20  10  something, you have to know that's something.  People don't
01:51:24  11  accidently really hide things.  So you will -- so you will see
01:51:28  12  that.

01:51:31  13  Also, I want to say that you will not be asked to
01:51:35  14  calculate the actual dollar damages.  Some of you may be great
01:51:40  15  at math and may be disappointed.  Others of you may be glad.
01:51:44  16  This is a the department of English and Philosophy, so it's not
01:51:47  17  about math and you won't have to calculate anything.

01:51:51  18  One other thing that -- that I want you to know in
01:51:56  19  this case is I will be putting on my case through witnesses
01:52:00  20  from Drexel, including Dr. Kurtz.  And they are not quote,
01:52:05  21  unquote, my witnesses.  So I will be treating them on
01:52:10  22  cross-examination as one would call a hostile witness.  So I
01:52:14  23  want you to know that up front.  It's not that I've met with
01:52:18  24  these witnesses and prepared them.  Certainly not.  It's
01:52:22  25  their -- they're on the other side and I will be working

*United States District Court*

01:52:25  1  through them in this case.

01:52:27  2       Finally, we're going to start our case right on the
01:52:37  3  eve of when this Court -- I will start my presentation of
01:52:41  4  witnesses about an event that occurred right on the eve of the
01:52:45  5  Court's finding of liability that Drexel had violated the Equal
01:52:53  6  Pay Act.  And it was an event where the plaintiff had requested
01:52:56  7  access to see certain payroll documents at Drexel in real time
01:53:05  8  in Drexel's databases, and she's going to see these over Zoom
01:53:11  9  and the plaintiff asked to see W-2s and Drexel would not let
01:53:18  10  her see them, did not allow access in real time.

01:53:23  11      And you'll see -- you will see me present this
01:53:28  12  through two witnesses and you will hear two very different
01:53:32  13  stories about what happened.

01:53:33  14      With that, that is it for now and we are glad you're
01:53:41  15  here, and we hope that you will be able to use your common
01:53:46  16  sense, and as Judge Beetlestone said this morning, your sense
01:53:51  17  of fairness in this case.

01:53:58  18      THE COURT:  Defense?

01:54:01  19      MS. GREENSPAN:  When it comes to salaries at Drexel,
01:54:32  20  the evidence in this case will show, first, Drexel considers
01:54:37  21  many factors in setting salaries.  Second, one of the
01:54:43  22  significant factors that Drexel considers in setting salaries
01:54:48  23  is whether a professor has taken on an administrative role.
01:54:53  24  While Professor Piety chose to focus solely on teaching and
01:54:57  25  research, she never pursued an administrative role.

*United States District Court*

01:55:02  1    When looking at professor Piety's pay, you should
01:55:06  2  determine the most similarly situated professors.  Drexel's
01:55:11  3  conduct was not willful.  Good afternoon.  My name is Leslie
01:55:17  4  Miller Greenspan.  And with me this week as you now know, will
01:55:23  5  be Dr. Roger Kurtz, who is the Department Head for the
01:55:26  6  Department of English and Philosophy at Drexel University.

01:55:31  7    MR. KURTZ:  Good afternoon.

01:55:32  8    MS. GREENSPAN:  And also with us, so you don't wonder,
01:55:34  9  we have with us Ms. Holly Lopez, who is working with me during
01:55:39  10  trial.

01:55:40  11    MS. LOPEZ:  Good afternoon.

01:55:41  12    MS. GREENSPAN:  You've likely passed Drexel before.
01:55:44  13  It's just a few blocks from 30th Street Station.  Drexel is
01:55:48  14  known for its focus on science, technology, engineering, math
01:55:54  15  and business.  It has a premier medical school and also a law
01:55:59  16  school.  Drexel also has a College of Arts and Sciences.
01:56:06  17  Within the College of Arts and Sciences is the Department of
01:56:09  18  English and Philosophy.  And within the Department of English
01:56:14  19  and Philosophy, there are two programs, which, not
01:56:18  20  surprisingly, are called English and Philosophy.

01:56:21  21    The plaintiff, Dr. Piety, is a professor within the
01:56:27  22  Philosophy program.  Like all faculty members at Drexel,
01:56:33  23  Professor Piety must conduct research, and publish articles,
01:56:38  24  teach a certain caseload and serve on University committees.
01:56:43  25  These are the minimal expectations of all full-time faculty

*United States District Court*

01:56:47  1  members.  And as a faculty member at Drexel, she has received

01:56:51  2  promotions and pay increases over time.

01:56:55  3       You will hear that the -- that Professor Piety first

01:57:00  4  came to Drexel in 1998, that she came as a visiting assistant

01:57:06  5  professor, and that was an entry level position at which she

01:57:09  6  was earning $       a year.  She rose through the ranks at

01:57:14  7  Drexel, first becoming an assistant professor with tenure, then

01:57:18  8  an Associate Professor, and then a full Professor.  There is

01:57:25  9  only rank at Drexel higher than a full professor, and that is

01:57:25  10  Distinguished Professor.

01:57:31  11       Each of Dr. Piety's promotions came with a salary

01:57:35  12  increase.  The evidence will show that the progression at

01:57:39  13  Drexel works the same for the men as the women.  There are men

01:57:43  14  and women in the department who are earning more than

01:57:47  15  Dr. Piety, and you will see why as this case develops.

01:57:51  16       The evidence will show that there is an important

01:57:54  17  distinction between Professor Piety and other professors.  She

01:57:58  18  has never in her 27 years at Drexel served in an administrative

01:58:03  19  role.  She has never sought to serve in an administrative

01:58:08  20  role --

01:58:08  21       MR. FOLEY:  Your Honor, I need to object.  That is

01:58:10  22  misstating the evidence.  She has sought administrative roles.

01:58:15  23       THE COURT:  This is the opening.

01:58:17  24       MR. FOLEY:  Yes.

01:58:18  25       THE COURT:  Ms. Greenspan is going to say what she

*United States District Court*

01:58:22  1  believes she's going to show.  If there's issues during trial,

01:58:23  2  with respect to objections you can make those objections.  Go

01:58:26  3  ahead.

01:58:27  4      MS. GREENSPAN:  Dr. Piety has never sought to be an

01:58:30  5  administrative role like the provost, dean, or Department Head.

01:58:35  6  The evidence will show that her salary pay reflects her career

01:58:39  7  choices.  By the end of this trial, we will ask you to find

01:58:43  8  that Drexel's conduct was not willful and that the proper

01:58:47  9  comparators are not if the former provost or vice provost.

01:58:53  10     As I told you when I first started, the evidence will

01:58:56  11 show that professors who take on administrative roles, whether

01:58:59  12 men or women, are compensated at a higher level reflecting the

01:59:04  13 demands and sacrifices of those positions.  Professor Piety has

01:59:09  14 not served in an administrative role.  She will, however,

01:59:12  15 attempt to compare herself to male professors who have served

01:59:16  16 the University in these important administrative roles.

01:59:20  17     Salaries at Drexel are not a one-size-fits-all kind of

01:59:26  18 thing.  Salaries at Drexel are analyzed by a compensation team,

01:59:31  19 which is part of the Human Resources Department.  That team's

01:59:35  20 role is to make sure that salaries are fair and equitable.

01:59:40  21 Each person who will testify about the compensation will

01:59:43  22 reiterate to you that raising your hand to tackle one of these

01:59:47  23 important administrative roles is a major influence for

01:59:51  24 compensation.

01:59:52  25     You have heard terms like "faculty" and

01:59:56   1   "administrator." Let me just take a moment to make sure I

02:00:00   2   explain that. When I say "professor" I am talking about

02:00:04   3   someone who teaches, publishes, does research and publishes and

02:00:08   4   sits on committees. Professors like Dr. Piety.

02:00:13   5   When I say "administrative roles" I mean roles at

02:00:18   6   Drexel like the provost of the University, the vice provost of

02:00:23   7   the University, the dean of a college or a Department Head. A

02:00:28   8   Department Head like Dr. Kurtz.

02:00:31   9   You will hear the terms "provost" and "vice provost."

02:00:35   10   The provost is the second highest ranking person at the

02:00:40   11   University, second only to the president.

02:00:42   12   It is undisputed that Drexel pays faculty and

02:00:47   13   administrative roles a higher salary. And when they step down

02:00:50   14   from those administrative roles, they are able to negotiate to

02:00:55   15   keep some portion of that salary. This is true for both men

02:00:58   16   and women in those roles. So once the salaries go up, they

02:01:04   17   never fully come back down.

02:01:06   18   Now, the University does this for two main reasons:

02:01:10   19   First, these are tough positions. They require a lot of work.

02:01:14   20   In fact, those roles are 12-month roles. While faculty

02:01:20   21   positions, professor positions, are nine-month roles.

02:01:23   22   As I told you a moment ago about the provost, the

02:01:27   23   provost is the second highest ranking person at the University,

02:01:30   24   second only to the President. This is an extremely important,

02:01:33   25   demanding and stressful job. The provost must oversee all 14

02:01:40 1 colleges, 22,000 students and 1,200 full-time faculty, plus

02:01:46 2 several thousand professional staff and part-time faculty.  And

02:01:50 3 with those increased responsibilities come increased salary.

02:01:57 4 Increasing one's salary to do this role incentivizes faculty to

02:02:03 5 step up to take those roles.

02:02:05 6 Second, when a faculty member takes on an

02:02:08 7 administrative role they pause their academic careers.  They

02:02:14 8 interrupt their teaching and their scholarship.  And this is a

02:02:19 9 big sacrifice for faculty and it can really limit their

02:02:23 10 professional opportunities.  Keep in mind some of these folks

02:02:27 11 became professors because they love teaching and research and

02:02:32 12 publishing.

02:02:32 13 When they take on these administrative roles, they

02:02:36 14 largely give that up.  Sometimes for a few years, sometimes for

02:02:40 15 a decade or more.  Years that they can never get back of

02:02:44 16 teaching and research.  The University, therefore, pays them a

02:02:47 17 higher salary and negotiates so that they can keep a portion of

02:02:52 18 it when they step down from those roles and rejoin the faculty

02:02:56 19 after those years as an administrator.

02:02:59 20 Now, let me be clear about something.  The undisputed

02:03:02 21 evidence will show that at Drexel, both men and women who take

02:03:07 22 on these administrative roles receive this benefit.  The

02:03:11 23 undisputed evidence will also show that the biggest reason for

02:03:15 24 the salary differences is that some of the faculty members

02:03:19 25 you're going to hear about held administrative roles and

*United States District Court*

02:03:23   1   Professor Piety never did.

02:03:25   2        In addition, the evidence will show that there are

02:03:28   3   other objective reasons for pay differences.  Some of these

02:03:33   4   that you're going to hear about how long someone who is worked

02:03:36   5   at Drexel, whether that faculty member has an area of academic

02:03:43   6   specialization that is in high demand at a science and

02:03:47   7   engineering and technology heavy University like Drexel,

02:03:51   8   whether the faculty member has prior experience in a tenure

02:03:56   9   lined position as opposed to coming in as an entry level

02:04:00  10   person, whether the faculty member has computing job offers at

02:04:04  11   the time of their hire.  All of these are factors that Drexel

02:04:08  12   considers in setting salaries.  So when you hear the evidence I

02:04:12  13   ask that you consider where Dr. Piety sits in comparison to

02:04:18  14   these factors.

02:04:21  15        Now, before you came in here as jurors, the Judge made

02:04:24  16   a ruling that Drexel violated the Equal Pay Act.  The Judge

02:04:28  17   left it up to you to decide whether Drexel acted willfully.

02:04:34  18   The Judge also left it up to you to decide whose salaries are

02:04:39  19   most appropriate to compare to Professor Piety's.  These are

02:04:44  20   questions for you to decide.  Drexel's conduct was not willful,

02:04:49  21   and the evidence will show that.  You will hear testimony and

02:04:54  22   see documents about the women in the department who are paid

02:04:58  23   more than Dr. Piety, like Dr. Doreen Saar, Dr. Eva Thury,

02:05:05  24   Dr. Miriam Kotsin, all of whom came to Drexel many years before

02:05:11  25   Dr. Piety.

*United States District Court*

02:05:12    1    You will hear testimony about the areas of

02:05:14    2    specialization that some of these probations hold, like

02:05:18    3    Dr. Scott Warnock and Dr. Andrew Smith.  You will hear that

02:05:23    4    some of the professions have different ranks, including the

02:05:26    5    highest rank I mentioned earlier of distinguished professor,

02:05:29    6    like Dr. Mark Greenberg and Dr. Richard Astro.  Dr. Piety does

02:05:35    7    not hold and never held that rank.

02:05:38    8    You will hear that some of the professors that

02:05:41    9    Dr. Piety is comparing herself to today held the role of

02:05:45    10    provost or vice provost, and their salaries went up when they

02:05:50    11    took those administrative positions and they never came back

02:05:54    12    down when they rejoined the faculty, like Dr. Mark Greenberg,

02:05:59    13    Dr. Richard Astro and Dr. Jacques Catudal.

02:06:04    14    You will hear that some these professors hold the role

02:06:07    15    of Department Head, like Dr. Kurtz and like Dr. Andrew Smith.

02:06:13    16    You will hear testimony about the professors who have worked at

02:06:16    17    Drexel longer than Dr. Piety, those who came from different

02:06:21    18    universities, those who served at tenure line positions before

02:06:26    19    coming to Drexel, those who are the highly decorated with

02:06:29    20    awards of grants, and those who formerly held titles such as

02:06:36    21    Department Head, like Abioseh Porter.  And you will hear that

02:06:39    22    Dr. Piety never sought to hold an administrative position like

02:06:43    23    provost, dean or Department Head.  All of this shows that

02:06:49    24    Drexel was not willful in setting salaries.

02:06:52    25    As you hear the evidence, you should keep in mind that

02:06:57　1　it is Dr. Piety who bears the burden of proving to you that

02:07:01　2　Drexel's conduct was willful.  It is Dr. Piety who bears the

02:07:05　3　burden of proving her damages.  At the end of this case, I am

02:07:10　4　going to come back up here and ask you to enter a verdict

02:07:14　5　finding that Drexel's conduct was not willful.

02:07:19　6　　　　I also ask you to consider the salaries, who's salary

02:07:23　7　should be compared to Dr. Piety's, whether it is her colleague

02:07:27　8　Andrew Smith, the only other full professor in the Philosophy

02:07:31　9　program.  Or her former colleague, Jacques Catudal, who has

02:07:36　10　since retired as a Philosophy professor, but came to Drexel

02:07:41　11　17 years before Dr. Piety and saved as vice provost.

02:07:47　12　　　　You will decide who to compare Dr. Piety's salary to

02:07:51　13　and the evidence will show that it is not who Dr. Piety thinks

02:07:56　14　it is.  Different people do different jobs and therefore are

02:07:59　15　paid different salaries.

02:08:01　16　　　　And I am going to end right where I began, with what

02:08:05　17　the evidence will show.  It will show that Drexel's salary

02:08:09　18　decisions are based on a number of factors.  It will show that

02:08:13　19　administrative roles play a significant role in sitting

02:08:17　20　salaries.  Professor Piety's salary must be compared to the

02:08:21　21　most similarly situated individuals.

02:08:25　22　　　　Drexel's conduct was not willful.  Thank you and thank

02:08:30　23　you for your promise to hear all of the evidence, including

02:08:33　24　Drexel's evidence, before making up your mind in the case.

02:08:36　25　　　　　　THE COURT:  Sidebar.

*United States District Court*

02:09:01   1          (Sidebar discussion follows:)

02:09:01   2          THE COURT:  Just wanted to make sure I heard you

02:09:01   3   correct.  Now, you said in your opening it was not Catudal,

02:09:05   4   because he was provost, right?  That was the comparator.

02:09:10   5          MS. GREENSPAN:  I said they may consider that it is

02:09:13   6   Catudal.  They may consider it's Andrew Smith.  They may

02:09:18   7   consider.

02:09:18   8          THE COURT:  They may consider.  Okay.  So that's not

02:09:21   9   what I heard, but you think Catudal, Smith and Warnock or not

02:09:25   10  Warnock?

02:09:26   11         MS. GREENSPAN:  It will be for them to decide Warnock.

02:09:29   12         THE COURT:  Be careful on how you present it because

02:09:31   13  what it sounded like was you were going to -- you were saying

02:09:35   14  no, no, no, but maybe.  So be really careful because you're

02:09:39   15  walking the line right now.  Understood?

02:09:42   16         MS. GREENSPAN:  I understand.

02:10:09   17         (Sidebar discussion ends.)

02:10:09   18         THE COURT:  Are these folks in the courtroom, any of

02:10:09   19  them witnesses?

02:10:09   20         MS. GREENSPAN:  I'm sorry, Your Honor?

02:10:11   21         THE COURT:  Any of these folks in the courtroom, are

02:10:13   22  they witnesses?

02:10:14   23         MR. FOLEY:  Not that I know of, Your Honor.  No.

02:10:16   24         THE COURT:  First witness.

02:10:17   25         MR. FOLEY:  And this witness is on Zoom, Your Honor,

*United States District Court*

| | | |
|---|---|---|
| 02:10:19 | 1 | so I am going to need a moment to -- Drexel -- I agreed to do |
| 02:10:25 | 2 | this on Zoom and Drexel is providing the technology. |
| 02:10:29 | 3 | THE COURT:  Okay.  What's the name of this witness? |
| 02:10:31 | 4 | MR. FOLEY:  Megan Weyler. |
| 02:11:01 | 5 | THE COURT:  Members of the jury, can you see that |
| 02:11:02 | 6 | screen or do you need it angled a bit more? |
| 02:11:54 | 7 | THE JURY:  That's good. |
| 02:11:54 | 8 | THE COURT:  Ms. Weyler, can you hear me?  Okay.  We |
| 02:11:59 | 9 | cannot hear Ms. Weyler.  Turn it up.  Counsel?  Can you turn it |
| 02:11:59 | 10 | up?  Oh, it's from you guys? |
| 02:11:59 | 11 | MR. FOLEY:  Yes. |
| 02:12:52 | 12 | MS. LOPEZ:  Can you hear us, Ms. Weyler? |
| 02:12:54 | 13 | (Technical issues with videoconference.) |
| 02:15:05 | 14 | THE COURT:  What's the problem? |
| 02:15:05 | 15 | MS. LOPEZ:  The audio is not coming through the |
| 02:15:08 | 16 | speakers. |
| 02:15:08 | 17 | THE COURT:  Okay.  Members of the jury, we've got some |
| 02:15:09 | 18 | technical problems.  Why don't you go back to the jury room? |
| 02:15:14 | 19 | The same admonitions continue to apply.  Don't talk about |
| 02:15:21 | 20 | anything to do with this case. |
| 02:15:21 | 21 | THE JURY:  Okay. |
| 02:15:26 | 22 | THE COURT:  Thank you. |
| 02:15:46 | 23 | We'll bring in IT.  Call me when it's resolved. |
| 02:29:59 | 24 | (Brief recess.) |
| 02:29:59 | 25 | THE COURT:  We are bringing in the jury.  We have it |

*United States District Court*

02:30:02    1   working.  Ms. Weyler, can you just say a few words?

02:30:07    2           MS. WEYLER:  Hello.  Good afternoon.  Can you hear me?

02:30:09    3           THE COURT:  Yes, I can.  Do you have anyone in the

02:30:09    4   room with you?

02:30:13    5           MS. WEYLER:  I have no one in the room with me.

02:30:15    6           THE COURT:  Thank you.

02:30:30    7           And by the way, I don't have an exhibit list with your

02:30:33    8   stipulations.

02:31:04    9           THE DEPUTY CLERK:  All rise for the jury.

02:31:05   10          (The jury enters the courtroom.)

02:31:05   11          THE COURT:  Have a seat.  Your witness.

02:31:05   12                 DIRECT EXAMINATION

02:31:05   13  BY MR. FOLEY:

02:31:17   14  Q.  Ms. Weyler, can you hear me?

02:31:21   15  A.  I can hear you, yes.

02:31:23   16  Q.  Good.  Okay.  Thanks.  Good afternoon, Ms. Weyler.  I'm

02:31:29   17  Brian Foley.  We met before when I took your deposition.  Do

02:31:33   18  you remember that?

02:31:33   19  A.  Yes.

02:31:34   20  Q.  Okay.  You are testifying today on Zoom because you're in

02:31:40   21  California; isn't that right?

02:31:42   22  A.  That's correct.

02:31:43   23  Q.  That's because you're on vacation; isn't that right?

02:31:46   24  A.  Correct.

02:31:47   25  Q.  And you are aware that I agreed to let you testify by Zoom

02:31:52  1  instead of coming here in person as an effort to -- as for your

02:32:02  2  convenience and for Drexel's convenience; isn't that right?

02:32:05  3  A.  I am aware and much appreciated.

02:32:08  4  Q.  And you're aware that it was agreed that it was Drexel's

02:32:12  5  responsibility to make sure the technology worked?

02:32:15  6  A.  I am aware.

02:32:16  7  Q.  All right.  All right.  So let's talk about you.  You are

02:32:22  8  the --

02:32:22  9      THE COURT:  Hold on.  You need to swear in the

02:32:26  10  witness.

02:32:27  11      MR. FOLEY:  Okay.

02:32:27  12      THE DEPUTY CLERK:  Ms. Weyler, would you please raise

02:32:29  13  your right hand?

02:32:33  14      (MEGAN VAN HORN, sworn.).

02:32:40  15      THE DEPUTY CLERK:  Please state your full name for the

02:32:40  16  record, spelling your last name.

02:32:43  17      THE WITNESS:  Megan Van Horn, V-A-N capital H-O-R-N.

02:32:48  18  My preferred work name is Megan Weyler, W-E-Y-L-E-R.

02:32:48  19                          EXAMINATION

02:32:48  20  BY MR. FOLEY:

02:32:56  21  Q.  All right.  So let's start in.  You're the Senior Vice

02:32:59  22  President and the Chief Human Resources Officer at Drexel; is

02:33:04  23  that correct?

02:33:04  24  A.  That's correct.

02:33:05  25  Q.  And you've held that position since January 1st, 2020; is

*United States District Court*

02:33:09    1    that right?

02:33:09    2    A.    That's correct.

02:33:11    3    Q.    And that's the highest position in Human Resources at

02:33:16    4    Drexel, correct?

02:33:17    5    A.    That's correct.

02:33:19    6    Q.    All right.  And as part of that position, you are aware of

02:33:25    7    and work with pay information for --

02:33:30    8    A.    I oversee.

02:33:32    9    Q.    Okay.  And that's -- that includes salary information?

02:33:35    10   A.    It does.

02:33:36    11   Q.    And documents regarding salary information?

02:33:39    12   A.    It does.

02:33:41    13   Q.    And pay information?

02:33:43    14   A.    Yes.

02:33:44    15   Q.    All right.  So I want to take us to the time of

02:33:52    16   September 19th, September 20th, before the judgment of

02:33:56    17   liability was entered in this case.  There was a request by the

02:34:02    18   plaintiff that you participate in a meeting to provide access

02:34:09    19   to payroll documents about Drexel employees on the Drexel

02:34:17    20   database; isn't that right?

02:34:19    21   A.    That is correct.

02:34:21    22   Q.    All right.  And what was requested was historical salary

02:34:26    23   information of professors in the Department of English and

02:34:29    24   Philosophy, correct?

02:34:31    25   A.    Correct.

*United States District Court*

02:34:31   1   Q.   And the request by plaintiff was that you meet in real

02:34:36   2   time and on Zoom and show these documents in real time; isn't

02:34:42   3   that right?

02:34:42   4   A.   That's correct.

02:34:44   5   Q.   All right.  So it would be virtual access, correct?

02:34:48   6   A.   Correct.

02:34:49   7   Q.   All right.  Let's talk about that meeting.  On that day,

02:34:55   8   September 20th, you were prescheduled to be out of the office

02:34:59   9   that day, correct?

02:35:00  10   A.   Correct.

02:35:02  11   Q.   Beginning at 12 o'clock; is that right?

02:35:04  12   A.   Yes.

02:35:05  13   Q.   And that's because you were going on vacation, correct?

02:35:09  14   A.   Yes.  We were heading to the shore.

02:35:12  15   Q.   Okay.  And that's the Jersey Shore, of course?

02:35:15  16   A.   Yes.

02:35:16  17   Q.   All right.  So at the time of the meeting you were in

02:35:19  18   Swedesboro, New Jersey, correct?

02:35:20  19   A.   That's correct.

02:35:22  20   Q.   And so when the meeting started, who was at this meeting?

02:35:26  21   It was attorney Leslie Greenspan, correct?

02:35:31  22   A.   Correct.

02:35:31  23   Q.   And Drexel in-house attorney, JuHwan Lee, correct?

02:35:37  24   A.   Correct.

02:35:37  25   Q.   And you, correct?

*United States District Court*

02:35:39   1   A.   Yes.

02:35:39   2   Q.   And then plaintiff, Professor Piety, joined the meeting,

02:35:44   3   correct?

02:35:44   4   A.   Correct.

02:35:44   5   Q.   And I joined it with her; isn't that right?

02:35:47   6   A.   Yes, and the court reporter.

02:35:49   7   Q.   There was no court reporter there.

02:35:53   8   A.   I'm sorry.  The recorder.

02:35:56   9   Q.   Okay.  Are you saying there was another person at the

02:36:01   10  meeting?

02:36:01   11  A.   Oh, I'm so sorry, no.  I'm thinking of the deposition

02:36:06   12  instead of the meeting that we were going to review the data.

02:36:10   13  Q.   All right.  Fair enough.  So at the beginning of the

02:36:13   14  meeting, the plaintiff asked you to see the W-2s of Department

02:36:18   15  of English and Philosophy professors; isn't that right?

02:36:22   16  A.   Correct.

02:36:23   17  Q.   And your understanding was that that request was so that

02:36:28   18  plaintiff could actually verify pay information that had been

02:36:32   19  provided beforehand; is that right?

02:36:34   20  A.   That is my understanding of the plaintiff's request, but

02:36:40   21  that's not my understanding of the data that was passed.

02:36:46   22  Q.   Okay.  But at the beginning of the meeting the plaintiff

02:36:49   23  asked for W-2s and to see the W-2s in real time on Drexel

02:36:56   24  database; isn't that right?

02:36:57   25  A.   That's correct.

*United States District Court*

02:36:58   1   Q.   Okay.  And you responded that you did not have access to

02:37:02   2   those W-2s, correct?

02:37:04   3   A.   That's correct.

02:37:05   4   Q.   All right.  Even though you are the highest ranking HR

02:37:10   5   person at Drexel?

02:37:11   6   A.   That is correct.  I have access to all the underlining

02:37:14   7   data for the W-2, but the payroll department, our executive

02:37:21   8   director of payroll is responsible for W-2s.  She does not

02:37:23   9   report to HR.

02:37:23  10   Q.   Okay.  And that executive director of payroll is Rose

02:37:26  11   Flavin, correct?

02:37:26  12   A.   That's correct.

02:37:27  13   Q.   And you said that Rose Flavin was the only person who had

02:37:31  14   access to those documents, correct?

02:37:33  15   A.   To my understanding.  I'm sure that there may be another

02:37:37  16   persons in her department that would have access to it, but

02:37:41  17   she's the creator of those documents.

02:37:43  18   Q.   All right.  But you don't know of anyone else other than

02:37:46  19   Rose Flavin who has access?

02:37:48  20   A.   I don't know.

02:37:50  21   Q.   You don't know that you don't know or you don't know?

02:37:55  22   A.   I don't know who has access besides Rose.

02:37:58  23   Q.   Okay.  All right.  So when plaintiff asked to see those

02:38:08  24   W-2s and you said that you didn't have access and only Rose

02:38:13  25   Flavin had access, you then e-mailed Rose Flavin; is that

*United States District Court*

02:38:19    1   correct?

02:38:19    2   A.   Correct.

02:38:20    3   Q.   All right. And that e-mail was asking her to join this

02:38:27    4   Zoom meeting; is that correct?

02:38:27    5   A.   Yes, but she was away on vacation.

02:38:27    6   Q.   Okay. And --

02:38:32    7   A.   I was trying to get you access to the W-2 information

02:38:36    8   while we were on the call.

02:38:38    9   Q.   All right. And you didn't telephone her, did you?

02:38:41   10   A.   No, I received her out of office as we were sending the

02:38:46   11   e-mail.

02:38:47   12   Q.   Okay. And you remember I asked you for a copy of that

02:38:50   13   e-mail?

02:38:51   14   A.   Offhand I don't remember, but...

02:38:57   15   Q.   Okay. Do you remember -- refresh your recollection, you

02:39:00   16   remember at your deposition in October?

02:39:03   17       MS. GREENSPAN: Objection, Your Honor.

02:39:04   18       THE COURT: Basis? Just give me the rule.

02:39:09   19       MS. GREENSPAN: A ruling previously made by the Court.

02:39:15   20       THE COURT: Very quickly. Which ruling?

02:39:18   21       MS. GREENSPAN: About discovery.

02:39:21   22       THE COURT: This is inquiry. Just talking about the

02:39:23   23   deposition. He is asking a question about the deposition.

02:39:28   24       MS. GREENSPAN: About a document asked for at the

02:39:30   25   deposition.

*United States District Court*

02:39:33　1　　　　THE COURT:  I don't know what you're asking for.  You

02:39:38　2　know the contours.  You'll ask the question.  If there is an

02:39:42　3　objection and if it's within the boundaries that I set then I

02:39:47　4　will sustain the objection.  I will tell the jury not to pay

02:39:52　5　attention to that evidence.  Just go ahead.

02:39:56　6　　　　MR. FOLEY:  Okay.  So I asked you if you have that --

02:39:59　7　if you still have that e-mail.  Do you remember that?

02:40:01　8　A.　I'm sorry.  I don't remember that.

02:40:06　9　Q.　All right.  And this -- all right.  This deposition was

02:40:11　10　less than a month after the meeting; is that right?

02:40:13　11　A.　Yes, around that time.

02:40:18　12　Q.　All right.  And when I asked if you might still have that

02:40:22　13　e-mail, you said that you might still not have it; isn't that

02:40:26　14　right?

02:40:26　15　A.　I don't recall.

02:40:30　16　Q.　Okay.  And you said that you might not still have it

02:40:35　17　because you delete thousands of e-mails per day.  Do you

02:40:40　18　remember saying that?

02:40:40　19　A.　We do.  Not necessarily, but I do.  I don't have room in

02:40:46　20　storage for all the e-mails.

02:40:48　21　Q.　All right.  So after you e-mailed Rose Flavin to get her

02:40:59　22　during the meeting, you got her out of the office automatic

02:41:01　23　reply.  After that you ended the Zoom call; is that right?

02:41:06　24　A.　No, that's not correct.

02:41:08　25　Q.　The Zoom call was ended; isn't that right?

*United States District Court*

02:41:11　1　A.　I asked to provide the information that I had gathered the

02:41:18　2　previous night before.　So I explained that I had brought

02:41:22　3　reports to be able to pull all the information that was

02:41:25　4　requested from specific time periods for specific people for

02:41:29　5　specific departments, and that I had both banner and reporting

02:41:33　6　system ready to show all the information that was requested,

02:41:36　7　and my understanding is that the plaintiff and counsel were not

02:41:41　8　looking for that data.　They only wanted to see W-2s.　So

02:41:45　9　counsel had ended the call.

02:41:47　10　Q.　So after the call ended, you then went -- you said that

02:41:53　11　your family was waiting to leave for the shore; is that right?

02:41:56　12　A.　Yes.　We were going to leave around noon.

02:42:02　13　Q.　All right.　You finished packing up for the shore?

02:42:04　14　A.　Yes.

02:42:05　15　Q.　All right.　And you did not -- you did not have Rose

02:42:12　16　Flavin join in that meeting; is that right?

02:42:13　17　A.　That's correct.　She was on vacation.

02:42:15　18　Q.　And that day you were not in a meeting with Rose Flavin;

02:42:20　19　is that correct?　On Zoom?

02:42:21　20　A.　That's correct, yes.

02:42:22　21　Q.　All right.　Now, when you went to the shore, you knew that

02:42:27　22　this information was still information that the plaintiff

02:42:30　23　wanted; isn't that right?

02:42:32　24　A.　Correct.

02:42:34　25　Q.　All right.　And when you went to the shore, you did not --

*United States District Court*

02:42:38   1   you didn't bring your computer with you; isn't that right?

02:42:41   2   A.   Correct.  I don't have access to that information that her

02:42:45   3   counsel wanted.

02:42:46   4   Q.   All right.  But if you brought your computer you could

02:42:49   5   have access to other pay information; isn't that right?

02:42:52   6   A.   That's correct.

02:42:53   7   Q.   Okay.  You didn't bring it with you, right?

02:42:55   8   A.   Correct.

02:42:57   9   Q.   All right.  Why didn't you bring it with you?

02:43:01   10  A.   I was only going for two days, and this was a trip for my

02:43:06   11  parents.  If I needed to access information and actually join

02:43:12   12  another Zoom call I would have driven the hour back home and

02:43:18   13  actually worked.

02:43:18   14  Q.   And so you would rather drive an hour back home and work

02:43:22   15  rather than just bring your computer with you?

02:43:25   16  A.   No.  I work on vacation every vacation.  This was just a

02:43:30   17  48-hour trip, so I didn't think I would need it.

02:43:34   18  Q.   And you got a call later that day from someone at Drexel;

02:43:39   19  isn't that right?

02:43:39   20  A.   Yes, from counsel JuHwon Lee.

02:43:44   21  Q.   All right.  And you couldn't provide any data because you

02:43:47   22  didn't bring your computer, correct?

02:43:49   23  A.   I wasn't asked for data.

02:43:52   24  Q.   Okay.  But you weren't able to provide it anyway, right?

02:43:57   25  A.   If I needed to provide data I could have provided data.

*United States District Court*

02:44:04  1  I -- again, I was an hour away from my home.  If I needed to

02:44:07  2  actually work over that weekend, I could have just gone home

02:44:11  3  and left my family there.

02:44:13  4  Q.  All right.  And don't you always bring your laptop on

02:44:17  5  vacations?

02:44:17  6  A.  Yes, just about.

02:44:20  7  Q.  Right.  But not this time?

02:44:24  8  A.  No.  Again, this was a trip for my parents.  I didn't

02:44:28  9  expect to need to work in that 48 hours.

02:44:31  10  Q.  All right.  I have no further questions.

02:44:37  11      THE COURT:  Cross?

02:44:37  12          CROSS-EXAMINATION

02:44:37  13  BY MS. GREENSPAN:

02:44:43  14  Q.  Good afternoon, Ms. Weyler.  Can you hear me okay?

02:44:46  15  A.  I can.  Good afternoon.

02:44:49  16  Q.  Counsel asked you some questions about a meeting on

02:44:53  17  September 20th, 2024.  I want to just ask you some more

02:44:57  18  questions about that.  What had you done to prepare for that

02:45:01  19  meeting?

02:45:01  20  A.  Well, on the 19th I was given very specific parameters for

02:45:08  21  a data request that was needed, where I needed to provide

02:45:11  22  salary information from a period of May of 2019 through, I

02:45:18  23  believe, September of 2024 for very specific individuals in the

02:45:23  24  department.  So after talking with counsel, understanding that

02:45:26  25  that meeting had to happen that next day, I went home, I logged

02:45:32    1    into the systems.  I got this the request late on my drive

02:45:36    2    home.

02:45:36    3        I logged into our Hyperion system, which is our reporting

02:45:42    4    database.  I built a report to pull those specific parameters

02:45:47    5    that provided all of the payroll data for those individual

02:45:52    6    employees for that time period as well as all the salary

02:45:55    7    information.  And that was just in preparation for a call at

02:46:01    8    11 o'clock the next day.

02:46:03    9    Q.   When you say "salary information" are you talking about

02:46:06   10    the salaries of the various professors in the Department of

02:46:10   11    English and Philosophy?

02:46:13   12    A.   That's correct.

02:46:14   13    Q.   And you had that information at the ready; is that right?

02:46:18   14    A.   Yes.  I had both the annual salary details as well as all

02:46:23   15    the payroll information.

02:46:24   16    Q.   At the meeting on September 20th, were you ready to show

02:46:29   17    Dr. Piety and her counsel any and every piece of payroll

02:46:34   18    information that they would have asked for?

02:46:36   19    A.   Yes.  With the exception of some personal information that

02:46:40   20    normally wouldn't, such as the Social Security numbers and

02:46:43   21    dates of birth, just personal identifiable information I left

02:46:49   22    out of the report.

02:46:49   23    Q.   When you -- you were part of a Zoom and you were -- how is

02:46:55   24    that going to work?  If we were in real time and you're on

02:47:00   25    Zoom, how -- just sort of highlight how does that work?

*United States District Court*

02:47:04  1    A.   So the system is web based, so I was going to pull up both
02:47:10  2    systems.  Hyperion is the first, and that's the reporting
02:47:11  3    database.  That would allow the plaintiff's counsel to actually
02:47:14  4    see all the parameters to see the department codes that were
02:47:18  5    being pulled, the time frames that we were pulling, as well as
02:47:21  6    the output of all of that information.

02:47:24  7        From there, we could verify individuals, such as Dr. Piety
02:47:29  8    could view all the information.  She'd be able to see the
02:47:32  9    accuracy of her own records.  And then we go into the Banner
02:47:36 10    system, and the Banner system is our fully integrated system,
02:47:40 11    so it houses all of our student information, Human Resources,
02:47:47 12    accounts payable, vendors, everything.  It's one combined
02:47:49 13    system.

02:47:49 14        From there we go into the Banner system and we could
02:47:53 15    verify, double-check, view each of the payroll records, view of
02:47:59 16    the general detail records that has all the salary information.
02:48:02 17    So it's pretty much everything that you could have -- possibly
02:48:06 18    have access to for HR and payroll.
02:48:09 19    Q.   So would that have included, in addition to salary
02:48:12 20    information that you were prepared to show them, would that
02:48:14 21    have also included any administrative supplements that these
02:48:19 22    professors receive?
02:48:20 23    A.   Yes.  So both Banner and Hyperion report contained all job
02:48:25 24    detail.  So a faculty member may have multiple positions.  Many
02:48:30 25    have extra teaching, so outside of normal teaching load, we

*United States District Court*

02:48:34  1  provide additional compensation for additional teaching.

02:48:38  2      We provide additional compensation for research, as well

02:48:41  3  as any type of administrative supplement for the department

02:48:44  4  heads, program managers, and things like that.  So every person

02:48:47  5  may have multiple roles and jobs, and all that information

02:48:50  6  would have been displayed both in the payroll records as well

02:48:55  7  as the --

02:48:55  8  Q.  Were you willing to share all of that information with

02:48:58  9  Dr. Piety and her counsel on that day?

02:49:00  10  A.  Yes, I was.

02:49:02  11  Q.  Were you able to share all of that information with

02:49:05  12  Dr. Piety and her counsel that day?

02:49:07  13  A.  Yes.

02:49:08  14  Q.  Were you willing to share all of that information with

02:49:12  15  Dr. Piety and her counsel that day?

02:49:14  16  A.  Yes.

02:49:15  17  Q.  And you mentioned that you didn't have access to --

02:49:20  18      THE COURT:  Sidebar.

02:49:43  19      (Sidebar conference follows:)

02:49:43  20      THE COURT:  Mr. Piety, was this meeting following the

02:49:47  21  order that I issued on 19th of September which spoke of

02:49:52  22  plaintiff's counsel access to Drexel University payroll

02:49:55  23  database, Keyanah Jones' laptop, and some other issues about

02:50:03  24  live testimony of Leslie Miller Greenspan.  Is that the order

02:50:07  25  that we're talking about here?

*United States District Court*

| 02:50:08 | 1 | MR. FOLEY: This was pursuant to the order on the |
| 02:50:11 | 2 | 19th, not the 20th. |
| 02:50:12 | 3 | THE COURT: Is this the order you're talking about? |
| 02:50:17 | 4 | MR. FOLEY: Yes. |
| 02:50:18 | 5 | THE COURT: Okay. Did you show this to the witness? |
| 02:50:22 | 6 | MS. GREENSPAN: I don't believe I did, Your Honor. |
| 02:50:24 | 7 | THE COURT: This is coming in. I am just going to ask |
| 02:50:28 | 8 | her some questions on it. |
| 02:50:48 | 9 | (Sidebar conference ends.) |
| 02:50:48 | 10 | THE COURT: Ms. Van Horn, this is Judge Beetlestone. |
| 02:50:51 | 11 | Can you hear me? Ms. Van Horn, can you hear me? |
| 02:50:57 | 12 | A. I can, faintly. I'm having a hard time hearing you. |
| 02:50:57 | 13 | THE COURT: Can you hear me? |
| 02:51:02 | 14 | A. I didn't know if you were talking to me. |
| 02:51:02 | 15 | THE COURT: Can you hear me now? |
| 02:51:06 | 16 | A. Yes. |
| 02:51:07 | 17 | THE COURT: Okay. Prior to this meeting, did your |
| 02:51:13 | 18 | lawyer provide you with an order issued by myself on the 19th |
| 02:51:19 | 19 | of September explaining what you were required to provide to |
| 02:51:24 | 20 | the plaintiff? |
| 02:51:26 | 21 | A. Yes, I was given all the parameters needed to provide to |
| 02:51:30 | 22 | the plaintiff. |
| 02:51:30 | 23 | THE COURT: So the order said before 12:00 p.m. on |
| 02:51:36 | 24 | September 20th, 2024, defendant shall provide plaintiff and |
| 02:51:41 | 25 | plaintiff's counsel access to a Drexel University payroll |

*United States District Court*

02:51:45  1  database containing the historical salary information of all

02:51:51  2  professors in the Department of English and Philosophy from May

02:51:52  3  9th, 2019, to the present.  Is that what you did?

02:51:56  4  A.   That is exactly what I did.

02:51:58  5       THE COURT:  Did you provide them access to the

02:52:00  6  database?

02:52:01  7  A.   I was ready and willing to provide access to the database,

02:52:05  8  but counsel decided he did not want that access, that he was

02:52:09  9  looking for W-2s instead, which the parameters of W-2s do not

02:52:14  10  fall within the request that we were given.

02:52:16  11       THE COURT:  Okay.  So you had this meeting by Zoom; is

02:52:19  12  that correct?

02:52:19  13  A.   That's correct.

02:52:21  14       THE COURT:  And you did not have access to the

02:52:27  15  database that was controlled by -- I think you said it was the

02:52:37  16  HR person or the --

02:52:39  17  A.   The payroll person.

02:52:41  18       THE COURT:  The payroll person.  You did not have

02:52:42  19  access to that; is that correct?

02:52:43  20  A.   That's correct.

02:52:45  21       THE COURT:  And you didn't provide the plaintiff

02:52:47  22  access to that?

02:52:48  23  A.   Correct, but for clarity, the W-2 doesn't fall within that

02:52:53  24  parameter.  W-2s are all calendar-year basis, so I couldn't

02:52:58  25  pull a May of 2019 through June of -- or September of 2024 for

*United States District Court*

02:53:02    1    a W-2.

02:53:03    2           THE COURT:  Are those W-2s in the payroll database?

02:53:09    3    A.   The W-2s are in the payroll database, yes.

02:53:10    4           THE COURT:  Okay.  And I said -- and I ordered that

02:53:11    5    defendant shall provide plaintiff and plaintiff's counsel

02:53:14    6    access to a Drexel University payroll database containing the

02:53:16    7    historical salary information of all professors in the

02:53:19    8    Department of English and Philosophy from May 9th, 2019, to the

02:53:23    9    present.  So you did that?

02:53:24   10    A.   That is exactly what I did.

02:53:28   11           THE COURT:  Go ahead.

02:53:31   12           MS. GREENSPAN:  I don't have any further questions,

02:53:33   13    Your Honor.  Thank you.

02:53:34   14           THE COURT:  Recross?

02:53:34   15                         RE-CROSS EXAMINATION

02:53:34   16    BY MR. FOLEY:

02:53:40   17    Q.   Ms. Weyler, you testified Ms. Greenspan asked you if you

02:53:45   18    were ready to provide administrative information about salary

02:53:50   19    and administrative supplements; is that correct?

02:53:53   20    A.   That's correct.

02:53:55   21    Q.   Okay.  You said that.  I want to show you an Exhibit.

02:54:00   22           MR. FOLEY:  Could you call up Exhibit 5, please?

02:54:24   23           All right.  I would like to -- this is joint

02:54:27   24    Exhibit 5.  I'd like to offer this into evidence.

02:54:30   25           THE COURT:  Any objection?

*United States District Court*

02:54:31    1       MS. GREENSPAN: No, Your Honor. This one is

02:54:33    2 stipulated to.

02:54:34    3       THE COURT: It's admitted. Published.

02:54:37    4       (Exhibit No. 5 admitted into evidence.).

02:54:37    5 BY MR. FOLEY:

02:54:39    6 Q. Ms. Weyler, this is Exhibit 5. You're aware that this

02:54:43    7 exhibit was provided to the plaintiff two days after the

02:54:48    8 September 20th meeting?

02:54:50    9 A. I'm sorry. I'm unable to see the exhibit.

02:54:55   10 Q. You're unable to see the exhibit? All right. We are

02:54:58   11 going to get it shared here. Can you see it now?

02:55:14   12 A. I can see the exhibit now. I can.

02:55:17   13 Q. And this provides salary information; is that right?

02:55:23   14 A. I don't know that I have ever seen this document before.

02:55:23   15 Q. All right.

02:55:28   16 A. Can you help me...

02:55:30   17 Q. Well, I am going to ask you, does this document say

02:55:35   18 anything at all? In fact, this document doesn't say anything

02:55:40   19 at all about administrative supplements, does it?

02:55:43   20 A. I cannot tell from just this. This looks like a primary

02:55:59   21 doc label. I don't know what the parameters were for the

02:56:03   22 report.

02:56:03   23 Q. Okay. There are no entries here about the administrative

02:56:08   24 supplements; isn't that right?

02:56:09   25 A. I don't see any on this page, no.

*United States District Court*

| | | |
|---|---|---|
| 02:56:17 | 1 | Q. All right. So let's look down at John Kurtz. See that? |
| 02:56:20 | 2 | It's organized alphabetically by first names? |
| 02:56:25 | 3 | A. Can you increase the size of this document? |
| 02:56:28 | 4 | Q. I will try. It's not my computer, but I will give it a |
| 02:56:56 | 5 | shot. Can you see it now? |
| 02:56:57 | 6 | A. I can see this a little better. And I'm sorry. Who am I |
| 02:57:01 | 7 | looking for? |
| 02:57:01 | 8 | Q. I'm having you look down at John Kurtz. Do you see that? |
| 02:57:07 | 9 | It's organized by first name -- |
| 02:57:09 | 10 | A. I do. |
| 02:57:10 | 11 | Q. -- for some reason? |
| 02:57:11 | 12 | A. Yes, I see him. |
| 02:57:13 | 13 | Q. Okay. And let's look at that. Going across that line, it |
| 02:57:18 | 14 | says, Professor, Department Head, English and Philosophy; isn't |
| 02:57:22 | 15 | that right? |
| 02:57:22 | 16 | A. That's correct. |
| 02:57:23 | 17 | Q. And then it says -- has salary lines below that. Now, |
| 02:57:28 | 18 | below this -- just for reference -- is Marilyn Piety, right? |
| 02:57:32 | 19 | A. Correct. |
| 02:57:33 | 20 | Q. Okay. So as we see the salary through the years, it says |
| 02:57:38 | 21 | professor, department head, English and Philosophy, and it has |
| 02:57:42 | 22 | a salary figure. It doesn't say anything about administrative |
| 02:57:46 | 23 | supplements. |
| 02:57:47 | 24 | A. I don't know what the request was for this specific |
| 02:57:51 | 25 | report. I don't know if this is asking for a total |

*United States District Court*

02:57:54    1   compensation for 2019, and what is the primary role, or if this

02:57:59    2   was asking just for base salary for an individual.  So I don't

02:58:04    3   know who created the report or what the parameters were for

02:58:07    4   this request.

02:58:08    5   Q.   All right.  But you said you were ready two days before

02:58:11    6   this to provide information that would include administrative

02:58:15    7   supplements.  That's what you testified this morning -- this

02:58:17    8   afternoon, right?

02:58:18    9   A.   That is correct.

02:58:19   10   Q.   And this information was provided two days later says

02:58:23   11   nothing about administrative supplements, does it?

02:58:26   12   A.   Who provided this information and what was requested for

02:58:29   13   the information?

02:58:31   14   Q.   Drexel provided this information.

02:58:34   15   A.   Again, I was not part of this report.  I was not part of

02:58:40   16   this request.  So I don't know who requested it, who created it

02:58:45   17   and what was asked for.  This could be total compensation for

02:58:49   18   2019 or it could be base salaries.  I am not sure.

02:58:52   19   Q.   Okay.  So it's -- so let's look again at John Kurtz.  Take

02:58:57   20   a look over at the far -- at the second to the right because I

02:59:01   21   think that our images are taking up part of the screen, but

02:59:06   22   take a look at the second column to the right, 2023.  It says

02:59:10   23   John Kurtz would get over $▮▮▮▮▮▮.  Do you see that?

02:59:17   24   A.   Yes.

02:59:18   25   Q.   And in -- one reading this would think that this says

*United States District Court*

02:59:23  1  professor, Department Head, and that that $█████ is what is

02:59:28  2  being paid for his work as professor and Department Head; isn't

02:59:34  3  that right?

02:59:34  4  A.  I cannot confirm.  I'd have to pull up the database to

02:59:38  5  actually confirm the information.

02:59:38  6  Q.  Well, ma'am --

02:59:40  7  A.  I don't know what the parameters are.

02:59:42  8  Q.  I'm not asking you to confirm the information.  I'm saying

02:59:43  9  this would appear to be a salary for someone working as

02:59:48  10  professor and Department Head, right?

02:59:51  11  A.  It could be a salary or it could be the total compensation

02:59:55  12  for all of the jobs.

02:59:55  13  Q.  Right.

02:59:57  14  A.  Again, I was not part of this.

02:59:57  15  Q.  So --

02:59:59  16  A.  It could include his supplement or it couldn't.  I am not

03:00:02  17  sure.

03:00:03  18  Q.  Correct.  So when we look below it, at Marilyn Piety, the

03:00:09  19  plaintiff in the case, look at her salary.  It says, Marilyn

03:00:10  20  Piety, professor, █████ -- $██████.  Do you see that?

03:00:18  21  A.  I do.

03:00:19  22  Q.  So it would look like she is being paid that money to be

03:00:24  23  professor in 2023, correct?

03:00:26  24  A.  I can assume, yes.

03:00:29  25  Q.  And just above, it looks like John Kurtz, Roger Kurtz is

*United States District Court*

03:00:34  1  being paid ████ et cetera, to be a professor and Department

03:00:39  2  Head; isn't that right?

03:00:39  3  A.   Again, I cannot confirm that that ██ is for his professor

03:00:46  4  position, it's for his professor Department Head or if it's for

03:00:52  5  his professor department head, plus any other administrative

03:00:54  6  stipends or additional teaching that he had.

03:00:56  7          MR. FOLEY:  Exactly.  That's exactly what I'm trying

03:00:59  8  to point out here.  Thanks.

03:01:04  9          No further questions.

03:01:05  10          THE COURT:  Next witness.

03:01:12  11          You can take Ms. Van Horn off the screen.

03:01:59  12          Are you the next witness?

03:02:02  13  A.   Yes.

03:02:03  14          THE COURT:  Come on up.

03:02:05  15          MR. FOLEY:  I call on Rose Flavin.

03:02:14  16          THE COURT:  Please swear in the witness.

03:02:14  17          (ROSE MARIE FLAVIN, sworn.)

03:02:14  18  A.   Yes, I do.

03:02:14  19          THE DEPUTY CLERK:  Please state your full name for the

03:02:14  20  record, spelling your last name.

03:02:25  21  A.   Rose Marie Flavin, F-L-A-V-I-N.

03:02:32  22          THE COURT:  Your witness.

03:02:32  23                        DIRECT EXAMINATION

03:02:32  24  BY MR. FOLEY:

03:02:34  25  Q.   Good afternoon, Ms. Flavin.  How are you today?

*United States District Court*

03:02:37　　1　A.　Good.　How are you?

03:02:38　　2　Q.　Good.　Thank you.　We met -- we've met a few times in this

03:02:42　　3　case; isn't that right?

03:02:43　　4　A.　Yes.

03:02:43　　5　Q.　All right.　We met in October for depositions in this

03:02:48　　6　case, correct?

03:02:49　　7　A.　Yes.

03:02:49　　8　Q.　And also met for a meeting at Drexel to look at data on

03:02:55　　9　the computer in the databases, correct?

03:02:58　　10　A.　Yes.

03:02:59　　11　Q.　All right.　And also in January, once again, in order to

03:03:03　　12　view the data once again; isn't that right?

03:03:05　　13　A.　Yes.

03:03:06　　14　Q.　All right.　So you are the Executive Director of Payroll

03:03:13　　15　Operations at Drexel University?

03:03:14　　16　A.　Yes, I am.

03:03:15　　17　Q.　And you have been doing that since July 15th, 2024?

03:03:19　　18　A.　Yes.

03:03:19　　19　Q.　And you've worked at Drexel itself since 2007, right?

03:03:24　　20　A.　Yes.

03:03:24　　21　Q.　Okay.　Your job is to oversee the payroll office, correct?

03:03:28　　22　A.　Yes.

03:03:28　　23　Q.　You're the head payroll person?

03:03:31　　24　A.　Yes, I am.

03:03:32　　25　Q.　All right.　And you have a staff at the payroll office

*United States District Court*

03:03:36  1   that you have, right?

03:03:37  2   A.   I do, yes.

03:03:38  3   Q.   And that's a staff of six people, correct?

03:03:40  4   A.   Correct.

03:03:41  5   Q.   All right.  And all of those six people are able to access

03:03:46  6   the payroll information, such as W-2s, correct?

03:03:50  7   A.   Yes, they are.

03:03:51  8   Q.   All right.  And there's even two more people in the IT

03:03:56  9   information technology department at Drexel who are able to

03:03:59  10  access W-2s on the Drexel database, right?

03:04:03  11  A.   Yes.

03:04:04  12  Q.   All right.  So including you, that's nine people at Drexel

03:04:07  13  who can access it?

03:04:09  14  A.   Yes.

03:04:09  15  Q.   Anybody else?

03:04:10  16  A.   Not to my knowledge.

03:04:11  17  Q.   Okay.  So when H -- when someone at HR needs to get W-2s,

03:04:21  18  they can't get them themselves?

03:04:24  19  A.   No, they can't.

03:04:25  20  Q.   All right.  So they call over to payroll, right?

03:04:28  21  A.   Correct.

03:04:29  22  Q.   But they don't have to call just you, do they?

03:04:32  23  A.   No.  They do not.

03:04:33  24  Q.   All right.  And people in HR know that you're not the only

03:04:37  25  person who can get a W-2 at Drexel, right?

*United States District Court*

03:04:41  1  A.   They do.  They would contact the payroll inbox.  Some

03:04:47  2  requests come right to me.

03:04:48  3  Q.   Okay.  But not all requests go right to you, right?

03:04:52  4  A.   No.

03:04:52  5  Q.   And people can make requests through other people in

03:04:56  6  payroll without involving you, right?

03:04:58  7  A.   Yes.

03:04:59  8  Q.   Okay.  So let's go to September 20th.  We want to talk

03:05:03  9  about that.  Are you aware that there was a requirement for a

03:05:09  10  meeting to be held?  It was on Zoom, but the requirement for

03:05:15  11  the meeting to be held with Professor Piety, her counsel, and

03:05:20  12  somebody from Drexel to provide payroll information as Judge --

03:05:27  13  to provide payroll information?

03:05:30  14  A.   I'm aware that there was a request.  I was not aware of

03:05:33  15  that until the afternoon of Friday, September 20th.

03:05:38  16  Q.   Okay.  So let's talk about September 20th.  There were

03:05:42  17  four people working in payroll that day, correct?

03:05:44  18  A.   Yes.

03:05:44  19  Q.   And you weren't working that day?

03:05:46  20  A.   I was not working.

03:05:47  21  Q.   You were on vacation?

03:05:49  22  A.   I was.

03:05:49  23  Q.   All right.  Were you unreachable that day?

03:05:52  24  A.   No, I was reachable.

03:05:53  25  Q.   Okay.  You were at home, right?

*United States District Court*

03:05:55  1  A.   Yes.

03:05:55  2  Q.   Okay.  And this was the Friday before the Monday when

03:06:00  3  classes start, correct?

03:06:02  4  A.   I believe so, yes.

03:06:03  5  Q.   All right.  So a busy day in payroll?

03:06:06  6  A.   The academic calendar doesn't affect the payroll

03:06:11  7  department.

03:06:12  8  Q.   Okay.  So I want to ask you to tell us how you heard about

03:06:16  9  the request to see W-2s?

03:06:19  10       MS. GREENSPAN:  Objection.  Privilege.

03:06:21  11       THE COURT:  To the extent that the request -- you got

03:06:24  12  the request from your attorney, you do not need to answer that

03:06:27  13  question.

03:06:27  14  BY MR. FOLEY:

03:06:31  15  Q.   So how did you hear about the request -- the plaintiff's

03:06:35  16  request to see W-2s?

03:06:38  17  A.   Megan Weyler called me and asked me if I would get on a

03:06:41  18  call with Leslie Greenspan and JuHwon How -- JuHwon who -- to

03:06:49  19  discuss the accessing the W-2s.

03:06:50  20  Q.   All right.  When you say JuHwon, that's JuHwon Lee?

03:06:53  21  A.   Yes.

03:06:53  22  Q.   And JuHwon Lee is in-house counsel at Drexel?

03:06:57  23  A.   Correct.

03:06:58  24  Q.   All right.  And so Megan Weyler called you on your

03:07:02  25  personal cell phone to get you on to a meeting at lunch time,

03:07:08    1    correct?

03:07:09    2    A.    Yes.

03:07:09    3    Q.    Okay.    Around lunchtime?

03:07:11    4    A.    Yes.

03:07:11    5    Q.    All right.    And she said for you to get on to a Zoom call;

03:07:18    6    is that right?

03:07:18    7    A.    She asked if I was available to get on to a Zoom call.

03:07:23    8    Q.    Okay.    And this was by telephone, right?

03:07:25    9    A.    Telephone or text message.    She contacted me on my

03:07:30   10    personal cell phone.

03:07:31   11    Q.    All right.    And you responded, right?

03:07:32   12    A.    Yes.

03:07:32   13    Q.    All right.    And then you got on to the Zoom call; isn't

03:07:37   14    that right?

03:07:37   15    A.    Yes.

03:07:38   16    Q.    So you joined a Zoom call around lunchtime with Megan

03:07:43   17    Weyler, correct?

03:07:44   18    A.    Yes.

03:07:45   19    Q.    And you joined the Zoom call that also had Leslie

03:07:52   20    Greenspan -- on it, right?

03:07:54   21    A.    Yes.

03:07:55   22    Q.    And JuHwon Lee, Drexel in-house counsel, right?

03:08:00   23    A.    Yes.

03:08:00   24    Q.    All right.    So Megan was on that Zoom call with you,

03:08:03   25    correct?

*United States District Court*

03:08:03     1   A.   Yes.

03:08:04     2   Q.   All right.  You could have accessed W-2s, right?

03:08:07     3   A.   I could -- at that point could I access W-2s?

03:08:14     4   Q.   Yes.

03:08:14     5   A.   I could have, yes.

03:08:15     6   Q.   Okay.  You could have shared them on the computer screen

03:08:17     7   on Zoom, right?

03:08:19     8   A.   Yes.

03:08:20     9   Q.   Okay.  Now, later that afternoon -- we talked about this

03:08:26    10   in your deposition -- Megan Weyler texted you later that

03:08:30    11   afternoon between 4:30 and 5:00; isn't that right?

03:08:34    12   A.   Yes.

03:08:34    13   Q.   And asked you to get on a call?

03:08:37    14   A.   Yes.

03:08:38    15   Q.   And that call was with Attorney Greenspan; is that right?

03:08:42    16   A.   Yes, and JuHwon Lee.

03:08:44    17   Q.   And JuHwon Lee, okay.  And you got on the call with them,

03:08:49    18   right?

03:08:49    19   A.   Yes, I did.

03:08:51    20   Q.   All right.  Now, after that phone call, was it your

03:08:57    21   understanding that there would be a meeting to show the W-2s to

03:09:03    22   Professor Piety?

03:09:03    23   A.   No.  That was not my understanding.

03:09:05    24   Q.   All right.  So that night, what did you do?

03:09:09    25   A.   I received a follow-up e-mail requesting the copies of the

03:09:17    1    W-2s.

03:09:18    2    Q.    Okay.    And what did you do?

03:09:21    3    A.    I downloaded the W-2s from the payroll system and sent

03:09:26    4    them to Leslie and JuHwon.

03:09:28    5    Q.    All right.    Saved them in PDF, right?

03:09:32    6    A.    Yes.

03:09:33    7    Q.    All right.    And after that, after you sent them, did you

03:09:35    8    do anything else?

03:09:37    9    A.    No, I did not.

03:09:39    10    Q.    All right.    And what about any e-mails over that weekend?

03:09:43    11    A.    Leslie sent me an e-mail on Saturday morning, but I did

03:09:48    12    not respond until Monday.

03:09:49    13    Q.    All right.    Why didn't did you respond until Monday?

03:09:52    14    A.    I didn't work over the weekend.

03:09:55    15    Q.    All right.    Did you read your e-mail over the weekend?

03:09:57    16    A.    No, I did not.

03:09:59    17    Q.    All right.    So you don't read your work e-mail on the

03:10:02    18    weekend?

03:10:02    19    A.    It depends on the weekend.

03:10:04    20    Q.    Okay.    And this weekend before classes started, not going

03:10:08    21    to read your e-mail?

03:10:09    22    A.    The academic calendar does not impact the payroll

03:10:13    23    department.

03:10:13    24    Q.    All right.    This weekend, knowing that W-2 information is

03:10:17    25    being sought, you didn't read your e-mail?

03:10:20  1  A.  No, I did not.

03:10:21  2  Q.  All right.  All right.  You did a declaration in this

03:10:25  3  case.  Do you remember that?

03:10:26  4  A.  Yes, I do.

03:10:27  5  Q.  All right.  I want to look at that.  It's at the end of

03:10:32  6  the exhibits.

03:10:35  7          THE COURT:  Which exhibit number is it?

03:10:38  8          MR. FOLEY:  It's at the end in the flap.  It's --

03:10:41  9  Counsel and I talked about it last night.

03:10:43  10          THE COURT:  What number is it?

03:10:45  11          MR. FOLEY:  It's not numbered, Your Honor.

03:10:47  12          THE COURT:  Well, I need it.

03:10:49  13          MR. FOLEY:  It's in the back flap of Volume II.

03:10:56  14          THE COURT:  I don't have the volumes.

03:10:58  15          MR. FOLEY:  I will get you one.

03:11:00  16          THE COURT:  Is it on the list?

03:11:02  17          MR. FOLEY:  It's not on the list, Your Honor.

03:11:06  18          THE COURT:  I need to view it.

03:11:12  19          MR. FOLEY:  Okay.

03:11:13  20          THE COURT:  We'll mark that.  This is 99.  And a Megan

03:11:18  21  Weyler declaration; is that correct -- or I'm sorry.  Rose

03:11:24  22  Flavin declaration; is that right?

03:11:29  23          MR. FOLEY:  Yes.

03:11:31  24          THE COURT:  Just take the document out of there.  I

03:11:34  25  don't need the whole thing.

*United States District Court*

03:11:36   1        MR. FOLEY:  Yes, Your Honor.

03:11:45   2        THE COURT:  Okay.  Are you seeking to have this

03:11:47   3  admitted?

03:11:47   4        MR. FOLEY:  Yes, I am, Your Honor.

03:11:49   5        THE COURT:  Any objection?

03:11:50   6        MS. GREENSPAN:  No objection.

03:11:51   7        THE COURT:  It is admitted, published.  We're going to

03:11:54   8  call it Exhibit 99.

03:11:56   9      (Exhibit 99 admitted into evidence.).

03:11:57  10        MR. FOLEY:  I am going to do a share screen.

03:12:01  11        MS. GREENSPAN:  I'm sorry, Your Honor.  He's sharing

03:12:04  12  a deposition transcript on the screen.

03:12:04  13  BY MR. FOLEY:

03:12:44  14  Q.  All right.  Can you see that, Ms. Flavin?

03:12:46  15  A.  I can.

03:12:47  16  Q.  Okay.  I'm going to take you to the end of the

03:12:51  17  declaration, here it's dated September 30th.  Do you see that?

03:12:54  18  A.  Yes.

03:12:55  19  Q.  And is that your signature?

03:12:57  20  A.  Yes, it is.

03:12:58  21  Q.  All right.  It says, I declare the under penalty of

03:13:01  22  perjury that the foregoing is true and correct?

03:13:04  23  A.  Yes.

03:13:05  24  Q.  Okay.  So how was this created?  Did you create this?

03:13:08  25  A.  I did not.

03:13:09  1  Q.  Who created it?

03:13:10  2  A.  Counsel shared it with me.

03:13:12  3  Q.  Okay.  What is counsel?  Who's counsel?

03:13:14  4  A.  Leslie Greenspan, JuHwon How- -- JuHwon Lee.

03:13:17  5  Q.  Okay.  What do you mean by "shared with you"?

03:13:19  6  A.  They sent me the PDF via e-mail.

03:13:22  7  Q.  Okay.  And did you write it?

03:13:24  8  A.  I reviewed it.  Offered my edits.  It was edited.

03:13:31  9  Q.  Okay.  All right.  So let's look at this declaration.  All

03:13:38  10  right.

03:13:38  11  A.  Can you make it bigger?

03:13:40  12  Q.  I'll try.

03:13:45  13  A.  Thank you.

03:13:46  14  Q.  All right.  So let's look at this.  Paragraph 3 here, it

03:13:52  15  says, Nonetheless, when I was contacted about this matter on

03:13:56  16  Friday afternoon, September 20th, 2024, around or after the

03:14:01  17  close of business, I undertook to compile the W-2s of 23 Drexel

03:14:08  18  employees from 2019 to 2023.  Did I read that right?

03:14:12  19  A.  Yes.

03:14:13  20  Q.  All right.  Before that, it doesn't say anything about you

03:14:15  21  being contacted, right?  Look in the paragraphs before that.

03:14:20  22  A.  No, it does not.

03:14:22  23  Q.  Okay.  Now, this declaration doesn't say anything about

03:14:30  24  Megan Weyler calling or texting you around lunch, does it?

03:14:35  25  A.  No, it does not.

*United States District Court*

03:14:36  1  Q.  All right.  And this declaration doesn't say anything

03:14:39  2  about you hopping on to a Zoom call around lunch with Megan

03:14:44  3  Weyler, Attorney Greenspan, and Attorney JuHwon Lee, does it?

03:14:49  4  A.  The details of how I was contacted are not contained

03:14:54  5  there.

03:14:55  6  Q.  All right.  In fact, no information at all about you being

03:14:58  7  contacted is contained here, is it?

03:15:00  8  A.  No.

03:15:01  9  Q.  Why didn't you put that in here?

03:15:04  10  A.  I didn't know that it was necessary.

03:15:08  11  Q.  All right.  And this was ten days after.  September 30th

03:15:19  12  is the day ten days after that meeting, right?

03:15:22  13  A.  Correct.

03:15:23  14  Q.  All right.  Understand the somebody reading this

03:15:37  15  declaration must think that you had not been contacted before

03:15:43  16  Friday afternoon after the close of business, right?

03:15:45  17  A.  Could you repeat the question?

03:15:47  18  Q.  Sure.  You understand that anybody reading this would not

03:15:49  19  think you had been contacted at any time before the close of

03:15:54  20  business on Friday, September 20th, right?

03:15:57  21  A.  I believe the vagueness "on Friday afternoon" leaves that

03:16:02  22  as open ended.

03:16:03  23  Q.  Okay.  But what about the following clause, "around or

03:16:09  24  after the close of business"?  It's not real vague, is it?

03:16:13  25  A.  No.

*United States District Court*

03:16:14   1   Q.   All right.  So that means probably after 5 o'clock, right?

03:16:18   2   A.   On or around, yes.

03:16:19   3   Q.   All right.  Doesn't mean lunch time, right?

03:16:22   4   A.   Correct.

03:16:22   5   Q.   Right.  All right.  All right.  So let's talk about --

03:16:35   6   take this down.  Let's talk about the October -- let's talk

03:16:39   7   about the meeting that you had at Drexel to show Professor

03:16:46   8   Piety W-2s on the Drexel system.  Do you remember that meeting?

03:16:50   9   A.   Yes, I do.

03:16:52   10  Q.   That was October 16th, correct?

03:16:55   11  A.   Yes.

03:16:55   12  Q.   Right.  And at that meeting, was Attorney Leslie

03:17:00   13  Greenspan, right?

03:17:00   14  A.   Yes.

03:17:01   15  Q.   And Professor Piety?

03:17:02   16  A.   Yes.

03:17:02   17  Q.   And I, right?

03:17:04   18  A.   Yes.

03:17:05   19  Q.   And it wasn't held in your office, right?

03:17:07   20  A.   No, it was not.

03:17:08   21  Q.   It was held in Megan Weyler's office, correct?

03:17:11   22  A.   Yes, it was.

03:17:12   23  Q.   Now, she wasn't there, right?

03:17:15   24  A.   She was not there.

03:17:16   25  Q.   Right.  And that's because you work remotely from Drexel?

*United States District Court*

03:17:19    1    A.   Yes, I do.

03:17:20    2    Q.   Okay.  So you don't have an office at Drexel?

03:17:22    3    A.   No, I do not.

03:17:23    4    Q.   All right.  Do you remember that meeting and you showed

03:17:26    5    some W-2s in real time, right?

03:17:28    6    A.   Yes.

03:17:28    7    Q.   All right.  But those W-2s were shown in -- we had some

03:17:33    8    discussion about this -- those W-2s were shown in Adobe,

03:17:38    9    correct?

03:17:39   10    A.   No, that's not correct.

03:17:41   11    Q.   Okay.  But those PDFs were shown in your browser, and you

03:17:48   12    said that they could be edited in Adobe; is that right?

03:17:52   13    A.   They were shown in Google Chrome, and my Google Chrome

03:17:56   14    application has an Adobe extension.

03:18:00   15    Q.   Okay.  But those PDFs we looked at in the meeting, those

03:18:08   16    could be edited in Adobe, right?

03:18:12   17    A.   Any PDF could be edited in Adobe.

03:18:15   18    Q.   Okay.  So those PDFs could be edited, right?

03:18:19   19    A.   If you have editing software for Adobe, yes.

03:18:23   20    Q.   Okay.  All right.  So now, let's talk about there was than

03:18:26   21    additional meeting after that; isn't that right?

03:18:29   22    A.   Yes.

03:18:29   23    Q.   That meeting was on -- I'm sorry.  Let me back up a

03:18:34   24    moment.  About more thing about that meeting.  At that meeting,

03:18:37   25    some information about Andrew Smith came up on the screen;

03:18:41  1  isn't that right?

03:18:41  2  A.  I believe so.

03:18:42  3  Q.  And the information showed that he has salary or pay of

03:18:45  4  around $███████; isn't that right?

03:18:48  5  A.  I don't remember that detail.

03:18:50  6  Q.  Okay.  Do you remember you explained that it was a glitch

03:18:53  7  in the system?

03:18:54  8  A.  What I remember is the W-2 was not being pulled up for the

03:19:01  9  correct employee, and we had to reset.  The salary history that

03:19:06  10  we were showing you was incorrect because it wasn't -- the form

03:19:09  11  was not working.

03:19:10  12  Q.  Okay.  And Andrew Smith actually makes less than ███████;

03:19:10  13  isn't that right?

03:19:19  14  A.  I believe so, yes.

03:19:20  15  Q.  Okay.  About ████?

03:19:23  16  A.  Yes.

03:19:27  17  Q.  Okay.  All right.  So then there was another meeting that

03:19:30  18  was held so you could even show -- so that you could show W-2s

03:19:36  19  in uneditable formats; is that right?

03:19:40  20  A.  Correct.

03:19:41  21  Q.  And that meeting took place on January 3rd, right?

03:19:44  22  A.  Yes.

03:19:45  23  Q.  Also in Megan Weyler's office, correct?

03:19:48  24  A.  Yes.

03:19:49  25  Q.  All right.  And that was 2-1/2 months after the October

03:19:52    1   meeting?

03:19:52    2   A.   Yes.

03:19:52    3   Q.   Okay.

03:19:53    4       MR. FOLEY:   No further questions.

03:19:55    5       THE COURT:   Cross?

03:19:55    6            CROSS EXAMINATION

03:19:55    7   BY MS. GREENSPAN:

03:20:02    8   Q.   Good afternoon, Ms. Flavin.

03:20:03    9   A.   Good afternoon.

03:20:05   10   Q.   In your role as executive director, are you in charge of

03:20:09   11   the payroll department?

03:20:10   12   A.   Yes, I am.

03:20:11   13   Q.   So important requests come to you; is that correct?

03:20:16   14   A.   Yes.

03:20:17   15   Q.   You were asked some questions about what you did and

03:20:21   16   didn't do, and I want to just go through that in a little bit

03:20:25   17   more detail?

03:20:26   18   A.   Okay.

03:20:27   19   Q.   You were asked some questions about September 20th, 2024.

03:20:30   20   On that day, did you provide W-2s?

03:20:34   21   A.   Yes, I did.

03:20:35   22   Q.   Do you recall, off the top of your head, how many W-2s you

03:20:40   23   provided?

03:20:40   24   A.   It was about 30 -- or 30 employees for four years.

03:20:44   25   Q.   And let me direct you.   Do you still have a copy of your

03:20:48  1  declaration in front of you or did you ever have a copy of the

03:20:52  2  declaration in front of you?

03:20:54  3  A.   No, I did not.  Just reading the screen.

03:20:56  4       MS. GREENSPAN:  Your Honor, may I approach?

03:20:58  5       THE COURT:  You may.

03:20:58  6  BY MS. GREENSPAN:

03:21:04  7  Q.   Ms. Flavin, I've handed you what's now been marked as

03:21:08  8  joint Exhibit 99.  Does that refresh your recollection as to

03:21:12  9  how many W-2s you provided on September 20th?

03:21:15  10  A.   Yes.

03:21:17  11  Q.   Did you hold back any pay information from what you

03:21:22  12  provided?

03:21:23  13  A.   No, I did not.

03:21:24  14  Q.   Now, going to the meeting you were asked about just now by

03:21:29  15  counsel, the first meeting which was October 16th, 2024?

03:21:34  16  A.   Yes.

03:21:34  17  Q.   He mentioned some kind of glitch with one of the W-2s.

03:21:39  18  Were you able to correct the glitch?

03:21:42  19  A.   The glitch was actually with the salary history form,

03:21:45  20  which was in addition to showing the W-2s.  We showed them the

03:21:49  21  salary history.  So I found that the software vendor identified

03:21:53  22  that there is a problem with that form.

03:21:55  23  Q.   Ultimately, though, did you show them everything they

03:21:58  24  asked for?

03:21:59  25  A.   Yes.

*United States District Court*

03:21:59   1   Q.   Did you hold back anything that they asked for?

03:22:02   2   A.   No, I did not.

03:22:04   3   Q.   Let me go also to the meeting on January 3rd, 2025.  At

03:22:11   4   that time, did you provide access to showing plaintiff and

03:22:16   5   counsel how to generate W-2s?

03:22:18   6   A.   Yes.

03:22:18   7   Q.   Did you answer any questions they had?

03:22:20   8   A.   Yes.

03:22:21   9   Q.   Did you provide them any information they requested?

03:22:25   10   A.   Yes.

03:22:25   11   Q.   Was there anything you held back?

03:22:27   12   A.   No.

03:22:31   13        MS. GREENSPAN:  Thank you.

03:22:32   14        THE COURT:  Redirect or recross the hostile.

03:22:32   15                         EXAMINATION

03:22:43   16   BY MR. FOLEY:

03:22:43   17   Q.   The meeting on January 3rd was because you had shown PDFs

03:22:51   18   in October -- in the October meeting in a format that could

03:22:55   19   have been edited; isn't that right?

03:22:57   20   A.   Yes.  They were shown in Google Chrome that has an Adobe

03:23:03   21   extension, so yes.

03:23:06   22        MR. FOLEY:  No further questions.

03:23:09   23        THE COURT:  Thank you very much.  You can leave the

03:23:10   24   stand.

03:23:11   25        THE WITNESS:  Thank you.

*United States District Court*

03:23:16    1         THE COURT:  Next witness.

03:23:32    2         MR. FOLEY:  Plaintiff calls Dr. Roger Kurtz.

03:23:41    3         MS. GREENSPAN:  Your Honor, may I just -- that's not

03:23:44    4    what I was expecting.  May we have one moment?

03:23:47    5         THE COURT:  Why don't we have a quick break.  We will

03:23:51    6    be in the courtroom at 3:30.

03:24:24    7         THE BAILIFF:  All rise.

03:24:24    8         THE COURT:  Okay.  Be back at 3:30.

03:36:18    9         MS. GREENSPAN:  We figured it out.

03:36:18   10         MR. FOLEY:  Yes, Your Honor.

03:36:18   11         THE COURT:  Professor Kurtz.

03:36:21   12         MR. FOLEY:  Yes.

03:36:23   13         THE COURT:  Professor, do you prefer Dr. or Professor?

03:36:26   14         THE WITNESS:  Either one is fine.

03:37:21   15         THE COURT:  Please swear the witness.

03:37:21   16         (JOHN ROGER KURTZ, sworn.)

03:37:21   17         THE BAILIFF:  Please state your full name for the

03:37:21   18    record, spelling your last name.

03:37:30   19         THE WITNESS:  John Roger Kurtz, K-U-R-T-Z.

03:37:34   20         THE COURT:  Your witness.

03:37:36   21    BY MR. FOLEY:

03:37:36   22    Q.   Good afternoon.  Do you wish to be called Dr. Kurtz?

03:37:40   23    A.   That will be fine.

03:37:41   24    Q.   Okay.  Good afternoon, Dr. Kurtz.  How are you today?

03:37:44   25    A.   I'm fine.  Thanks.

*United States District Court*

03:37:46  1  Q.  All right.  I want to talk with you about the job of

03:37:51  2  tenured professor in the Department of English and Philosophy.

03:37:56  3  So you are the Department Head for the Department of English

03:38:00  4  and Philosophy at Drexel, correct?

03:38:03  5  A.  Correct.

03:38:04  6  Q.  And you have been doing that since the fall of 2017,

03:38:07  7  correct?

03:38:08  8  A.  Yes.

03:38:08  9  Q.  And as director, you are the person who runs the whole

03:38:16  10  program?

03:38:16  11  A.  As Department Head.

03:38:18  12  Q.  Correct.  I'm sorry, as Department Head.  I keep calling

03:38:18  13  it director, sorry.

03:38:22  14      As Department Head, you are the head of the professors of

03:38:26  15  English in the department?

03:38:27  16  A.  Yes.  Would you like me to say a little bit about the

03:38:32  17  duties of Department Head?

03:38:33  18  Q.  Sure.  And you are the head of Philosophy professors in

03:38:36  19  the department?

03:38:38  20  A.  Correct.

03:38:38  21  Q.  Tell us about your duties.

03:38:40  22  A.  So Department Head is just a place in the context of the

03:38:43  23  whole university.  You heard earlier about the provost who is

03:38:47  24  in charge of the whole academic area.  There are multiple

03:38:51  25  colleges across the whole university.  Drexel I believe has 13

*United States District Court*

03:38:53   1   different colleges.  At the head of each is the dean, and then

03:38:57   2   within each college -- and I am in the College of Arts and

03:39:00   3   Sciences -- within each college there are departments.  And in

03:39:05   4   our college there happen to be 13 different departments;

03:39:08   5   Department of History, Department of Politics, Criminal

03:39:11   6   Justice, and so forth.  I'm the head of the Department of

03:39:15   7   English and Philosophy.  English and Philosophy is one of the

03:39:19   8   larger departments.

03:39:20   9      All of those department heads, we're kind of, maybe you'd

03:39:23  10   call it a middle management role.  We are in charge of

03:39:27  11   basically soup to nuts.  The big things, helping establish a

03:39:32  12   vision and a direction for the department.  I am in charge of

03:39:37  13   hiring.  The most important thing probably is I am in charge of

03:39:41  14   scheduling and staffing all the classes that we teach to all

03:39:46  15   our students in English and Philosophy and, indeed, across the

03:39:50  16   University.  So there's those things.  I am in charge of the

03:39:53  17   budget.  I am in charge of making sure that promotion and

03:39:56  18   personnel processes go properly.

03:39:59  19      Facilities:  On any given day, there is all sorts of

03:40:04  20   things happening, and I like to say that it's anything between

03:40:08  21   this big picture, looking out, the determining a 5-year plan to

03:40:13  22   the photocopier is broken, somebody needs to take care of it.

03:40:17  23      Those are the things that a Department Head does in

03:40:20  24   supervising and overseeing a department like the Department of

03:40:23  25   English and Philosophy.

03:40:24  1  Q.  So you're also a professor of English at Drexel; isn't

03:40:31  2  that right?

03:40:31  3  A.  That's correct.  I also hold a faculty rank Professor of

03:40:35  4  English.

03:40:35  5  Q.  Okay.  And as Professor of English, you get a base salary,

03:40:41  6  correct?

03:40:42  7  A.  Yes.  I was hired in 2017 to come and I was hired to be

03:40:47  8  professor and I was given a rank of tenured professor, and also

03:40:52  9  the role of Department Head at that point.  I came for that

03:40:56  10  job, to be professor and Department Head.

03:41:00  11  Q.  Okay.  So you're a full professor?

03:41:02  12  A.  Yes.

03:41:02  13  Q.  Just as Dr. Piety is, correct?

03:41:05  14  A.  That's correct.

03:41:05  15  Q.  I want to show you an exhibit.  It's one that you

03:41:10  16  stipulated to, Exhibit 90?

03:41:13  17          THE COURT:  Any objection?

03:41:13  18          MS. GREENSPAN:  No, Your Honor.

03:41:14  19          THE COURT:  Admitted publish.

03:41:16  20          (Exhibit 90 admitted into evidence.)

03:41:16  21  BY MR. FOLEY:

03:41:22  22  Q.  Is it up on the screen?

03:41:25  23  A.  I don't see anything.

03:41:39  24  Q.  All right.  So I just want to start and show you on this

03:41:42  25  exhibit, this is Exhibit 90, and this is the Department of

*United States District Court*

03:41:49    1    English and Philosophy positions held in compensation for

03:41:52    2    tenured and tenure track faculty, 2019 to 2025, correct?  You

03:41:58    3    see that?

03:41:58    4    A.   Correct.

03:41:59    5    Q.   I want to take you down to -- this is once again organized

03:42:04    6    alphabetically, but by first name for some reason.  But here we

03:42:09    7    go.  The lines 28, that's you, correct?

03:42:11    8    A.   Yes.

03:42:11    9    Q.   All right.  And it says Professor, Department Head,

03:42:14   10    English and Philosophy.  Do you see that?

03:42:16   11    A.   Yes.

03:42:16   12    Q.   It says starting 2019 it's ███████, and -- is that right?

03:42:24   13    Did I read that right?

03:42:25   14    A.   Correct.

03:42:26   15    Q.   We take that up through 2025 and we see you're up to

03:42:31   16    ██████ and change, correct?

03:42:35   17    A.   Yes.

03:42:36   18    Q.   All right.  So let's look at the line right below that.

03:42:42   19    What is that that says Department Head, English and Philosophy?

03:42:46   20    A.   So what you see on the first line, the line above that, is

03:42:50   21    my base salary, and that is my salary for my role as Professor

03:42:55   22    and Department Head.  In addition, I get a stipend, and this is

03:42:59   23    the same stipend that any Department Head gets in the College

03:43:03   24    of English and Philosophy.  All those 13 departments I

03:43:06   25    mentioned, Department Heads are compensated with an additional

*United States District Court*

03:43:10  1  stipend for their work.

03:43:12  2  Q.   Right.  And that's to do the work of Department Head,

03:43:15  3  right?

03:43:16  4  A.   That is, yes.  You get that by virtue of being a

03:43:19  5  Department Head.  That is not my only compensation for being

03:43:23  6  Department Head.

03:43:24  7  Q.   Okay.  Why doesn't it say -- why doesn't it say -- why

03:43:30  8  would you get some additional compensation for being Department

03:43:33  9  Head when you're already getting compensation, you say, for

03:43:36  10  being Department Head?

03:43:39  11  A.   I don't understand the question.  Sorry.

03:43:40  12  Q.   Why get a stipend if you're already being paid for being

03:43:46  13  Department Head as you claim?

03:43:47  14  A.   Well, one of the reasons, possibly, is most faculty

03:43:51  15  appointments are 9-month appointments and administrative

03:43:55  16  appointments are 12-month appointments, so one of the reasons

03:43:58  17  they'll give stipends is to compensation you for the extra,

03:44:01  18  additional three months that you're working.  But for the most

03:44:04  19  part, I think it's generally recognized that being Department

03:44:09  20  Head is a difficult and challenging job.  As I mentioned, it

03:44:12  21  has a lot of responsibility.  You have supervisory

03:44:14  22  responsibility, you have budgetary responsibility.  So in

03:44:17  23  addition to whatever salary you're getting, you will also get a

03:44:20  24  stipend on top of that.

03:44:23  25  Q.   Okay.  Let's -- all right.  Let's we'll come back to this

*United States District Court*

03:44:29    1    in a little bit, and stop the share, please.  Thanks.

03:44:37    2        All right.  Let's talk about what tenure, tenure track,

03:44:39    3    tenured professors do in the Department of English and

03:44:44    4    Philosophy.  The comparisons, the people that we want to have

03:44:50    5    as comparators in this case, they're all tenured professors,

03:44:54    6    right?

03:44:55    7    A.   The comparators that you mentioned, yes.

03:44:59    8    Q.   Yes.  So Jacques Catudal was a tenured professor, correct?

03:45:05    9    A.   Yes.

03:45:05   10    Q.   Richard Astro --

03:45:05   11    A.   Yes.

03:45:07   12    Q.   -- tenured professor?

03:45:08   13    A.   Yes.

03:45:08   14    Q.   Mark Greenberg, a tenured professor.  Abioseh Porter,

03:45:14   15    tenured professor, yes?

03:45:16   16    A.   Yes, yes.  The only thing I would add there is that we use

03:45:20   17    the word "professor" sometimes generically to refer to anybody

03:45:25   18    who teaches at the University, but we also sometimes use this

03:45:31   19    term "professor" in a much more specific way to refer to the

03:45:35   20    specific ranks.  You hear already the terms assistant

03:45:37   21    professor, associate professor, and then what's sometimes

03:45:40   22    called full professor but sometimes we will just say professor.

03:45:43   23    So I think that's the term, that's the way you're using that

03:45:46   24    term.  When you say "professor," you're referring to category

03:45:49   25    of full professor, am I right?

*United States District Court*

03:45:51　1　Q.　Well, I'm asking if these are tenured professors at

03:45:55　2　Drexel.

03:45:55　3　A.　Yes.　And not professor in the generic sense, but

03:45:58　4　specifically full professors, with two exceptions.　We have

03:46:00　5　two, two of those people are actually at an even higher rank,

03:46:03　6　which is the rank of Distinguished University Professor.

03:46:07　7　Q.　All right.　And you get paid when you get promoted to

03:46:11　8　Distinguished University Professor, right?

03:46:13　9　A.　I don't know what the salary bump is for that.

03:46:16　10　Q.　Okay.　So there may be no salary bump, right?

03:46:19　11　A.　I think it's usually given as sort of an acknowledgment of

03:46:24　12　great work over a period of time.　So what you'll see, for

03:46:28　13　instance, is that two people in my department on this list who

03:46:33　14　have that very top ranking of Distinguish University Professor,

03:46:38　15　those are the two gentlemen who also had been provosts of the

03:46:44　16　whole University for some time.

03:46:45　17　Q.　All right.　So we're going to talk about two more people

03:46:50　18　just to make sure they are tenured professors.　Andrew Smith,

03:46:55　19　tenured professor, right?

03:46:56　20　A.　Yes.

03:46:56　21　Q.　And Scott Warnock, tenured professor?

03:46:57　22　A.　Tenured professor, and in this case, full professor at

03:47:02　23　that highest rank.

03:47:03　24　Q.　Okay.　So you make that distinction between distinguished

03:47:07　25　professor, full professor.　Jacques Catudal was never a full

*United States District Court*

03:47:11   1   professor, right?

03:47:11   2   A.   Jacques Catudal was an associate professor when he

03:47:14   3   retired.

03:47:14   4   Q.   So let's talk about what these tenured professors did.

03:47:21   5   Professor Piety is a tenured professor, right?

03:47:25   6   A.   Correct.

03:47:25   7   Q.   Is that the full professor?

03:47:28   8   A.   Yes.

03:47:29   9   Q.   Let's talk about what they do for the department.  They're

03:47:30   10  required to teach course, right?

03:47:32   11  A.   So all faculty, all professors have three main areas of

03:47:37   12  work:  Teaching, scholarship, and service.  So, yes, the

03:47:43   13  teaching that you just mentioned, that is definitely part of

03:47:46   14  the expectation for all professors.

03:47:47   15  Q.   Right.  So all of the tenured professors have, as you

03:47:50   16  said, the requirement of teaching the scholarship and service?

03:47:54   17  A.   That's right.

03:47:54   18  Q.   Every one of them, right?

03:47:56   19  A.   The three legs of the stool.

03:47:58   20  Q.   Okay, great.  So those three legs of the stool, let's talk

03:48:02   21  about each one.

03:48:03   22       First, there's no fourth leg, right?  Those are the

03:48:06   23  jobs --

03:48:07   24  A.   Those are the three main areas of expectation for the

03:48:11   25  work, yes.

*United States District Court*

03:48:11  1  Q.  And then if somebody does something in addition to those

03:48:15  2  three legs of the stool, they get paid for that, right?

03:48:18  3  A.  Or it's built into their job, yes.

03:48:20  4  Q.  Okay.  But they'll get a stipend if they have some kind of

03:48:24  5  administrative job, right?

03:48:26  6  A.  They might.

03:48:27  7  Q.  Okay.  All right.  Actually, let's go up to 90 again,

03:48:35  8  Exhibit 90.  Is there anybody on this chart who's got

03:48:41  9  administrative role that doesn't have a stipend?

03:48:45  10  A.  That has an administrative role --

03:48:49  11  Q.  Currently.

03:48:50  12  A.  Currently, with no stipend.

03:48:53  13  Q.  Correct.

03:48:57  14      THE COURT:  Hold on a second.  Someone with a phone

03:49:00  15  on, please turn your phone off.

03:49:07  16      MR. FOLEY:  I will check mine, Your Honor, just in

03:49:09  17  case.

03:49:09  18  BY MR. FOLEY:

03:49:26  19  Q.  Let's make it easier.  No one among the people we've

03:49:29  20  mentioned as doing the administrative work right now doesn't

03:49:33  21  have a stipend, correct?  So that's like a --

03:49:35  22  A.  Well, that's not quite correct.

03:49:37  23  Q.  Let's look through these.  There's Richard Astro, right?

03:49:42  24  We go down to number 41, Richard Astro.  He's not doing any

03:49:49  25  administrative work right now, correct?

*United States District Court*

03:49:51   1   A.   He is not.

03:49:51   2   Q.   He gets no stipend, correct?

03:49:53   3   A.   Correct.

03:49:54   4   Q.   Okay.  Jacques Catudal, he is up at line 21, right?  He

03:50:02   5   is, and as we carry over he retired, but during that time

03:50:08   6   period here he was associate professor emeritus it says, he's

03:50:14   7   not doing any administrative work, right?

03:50:17   8   A.   During this time period, no.

03:50:18   9   Q.   Correct.  And he's not getting any stipend for doing any

03:50:22  10   administrative work?

03:50:24  11   A.   Not during this time period, no.

03:50:25  12   Q.   So during this time period -- well, let's go look at

03:50:27  13   Abioseh Porter.

03:50:29  14   A.   Well, this is why I was hesitating --

03:50:31  15   Q.   Wait.  Let me just do this.  Abioseh Porter, number one

03:50:37  16   alphabetically, underlined.  So during this entire time,

03:50:41  17   Abioseh Porter, he is not doing any administrative work, is he?

03:50:46  18   A.   Well, he is, actually.  He is presently the director of

03:50:51  19   our Africana Studies program.  I'm not sure --

03:50:54  20   Q.   Where does it say that on the chart?

03:50:57  21   A.   I am not sure whether he receives a stipend for that or

03:51:01  22   not.  But that's why I was hesitating.  I don't know.

03:51:04  23   Q.   Okay.  But it doesn't say that on the chart, correct?

03:51:06  24   A.   Correct.

03:51:07  25   Q.   So if somebody is trying to compare salary to Professor

*United States District Court*

03:51:12   1   Piety's, they can't tell what is being paid for him to be a

03:51:18   2   Director of Africana Studies versus what he's being paid to be

03:51:21   3   a professor, right?

03:51:22   4   A.   Well, all of these figures are base salary figures, which

03:51:26   5   is a good way to compare.

03:51:29   6   Q.   Okay.   Good.   So base salary for being a professor in the

03:51:31   7   department?

03:51:31   8   A.   For being a professor or for whatever you were hired to

03:51:34   9   be.

03:51:34  10   Q.   Right.   So we go to Richard Astro.   He is a professor in

03:51:38  11   the department.   That is the only work he is doing in this time

03:51:43  12   period, right?

03:51:43  13   A.   At this time, yes.

03:51:44  14   Q.   All right.   Three legs of the stool, right?

03:51:46  15   A.   Correct.

03:51:47  16   Q.   No fourth leg, correct?

03:51:49  17   A.   He's -- at this time, he is a professor in the department,

03:51:52  18   yes.

03:51:53  19   Q.   Okay.   And let's just go down to Scott Warnock.   Is that

03:52:01  20   line 42?   Right, we see that.   He is a professor, he gets paid

03:52:06  21   for that, and then we see lines below where he's associate

03:52:15  22   dean, and then we see below that that he's director of the

03:52:21  23   writing center, and we see administrative stipend for that,

03:52:25  24   right?   Associate dean he is getting ██████ in 2022, right?

03:52:29  25   A.   Right.

*United States District Court*

03:52:30  1  Q.  ███  in 2023.  2024 and 2025, right?

03:52:37  2  Okay.  And that's on top of his base salary, correct?

03:52:41  3  A.  That's correct.

03:52:42  4  Q.  And then he was did the director of writing center at one

03:52:46  5  point in 2019, right?  That's line 44, right?

03:52:49  6  A.  Yes, you can see that reflected here.  He was director of

03:52:53  7  the writing center, actually for many years, until it looks

03:52:56  8  like the end of -- or August of 2021, and then he took the role

03:53:00  9  of associate dean.

03:53:02  10  Q.  All right.  And then what happened to that stipend after?

03:53:06  11  What is that N/A?

03:53:08  12  A.  Well, because he is no longer in the role of director of

03:53:11  13  the writing center, he will no longer receive that stipend.

03:53:14  14  Q.  Right.  Because he is not doing work, right?

03:53:16  15  A.  Correct.

03:53:17  16  Q.  Okay.  Let's talk about the work that these professors do

03:53:20  17  in the department as professors.  We talked about the three

03:53:25  18  legs of the stool, teaching, scholarship, service.  Teaching,

03:53:31  19  they all teach the same the number of classes.  There is a

03:53:34  20  requirement number of classes for all of them, isn't there?

03:53:37  21  A.  Yeah, the standard if workload for tenured faculty members

03:53:43  22  in the -- or tenured line faculty members in English and

03:53:44  23  Philosophy is five courses per year, five 3-credit courses.

03:53:49  24  Five 3-credit-hour courses annually.

03:53:53  25  Q.  So all the people we just talked about, I won't keep

03:53:57    1   listing them all, but all of those male professors being paid

03:54:01    2   more than Professor Piety, they are all under that same

03:54:05    3   requirement, correct?

03:54:06    4   A.    That is the standard load.   That is the standard work

03:54:08    5   load, yeah.

03:54:08    6   Q.    And Professor Piety is under that same --

03:54:08    7   A.    She is on the same.

03:54:13    8   Q.    -- workload as well, right?

03:54:14    9   A.    Yes.

03:54:14   10   Q.    When they teach classes, they have their freedom, academic

03:54:19   11   freedom to design the class how they want to design it, right?

03:54:22   12   A.    Well, yes.   I'm hesitating a little bit because if you

03:54:28   13   teach a certain class, you must teach what the class is about.

03:54:32   14   There are certain source objectives that you have to teach in

03:54:37   15   that class.   So that's -- within those constraints, yes, there

03:54:39   16   is a great deal of autonomy about what you can teach in that

03:54:43   17   class.

03:54:43   18   Q.    Of course, You're able to then design what books you want

03:54:46   19   to assign, what lessons you want to give, right?

03:54:49   20   A.    Yes.   That's part of your job as a professor, is to design

03:54:52   21   the class, teach it, deliver it.

03:54:55   22   Q.    So everyone has that freedom, right?

03:54:58   23   A.    Yes.

03:54:58   24   Q.    Okay.   And let's talk about scholarship.   All of the

03:55:02   25   tenured -- all of these tenured professors compared to Dr.

03:55:09   1   Piety and along with Dr. Piety, they have the same requirements

03:55:13   2   for doing scholarship, right?

03:55:14   3   A.   Yeah.  I would say we have minimal standards for

03:55:17   4   requirements, so if you're a tenured line professor in the

03:55:21   5   department or anywhere in the University, we expect a certain

03:55:24   6   level of research activity your part, yes.

03:55:27   7   Q.   And if you -- scratch that.

03:55:30   8        So all of these professors have that same minimum

03:55:35   9   requirement for scholarship, right?

03:55:37  10   A.   That's correct.

03:55:38  11   Q.   Okay.  During the time you worked as a tenured professor?

03:55:41  12   A.   Yeah.  Now, within that there are some variations of, I

03:55:44  13   think I mentioned this department includes both English and

03:55:48  14   Philosophy.  We have slightly different requirements between

03:55:51  15   the English faculty and the Philosophy faculty to accommodate

03:55:55  16   for differences in the field, but generally it's pretty much

03:56:00  17   the same.  And that's pretty much true all across the College

03:56:04  18   of Arts and Sciences, we have some fairly standard expectations

03:56:08  19   about what level of work you're supposed to do as a professor.

03:56:12  20   Q.   All right.  And those differences, we talked about this

03:56:12  21   before, those differences are to make it comparable, to make it

03:56:15  22   equal, right?

03:56:16  23   A.   Yes, reflecting differences in the disciplines.

03:56:19  24   Q.   Right.  So they have the same workload at the end of the

03:56:21  25   day?

*United States District Court*

03:56:22  1  A.   Yeah, the idea is there is a same minimal standard that
03:56:25  2  everyone has to meet.
03:56:26  3  Q.   So basically, they're all required at the end of the day
03:56:31  4  to meet the same minimal standards, scholarship, same amount of
03:56:36  5  work, right?
03:56:37  6  A.   Yes.
03:56:38  7  Q.   And let's talk about service.  They have some kind of
03:56:41  8  minimal requirement to do service, right?
03:56:43  9  A.   Yeah.  And just to break it out for you a little bit, we
03:56:47  10  would say the teaching part of your job should be 40 to
03:56:52  11  50 percent of your job, the research or scholarship part of
03:56:56  12  your job should be 40 to 50 percent, and the service part
03:56:59  13  should be 10 to 20 percent of your job.  So that's -- those are
03:57:03  14  the general parameters.  You can see the service part is a lot
03:57:05  15  smaller, and then teaching and research are kind of equal, and
03:57:08  16  those are the larger parts of what you're supposed to do.
03:57:11  17  Q.   And those parameters, they aren't mandated, are they?
03:57:18  18  A.   What do you mean?
03:57:19  19  Q.   I mean some professor might do more scholarship than --
03:57:23  20  put more time into scholarship than into teaching, right?
03:57:26  21  A.   Well, again, we have what I would call minimal
03:57:31  22  expectations in each area.  As long as you're meeting those
03:57:34  23  minimal expectations, then maybe you could exceed those
03:57:39  24  expectation in those areas and that's fine too.
03:57:42  25  Q.   All right.  And somebody who exceeds them, do they get

*United States District Court*

03:57:44  1  higher base the salary for exceeding?

03:57:47  2  A.   Well, that would be reflected then maybe in your

03:57:49  3  performance reviews and maybe you would get better -- it helps

03:57:54  4  toward promotion and merit increases and that sort of thing.

03:57:58  5  Q.   Okay.  But the bottom line is they're all paid the base

03:58:01  6  salary to meet those minimum requirements, right?

03:58:04  7  A.   Yes.  I mean, there's sort of the general workload

03:58:08  8  expectation across the whole University, which try and

03:58:11  9  standardize across the whole College of Arts and Sciences, so

03:58:13  10 that, you know, there is this equal understanding of workload.

03:58:18  11 I mean, the policy is called the workload policy, so we have a

03:58:22  12 sort of equal work load for everybody, men and women, in

03:58:28  13 English and Philosophy outside of those areas too.

03:58:29  14 Q.   And that workload policy, so that extends beyond the

03:58:33  15 Department of English and Philosophy to the whole College of

03:58:35  16 Arts and Sciences, right?

03:58:37  17 A.   Actually, the provost's office has a whole workload policy

03:58:38  18 for the whole University, yeah.

03:58:40  19 Q.   But certainly there is only one workload policy applicable

03:58:46  20 to the professors in the -- the tenured professors in your

03:58:51  21 department?

03:58:51  22 A.   In a general sense, yeah.  The general policy, yes.

03:58:55  23 Q.   Okay.  And you mentioned there'd be some raises people

03:59:00  24 will get.  Those raises, those are like about 2, 3 percent?

03:59:07  25 A.   Are you talking about any possible the raise someone may

*United States District Court*

03:59:12  1  get?

03:59:12  2  Q.   Merit raises, sure.

03:59:14  3  A.   Okay.  So generally, the way it works for being able to
03:59:17  4  get raises at a place like Drexel is you're hired at a certain
03:59:21  5  salary level and that's negotiated at that time.  Then your
03:59:25  6  opportunities for raises, there are really two.  One is when
03:59:29  7  you get promoted.  So, again, you start as an assistant
03:59:35  8  professor, then you go to associate, then you go to full, and
03:59:39  9  there are fixed amounts that you get.  You get 5 percent for
03:59:43  10 each promotion that you get.

03:59:45  11     And then also, at the same time that you're promoted the
03:59:47  12 first time, you apply for tenure, and if you get tenure, that's
03:59:50  13 another 7 percent raise.  That's University-wide, that's
03:59:53  14 everybody, that's standard, so you can kind of count on those,
03:59:56  15 and you know that that's the rhythm, and you can expect those
03:59:59  16 raises as you go through your -- the life cycle of your career
04:00:04  17 as a professor.

04:00:05  18     The other thing that you can look forward to in terms of
04:00:08  19 raises is any possible, usually annual, merit or cost-of-living
04:00:13  20 increases that the University will give.  So in the seven years
04:00:17  21 that I have been at Drexel, actually eight now, seven and a
04:00:23  22 half years, we've had three years where we've had zero percent
04:00:28  23 merit increases, a couple of years where there were 2 percent,
04:00:32  24 one year there was a 5 percent increase.  So it varies
04:00:38  25 somewhere along those lines.

*United States District Court*

04:00:39    1    So those are the sorts of things you can expect.  And

04:00:42    2    again, these are available to everybody across the board and

04:00:45    3    they try and do it University-wide so it's fairly standard.

04:00:49    4  Q.    So if two professors were doing the same work but they're

04:00:53    5    paid differently and they each get promoted, then the professor

04:00:57    6    who's making more money is going to get more money as part of

04:01:01    7    that promotion raise, right?

04:01:03    8  A.    So your raises -- I mean, whenever salary you have at the

04:01:08    9    moment is based on these two things, on whatever your starting

04:01:11   10    salary is, and then any of these raises you have going along.

04:01:16   11    And yes, I think what you're getting at is that we do the

04:01:19   12    these -- we, Drexel, does these raises in terms of percentages,

04:01:23   13    not just absolute dollar amounts.  So, yes, if you're making

04:01:27   14    more and you get a 5 percent increase, it will be slightly

04:01:31   15    higher than if you were making less.

04:01:33   16  Q.    So besides being paid less it's just going to get a little

04:01:37   17    more raise even for the same work?

04:01:38   18  A.    Right.  It's the same percent raise, but, yes, lower

04:01:41   19    absolute number.

04:01:41   20  Q.    Dollars and cents --

04:01:42   21  A.    Correct, yes.  And that's -- yeah.

04:01:43   22  Q.    All right.  All right.  And these three legs of the stool,

04:01:50   23    everybody in the department gets reviewed along those three

04:01:55   24    legs of the stool, right?

04:01:57   25  A.    So one of the big parts of my job as a department hear, as

04:02:01  1   a supervisor, is to do annual reviews for everybody.  I have

04:02:06  2   actually a very large department.  I have about 50 people in

04:02:10  3   the department that I have to review annually.  Now, not all of

04:02:14  4   them are tenure or tenure tracked folks so --

04:02:18  5   Q.  We're talking about the tenure?

04:02:20  6   A.  We are talking about the tenure and tenure track folks,

04:02:23  7   yes.  That's, right now, like 16 of them, plus me.

04:02:27  8       So every year I do an annual review of everybody and there

04:02:31  9   is a standard form that we use to do this review.  It has us

04:02:35  10  review these three areas:  Review your work in teaching; review

04:02:39  11  your work in scholarship; review your work in service.

04:02:43  12  Q.  And you do that for the professors who teach English,

04:02:47  13  right?

04:02:48  14  A.  I do that for everybody in the department, whether you are

04:02:51  15  the English program or the Philosophy program.  Because we're

04:02:55  16  together in one department and I'm supervising both of those,

04:02:59  17  we do them all.

04:03:00  18  Q.  And the forms are the same for professors who teach

04:03:04  19  English as who teach Philosophy, right?

04:03:07  20  A.  Actually they are the same across the whole college and

04:03:10  21  most of the University, actually.

04:03:12  22  Q.  All right.  Let's talk about anything else we need to talk

04:03:19  23  about.  There's some professors who teach courses in English

04:03:23  24  and in Philosophy, right?

04:03:24  25  A.  That's very rare.  It hasn't happened in recent years.

*United States District Court*

04:03:31   1   Q.   Jennifer Yusin does, right?

04:03:34   2   A.   She hasn't for a while.

04:03:35   3   Q.   And Stacey Ake does, right?

04:03:37   4   A.   Again, she hasn't for a while.  I don't know if Stacey has

04:03:41   5   done any, Dr. Ake.

04:03:42   6   Q.   But it happens, right?

04:03:44   7   A.   Well, for example, sometimes we have courses that might be

04:03:50   8   cross-listed between programs or departments, so if you have a

04:03:54   9   course that's got a title like the Philosophy of Literature,

04:03:59   10   that makes a lot of sense that it could be taught by a

04:04:03   11   philosopher or it could be taught by an English professor.  So

04:04:06   12   courses like that, we will put in somebody who -- I mean, it

04:04:10   13   might be someone from English or someone from Philosophy

04:04:13   14   teaching that.

04:04:14   15       So, yeah, it's quite possibly -- I mean it's possible that

04:04:17   16   sometimes, and say you are a professor in the English program,

04:04:21   17   you might teach some courses outside of English from time to

04:04:25   18   time, even though your home is in English.  And the same way if

04:04:28   19   you're in the Philosophy program, you might teach a few courses

04:04:31   20   outside of the Philosophy program from time to time, even

04:04:34   21   though your home is in Philosophy.

04:04:36   22   Q.   Okay.  But all the same department?

04:04:38   23   A.   One department, yes.

04:04:40   24   Q.   All right.  So to wrap up, the effort required of this

04:04:49   25   professors, the minimal effort course load, scholarship, and

*United States District Court*

04:04:54  1  services is the same for all of them, isn't it?

04:04:57  2  A.  So, I mean, it's very -- yes, it's comparable overall.  I

04:05:04  3  mean, we're definitely trying to make sure that one professor

04:05:09  4  in one area, one program, is not having to like bear a much

04:05:15  5  heavier workload than someone in another department or program.

04:05:19  6  So that's true University-wide.  We have these common workload

04:05:24  7  policies as a result.  So, yeah, there is an attempt to make

04:05:27  8  sure that the working conditions are similar for everybody.

04:05:30  9  Q.  Okay.  So in fact, part of your job as head of the

04:05:34  10  department is to work toward making the working conditions

04:05:37  11  similar for everybody, right?

04:05:39  12  A.  I would say to make them equitable, yes.

04:05:45  13  Q.  Okay.  And equitable, so do you mean equal or similar?

04:05:48  14  A.  I mean, well, so that they're fair.

04:05:55  15  Q.  Okay.  So that they're all required to do the same amount

04:06:00  16  of work?

04:06:02  17  A.  Right.  And it all has to fit within the broader policies

04:06:06  18  of the whole University.  So the University has all these

04:06:09  19  policies that try to make sure that we're not, you know,

04:06:11  20  exploiting one category of worker whether it's one department

04:06:16  21  or another department, or one discipline or another, so, yeah.

04:06:21  22  Q.  All right.  So wrapping up, the department, all professors

04:06:27  23  have, quote/unquote, similar working conditions, right?

04:06:31  24  A.  I would say in the same way that in any professor that is

04:06:37  25  true.  So you can think about your own jobs, you know, the same

*United States District Court*

04:06:40    1    category of employee is going to have similar working

04:06:46    2    conditions, right.

04:06:47    3    Q.   Okay.  All right.  Let's talk about is how the professors

04:06:58    4    in the department are under the same set of bylaws, right?

04:07:02    5    A.   Yeah.  We are in the Department of English and Philosophy.

04:07:04    6    We have a set of bylaws that refer to how we organize ourselves

04:07:09    7    in the department, and a lot of it has to do with how we set up

04:07:13    8    the committees.  That's the service part of your job.  A lot of

04:07:15    9    service serve on committees.  So, yes, we have bylaws about the

04:07:18   10    department and what and their commits for different things, and

04:07:22   11    we assign those committee members through those bylaws.

04:07:26   12    Q.   All right.  Let's talk about the skills of the professors.

04:07:29   13    The tenured professors, they're required to have Ph.D.s, right?

04:07:35   14    A.   Yes.

04:07:35   15    Q.   Okay.  And they have some -- they are required to have

04:07:40   16    teaching certificates though, right?

04:07:41   17    A.   So if you want to be a professor in English or Philosophy

04:07:46   18    at a place like Drexel, yes, you will definitely need a Ph.D.

04:07:52   19    It helps if you have some teaching experience.  We like that

04:07:55   20    when we hire you as well.  You don't have to have special --

04:07:59   21    actually, you don't have to have certification, that's correct,

04:08:00   22    in teaching.

04:08:01   23    Q.   Okay.  And even to teach -- to teach courses in the

04:08:06   24    department, people aren't even required to be tenured, correct?

04:08:10   25    A.   In fact, most people who teach courses in my department

04:08:15  1  are not tenured.  So I mentioned I have a very large

04:08:19  2  department.  Actually, it's one of the largest in the whole

04:08:23  3  University, partly because we teach a lot of composition

04:08:27  4  courses.  I would say, I mentioned that I supervise 50

04:08:32  5  full-time faculty.  In addition to that, any given quarter I

04:08:37  6  have 50 to 70 part-time or adjunct faculty that I'm supervising

04:08:43  7  as well.

04:08:44  8      So there's -- and those folks don't have tenure.  They are

04:08:48  9  not able to have tenure.  The part-timers certainly are not,

04:08:53  10  and even among the full-time faculty we have this category

04:08:54  11  called teaching faculty, and they are not given tenure either,

04:08:58  12  so.

04:08:59  13  Q.  So courses in the department can be taught, you know, one

04:09:03  14  of any particular course can be taught by a full professor,

04:09:08  15  associate professor, distinguish professor, assistant

04:09:13  16  professor, right?

04:09:13  17  A.  Yeah.  Look, when I'm scheduling the classes, staffing the

04:09:17  18  classes, which is one of the most important parts of my job, I

04:09:20  19  will say we will have all these list of classes that we need to

04:09:24  20  offer next term.  What I'm thinking about in tells of who's

04:09:28  21  teaching them is I'm thinking who's qualified to teach this.

04:09:32  22  And just because you have a Ph.D., doesn't necessarily mean

04:09:37  23  you're qualified to teach that.

04:09:39  24      So, again, we have the Philosophy side, we have the

04:09:44  25  English side.  There is a wide range of that.  Even within the

*United States District Court*

04:09:48  1  English side we have a whole bunch of different kinds of

04:09:50  2  courses.  One of the things we do really well is we have a lot

04:09:51  3  of creative writing classes, to teach how to be a poet, how to

04:09:57  4  be a novelist and so forth.  That's one kind of skill that you

04:10:01  5  have, and that's different from teaching, you know, Chaucer or

04:10:04  6  Shakespeare.  I'm looking for what your skills are rather than

04:10:09  7  specifically what your degree is when I schedule those class.

04:10:14  8  Q.  Right.  And so someone who teaches Shakespeare or Chaucer

04:10:20  9  as you mentioned doesn't get paid more for teaching Shakespeare

04:10:20  10  or Chaucer than if they teach Hemingway or something, right?

04:10:30  11  A.  You're not paid per class in the send that -- I mean,

04:10:32  12  unless you're an adjunct, you are being paid per class.  The

04:10:36  13  salary that you're paid depends on two things.  It depends on

04:10:39  14  the amount you were -- the contract you signed when you were

04:10:42  15  hired and what your starting salary was, and then any of those

04:10:45  16  salary increases that you got along the way, that I mentioned.

04:10:49  17  Q.  All right.  And let's talk about the -- let's talk about

04:10:57  18  the responsibility of each of these tenured professors in the

04:11:02  19  departments, which are Richard Astro, Jacques Catudal, Mark

04:11:06  20  Greenberg, Roger Kurtz, Abioseh Porter, Scott Warnock, Andrew

04:11:12  21  Smith, in their role as a professor in the department and only

04:11:16  22  as a professor in the department, they all have the same degree

04:11:19  23  of responsibility, right?

04:11:21  24  A.  In a very the general sense, yes.

04:11:25  25  Q.  Right.  Like a full professor doesn't get to get more

*United States District Court*

04:11:31  1  control over more students because they're full professor?

04:11:36  2  A.   We try not to control students, in any case.

04:11:39  3  Q.   Okay.  So basically, the responsibility level when they're

04:11:47  4  being professors in the department, not administrators,

04:11:51  5  professors, it's the same, right?

04:11:52  6  A.   Yeah.  I mean, in the most general sense, yes.  To be a

04:11:55  7  professor, when you're a professor, you're a professor.  Again,

04:11:58  8  it's sort of like other professions.  You're hired to be a

04:12:01  9  doctor, you're a doctor.  You do the doctor things.  You do the

04:12:05  10  professor things.

04:12:05  11  Q.   Okay.  All right.  So I want to talk about this idea of

04:12:18  12  administrative pay for these professors.  So, remember I took

04:12:21  13  your deposition last December.  Do you remember that?

04:12:24  14  A.   I do.

04:12:25  15  Q.   Okay.  And let's talk at Jacques Catudal.  I asked you

04:12:28  16  about him, do you remember that?

04:12:29  17  A.   I do.

04:12:30  18  Q.   And let's look at Jacques Catudal's salary.  He is up on

04:12:39  19  line 21, right?  He is an associate professor emeritus?  Now,

04:12:45  20  emeritus means now he's retired, right?

04:12:48  21       So in the years before he was retired, look at 2019 and

04:12:52  22  2020, he is -- he is not emeritus then, right?

04:12:57  23  A.   Correct.

04:12:58  24  Q.   He is an associate professor?

04:13:00  25  A.   He's teaching in the department, yes.

*United States District Court*

04:13:03    1    Q.    Okay.  So at that time he's teaching in the department,

04:13:07    2    his salary -- let's go to 2021, the same as 2020.  That's

04:13:15    3    $▮▮▮▮▮▮, right?

04:13:20    4    A.    Correct.

04:13:21    5    Q.    Okay.  And during that time he is, as we discussed,

04:13:24    6    working as a professor in the department?

04:13:27    7    A.    Yes.

04:13:28    8    Q.    And only as a professor in the department?

04:13:30    9    A.    Right.  Yes.

04:13:31    10   Q.    Okay.  And now let's look a Professor Piety down in

04:13:37    11   line 30.  She's a professor.  What's the difference between

04:13:40    12   associate professor and a professor?

04:13:42    13   A.    Within the tenure line faculty ranks, the faculty ranks,

04:13:51    14   as I've explained, the entry level position is you start out as

04:13:53    15   an assistant professor.  After six years you can apply for

04:13:57    16   promotion, if you've done well, get promoted to associate

04:13:59    17   professor.  Again, if you've done well and you want to apply

04:14:03    18   for promotion to full professor, then you can do that.  So

04:14:07    19   that's the difference.

04:14:08    20   Q.    So she's achieved higher rank?

04:14:11    21   A.    She's achieved the highest rank.

04:14:11    22   Q.    Right.  He was never promoted to full professor?

04:14:14    23   A.    That's correct.

04:14:14    24   Q.    So let's look at her salary here.  2021, we've got her at

04:14:22    25   $▮▮▮▮, right?

*United States District Court*

04:14:24  1  A.  Yes.

04:14:26  2  Q.  And his is ███ ?

04:14:29  3  A.  Yes.

04:14:30  4  Q.  During that time they're doing the same work, right?

04:14:33  5  A.  And you can look also, for instance, at Eva Thury --

04:14:37  6  Q.  I'm just asking about that.

04:14:39  7  A.  Yeah.  So, yes, they are different ranks, so they're doing

04:14:41  8  the same sort of professorial work at that point, yes.

04:14:48  9  Q.  Is Catudal at that point doing anything other than the

04:14:51  10  three legs of the stool --

04:14:51  11  A.  At that point --

04:14:52  12  Q.  -- to be paid that much more than Piety?

04:14:55  13  A.  No, he's doing the same -- he has the same role as a

04:14:58  14  faculty member that other faculty members do, as he is doing

04:15:02  15  his teaching, he's doing his scholarship, and he's doing his

04:15:04  16  service.

04:15:04  17  Q.  And that you would you say that for all these people,

04:15:08  18  except for the administrative stipend, same work?

04:15:11  19  A.  Yes and no.

04:15:14  20  Q.  Okay.  Well, let's talk about Catudal.  So remember I

04:15:20  21  asked you, Catudal, you said that you couldn't explain why his

04:15:27  22  salary was so much higher than Piety, could you?

04:15:31  23  A.  That's not what I said.

04:15:32  24  Q.  You said you didn't know.

04:15:34  25  A.  Well, I said I didn't know what his salary was originally,

*United States District Court*

04:15:40  1  like I didn't know what his starting salary is.  I still don't

04:15:44  2  know actually what his starting salary is.  So like I said,

04:15:46  3  you're -- whatever salary you have is based on whatever you

04:15:48  4  started out and any raises you get along.

04:15:52  5      So prior to when I came in 2017, I don't know.  That is

04:15:55  6  what I was telling you.  I don't know what those bumps were at

04:15:59  7  that point or what his starting salary was.

04:16:01  8  Q.  Now, when you had the deposition in December --

04:16:01  9  A.  Yes.

04:16:03  10  Q.  -- you were serving then, as you are here today, as

04:16:07  11  Drexel's corporate representative, right?

04:16:10  12  A.  Yes.

04:16:10  13  Q.  And that meant that you weren't just speaking on what you

04:16:13  14  knew personally, right?

04:16:15  15  A.  Well, I was speaking to this time period that we were

04:16:18  16  looking at that I was asked to speak to.

04:16:20  17  Q.  Right.  But you were speaking and you were supposed to

04:16:24  18  have all of the knowledge reasonably available, not just you

04:16:29  19  but to Drexel, right?

04:16:30  20  A.  Within the scope of the time period --

04:16:30  21  Q.  Okay.

04:16:33  22  A.  -- that we are talking about, yes.

04:16:34  23  Q.  You were asked to explain why in this time period Catudal

04:16:39  24  gets paid more than Piety, right?

04:16:41  25  A.  And I did.

*United States District Court*

04:16:42　1　Q.　Well, you couldn't explain.  You said you didn't know.

04:16:46　2　A.　Well, I think I told you that it is a practice at a lot of

04:16:50　3　universities that when individuals get these upper-level

04:16:55　4　administrative roles such as provost, vice provost, dean,

04:17:01　5　you'll get a salary increase at that point.  And what happens

04:17:05　6　with that is the result of an individual negotiation that I am

04:17:09　7　not aware of, and so when you step down from that role, the

04:17:13　8　step-down salary may continue, it may be slightly reduced.  It

04:17:17　9　varies.

04:17:18　10　　　And that is exactly the practice at all universities

04:17:21　11　across the United States, not just Drexel.

04:17:23　12　Q.　You just said that but when I asked you about that, and

04:17:26　13　you're Drexel's corporate representative, you said you didn't

04:17:32　14　know if Drexel had that as a policy; isn't that right?

04:17:35　15　A.　I said I understood that it was a practice but I did not

04:17:39　16　know if there was a specific policy.

04:17:41　17　Q.　But you said you did not know if that was the reason why.

04:17:45　18　A.　I did not know for sure if that was the reason why, but I

04:17:50　19　knew it was a practice, so.

04:17:51　20　Q.　Well, that doesn't really work, does it?  You said you

04:17:56　21　couldn't explain it but you knew it was a practice.

04:17:59　22　A.　Well, let me put it this way.  So when I first came to

04:18:03　23　Drexel in the fall of 2017 to be the department head in this

04:18:07　24　department -- I was hired as a professor and Department Head --

04:18:11　25　one of the first things I noticed was, wow, let me take a look

*United States District Court*

04:18:15 1 at who our people are and what their salaries are, and as you

04:18:20 2 can see, all the salaries are different.  That's normal.

04:18:22 3 That's true at any university.

04:18:23 4     And so what I'm curious about is what the reasons for

04:18:27 5 those differences, and I wanted to understand some of those.

04:18:31 6 And I quickly came to realize, well, a couple of these folks --

04:18:35 7 actually, this was little surprising to me -- I have two former

04:18:38 8 provosts and a former vice provost who are now faculty in my

04:18:45 9 department, which that had happened once before with a provost,

04:18:48 10 but that explained to me when I saw those salaries exactly,

04:18:52 11 aha, that made sense.  That's why they have these hire

04:18:55 12 salaries.  Because I knew that was the practice elsewhere and

04:18:58 13 apparently also here at Drexel.

04:19:00 14 Q.   Okay.  But you hadn't checked that out when we talked last

04:19:04 15 December, had you?

04:19:05 16 A.   Well, I am telling you the same thing now, that I assumed

04:19:07 17 that that's -- that I know that it is a practice.

04:19:09 18 Q.   Right.

04:19:09 19 A.   Yes.

04:19:10 20 Q.   But you said you were guessing last December.

04:19:14 21 A.   I said I didn't know specifically what their individual

04:19:20 22 arrangements were, and I still don't.

04:19:22 23 Q.   You couldn't explain what portion of Catudal's salary was

04:19:28 24 the result of his having held a position in the provost office

04:19:33 25 at some point, right?

*United States District Court*

04:19:34  1   A.   I didn't know the starting salary, I didn't know what any

04:19:38  2   of that information prior to the scope of the period we were

04:19:42  3   looking at, which is now prior to 2019 and prior to when I

04:19:48  4   came.

04:19:49  5   Q.   You were supposed to explain the reason for these pay

04:19:54  6   discrepancies, correct?

04:19:55  7   A.   Well, that is a very reasonable explanation.

04:19:58  8   Q.   I don't know.

04:20:00  9   A.   The fact that it is a practice and it's what universities

04:20:09  10  normally do.

04:20:10  11  Q.   All right.  At that time you testified there was -- you

04:20:13  12  knew of no actual policy at Drexel about that?

04:20:17  13  A.   That's correct.  I still don't.

04:20:19  14  Q.   Right.  You still don't know.

04:20:22  15  A.   Right.

04:20:23  16  Q.   So you don't know if Drexel lets people keep -- let's go

04:20:27  17  to this -- Catudal at this point, say 2019, how long had it

04:20:36  18  been since he worked at the provost's office?

04:20:39  19  A.   Well, Catudal, as you can see -- what line is he on?

04:20:45  20  Yeah.  There are a couple of things going on with Dr. Catudal.

04:20:49  21  He started working at Drexel in 1981, so he has a longevity

04:20:54  22  factor going for him.  And then at some point he worked as the

04:20:57  23  vice provost in the vice provost's office.  I don't know off

04:21:02  24  the top of my head how long that was or what the years were

04:21:05  25  exactly, but it was prior to when I came here.

*United States District Court*

04:21:08    1   Q.   About 15 years, probably?

04:21:10    2   A.   15 years of being in that office, you're saying?

04:21:13    3   Q.   No, 15 years since he had been working as provost?

04:21:17    4   A.   I don't know.  Possibly.

04:21:19    5   Q.   But certainly the entire time you have been at Drexel, he

04:21:23    6   did not do any work as a provost?

04:21:26    7   A.   I have been at Drexel for seven and a half years and he

04:21:29    8   has not been a vice provost during that time, correct.

04:21:33    9   Q.   But he's getting paid this big salary, right?

04:21:36   10   A.   Correct.

04:21:37   11   Q.   All right.  Let's actually display this list.

04:21:47   12        Can you name the people on this list who were in the

04:21:50   13   provost's office?

04:21:51   14   A.   Yes.  Dr. Richard Astro served as a provost.  He was

04:21:55   15   actually hired at Drexel to be the provost.  I think he was a

04:22:00   16   provost elsewhere before that, and even before that he been

04:22:05   17   dean at Northeastern University, so he came in with quite a few

04:22:08   18   the impressive credentials.

04:22:11   19        Dr. Mark Greenberg was a provost as well, and then Jacques

04:22:17   20   Catudal was a vice provost.

04:22:19   21        So that's all that I know of that worked in the provost or

04:22:24   22   vice provost positions.

04:22:25   23   Q.   Okay.  Those are all men, right?

04:22:27   24   A.   Correct.

04:22:28   25   Q.   No women from this department have ever gotten that bump

*United States District Court*

04:22:34    1    up to provost?

04:22:36    2    A.    Not from this department, that I -- not that I know of.

04:22:37    3    Again, I've been here 7 and a half years.

04:22:41    4    Q.    Right.  But you don't know any of these people that has

04:22:46    5    been provost in the provost office currently?

04:22:48    6    A.    I don't know.

04:22:49    7    Q.    None of these people to your knowledge has been raised up

04:22:54    8    to the provost office, right?

04:22:55    9    A.    Other than Astro, who was hired to be a provost,

04:22:59    10   Greenberg, who was a provost, I am not sure of the conditions

04:23:03    11   of his hiring, and Jacques Catudal, those three from my

04:23:08    12   department, yeah.

04:23:08    13   Q.    Right.  And when I talked to you in December, you were --

04:23:11    14   December 23rd when you had -- you were supposed to have all the

04:23:15    15   knowledge available not just to you but to Drexel, you said you

04:23:19    16   didn't know what Astro's starting salary was?

04:23:23    17   A.    I did not -- I still don't know what his starting salary

04:23:27    18   was.

04:23:27    19   Q.    Okay.  I want to correct that.  It was February of 2024

04:23:30    20   when we talked.

04:23:31    21        So you don't know for sure if his pay is based on that,

04:23:35    22   right?

04:23:35    23   A.    I don't know what his starting salary was when he started

04:23:40    24   here.

04:23:40    25   Q.    Now, let's look up that Richard Astro.  He's on line 41.

*United States District Court*

04:23:48    1   And lets's just take it -- he still works there -- let's take

04:23:52    2   it up to 2025.  All these single years here on page -- on

04:23:58    3   line 41, he's working as a professor in the department, right?

04:24:03    4   A.   Distinguished University Professor.

04:24:05    5   Q.   Yeah, and same -- same work as --

04:24:08    6   A.   Similar -- similar duties.

04:24:09    7   Q.   -- anyone else in the department, any other tenured

04:24:13    8   professor, and he is getting paid $197,833 for that line of

04:24:20    9   work, right?

04:24:20   10   A.   Right.  And as I explained, I think there are

04:24:22   11   understandable reasons for that.

04:24:24   12   Q.   But you don't know the reasons?

04:24:26   13   A.   Well, I'm pretty sure I do know what those reasons are.

04:24:30   14   One, he was hired as a provost, so he worked as a provost for

04:24:33   15   quite a few years.  I don't know exactly what the terms were

04:24:37   16   for him, and also he's been here since 1996, so he's been here

04:24:41   17   a little longer than Dr. Piety.

04:24:44   18   Q.   Okay.  And we see Dr. Piety has been here since 1998, line

04:24:49   19   30.  During that time, she's getting paid up to █ , so he's

04:24:54   20   getting paid more than $█    for the same work, right?

04:24:58   21   A.   To correct that, I think Dr. Piety started in 1998, not a

04:25:03   22   tenure track line.  That was a visiting assistant professor

04:25:09   23   role.  She didn't start in the tenure track until 2001, so that

04:25:14   24   be would a better starting date to think of for her.

04:25:17   25   Q.   Okay.  But at the end of the day, you still can't now

*United States District Court*

04:25:20 1 explain dollars and cents how Astro's pay got to be so high?

04:25:26 2 A.   Well, like I said, when I first came and I looked at this

04:25:30 3 list of faculty and their salaries, yeah, it was very clear to

04:25:36 4 me here is somebody who was -- actually, I was little

04:25:39 5 intimidated by having a provost in my department.  That's a

04:25:42 6 little bit scary because you're supervising this person who is

04:25:45 7 used to supervising this whole academic enterprise, but a great

04:25:50 8 guy.  As it turns out it was fine, not a problem.

04:25:53 9      But in any case, it was very clear to me, oh, yes, that

04:25:56 10 salary is due to the fact that he had been a provost, and he's

04:25:59 11 been here for quite a while.  And again, like I said, he was

04:26:02 12 hired in as a provost.  At one point he was tasked with setting

04:26:09 13 up a campus in Florida somewhere.  He had been -- when Drexel

04:26:16 14 was talking about setting up programs in Eastern Europe, he was

04:26:20 15 involved in that.  So he was involved in some of this very

04:26:23 16 high-level work.

04:26:25 17 Q.   So you said when you came to the department you noticed

04:26:36 18 these salary differences?

04:26:37 19 A.   Yes, very much.

04:26:38 20 Q.   And you said you looked into trying to find out why?

04:26:42 21 A.   Well, I wanted to find -- yes, I wanted to sort of

04:26:46 22 understand, because one of the things you worry about when you

04:26:49 23 are Department Head and thinking about salaries and fairness

04:26:53 24 and does it make sense, you want to make sure there is not

04:26:58 25 compression or inversion or some inequities like this going on.

*United States District Court*

04:27:03    1    So, yes, that was one of the first things I was interested

04:27:06    2    in looking at, and I have to say, you know, we all wish we made

04:27:10    3    more money.  I sure do, and I wish that for my department

04:27:14    4    certainly, but the salaries all made good sense.

04:27:19    5    Q.  So you said it made good sense but you didn't find any

04:27:26    6    written policy at Drexel that said if you work in the

04:27:31    7    administrative job you get paid more for that without a

04:27:37    8    stipend, right?

04:27:38    9    A.  As I said, the salaries are a result of two things.  They

04:27:40   10    are a result of whatever you were hired at, that figure, and

04:27:42   11    then any increases you get along the way.  There's no policy

04:27:46   12    about assistant professors make this, associate professors make

04:27:53   13    that, professors make that.  There's nothing like that.  That's

04:27:56   14    not how it works.

04:27:57   15    Q.  Right.  So it works just, basically, people get paid

04:28:02   16    amounts for whatever they want.  I'm sorry.  People get paid

04:28:07   17    amounts that are -- there is no real basis for it, right?

04:28:13   18    A.  Actually there is a very real basis for it.  I mean,

04:28:16   19    people don't just get paid whatever they want.  Would that were

04:28:21   20    true.  So your salary is based on when we hire you in the first

04:28:26   21    place, we figure out what the correct salary is for you and

04:28:29   22    there is actually a very -- Drexel has a very clear, consistent

04:28:35   23    and comprehensive process for figuring that out.  There is a

04:28:39   24    whole office of compensation in the HR office, a compensation

04:28:43   25    team that helps figure out what is an appropriate salary for

*United States District Court*

04:28:43  1  this.

04:28:46  2      And so before we even -- before we even advertise a job we

04:28:52  3  go to the compensation team and they say based on our data,

04:28:58  4  looking at, you know, internal factors in Drexel and external

04:29:03  5  factors looking at the market, here is what we think the

04:29:07  6  correct salary range should be for this kind of job that you're

04:29:11  7  hiring this person to do.  So it's not at all arbitrary.  It's

04:29:15  8  very clear.

04:29:16  9  Q.  Okay.  Very clear but it's not written down, right?

04:29:19  10  A.  What's not written down?

04:29:22  11  Q.  This so-called policy.

04:29:27  12  A.  What salary are you talking about?

04:29:31  13  Q.  Guiding this compensation team.

04:29:33  14  A.  I mean, look, I've hired multiple people and that's how we

04:29:37  15  do it every time.  I mean, I couldn't hire anybody without

04:29:40  16  going through this process all along.

04:29:44  17  Q.  My point is there are no documents that govern this

04:29:48  18  process of setting salaries, are there?

04:29:52  19  A.  I don't know.  There probably are.

04:29:58  20  Q.  But you don't know if there are?

04:30:00  21  A.  Well, I just know that when I start that process, that's

04:30:03  22  what I have to do.  I would love to hire more faculty members

04:30:07  23  in my department.  We have a real need for that right now.  I'm

04:30:10  24  desperately needing someone to teach Shakespeare, for instance.

04:30:15  25  But before I am allowed to hire anybody -- I don't have the

*United States District Court*

04:30:19   1   authority myself to hire anybody.  I have to get approval from

04:30:22   2   the dean.  It has to be also approved by the provost's office.

04:30:25   3   If the compensation team comes in it figures out what the

04:30:29   4   correct compensation is.  Even before I am approved to even

04:30:32   5   advertise for this job we have to -- I have to get all these

04:30:34   6   approvals.  So, yes, that's very clear.  That's how we run.

04:30:38   7   Q.   You're Drexel's corporate representative here today,

04:30:41   8   right?

04:30:42   9   A.   I am.

04:30:42   10   Q.   You are aware that not a single document was ever provided

04:30:46   11   by Drexel and there is no exhibit in this case about how the

04:30:52   12   compensation team is supposed to assess salaries, is there?

04:30:56   13   A.   Well, I'm telling you now that's how we do it.

04:30:59   14   Q.   That's how you do it.  There is no -- no written guidance?

04:31:01   15   A.   Well, I don't have that front of my fingertips.

04:31:06   16   Q.   You've never seen it?

04:31:07   17   A.   Well, because I know that's how it works, right.

04:31:10   18   Q.   Not from document.

04:31:11   19   A.   Well, goodness, I can't say that for sure because there

04:31:17   20   might be documents there or --

04:31:18   21   Q.   But the point is --

04:31:20   22   A.   I've had -- I've had direction -- I mean, look, I am the

04:31:23   23   department head.  I am not -- as the department head I know how

04:31:26   24   this works for me in my role in hiring, and so I have to follow

04:31:30   25   the directions that come to me from the dean and the provost.

04:31:35   1  Q.  Right.  But so this so-called compensation team, who's on

04:31:39   2  it?

04:31:39   3  A.  So the compensation team is housed in the human resources

04:31:46   4  department.

04:31:46   5  Q.  Right --

04:31:47   6  A.  Yeah, and I don't know the individuals.  I don't have

04:31:50   7  direct connection with them.

04:31:51   8  Q.  No documents have been provided showing any such team

04:31:56   9  exists, right?

04:31:56  10  A.  Well, there might be such documents but maybe you haven't

04:32:01  11  seen them.

04:32:01  12  Q.  You haven't either, have you?

04:32:03  13  A.  Well, I can't recall.  Let's say that.  They might exist.

04:32:07  14  Q.  All right.  So let's look here too and let's talk for a

04:32:11  15  minute about Abioseh Porter.

04:32:11  16  A.  Sure.

04:32:13  17  Q.  I bring him up because he used to be a department head

04:32:18  18  before you were, right?

04:32:19  19  A.  Abioseh Porter --

04:32:21  20  Q.  And he's up at number 3 here.

04:32:24  21  A.  Yes, he's the top line there.

04:32:24  22  Q.  Right.

04:32:25  23  A.  So you can see he's worked here at Drexel since 1986, he

04:32:29  24  is a senior member of the department, and he was the department

04:32:32  25  head for something like 14 years.  Before he came to Drexel he

*United States District Court*

04:32:38　1　had a tenure track job at another university that I don't

04:32:43　2　remember where it was, but hired in 1986.

04:32:47　3　Q.　You don't know -- you don't know how being a Department

04:32:52　4　Head effects this salary here if at all, do you?

04:32:56　5　A.　No, I do not because that was before, well before I came

04:33:00　6　here.

04:33:00　7　Q.　Right.　And he's got no administrative stipend here for

04:33:03　8　Department Head, right?

04:33:05　9　A.　Well, I would say his --

04:33:07　10　Q.　It doesn't say that?

04:33:09　11　A.　His salary that you see here is a reflection, like I said

04:33:15　12　before, whatever his starting salary is, whatever he was hired

04:33:18　13　at, and then any sort of increases that he got along the way.

04:33:21　14　So if he was given some sort of salary incentive or boost to

04:33:25　15　become the Department Head, then that would be part of what you

04:33:28　16　see here, but I don't know if that's the case.

04:33:31　17　Q.　Right.　And during this time, again, he's not doing any

04:33:34　18　work as the other Department Head?

04:33:37　19　A.　During this time he is not.　He is however doing some work

04:33:40　20　as director of the Africana Studies program.　I should mention

04:33:44　21　Dr. Abioseh Porter is an expert in African literature.　He is a

04:33:46　22　native of Sierra Leone.

04:33:48　23　Q.　And we can't disentangle what he gets paid for that from

04:33:54　24　his salary, can we, from this chart?

04:33:56　25　A.　Can't disentangle what?

*United States District Court*

04:34:00    1  Q.  The money he gets for being director of Africana Studies?

04:34:04    2  A.  What you're seeing here is his base salary.

04:34:08    3  Q.  Okay.  So there is a stipend or there isn't?

04:34:10    4  A.  I don't know.

04:34:11    5  Q.  If there were a stipend, wouldn't it be on this chart?

04:34:15    6  A.  I would assume so and you got this from somebody else, so.

04:34:19    7  Q.  From Drexel.

04:34:21    8  A.  Yeah.

04:34:22    9  Q.  So it should be there.

04:34:22   10  A.  So then --

04:34:24   11  Q.  If it isn't there then there isn't a stipend, correct?

04:34:27   12  A.  I would assume so.

04:34:29   13  Q.  Okay.  Assume there is no stipend.

04:34:32   14      All right.  And going down here, department head, so

04:34:38   15  you're saying somehow that effects the pay.  No women have ever

04:34:45   16  been Department Head, have they?

04:34:47   17  A.  That's not correct.  In --

04:34:48   18  Q.  Who on this chart was a Department Head as a woman?

04:34:53   19  A.  No one on this chart other than Abioseh Porter and I have

04:34:56   20  been Department Heads, but in 1980s there was a woman who was

04:35:01   21  Department Head.

04:35:01   22  Q.  Who was that?

04:35:02   23  A.  Margaret, and I'm sorry, I am blanking on her last name.

04:35:07   24  Q.  Do you know if she got paid more for that?

04:35:09   25  A.  I don't know.  She was a -- we had a woman department head

*United States District Court*

04:35:12    1   for about, I think she was place for about 10 years.

04:35:16    2   Q.   You mentioned longevity is an issue that would effect

04:35:21    3   someone's pay?

04:35:22    4   A.   Certainly.

04:35:24    5   Q.   Make it higher, right?

04:35:24    6   A.   Sorry?

04:35:26    7   Q.   It should make it higher, right, the longer somebody has

04:35:28    8   been there?

04:35:28    9   A.   It can be one of those factors.  So, remember, every year

04:35:32    10  you might get those merit increases, so if you've been here

04:35:37    11  longer, you're going to get more of those over time, correct.

04:35:41    12  Q.   All right.  Let's look at Andrew Smith on line 6.  So

04:35:45    13  Andrew Smith's hire date was September 1, 2010, correct?

04:35:49    14  A.   Correct.

04:35:50    15  Q.   All right.  Now, at that point, Professor Piety had

04:35:55    16  already been working at Drexel, right?

04:35:58    17  A.   Yes.

04:35:59    18  Q.   In fact at that point Professor Piety had been tenured

04:36:04    19  already for three years?

04:36:05    20  A.   Right.

04:36:06    21  Q.   Okay.  So we can say she has much bigger longevity than

04:36:14    22  Andrew Smith, right?

04:36:15    23  A.   She has been here longer than Andrew Smith.

04:36:19    24  Q.   Okay.  So let's look at the salary through the years of

04:36:22    25  his professor salary.  Let's look at associate professor salary

*United States District Court*

04:36:27  1  for let's take 2021.  He's making ███ , right?  He is an

04:36:37  2  associate professor, and ███ , that is in line 7 for 2021.

04:36:43  3      Let's go down to Professor Piety, line 30.  So take a look

04:36:52  4  at Professor Piety on line 30, what is her salary?

04:36:57  5  A.  These are small figures.

04:37:01  6  Q.  They sure are.

04:37:03  7  A.  ███ .  Yeah, I wish everyone's salaries were higher too.

04:37:08  8  Q.  So ███ , and she's already tenured three years before

04:37:14  9  Andrew Smith arrives?

04:37:16  10  A.  Right.

04:37:16  11  Q.  And Andrew Smith is not tenured when he arrives.  Andrew

04:37:23  12  Smith is getting paid just a, fair to say, couple thousand

04:37:30  13  less?

04:37:30  14  A.  So at this point --

04:37:31  15  Q.  So you said longevity, so Piety, she's been here longer,

04:37:35  16  that means that's why he's been paid.  Well, it doesn't look

04:37:38  17  like that here, does it?

04:37:40  18  A.  So we are looking at 2021?  Were those the numbers --

04:37:40  19  Q.  Sure.

04:37:40  20  A.  -- you were looking at?

04:37:43  21      Yeah, so in that year, 2021, Dr. Piety would have been the

04:37:46  22  highest paid professor in the Philosophy program.  She was also

04:37:50  23  the senior ranking and longest serving member in that program.

04:37:56  24  You will recall that I said the reasons for people's salaries

04:38:01  25  depend on whatever your starting salary is plus any increases

*United States District Court*

04:38:06   1   along the way, right?  And I think the reason I would point to

04:38:10   2   for the difference in salaries here is that when she was hired,

04:38:15   3   she had I believe in 2021, starting salary was $███.  You

04:38:20   4   can see that --

04:38:21   5   Q.   She wasn't hired in 2021.

04:38:24   6   A.   2001, I'm sorry.  2001.  Here in later, you know, later,

04:38:29   7   and you can see that Andrew Smith, when he started and when he

04:38:32   8   was first hired, well, we don't have a starting salary here but

04:38:37   9   by this point he is in the ██s so.

04:38:44   10  Q.   High --

04:38:45   11  A.   One thing to note, sorry, I would just point out is that

04:38:49   12  these are both -- Andrew Smith, Dr. Andrew Smith is a professor

04:38:51   13  in the Philosophy program, Dr. Piety is a professor in the

04:38:56   14  Philosophy program.  They were hired at very different times.

04:38:58   15  So in 2001 when Dr. Piety was hired, we actually weren't even

04:39:03   16  the Department of English and Philosophy at that point, and

04:39:06   17  there was no Philosophy major at that point.  Philosophy was a

04:39:10   18  very small and service-oriented aspect of what we do.  We were

04:39:17   19  actually called the Department of Humanities and Communication,

04:39:22   20  something like that.

04:39:23   21       We later evolved and split off into real departments if

04:39:28   22  you will, eventually becoming a Department of English and

04:39:31   23  Philosophy.  In 2011 is when we started our major in

04:39:36   24  Philosophy.  So before 2011 if you were a student at Drexel,

04:39:40   25  you could not major in Philosophy.  You could take some

*United States District Court*

04:39:44　1　philosophy courses, sort of general philosophy courses, but it

04:39:48　2　was in 2011 that we started the major.

04:39:50　3　　　So this is one of the differences.  When Dr. Piety was

04:39:53　4　hired, she was hired as a generalist in this program that was

04:39:57　5　doing these very general kind of courses, so that explains sort

04:40:02　6　of where she started from.  Around 2011 when they started this

04:40:09　7　Philosophy program, the dean decided, hey, we need to make some

04:40:13　8　good hires here to beef up this program.  We are going to make

04:40:17　9　a real major, going to make a go of it, and so they actually

04:40:19　10　hired 3 people right around the same time.  That's Dr. Andrew

04:40:23　11　Smith and two other people on this list, Dr. Flavia Padovani

04:40:28　12　and Dr. Nathan Hanna.  They were -- Flavia Padovani and Nathan

04:40:32　13　Hanna are still associate professors.  Andrew Smith has gone on

04:40:36　14　to be promoted to full professor, but they were all three hired

04:40:39　15　at that time with the intent of let's make this Philosophy

04:40:42　16　program into something.  And they were hired because each of

04:40:45　17　them had certain expertise that Drexel deemed really valuable

04:40:51　18　for building a Philosophy program at a place like Drexel where

04:40:55　19　we have this reputation for being very technology, engineering,

04:41:00　20　science-oriented.

04:41:02　21　Q.　All right.  So let's write that down.  You think it's fine

04:41:06　22　that Smith, who's hired so much later than Piety, is making

04:41:12　23　almost the same as she is and he's lower ranked?

04:41:16　24　A.　I didn't say I thought anything was fine on this whole

04:41:20　25　list.

*United States District Court*

04:41:20    1    Q.   Well, why didn't you do anything about it?  You're the

04:41:25    2    Department Head, right?  You looked into these salary

04:41:27    3    discrepancies.

04:41:27    4    A.   I don't control the salaries.

04:41:29    5    Q.   You have some say in it, don't you?

04:41:32    6    A.   Sorry?

04:41:29    7    Q.   You have some say in it.

04:41:32    8    A.   I have -- salaries are determined, as I've told you, by

04:41:34    9    whatever the person's starting salary is, which I cannot

04:41:38   10    control, and then any increases that you get over time.  That's

04:41:43   11    it.

04:41:44   12         Actually, as Department Heads, we have very little control

04:41:47   13    over what an individual's salary is.  We have -- it's pretty

04:41:51   14    standard across the board, like I mentioned, if you get a

04:41:55   15    promotion, you get a 5 percent increase.  If you get tenure,

04:41:57   16    you get a 7 percent increase.  If you get another promotion,

04:41:59   17    you get another 5 percent increase.  That's how it is for

04:42:03   18    everybody across the board.

04:42:05   19    Q.   Right.  And so at the end of the day, to wrap this part

04:42:07   20    up, longevity isn't really an explanation, is it?

04:42:09   21    A.   Oh, it absolutely is.

04:42:12   22    Q.   It isn't between Smith and Piety, right?

04:42:15   23    A.   Well, because there is another factor, and that's the

04:42:18   24    starting salary.

04:42:19   25    Q.   Right.  And when you're making starting salaries, are you

*United States District Court*

04:42:25    1    looking to make sure the resulting starting salary of a man is

04:42:30    2    not being paid more or being paid more than a woman for the

04:42:36    3    same work?

04:42:37    4    A.    Well, take a look at those three that I just mentioned,

04:42:41    5    and look right there in 2021, Dr. Smith, male, Dr. Hanna, male,

04:42:48    6    Dr. Padovani, female, all hired about the same time, and Dr.

04:42:54    7    Padovani is actually the higher of the trio.

04:42:58    8    Q.    And their salaries are really close to Piety's, right?

04:43:00    9    A.    And they are close to each other, and they are below Dr.

04:43:04    10    Piety's.

04:43:04    11    Q.    Barely.

04:43:05    12    A.    They're below.

04:43:08    13    Q.    Right.  But not -- you go to Richard Astro and we're up

04:43:13    14    over ▇▇▇▇ more.

04:43:13    15    A.    Right.

04:43:13    16    Q.    -- we got you, you're significantly more than her?

04:43:16    17    A.    Yes.

04:43:16    18    Q.    Abioseh Porter is significantly more.

04:43:20    19         And in fact, we look at this list of men -- we won't

04:43:25    20    necessarily go through it right now -- I believe it's something

04:43:27    21    to take back to the jury room with you.  They love this chart.

04:43:32    22         This chart, you can look and you can see that all of

04:43:36    23    these men are paid more than the women in the department,

04:43:39    24    aren't they?

04:43:40    25    A.    There are women who are paid more than men here.

04:43:44　1　Q.　Astro is paid more than anybody?

04:43:46　2　A.　Correct.

04:43:49　3　Q.　Right?

04:43:49　4　A.　Yes.

04:43:49　5　Q.　Catudal --

04:43:50　6　A.　Unless you're looking at Greenberg still.

04:43:54　7　Q.　Right, Greenberg paid more than Piety.  Catudal paid more

04:43:56　8　than -- I think he is paid more than any woman on here, wasn't

04:44:01　9　he, at this time?

04:44:02　10　A.　Quite possibly, yeah.

04:44:05　11　Q.　I mean, he was or he wasn't, right?  The jury can look at

04:44:10　12　that back in the jury room certainly.

04:44:12　13　A.　Yeah.  So, I mean, there are men and women who make more

04:44:16　14　than Dr. Piety, and there are men and women on this list who

04:44:19　15　make less than Dr. Piety.

04:44:21　16　Q.　Right.  Let's look, just briefly, let's look at the

04:44:26　17　various administrative stipends here since we have got the

04:44:29　18　chart up.  Your administrative stipend is ▮▮▮▮, right?

04:44:34　19　A.　That's right.

04:44:34　20　Q.　And we have another administrative stipend for, let's see,

04:44:40　21　for Scott Warnock, and his is for being the director of the

04:44:46　22　writing center at line 44, $▮▮▮▮, right?  And then when he's

04:44:54　23　got did the dean's stipend, he's at$▮▮▮▮.

04:44:58　24　　There are some women on here, stipends correct?

04:45:02　25　A.　You want to point me to them?

*United States District Court*

04:45:05    1    Q.    Sure.    Why don't we take a look at -- it's hard for me to

04:45:14    2    go through with the alphabetical.

04:45:17    3    A.    Okay.    Dr. Elizabeth Kimball?

04:45:19    4    Q.    Yes.    Here she is, director, University Writing Program.

04:45:23    5    A few years after Warnock, some kind of writing director, her

04:45:29    6    stipend is $███.

04:45:29    7    A.    Yes.

04:45:30    8    Q.    So that's less than the stipends the men get, right?

04:45:36    9         Let me go back up here too.    Let's look at Andrew Smith,

04:45:42   10    line 6, and see the stipend he's getting as a Department Head.

04:45:48   11    He's getting ███ for being a Department Head, but my point

04:45:52   12    is look at all these stipends that people get.    The men's are

04:45:57   13    always higher than the women's.    Look at Jennifer Yusin.    See

04:46:02   14    that?    Look at her stipends for being assistant Department

04:46:06   15    Head, ███?

04:46:08   16    A.    Right.    So one of the things -- during my time at Drexel,

04:46:11   17    the stipends for Department Heads have been very stable, and

04:46:14   18    they are the same across the whole college.    So all departments

04:46:19   19    head get the same stipend.

04:46:21   20         Stipends for other administrative roles have varied and

04:46:24   21    will become -- they are negotiated individually.

04:46:26   22    Q.    So how is it that the stipends for men come up always

04:46:31   23    higher than the stipends for women here?

04:46:33   24    A.    Well, they don't.    I mean, there are women Department

04:46:36   25    Heads in the College of Arts and Sciences, and they also got

*United States District Court*

04:46:38  1  that same $███ --

04:46:41  2  Q.   Right.  I'm looking at this chart.

04:46:43  3  A.   Yeah.  Well, I mean, so those are, again, negotiated

04:46:49  4  individually on a case-by-case basis.

04:46:52  5  Q.   Right.  So who's negotiating them?

04:46:53  6  A.   The dean.

04:46:54  7  Q.   All right.  Is the dean a man?

04:46:56  8  A.   During my seven and a half years at Drexel I have had five

04:47:00  9  different deans.  Four of them are women and now, currently,

04:47:04  10  there is a man.

04:47:06  11  Q.   Okay.  But these negotiations, there's nothing governing

04:47:12  12  how you set the salary, right?  It's all what you can

04:47:15  13  negotiate, is that right?

04:47:16  14  A.   It's always negotiable.

04:47:19  15       Yeah, I mean, and also you have to -- part of this is in

04:47:21  16  the context of Drexel being in a kind of belt-tightening mode,

04:47:26  17  and so one of the first things you do when you're tightening

04:47:30  18  the belt, when the dean says -- well, the dean will hear from

04:47:31  19  the provost, as we did just recently, oh, you need to cut your

04:47:35  20  budget by another million dollars.  One of the thins he is

04:47:38  21  going to look at is all these administrative stipends.  You

04:47:41  22  know, do we still need them, can they can be tightened up a

04:47:46  23  little bit, that sort of thing.

04:47:47  24       And also, the other thing to think about when you --

04:47:47  25       MR. FOLEY:  Past --

*United States District Court*

04:47:51    1          THE COURT:  Stop.  You cannot talk over each other,

04:47:54    2    because she's not taking down.  He asks a question, then you

04:47:56    3    wait, then you answer the question then he asks the next one.

04:48:01    4          THE WITNESS:  Got it.

04:48:02    5          MR. FOLEY:  Sorry.

04:48:02    6    BY MR. FOLEY:

04:48:02    7    Q.  So you said he is going to look at it.  Do you think the

04:48:07    8    difference in someone is going to look at the issue of whether

04:48:11    9    to pay these stipends at all?

04:48:14   10    A.  Well, every -- I would say every year I hear from the

04:48:24   11    dean's office, you know, we've got to cut some of these things,

04:48:29   12    and of course I'm always arguing, no, please don't cut, we need

04:48:34   13    these things.  And sometimes they will listen to me and

04:48:36   14    sometimes they won't.

04:48:37   15    Q.  All right.  So have you done anything to try -- you have

04:48:47   16    not -- you have not made salaries and stipends in your

04:48:55   17    department such that men and women who are doing the same work

04:49:04   18    are getting paid the same, have you?

04:49:07   19    A.  I have not made everybody in the department get the same

04:49:13   20    salary, no.

04:49:15   21    Q.  Right, but I asked about men and women.

04:49:17   22    A.  Well, you can see everybody in the department has a

04:49:22   23    different salary, and I think there are very obvious and

04:49:27   24    understandable reasons for each one of those.

04:49:30   25    Q.  All right.  You barely -- we'll go with -- scratch that.

*United States District Court*

04:49:37    1    A.    May I add something?

04:49:37    2    Q.    What's that?

04:49:40    3    A.    May I add one thing?

04:49:42    4    Q.    Sure.

04:49:43    5    A.    I do want you to know that in my role as Department Head,

04:49:46    6    I am an advocate for the faculty and for their best interest.

04:49:50    7    And so I am actually always advocating for the maximum amount

04:49:56    8    of money for as many of my faculty as possible that is

04:49:59    9    definitely one of the things that I try to do.  And so whether

04:50:02    10    it's talking with the dean about what the merit raises are

04:50:07    11    going to be or talking with the dean about promotions or that

04:50:11    12    sort of thing, whenever possible, I am a strong advocate for

04:50:15    13    every single one of my faculty because I want them to be happy

04:50:20    14    and I want them to stay, frankly.  Because one of the things

04:50:23    15    that could happen is if you don't pay someone well enough, they

04:50:28    16    might take a job somewhere else.

04:50:30    17    Q.    How realistic is that in today's climate for academia?

04:50:36    18    A.    What do you mean?

04:50:36    19    Q.    There aren't many jobs out there in English, are there?

04:50:40    20    A.    I've had two faculty members that are on this list leave

04:50:43    21    for precisely this reason.  They took jobs elsewhere.  They got

04:50:49    22    job offers from other places and we tried desperately.  I went

04:50:52    23    to the dean, said, look, please help me keep these people.  We

04:50:57    24    tried to sweeten the pot as much as possible, but we could not

04:51:01    25    match their offers.

*United States District Court*

04:51:02  1  Q.  All right.  Let's -- we need to correct a factual

04:51:06  2  misstatement that Ms. Greenspan in her opening.  She said that

04:51:10  3  Dr. Professor Piety has never sought any administrative role,

04:51:15  4  but that's not true, is it?

04:51:17  5  A.  Well, I think what Ms. Greenspan said was that she's never

04:51:21  6  sought an administrative role like provost or vice provost or

04:51:25  7  dean.  I'm pretty sure that's true.  Or even Department Head.

04:51:29  8  I am pretty sure that's true.

04:51:31  9  Q.  But she has sought position as Philosophy program

04:51:36  10  director, right?

04:51:37  11  A.  So there are administrative roles --

04:51:39  12  Q.  Yes or no?

04:51:39  13  A.  Yes.

04:51:39  14  Q.  So --

04:51:40  15  A.  There are --

04:51:40  16      THE COURT:  Stop.  You have to wait until he's

04:51:43  17  finished.  You have to answer his question, not what you want

04:51:45  18  to answer.  Right?

04:51:47  19      THE WITNESS:  Got it.

04:51:47  20      THE COURT:  Okay.  Go ahead.

04:51:47  21  BY MR. FOLEY:

04:51:50  22  Q.  So the claim that she never sought an administrative

04:51:53  23  position is simply false, isn't it?

04:51:55  24  A.  Again, I think you're misunderstanding her statement.  I

04:51:59  25  would say that she never sought an administrative role at those

*United States District Court*

04:52:03  1   levels that Ms. Greenspan was saying.  But yes, she did apply
04:52:07  2   to be the director of the Philosophy program, which is an
04:52:12  3   administrative role in my department that I oversee.
04:52:17  4   Q.   All right.  And do you know if there was some application
04:52:21  5   process for Abioseh Porter to become Department Head?
04:52:25  6   A.   When he became Department Head?
04:52:30  7   Q.   Uh-huh?
04:52:30  8   A.   That was well before my time.  I don't know.
04:52:33  9   Q.   So he could have just been selected as such, right?
04:52:36  10  A.   That's possible.  So, deans can appoint Department Heads.
04:52:39  11  That's their job.  That's their role, and they can do it in any
04:52:44  12  way that they want to.  Normally what happens is the dean will
04:52:46  13  decide if there is an opening for a Department Head, whether he
04:52:51  14  will do -- usually they'll do sort of a search or an opening
04:52:55  15  and invite people to apply for that job.  They might decide to
04:52:59  16  do an internal search and say, okay, say you're the Philosophy
04:53:02  17  program or the history department or whatever, pick who you
04:53:06  18  want -- recommend someone to be your Department Head and let's
04:53:10  19  see.
04:53:10  20       So that would be one way to do it.  Another way is to say
04:53:14  21  I want to look more broadly and do a whole national search, in
04:53:19  22  which case it's open to the whole universe.
04:53:19  23  Q.   So you said who would ask whom to recommend someone to be
04:53:23  24  a Department Head?
04:53:24  25  A.   The dean is in charge of that process.

*United States District Court*

04:53:27    1    Q.   So it's not that people are just always applying to be

04:53:32    2    Department Head, right?

04:53:33    3    A.   No.   That's correct.

04:53:34    4    Q.   And Catudal worked in the provost office.   Do you know if

04:53:39    5    he went through some kind of application process or if he was

04:53:43    6    just selected?

04:53:44    7    A.   It's possible.   I don't know.

04:53:46    8          THE COURT:   Is this a good time for you to stop?

04:53:49    9          MR. FOLEY:   I think so, Your Honor.

04:53:50   10          ***END OF DAY***.

04:53:50   11          THE COURT:   Thank you.   It's 5 o'clock.   I want to let

04:53:52   12    the jury go home.

04:53:52   13          MR. FOLEY:   Thank you.

04:53:54   14          THE COURT:   Mr. Kurtz, you can leave the stand.   When

04:53:57   15    you return tomorrow, you remain under oath.

04:54:02   16          THE WITNESS:   Thank you.

04:54:06   17          THE COURT:   Members of the jury, we are about to take

04:54:07   18    our first recess and I remind you of the instructions gave you

04:54:12   19    earlier.   During this recess and any other recess, you must not

04:54:14   20    discuss the case with anyone including your fellow jurors,

04:54:17   21    members of your family, people involved in the trial or anyone

04:54:20   22    else.   If anyone tries to talk to you about the case, do not

04:54:23   23    talk to them and immediately tell Mr. Malave so that I can deal

04:54:28   24    with it.

04:54:29   25          Don't read anything about the trial, any news reports.

*United States District Court*

04:54:32  1   Don't conduct any research in any way whatsoever, and keep an
04:54:37  2   open mind until all the evidence has been received and you have
04:54:41  3   heard the views of your fellow jurors.
04:54:42  4        Obviously you're going to have to tell your employers
04:54:44  5   that you are on this trial.  You can tell them that.  Tell
04:54:47  6   them, however, that Judge Beetlestone says that you can say
04:54:50  7   that it is a civil trial, that it is likely to end before
04:54:52  8   Friday but you cannot tell them anything else.
04:54:55  9        And the I will see you tomorrow.  We will start at
04:54:57  10  9:00.  Thank you.
04:54:57  11        (Jury Exits.)
04:55:29  12        THE COURT:  Have a seat.
04:55:30  13        Okay.  So, Mr. Foley, how long do you think we are
04:55:35  14  going to have on Professor Kurtz tomorrow?
04:55:40  15        MR. FOLEY:  Probably, I will try to keep it to
04:55:44  16  30 minutes, Your Honor.
04:55:45  17        THE COURT:  Okay.  And you've got some cross, correct?
04:55:48  18        MS. GREENSPAN:  Yes, Your Honor.
04:55:49  19        THE COURT:  And then we will see whether there is any
04:55:51  20  redirect.
04:55:52  21        Who else do you have tomorrow?
04:55:54  22        MR. FOLEY:  Your Honor, I think that's it for now.
04:55:59  23        THE COURT:  Okay.  So then we will be turning to
04:56:01  24  defense case.  Who have you got?
04:56:03  25        MS. GREENSPAN:  Your Honor, for our case we are

04:56:05   1   calling Dr. Kurtz on direct.  We are calling Keyanah Jones on

04:56:11   2   direct from human resources, and we are calling Dr. Paul

04:56:15   3   Jensen, provost, on direct.

04:56:18   4          I believe that's it, Your Honor.  I will double-check

04:56:20   5   my notes but I believe that's it.

04:56:22   6          THE COURT:  And how long do we think they are going to

04:56:25   7   go?

04:56:25   8          MS. GREENSPAN:  I would think less than the day.

04:56:27   9          THE COURT:  Okay.  So there is a remote possibility

04:56:30  10   that we will finish testimony tomorrow, right?

04:56:33  11          MS. GREENSPAN:  Yes.

04:56:33  12          THE COURT:  So I think what you need to do is to make

04:56:36  13   sure the -- and if we finish around 4:00, I will just let the

04:56:41  14   jury go.  Even if we finish before that, we are going to do the

04:56:47  15   charging conference.  So I think you both need to look at that

04:56:51  16   final, those final jury instructions and work out any

04:56:56  17   difficulty, any differences you may have.

04:56:57  18          Remember, I told you that what you're going to do is

04:57:00  19   you're going to look at it.  Anything that I have provided to

04:57:03  20   you, which the basic model jury instructions, you're going to

04:57:06  21   read those.  If it is anything specific that pertains to this

04:57:10  22   case, you're going to see where you differ and you will try and

04:57:14  23   work out those differences.  So what you should give me is the

04:57:17  24   final document, which is everything as you have agreed or that

04:57:20  25   I have included, and if there is a difference, you show

*United States District Court*

04:57:24    1    plaintiff's in italics and defendant's in, I think it's

04:57:27    2    underline, so that I know exactly where the issue is.  And the

04:57:31    3    sooner you can get me that document, the sooner I can evaluate

04:57:35    4    and the differences and we will have a much more fruitful

04:57:40    5    charging conference.

04:57:41    6              Okay.  Anything else?

04:57:42    7              MS. GREENSPAN:  No, Your Honor.

04:57:43    8              MR. FOLEY:  No, Your Honor.

04:57:44    9              THE COURT:  Okay.  Thank you.  See you tomorrow.

04:57:46   10    Again, if you need to talk to me earlier than the 9 o'clock

04:57:49   11    start, text Alex and he will tell me.

           12              C E R T I F I C A T E

           13

           14               I certify that the foregoing is a correct transcript

           15    from the record of proceedings in the above-entitled matter.

           16

           17

           18              /s/ Kim L. Haley, CSR, CRR, RPR
                           1/31/2025
           19

           20

           21

           22

           23

           24

           25

*United States District Court*

```
 1                    I N D E X
 2
 3  WITNESS                          PAGE
 4
    MEGAN VAN HORN
 5
    BY MR. FOLEY----------------------------122, 137
 6
    BY MS. GREENSPAN-------------------------131
 7
 8  ROSE MARIE FLAVIN
 9  BY MR. FOLEY----------------------------142, 159
10  BY MS. GREENSPAN-------------------------157
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

*United States District Court*

## $

$ ███ [1] - 194:20
$ ███ [1] - 156:4
$ ███ [1] - 186:3
$ ███ [1] - 209:6
$ ███ [1] - 141:1
$ ███ [1] - 140:23
$ ███ [1] - 208:22
$ ███ [1] - 194:8
$ ███ [1] - 109:5, 210:1
$ ███ [1] - 112:6
$ ███ [1] - 204:3
$ ███ [1] - 186:25
$ ███ [1] - 141:20
$ ███ [1] - 141:20

## '

'26 [1] - 59:9

## /

/s [1] - 218:18

## 0

01970 [1] - 1:16
020 [1] - 17:3

## 1

1 [11] - 14:17, 14:20, 14:21, 14:22, 15:1, 27:2, 28:21, 31:10, 92:7, 92:14, 202:13
1,200 [1] - 115:1
1/31/2025 [1] - 218:18
10 [11] - 24:25, 27:13, 28:14, 29:5, 29:8, 57:16, 79:17, 91:24, 92:1, 175:13, 202:1
10-minute [1] - 105:6
100 [1] - 71:24
███ [1] - 207:14
███ [1] - 156:15
11 [6] - 28:18, 29:5, 47:25, 65:22, 67:5, 132:8
12 [14] - 24:5, 24:8, 24:25, 26:23, 27:2, 27:13, 29:1, 67:23, 87:8, 87:19, 87:20, 88:18, 88:19, 124:11
12-month [2] - 114:20, 165:16

122 [1] - 219:5
12:00 [1] - 135:23
13 [9] - 27:6, 27:13, 29:5, 29:8, 45:2, 72:17, 161:25, 162:4, 164:24
131 [1] - 219:6
137 [1] - 219:5
14 [17] - 1:16, 27:6, 27:13, 28:21, 29:5, 30:21, 30:25, 77:6, 86:19, 87:1, 87:10, 92:2, 92:7, 92:15, 114:25, 199:25
142 [1] - 219:9
143,7 [1] - 187:2
███ [1] - 156:12
███ [1] - 164:12
14th [1] - 4:23
15 [15] - 26:23, 27:6, 27:13, 28:21, 31:7, 79:17, 81:11, 87:14, 87:15, 92:4, 92:7, 92:16, 192:1, 192:2, 192:3
157 [1] - 219:10
159 [1] - 219:9
15th [1] - 143:17
16 [8] - 86:19, 86:21, 86:22, 86:25, 87:2, 87:10, 87:15, 179:7
160 [1] - 142:3
160,000 [1] - 142:1
160,267 [1] - 164:16
16th [2] - 154:10, 158:15
17 [8] - 27:6, 27:14, 27:23, 28:22, 29:1, 29:8, 29:19, 118:11
18 [3] - 24:25, 26:24, 54:13
18,000 [2] - 171:24, 172:1
19 [3] - 27:2, 27:14, 27:23
190 [1] - 194:19
19103 [1] - 2:5
19106 [1] - 1:9
1980s [1] - 201:20
1981 [1] - 191:21
1986 [2] - 199:23, 200:2
1996 [1] - 194:16
1998 [3] - 112:4, 194:18, 194:21
19th [5] - 123:16, 131:20, 134:21, 135:2, 135:18
1st [1] - 122:25

## 2

2 [11] - 26:23, 31:13, 34:7, 86:20, 87:1, 91:9, 92:7, 92:14, 176:24, 177:23
2-1/2 [1] - 156:25
20 [8] - 19:20, 27:14, 28:19, 29:8, 32:16, 79:17, 175:13
2001 [4] - 194:23, 204:6, 204:15
2007 [1] - 143:19
2008 [1] - 41:18
2009 [1] - 41:18
2010 [1] - 202:13
2011 [4] - 204:23, 204:24, 205:2, 205:6
2017 [4] - 161:6, 163:7, 188:5, 189:23
2019 [21] - 14:15, 14:17, 15:12, 15:23, 16:3, 16:20, 17:23, 131:22, 136:3, 136:25, 137:8, 140:1, 140:18, 152:18, 164:2, 164:12, 172:5, 185:21, 191:3, 191:17
2020 [12] - 15:7, 15:12, 15:13, 15:14, 15:16, 15:23, 16:10, 16:21, 18:1, 122:25, 185:22, 186:2
2021 [12] - 14:18, 14:20, 172:8, 186:2, 186:24, 203:1, 203:2, 203:18, 203:21, 204:3, 204:5, 207:5
2022 [1] - 171:24
2023 [7] - 14:20, 14:23, 15:1, 140:22, 141:23, 152:18, 172:1
2024 [12] - 4:17, 4:23, 131:17, 131:23, 135:24, 136:25, 143:17, 152:16, 157:19, 158:15, 172:1, 193:19
2025 [7] - 1:9, 4:23, 159:3, 164:2, 164:15, 172:1, 194:2
206(d)(1) [1] - 95:6
20th [14] - 123:16, 124:8, 131:17, 132:16, 135:2, 135:24, 138:8,

145:8, 145:15, 145:16, 152:16, 153:20, 157:19, 158:9
21 [7] - 24:25, 26:24, 27:14, 28:22, 29:9, 170:4, 185:19
22 [9] - 25:1, 26:24, 27:7, 27:14, 28:22, 29:1, 54:13, 66:7, 66:10
22,000 [1] - 115:1
22-01777 [1] - 3:3
22-1777 [1] - 1:4
225 [1] - 4:24
23 [2] - 74:16, 152:17
236 [1] - 4:24
23rd [3] - 4:17, 10:2, 193:14
24,000 [2] - 208:18, 209:11
2500 [1] - 2:4
27 [2] - 1:9, 112:18
28 [1] - 164:7
29 [1] - 95:6

## 3

3 [15] - 8:3, 26:23, 27:2, 30:22, 34:23, 45:12, 87:9, 91:12, 92:7, 92:14, 152:14, 176:24, 199:20, 205:10
3-credit [1] - 172:23
3-credit-hour [1] - 172:24
30 [8] - 75:22, 157:24, 186:11, 194:19, 203:3, 203:4, 216:16
30th [4] - 4:23, 111:13, 151:17, 153:11
31 [3] - 14:18, 14:20, 16:3
31st [1] - 14:15
33 [2] - 69:20
35 [1] - 75:22
37 [2] - 69:20, 69:21
███ [1] - 203:2
3:30 [2] - 160:6, 160:8
3rd [3] - 156:21, 159:3, 159:17

## 4

4 [10] - 26:23, 27:12, 29:1, 31:6, 37:21, 88:25, 91:15, 92:7, 92:15
40 [4] - 79:18, 84:23,

175:10, 175:12
41 [3] - 169:24, 193:25, 194:3
42 [1] - 171:20
44 [2] - 172:5, 208:22
48 [1] - 131:9
48-hour [1] - 130:17
4:00 [1] - 217:13
4:30 [1] - 148:11

## 5

5 [24] - 27:12, 28:21, 29:5, 40:10, 42:15, 88:5, 88:6, 88:19, 91:18, 92:7, 92:15, 93:19, 137:22, 137:24, 138:4, 138:6, 154:1, 177:9, 177:24, 178:14, 206:15, 206:17, 215:11
5-year [1] - 162:21
50 [6] - 72:1, 175:11, 175:12, 179:2, 183:4, 183:6
5:00 [3] - 105:8, 105:12, 148:11

## 6

6 [11] - 27:12, 29:5, 43:15, 77:20, 87:1, 91:21, 92:7, 92:15, 202:12, 209:10
███ [1] - 209:15
601 [1] - 1:8
62 [1] - 54:13
63 [1] - 54:13

## 7

7 [11] - 27:2, 27:12, 35:4, 42:16, 46:10, 91:24, 92:2, 177:13, 193:3, 203:2, 206:16
70 [1] - 183:6
70s [1] - 204:9
███ [1] - 203:1
7th [1] - 34:12

## 8

8 [17] - 26:23, 27:2, 27:6, 27:12, 27:17, 27:23, 28:21, 29:19, 30:22, 35:4, 51:1, 54:22, 55:8, 87:1, 87:8, 92:4
801 [1] - 2:5

■ [2] - 203:7, 203:8
**8th** [2] - 34:12, 38:5

## 9

**9** [6] - 24:25, 29:8, 53:8, 56:8, 218:10
**9's** [1] - 56:7
**9-month** [1] - 165:15
**90** [5] - 163:16, 163:20, 163:25, 169:7, 169:8
**99** [4] - 150:20, 151:8, 151:9, 158:8
**9:00** [3] - 1:10, 105:5, 216:10
**9th** [17] - 14:15, 15:7, 15:12, 15:13, 15:14, 15:16, 15:23, 16:10, 16:20, 16:21, 17:3, 17:23, 18:1, 136:3, 137:8

## A

**abide** [1] - 8:2
**ability** [41] - 32:25, 34:17, 35:19, 36:21, 37:18, 38:11, 38:16, 39:8, 39:24, 41:2, 42:5, 43:3, 44:17, 45:23, 47:9, 47:16, 49:9, 51:16, 54:5, 55:21, 56:24, 58:23, 59:14, 60:24, 62:17, 64:19, 66:19, 68:20, 69:8, 70:4, 70:20, 74:2, 75:10, 76:6, 78:21, 80:5, 81:1, 82:19, 84:3, 86:8, 101:17
**Abioseh** [14] - 26:7, 106:20, 117:21, 166:14, 170:13, 170:15, 170:17, 184:20, 199:15, 199:19, 200:21, 201:19, 207:18, 214:5
**able** [16] - 5:7, 10:11, 29:11, 110:15, 114:14, 129:3, 130:24, 133:8, 134:11, 144:5, 144:9, 158:18, 173:18, 177:3, 183:9
**above-entitled** [1] - 218:15
**absolute** [3] - 23:18,

178:13, 178:19
**absolutely** [4] - 64:11, 65:2, 89:8, 206:21
**academia** [3] - 51:9, 51:24, 212:17
**academic** [7] - 115:7, 116:5, 146:6, 149:22, 161:24, 173:10, 195:7
**accept** [2] - 4:16, 98:24
**accepted** [2] - 7:20, 61:15
**access** [34] - 96:17, 104:25, 110:7, 110:10, 123:18, 124:5, 126:1, 126:6, 126:14, 126:16, 126:19, 126:22, 126:24, 126:25, 127:7, 130:2, 130:5, 130:11, 133:18, 134:17, 134:22, 135:25, 136:5, 136:7, 136:8, 136:14, 136:19, 136:22, 137:6, 144:5, 144:10, 144:13, 148:3, 159:4
**accessed** [1] - 148:2
**accessing** [1] - 146:19
**accidently** [1] - 109:11
**accommodate** [1] - 174:15
**according** [1] - 107:18
**accountant** [1] - 53:25
**accounts** [1] - 133:12
**accuracy** [1] - 115:13
**accused** [4] - 28:10, 28:15, 63:14, 66:1
**achieved** [3] - 23:11, 186:20, 186:21
**acknowledgment** [1] - 167:11
**acquaintances** [1] - 46:20
**acquainted** [2] - 24:17, 25:2
**Act** [18] - 6:6, 10:4, 23:4, 32:22, 41:23, 85:22, 95:6, 95:13, 96:1, 96:4, 105:23, 105:25, 108:4, 108:9, 108:16, 109:2, 110:6, 116:16
**acted** [1] - 116:17
**action** [1] - 63:11
**ACTION** [1] - 1:3
**actions** [2] - 6:17, 6:18

**activity** [1] - 174:6
**actual** [3] - 4:18, 109:14, 191:12
**Adam** [1] - 26:1
**add** [3] - 166:16, 212:1, 212:3
**added** [1] - 17:19
**addition** [9] - 6:20, 97:18, 116:2, 133:19, 158:20, 164:22, 165:23, 169:1, 183:5
**additional** [10] - 18:22, 18:24, 134:1, 134:2, 142:6, 155:21, 164:25, 165:8, 165:18
**addressed** [1] - 21:11
**adequately** [1] - 5:21
**adjunct** [2] - 183:6, 184:12
**administration** [1] - 31:21
**administrative** [74] - 18:3, 18:17, 18:25, 19:7, 19:11, 19:13, 19:16, 19:19, 19:25, 20:1, 20:4, 20:5, 20:10, 20:14, 20:21, 107:3, 108:19, 108:20, 110:23, 110:25, 112:18, 112:19, 112:22, 113:5, 113:11, 113:14, 113:16, 113:23, 114:5, 114:13, 114:14, 115:7, 115:13, 115:22, 115:25, 117:11, 117:22, 118:19, 133:21, 134:3, 137:18, 137:19, 138:19, 138:23, 139:22, 140:6, 140:11, 142:5, 165:15, 169:5, 169:9, 169:10, 169:20, 169:25, 170:7, 170:10, 170:17, 171:23, 185:12, 187:18, 189:4, 196:7, 200:7, 208:17, 208:18, 208:20, 209:20, 210:21, 213:3, 213:6, 213:11, 213:22, 213:25, 214:3
**administrator** [2] -

114:1, 115:19
**administrators** [1] - 185:4
**admission** [1] - 5:14
**admitted** [9] - 97:15, 105:2, 138:3, 138:4, 151:3, 151:7, 151:9, 163:19, 163:20
**admonitions** [1] - 120:19
**Adobe** [7] - 155:8, 155:12, 155:14, 155:16, 155:17, 155:19, 159:20
**advantage** [1] - 102:19
**advertise** [2] - 197:2, 198:5
**advisor** [1] - 51:18
**advocate** [2] - 212:6, 212:12
**advocating** [1] - 212:7
**affect** [1] - 146:6
**African** [1] - 200:21
**Africana** [4] - 170:19, 171:2, 200:20, 201:1
**afternoon** [20] - 105:18, 111:3, 111:7, 111:11, 121:2, 121:16, 131:14, 131:15, 140:8, 142:25, 145:15, 148:9, 148:11, 152:16, 153:16, 153:21, 157:8, 157:9, 160:22, 160:24
**afterwards** [1] - 87:22
**agency** [1] - 59:19
**agent** [1] - 56:15
**aggravating** [1] - 62:9
**ago** [16] - 36:15, 36:16, 42:16, 45:9, 54:11, 54:12, 54:22, 64:5, 64:7, 75:8, 75:20, 75:21, 75:22, 79:15, 79:16, 114:22
**agree** [6] - 10:22, 64:25, 87:4, 92:8, 95:4
**agreed** [10] - 9:18, 11:8, 12:18, 20:25, 21:19, 98:23, 120:1, 121:25, 122:4, 217:24
**agreeing** [1] - 49:4
**agreement** [1] - 13:10
**agreements** [1] - 102:22
**agrees** [2] - 5:10,

20:16
**aha** [1] - 190:11
**ahead** [6] - 36:4, 50:4, 73:19, 113:3, 128:5, 137:11, 213:20
**aid** [1] - 23:20
**aided** [1] - 1:22
**air** [1] - 78:2
**Ake** [2] - 180:3, 180:5
**Alex** [1] - 218:11
**aligned** [1] - 37:10
**alleging** [1] - 23:2
**Allentown** [1] - 81:21
**allow** [2] - 110:10, 133:3
**allowed** [5] - 49:23, 89:4, 89:8, 102:6, 197:25
**almost** [1] - 205:23
**alone** [2] - 13:21, 17:25
**alphabetical** [1] - 209:2
**alphabetically** [3] - 139:2, 164:6, 170:16
**alternate** [4] - 61:25, 62:1, 80:22, 80:24
**alternatively** [1] - 87:23
**Amato** [1] - 25:12
**American** [2] - 23:5, 51:25
**amount** [10] - 27:4, 52:10, 72:21, 77:12, 83:7, 107:19, 175:4, 181:15, 184:14, 212:7
**amounts** [4] - 177:9, 178:13, 196:16, 196:17
**analyzed** [1] - 113:18
**AND** [1] - 1:12
**Andre** [1] - 25:14
**Andrew** [23] - 26:9, 106:25, 117:3, 117:15, 118:8, 119:6, 155:25, 156:12, 167:18, 184:20, 202:12, 202:13, 202:22, 202:23, 203:9, 203:11, 204:7, 204:12, 205:10, 205:13, 209:9
**Angeles** [1] - 34:13
**anger** [2] - 6:15, 6:16
**angled** [1] - 120:6
**annual** [4] - 132:14, 177:19, 179:1, 179:8
**annually** [2] - 172:24,

179:3
**answer** [28] - 19:5, 19:22, 24:15, 24:21, 25:7, 26:14, 26:17, 26:20, 27:10, 27:20, 28:1, 28:4, 28:7, 28:9, 28:13, 29:17, 29:23, 32:15, 50:12, 69:17, 80:10, 86:23, 100:4, 146:12, 159:7, 211:3, 213:17, 213:18
**answered** [34] - 24:9, 25:9, 29:25, 30:2, 31:13, 33:22, 34:10, 35:3, 37:24, 40:13, 42:12, 43:21, 46:6, 46:14, 47:25, 50:15, 51:3, 53:9, 56:3, 57:22, 65:23, 66:6, 67:25, 70:10, 71:8, 72:19, 74:8, 74:12, 74:16, 77:10, 81:14, 85:12, 87:15
**answering** [1] - 28:14
**antidiscrimination** [5] - 28:20, 32:17, 41:14, 79:12, 85:13
**antitrust** [1] - 41:21
**anyway** [2] - 63:23, 130:24
**apart** [1] - 26:15
**apologize** [4] - 33:19, 34:1, 34:2, 61:4
**appear** [1] - 141:9
**APPEARANCES** [2] - 1:14, 2:1
**apples** [2] - 16:17
**applicable** [1] - 176:19
**application** [3] - 155:14, 214:4, 215:5
**applications** [1] - 84:13
**applied** [1] - 23:14
**applies** [1] - 104:1
**apply** [9] - 88:13, 94:19, 104:1, 120:19, 177:12, 186:15, 186:17, 214:1, 214:15
**applying** [1] - 215:1
**appoint** [1] - 214:10
**appointments** [4] - 165:15, 165:16
**appreciate** [2] - 92:21
**appreciated** [1] - 122:3
**appreciation** [1] - 92:22

**approach** [1] - 158:4
**approached** [1] - 97:13
**appropriate** [4] - 14:7, 21:13, 116:19, 196:25
**approval** [1] - 198:1
**approvals** [1] - 198:6
**approved** [2] - 198:2, 198:4
**arbitrary** [1] - 197:7
**arbitration** [6] - 82:5, 82:8, 82:12, 82:23, 82:25, 83:1
**area** [4] - 116:5, 161:24, 175:22, 181:4
**areas** [6] - 117:1, 168:11, 168:24, 175:24, 176:13, 179:10
**argue** [1] - 7:11
**argues** [1] - 96:3
**arguing** [2] - 21:3, 21:5, 211:12
**argument** [1] - 7:18
**arguments** [3] - 99:2, 104:20, 104:22
**arm** [1] - 63:15
**arrangements** [1] - 190:22
**arrives** [2] - 203:9, 203:11
**art** [1] - 38:6
**article** [2] - 97:16, 97:17
**articles** [1] - 111:23
**Arts** [7] - 111:16, 111:17, 162:2, 174:18, 176:9, 176:16, 209:25
**aspect** [1] - 204:18
**assault** [1] - 61:25
**assess** [1] - 198:12
**assign** [2] - 173:19, 182:11
**assigned** [1] - 24:2
**assist** [1] - 56:17
**assistant** [2] - 56:16, 71:15, 71:19, 112:4, 112:7, 166:20, 177:7, 183:15, 186:15, 194:22, 196:12, 209:14
**Associate** [1] - 112:8
**associate** [17] - 3:21, 166:21, 168:2, 170:6, 171:21, 171:24, 172:9, 177:8, 183:15,

185:19, 185:24, 186:12, 186:16, 196:12, 202:25, 203:2, 205:13
**assume** [7] - 18:19, 53:2, 102:11, 141:24, 201:6, 201:12, 201:13
**assumed** [2] - 7:13, 190:16
**assuming** [2] - 8:13, 13:24
**astonished** [1] - 8:11
**Astro** [18] - 7:16, 17:20, 21:16, 25:13, 106:16, 106:17, 117:6, 117:13, 166:10, 169:23, 169:24, 171:10, 184:19, 192:14, 193:9, 193:25, 207:13, 208:1
**Astro's** [3] - 17:23, 193:16, 195:1
**at$18,000** [1] - 208:23
**attempt** [2] - 113:15, 181:7
**attention** [4] - 96:10, 102:13, 102:17, 128:5
**attic** [1] - 42:16
**Attorney** [5] - 39:18, 148:15, 153:3, 154:12
**attorney** [5] - 3:7, 104:4, 124:21, 124:23, 146:12
**attorney's** [1] - 98:15
**attorneys** [5] - 30:4, 104:5, 104:19
**audio** [1] - 120:15
**August** [5] - 14:15, 14:18, 14:20, 16:3, 172:8
**authentications** [1] - 90:11
**authority** [1] - 198:1
**automatic** [2] - 60:3, 128:22
**automotive** [1] - 73:4
**autonomy** [1] - 173:16
**available** [9] - 6:20, 6:23, 6:24, 7:11, 102:12, 147:7, 178:2, 188:18, 193:15
**average** [4] - 11:19, 14:8, 20:1, 22:1
**averaged** [1] - 15:19
**averages** [1] - 13:20

**averaging** [2] - 13:25, 15:19
**awards** [1] - 117:20
**aware** [11] - 121:25, 122:3, 122:4, 122:6, 123:6, 138:6, 145:9, 145:14, 189:7, 198:10

# B

**babysitting** [2] - 10:12, 10:13
**backed** [1] - 50:22
**backwards** [1] - 24:7
**bacon** [2] - 45:12, 45:15
**bad** [1] - 42:17
**BAILIFF** [2] - 160:7, 160:17
**bankrupt** [1] - 55:5
**banner** [1] - 129:5
**Banner** [4] - 133:9, 133:10, 133:14, 133:23
**bans** [1] - 96:12
**barely** [2] - 207:11, 211:25
**base** [33] - 18:3, 18:7, 18:10, 18:18, 19:2, 19:6, 19:9, 20:12, 20:17, 20:24, 21:1, 106:22, 106:23, 106:24, 107:3, 107:5, 107:17, 108:17, 108:22, 108:23, 109:3, 109:5, 140:2, 140:18, 163:5, 164:21, 171:4, 171:6, 172:2, 176:1, 176:5, 201:2
**based** [15] - 7:2, 60:15, 64:16, 73:16, 95:7, 95:22, 99:6, 106:5, 118:18, 133:1, 178:9, 188:3, 193:21, 196:20, 197:3
**basic** [3] - 19:24, 20:10, 217:20
**basis** [5] - 127:18, 136:24, 196:17, 196:18, 210:4
**bathroom** [1] - 75:2
**Baylis** [1] - 65:23
**bear** [3] - 33:23, 101:25, 181:4
**bears** [2] - 118:1, 118:2

**became** [2] - 115:11, 214:6
**become** [5] - 23:16, 46:21, 200:15, 209:21, 214:5
**becoming** [2] - 112:7, 204:22
**beef** [1] - 205:8
**BEETLESTONE** [1] - 1:11
**Beetlestone** [3] - 110:16, 135:10, 216:6
**BEFORE** [1] - 1:11
**beforehand** [1] - 125:19
**began** [1] - 118:16
**beginning** [3] - 124:11, 125:13, 125:22
**behalf** [1] - 3:14
**behave** [1] - 10:12
**behind** [1] - 5:12
**belief** [1] - 101:14
**beliefs** [1] - 29:13
**believability** [1] - 102:1
**believable** [1] - 102:4
**believes** [2] - 87:5, 113:1
**below** [8] - 139:17, 139:18, 141:18, 164:18, 171:21, 171:22, 207:9, 207:12
**belt** [2] - 210:16, 210:18
**belt-tightening** [1] - 210:16
**bench** [6] - 12:5, 22:12, 90:19, 93:14, 94:3, 98:8
**benefit** [1] - 115:22
**benefits** [2] - 44:15, 49:4
**best** [4] - 35:9, 35:24, 63:20, 212:6
**better** [4] - 12:9, 139:6, 176:3, 194:24
**between** [15] - 7:15, 9:18, 45:3, 86:1, 87:24, 88:14, 112:17, 148:11, 162:20, 167:24, 174:14, 180:8, 186:11, 206:22
**beyond** [6] - 33:12, 57:11, 65:3, 79:5, 103:24, 176:14
**bias** [1] - 101:21

**biased** [2] - 51:20, 51:25
**bickering** [1] - 12:10
**big** [5] - 115:9, 162:11, 162:21, 178:25, 192:9
**bigger** [2] - 152:11, 202:21
**biggest** [1] - 115:23
**bio** [1] - 51:11
**birth** [1] - 132:21
**bit** [15] - 15:15, 60:13, 60:15, 63:5, 68:14, 69:14, 87:19, 120:6, 157:16, 161:16, 166:1, 173:12, 175:9, 195:6, 210:23
**blank** [3] - 56:7, 67:8, 104:25
**blanking** [1] - 201:23
**blocks** [1] - 111:13
**blog** [1] - 97:3
**blogs** [1] - 97:24
**blowers** [1] - 77:25
**blurring** [1] - 36:5
**board** [3] - 178:2, 206:14, 206:18
**boards** [2] - 60:5
**bona** [2] - 6:25, 95:19
**bonus** [1] - 60:7
**book** [8] - 46:18, 46:22, 47:16, 47:23, 48:3, 48:11, 48:12, 49:13
**books** [5] - 56:17, 56:19, 56:20, 56:21, 173:18
**boost** [1] - 200:14
**boss** [1] - 44:12
**bottom** [1] - 176:5
**boundaries** [1] - 128:3
**boundary** [1] - 9:19
**box** [1] - 92:13
**boyfriend** [1] - 39:17
**boyfriend's** [4] - 53:13, 53:22, 53:23, 54:11
**break** [8] - 18:24, 87:19, 88:18, 89:14, 105:6, 105:7, 160:5, 175:9
**break-outs** [1] - 18:24
**Brian** [4] - 3:7, 25:5, 105:18, 121:17
**brief** [3] - 13:8, 14:3, 22:23
**Brief** [3] - 22:15, 94:10, 120:24
**briefly** [5] - 5:16, 49:12, 208:16

**bring** [16] - 11:24, 22:13, 29:25, 64:14, 68:25, 93:20, 94:11, 96:10, 120:23, 130:1, 130:7, 130:9, 130:15, 130:22, 131:4, 199:17
**bringing** [1] - 120:25
**Broad** [1] - 63:4
**broader** [1] - 181:17
**broadly** [1] - 214:21
**broken** [1] - 162:22
**brother** [2] - 77:17, 81:18, 82:6
**brother-in-law** [2] - 81:18, 82:6
**brought** [7] - 62:8, 63:13, 64:1, 95:5, 103:5, 129:2, 130:4
**browser** [1] - 155:11
**budget** [2] - 162:17, 210:20
**budgetary** [1] - 165:22
**building** [2] - 69:23, 205:18
**built** [3] - 54:21, 132:4, 169:3
**bump** [6] - 20:15, 20:16, 167:9, 167:10, 192:25
**bumps** [1] - 188:6
**bunch** [1] - 184:1
**burden** [5] - 103:6, 103:14, 104:11, 118:1, 118:3
**burnt** [1] - 45:14
**business** [11] - 44:3, 44:9, 44:14, 57:13, 77:23, 78:1, 111:15, 152:17, 153:16, 153:20, 153:24
**busy** [1] - 146:5
**but..** [1] - 127:14
**BY** [22] - 1:15, 2:3, 121:13, 122:20, 131:13, 137:16, 138:5, 142:24, 146:14, 151:13, 157:7, 158:6, 159:16, 160:21, 163:21, 169:18, 211:6, 213:21, 219:5, 219:6, 219:9, 219:10
**bylaws** [4] - 182:4, 182:6, 182:9, 182:11
**Byrne** [1] - 1:8

# C

**calculate** [4] - 12:1, 22:4, 109:14, 109:17
**calculated** [1] - 21:20
**calculating** [1] - 11:23
**calculation** [14] - 10:19, 10:20, 10:23, 11:13, 13:10, 13:25, 15:24, 16:13, 16:25, 18:6, 20:18, 20:19, 21:12, 21:17
**calendar** [3] - 136:24, 146:6, 149:22
**calendar-year** [1] - 136:24
**California** [1] - 121:21
**campus** [1] - 195:13
**cannot** [11] - 8:11, 9:9, 30:8, 30:11, 120:9, 138:20, 141:4, 142:3, 206:9, 211:1, 216:8
**capacity** [4] - 29:7, 54:18, 63:8, 64:19
**capital** [1] - 122:17
**card** [2] - 24:3, 24:12
**care** [3] - 12:21, 85:5, 162:22
**career** [2] - 113:6, 177:16
**careers** [1] - 115:7
**careful** [2] - 119:12, 119:14
**Carrington** [1] - 25:14
**carry** [1] - 170:5
**carrying** [1] - 101:2
**Caruthers** [1] - 25:15
**case** [149] - 5:5, 5:11, 7:7, 8:24, 11:25, 12:19, 22:20, 22:21, 22:24, 23:14, 25:4, 25:9, 26:18, 29:3, 29:10, 30:8, 30:9, 30:10, 30:18, 32:25, 33:5, 34:14, 34:17, 35:19, 36:21, 37:11, 37:18, 38:10, 38:12, 38:17, 39:8, 39:25, 41:3, 42:5, 42:13, 42:16, 43:3, 43:5, 44:17, 45:10, 45:23, 47:9, 47:17, 49:9, 51:17, 54:6, 55:21, 56:24, 58:24, 59:14, 60:24, 61:25, 62:5, 62:7, 62:13, 62:17, 63:20, 63:21, 64:2, 64:18, 64:19, 64:25, 65:18, 66:14, 66:19,

68:20, 69:3, 69:5, 69:9, 70:4, 70:20, 74:2, 75:10, 76:6, 78:21, 80:6, 80:23, 81:1, 82:19, 84:3, 86:8, 87:4, 88:16, 88:21, 88:23, 88:25, 89:8, 94:17, 95:5, 95:11, 96:8, 96:10, 96:19, 96:20, 96:23, 97:15, 97:17, 97:20, 97:22, 98:1, 98:6, 98:17, 99:3, 99:5, 101:21, 103:4, 103:7, 103:19, 104:13, 104:15, 104:24, 105:19, 108:13, 108:14, 109:19, 110:1, 110:2, 110:17, 110:20, 112:15, 118:3, 118:24, 120:20, 123:17, 141:19, 143:3, 143:6, 150:3, 166:5, 167:22, 169:17, 185:2, 195:9, 198:11, 200:16, 210:4, 214:22, 215:20, 215:22, 216:24, 216:25, 217:22
**case-by-case** [1] - 210:4
**caseload** [1] - 111:24
**cases** [5] - 62:16, 88:17, 104:1, 104:2, 105:11
**category** [6] - 15:22, 16:10, 166:24, 181:20, 182:1, 183:10
**Catudal** [32] - 7:16, 14:18, 16:7, 19:12, 19:24, 21:18, 25:16, 106:17, 106:18, 117:13, 118:9, 119:3, 119:6, 119:9, 166:8, 167:25, 168:2, 170:4, 184:19, 185:15, 187:9, 187:20, 187:21, 188:23, 191:17, 191:19, 191:20, 192:20, 193:11, 208:5, 208:7, 215:4
**Catudal's** [3] - 20:9, 185:18, 190:23
**caused** [1] - 54:25

**cell** [4] - 96:15, 96:23, 146:25, 147:10
**center** [5] - 171:23, 172:4, 172:7, 172:13, 208:22
**Center** [1] - 2:4
**central** [2] - 85:1, 85:3
**cents** [2] - 178:20, 195:1
**certain** [21] - 21:18, 61:16, 63:11, 99:13, 100:7, 110:7, 111:24, 173:13, 173:14, 174:5, 177:4, 205:17
**certainly** [7] - 109:24, 176:19, 183:9, 192:5, 196:4, 202:4, 208:12
**certificates** [1] - 182:16
**certification** [1] - 182:21
**certify** [1] - 218:14
**cetera** [1] - 142:1
**challenge** [2] - 5:15, 8:17
**challenges** [1] - 67:18
**challenging** [1] - 165:20
**chance** [1] - 37:6
**change** [3] - 14:10, 22:8, 164:16
**changed** [1] - 60:6
**charge** [8] - 157:10, 161:24, 162:10, 162:12, 162:13, 162:16, 162:17, 214:25
**charges** [1] - 5:2
**charging** [2] - 217:15, 218:5
**chart** [13] - 14:3, 19:18, 20:5, 24:10, 169:8, 170:20, 170:23, 200:24, 201:5, 201:18, 201:19, 207:21, 207:22, 208:18, 210:2
**charts** [2] - 11:10, 18:23
**chat** [4] - 30:7, 30:8, 30:17, 97:3
**Chat** [1] - 97:7
**Chaucer** [3] - 184:5, 184:8, 184:10
**check** [6] - 22:1, 23:7, 87:6, 133:15, 169:16, 217:4

checked [1] - 190:14
chemistry [1] - 51:11
Chester [3] - 45:10, 80:21
chief [1] - 3:21
Chief [1] - 122:22
children'S [1] - 31:18
choices [1] - 113:7
choose [1] - 87:3
CHOP [6] - 58:2, 58:4, 58:5, 58:11, 58:13, 58:14
chose [1] - 110:24
chosen [2] - 15:18, 17:20
Chrome [3] - 155:13, 159:20
circumstances [1] - 62:9
circumstantial [4] - 100:23, 100:24, 101:3, 101:7
citizens [1] - 23:21
citizenship [1] - 23:19
City [2] - 56:13, 66:13
CIVIL [1] - 1:3
civil [10] - 22:21, 29:2, 39:21, 42:13, 42:16, 45:10, 66:13, 103:4, 104:1, 216:7
claim [6] - 6:6, 6:24, 103:15, 103:16, 165:13, 213:22
claims [3] - 64:25, 98:4, 103:9
clarification [1] - 35:22
clarify [1] - 59:3
clarity [1] - 136:23
class [11] - 61:19, 83:14, 173:11, 173:13, 173:15, 173:17, 173:21, 184:7, 184:11, 184:12
classes [11] - 51:14, 146:3, 149:20, 162:14, 172:19, 172:20, 173:10, 183:17, 183:18, 183:19, 184:3
clause [1] - 153:23
clear [11] - 5:12, 10:1, 16:8, 54:23, 115:20, 195:3, 195:9, 196:22, 197:8, 197:9, 198:6
clearly [1] - 6:15
CLERK [16] - 3:1, 22:11, 22:17, 24:6,

53:6, 66:9, 86:19, 92:25, 93:7, 93:22, 94:7, 94:12, 121:9, 122:12, 122:15, 142:19
client [3] - 3:22, 6:1, 44:8
clients [3] - 5:21, 5:25, 99:24
clients' [1] - 104:21
climate [1] - 212:17
close [27] - 26:21, 26:25, 27:15, 28:10, 28:15, 28:23, 31:14, 34:11, 35:5, 36:6, 38:1, 39:14, 46:15, 52:6, 53:17, 65:25, 70:11, 71:6, 71:9, 81:15, 102:13, 152:17, 153:16, 153:19, 153:24, 207:8, 207:9
closely [2] - 12:4, 37:10
closing [2] - 104:20, 104:22
co [1] - 46:20
co-workers [1] - 46:20
coat [1] - 101:1
codes [1] - 133:4
colleague [3] - 95:10, 118:7, 118:9
colleagues [1] - 44:5
collective [1] - 102:20
college [14] - 27:1, 31:15, 36:7, 46:16, 52:7, 68:15, 68:25, 71:10, 114:7, 162:2, 162:3, 162:4, 179:20, 209:18
College [8] - 111:16, 111:17, 162:2, 164:23, 174:17, 176:9, 176:15, 209:25
colleges [3] - 115:1, 161:25, 162:1
collegiality [1] - 12:19
column [2] - 56:7, 140:22
combined [1] - 133:12
comfortable [2] - 102:23, 102:24
coming [6] - 69:17, 116:9, 117:19, 120:15, 122:1, 135:7
Commanders [1] - 30:15
Commencing [1] - 1:10

commitment [1] - 92:22
commits [1] - 182:10
committee [1] - 182:11
committees [4] - 111:24, 114:4, 182:8, 182:9
common [5] - 23:12, 62:24, 99:10, 110:15, 181:6
communicate [5] - 88:22, 96:18, 96:19, 96:22, 96:25
Communication [1] - 204:19
community [1] - 85:1
companies [1] - 32:2
company [13] - 32:19, 32:20, 41:17, 55:5, 77:16, 77:19, 78:3, 78:4, 78:7, 78:16, 78:20, 78:21
comparable [2] - 174:21, 181:2
comparator [16] - 4:15, 5:1, 5:5, 7:9, 7:11, 8:5, 14:2, 14:16, 14:19, 14:21, 16:1, 16:12, 16:24, 17:21, 119:4
comparators [18] - 5:8, 7:15, 7:16, 7:25, 8:4, 11:4, 13:25, 14:7, 15:11, 15:13, 15:16, 15:18, 21:13, 21:24, 96:2, 113:9, 166:5, 166:7
compare [8] - 14:9, 16:17, 108:23, 113:15, 116:19, 118:12, 170:25, 171:5
compared [5] - 15:19, 109:7, 118:7, 118:20, 173:25
comparing [3] - 17:23, 17:25, 117:9
comparison [1] - 116:13
comparisons [2] - 19:10, 166:4
compensated [2] - 113:12, 164:25
compensation [22] - 113:18, 113:21, 113:24, 134:1, 134:2, 140:1, 140:17, 141:11, 164:1, 165:5, 165:8,

165:9, 165:17, 196:24, 197:3, 197:13, 198:3, 198:4, 198:12, 199:1, 199:3
compile [1] - 152:17
complain [2] - 73:8, 73:23
complaint [1] - 78:12
complaints [4] - 60:17, 64:15, 78:25, 80:2
complete [2] - 23:18, 85:20
completed [3] - 11:11, 24:14, 90:20
compliance [4] - 28:20, 32:17, 41:13, 79:12
compliant [1] - 32:21
composition [1] - 183:3
comprehensive [1] - 196:23
compression [1] - 195:25
computer [11] - 1:22, 96:24, 104:25, 130:1, 130:4, 130:15, 130:22, 139:4, 143:9, 148:6
computer-aided [1] - 1:22
computers [1] - 96:16
computing [1] - 116:10
concern [1] - 10:9
concerned [2] - 5:20, 75:13
concession [1] - 5:14
conclude [1] - 101:3
concluded [2] - 88:8, 90:17
conclusion [3] - 98:4, 99:14, 99:15
condition [1] - 100:22
conditions [10] - 6:10, 47:1, 47:7, 95:17, 107:9, 181:8, 181:10, 181:23, 182:2, 193:10
conduct [2] - 96:5, 111:3, 111:23, 113:8, 116:20, 118:2, 118:5, 118:22, 216:1
conference [9] - 4:10, 7:8, 98:9, 98:15, 98:16, 134:19, 135:9, 217:15, 218:5

conferences [2] - 98:11, 98:14
conferred [1] - 11:2
confines [1] - 98:3
confirm [5] - 87:12, 141:4, 141:5, 141:8, 142:3
confuse [1] - 17:2
connected [1] - 25:9
connection [13] - 12:20, 24:20, 24:23, 25:3, 28:20, 32:17, 41:13, 53:10, 57:24, 68:2, 79:12, 85:13, 199:7
consider [13] - 82:7, 98:16, 99:11, 100:9, 101:5, 101:16, 103:20, 116:13, 118:6, 119:5, 119:6, 119:7, 119:8
consideration [3] - 21:1, 21:4, 86:5
considered [4] - 22:20, 96:1, 101:24
considering [1] - 103:15
considers [3] - 110:20, 110:22, 116:12
consistent [2] - 8:23, 196:22
consists [1] - 98:20
constraints [1] - 173:15
construed [1] - 5:14
consult [1] - 97:23
contact [3] - 93:12, 94:2, 145:1
contacted [7] - 147:9, 152:15, 152:21, 153:4, 153:7, 153:15, 153:19
contained [3] - 133:23, 153:4, 153:7
containing [2] - 136:1, 137:6
contested [1] - 50:21
context [5] - 6:21, 13:21, 29:12, 161:22, 210:16
continue [5] - 8:10, 88:13, 88:14, 120:19, 189:8
continued [1] - 19:15
CONTINUED [1] - 2:1
contours [1] - 128:2
contract [8] - 48:9, 48:12, 48:14, 48:22, 82:6, 82:14, 83:1,

184:14
**contracts** [2] - 57:4, 57:10
**contradicted** [1] - 101:22
**control** [6] - 99:16, 185:1, 185:2, 206:4, 206:10, 206:12
**controlled** [1] - 136:15
**convenience** [2] - 122:2
**conversation** [1] - 88:15
**conversations** [3] - 36:17, 39:23, 89:10
**copies** [1] - 148:25
**copy** [4] - 90:13, 127:12, 157:25, 158:1
**corporate** [3] - 188:11, 189:13, 198:7
**correct** [159] - 14:25, 31:16, 33:21, 37:19, 55:6, 87:13, 91:5, 91:6, 91:7, 91:10, 91:13, 91:16, 91:19, 91:22, 92:4, 119:3, 121:22, 121:24, 122:23, 122:24, 123:2, 123:4, 123:5, 123:21, 123:24, 123:25, 124:4, 124:5, 124:6, 124:9, 124:10, 124:13, 124:18, 124:19, 124:21, 124:22, 124:23, 124:24, 124:25, 125:3, 125:4, 125:16, 125:25, 126:2, 126:3, 126:6, 126:11, 126:12, 126:14, 127:1, 127:2, 127:4, 128:24, 129:17, 129:19, 129:20, 129:24, 130:2, 130:6, 130:8, 130:22, 132:12, 136:12, 136:13, 136:19, 136:20, 136:23, 137:19, 137:20, 139:16, 139:19, 140:9, 141:18, 141:23, 143:6, 143:9, 143:21, 144:3, 144:4, 144:6, 144:21, 145:17, 146:3, 146:23,

147:1, 147:17, 147:25, 150:21, 151:22, 153:13, 154:4, 154:10, 154:21, 155:9, 155:10, 156:9, 156:20, 156:23, 157:13, 158:18, 161:4, 161:5, 161:7, 161:12, 161:20, 163:3, 163:6, 163:13, 163:14, 164:2, 164:4, 164:7, 164:14, 164:16, 166:8, 168:6, 169:13, 169:21, 169:22, 169:25, 170:2, 170:3, 170:9, 170:23, 170:24, 171:15, 171:16, 172:2, 172:3, 172:15, 173:3, 174:10, 178:21, 182:21, 182:24, 185:23, 186:4, 186:23, 191:6, 191:13, 192:8, 192:10, 192:24, 193:19, 194:21, 196:21, 197:6, 198:4, 201:11, 201:17, 202:11, 202:13, 202:14, 208:2, 208:24, 213:1, 215:3, 216:17, 218:14
**correctly** [2] - 37:15, 98:12
**corridor** [1] - 89:2
**cost** [1] - 177:19
**cost-of-living** [1] - 177:19
**Counsel** [2] - 120:9, 150:9
**counsel** [32] - 3:21, 8:14, 8:22, 9:11, 9:15, 11:5, 89:12, 104:11, 104:14, 129:7, 129:9, 130:3, 130:20, 131:16, 131:24, 132:17, 133:3, 134:9, 134:12, 134:15, 134:22, 135:25, 136:8, 137:5, 145:11, 146:22, 147:22, 152:2, 152:3, 158:15, 159:5
**count** [1] - 177:14
**counter** [1] - 23:3

**county** [1] - 63:10
**County** [1] - 80:22
**couple** [6] - 40:21, 45:9, 177:23, 190:6, 191:20, 203:12
**course** [14] - 32:21, 42:24, 95:1, 98:13, 102:11, 102:15, 108:11, 124:15, 168:10, 173:18, 180:9, 180:25, 183:14, 211:12
**courses** [16] - 172:23, 172:24, 179:23, 180:7, 180:12, 180:17, 180:19, 182:23, 182:25, 183:4, 183:13, 184:2, 205:1, 205:5
**court** [6] - 4:3, 62:24, 80:21, 89:1, 125:6, 125:7
**COURT** [540] - 1:1, 3:1, 3:2, 3:12, 3:19, 3:23, 4:1, 4:4, 4:7, 5:18, 8:18, 8:25, 9:5, 9:14, 9:23, 10:5, 10:15, 10:19, 11:1, 11:7, 11:21, 12:15, 12:22, 13:2, 13:4, 13:9, 13:12, 13:19, 14:4, 14:24, 15:1, 15:10, 15:21, 16:4, 16:8, 16:15, 16:19, 17:5, 17:8, 17:11, 17:15, 17:17, 18:2, 18:5, 18:11, 18:14, 19:4, 19:12, 19:23, 20:7, 20:14, 20:20, 21:3, 21:9, 21:21, 22:8, 22:10, 22:12, 22:18, 24:7, 28:18, 30:21, 31:11, 31:13, 31:17, 31:22, 32:4, 32:7, 32:12, 32:15, 32:24, 33:3, 33:11, 33:17, 33:21, 34:4, 34:7, 34:10, 34:14, 34:16, 34:19, 34:22, 35:1, 35:3, 35:8, 35:10, 35:13, 35:16, 35:18, 35:21, 36:6, 36:9, 36:11, 36:13, 36:15, 36:17, 36:20, 36:24, 37:2, 37:6, 37:17, 37:20, 37:22, 37:24, 38:4, 38:7, 38:10, 38:14, 38:16, 38:19, 38:22, 39:1, 39:3, 39:7, 39:10,

39:13, 39:19, 39:21, 39:23, 40:2, 40:4, 40:6, 40:10, 40:13, 40:16, 40:19, 40:22, 40:24, 41:1, 41:12, 41:16, 41:22, 42:2, 42:4, 42:8, 42:10, 42:12, 42:14, 42:18, 42:20, 42:24, 43:2, 43:5, 43:9, 43:12, 43:15, 43:18, 43:23, 44:6, 44:10, 44:12, 44:16, 44:19, 44:21, 45:6, 45:8, 45:16, 45:18, 45:20, 45:22, 46:1, 46:3, 46:5, 46:10, 46:13, 46:22, 46:25, 47:3, 47:8, 47:11, 47:15, 47:19, 47:21, 47:25, 48:4, 48:6, 48:14, 48:17, 48:23, 49:1, 49:6, 49:11, 49:18, 49:25, 50:4, 50:11, 50:14, 50:23, 51:7, 51:10, 51:12, 51:15, 51:21, 52:2, 52:5, 52:9, 52:13, 52:15, 52:17, 52:20, 52:22, 52:25, 53:5, 53:7, 53:14, 53:18, 53:21, 53:23, 54:1, 54:4, 54:8, 54:10, 54:14, 54:16, 54:20, 55:2, 55:7, 55:10, 55:12, 55:17, 55:20, 55:23, 55:25, 56:2, 56:8, 56:10, 56:14, 56:17, 56:21, 56:23, 57:3, 57:8, 57:11, 57:16, 57:19, 57:21, 58:4, 58:9, 58:13, 58:16, 58:19, 58:22, 59:1, 59:5, 59:8, 59:11, 59:16, 59:21, 59:24, 60:16, 60:23, 61:2, 61:6, 61:9, 61:21, 61:23, 62:3, 62:13, 62:16, 62:20, 63:6, 63:18, 63:21, 64:5, 64:8, 64:18, 64:22, 64:24, 65:3, 65:13, 65:20, 65:23, 66:4, 66:6, 66:10, 66:12, 66:15, 66:18, 66:22, 66:25, 67:4, 67:9, 67:12, 67:14, 67:16, 67:19, 67:23, 68:5, 68:7, 68:10, 68:12, 68:16, 68:19, 68:23, 69:2, 69:7, 69:11, 69:14,

69:25, 70:3, 70:7, 70:10, 70:15, 70:17, 70:19, 70:23, 71:1, 71:3, 71:8, 71:12, 71:16, 71:18, 72:5, 72:7, 72:16, 72:24, 73:3, 73:5, 73:8, 73:11, 73:14, 73:19, 73:23, 74:1, 74:6, 74:8, 74:12, 74:16, 74:20, 74:24, 75:3, 75:6, 75:9, 75:14, 75:18, 75:21, 75:23, 76:1, 76:3, 76:5, 76:8, 76:13, 76:15, 76:17, 76:19, 76:22, 77:5, 77:7, 77:9, 77:14, 77:23, 78:1, 78:4, 78:6, 78:9, 78:12, 78:15, 78:18, 78:20, 78:24, 79:3, 79:5, 79:9, 79:11, 79:15, 79:17, 79:19, 79:23, 80:1, 80:5, 80:8, 80:13, 80:18, 80:20, 80:25, 81:3, 81:5, 81:7, 81:11, 81:17, 81:22, 82:1, 82:3, 82:8, 82:11, 82:18, 82:22, 83:4, 83:6, 83:10, 83:17, 83:19, 83:23, 84:2, 84:5, 84:16, 84:18, 84:21, 84:24, 85:2, 85:6, 85:9, 85:12, 85:16, 85:21, 85:25, 86:7, 86:10, 86:12, 86:14, 86:18, 86:21, 86:25, 87:8, 87:12, 87:15, 87:18, 88:2, 88:9, 89:12, 89:14, 89:20, 89:23, 89:25, 90:6, 90:14, 90:16, 90:25, 91:3, 91:9, 91:12, 91:15, 91:18, 91:21, 91:24, 92:2, 92:4, 92:6, 92:10, 92:12, 93:3, 93:6, 93:10, 93:19, 93:25, 94:9, 94:11, 94:14, 110:18, 112:23, 112:25, 118:25, 119:2, 119:8, 119:12, 119:18, 119:21, 119:24, 120:3, 120:5, 120:8, 120:14, 120:17, 120:22, 120:25, 121:3, 121:6, 121:11, 122:9, 127:18, 127:20,

127:22, 128:1, 131:11, 134:18, 134:20, 135:3, 135:5, 135:7, 135:10, 135:13, 135:15, 135:17, 135:23, 136:5, 136:11, 136:14, 136:18, 136:21, 137:2, 137:4, 137:11, 137:14, 137:25, 138:3, 142:10, 142:14, 142:16, 142:22, 146:11, 150:7, 150:10, 150:12, 150:14, 150:16, 150:18, 150:20, 150:24, 151:2, 151:5, 151:7, 157:5, 158:5, 159:14, 159:23, 160:1, 160:5, 160:8, 160:11, 160:13, 160:15, 160:20, 163:17, 163:19, 169:14, 211:1, 213:16, 213:20, 215:8, 215:11, 215:14, 215:17, 216:12, 216:17, 216:19, 216:23, 217:6, 217:9, 217:12, 218:9

**Court** [17] - 1:20, 4:9, 4:14, 4:25, 9:8, 9:13, 10:12, 11:5, 23:16, 29:4, 62:24, 75:16, 95:11, 99:7, 108:15, 110:3, 127:19

**Court's** [5] - 4:16, 5:15, 9:10, 100:2, 110:5

**courthouse** [1] - 89:6

**Courthouse** [1] - 1:8

**courtroom** [14] - 3:6, 26:16, 30:11, 63:2, 94:8, 94:13, 98:3, 99:5, 99:8, 101:1, 119:18, 119:21, 121:10, 160:6

**covered** [2] - 19:2, 101:1

**crazy** [2] - 43:8, 45:14

**create** [1] - 151:24

**created** [4] - 140:3, 140:16, 151:24, 152:1

**creates** [1] - 5:3

**creative** [1] - 184:3

**creator** [1] - 126:17

**credentials** [1] - 192:18

**credibility** [2] - 101:11, 101:13

**criminal** [2] - 29:2, 104:1

**Criminal** [1] - 162:5

**criteria** [2] - 64:16, 107:19

**critical** [2] - 88:20, 88:24

**cross** [7] - 104:12, 104:14, 109:22, 131:11, 157:5, 180:8, 216:17

**CROSS** [3] - 131:12, 137:15, 157:6

**cross-examination** [1] - 109:22

**CROSS-EXAMINATION** [1] - 131:12

**cross-examine** [2] - 104:12, 104:14

**cross-listed** [1] - 180:8

**CRR** [2] - 1:19, 218:18

**CSL** [1] - 32:19

**CSR** [1] - 218:18

**curious** [1] - 190:4

**current** [7] - 50:9, 50:10, 52:12, 52:13, 100:22, 105:22, 106:21

**cut** [3] - 210:19, 211:11, 211:12

**cycle** [1] - 177:16

## D

**dad** [5] - 53:13, 53:21, 53:22, 54:12, 61:19

**damages** [15] - 5:9, 7:12, 7:13, 7:20, 8:6, 10:19, 10:21, 10:23, 12:1, 14:10, 21:12, 96:2, 106:8, 109:14, 118:3

**data** [13] - 125:12, 125:21, 126:7, 129:8, 130:21, 130:23, 130:25, 131:21, 132:5, 143:8, 143:12, 197:3

**database** [14] - 123:20, 125:24, 132:4, 133:3, 134:23, 136:1, 136:6, 136:7,
136:15, 137:2, 137:3, 137:6, 141:4, 144:10

**databases** [2] - 110:8, 143:9

**date** [3] - 90:4, 194:24, 202:13

**dated** [1] - 151:17

**dates** [1] - 132:21

**daughter** [3] - 58:1, 61:10, 65:8

**daughter's** [2] - 61:8, 65:11

**DAY** [1] - 1:5

**DAY*** [1] - 215:10

**days** [7] - 105:16, 130:10, 138:7, 140:5, 140:10, 153:11, 153:12

**deal** [4] - 39:3, 40:24, 173:16, 215:23

**dealer** [1] - 75:24

**dealing** [1] - 18:5

**dean** [23] - 18:21, 113:5, 114:7, 117:23, 162:1, 171:22, 171:24, 172:9, 189:4, 192:17, 198:2, 198:25, 205:7, 210:6, 210:7, 210:18, 212:10, 212:11, 212:23, 213:7, 214:12, 214:25

**dean's** [2] - 208:23, 211:11

**deans** [2] - 210:9, 214:10

**death** [3] - 62:7, 62:11, 76:10

**decade** [1] - 115:15

**December** [6] - 185:13, 188:8, 190:15, 190:20, 193:13, 193:14

**decide** [59] - 5:7, 32:25, 34:17, 35:19, 36:21, 37:18, 38:11, 38:17, 39:8, 39:25, 41:2, 42:5, 43:3, 44:17, 45:23, 47:9, 47:17, 49:9, 51:17, 54:5, 55:21, 56:24, 58:24, 59:14, 60:2, 60:8, 60:12, 60:14, 60:24, 62:17, 64:19, 66:19, 68:20, 69:9, 70:4, 70:20, 74:2, 75:10, 76:6, 78:21,
80:6, 81:1, 82:19, 84:3, 86:8, 90:9, 94:18, 94:21, 97:21, 98:1, 101:8, 101:10, 116:17, 116:18, 116:20, 118:12, 119:11, 214:13, 214:15

**decided** [6] - 14:11, 60:9, 64:2, 77:17, 136:8, 205:7

**decides** [2] - 11:4, 23:15

**deciding** [2] - 101:9, 101:15

**decision** [12] - 4:16, 42:17, 42:18, 57:7, 62:2, 65:9, 68:24, 69:10, 77:4, 99:6, 99:9, 99:21

**decision-making** [1] - 57:7

**decisions** [7] - 44:3, 44:9, 44:14, 64:16, 95:1, 95:3, 118:18

**declaration** [10] - 150:2, 150:21, 150:22, 151:17, 152:9, 152:23, 153:1, 153:15, 158:1, 158:2

**declare** [1] - 151:21

**decorated** [1] - 117:19

**deduction** [1] - 20:10

**deemed** [1] - 205:17

**defalcations** [3] - 5:25, 6:18, 8:9

**DEFENDANT** [1] - 2:3

**defendant** [15] - 3:14, 24:23, 33:6, 53:11, 57:24, 62:7, 68:3, 103:5, 103:12, 103:14, 104:5, 104:12, 104:13, 135:24, 137:5

**defendant's** [2] - 6:18, 218:1

**defendants** [3] - 6:12, 18:15, 42:21

**defender** [1] - 39:17

**defense** [8] - 45:18, 45:19, 59:19, 93:16, 94:6, 104:15, 110:18, 216:24

**defenses** [4] - 6:21, 6:22, 98:5, 106:5

**definite** [1] - 47:12

**definitely** [4] - 168:13, 181:3, 182:18, 212:9

**degree** [3] - 63:3,
184:7, 184:22

**Delaware** [1] - 39:18

**delete** [1] - 128:17

**deliberate** [4] - 66:15, 96:7, 102:21, 104:24

**deliberations** [2] - 98:6, 102:13

**deliver** [1] - 173:21

**demand** [1] - 116:6

**demanding** [1] - 114:25

**demands** [1] - 113:13

**Democracy** [1] - 23:7

**demonstrate** [2] - 95:8, 95:18

**demonstrated** [1] - 95:14

**denied** [6] - 37:20, 50:25, 51:19, 65:19, 65:20, 77:5

**denies** [1] - 96:4

**denying** [1] - 98:16

**Department** [89] - 18:22, 106:21, 107:21, 108:21, 108:24, 108:25, 109:4, 111:5, 111:6, 111:17, 111:18, 113:5, 113:19, 114:7, 114:8, 117:15, 117:21, 117:23, 123:23, 125:14, 132:10, 136:2, 137:8, 139:14, 141:1, 141:2, 141:10, 142:1, 142:4, 161:2, 161:3, 161:11, 161:12, 161:14, 161:17, 161:22, 162:5, 162:6, 162:23, 162:24, 163:9, 163:10, 163:25, 164:9, 164:19, 164:22, 164:23, 164:25, 165:2, 165:5, 165:6, 165:8, 165:10, 165:13, 165:19, 166:3, 176:15, 182:5, 189:24, 195:23, 200:3, 200:8, 200:15, 200:18, 201:16, 201:18, 201:20, 201:21, 204:16, 204:19, 204:22, 206:2, 206:12, 209:10, 209:11, 209:14, 209:17,

209:24, 212:5, 213:7, 214:5, 214:6, 214:10, 214:13, 214:18, 214:24, 215:2

**department** [104] - 3:18, 14:17, 15:6, 15:18, 16:11, 17:22, 18:20, 51:19, 52:17, 68:7, 77:21, 106:10, 106:19, 106:23, 107:1, 107:4, 107:6, 107:11, 107:17, 107:18, 107:22, 107:24, 109:16, 112:14, 116:22, 126:7, 126:16, 131:24, 133:4, 134:3, 139:21, 142:5, 144:9, 146:7, 149:23, 157:11, 161:15, 161:19, 162:9, 162:12, 162:24, 167:13, 168:9, 171:7, 171:11, 171:17, 172:17, 174:5, 174:13, 176:21, 178:23, 178:25, 179:2, 179:3, 179:14, 179:16, 180:22, 180:23, 181:5, 181:10, 181:20, 181:21, 181:22, 182:4, 182:7, 182:10, 182:24, 182:25, 183:2, 183:13, 184:21, 184:22, 185:4, 185:25, 186:1, 186:6, 186:8, 189:23, 189:24, 190:9, 192:25, 193:2, 193:12, 194:3, 194:7, 195:5, 195:17, 196:3, 197:23, 198:23, 199:4, 199:17, 199:24, 201:14, 201:25, 207:23, 211:17, 211:19, 211:22, 214:3, 214:17

**departments** [9] - 129:5, 162:3, 162:4, 162:8, 164:24, 180:8, 184:19, 204:21, 209:18

**deposition** [12] - 19:19, 121:17, 125:11, 127:16,

127:23, 127:25, 128:9, 148:10, 151:12, 185:13, 188:8

**depositions** [1] - 143:5

**depth** [1] - 39:20

**DEPUTY** [14] - 3:1, 22:11, 22:17, 24:6, 66:9, 92:25, 93:7, 93:22, 94:7, 94:12, 121:9, 122:12, 122:15, 142:19

**Deputy** [1] - 39:18

**describe** [1] - 52:18

**describes** [1] - 8:22

**description** [1] - 22:23

**deserves** [2] - 99:13, 102:5

**design** [4] - 173:11, 173:18, 173:20

**designate** [1] - 60:9

**desired** [1] - 50:8

**desperately** [1] - 197:24, 212:22

**detail** [5] - 49:2, 133:16, 133:24, 156:5, 157:17

**details** [7] - 31:22, 48:22, 54:23, 55:12, 55:18, 132:14, 153:4

**determination** [12] - 6:3, 6:4, 6:19, 6:22, 7:12, 8:1, 8:3, 9:8, 10:16, 20:8, 21:12, 60:14

**determine** [5] - 44:10, 83:16, 84:13, 88:12, 111:2

**determined** [10] - 7:10, 14:7, 21:13, 62:11, 63:24, 83:14, 84:14, 95:12, 105:25, 206:8

**determines** [2] - 16:24, 23:14

**determining** [5] - 60:18, 83:12, 96:2, 103:18, 162:21

**Detre** [1] - 32:10

**develops** [1] - 112:15

**device** [1] - 96:24

**devices** [2] - 96:16, 96:24

**dictionaries** [1] - 97:23

**differ** [1] - 217:22

**difference** [7] - 106:5, 106:6, 186:11, 186:19, 204:2,

211:8, 217:25

**differences** [13] - 95:19, 115:24, 116:3, 174:16, 174:20, 174:21, 174:23, 190:5, 195:18, 205:3, 217:17, 217:23, 218:4

**different** [25] - 6:16, 15:3, 15:4, 17:11, 28:6, 84:21, 95:10, 105:4, 110:12, 117:4, 117:17, 118:14, 118:15, 162:1, 162:4, 174:14, 182:10, 184:1, 184:5, 187:7, 190:2, 204:14, 210:9, 211:23

**differential** [5] - 6:24, 7:2, 14:9, 17:24, 95:21

**differentials** [6] - 7:15, 7:19, 7:23, 22:5, 78:13, 86:1

**differently** [5] - 6:8, 15:15, 80:2, 103:10, 178:5

**difficult** [4] - 29:22, 37:11, 102:16, 165:20

**difficulty** [1] - 217:17

**dire** [2] - 62:6, 92:20

**direct** [10] - 100:14, 100:15, 100:20, 100:21, 101:7, 157:25, 199:7, 217:1, 217:2, 217:3

**DIRECT** [2] - 121:12, 142:23

**directing** [1] - 4:14

**direction** [2] - 162:12, 198:22

**directions** [1] - 198:25

**directly** [1] - 48:8

**director** [20] - 18:21, 71:15, 71:19, 126:8, 126:10, 157:10, 161:9, 161:13, 170:18, 171:22, 172:4, 172:6, 172:12, 200:20, 201:1, 208:21, 209:4, 209:5, 213:10, 214:2

**Director** [2] - 143:14, 171:2

**disability** [3] - 29:21, 63:18, 64:9

**disabled** [1] - 65:1

**disappointed** [1] - 109:15

**discharged** [1] - 23:22

**discipline** [1] - 181:21

**disciplines** [1] - 174:23

**discovery** [4] - 5:24, 6:18, 9:9, 127:21

**discrepancies** [2] - 191:6, 206:3

**discrete** [1] - 14:14

**discriminate** [1] - 64:11

**discriminating** [3] - 28:11, 41:25, 66:1

**discrimination** [7] - 27:16, 28:15, 41:25, 63:18, 64:9, 79:20, 95:7

**discriminatory** [1] - 63:14

**discuss** [5] - 7:9, 14:5, 96:8, 146:19, 215:20

**discussed** [3] - 21:15, 37:15, 186:5

**discussion** [6] - 11:9, 79:23, 80:11, 119:1, 119:17, 155:8

**discussions** [5] - 80:11, 80:13, 82:11, 82:18, 96:12

**disentangle** [2] - 200:23, 200:25

**dismissed** [2] - 80:23, 93:3

**disorienting** [1] - 43:8

**display** [1] - 192:11

**displayed** [1] - 134:6

**dispute** [2] - 9:9, 55:13

**disregard** [2] - 99:4, 100:9

**disregarding** [1] - 29:13

**distinction** [3] - 101:6, 112:17, 167:24

**distinguish** [1] - 183:15

**Distinguish** [1] - 167:14

**distinguished** [3] - 117:5, 167:24, 194:4

**Distinguished** [3] - 112:10, 167:6, 167:8

**DISTRICT** [2] - 1:1, 1:2

**District** [1] - 81:19

**district** [1] - 81:21

**dive** [1] - 13:22

**divided** [1] - 45:3

**doc** [1] - 138:21

**docket** [1] - 4:24

**doctor** [3] - 185:9

**document** [10] - 127:24, 138:14, 138:17, 138:18, 139:3, 150:24, 198:10, 198:18, 217:24, 218:3

**documents** [14] - 5:11, 88:14, 98:21, 110:7, 116:22, 123:11, 123:19, 124:2, 126:14, 126:17, 197:17, 198:20, 199:8, 199:10

**DOD** [3] - 59:20, 63:10, 63:24

**dollar** [2] - 109:14, 178:13

**dollars** [3] - 178:20, 195:1, 210:20

**dominated** [1] - 77:1

**done** [12] - 8:18, 24:16, 39:21, 87:20, 92:19, 93:3, 107:8, 131:18, 180:5, 186:16, 186:17, 211:15

**Donna** [1] - 26:5

**Doreen** [2] - 26:8, 116:23

**double** [3] - 87:6, 133:15, 217:4

**double-check** [2] - 133:15, 217:4

**doubt** [1] - 103:25

**down** [28] - 13:23, 19:15, 24:4, 24:12, 29:17, 61:16, 63:4, 92:24, 102:10, 114:13, 114:17, 115:18, 117:12, 139:1, 139:8, 154:6, 164:5, 169:24, 171:19, 186:10, 189:7, 189:8, 197:9, 197:10, 201:14, 203:3, 205:21, 211:2

**downloaded** [1] - 149:3

**Dr** [78] - 18:22, 21:17, 22:25, 108:21, 109:5, 109:6, 109:20, 111:5, 111:21, 112:11, 112:15, 113:4, 114:4, 114:8, 116:13, 116:23,

116:24, 116:25, 117:3, 117:6, 117:9, 117:12, 117:13, 117:15, 117:17, 117:22, 118:1, 118:2, 118:7, 118:11, 118:12, 118:13, 132:17, 133:7, 134:9, 134:12, 134:15, 160:2, 160:13, 160:22, 160:24, 163:13, 173:25, 174:1, 180:5, 191:20, 192:14, 192:19, 194:17, 194:18, 194:21, 200:21, 203:21, 204:12, 204:13, 204:15, 205:3, 205:10, 205:11, 205:12, 207:5, 207:6, 207:9, 208:14, 208:15, 209:3, 213:3, 217:1, 217:2

**dramatic** [1] - 63:2
**Drexel** [156] - 3:3, 3:14, 3:18, 3:21, 5:10, 6:24, 8:2, 8:9, 8:14, 10:4, 12:16, 12:20, 19:20, 23:1, 23:2, 24:23, 53:11, 53:13, 53:15, 53:19, 53:23, 54:2, 54:12, 57:25, 58:3, 58:5, 58:12, 58:13, 58:17, 58:20, 59:4, 59:13, 61:8, 61:11, 65:8, 65:10, 65:15, 68:3, 68:10, 68:13, 95:12, 95:18, 95:24, 96:3, 96:4, 105:22, 105:25, 106:4, 106:7, 108:7, 108:11, 108:12, 108:14, 108:17, 109:1, 109:20, 110:5, 110:7, 110:9, 110:19, 110:20, 110:22, 111:6, 111:12, 111:13, 111:16, 111:22, 112:1, 112:4, 112:7, 112:9, 112:13, 112:18, 113:17, 113:18, 114:6, 114:12, 115:21, 116:5, 116:7, 116:11, 116:16, 116:17, 116:24,

117:17, 117:19, 117:24, 118:10, 120:1, 120:2, 122:22, 123:4, 123:19, 124:23, 125:23, 126:5, 130:18, 134:22, 135:25, 137:6, 140:14, 143:8, 143:15, 143:19, 144:9, 144:10, 144:12, 144:25, 145:12, 146:22, 147:22, 152:17, 154:7, 154:8, 154:25, 155:2, 161:4, 161:25, 163:1, 167:2, 177:4, 177:21, 178:12, 182:18, 188:19, 189:11, 189:14, 189:23, 190:13, 191:12, 191:16, 191:21, 192:5, 192:7, 192:15, 193:15, 195:13, 196:6, 196:22, 197:4, 198:11, 199:23, 199:25, 201:7, 202:16, 204:24, 205:17, 205:18, 209:16, 210:8, 210:16
**DREXEL** [1] - 1:5
**Drexel's** [17] - 20:9, 76:25, 108:4, 110:8, 111:2, 113:8, 116:20, 118:2, 118:5, 118:17, 118:22, 118:24, 122:2, 122:4, 188:11, 189:13, 198:7
**drive** [3] - 105:1, 130:14, 132:1
**driven** [1] - 130:12
**drivers** [6] - 83:14, 83:17, 83:18, 83:20, 83:22, 83:23
**drops** [1] - 101:2
**drug** [1] - 75:24
**due** [1] - 195:10
**during** [29] - 7:8, 55:7, 88:20, 94:23, 95:1, 96:6, 98:7, 102:10, 102:12, 102:15, 103:2, 111:9, 113:1, 128:22, 170:5, 170:8, 170:11, 170:12, 170:16,

174:11, 186:5, 187:4, 192:8, 194:19, 200:17, 200:19, 209:16, 210:8, 215:19
**duties** [3] - 161:17, 161:21, 194:6
**duty** [2] - 23:19, 23:22

## E

**e-mail** [18] - 13:12, 13:13, 13:17, 16:9, 16:19, 97:1, 127:3, 127:11, 127:13, 128:7, 128:13, 148:25, 149:11, 149:15, 149:17, 149:21, 149:25, 152:6
**e-mailed** [2] - 126:25, 128:21
**e-mails** [3] - 128:17, 128:20, 149:10
**Eagles** [1] - 30:15
**early** [1] - 105:9
**earning** [2] - 112:6, 112:14
**earnings** [2] - 7:1, 95:21
**easier** [2] - 43:8, 169:19
**EASTERN** [1] - 1:2
**Eastern** [2] - 36:12, 195:14
**edited** [6] - 152:8, 155:12, 155:16, 155:17, 155:18, 159:19
**editing** [1] - 155:19
**edits** [1] - 152:8
**education** [1] - 38:10
**EEO** [1] - 64:15
**effect** [5] - 19:21, 65:10, 65:11, 77:1, 202:2
**effects** [3] - 76:13, 200:4, 201:15
**effort** [8] - 6:9, 10:9, 23:12, 95:16, 107:8, 122:1, 180:24, 180:25
**eight** [1] - 177:21
**either** [9] - 29:3, 54:5, 62:16, 73:23, 97:11, 101:7, 160:14, 183:11, 199:12
**electronic** [2] - 96:15, 97:25
**electronically** [2] -

96:20, 96:25
**elementary** [2] - 35:15, 36:3
**elevator** [2] - 63:4, 97:9
**Elizabeth** [1] - 209:3
**Elizbeth** [1] - 25:25
**elsewhere** [3] - 190:12, 192:16, 212:21
**emeritus** [4] - 170:6, 185:19, 185:20, 185:22
**employed** [16] - 26:22, 26:25, 28:24, 31:15, 34:11, 35:6, 36:7, 38:2, 39:15, 46:16, 51:5, 52:6, 58:14, 70:12, 71:9, 81:15
**employee** [10] - 6:7, 24:24, 27:24, 28:2, 57:25, 73:5, 78:16, 95:14, 156:9, 182:1
**employees** [28] - 27:4, 27:11, 38:23, 40:17, 43:24, 44:22, 48:1, 48:9, 50:3, 52:11, 59:17, 64:14, 71:13, 72:21, 74:9, 77:12, 77:17, 78:10, 79:7, 83:8, 84:19, 84:22, 85:6, 96:1, 123:19, 132:6, 152:18, 157:24
**employer** [7] - 23:2, 27:18, 27:25, 28:3, 68:3, 88:22, 105:22
**employers** [1] - 216:4
**employment** [2] - 57:13, 63:12
**enacted** [1] - 95:7
**encountered** [1] - 29:14
**end** [23] - 11:9, 17:20, 24:8, 25:11, 58:8, 63:11, 98:6, 102:21, 105:8, 105:9, 113:7, 118:3, 118:16, 150:5, 150:8, 151:16, 172:8, 174:24, 175:3, 194:25, 206:19, 216:7
**END** [1] - 215:10
**ended** [8] - 63:22, 64:2, 105:10, 128:23, 128:25, 129:9, 129:10, 153:22
**endemic** [1] - 61:18

**ends** [4] - 20:5, 20:6, 119:17, 135:9
**engage** [1] - 12:9
**engaged** [1] - 60:17
**engineer** [1] - 76:25
**engineering** [4] - 53:16, 111:14, 116:7, 205:19
**English** [52] - 3:17, 3:18, 106:10, 106:17, 109:16, 111:6, 111:18, 111:20, 123:23, 125:15, 132:11, 136:2, 137:8, 139:14, 139:21, 161:2, 161:3, 161:15, 162:7, 162:15, 162:25, 163:1, 163:4, 163:5, 164:1, 164:10, 164:19, 164:24, 166:3, 172:22, 174:13, 174:15, 176:13, 176:15, 179:12, 179:15, 179:19, 179:23, 180:11, 180:13, 180:16, 180:17, 180:18, 182:5, 182:17, 183:25, 184:1, 204:16, 204:22, 212:19
**enter** [3] - 4:16, 22:16, 118:4
**entered** [2] - 4:20, 123:17
**enterprise** [1] - 195:7
**enters** [3] - 93:21, 94:13, 121:10
**entire** [3] - 17:22, 170:16, 192:5
**entitled** [2] - 5:8, 218:15
**entries** [2] - 4:24, 138:23
**entry** [5] - 4:21, 5:15, 112:5, 116:9, 186:14
**envision** [1] - 11:3
**Equal** [19] - 6:6, 10:4, 23:3, 32:22, 41:22, 85:21, 95:6, 95:12, 95:25, 96:4, 105:23, 105:25, 108:4, 108:8, 108:16, 109:2, 110:5, 116:16
**equal** [22] - 5:6, 6:8, 63:12, 79:23, 79:25, 80:11, 80:14, 80:16, 86:3, 95:15, 95:16,

95:25, 106:3, 106:4, 106:13, 107:6, 174:22, 175:15, 176:10, 176:12, 181:13
**equitable** [3] - 113:20, 181:12, 181:13
**especially** [1] - 102:25
**ESQUIRE** [2] - 1:15, 2:3
**essence** [1] - 30:17
**essential** [1] - 23:6
**essentially** [2] - 21:21, 48:17
**establish** [1] - 162:11
**established** [2] - 5:4, 108:5
**et** [1] - 142:1
**Europe** [1] - 195:14
**Eva** [3] - 26:10, 116:23, 187:5
**evaluate** [2] - 88:11, 218:3
**evaluated** [2] - 107:18, 107:20
**evaluations** [1] - 44:22
**eve** [2] - 110:3, 110:4
**Eve** [1] - 25:17
**event** [3] - 82:24, 110:4, 110:6
**events** [1] - 99:12
**eventually** [1] - 204:22
**everyday** [1] - 99:11
**evidence** [95] - 7:14, 20:23, 29:11, 94:18, 94:24, 96:7, 96:14, 97:15, 97:22, 98:5, 98:12, 98:19, 98:25, 99:1, 99:6, 99:11, 99:14, 99:17, 99:18, 99:19, 99:21, 99:23, 99:25, 100:1, 100:5, 100:7, 100:9, 100:10, 100:13, 100:14, 100:15, 100:20, 100:21, 100:23, 100:24, 101:3, 101:5, 101:7, 101:8, 101:23, 101:24, 102:2, 103:4, 103:7, 103:9, 103:10, 103:11, 103:15, 103:17, 103:19, 103:22, 104:7, 104:8, 104:13, 104:14, 104:17, 104:18, 104:20, 104:22, 105:2, 106:9, 107:5,

107:10, 107:16, 108:3, 108:7, 108:11, 108:12, 108:14, 108:16, 108:17, 109:8, 110:20, 112:12, 112:16, 112:22, 113:6, 113:10, 115:21, 115:23, 116:2, 116:12, 116:21, 117:25, 118:13, 118:17, 118:23, 118:24, 128:5, 137:24, 163:20, 216:2
**evidence.)** [2] - 138:4, 151:9
**evolved** [1] - 204:21
**ex** [1] - 39:17
**ex-the** [1] - 39:17
**exact** [4] - 12:6, 12:8, 72:11, 106:3
**exactly** [12] - 5:21, 21:8, 83:25, 136:4, 137:10, 142:7, 189:10, 190:10, 191:25, 194:15, 218:2
**examination** [1] - 109:22
**EXAMINATION** [7] - 121:12, 122:19, 131:12, 137:15, 142:23, 157:6, 159:15
**examine** [2] - 104:12, 104:14
**example** [8] - 17:20, 18:21, 31:5, 97:21, 100:15, 100:18, 100:25, 180:7
**exceed** [1] - 175:23
**exceeding** [1] - 176:1
**exceeds** [1] - 175:25
**excellent** [1] - 60:12
**except** [5] - 4:9, 16:2, 90:4, 105:1, 187:18
**exception** [1] - 132:19
**exceptions** [1] - 167:4
**excited** [1] - 51:2
**excluded** [1] - 100:10
**executive** [3] - 126:7, 126:10, 157:10
**Executive** [1] - 143:14
**exercises** [1] - 89:16
**Exhibit** [12] - 137:21, 137:22, 137:24, 138:4, 138:6, 151:8, 151:9, 158:8, 163:16, 163:20,

163:25, 169:8
**exhibit** [13] - 90:10, 99:17, 100:11, 100:21, 121:7, 138:7, 138:9, 138:10, 138:12, 150:7, 163:15, 163:25, 198:11
**exhibits** [4] - 98:22, 103:22, 105:2, 150:6
**exist** [1] - 199:13
**existence** [1] - 100:22
**exists** [1] - 199:9
**exit** [1] - 93:5
**Exits** [1] - 216:11
**exits** [2] - 93:18, 94:8
**expect** [7] - 10:10, 10:11, 131:9, 174:5, 177:15, 178:1
**expectation** [4] - 168:14, 168:24, 175:24, 176:8
**expectations** [4] - 111:25, 174:18, 175:22, 175:23
**expecting** [1] - 160:4
**expects** [1] - 104:8
**experience** [26] - 32:24, 34:16, 38:11, 43:2, 44:16, 45:22, 47:15, 51:15, 51:21, 51:22, 51:23, 51:24, 55:20, 65:17, 66:18, 73:17, 74:1, 76:5, 80:25, 83:16, 84:2, 84:14, 99:11, 99:13, 116:8, 182:19
**experienced** [1] - 73:22
**expert** [1] - 200:21
**expertise** [1] - 205:17
**explain** [12] - 13:18, 33:18, 88:4, 95:2, 114:2, 187:21, 188:23, 189:1, 189:21, 190:23, 191:5, 195:1
**explained** [6] - 95:19, 129:2, 156:6, 186:14, 190:10, 194:10
**explaining** [2] - 5:21, 135:19
**explains** [1] - 205:5
**explanation** [2] - 191:7, 206:20
**exploiting** [1] - 181:20
**express** [1] - 68:22
**extends** [1] - 176:14
**extension** [2] -

155:14, 159:21
**extensive** [1] - 79:21
**extent** [3] - 5:10, 75:19, 146:11
**external** [1] - 197:4
**extra** [4] - 60:18, 109:5, 133:25, 165:17
**extremely** [1] - 114:24

## F

**F-L-A-V-I-N** [1] - 142:21
**Facebook** [2] - 97:2, 97:5
**faced** [1] - 60:16
**facilities** [1] - 162:19
**facility** [1] - 85:5
**facing** [2] - 93:14, 94:3
**fact** [20] - 13:15, 72:11, 91:5, 92:8, 99:22, 100:25, 102:2, 103:15, 103:16, 103:18, 109:5, 114:20, 138:18, 153:6, 181:9, 182:25, 191:9, 195:10, 202:18, 207:19
**factor** [4] - 7:3, 95:22, 191:22, 206:23
**factors** [10] - 101:16, 101:25, 110:21, 110:22, 116:11, 116:14, 118:18, 197:4, 197:5, 202:9
**facts** [14] - 23:15, 37:10, 94:18, 94:19, 94:20, 94:22, 98:20, 98:22, 98:23, 98:24, 100:21, 100:24, 101:9, 102:22
**factual** [2] - 5:4, 213:1
**faculty** [43] - 46:19, 47:6, 111:22, 111:25, 112:1, 113:25, 114:12, 114:20, 115:1, 115:2, 115:4, 115:6, 115:9, 115:18, 115:24, 116:5, 116:8, 116:10, 117:12, 133:24, 163:3, 164:2, 165:14, 168:11, 172:21, 172:22, 174:15, 183:5, 183:6, 183:10,

183:11, 186:13, 187:14, 190:8, 195:3, 197:22, 212:6, 212:8, 212:13, 212:20
**fail** [1] - 85:20
**failed** [1] - 95:18
**failing** [1] - 8:2
**fails** [1] - 103:13
**faintly** [1] - 135:12
**fair** [15] - 37:12, 50:7, 50:8, 50:9, 50:10, 50:24, 55:17, 57:10, 60:21, 65:18, 72:13, 113:20, 125:13, 181:14, 203:12
**fairly** [41] - 32:25, 34:17, 35:19, 36:21, 37:18, 38:12, 38:17, 39:8, 39:25, 41:3, 42:5, 43:3, 44:17, 45:23, 47:4, 47:9, 47:17, 49:9, 51:17, 54:6, 55:21, 56:24, 58:24, 59:14, 60:24, 62:17, 64:20, 66:19, 69:9, 70:5, 70:20, 74:2, 75:10, 76:6, 78:22, 80:6, 81:1, 82:19, 86:8, 174:18, 178:3
**fairness** [3] - 23:18, 110:17, 195:23
**faithfully** [1] - 23:23
**fall** [5] - 80:23, 136:10, 136:23, 161:6, 189:23
**false** [1] - 213:23
**familiar** [2] - 85:24, 87:25
**families** [1] - 62:25
**family** [27] - 24:20, 24:22, 25:3, 27:15, 28:23, 29:6, 30:17, 39:14, 53:10, 54:17, 57:23, 63:7, 68:2, 70:13, 70:21, 71:2, 71:9, 74:17, 77:16, 78:1, 78:6, 78:20, 88:22, 96:21, 129:11, 131:3, 215:21
**family-owned** [1] - 77:16
**fan** [1] - 30:15
**far** [5] - 44:14, 62:6, 75:12, 82:14, 140:20
**father** [2] - 81:19, 81:22
**fault** [1] - 17:1

**favorable** [2] - 103:11
**favorably** [2] - 27:25, 28:3
**February** [1] - 193:19
**federal** [3] - 29:3, 63:10, 95:5
**feelings** [1] - 64:13
**fellow** [4] - 23:21, 96:10, 215:20, 216:3
**fellowship** [1] - 85:1
**felt** [1] - 100:17
**female** [12] - 23:1, 27:24, 28:2, 41:9, 45:5, 52:1, 78:9, 83:19, 83:21, 83:23, 108:10, 207:6
**few** [21] - 4:11, 37:24, 40:13, 61:15, 67:25, 73:7, 76:24, 81:13, 88:1, 96:5, 105:11, 105:14, 105:16, 111:13, 115:14, 121:1, 143:2, 180:19, 192:17, 194:15, 209:5
**fiction** [1] - 5:3
**fide** [2] - 6:25, 95:19
**field** [4] - 70:1, 73:7, 77:3, 174:16
**fighting** [1] - 12:2
**figure** [9] - 12:4, 12:5, 13:5, 76:11, 83:2, 139:22, 196:10, 196:21, 196:25
**figured** [1] - 160:9
**figures** [4] - 171:4, 198:3, 203:5
**figuring** [2] - 11:23, 196:23
**filed** [3] - 4:23, 90:3, 103:6
**filing** [2] - 15:8, 17:7
**final** [10] - 4:10, 6:2, 7:8, 9:14, 14:22, 63:6, 85:12, 217:16, 217:24
**finally** [3] - 71:12, 107:2, 110:2
**fine** [8] - 30:7, 160:14, 160:23, 160:25, 175:24, 195:8, 205:21, 205:24
**fingertips** [1] - 198:15
**finish** [4] - 105:12, 217:10, 217:13, 217:14
**finished** [4] - 75:2, 90:25, 129:13, 213:17
**finishing** [1] - 89:17

**fire** [3] - 45:11, 45:13, 73:1
**firm** [1] - 64:15
**first** [46] - 3:5, 5:18, 12:25, 24:17, 31:14, 35:5, 38:1, 40:16, 43:7, 43:23, 53:9, 57:23, 65:25, 68:1, 72:19, 77:10, 77:16, 78:6, 81:14, 87:6, 96:5, 104:3, 104:10, 105:4, 110:20, 112:3, 112:7, 113:10, 114:19, 119:24, 133:2, 139:2, 139:9, 158:15, 164:6, 164:20, 168:22, 177:12, 189:22, 189:25, 195:2, 196:1, 196:20, 204:8, 210:17, 215:18
**fit** [1] - 181:17
**fits** [1] - 113:17
**five** [8] - 31:19, 36:16, 75:25, 94:9, 172:23, 172:24, 210:8
**fix** [1] - 55:1
**fixed** [3] - 96:17, 96:23, 177:9
**flap** [2] - 150:8, 150:13
**Flavia** [3] - 26:6, 205:11, 205:12
**FLAVIN** [2] - 142:17, 219:8
**Flavin** [16] - 25:18, 126:11, 126:13, 126:19, 126:25, 128:21, 129:16, 129:18, 142:15, 142:21, 142:25, 150:22, 151:14, 157:8, 158:7
**floor** [2] - 44:4, 48:20
**Florida** [1] - 195:13
**foam** [1] - 42:16
**focus** [3] - 92:22, 110:24, 111:14
**FOLEY** [168] - 1:3, 1:15, 1:15, 3:7, 3:10, 9:24, 10:14, 10:18, 10:24, 12:14, 12:18, 12:25, 13:7, 13:11, 13:17, 13:24, 14:12, 14:25, 15:4, 15:14, 16:1, 16:6, 16:14, 17:1, 17:6, 17:10, 17:13, 17:16, 17:19, 18:4, 18:7, 18:12,

18:16, 19:9, 19:17, 20:2, 21:8, 21:14, 22:6, 22:9, 32:14, 33:10, 34:6, 34:21, 35:22, 36:1, 36:4, 37:1, 37:4, 37:13, 37:19, 38:21, 39:11, 40:5, 40:9, 41:6, 41:8, 41:10, 42:11, 43:11, 43:14, 44:22, 44:24, 45:1, 45:3, 46:4, 46:9, 47:22, 49:20, 50:1, 50:5, 50:8, 50:18, 53:4, 54:11, 56:1, 57:1, 57:4, 57:9, 57:15, 59:3, 59:7, 62:22, 64:25, 65:7, 66:24, 67:17, 67:22, 70:9, 71:5, 72:6, 72:15, 74:4, 74:7, 76:18, 76:23, 79:4, 80:10, 81:6, 81:10, 83:5, 84:17, 85:11, 86:11, 86:13, 86:17, 87:13, 87:17, 89:17, 89:24, 91:8, 91:11, 91:14, 91:17, 91:20, 91:23, 105:18, 112:21, 112:24, 119:23, 119:25, 120:4, 120:11, 121:13, 122:11, 122:20, 128:6, 135:1, 135:4, 137:16, 137:22, 138:5, 142:7, 142:15, 142:24, 146:14, 150:8, 150:11, 150:13, 150:15, 150:17, 150:19, 150:23, 151:1, 151:4, 151:10, 151:13, 157:4, 159:16, 159:22, 160:2, 160:10, 160:12, 160:21, 163:21, 169:16, 169:18, 210:25, 211:5, 211:6, 213:21, 215:9, 215:13, 216:15, 216:22, 218:8, 219:5, 219:9
**Foley** [15] - 3:3, 3:7, 3:8, 3:11, 21:16, 22:25, 24:18, 25:5, 83:4, 84:16, 105:18, 105:20, 121:17, 216:13
**folks** [10] - 3:6, 12:23, 58:6, 115:10,

119:18, 119:21, 179:4, 179:6, 183:8, 190:6
**follow** [72] - 32:12, 34:19, 35:21, 36:24, 37:1, 38:19, 40:2, 40:3, 40:4, 41:5, 41:19, 42:8, 42:10, 43:9, 44:19, 44:20, 44:21, 46:1, 46:3, 46:13, 47:19, 47:20, 47:21, 49:11, 49:18, 50:11, 52:2, 54:8, 54:10, 55:23, 55:25, 57:1, 57:2, 57:3, 59:1, 61:2, 61:4, 62:20, 64:22, 64:24, 65:24, 66:22, 70:7, 70:23, 71:4, 71:16, 72:5, 74:4, 74:6, 76:15, 76:17, 78:24, 79:3, 79:9, 80:8, 81:3, 81:5, 81:13, 82:22, 82:23, 83:4, 83:5, 84:5, 84:17, 85:9, 86:10, 86:12, 94:7, 95:3, 100:6, 148:25, 198:24
**follow-up** [66] - 32:12, 34:19, 35:21, 36:24, 37:1, 38:19, 40:2, 40:3, 40:4, 41:5, 41:19, 42:8, 42:10, 43:9, 44:19, 44:20, 44:21, 46:1, 46:3, 46:13, 47:19, 47:20, 47:21, 49:11, 49:18, 50:11, 52:2, 54:8, 54:10, 55:23, 55:25, 57:1, 57:2, 57:3, 59:1, 61:4, 62:20, 64:22, 64:24, 65:24, 66:22, 70:7, 70:23, 71:4, 71:16, 72:5, 74:4, 74:6, 76:15, 76:17, 78:24, 79:3, 79:9, 80:8, 81:3, 81:5, 82:22, 82:23, 83:4, 83:5, 84:5, 84:17, 85:9, 86:10, 86:12, 148:25
**following** [8] - 25:12, 94:15, 98:20, 99:1, 101:16, 104:13, 134:20, 153:23
**follows** [2] - 119:1, 134:19
**footing** [1] - 64:16
**FOR** [3] - 1:2, 1:15, 2:2

**foregoing** [2] - 151:22, 218:14
**foreperson** [3] - 42:25, 45:20, 62:14
**forget** [1] - 36:14
**form** [5] - 100:20, 156:10, 158:19, 158:22, 179:9
**formal** [2] - 44:22, 63:13
**formally** [1] - 98:22
**format** [1] - 159:18
**formats** [1] - 156:19
**former** [4] - 113:9, 118:9, 190:7, 190:8
**formerly** [1] - 117:20
**forms** [1] - 179:18
**forth** [3] - 89:16, 162:6, 184:4
**forward** [1] - 177:18
**foundation** [1] - 23:6
**foundations** [1] - 90:11
**four** [5] - 31:19, 49:15, 145:17, 157:24, 210:9
**fourth** [2] - 168:22, 171:16
**frames** [1] - 133:5
**frankly** [1] - 212:14
**free** [2] - 92:25, 99:14
**freedom** [4] - 23:13, 173:10, 173:11, 173:22
**freshmen** [1] - 51:13
**Friday** [12] - 4:10, 7:4, 9:8, 10:8, 10:16, 145:15, 146:2, 152:16, 153:16, 153:20, 153:21, 216:8
**friend** [16] - 24:20, 24:22, 25:3, 27:16, 28:24, 35:9, 35:25, 39:14, 39:16, 53:10, 57:24, 68:2, 70:13, 81:20, 81:22, 81:25
**friends** [2] - 53:1, 96:21
**front** [6] - 5:13, 24:6, 109:23, 158:1, 158:2, 198:15
**fruitful** [1] - 218:4
**Fry** [1] - 25:19
**fulfill** [1] - 98:11
**full** [27] - 58:7, 58:18, 111:25, 112:8, 112:9, 115:1, 118:8, 122:15, 142:19, 160:17, 163:11,

166:22, 166:25, 167:4, 167:22, 167:25, 168:7, 177:8, 183:5, 183:10, 183:14, 184:25, 185:1, 186:18, 186:22, 205:14
**full-time** [6] - 58:7, 58:18, 111:25, 115:1, 183:5, 183:10
**fully** [3] - 13:13, 114:17, 133:10
**function** [2] - 10:13, 44:4
**functioning** [1] - 45:11
**fund** [1] - 3:22
**fundamental** [1] - 23:8

## G

**Gabriella** [1] - 25:22
**gain** [1] - 102:19
**Gasho** [2] - 77:7, 77:8
**gasps** [1] - 63:1
**gathered** [1] - 129:1
**GAYE** [1] - 1:3
**Gaye** [6] - 3:8, 3:10, 22:25, 24:18, 24:19, 105:19
**gender** [8] - 27:19, 27:22, 28:7, 28:12, 41:8, 42:1, 66:2
**general** [13] - 3:21, 6:16, 51:24, 77:16, 133:16, 175:14, 176:7, 176:22, 184:24, 185:6, 205:1, 205:5
**General** [1] - 39:18
**generalist** [1] - 205:4
**generally** [6] - 30:10, 105:3, 105:5, 165:19, 174:16, 177:3
**generate** [1] - 159:5
**generic** [1] - 167:3
**generically** [1] - 166:17
**Genesis** [2] - 70:2
**gentlemen** [2] - 45:4, 167:15
**given** [19] - 21:22, 33:14, 37:8, 37:9, 37:10, 51:21, 73:15, 101:7, 102:14, 102:25, 131:20, 135:21, 136:10, 162:19, 163:8,

167:11, 183:5, 183:11, 200:14
**glad** [2] - 109:15, 110:14
**glitch** [4] - 156:6, 158:17, 158:18, 158:19
**global** [1] - 32:20
**goodness** [1] - 198:19
**Google** [3] - 155:13, 159:20
**gosh** [1] - 36:14
**govern** [1] - 197:17
**governing** [1] - 210:11
**Government** [1] - 59:24
**Governmental** [1] - 23:8
**grade** [2] - 34:13, 38:5
**graduate** [4] - 51:8, 51:10, 51:16, 54:12
**graduates** [1] - 59:9
**Grand** [3] - 29:3, 74:15, 75:18
**grand** [1] - 74:21
**grant** [1] - 98:15
**granting** [1] - 98:16
**grants** [1] - 117:20
**great** [9] - 3:23, 23:13, 50:15, 90:16, 109:14, 167:12, 168:20, 173:16, 195:7
**greatest** [1] - 23:21
**Greenberg** [11] - 7:17, 25:20, 106:18, 117:6, 117:12, 166:14, 184:20, 192:19, 193:10, 208:6, 208:7
**Greenburg** [8] - 14:16, 15:5, 15:9, 15:10, 15:14, 112:25, 124:21, 134:24, 137:17, 146:18, 147:20, 148:15, 152:4, 153:3, 154:13, 213:2, 213:5, 214:1
**Greenspan's** [1] - 3:25
**grill** [2] - 45:13, 45:14
**ground** [1] - 45:14
**group** [3] - 52:19, 77:20, 87:2
**GROUP** [1] - 2:2
**Group** [1] - 25:6
**guess** [1] - 82:6
**guessing** [1] - 190:20
**guidance** [2] - 94:16, 198:14

50:17, 52:4, 53:3, 54:9, 55:24, 56:6, 56:9, 57:2, 59:2, 59:10, 61:3, 61:10, 62:21, 64:23, 65:6, 65:14, 65:21, 66:23, 67:2, 67:7, 67:15, 67:21, 70:8, 70:24, 71:17, 71:21, 71:24, 72:2, 72:4, 72:10, 74:5, 76:16, 76:21, 77:2, 78:25, 79:10, 80:9, 81:4, 81:9, 82:23, 84:6, 84:9, 84:15, 85:10, 86:16, 87:5, 87:11, 87:25, 88:7, 89:18, 89:21, 90:3, 90:13, 90:15, 91:2, 91:7, 91:10, 91:13, 91:16, 91:19, 91:22, 92:1, 92:3, 92:5, 92:9, 92:11, 110:19, 111:8, 111:12, 113:4, 119:5, 119:11, 119:16, 119:20, 127:17, 127:19, 127:21, 127:24, 131:13, 135:6, 137:12, 138:1, 146:10, 151:6, 151:11, 157:7, 158:4, 158:6, 159:13, 160:3, 160:9, 163:18, 216:18, 216:25, 217:8, 217:11, 218:7, 219:6, 219:10
**Greenspan** [23] - 3:14, 5:20, 6:14, 7:5, 7:18, 8:12, 25:6, 50:11, 52:3, 111:4, 112:25, 124:21, 134:24, 137:17, 146:18, 147:20, 148:15, 152:4, 153:3, 154:13, 213:2, 213:5, 214:1

**guide** [1] - 95:3
**guiding** [1] - 197:13
**guilty** [3] - 62:8, 62:12, 76:2
**guy** [2] - 75:1, 195:8
**guys** [1] - 120:10

## H

**H-O-R-N** [1] - 122:17
**Haley** [3] - 1:19, 4:4, 218:18
**half** [9] - 59:8, 64:7, 105:5, 105:6, 105:7, 177:22, 192:7, 193:3, 210:8
**hall** [1] - 97:9
**hand** [7] - 25:10, 84:12, 93:8, 93:23, 113:22, 122:13
**handed** [1] - 158:7
**handicap** [1] - 64:12
**handicapped** [1] - 63:17
**handing** [1] - 11:15
**hands** [1] - 29:17
**Hanna** [4] - 25:21, 205:12, 205:13, 207:5
**happiness** [1] - 23:25
**happy** [2] - 42:23, 212:13
**hard** [5] - 64:13, 69:10, 108:23, 135:12, 209:1
**hardy** [1] - 31:11
**head** [19] - 3:17, 139:21, 142:5, 143:23, 157:22, 161:14, 161:18, 162:1, 162:6, 181:9, 189:23, 191:24, 198:23, 199:17, 199:25, 201:14, 201:25, 209:19
**Head** [61] - 18:22, 106:21, 107:21, 108:22, 108:24, 108:25, 109:4, 111:5, 113:5, 114:7, 114:8, 117:15, 117:21, 117:23, 139:14, 141:1, 141:2, 141:10, 142:2, 142:4, 161:3, 161:11, 161:12, 161:14, 161:17, 161:22, 162:23, 163:9, 163:10, 164:9, 164:19,

164:22, 164:23, 165:2, 165:5, 165:6, 165:9, 165:10, 165:13, 165:20, 189:24, 195:23, 200:4, 200:8, 200:15, 200:18, 201:16, 201:18, 201:21, 206:2, 209:10, 209:11, 209:15, 212:5, 213:7, 214:5, 214:6, 214:13, 214:18, 214:24, 215:2
**head's** [1] - 67:7
**heading** [1] - 124:14
**headquartered** [1] - 59:20
**heads** [3] - 11:5, 134:4, 162:9
**Heads** [6] - 164:25, 201:20, 206:12, 209:17, 209:25, 214:10
**hear** [47] - 30:6, 36:4, 69:3, 70:24, 71:17, 80:10, 84:6, 94:18, 99:4, 99:6, 99:8, 101:17, 106:20, 106:25, 107:2, 108:14, 110:12, 112:3, 114:9, 115:25, 116:4, 116:12, 116:21, 117:1, 117:3, 117:8, 117:14, 117:16, 117:21, 117:25, 118:23, 120:8, 120:9, 120:12, 121:2, 121:14, 121:15, 131:14, 135:11, 135:13, 135:15, 146:15, 166:20, 178:25, 210:18, 211:10
**heard** [17] - 26:18, 30:12, 34:14, 49:7, 60:16, 74:23, 96:6, 100:18, 103:24, 105:21, 113:25, 119:2, 119:9, 146:8, 161:23, 216:3
**hearing** [2] - 98:8, 135:12
**heavier** [1] - 181:5
**heavy** [1] - 116:7
**held** [13] - 115:25, 117:7, 117:9, 117:20, 122:25, 145:10, 145:11,

154:19, 154:21,
156:18, 159:11,
164:1, 190:24
**hello** [3] - 34:25, 77:7,
121:2
**Hello** [1] - 65:23
**help** [7] - 13:21, 44:6,
69:14, 98:1, 104:7,
138:16, 212:23
**helped** [1] - 92:20
**helpful** [1] - 104:21
**helping** [2] - 44:4,
162:11
**helps** [3] - 176:3,
182:19, 196:25
**Hemingway** [1] -
184:10
**heritage** [1] - 23:13
**Hermes** [1] - 44:1
**herself** [2] - 113:15,
117:9
**hesitating** [3] -
170:14, 170:22,
173:12
**hi** [4] - 34:8, 34:9,
34:24, 64:13
**Hi** [1] - 43:16
**hide** [4] - 108:13,
109:8, 109:9, 109:11
**hiding** [1] - 109:9
**high** [8] - 13:22,
23:19, 35:13, 81:20,
116:6, 195:1,
195:16, 204:10
**high-level** [1] - 195:16
**higher** [23] - 38:10,
50:3, 60:9, 60:15,
73:22, 106:24,
109:6, 109:7, 112:9,
113:12, 114:13,
115:17, 167:5,
176:1, 178:15,
186:20, 187:22,
202:5, 202:7, 203:7,
207:7, 209:13,
209:23
**highest** [9] - 14:2,
114:10, 114:23,
117:5, 123:3, 126:4,
167:23, 186:21,
203:22
**highlight** [1] - 132:25
**highly** [2] - 51:25,
117:19
**Hillary** [1] - 25:7
**hire** [13] - 60:5, 63:16,
72:25, 83:19,
116:11, 182:20,
190:11, 196:20,
197:15, 197:22,

197:25, 198:1,
202:13
**hired** [31] - 63:20,
64:1, 73:18, 77:3,
163:7, 171:8, 177:4,
184:15, 185:8,
189:24, 192:15,
193:9, 194:14,
195:12, 196:10,
197:14, 200:2,
200:12, 204:2,
204:5, 204:8,
204:14, 204:15,
205:4, 205:10,
205:14, 205:16,
205:22, 207:6
**hires** [1] - 205:8
**hiring** [10] - 44:3,
60:5, 63:11, 83:12,
84:8, 86:5, 162:13,
193:11, 197:7,
198:24
**historical** [2] - 123:22,
136:1, 137:7
**history** [5] - 68:9,
156:9, 158:19,
158:21, 214:17
**History** [1] - 162:5
**hold** [13] - 15:10, 24:3,
24:10, 86:22, 117:2,
117:7, 117:14,
117:22, 122:9,
158:11, 159:1,
163:3, 169:14
**Holly** [2] - 3:24, 111:9
**home** [10] - 130:12,
130:14, 131:1,
131:2, 131:25,
132:2, 145:25,
180:18, 180:21,
215:12
**honesty** [1] - 23:18
**Honor** [127] - 3:13,
3:20, 4:5, 4:8, 4:20,
5:16, 8:16, 8:20,
8:23, 9:7, 9:21, 9:24,
10:14, 10:18, 10:24,
10:25, 11:3, 11:14,
12:13, 12:14, 12:18,
13:3, 13:6, 13:7,
13:11, 13:24, 14:12,
15:14, 16:1, 17:10,
17:13, 17:16, 18:4,
18:7, 18:13, 18:16,
19:17, 20:2, 20:12,
20:24, 21:8, 21:14,
21:15, 22:6, 22:7,
22:9, 32:13, 32:14,
33:15, 34:1, 34:3,
34:20, 34:21, 37:8,

37:13, 37:23, 38:20,
38:21, 39:12, 40:9,
43:10, 43:11, 49:24,
50:5, 50:13, 50:17,
50:19, 52:4, 56:6,
57:18, 59:2, 61:3,
62:21, 64:23, 65:7,
65:14, 66:23, 66:24,
67:2, 67:7, 67:17,
67:21, 67:22, 70:8,
70:9, 72:10, 74:5,
79:10, 80:9, 81:6,
81:9, 81:10, 85:10,
85:11, 86:11, 86:13,
87:5, 90:3, 91:1,
91:2, 92:11, 112:21,
119:20, 119:23,
119:25, 127:17,
135:6, 137:13,
138:1, 150:11,
150:17, 151:1,
151:4, 151:11,
158:4, 160:3,
160:10, 163:18,
169:16, 215:9,
216:16, 216:18,
216:22, 216:25,
217:4, 218:7, 218:8
**Honor's** [2] - 14:1,
88:1
**HONORABLE** [1] -
1:11
**honorably** [1] - 23:23
**hope** [4] - 8:8, 8:9,
12:25, 110:15
**hopping** [1] - 153:2
**HORN** [2] - 122:14,
219:4
**Horn** [5] - 26:12,
122:17, 135:10,
135:11, 142:11
**hospital** [2] - 31:19,
32:5
**Hospital** [1] - 32:8
**hostile** [2] - 109:22,
159:14
**hotly** [1] - 50:21
**hour** [8] - 88:20,
90:23, 105:5, 105:6,
105:7, 130:12,
130:14, 131:1
**hours** [1] - 131:9
**house** [6] - 8:13,
54:22, 54:24,
124:23, 146:22,
147:22
**housed** [1] - 199:3
**housekeeping** [1] -
10:1
**houses** [1] - 133:11

**HR** [11] - 27:8, 39:3,
84:9, 84:11, 126:4,
126:9, 133:18,
136:16, 144:17,
144:24, 196:24
**Human** [4] - 113:19,
122:22, 123:3,
133:11
**human** [4] - 27:8,
84:12, 199:3, 217:2
**Humanities** [1] -
204:19
**hundred** [1] - 71:23
**husband** [1] - 32:7
**Hyperion** [3] - 132:3,
133:2, 133:23

# I

**Ibieta** [1] - 25:22
**idea** [4] - 44:6, 109:8,
175:1, 185:11
**ideas** [1] - 29:13
**identical** [1] - 90:4
**identifiable** [1] -
132:21
**identified** [3] - 7:16,
16:12, 158:21
**ignore** [1] - 100:3
**II** [1] - 150:13
**III** [1] - 1:15
**images** [1] - 140:21
**immediate** [5] - 29:6,
54:17, 56:3, 63:7,
74:17
**immediately** [3] -
31:4, 96:11, 215:23
**impact** [45] - 32:25,
33:8, 34:16, 35:18,
36:21, 37:17, 38:11,
38:16, 39:7, 39:24,
41:2, 42:5, 43:3,
44:17, 45:23, 47:8,
47:16, 49:8, 51:16,
54:5, 55:21, 56:23,
58:23, 59:13, 60:24,
62:17, 64:19, 66:19,
68:20, 69:8, 70:3,
70:4, 70:19, 72:14,
74:2, 75:10, 76:6,
77:4, 78:21, 80:5,
81:1, 82:19, 84:3,
86:7, 149:22
**impacted** [2] - 33:5,
64:8
**impartial** [1] - 65:18
**impartially** [38] - 33:1,
34:17, 35:19, 36:22,
37:18, 38:12, 38:17,
39:8, 39:25, 41:3,

42:6, 43:3, 44:17,
45:23, 47:9, 47:17,
49:9, 51:17, 54:6,
55:21, 56:24, 58:24,
59:14, 60:25, 62:18,
64:20, 66:20, 69:9,
70:5, 70:20, 74:2,
75:10, 76:6, 78:22,
80:6, 81:1, 82:20,
86:8
**important** [12] - 23:15,
80:16, 96:13, 98:10,
102:4, 112:16,
113:16, 113:23,
114:24, 157:13,
162:13, 183:18
**impossible** [1] - 29:22
**impressive** [1] -
192:18
**imprisoned** [1] - 62:10
**improper** [1] - 99:25
**IN** [1] - 1:1
**in-house** [4] - 8:13,
124:23, 146:22,
147:22
**inbox** [1] - 145:1
**incentive** [1] - 200:14
**incentivizes** [1] -
115:4
**include** [4] - 19:7,
54:24, 140:6, 141:16
**included** [7] - 16:2,
16:12, 16:13, 51:9,
133:19, 133:21,
217:25
**includes** [3] - 96:20,
123:9, 174:13
**including** [11] - 24:24,
57:25, 96:10, 97:1,
97:5, 101:16,
109:20, 117:4,
118:23, 144:12,
215:20
**incorrect** [1] - 156:10
**increase** [8] - 112:12,
139:3, 177:24,
178:14, 189:5,
206:15, 206:16,
206:17
**increased** [3] - 60:1,
115:3
**increases** [12] - 60:1,
60:3, 112:2, 176:4,
177:20, 177:23,
184:16, 196:11,
200:13, 202:10,
203:25, 206:10
**increasing** [1] - 115:4
**indeed** [2] - 109:6,
162:15

**independent** [1] - 97:19
**indicated** [1] - 50:23
**indicating** [1] - 94:24
**indicating)** [2] - 41:11, 56:1
**indication** [1] - 98:17
**indicted** [1] - 76:1
**individual** [10] - 23:8, 31:2, 63:15, 64:10, 85:6, 102:20, 132:5, 140:2, 189:6, 190:21
**individual's** [2] - 11:20, 206:13
**individually** [2] - 209:21, 210:4
**individuals** [11] - 7:22, 49:13, 63:12, 63:20, 64:1, 71:21, 118:21, 131:23, 133:7, 189:3, 199:6
**industrial** [1] - 77:25
**industry** [1] - 76:24
**inequities** [1] - 195:25
**influence** [2] - 99:8, 113:23
**influenced** [2] - 99:22, 100:1
**information** [63] - 7:11, 7:19, 30:2, 88:11, 93:12, 94:2, 97:25, 98:2, 98:10, 123:7, 123:9, 123:11, 123:13, 123:23, 125:18, 127:7, 129:1, 129:3, 129:6, 129:22, 130:2, 130:5, 130:11, 131:22, 132:7, 132:9, 132:13, 132:15, 132:18, 132:19, 132:21, 133:6, 133:8, 133:11, 133:16, 133:20, 134:5, 134:8, 134:11, 134:14, 136:1, 137:7, 137:18, 138:13, 140:6, 140:10, 140:12, 140:13, 140:14, 141:5, 141:8, 144:6, 144:9, 145:12, 145:13, 149:24, 153:6, 155:25, 156:3, 158:11, 159:9, 191:2
**inject** [1] - 12:18
**inquiry** [1] - 127:22
**Instagram** [1] - 97:5

**instance** [3] - 167:13, 187:5, 197:24
**instances** [1] - 105:9
**instant** [2] - 97:1, 97:2
**instead** [3] - 122:1, 125:12, 136:9
**institute** [1] - 31:20
**institutions** [2] - 51:25
**instruct** [1] - 96:6, 104:19
**instructed** [3] - 100:4, 100:8, 103:20
**instructing** [1] - 4:25
**instruction** [1] - 100:6
**instructions** [9] - 5:11, 29:13, 90:22, 93:15, 94:4, 94:16, 215:18, 217:16, 217:20
**integrated** [1] - 133:10
**intend** [1] - 20:23
**intent** [1] - 205:15
**interest** [3] - 14:1, 101:20, 212:6
**interested** [2] - 12:3, 196:1
**interesting** [1] - 19:17
**interject** [1] - 61:4
**internal** [2] - 197:4, 214:16
**internet** [4] - 96:17, 97:3, 97:21, 97:24
**interns** [3] - 38:24, 39:1, 39:7
**internship** [1] - 44:2
**interpret** [1] - 104:20
**interrupt** [1] - 115:8
**interview** [3] - 83:15, 84:14, 86:5
**interviews** [1] - 84:8
**intimidated** [1] - 195:5
**introduce** [2] - 3:5, 3:15
**inventory** [1] - 85:4
**inversion** [1] - 195:25
**investigation** [1] - 97:19
**investigator** [1] - 63:23
**investigators** [2] - 31:20, 32:1
**invite** [1] - 214:15
**involve** [1] - 12:22
**involved** [11] - 31:24, 48:10, 48:21, 49:5, 50:9, 57:4, 58:2, 84:9, 195:15, 215:21
**involving** [1] - 145:6
**issue** [15] - 7:9, 7:10, 7:22, 7:24, 14:1,

19:17, 20:21, 32:9, 57:14, 60:22, 84:21, 202:2, 211:8, 218:2
**issued** [2] - 134:21, 135:18
**issues** [11] - 5:25, 7:24, 9:9, 9:10, 10:15, 30:9, 30:10, 82:12, 113:1, 120:13, 134:23
**IT** [3] - 12:23, 120:23, 144:8
**it'** [1] - 71:1
**italics** [1] - 218:1
**item** [1] - 100:4
**itself** [4] - 19:20, 23:16, 82:9, 143:19

**J**

**J.F** [1] - 1:15
**Jack** [1] - 25:5
**Jacques** [14] - 25:16, 106:17, 106:18, 117:13, 118:9, 166:8, 167:25, 168:2, 170:4, 184:19, 185:15, 185:18, 192:19, 193:11
**jail** [1] - 76:3
**Jakeya** [1] - 25:15
**James** [1] - 1:8
**January** [7] - 1:9, 4:23, 122:25, 143:11, 156:21, 159:3, 159:17
**Jennifer** [4] - 26:13, 77:8, 180:1, 209:13
**Jensen** [2] - 25:23, 217:3
**Jersey** [2] - 124:15, 124:18
**Jessica** [2] - 81:20, 81:25
**job** [45] - 19:11, 27:3, 27:21, 28:5, 47:8, 52:9, 60:23, 69:16, 69:19, 69:22, 71:14, 72:12, 72:20, 73:15, 77:11, 83:6, 83:13, 93:4, 114:25, 116:10, 133:23, 143:21, 161:1, 163:10, 165:20, 169:3, 169:5, 173:20, 175:10, 175:11, 175:12, 175:13, 178:25, 181:9, 182:8,

183:18, 196:7, 197:2, 197:6, 198:5, 200:1, 212:16, 212:22, 214:11, 214:15
**jobs** [8] - 73:17, 118:14, 134:5, 141:12, 168:23, 181:25, 212:19, 212:21
**Joe** [1] - 25:6
**JOHN** [2] - 1:15, 160:16
**John** [3] - 3:16, 25:5, 25:19, 26:3, 32:10, 139:1, 139:8, 140:19, 140:23, 141:25, 160:19
**join** [3] - 127:3, 129:16, 130:11
**joined** [5] - 69:22, 125:2, 125:5, 147:16, 147:19
**joint** [3] - 8:24, 137:23, 158:8
**Jones** [2] - 25:24, 217:1
**Jones'** [1] - 134:23
**Jr** [1] - 25:7
**Judge** [8] - 105:24, 110:16, 116:15, 116:16, 116:18, 135:10, 145:12, 216:6
**judge** [6] - 23:11, 23:14, 62:8, 63:3, 94:25, 105:21
**judge's** [1] - 30:25
**judges** [2] - 94:20, 101:11
**judging** [1] - 94:21
**judgment** [12] - 4:16, 4:22, 5:15, 18:12, 18:14, 18:23, 23:18, 75:5, 75:14, 108:22, 109:1, 123:16
**judicial** [2] - 6:15, 8:3
**judicially** [1] - 98:23
**JuHwan** [1] - 124:23
**JuHwon** [14] - 3:20, 130:20, 146:18, 146:20, 146:22, 147:22, 148:16, 148:17, 149:4, 152:4, 153:3
**July** [1] - 143:17
**June** [1] - 136:25
**juries** [1] - 23:20
**JUROR** [290] - 28:17, 31:12, 31:16, 31:18,

31:24, 32:6, 32:11, 32:19, 32:23, 33:2, 33:7, 34:9, 34:12, 34:15, 34:18, 34:25, 35:2, 35:7, 35:9, 35:11, 35:15, 35:17, 35:20, 35:24, 36:2, 36:8, 36:10, 36:12, 36:14, 36:16, 36:19, 36:23, 37:23, 38:3, 38:5, 38:8, 38:13, 38:15, 38:18, 38:24, 39:2, 39:5, 39:9, 39:16, 39:20, 39:22, 40:1, 40:12, 40:15, 40:18, 40:20, 40:23, 40:25, 41:4, 41:7, 41:9, 41:11, 41:15, 41:17, 41:24, 42:3, 42:7, 42:13, 42:15, 42:19, 42:22, 43:1, 43:4, 43:7, 43:17, 43:19, 43:22, 43:25, 44:7, 44:11, 44:13, 44:18, 44:23, 44:25, 45:2, 45:4, 45:7, 45:9, 45:17, 45:19, 45:21, 45:24, 46:12, 46:17, 46:24, 47:2, 47:5, 47:10, 47:13, 47:18, 47:24, 48:2, 48:5, 48:8, 48:16, 48:19, 48:25, 49:2, 49:10, 49:15, 49:17, 49:22, 50:6, 50:10, 51:6, 51:8, 51:11, 51:13, 51:18, 51:23, 52:8, 52:12, 52:14, 52:16, 52:18, 52:21, 52:24, 53:12, 53:16, 53:20, 53:22, 53:24, 54:3, 54:7, 54:13, 54:15, 54:19, 54:21, 55:4, 55:9, 55:11, 55:14, 55:19, 55:22, 56:5, 56:13, 56:15, 56:19, 56:22, 56:25, 57:6, 57:18, 57:20, 58:1, 58:6, 58:10, 58:14, 58:17, 58:21, 58:25, 59:15, 59:18, 59:23, 60:2, 60:19, 61:1, 61:7, 61:13, 61:22, 61:24, 62:4, 62:15, 62:19, 62:23, 63:9, 63:19, 63:22, 64:6, 64:10, 64:21, 65:2, 66:3, 66:5, 66:11, 66:13, 66:17, 66:21, 67:11, 67:13, 68:4, 68:6, 68:8,

68:11, 68:14, 68:18, 68:21, 68:24, 69:6, 69:10, 69:12, 69:15, 70:1, 70:6, 70:13, 70:16, 70:18, 70:21, 71:2, 71:6, 71:11, 71:14, 71:20, 71:23, 72:1, 72:3, 72:23, 72:25, 73:4, 73:6, 73:10, 73:12, 73:16, 73:20, 73:25, 74:3, 74:11, 74:14, 74:19, 74:22, 75:1, 75:4, 75:7, 75:11, 75:16, 75:20, 75:22, 75:24, 76:2, 76:4, 76:7, 76:9, 76:14, 77:8, 77:13, 77:15, 77:25, 78:5, 78:8, 78:11, 78:14, 78:17, 78:19, 78:23, 79:2, 79:8, 79:13, 79:16, 79:18, 79:21, 79:24, 80:4, 80:7, 80:15, 80:19, 80:21, 81:2, 81:16, 81:18, 81:24, 82:2, 82:4, 82:10, 82:13, 82:21, 82:25, 83:9, 83:11, 83:18, 83:21, 83:25, 84:4, 84:8, 84:11, 84:20, 84:22, 84:25, 85:3, 85:8, 85:15, 85:18, 85:23, 86:2, 86:9, 86:24, 93:2

**juror** [46] - 29:2, 31:6, 31:10, 34:7, 34:23, 37:21, 40:10, 43:15, 45:6, 46:10, 51:1, 53:8, 56:7, 56:8, 57:16, 61:21, 65:22, 66:10, 67:5, 67:23, 72:17, 74:13, 74:22, 77:6, 80:18, 81:11, 86:21, 86:22, 91:4, 91:6, 91:9, 91:12, 91:15, 91:18, 91:21, 91:24, 92:14, 92:15, 92:16, 96:10, 97:12

**jurors** [12] - 22:16, 23:5, 23:16, 23:17, 23:24, 87:8, 93:5, 94:16, 96:5, 116:15, 215:20, 216:3

**JURY** [4] - 1:5, 1:12, 120:7, 120:21

**jury** [77] - 4:15, 4:25, 5:2, 5:3, 5:7, 5:10, 5:13, 8:22, 9:12, 10:21, 11:4, 11:16, 11:24, 11:25, 12:10,

14:7, 14:11, 16:12, 16:24, 20:8, 21:12, 21:23, 22:10, 22:17, 22:19, 22:20, 23:6, 23:11, 23:15, 23:19, 29:22, 30:22, 42:14, 42:25, 43:6, 62:11, 62:22, 66:15, 67:2, 74:15, 74:21, 80:22, 88:10, 90:21, 90:22, 92:8, 92:13, 93:9, 93:11, 93:15, 93:20, 93:24, 94:1, 94:4, 94:11, 94:12, 94:14, 96:7, 102:19, 102:23, 104:23, 120:5, 120:17, 120:18, 120:25, 121:9, 121:10, 128:4, 207:21, 208:11, 208:12, 215:12, 215:17, 217:14, 217:16, 217:20

**Jury** [8] - 29:3, 74:15, 75:19, 93:18, 93:21, 94:8, 94:13, 216:11

**Justice** [1] - 162:6

**justice** [6] - 23:6, 23:21, 75:12, 75:15, 92:21

## K

**K-U-R-T-Z** [1] - 160:19

**Katartynick** [1] - 37:22

**keep** [17] - 25:10, 96:13, 98:5, 98:10, 98:13, 108:13, 114:15, 115:10, 115:17, 117:25, 161:12, 172:25, 191:16, 212:23, 216:1, 216:15

**Keyanah** [3] - 25:24, 134:23, 217:1

**kid** [1] - 76:10

**kids** [1] - 56:19

**Kim** [3] - 1:19, 4:4, 218:18

**Kim_Haley@paed. uscourts.gov** [1] - 1:20

**Kimball** [2] - 25:25, 209:3

**kind** [30] - 24:21, 24:23, 25:4, 31:22, 53:11, 55:5, 56:17, 57:24, 65:11, 68:2, 69:22, 73:3, 88:23,

88:24, 90:8, 96:24, 96:25, 113:17, 158:17, 162:9, 169:4, 175:7, 175:15, 177:14, 184:4, 197:6, 205:5, 209:5, 210:16, 215:5

**kinds** [2] - 101:5, 184:1

**knowing** [2] - 69:12, 149:24

**knowledge** [5] - 23:22, 144:16, 188:18, 193:7, 193:15

**Knowles** [1] - 26:1

**known** [4] - 26:3, 26:12, 76:25, 111:14

**knows** [1] - 100:16

**knuckles** [1] - 6:12

**Kotsin** [1] - 116:24

**Kotzin** [1] - 26:2

**KURTZ** [3] - 3:16, 111:7, 160:16

**Kurtz** [30] - 3:16, 7:16, 18:22, 26:3, 106:21, 107:21, 108:21, 109:5, 109:20, 111:5, 114:8, 117:15, 139:1, 139:8, 140:19, 140:23, 141:25, 160:2, 160:11, 160:19, 160:22, 160:24, 184:20, 215:14, 216:14, 217:1

## L

**label** [1] - 138:21

**lack** [1] - 86:1

**Lansdale** [1] - 42:15

**laptop** [2] - 131:4, 134:23

**laptops** [1] - 96:16

**large** [3] - 107:15, 179:2, 183:1

**largely** [2] - 23:10, 115:14

**larger** [2] - 162:8, 175:16

**largest** [1] - 183:2

**last** [9] - 10:8, 122:16, 142:20, 150:9, 160:18, 185:13, 190:14, 190:20, 201:23

**late** [1] - 132:1

**Law** [1] - 25:6

**law** [21] - 23:14, 23:20, 28:25, 29:12, 29:14, 36:8, 37:14, 39:15, 62:24, 81:18, 82:6, 94:19, 94:25, 95:4, 95:5, 95:6, 98:13, 101:6, 104:19, 108:5, 111:15

**LAW** [3] - 2:2, 53:6, 86:19

**laws** [6] - 28:20, 32:17, 41:14, 41:21, 79:12, 85:14

**lawsuit** [1] - 15:8, 17:7, 29:7, 54:18, 63:8, 63:13, 74:18, 75:3, 103:5, 103:6

**lawsuits** [1] - 79:1

**lawyer** [9] - 28:24, 39:14, 54:24, 97:8, 99:17, 99:18, 99:19, 99:20, 135:18

**lawyers** [14] - 24:16, 25:4, 88:10, 89:3, 89:9, 93:13, 94:2, 98:8, 99:2, 99:3, 99:24, 102:6, 105:14

**Le** [1] - 81:20

**leader** [1] - 64:3

**leads** [1] - 99:14

**leakage** [1] - 54:25

**learn** [2] - 88:25, 109:2

**least** [6] - 4:15, 5:1, 5:5, 8:5, 8:6, 95:14

**leave** [6] - 12:5, 129:11, 129:12, 159:23, 212:20, 215:14

**leaves** [1] - 153:21

**LEE** [1] - 3:20

**Lee** [11] - 3:20, 34:8, 124:23, 130:20, 146:20, 146:22, 147:22, 148:16, 148:17, 152:4, 153:3

**left** [6] - 14:16, 106:19, 116:17, 116:18, 131:3, 132:21

**leg** [2] - 168:22, 171:16

**legal** [7] - 75:12, 95:1, 95:2

**legs** [8] - 168:19, 168:20, 169:2, 171:14, 172:18, 178:22, 178:24, 187:10

**length** [1] - 98:14

**Leone** [1] - 200:22

**leslie** [1] - 149:11

**LESLIE** [1] - 2:3

**Leslie** [10] - 3:13, 25:6, 111:3, 124:21, 134:24, 146:18, 147:19, 149:4, 152:4, 154:12

**less** [15] - 22:21, 23:3, 27:25, 44:4, 60:13, 95:9, 105:15, 128:10, 156:12, 178:15, 178:16, 203:13, 208:15, 209:8, 217:8

**lessons** [1] - 173:19

**lets's** [1] - 194:1

**level** [12] - 13:22, 51:14, 112:5, 113:12, 116:9, 174:6, 174:19, 177:5, 185:3, 186:14, 189:3, 195:16

**levels** [1] - 214:1

**liability** [16] - 4:16, 5:15, 6:1, 6:3, 6:4, 6:20, 6:21, 8:1, 10:3, 18:15, 18:24, 108:15, 108:22, 109:1, 110:5, 123:17

**liable** [1] - 95:12

**liberties** [1] - 23:10

**liberty** [2] - 23:9, 23:25

**library** [1] - 61:17

**license** [2] - 31:25, 32:2

**life** [5] - 23:24, 62:10, 63:1, 68:15, 177:16

**light** [3] - 99:11, 101:24, 103:8

**Lija** [1] - 67:24

**likely** [5] - 22:21, 103:9, 103:16, 111:12, 216:7

**limit** [2] - 106:8, 115:9

**limitations** [2] - 17:8, 17:12

**limited** [2] - 97:5, 100:5

**line** [35] - 50:4, 58:7, 61:14, 85:19, 85:20, 87:2, 87:10, 117:18, 119:15, 139:13, 164:18, 164:20, 170:4, 171:20, 172:5, 172:22, 174:4, 176:5, 185:19, 186:11, 186:13, 191:19,

*United States District Court*

193:25, 194:3, 194:8, 194:18, 194:22, 199:21, 202:12, 203:2, 203:3, 203:4, 208:22, 209:10
**lined** [1] - 116:9
**lines** [4] - 139:17, 164:7, 171:21, 177:25
**LinkedIn** [1] - 97:5
**liquid** [1] - 78:3
**list** [19] - 15:11, 25:8, 25:11, 30:25, 87:18, 90:11, 121:7, 150:16, 150:17, 167:13, 183:19, 192:11, 192:12, 195:3, 205:11, 205:25, 207:19, 208:14, 212:20
**listed** [3] - 15:25, 16:9, 180:8
**listen** [3] - 97:14, 97:18, 211:13
**listing** [1] - 173:1
**literary** [1] - 56:15
**Literature** [1] - 180:9
**literature** [1] - 200:21
**litigation** [1] - 3:22
**live** [1] - 134:24
**lived** [1] - 76:12
**living** [1] - 177:19
**LLC** [1] - 25:6
**load** [6] - 107:12, 133:25, 173:4, 173:5, 176:12, 180:25
**loans** [1] - 58:15
**logged** [2] - 131:25, 132:3
**logistics** [1] - 59:19
**longest** [1] - 203:23
**longevity** [5] - 191:21, 202:2, 202:21, 203:15, 206:20
**look** [57] - 6:5, 26:15, 45:15, 84:12, 139:1, 139:8, 139:13, 140:19, 140:20, 140:22, 141:18, 141:19, 141:22, 143:8, 150:5, 152:9, 152:14, 152:21, 164:18, 169:23, 170:12, 177:18, 183:17, 185:18, 185:21, 186:10, 186:24, 187:5, 189:25, 193:25,

197:14, 198:22, 199:14, 202:12, 202:24, 202:25, 203:3, 203:16, 207:4, 207:5, 207:19, 207:22, 208:11, 208:16, 209:1, 209:9, 209:12, 209:13, 209:14, 210:21, 211:7, 211:8, 212:23, 214:21, 217:15, 217:19
**looked** [4] - 155:15, 195:2, 195:20, 206:2
**looking** [7] - 13:13, 13:20, 19:24, 20:1, 21:22, 22:3, 22:4, 69:7, 82:14, 111:1, 129:8, 136:9, 139:7, 162:21, 184:6, 188:16, 191:3, 196:2, 197:4, 197:5, 203:18, 203:20, 207:1, 208:6, 210:2
**looks** [3] - 138:20, 141:25, 172:7
**LOPEZ** [3] - 3:24, 111:11, 120:15
**IOPEZ** [1] - 120:12
**Lopez** [2] - 3:24, 111:9
**Lorrie** [1] - 25:5
**Los** [1] - 34:13
**love** [3] - 115:11, 197:22, 207:21
**lower** [2] - 178:18, 205:23
**Lunch** [1] - 90:24
**lunch** [9] - 88:19, 88:21, 89:25, 90:1, 105:7, 146:25, 152:24, 153:2, 154:3
**lunchtime** [2] - 147:3, 147:16
**LYNDE** [1] - 1:16

## M

**MA** [1] - 1:16
**ma'am** [1] - 141:6
**magic** [2] - 30:21, 86:18
**mail** [18] - 13:12, 13:13, 13:17, 16:9, 16:19, 97:1, 127:3, 127:11, 127:13, 128:7, 128:13, 148:25, 149:11, 149:15, 149:17, 149:21, 149:25,

152:6
**mailed** [2] - 126:25, 128:21
**mails** [3] - 128:17, 128:20, 149:10
**main** [4] - 104:15, 114:18, 168:11, 168:24
**maintenance** [1] - 23:20
**major** [6] - 113:23, 204:17, 204:23, 204:25, 205:2, 205:9
**malave** [5] - 22:10, 22:13, 92:13, 93:6, 215:23
**Malave** [3] - 93:11, 94:1, 96:11
**male** [18] - 5:1, 5:5, 23:3, 28:1, 28:4, 77:1, 78:9, 83:19, 83:22, 95:14, 96:1, 106:1, 106:10, 108:9, 113:15, 173:1, 207:5
**man** [4] - 107:20, 207:1, 210:7, 210:10
**manage** [2] - 52:17, 59:21
**managed** [1] - 73:1
**management** [1] - 162:10
**manager** [9] - 40:20, 41:18, 48:2, 49:22, 52:14, 59:20, 77:16, 79:14, 85:1
**managers** [4] - 41:21, 48:20, 64:15, 134:4
**mandated** [1] - 175:17
**mandatory** [1] - 32:20
**Mandell** [1] - 26:4
**manger** [1] - 77:15
**manner** [2] - 101:19, 102:18
**Margaret** [1] - 201:23
**MARIE** [2] - 142:17, 219:8
**Marie** [1] - 142:21
**Marilyn** [11] - 3:8, 3:9, 3:10, 22:25, 24:18, 24:19, 105:19, 139:18, 141:18, 141:19
**MARILYN** [1] - 1:3
**Mark** [4] - 14:15, 25:20, 106:18, 184:19
**mark** [6] - 91:3, 117:6, 117:12, 150:20, 166:14, 192:19

**marked** [1] - 158:7
**Market** [2] - 1:8, 2:5
**market** [1] - 197:5
**married** [1] - 105:20
**match** [1] - 212:25
**materials** [1] - 97:24
**math** [6] - 70:14, 70:24, 71:5, 109:15, 109:17, 111:14
**matter** [4] - 81:23, 86:3, 152:15, 218:15
**matters** [2] - 50:20, 97:19
**maximum** [1] - 212:7
**Mayer** [2] - 51:2, 53:5
**McKinley** [1] - 25:5
**me..** [1] - 138:16
**mean** [34] - 18:14, 33:15, 68:24, 69:12, 76:9, 97:15, 108:6, 114:5, 152:5, 154:3, 175:18, 175:19, 176:7, 176:11, 178:8, 180:12, 180:15, 181:2, 181:3, 181:13, 181:14, 183:22, 184:11, 185:6, 196:18, 197:14, 197:15, 198:22, 208:11, 208:13, 209:24, 210:3, 210:15, 212:18
**means** [11] - 6:5, 30:24, 95:13, 95:18, 99:20, 101:13, 103:8, 108:6, 154:1, 185:20, 203:16
**meant** [3] - 7:9, 95:8, 188:13
**measures** [2] - 7:1, 95:20
**media** [3] - 26:18, 88:23, 88:24
**medical** [1] - 111:15
**meet** [7] - 35:1, 43:18, 103:14, 124:1, 175:2, 175:4, 176:6
**meeting** [49] - 48:10, 89:15, 123:18, 124:7, 124:17, 124:20, 125:2, 125:10, 125:12, 125:14, 125:22, 127:4, 128:10, 128:22, 129:16, 129:18, 131:16, 131:19, 131:25, 132:16, 134:20, 135:17, 136:11,

138:8, 143:8, 145:10, 145:11, 146:25, 148:21, 153:12, 154:7, 154:8, 154:12, 155:4, 155:15, 155:21, 155:23, 155:24, 156:17, 156:21, 157:1, 158:14, 158:15, 159:3, 159:17, 159:18, 175:22
**meetings** [1] - 41:20
**Megan** [15] - 26:12, 120:4, 122:17, 122:18, 146:17, 146:24, 147:16, 147:24, 148:10, 150:20, 152:24, 153:2, 154:21, 156:23
**MEGAN** [2] - 122:14, 219:4
**member** [20] - 24:20, 24:22, 25:3, 27:15, 28:23, 29:3, 29:20, 53:10, 57:23, 71:2, 71:9, 112:1, 115:6, 116:5, 116:8, 116:10, 133:24, 187:14, 199:24, 203:23
**members** [19] - 29:21, 30:22, 88:9, 90:18, 94:14, 102:23, 111:22, 112:1, 115:24, 120:5, 120:17, 172:21, 172:22, 182:11, 187:14, 197:22, 212:20, 215:17, 215:21
**memories** [3] - 102:20, 102:25
**memory** [1] - 101:19
**men** [30] - 23:17, 28:8, 44:24, 45:3, 49:16, 49:17, 72:2, 73:5, 78:12, 78:18, 78:19, 79:4, 80:3, 86:1, 112:13, 113:12, 114:15, 115:21, 176:12, 192:23, 207:19, 207:23, 207:25, 208:13, 208:14, 209:8, 209:22, 211:17, 211:21
**men's** [1] - 209:12
**mention** [1] - 200:20

**mentioned** [19] - 26:16, 78:25, 117:5, 134:17, 158:17, 164:25, 165:20, 166:7, 168:13, 169:20, 174:13, 176:23, 183:1, 183:4, 184:9, 184:16, 202:2, 206:14, 207:4
**mentorship** [1] - 44:8
**Merck** [2] - 52:16, 52:17
**merit** [11] - 6:25, 60:1, 60:4, 95:20, 176:4, 177:2, 177:19, 177:23, 202:10, 212:10
**message** [1] - 147:9
**messages** [3] - 96:25, 97:1
**messaging** [1] - 97:2
**Messenger** [1] - 97:3
**met** [6] - 109:23, 121:17, 143:2, 143:5, 143:8
**method** [2] - 11:12, 13:10
**MG** [2] - 3:9, 24:18
**Michael** [1] - 53:5
**mid-2000s** [1] - 40:21
**middle** [2] - 81:25, 162:10
**might** [24] - 20:21, 72:1, 73:18, 77:1, 100:11, 102:22, 102:23, 102:24, 128:12, 128:13, 128:16, 169:6, 175:19, 180:7, 180:13, 180:17, 180:19, 198:20, 199:10, 199:13, 202:10, 212:16, 214:15
**Miller** [3] - 25:6, 111:4, 134:24
**MILLER** [1] - 2:3
**million** [1] - 210:20
**mind** [10] - 33:23, 43:4, 43:5, 96:13, 98:5, 104:2, 115:10, 117:25, 118:24, 216:2
**mine** [1] - 169:16
**minimal** [8] - 111:25, 174:3, 175:1, 175:4, 175:8, 175:21, 175:23, 180:25
**minimum** [3] - 98:14,

174:8, 176:6
**minute** [2] - 15:21, 199:15
**minutes** [8] - 75:25, 88:1, 88:5, 88:6, 88:19, 105:11, 105:14, 216:16
**Miriam** [1] - 26:2
**miriam** [1] - 116:24
**misdemeanor** [1] - 19:8
**misheard** [1] - 74:14
**Miss** [5] - 5:20, 6:14, 7:5, 7:18, 8:12, 17:22, 34:24, 43:16, 52:3
**missed** [1] - 47:22
**missing** [1] - 63:15
**misstatement** [1] - 213:2
**misstating** [1] - 112:22
**misunderstanding** [1] - 213:24
**mix** [1] - 72:2
**mode** [1] - 210:16
**model** [1] - 217:20
**moment** [9] - 21:18, 93:14, 94:3, 114:1, 114:22, 120:1, 155:24, 160:4, 178:9
**Monday** [3] - 146:2, 149:12, 149:13
**money** [25] - 27:4, 28:6, 52:10, 55:1, 60:9, 60:10, 60:11, 65:10, 69:24, 72:21, 75:1, 75:5, 75:12, 75:15, 75:17, 77:12, 83:7, 106:2, 141:22, 178:6, 196:3, 201:1, 212:8
**month** [3] - 41:20, 114:21, 128:10
**months** [4] - 60:18, 77:20, 156:25, 165:18
**Moors** [1] - 40:11
**morning** [22] - 3:2, 3:13, 3:20, 3:24, 22:18, 31:11, 33:4, 34:9, 37:22, 37:23, 40:11, 43:17, 46:11, 46:12, 57:16, 57:18, 67:24, 81:12, 105:13, 110:16, 140:7, 149:11
**most** [15] - 63:25, 64:1, 75:25, 85:18, 96:13, 111:2,

116:19, 118:21, 162:13, 165:14, 165:18, 179:21, 182:25, 183:18, 185:6
**mostly** [4] - 47:5, 56:19, 77:1, 78:19
**motion** [13] - 31:4, 31:5, 34:4, 34:5, 37:7, 37:20, 43:13, 50:18, 50:25, 53:2, 65:19, 65:20, 67:20
**motions** [14] - 4:22, 31:3, 37:3, 40:7, 40:8, 43:12, 46:7, 50:16, 65:5, 72:9, 76:20, 76:22, 81:8, 86:15
**motive** [1] - 101:21
**move** [9] - 8:19, 9:6, 33:24, 37:9, 54:16, 59:16, 72:10, 72:14, 87:21
**moved** [1] - 78:15
**moving** [1] - 88:9
**MR** [167] - 3:7, 3:16, 3:20, 9:24, 10:14, 10:18, 10:24, 12:14, 12:18, 12:25, 13:7, 13:11, 13:17, 13:24, 14:12, 14:25, 15:4, 15:14, 16:1, 16:6, 16:14, 17:1, 17:6, 17:10, 17:13, 17:16, 17:19, 18:4, 18:7, 18:12, 18:16, 19:9, 19:17, 20:2, 21:8, 21:14, 22:6, 22:9, 32:14, 33:10, 34:6, 34:21, 35:22, 36:1, 36:4, 37:1, 37:4, 37:13, 37:19, 38:21, 39:11, 40:5, 40:9, 41:6, 41:8, 41:10, 42:11, 43:11, 43:14, 44:22, 44:24, 45:1, 45:3, 46:4, 46:9, 47:22, 49:20, 50:1, 50:5, 50:8, 50:18, 53:4, 54:11, 56:1, 57:1, 57:4, 57:9, 57:15, 59:3, 59:7, 62:22, 64:25, 65:7, 66:24, 67:17, 67:22, 70:9, 71:5, 72:6, 72:15, 74:4, 74:7, 76:18, 76:23, 79:4, 80:10, 81:6, 81:10, 83:5, 84:17, 85:11, 86:11, 86:13, 86:17,

87:13, 87:17, 89:17, 89:24, 91:8, 91:11, 91:14, 91:17, 91:20, 91:23, 105:18, 111:7, 112:21, 112:24, 119:23, 119:25, 120:4, 120:11, 121:13, 122:11, 122:20, 128:6, 135:1, 135:4, 137:16, 137:22, 138:5, 142:7, 142:15, 142:24, 146:14, 150:8, 150:11, 150:13, 150:15, 150:17, 150:19, 150:23, 151:1, 151:4, 151:10, 151:13, 157:4, 159:16, 159:22, 160:2, 160:10, 160:12, 160:21, 163:21, 169:16, 169:18, 210:25, 211:5, 211:6, 213:21, 215:9, 215:13, 216:15, 216:22, 218:8, 219:5, 219:9
**MS** [155] - 3:10, 3:13, 3:24, 4:5, 4:8, 8:16, 8:20, 9:3, 9:7, 9:21, 10:25, 11:2, 11:14, 12:13, 13:3, 13:6, 16:16, 20:12, 20:19, 20:23, 21:15, 22:7, 31:9, 32:13, 33:4, 33:9, 33:15, 33:19, 34:1, 34:5, 34:20, 36:25, 37:5, 37:8, 38:20, 39:12, 40:3, 40:8, 41:5, 42:9, 43:10, 43:13, 44:20, 46:2, 46:8, 47:20, 49:12, 49:16, 49:19, 49:23, 50:13, 50:17, 52:4, 53:3, 54:9, 55:24, 56:6, 56:9, 57:2, 59:2, 59:10, 61:3, 61:10, 62:21, 64:23, 65:6, 65:14, 65:21, 66:23, 67:2, 67:7, 67:15, 67:21, 70:8, 70:24, 71:17, 71:21, 71:24, 72:2, 72:4, 72:10, 74:5, 76:16, 76:21, 77:2, 78:25, 79:10, 80:9, 81:4, 81:9, 82:23, 84:6, 84:9, 84:15, 85:10, 86:16, 87:5,

87:11, 87:25, 88:7, 89:18, 89:21, 90:3, 90:13, 90:15, 91:2, 91:7, 91:10, 91:13, 91:16, 91:19, 91:22, 92:1, 92:3, 92:5, 92:9, 92:11, 110:19, 111:8, 111:11, 111:12, 113:4, 119:5, 119:11, 119:16, 119:20, 120:12, 120:15, 121:2, 121:5, 127:17, 127:19, 127:21, 127:24, 131:13, 135:6, 137:12, 138:1, 146:10, 151:6, 151:11, 157:7, 158:4, 158:6, 159:13, 160:3, 160:9, 163:18, 216:18, 216:25, 217:8, 217:11, 218:7, 219:6, 219:10
**multiple** [7] - 11:17, 11:19, 51:24, 133:24, 134:5, 161:24, 197:14
**Murasko** [1] - 26:5
**murder** [1] - 62:5
**must** [20] - 4:15, 4:25, 23:17, 23:24, 88:22, 88:23, 95:3, 96:18, 98:24, 99:5, 100:5, 102:13, 103:14, 111:23, 114:25, 118:20, 153:15, 173:13, 215:19
**mystery** [1] - 105:20

# N

**N/A** [1] - 172:11
**name** [17] - 3:7, 3:9, 3:24, 105:18, 111:3, 120:3, 122:15, 122:16, 122:18, 139:9, 142:19, 142:20, 160:17, 160:18, 164:6, 192:12, 201:23
**names** [4] - 24:18, 30:12, 106:15, 139:2
**nanny** [1] - 67:13
**Nathan** [3] - 25:21, 205:12
**national** [1] - 214:21
**native** [1] - 200:22
**naughty** [1] - 6:12

nay [1] - 86:23
neat [1] - 12:22
necessarily [5] - 84:11, 102:3, 128:19, 183:22, 207:20
necessary [4] - 23:7, 98:7, 98:11, 153:10
need [35] - 10:16, 11:12, 13:19, 13:20, 16:19, 16:20, 17:15, 19:23, 20:8, 44:7, 47:12, 88:5, 96:13, 112:21, 120:1, 120:6, 122:9, 130:17, 131:9, 146:12, 150:12, 150:18, 150:25, 179:22, 182:18, 183:19, 197:23, 205:7, 210:19, 210:22, 211:12, 213:1, 217:12, 217:15, 218:10
needed [6] - 130:11, 130:25, 131:1, 131:21, 135:21
needing [1] - 197:24
needs [2] - 144:17, 162:22
negotiable [1] - 210:14
negotiate [2] - 114:14, 210:13
negotiated [3] - 177:5, 209:21, 210:3
negotiates [1] - 115:17
negotiating [3] - 48:9, 48:12, 210:5
negotiation [3] - 50:3, 50:20, 189:6
negotiations [7] - 48:15, 48:18, 48:21, 48:24, 49:3, 49:7, 210:11
neighbor's [2] - 53:12, 53:14
Nelson [3] - 12:23, 13:4, 90:14
netbooks [1] - 96:16
networking [1] - 97:4
neutral [1] - 37:12
never [25] - 20:15, 45:15, 60:20, 60:21, 64:11, 75:2, 75:4, 75:5, 110:25, 112:18, 112:19, 113:4, 114:17, 115:15, 116:1,

117:7, 117:11, 117:22, 167:25, 186:22, 198:16, 213:3, 213:5, 213:22, 213:25
New [2] - 56:13, 124:18
new [2] - 78:21, 82:5
news [1] - 215:25
newspaper [1] - 97:16
next [29] - 5:19, 8:15, 9:6, 9:20, 22:3, 33:17, 38:22, 39:13, 41:12, 52:5, 52:9, 54:16, 56:2, 59:16, 67:8, 71:8, 78:16, 79:6, 83:6, 84:18, 88:10, 104:5, 131:25, 132:8, 142:10, 142:12, 160:1, 183:20, 211:3
niece [1] - 68:6
night [3] - 129:2, 148:24, 150:9
nine [2] - 114:21, 144:12
nine-month [1] - 114:21
NO [1] - 1:3
noise [2] - 30:6, 36:5
Nomi [1] - 25:17
non [11] - 14:11, 15:3, 15:4, 15:22, 16:4, 16:6, 16:10, 16:21, 17:2, 17:9, 17:25
non-willful [10] - 15:3, 15:4, 15:22, 16:4, 16:6, 16:10, 16:21, 17:2, 17:9, 17:25
non-willfulness [1] - 14:11
none [10] - 7:24, 15:25, 40:5, 40:9, 42:11, 43:14, 54:9, 86:16, 101:15, 193:7
Nonetheless [1] - 152:15
nonwillful [1] - 15:25
noon [2] - 89:14, 129:12
normal [1] - 133:25, 190:2
normally [3] - 132:20, 191:10, 214:12
North [1] - 61:25
Northeastern [1] - 192:17
note [2] - 4:17, 204:11
notes [7] - 102:15, 102:16, 102:23,

102:24, 103:1, 103:2, 217:5
nothing [11] - 17:3, 65:16, 76:9, 76:21, 82:15, 88:15, 88:16, 140:11, 196:13, 210:11
notice [1] - 98:24
noticed [3] - 69:22, 189:25, 195:17
notions [1] - 29:13
novelist [1] - 184:4
nuance [1] - 21:19
nuanced [1] - 21:17
Number [2] - 26:23, 27:2
number [145] - 4:14, 11:22, 20:13, 22:3, 22:5, 24:2, 24:3, 24:4, 24:25, 25:1, 25:11, 26:23, 26:24, 27:2, 27:6, 27:7, 27:12, 27:13, 27:14, 27:17, 27:23, 28:14, 28:18, 28:19, 28:21, 28:22, 29:1, 29:8, 29:9, 29:18, 30:21, 31:6, 31:7, 31:10, 34:7, 34:23, 37:21, 38:24, 40:10, 43:15, 46:10, 51:1, 53:8, 56:7, 56:8, 57:16, 61:5, 65:22, 67:5, 67:23, 72:17, 77:6, 81:11, 86:18, 86:21, 86:22, 87:1, 87:14, 87:15, 90:5, 91:6, 91:9, 91:12, 91:15, 91:18, 91:21, 91:24, 92:2, 92:12, 92:14, 92:15, 92:16, 98:14, 101:16, 102:3, 102:19, 118:18, 150:7, 150:10, 169:24, 170:15, 172:19, 172:20, 178:19, 199:20
numbered [1] - 150:11
numbers [11] - 11:6, 13:21, 20:24, 22:2, 24:11, 24:12, 49:5, 60:15, 91:4, 132:20, 203:18
numerous [1] - 5:24
nurse [3] - 58:2, 58:11, 59:6
nursing [6] - 58:8, 59:5, 68:8, 70:1, 71:15, 85:4
nuts [1] - 162:11

# O

o'clock [5] - 124:11, 132:8, 154:1, 215:11, 218:10
oath [1] - 215:15
object [6] - 4:13, 9:2, 9:20, 45:24, 99:19, 112:21
objection [12] - 72:15, 99:23, 100:2, 127:17, 128:3, 128:4, 137:25, 146:10, 151:5, 151:6, 163:17
objections [6] - 4:21, 99:3, 99:23, 99:24, 113:2
objective [1] - 116:3
objectives [1] - 173:14
obligation [1] - 99:24
obtain [1] - 97:25
obvious [1] - 211:23
obviously [6] - 5:13, 7:13, 12:11, 14:10, 87:20, 216:4
occasionally [1] - 39:20
occur [1] - 11:1
occurred [1] - 110:4
October [8] - 127:16, 143:5, 154:6, 154:10, 156:25, 158:15, 159:18
OF [2] - 1:2, 215:10
offer [2] - 137:24, 183:20
offered [2] - 99:25, 152:8
offers [4] - 99:17, 116:10, 212:22, 212:25
offhand [1] - 127:14
office [25] - 27:9, 28:25, 39:15, 124:8, 127:10, 128:22, 143:21, 143:25, 154:19, 154:21, 155:2, 156:23, 176:17, 190:24, 191:18, 191:23, 192:2, 192:13, 193:5, 193:8, 196:24, 198:2, 211:11, 215:4
Officer [1] - 122:22
officers [1] - 10:12
Official [1] - 1:20
often [2] - 50:21, 61:19

old [1] - 35:23
on-line [4] - 58:7, 61:14, 85:19, 85:20
once [12] - 11:4, 12:10, 21:12, 24:11, 24:14, 24:15, 41:20, 114:16, 143:11, 143:12, 164:5, 190:9
one [114] - 4:15, 5:1, 5:5, 5:18, 5:19, 7:11, 7:12, 8:5, 11:2, 11:17, 12:11, 13:14, 13:15, 14:14, 20:7, 22:22, 24:7, 30:4, 31:14, 34:10, 35:5, 35:24, 38:1, 39:13, 47:12, 48:12, 51:4, 51:19, 52:2, 59:1, 59:16, 65:25, 67:5, 67:8, 68:1, 68:8, 71:11, 73:20, 73:21, 74:14, 83:13, 84:23, 85:23, 87:23, 88:21, 90:19, 91:5, 91:6, 95:14, 95:24, 100:14, 100:24, 102:18, 105:11, 109:18, 109:22, 110:21, 113:17, 113:22, 121:5, 133:12, 138:1, 140:25, 150:15, 158:17, 160:4, 160:14, 162:7, 163:15, 165:14, 165:16, 168:18, 168:21, 169:19, 170:15, 172:4, 176:19, 177:6, 177:24, 178:25, 179:16, 180:23, 181:3, 181:4, 181:20, 181:21, 183:2, 183:13, 183:18, 184:2, 184:4, 189:25, 194:14, 195:12, 195:22, 196:1, 201:19, 202:9, 204:11, 205:3, 209:16, 210:17, 210:20, 211:3, 211:24, 212:3, 212:9, 212:13, 212:14, 214:20
ONE [1] - 1:5
one's [1] - 115:4
one-size-fits-all [1] - 113:17
online [1] - 58:3

**open** [6] - 11:14, 96:13, 98:5, 153:22, 214:22, 216:2
**opening** [14] - 93:16, 93:17, 94:5, 94:6, 104:4, 104:5, 104:6, 104:9, 104:22, 112:23, 119:3, 213:2, 214:13, 214:14
**openings** [1] - 90:22
**OPENS** [1] - 3:1
**Operations** [1] - 143:15
**opinion** [6] - 50:2, 50:6, 50:7, 50:20, 57:9, 98:17
**opportunities** [2] - 115:10, 177:6
**opportunity** [3] - 63:12, 80:16, 101:17
**opposed** [1] - 116:9
**opposite** [2] - 6:7, 103:12
**option** [1] - 30:3
**orally** [1] - 96:22
**order** [8] - 23:20, 134:21, 134:24, 135:1, 135:3, 135:18, 135:23, 143:11
**ordered** [2] - 100:8, 137:4
**orders** [1] - 8:3
**organization** [1] - 39:6
**organize** [1] - 182:6
**organized** [3] - 139:2, 139:9, 164:5
**oriented** [2] - 204:18, 205:20
**originally** [1] - 187:25
**otherwise** [3] - 16:21, 103:20, 105:13
**ourselves** [1] - 182:6
**outcome** [2] - 42:23, 101:20
**outline** [1] - 104:7
**output** [1] - 133:6
**outs** [1] - 18:24
**outside** [10] - 22:11, 89:7, 98:2, 99:5, 99:8, 100:19, 133:25, 176:13, 180:17, 180:20
**outstanding** [1] - 60:10
**overall** [1] - 181:2
**overlap** [2] - 16:16, 16:18
**overruled** [1] - 100:3

**oversee** [4] - 114:25, 123:8, 143:21, 214:3
**overseeing** [2] - 44:3, 162:24
**oversteps** [1] - 9:19
**overturned** [1] - 51:20
**owed** [1] - 96:2
**own** [6] - 72:25, 78:20, 97:19, 100:17, 133:9, 181:25
**owned** [2] - 46:18, 77:16
**owner** [5] - 48:11, 48:19, 48:23, 49:7, 73:13

**P**

**P.C** [1] - 1:15
**p.m** [1] - 135:23
**PA** [3] - 1:9, 2:5, 45:10
**packing** [1] - 129:13
**Padovani** [5] - 26:6, 205:11, 205:12, 207:6, 207:7
**page** [2] - 138:25, 194:2
**PAGE** [1] - 219:3
**paid** [69] - 6:7, 23:3, 27:4, 28:5, 28:9, 39:1, 39:2, 44:10, 52:11, 58:13, 58:16, 72:21, 77:12, 77:22, 79:4, 80:2, 83:8, 95:9, 95:14, 106:12, 107:6, 107:17, 107:25, 108:18, 108:19, 116:22, 118:15, 141:2, 141:22, 142:1, 165:12, 167:7, 169:2, 171:1, 171:2, 171:20, 173:1, 176:5, 178:5, 178:16, 184:9, 184:11, 184:12, 184:13, 187:12, 188:24, 192:9, 194:8, 194:19, 194:20, 196:7, 196:15, 196:16, 196:19, 200:23, 201:24, 203:12, 203:16, 203:22, 207:2, 207:23, 207:25, 208:1, 208:7, 208:8, 211:18
**panel** [18] - 22:17, 22:20, 29:20, 63:16, 88:9, 88:12, 90:18,

91:6, 91:9, 91:12, 91:15, 91:18, 91:24, 92:6, 92:20, 93:6, 93:7, 93:22
**Panel** [1] - 91:21
**paper** [3] - 11:16, 66:7, 89:18
**paragraph** [1] - 152:14
**paragraphs** [1] - 152:21
**paralegal** [1] - 3:25
**parameter** [1] - 136:24
**parameters** [11] - 10:7, 131:20, 132:4, 133:4, 135:21, 136:9, 138:21, 140:3, 141:7, 175:14, 175:17
**parents** [6] - 54:21, 54:23, 54:25, 55:10, 130:11, 131:8
**part** [4] - 16:24, 23:16, 27:8, 48:14, 50:3, 51:9, 59:20, 60:3, 60:4, 62:5, 62:11, 63:4, 63:13, 63:16, 71:14, 79:24, 92:20, 94:21, 96:3, 101:14, 113:19, 115:2, 123:6, 132:23, 140:15, 140:21, 141:14, 165:19, 168:13, 173:20, 174:6, 175:10, 175:11, 175:12, 175:14, 178:6, 181:9, 182:8, 183:6, 183:9, 200:15, 206:19, 210:15
**part-time** [2] - 115:2, 183:6
**part-timers** [1] - 183:9
**participate** [1] - 123:18
**participated** [6] - 29:7, 54:17, 63:7, 74:17, 74:19, 74:21
**particular** [4] - 20:5, 50:12, 99:21, 183:14
**parties** [11] - 3:4, 3:6, 7:4, 9:18, 9:19, 10:22, 21:11, 89:3, 92:8, 98:23, 99:3
**parties'** [1] - 104:15
**partly** [1] - 183:3
**parts** [4] - 23:3, 175:16, 178:25, 183:18
**party** [8] - 29:7, 54:18,

63:8, 97:8, 103:4, 103:5, 104:8, 104:9
**pass** [3] - 85:20, 87:23, 97:9
**passed** [2] - 111:12, 125:21
**passing** [1] - 88:14
**past** [2] - 60:6, 210:25
**patient** [1] - 98:9
**Paul** [2] - 25:23, 217:2
**pause** [1] - 115:7
**Pay** [18] - 6:6, 10:4, 23:4, 32:22, 41:22, 85:21, 95:6, 95:13, 95:25, 96:4, 105:23, 105:25, 108:4, 108:9, 108:16, 109:2, 110:6, 116:16
**pay** [54] - 5:6, 40:24, 42:2, 48:15, 48:18, 48:24, 50:2, 54:25, 55:15, 57:5, 58:20, 59:22, 65:10, 65:16, 70:17, 79:23, 79:25, 80:11, 80:12, 80:14, 82:3, 82:7, 82:12, 82:15, 83:12, 83:14, 83:16, 85:7, 86:1, 95:7, 95:19, 102:13, 102:17, 106:5, 111:1, 112:2, 113:6, 116:3, 123:7, 123:13, 125:18, 128:4, 130:5, 156:3, 158:11, 185:12, 191:5, 193:21, 195:1, 201:15, 202:3, 211:9, 212:15
**payable** [1] - 133:12
**paying** [5] - 59:4, 65:9, 69:20, 106:1, 108:9
**Payroll** [1] - 143:14
**payroll** [33] - 110:7, 123:19, 126:7, 126:8, 126:10, 132:5, 132:15, 132:17, 133:15, 133:18, 134:6, 134:22, 135:25, 136:17, 136:18, 137:2, 137:3, 137:6, 143:21, 143:23, 143:25, 144:6, 144:20, 145:1, 145:6, 145:12, 145:13, 145:17, 146:5, 146:6, 149:3, 149:22, 157:11
**pays** [3] - 59:6,

114:12, 115:16
**PDF** [3] - 149:5, 152:6, 155:17
**PDFs** [4] - 155:11, 155:15, 155:18, 159:17
**penalty** [2] - 62:7, 151:21
**Penn** [2] - 2:4, 70:13
**PENNSYLVANIA** [1] - 1:2
**Pennsylvania** [4] - 32:5, 32:8, 38:9, 71:3
**people** [76] - 11:18, 11:19, 14:6, 21:23, 23:24, 25:8, 25:12, 26:15, 30:11, 31:1, 31:7, 40:22, 41:6, 41:25, 44:3, 47:12, 49:8, 49:14, 50:21, 60:8, 60:18, 60:19, 69:23, 71:18, 71:24, 72:25, 73:1, 74:20, 74:24, 77:21, 83:12, 84:23, 88:16, 99:12, 109:8, 109:10, 118:14, 129:4, 144:3, 144:5, 144:8, 144:12, 144:24, 145:5, 145:17, 166:4, 167:5, 167:13, 167:17, 169:19, 172:25, 176:23, 179:2, 182:24, 182:25, 187:17, 190:1, 191:16, 192:12, 193:4, 193:7, 196:15, 196:16, 196:19, 197:14, 205:10, 205:11, 209:12, 212:23, 214:15, 215:1, 215:21
**people's** [2] - 59:21, 203:24
**peoples'** [1] - 73:11
**per** [4] - 128:17, 172:23, 184:11, 184:12
**percent** [14] - 175:11, 175:12, 175:13, 176:24, 177:9, 177:13, 177:22, 177:23, 177:24, 178:14, 178:18, 206:15, 206:16, 206:17
**percentages** [1] -

178:12
**perform** [1] - 23:5
**performance** [1] - 176:3
**performed** [1] - 95:16
**performing** [2] - 6:8, 95:15
**perhaps** [1] - 6:14
**period** [29] - 14:13, 14:14, 14:22, 15:13, 15:24, 16:2, 16:13, 16:18, 16:21, 17:2, 21:23, 22:2, 22:3, 55:7, 69:7, 80:1, 88:21, 131:22, 132:6, 167:12, 170:6, 170:8, 170:11, 170:12, 171:12, 188:15, 188:20, 188:23, 191:2
**periods** [4] - 14:5, 14:6, 21:22, 129:4
**perjury** [1] - 151:22
**permitted** [3] - 99:19, 102:7, 104:16
**person** [26] - 4:15, 11:17, 12:17, 15:10, 28:6, 43:6, 52:22, 65:1, 73:22, 113:21, 114:10, 114:23, 116:10, 122:1, 125:9, 126:5, 126:13, 134:4, 136:16, 136:17, 136:18, 143:23, 144:25, 161:9, 195:6, 197:7
**person's** [1] - 206:9
**personal** [7] - 28:24, 39:14, 85:4, 132:19, 132:21, 146:25, 147:10
**personally** [4] - 24:17, 25:2, 60:20, 188:14
**personnel** [2] - 27:9, 162:18
**persons** [2] - 102:19, 126:16
**pertain** [2] - 20:21, 30:18
**pertains** [1] - 217:21
**Peter** [1] - 25:12
**Petro** [1] - 46:11
**pews** [1] - 92:17
**Ph.D** [2] - 182:18, 183:22
**Ph.D.s** [1] - 182:13
**phase** [1] - 88:10
**Philadelphia** [6] - 1:9,

2:5, 31:19, 39:17, 59:19, 61:25
**philosopher** [1] - 180:11
**philosophy** [3] - 106:11, 205:1
**Philosophy** [63] - 3:18, 23:1, 56:21, 106:10, 106:18, 109:16, 111:6, 111:18, 111:19, 111:20, 111:22, 118:8, 118:10, 123:24, 125:15, 132:11, 136:2, 137:8, 139:14, 139:21, 161:2, 161:4, 161:18, 162:7, 162:15, 162:25, 164:1, 164:10, 164:19, 164:24, 166:4, 172:23, 174:14, 174:15, 176:13, 176:15, 179:15, 179:19, 179:24, 180:9, 180:13, 180:19, 180:20, 180:21, 182:5, 182:17, 183:24, 203:22, 204:13, 204:14, 204:16, 204:17, 204:23, 204:24, 204:25, 205:7, 205:15, 205:18, 213:9, 214:2, 214:16
**phone** [6] - 96:23, 146:25, 147:10, 148:20, 169:14, 169:15
**phones** [2] - 96:15
**photocopier** [1] - 162:22
**physics** [3] - 81:19, 81:24, 81:25
**pick** [3] - 14:17, 14:19, 214:17
**picking** [1] - 88:3
**picture** [4] - 15:5, 15:9, 56:20, 162:21
**piece** [2] - 11:15, 132:17
**Piety** [87] - 3:8, 3:9, 3:10, 15:6, 15:20, 17:22, 17:24, 19:10, 22:25, 24:18, 24:19, 95:13, 96:2, 96:3, 105:19, 106:1, 106:11, 107:25,

108:10, 110:24, 111:21, 111:23, 112:3, 112:15, 112:17, 113:4, 113:13, 114:4, 116:1, 116:13, 116:23, 116:25, 117:6, 117:9, 117:17, 117:22, 118:1, 118:2, 118:11, 118:13, 125:2, 132:17, 133:7, 134:9, 134:12, 134:15, 134:20, 139:18, 141:18, 141:20, 145:11, 148:22, 154:8, 154:15, 163:13, 168:5, 173:2, 173:6, 174:1, 186:10, 187:12, 187:22, 188:24, 194:17, 194:18, 194:21, 202:15, 202:18, 203:3, 203:4, 203:15, 203:21, 204:13, 204:15, 205:3, 205:22, 206:22, 208:7, 208:14, 208:15, 213:3
**PIETY** [1] - 1:3
**Piety's** [13] - 18:1, 106:24, 108:23, 109:6, 111:1, 112:11, 116:19, 118:7, 118:12, 118:20, 171:1, 207:8, 207:10
**place** [8] - 66:2, 156:21, 161:22, 177:4, 182:18, 196:21, 202:1, 205:18
**places** [1] - 212:22
**plaintiff** [53] - 3:8, 3:10, 5:4, 5:8, 16:17, 16:18, 21:4, 22:25, 24:18, 33:5, 42:20, 42:22, 45:18, 76:22, 89:21, 89:23, 93:15, 94:5, 95:13, 103:4, 103:6, 103:8, 103:11, 103:12, 103:13, 104:10, 104:11, 104:12, 104:14, 105:17, 105:19, 110:6, 110:9, 111:21, 123:18, 124:1,

125:2, 125:14, 125:18, 125:22, 126:23, 129:7, 129:22, 135:20, 135:22, 135:24, 136:21, 137:5, 138:7, 141:19, 159:4, 160:2
**PLAINTIFF** [1] - 1:15
**plaintiff's** [12] - 8:22, 9:11, 9:15, 14:9, 104:13, 125:20, 133:3, 134:22, 135:25, 137:5, 146:15, 218:1
**plaintiffs** [3] - 33:14, 95:8, 104:4
**plan** [1] - 162:21
**play** [4] - 7:23, 20:13, 94:21, 118:19
**plus** [5] - 87:1, 115:1, 142:5, 179:7, 203:25
**podium** [1] - 4:6
**poet** [1] - 184:3
**point** [30] - 17:18, 21:25, 88:19, 90:21, 142:8, 148:3, 163:9, 172:5, 187:8, 187:9, 187:11, 188:7, 189:5, 190:25, 191:17, 191:22, 195:12, 197:17, 198:21, 202:15, 202:18, 203:14, 204:1, 204:9, 204:11, 204:16, 204:17, 208:25, 209:11
**points** [1] - 4:12
**policies** [3] - 181:7, 181:17, 181:19
**policy** [12] - 176:11, 176:14, 176:17, 176:19, 176:22, 189:14, 189:16, 191:12, 196:6, 196:11, 197:11
**Politics** [1] - 162:5
**pool** [1] - 60:11
**portable** [3] - 96:15, 96:16, 96:23
**Porter** [15] - 7:17, 26:7, 106:20, 117:21, 166:14, 170:13, 170:15, 170:17, 184:20, 199:15, 199:19, 200:21, 201:19, 207:18, 214:5
**portion** [3] - 114:15,

115:17, 190:23
**position** [22] - 19:16, 20:2, 20:5, 20:9, 20:15, 24:5, 50:24, 64:14, 69:23, 80:17, 104:21, 112:5, 116:9, 117:22, 122:25, 123:3, 123:6, 142:4, 186:14, 190:24, 213:9, 213:23
**positions** [12] - 8:12, 50:22, 79:13, 113:13, 114:19, 114:21, 117:11, 117:18, 133:24, 164:1, 192:22
**possessed** [1] - 23:17
**possession** [1] - 24:3
**possibility** [1] - 217:9
**possible** [9] - 104:16, 176:25, 177:19, 180:15, 212:8, 212:12, 212:24, 214:10, 215:7
**possibly** [5] - 133:17, 165:14, 180:15, 192:4, 208:10
**posting** [1] - 96:25
**pot** [1] - 212:24
**POTENTIAL** [2] - 28:17, 32:6
**potentially** [1] - 33:5
**Pottstown** [1] - 38:8
**power** [2] - 23:8, 76:11
**practice** [9] - 23:12, 189:2, 189:10, 189:15, 189:19, 189:21, 190:12, 190:17, 191:9
**practitioner** [2] - 58:2, 59:6
**pre** [1] - 38:5
**pre-K** [1] - 38:5
**precisely** [1] - 212:21
**precluded** [1] - 8:3
**preemptories** [3] - 30:23, 87:9, 90:25
**preemptory** [2] - 37:7, 67:18
**prefer** [2] - 4:5, 160:13
**preferred** [1] - 122:18
**prejudice** [1] - 101:21
**preliminary** [3] - 93:15, 94:4, 94:16
**premier** [1] - 111:15
**preparation** [1] - 132:7
**prepare** [1] - 131:18

**prepared** [3] - 1:22, 109:24, 133:20
**preponderance** [4] - 103:3, 103:7, 103:17, 103:19
**prescheduled** [1] - 124:8
**present** [12] - 104:11, 104:12, 104:13, 104:16, 104:19, 104:24, 108:15, 108:17, 110:11, 119:12, 136:3, 137:9
**presentation** [2] - 96:14, 110:3
**presented** [7] - 19:21, 29:11, 97:22, 98:12, 101:6, 104:15, 104:18
**presently** [1] - 170:18
**presents** [1] - 9:11
**president** [1] - 114:11
**President** [2] - 114:24, 122:22
**pressure** [1] - 62:25
**pretrial** [4] - 4:10, 6:2, 7:8, 9:15
**pretty** [7] - 133:17, 174:16, 174:17, 194:13, 206:13, 213:7, 213:8
**prevent** [1] - 9:3
**preventative** [1] - 9:5
**previous** [5] - 69:16, 72:12, 79:13, 83:13, 129:2
**previously** [1] - 127:19
**Pricilla** [2] - 52:22, 53:1
**primary** [2] - 138:20, 140:1
**Princeton** [2] - 44:1, 46:18
**principal** [4] - 35:12, 35:23, 36:1, 36:3
**principles** [2] - 23:12, 95:2
**printed** [1] - 12:8
**privilege** [1] - 146:10
**pro** [1] - 42:22
**probations** [1] - 117:2
**problem** [4] - 29:21, 120:14, 158:22, 195:8
**problems** [1] - 120:18
**procedures** [1] - 88:1
**proceed** [1] - 104:3
**proceedings** [1] - 218:15

**Proceedings** [1] - 1:22
**process** [31] - 11:22, 11:23, 12:5, 12:6, 12:9, 12:10, 13:5, 13:22, 30:19, 60:17, 67:17, 75:6, 75:9, 83:11, 83:15, 83:24, 83:25, 84:8, 86:5, 86:6, 90:20, 92:23, 196:23, 197:16, 197:18, 197:21, 214:5, 214:25, 215:5
**processes** [1] - 162:18
**processing** [1] - 44:7
**procurement** [1] - 85:4
**produced** [1] - 103:23
**production** [2] - 7:2, 95:21
**profession** [2] - 56:9, 107:15
**professional** [3] - 3:9, 115:2, 115:10
**professions** [2] - 117:4, 185:8
**Professor** [49] - 3:9, 15:6, 95:13, 96:2, 96:3, 106:1, 106:11, 106:16, 106:17, 106:20, 106:24, 107:2, 107:25, 108:10, 110:24, 111:23, 112:3, 112:8, 112:10, 112:17, 116:1, 116:19, 118:20, 125:2, 139:14, 145:11, 148:22, 154:7, 154:15, 160:13, 163:3, 163:5, 164:9, 164:21, 167:6, 167:8, 167:14, 170:25, 173:2, 173:6, 186:10, 194:4, 202:15, 202:18, 203:3, 203:4, 213:3, 216:14
**professor** [132] - 3:17, 18:19, 18:20, 20:4, 23:1, 52:1, 70:14, 70:25, 71:5, 81:20, 106:11, 106:17, 106:18, 106:20, 106:22, 106:23, 107:1, 107:4, 107:21, 108:10, 108:18, 108:23,

108:25, 110:23, 111:1, 111:21, 112:5, 112:7, 112:9, 113:13, 114:2, 114:21, 117:5, 118:8, 118:10, 139:21, 141:1, 141:2, 141:10, 141:20, 141:23, 142:1, 142:3, 142:4, 142:5, 160:11, 160:13, 161:2, 163:1, 163:8, 163:10, 163:11, 166:8, 166:12, 166:14, 166:15, 166:17, 166:19, 166:21, 166:22, 166:24, 166:25, 167:3, 167:19, 167:21, 167:22, 167:25, 168:1, 168:2, 168:5, 168:7, 170:6, 171:3, 171:6, 171:8, 171:10, 171:17, 171:20, 173:20, 174:4, 174:11, 174:19, 175:19, 177:8, 177:17, 178:5, 180:11, 180:16, 181:3, 181:24, 182:17, 183:14, 183:15, 183:16, 184:21, 184:22, 184:25, 185:1, 185:7, 185:10, 185:19, 185:24, 186:6, 186:8, 186:11, 186:12, 186:15, 186:17, 186:18, 186:22, 189:24, 194:3, 194:8, 194:22, 202:25, 203:2, 203:22, 204:12, 204:13, 205:14
**professor's** [1] - 18:19
**professorial** [1] - 187:8
**professors** [68] - 19:3, 61:14, 68:17, 106:1, 106:10, 106:14, 106:16, 107:6, 107:11, 107:12, 107:13, 107:16, 107:18, 107:23, 107:24, 108:9, 108:18, 111:2, 112:17, 113:11, 113:15, 114:4,

115:11, 117:8, 117:14, 117:16, 123:23, 125:15, 132:10, 133:22, 136:2, 137:7, 161:14, 161:18, 166:3, 166:5, 167:1, 167:4, 167:18, 168:4, 168:11, 168:14, 168:15, 172:16, 172:17, 173:1, 173:25, 174:8, 176:20, 178:4, 179:12, 179:18, 179:23, 180:25, 181:22, 182:3, 182:12, 182:13, 184:18, 185:4, 185:5, 185:12, 196:12, 196:13, 205:13
**program** [36] - 18:21, 58:2, 58:7, 58:12, 59:6, 59:8, 59:9, 61:14, 61:15, 61:18, 65:12, 111:22, 118:9, 134:4, 161:10, 170:19, 179:15, 180:16, 180:19, 180:20, 181:4, 181:5, 200:20, 203:22, 203:23, 204:13, 204:14, 205:4, 205:7, 205:8, 205:16, 205:18, 213:9, 214:2, 214:17
**Program** [1] - 209:4
**programs** [3] - 111:19, 180:8, 195:14
**progressing** [1] - 61:20
**progression** [1] - 112:12
**promise** [1] - 118:23
**promoted** [8] - 15:17, 167:7, 177:7, 177:11, 178:5, 186:16, 186:22, 205:14
**promotion** [13] - 14:21, 63:11, 63:23, 64:3, 162:17, 176:4, 177:10, 178:7, 186:16, 186:18, 206:15, 206:16
**promotions** [5] - 60:4, 60:5, 112:2, 112:11, 212:11
**proof** [4] - 100:24,

103:24, 103:25, 104:11
**proper** [1] - 113:8
**properly** [1] - 162:18
**prospective** [1] - 93:5
**PROSPECTIVE** [287] - 31:12, 31:16, 31:18, 31:24, 32:11, 32:19, 32:23, 33:2, 33:7, 34:9, 34:12, 34:15, 34:18, 34:25, 35:2, 35:9, 35:11, 35:15, 35:17, 35:20, 35:24, 36:2, 36:8, 36:10, 36:12, 36:14, 36:16, 36:19, 36:23, 37:23, 38:3, 38:5, 38:8, 38:13, 38:15, 38:18, 38:24, 39:2, 39:5, 39:9, 39:16, 39:20, 39:22, 40:1, 40:12, 40:15, 40:18, 40:20, 40:23, 40:25, 41:4, 41:7, 41:9, 41:11, 41:15, 41:17, 41:24, 42:3, 42:7, 42:13, 42:15, 42:19, 42:22, 43:1, 43:4, 43:7, 43:17, 43:19, 43:22, 43:25, 44:7, 44:11, 44:13, 44:18, 44:23, 44:25, 45:2, 45:4, 45:7, 45:9, 45:17, 45:19, 45:21, 45:24, 46:12, 46:17, 46:24, 47:2, 47:5, 47:10, 47:13, 47:18, 47:24, 48:2, 48:5, 48:8, 48:16, 48:19, 48:25, 49:2, 49:10, 49:15, 49:17, 49:22, 50:6, 50:10, 51:6, 51:8, 51:11, 51:13, 51:18, 51:23, 52:8, 52:12, 52:14, 52:16, 52:18, 52:21, 52:24, 53:12, 53:16, 53:20, 53:22, 53:24, 54:3, 54:7, 54:13, 54:15, 54:19, 54:21, 55:4, 55:9, 55:11, 55:14, 55:19, 55:22, 56:5, 56:13, 56:15, 56:19, 56:22, 56:25, 57:6, 57:18, 57:20, 58:1, 58:6, 58:10, 58:14, 58:17, 58:21, 58:25, 59:15, 59:18, 59:23, 60:2, 60:19, 61:1, 61:7, 61:13, 61:22, 61:24, 62:4, 62:15, 62:19,

62:23, 63:9, 63:19, 63:22, 64:6, 64:10, 64:21, 65:2, 66:3, 66:5, 66:11, 66:13, 66:17, 66:21, 67:11, 67:13, 68:4, 68:6, 68:8, 68:11, 68:14, 68:18, 68:21, 68:24, 69:6, 69:10, 69:12, 69:15, 70:1, 70:6, 70:13, 70:16, 70:18, 70:21, 71:2, 71:6, 71:11, 71:14, 71:20, 71:23, 72:1, 72:3, 72:23, 72:25, 73:4, 73:6, 73:10, 73:12, 73:16, 73:20, 73:25, 74:3, 74:11, 74:14, 74:19, 74:22, 75:1, 75:4, 75:7, 75:11, 75:16, 75:20, 75:22, 75:24, 76:2, 76:4, 76:7, 76:9, 76:14, 77:8, 77:13, 77:15, 77:25, 78:5, 78:8, 78:11, 78:14, 78:17, 78:19, 78:23, 79:2, 79:8, 79:13, 79:16, 79:18, 79:21, 79:24, 80:4, 80:7, 80:15, 80:19, 80:21, 81:2, 81:16, 81:18, 81:24, 82:2, 82:4, 82:10, 82:13, 82:21, 82:25, 83:9, 83:11, 83:18, 83:21, 83:25, 84:4, 84:8, 84:11, 84:20, 84:22, 84:25, 85:3, 85:8, 85:15, 85:18, 85:23, 86:2, 86:9, 86:24, 93:2

**Prospective** [1] - 22:16
**protection** [3] - 23:10, 23:24, 95:25
**Protection** [1] - 6:6
**prove** [4] - 102:2, 103:8, 106:8, 108:3
**proved** [5] - 6:11, 6:13, 100:21, 103:17, 103:18
**provide** [29] - 11:5, 22:23, 90:2, 90:10, 90:13, 95:8, 123:18, 129:1, 130:21, 130:24, 130:25, 131:21, 134:1, 134:2, 135:18, 135:19, 135:21, 135:24, 136:5,

136:7, 136:21, 137:5, 137:18, 140:6, 145:12, 145:13, 157:20, 159:4, 159:9
**provided** [14] - 4:10, 125:19, 130:25, 132:5, 138:7, 140:10, 140:12, 140:14, 157:23, 158:9, 158:12, 198:10, 199:8, 217:19
**provides** [1] - 138:13
**providing** [1] - 120:2
**province** [1] - 5:2
**proving** [5] - 5:5, 6:6, 103:6, 118:1, 118:3
**provost** [51] - 19:21, 113:5, 113:9, 114:6, 114:9, 114:10, 114:22, 114:23, 114:25, 117:10, 117:23, 118:11, 119:4, 161:23, 189:4, 190:8, 190:9, 190:24, 191:23, 192:3, 192:6, 192:8, 192:14, 192:15, 192:16, 192:19, 192:20, 192:21, 192:22, 193:1, 193:5, 193:8, 193:9, 193:10, 194:14, 195:5, 195:10, 195:12, 198:25, 210:19, 213:6, 215:4, 217:3
**provost's** [5] - 176:17, 191:18, 191:23, 192:13, 198:2
**provosts** [2] - 167:15, 190:8
**public** [1] - 39:17
**publish** [3] - 107:13, 111:23, 163:19
**published** [2] - 138:3, 151:7
**publishes** [2] - 114:3
**publishing** [1] - 115:12
**pull** [5] - 129:3, 132:4, 133:1, 136:25, 141:4
**pulled** [2] - 133:5, 156:8
**pulling** [1] - 133:5
**pumps** [1] - 77:25
**purpose** [2] - 8:7, 100:5
**purposefully** [1] -

54:24
**purposes** [4] - 4:13, 5:6, 20:18, 20:19
**pursuant** [1] - 135:1
**pursued** [1] - 110:25
**pursuit** [1] - 23:25
**push** [1] - 31:7
**put** [25] - 3:5, 4:1, 6:23, 9:17, 11:5, 11:12, 11:25, 12:6, 12:25, 13:14, 13:23, 20:23, 23:12, 24:4, 24:12, 25:10, 29:17, 29:18, 87:2, 103:10, 104:2, 153:9, 175:20, 180:12, 189:22
**putting** [1] - 109:19

## Q

**qualified** [4] - 63:25, 64:1, 183:21, 183:23
**quality** [3] - 7:2, 95:21, 101:18
**quantity** [2] - 7:1, 95:21
**quarter** [1] - 183:5
**questioned** [1] - 72:13
**questionnaires** [1] - 85:20
**questions** [55] - 24:1, 24:9, 24:14, 24:15, 30:1, 30:3, 30:12, 31:13, 32:12, 33:3, 33:10, 33:20, 33:21, 33:23, 33:25, 37:24, 39:10, 39:11, 39:12, 40:13, 43:9, 43:20, 46:5, 46:13, 50:15, 51:3, 53:9, 56:4, 57:21, 65:14, 65:24, 67:25, 72:18, 77:10, 81:13, 86:23, 87:16, 95:23, 95:24, 99:2, 99:23, 102:6, 102:7, 116:20, 131:10, 131:16, 131:18, 135:8, 137:12, 142:9, 157:4, 157:15, 157:19, 159:7, 159:22
**quick** [3] - 35:22, 61:5, 160:5
**quickly** [2] - 127:20, 190:6
**quite** [8] - 45:15, 61:15, 169:22, 180:15, 192:17, 194:15, 195:11,

208:10
**quote** [1] - 109:20
**quote/unquote** [1] - 181:23

## R

**race** [1] - 42:1
**radio** [1] - 97:16
**rain** [1] - 101:1
**raining** [3] - 100:19, 100:20, 101:4
**raise** [9] - 14:22, 93:7, 93:22, 122:12, 176:25, 177:13, 178:7, 178:17, 178:18
**raised** [2] - 82:12, 193:7
**raises** [15] - 73:13, 77:18, 82:15, 176:23, 176:24, 177:2, 177:4, 177:6, 177:16, 177:19, 178:8, 178:10, 178:12, 188:4, 212:10
**raising** [1] - 113:22
**range** [3] - 84:23, 183:25, 197:6
**rank** [10] - 112:9, 117:5, 117:7, 163:3, 163:8, 167:5, 167:6, 167:23, 186:20, 186:21
**ranked** [1] - 205:23
**ranking** [5] - 114:10, 114:23, 126:4, 167:14, 203:23
**ranks** [6] - 112:6, 117:4, 166:20, 186:13, 187:7
**rare** [3] - 73:7, 77:3, 179:25
**rarely** [1] - 82:2
**rate** [2] - 83:12, 83:14
**rates** [1] - 73:1
**rather** [3] - 130:14, 130:15, 184:6
**RE** [1] - 137:15
**RE-CROSS** [1] - 137:15
**reach** [3] - 98:4, 99:15, 102:21
**reachable** [1] - 145:24
**reaching** [2] - 29:14, 100:14
**read** [18] - 8:21, 8:24, 13:17, 63:1, 90:7, 90:8, 97:14, 97:17,

149:15, 149:17, 149:21, 149:25, 152:18, 164:13, 215:25, 217:21
**reading** [5] - 15:1, 140:25, 153:14, 153:18, 158:3
**ready** [7] - 77:20, 129:6, 132:13, 132:16, 136:7, 137:18, 140:5
**real** [14] - 23:23, 110:7, 110:10, 124:1, 124:2, 125:23, 132:24, 153:24, 155:5, 196:17, 196:18, 197:23, 204:21, 205:9
**realistic** [1] - 212:17
**realize** [2] - 69:19, 190:6
**really** [16] - 14:13, 37:14, 37:15, 42:1, 44:2, 53:20, 55:11, 109:11, 115:9, 119:14, 177:6, 184:2, 189:20, 205:17, 206:20, 207:8
**reason** [10] - 11:15, 63:16, 115:23, 139:11, 164:6, 189:17, 189:18, 191:5, 204:1, 212:21
**reasonable** [3] - 101:23, 103:25, 191:7
**reasonably** [2] - 99:14, 188:18
**reasons** [13] - 96:12, 102:18, 103:1, 114:18, 116:3, 165:14, 165:16, 190:4, 194:11, 194:12, 194:13, 203:24, 211:24
**rebuttal** [1] - 104:17
**receive** [4] - 85:25, 115:22, 133:22, 172:13
**received** [12] - 18:23, 79:20, 88:12, 89:18, 98:21, 99:16, 100:5, 103:22, 112:1, 127:10, 148:25, 216:2
**receives** [2] - 109:5, 170:21
**recent** [1] - 179:25

**recently** [1] - 210:19
**recess** [7] - 13:8, 90:24, 94:10, 120:24, 215:18, 215:19
**Recess** [1] - 22:15
**reckless** [2] - 108:7, 108:8
**recognized** [1] - 165:19
**recollection** [2] - 127:15, 158:8
**recommend** [2] - 60:7, 214:18, 214:23
**recommendations** [1] - 59:25
**reconsideration** [1] - 4:22
**record** [23] - 3:5, 4:2, 4:11, 4:14, 4:17, 4:21, 5:12, 7:6, 7:7, 9:17, 9:25, 11:12, 12:1, 12:7, 13:14, 16:9, 17:15, 17:18, 100:8, 122:16, 142:20, 160:18, 218:15
**recorder** [1] - 125:8
**recording** [1] - 102:9
**records** [4] - 133:9, 133:15, 133:16, 134:6
**recross** [2] - 137:14, 159:14
**redirect** [2] - 159:14, 216:20
**reduced** [1] - 189:8
**refer** [4] - 10:2, 166:17, 166:19, 182:6
**reference** [2] - 97:24, 139:18
**referring** [1] - 166:24
**reflected** [2] - 172:6, 176:2
**reflecting** [2] - 113:12, 174:23
**reflection** [1] - 200:11
**reflects** [2] - 14:13, 113:6
**refresh** [2] - 127:15, 158:8
**regard** [1] - 72:11
**regarding** [2] - 107:14, 123:11
**regardless** [3] - 50:24, 103:21, 103:22
**regular** [1] - 41:20
**reiterate** [1] - 113:22
**rejoin** [1] - 115:18

**rejoined** [1] - 117:12
**related** [1] - 97:14
**relating** [2] - 97:17, 97:20
**relations** [1] - 27:8
**relationship** [9] - 35:18, 36:20, 54:4, 57:13, 58:22, 59:12, 65:8, 65:17, 68:19
**relationships** [1] - 39:24
**relatively** [1] - 48:11
**relevant** [2] - 17:4, 21:11
**relitigate** [1] - 8:17
**rely** [1] - 23:24
**remain** [1] - 215:15
**remaining** [3] - 92:17, 95:23, 95:24
**remains** [1] - 5:2
**remedy** [2] - 95:7, 95:8
**remember** [27] - 37:14, 55:7, 55:12, 55:17, 86:2, 97:10, 121:18, 127:12, 127:14, 127:15, 127:16, 128:7, 128:8, 128:18, 150:3, 154:8, 154:4, 156:5, 156:6, 156:8, 185:12, 185:13, 185:16, 187:20, 200:2, 202:9, 217:18
**remind** [2] - 84:24, 215:18
**remote** [1] - 217:9
**remotely** [1] - 154:25
**render** [1] - 29:11
**repair** [1] - 77:21
**repeat** [1] - 153:17
**reply** [1] - 128:23
**report** [9] - 97:16, 97:18, 126:9, 132:4, 132:22, 133:23, 138:22, 139:25, 140:3, 140:15
**reporter** [3] - 4:3, 125:6, 125:7
**Reporter** [1] - 1:20
**REPORTER** [1] - 4:4
**reporting** [3] - 129:5, 132:3, 133:2
**reports** [2] - 129:3, 215:25
**represent** [1] - 105:19
**representative** [3] - 188:11, 189:13, 198:7
**reputation** [1] -

205:19
**request** [18] - 98:15, 98:16, 123:17, 124:1, 125:17, 125:20, 131:21, 132:1, 136:10, 139:24, 140:4, 140:16, 145:14, 146:9, 146:11, 146:12, 146:15, 146:16
**requested** [7] - 110:6, 123:22, 129:4, 129:6, 140:12, 140:16, 159:9
**requesting** [2] - 99:20, 148:25
**requests** [4] - 145:2, 145:3, 145:5, 157:13
**require** [1] - 114:19
**required** [10] - 19:5, 104:9, 135:19, 168:10, 175:3, 180:24, 181:15, 182:13, 182:15, 182:24
**requirement** [9] - 12:20, 107:14, 145:9, 145:10, 168:16, 172:20, 173:3, 174:9, 175:8
**requirements** [6] - 6:5, 107:12, 174:1, 174:4, 174:14, 176:6
**requires** [1] - 21:19
**research** [15] - 31:20, 31:23, 88:24, 97:19, 97:21, 110:25, 111:23, 114:3, 115:11, 115:16, 134:2, 174:6, 175:11, 175:15, 216:1
**reset** [1] - 156:9
**resolved** [1] - 120:23
**resource** [1] - 84:12
**Resources** [4] - 113:19, 122:22, 123:3, 133:11
**resources** [2] - 199:3, 217:2
**respect** [15] - 4:8, 7:13, 7:19, 7:21, 8:20, 9:7, 10:19, 14:10, 17:9, 17:12, 20:9, 31:6, 50:24, 91:5, 113:2
**respond** [4] - 13:15, 24:13, 149:12, 149:13

**responded** [2] - 126:1, 147:11
**response** [2] - 37:13, 65:13
**responsibile** [5] - 27:3, 52:10, 72:20, 77:11, 83:7
**responsibilities** [2] - 51:9, 115:3
**responsibility** [12] - 6:9, 41:2, 95:16, 98:11, 107:7, 122:5, 165:21, 165:22, 184:18, 184:23, 185:3
**responsible** [1] - 126:8
**rest** [1] - 45:5
**restaurant** [1] - 45:12
**restoration** [1] - 73:4
**result** [5] - 181:7, 189:6, 190:24, 196:9, 196:10
**resulting** [1] - 207:1
**resumes** [1] - 84:13
**retail** [2] - 79:14, 80:2
**retire** [4] - 67:12, 77:20, 96:7, 104:23
**retired** [11] - 14:16, 14:19, 21:18, 67:3, 67:10, 118:10, 168:3, 170:5, 185:20, 185:21
**retires** [1] - 16:7
**return** [2] - 44:8, 215:15
**review** [9] - 102:12, 125:12, 179:3, 179:8, 179:9, 179:10, 179:11
**reviewed** [2] - 152:8, 178:23
**reviews** [3] - 84:7, 176:3, 179:1
**revisit** [1] - 5:16
**reward** [1] - 23:22
**rhythm** [1] - 177:15
**Richard** [15] - 17:20, 17:23, 21:16, 25:13, 106:16, 117:6, 117:13, 166:10, 169:23, 169:24, 171:10, 184:19, 192:14, 193:25, 207:13
**ride** [1] - 97:9
**rights** [2] - 23:10, 86:3
**rise** [7] - 92:12, 93:7, 93:22, 94:7, 94:12, 121:9, 160:7

**RN** [2] - 58:1, 58:18
**Robinson** [2] - 52:23, 53:1
**ROGER** [1] - 160:16
**Roger** [12] - 3:16, 3:17, 26:3, 106:20, 107:21, 111:5, 141:25, 160:2, 160:19, 184:20
**role** [38] - 21:2, 23:5, 52:12, 52:13, 94:25, 107:3, 110:23, 110:25, 112:19, 112:20, 113:5, 113:14, 113:20, 115:4, 115:7, 117:9, 117:14, 118:19, 140:1, 157:10, 162:10, 163:9, 164:21, 169:9, 169:10, 172:8, 172:12, 184:21, 187:13, 189:7, 194:23, 198:24, 212:5, 213:3, 213:6, 213:25, 214:3, 214:11
**roles** [22] - 112:22, 113:11, 113:16, 113:23, 114:5, 114:13, 114:14, 114:16, 114:20, 114:21, 115:5, 115:13, 115:18, 115:22, 115:25, 118:19, 134:5, 189:4, 209:20, 213:11
**room** [14] - 7:10, 10:6, 26:15, 93:11, 94:1, 96:7, 97:3, 104:23, 120:18, 121:4, 121:5, 128:19, 207:21, 208:12
**Rose** [13] - 25:18, 126:10, 126:13, 126:19, 126:22, 126:24, 126:25, 128:21, 129:15, 129:18, 142:15, 142:21, 150:21
**rose** [1] - 112:6
**ROSE** [2] - 142:17, 219:8
**row** [1] - 24:5
**royalties** [1] - 57:5
**RPR** [2] - 1:19, 218:18
**rude** [1] - 89:5
**rule** [4] - 31:3, 31:5, 99:21, 127:18

*United States District Court*

**rules** [4] - 88:13, 99:16, 99:19, 100:1
**ruling** [6] - 9:10, 9:20, 100:2, 116:16, 127:19, 127:20
**rumors** [1] - 99:7
**run** [1] - 198:6
**runs** [1] - 161:9

## S

**Saar** [2] - 26:8, 116:23
**sacrifice** [1] - 115:9
**sacrifices** [1] - 113:13
**safeguard** [1] - 23:8
**sake** [1] - 13:25
**salaries** [41] - 11:20, 18:8, 19:1, 21:24, 78:7, 79:1, 108:18, 110:19, 110:21, 110:22, 113:17, 113:18, 113:20, 114:16, 116:12, 116:18, 117:10, 117:24, 118:6, 118:15, 118:20, 132:10, 140:18, 190:1, 190:2, 190:10, 190:2, 195:3, 195:23, 196:4, 196:9, 197:18, 198:12, 203:7, 203:24, 204:2, 206:4, 206:8, 206:25, 207:8, 211:16
**salary** [136] - 14:8, 14:9, 17:23, 17:25, 18:3, 18:18, 19:2, 19:6, 19:9, 19:18, 19:21, 19:24, 20:10, 20:12, 20:16, 20:17, 20:24, 21:1, 44:15, 48:4, 48:7, 50:8, 50:9, 77:17, 78:13, 106:22, 106:23, 106:24, 107:3, 107:5, 107:17, 108:23, 109:3, 109:6, 112:11, 113:6, 114:13, 114:15, 115:3, 115:4, 115:17, 115:24, 118:6, 118:12, 118:17, 118:20, 123:9, 123:11, 123:22, 131:22, 132:6, 132:9, 132:14, 133:16, 133:19,

136:1, 137:7, 137:18, 138:13, 139:17, 139:20, 139:22, 140:2, 141:9, 141:11, 141:19, 156:3, 156:9, 158:19, 158:21, 163:5, 164:21, 165:23, 167:9, 167:10, 170:25, 171:4, 171:6, 172:2, 176:1, 176:6, 177:5, 178:8, 178:10, 184:13, 184:15, 184:16, 185:18, 186:2, 186:24, 187:22, 187:25, 188:1, 188:2, 188:3, 188:7, 189:5, 189:8, 190:23, 191:1, 192:9, 193:16, 193:17, 193:23, 195:10, 195:18, 196:20, 196:21, 196:25, 197:6, 197:12, 200:4, 200:11, 200:12, 200:14, 200:24, 201:2, 202:24, 202:25, 203:4, 203:25, 204:3, 204:8, 206:2, 206:9, 206:13, 206:24, 207:1, 210:12, 211:20, 211:23
**sale** [1] - 44:8
**SALEM** [1] - 1:16
**sales** [1] - 40:20
**Samuel** [1] - 35:17
**sanction** [9] - 4:19, 5:23, 5:24, 5:25, 6:11, 6:12, 6:13, 8:2
**sat** [3] - 24:7, 62:1, 80:22
**Saturday** [1] - 149:11
**saved** [2] - 118:11, 149:5
**saw** [2] - 100:19, 190:10
**scales** [2] - 103:12, 103:13
**scared** [1] - 76:10
**scary** [1] - 195:6
**scenes** [1] - 5:12
**schedule** [1] - 184:7
**scheduling** [3] - 44:15, 162:14, 183:17
**scholarship** [16] -

107:13, 107:19, 115:8, 168:12, 168:16, 172:18, 173:24, 174:2, 174:9, 175:4, 175:11, 175:19, 175:20, 179:11, 180:25, 187:15
**school** [10] - 35:13, 36:3, 58:8, 59:5, 76:25, 81:21, 81:25, 85:4, 111:15, 111:16
**School** [2] - 38:8, 81:19
**science** [4] - 32:1, 111:14, 116:6, 205:20
**Science** [1] - 34:13
**science-oriented** [1] - 205:20
**Sciences** [7] - 111:16, 111:17, 162:3, 174:18, 176:9, 176:16, 209:25
**scientists** [2] - 52:19, 52:20
**scope** [8] - 33:12, 33:20, 33:21, 34:2, 65:3, 79:5, 188:20, 191:2
**Scott** [7] - 26:11, 107:2, 117:3, 167:21, 171:19, 184:20, 208:21
**scratch** [2] - 174:7, 211:25
**screen** [9] - 120:6, 140:21, 142:11, 148:6, 151:10, 151:12, 155:25, 158:3, 163:22
**search** [4] - 97:24, 214:14, 214:16, 214:21
**seat** [12] - 3:2, 5:22, 22:18, 52:25, 66:25, 72:8, 86:14, 90:21, 92:10, 92:13, 121:11, 216:12
**seated** [1] - 94:14
**second** [14] - 22:13, 24:5, 62:13, 97:14, 108:2, 110:21, 114:10, 114:11, 114:23, 114:24, 115:6, 140:20, 140:22, 169:14
**secret** [1] - 108:14
**Security** [1] - 132:20
**see** [92] - 14:24, 24:21,

25:7, 26:14, 26:17, 27:10, 28:1, 28:4, 28:7, 28:9, 28:13, 29:23, 33:7, 57:6, 64:12, 89:2, 90:23, 93:19, 94:9, 99:4, 99:6, 99:8, 101:17, 102:9, 107:10, 108:16, 108:21, 109:11, 110:7, 110:8, 110:9, 110:10, 110:11, 112:15, 116:22, 120:5, 125:14, 125:23, 126:23, 129:8, 133:4, 133:8, 138:9, 138:10, 138:11, 138:12, 138:25, 139:1, 139:5, 139:6, 139:8, 139:12, 139:20, 140:23, 141:20, 146:9, 146:16, 151:14, 151:17, 163:23, 164:3, 164:10, 164:15, 164:20, 167:12, 171:20, 171:21, 171:22, 171:23, 172:6, 175:14, 190:2, 191:19, 194:18, 199:23, 200:11, 200:16, 204:4, 204:7, 207:22, 208:20, 209:10, 209:13, 211:22, 214:19, 216:9, 216:19, 217:22, 218:9
**seeing** [1] - 201:2
**seeking** [1] - 151:2
**select** [8] - 4:15, 5:1, 11:17, 11:19, 11:24, 11:25, 24:16
**selected** [6] - 22:19, 29:10, 92:18, 94:15, 214:9, 215:6
**selecting** [1] - 89:10
**selection** [2] - 88:10, 89:15
**selling** [3] - 44:1, 46:23, 46:24
**send** [1] - 184:11
**sending** [1] - 127:10
**senior** [3] - 64:3, 199:24, 203:23
**Senior** [1] - 122:21
**seniority** [2] - 6:25, 95:20
**sense** [18] - 17:2,

23:18, 23:23, 48:7, 76:23, 99:10, 105:10, 110:16, 167:3, 176:22, 180:10, 184:24, 185:6, 190:11, 195:24, 196:4, 196:5
**senses** [1] - 100:17
**sent** [4] - 149:3, 149:7, 149:11, 152:6
**sentenced** [1] - 62:10
**September** [29] - 4:17, 4:23, 10:2, 14:17, 14:19, 14:21, 14:22, 15:1, 123:16, 124:8, 131:17, 131:23, 132:16, 134:21, 135:19, 135:24, 136:25, 138:8, 145:8, 145:15, 145:16, 151:17, 152:16, 153:11, 153:20, 157:19, 158:9, 202:13
**series** [1] - 24:1
**serve** [5] - 22:20, 24:16, 111:24, 112:19, 182:9
**served** [13] - 29:2, 45:6, 61:21, 61:24, 62:7, 66:10, 74:13, 80:18, 112:18, 113:14, 113:15, 117:18, 192:14
**serves** [2] - 18:20, 107:3
**service** [20] - 22:19, 42:14, 43:6, 77:15, 77:21, 92:19, 107:14, 107:19, 168:12, 168:16, 172:18, 175:7, 175:8, 175:12, 175:14, 179:11, 182:8, 182:9, 187:16, 204:18
**service-oriented** [1] - 204:18
**services** [4] - 23:19, 97:2, 97:4, 181:1
**serving** [3] - 29:21, 188:10, 203:23
**sessions** [3] - 85:17, 85:18, 85:19
**set** [12] - 48:4, 59:21, 59:24, 73:1, 73:11, 73:12, 78:7, 128:3, 182:4, 182:6, 182:7, 210:12
**setting** [13] - 27:4,

52:10, 57:5, 72:21, 77:11, 83:7, 110:21, 110:22, 116:12, 117:24, 195:12, 195:14, 197:18
**settled** [2] - 55:6, 66:14
**setup** [1] - 12:20
**seven** [5] - 107:24, 177:20, 177:21, 192:7, 210:8
**several** [1] - 115:2
**sex** [11] - 6:7, 7:3, 27:19, 27:22, 28:6, 28:12, 66:2, 95:7, 95:10, 95:22, 106:6
**Shakespeare** [4] - 184:6, 184:8, 184:9, 197:24
**shall** [2] - 135:24, 137:5
**share** [6] - 14:2, 134:8, 134:11, 134:14, 151:10, 166:1
**shared** [4] - 138:11, 148:6, 152:2, 152:5
**sharing** [1] - 151:11
**sheet** [7] - 4:9, 5:1, 5:10, 30:24, 56:11, 67:2
**shift** [1] - 72:1
**shop** [3] - 72:25, 73:1, 73:3
**shore** [5] - 124:14, 129:11, 129:13, 129:21, 129:25
**Shore** [1] - 124:15
**shortly** [2] - 24:1, 90:20
**shot** [1] - 139:5
**show** [39] - 104:8, 106:9, 106:13, 107:5, 107:10, 107:16, 108:3, 108:7, 108:11, 108:12, 109:7, 110:20, 112:12, 112:16, 113:1, 113:6, 113:11, 115:21, 115:23, 116:2, 116:21, 118:13, 118:17, 118:18, 124:2, 129:6, 132:16, 133:20, 135:5, 137:21, 148:21, 154:7, 156:18, 158:23, 163:15, 163:24, 217:25

**showed** [4] - 75:4, 155:4, 156:3, 158:20
**showing** [5] - 107:23, 156:10, 158:20, 159:4, 199:8
**shown** [8] - 20:3, 100:12, 155:7, 155:8, 155:11, 155:13, 159:17, 159:20
**shows** [4] - 20:6, 56:11, 97:12, 117:23
**side** [9] - 39:21, 78:2, 78:3, 99:18, 103:13, 109:25, 183:24, 183:25, 184:1
**Sidebar** [2] - 90:17, 135:9
**sidebar** [11] - 24:15, 30:1, 30:6, 30:20, 88:8, 89:12, 118:25, 119:1, 119:17, 134:18, 134:19
**Sidebar** [1] - 89:13
**sides** [1] - 103:12
**Sierra** [1] - 200:22
**signature** [1] - 151:19
**signed** [1] - 184:14
**significant** [2] - 110:22, 118:19
**significantly** [2] - 207:16, 207:18
**similar** [9] - 6:9, 95:16, 181:8, 181:11, 181:13, 181:23, 182:1, 194:6
**similarly** [4] - 89:6, 95:9, 111:2, 118:21
**simple** [4] - 11:15, 17:21, 21:16, 75:5
**simpler** [1] - 19:4
**simply** [3] - 99:20, 104:7, 213:23
**single** [4] - 16:1, 194:2, 198:10, 212:13
**sister** [4] - 36:8, 37:8, 37:9, 37:14
**sister-in-law** [2] - 36:8, 37:14
**sit** [1] - 29:10
**sits** [2] - 114:4, 116:13
**sitting** [1] - 118:19
**situated** [3] - 95:9, 111:2, 118:21
**situation** [1] - 69:15
**six** [3] - 144:3, 144:5, 186:15
**size** [2] - 113:17, 139:3

**skill** [4] - 6:9, 95:16, 107:7, 184:4
**skills** [2] - 182:12, 184:6
**slightly** [3] - 174:14, 178:14, 189:8
**slip** [1] - 80:23
**small** [4] - 39:5, 48:11, 203:5, 204:18
**smaller** [1] - 175:15
**smart** [1] - 96:15
**smartphone** [1] - 96:23
**Smith** [30] - 7:17, 14:20, 15:17, 16:2, 26:9, 106:25, 117:3, 117:15, 118:8, 119:6, 119:9, 155:25, 156:12, 167:18, 184:21, 202:12, 202:22, 202:23, 203:9, 203:11, 203:12, 204:7, 204:12, 205:11, 205:13, 205:22, 206:22, 207:5, 209:9
**Smith's** [1] - 202:13
**Snap** [1] - 97:6
**so-called** [2] - 197:11, 199:1
**so..** [2] - 61:20, 76:12
**social** [3] - 88:23, 88:24, 97:4
**Social** [1] - 132:20
**software** [2] - 155:19, 158:21
**sold** [3] - 77:19, 78:3, 78:4
**sole** [2] - 14:2, 101:11
**solely** [2] - 29:11, 110:24
**someone** [40] - 8:14, 21:16, 26:21, 26:25, 27:21, 27:25, 28:3, 28:10, 28:15, 28:16, 31:14, 34:11, 35:5, 36:6, 38:1, 46:15, 51:4, 52:5, 60:14, 65:25, 70:11, 81:14, 97:12, 100:25, 114:3, 116:4, 130:18, 141:9, 144:17, 169:14, 176:25, 180:13, 181:5, 184:8, 197:24, 211:8, 212:15, 214:18, 214:23
**sometimes** [13] -

61:17, 64:14, 68:22, 115:14, 166:17, 166:18, 166:21, 166:22, 180:7, 180:16, 211:13, 211:14
**somewhat** [1] - 103:13
**somewhere** [5] - 41:18, 52:15, 177:25, 195:13, 212:16
**Sommer** [1] - 81:20
**son** [4] - 34:12, 53:12, 53:14, 53:18
**soon** [1] - 13:1
**sooner** [1] - 218:3
**sophomore** [1] - 51:13
**sorry** [27] - 17:1, 18:12, 28:14, 33:15, 33:19, 36:14, 56:10, 67:17, 119:20, 125:8, 125:11, 128:8, 138:9, 139:6, 150:21, 151:11, 155:23, 161:12, 161:13, 165:11, 196:16, 201:23, 202:6, 204:6, 204:11, 206:6, 211:5
**sort** [17] - 5:14, 41:21, 132:25, 167:11, 176:4, 176:7, 176:12, 185:8, 187:8, 195:21, 200:13, 200:14, 205:1, 205:5, 210:23, 212:12, 214:14
**sorts** [2] - 162:19, 178:1
**sought** [10] - 112:19, 112:22, 113:4, 117:22, 149:25, 213:3, 213:6, 213:9, 213:22, 213:25
**sound** [2] - 23:17, 85:23
**sounded** [1] - 119:13
**soup** [1] - 162:11
**source** [2] - 98:2, 173:14
**Southern** [1] - 81:19
**speakers** [1] - 61:13
**speaking** [3] - 188:13, 188:15, 188:17
**special** [3] - 29:20, 63:4, 182:20
**specialization** [2] -

116:6, 117:2
**specific** [15] - 5:25, 14:5, 14:6, 61:13, 129:4, 129:5, 131:20, 131:23, 132:4, 139:24, 166:19, 166:20, 189:16, 217:21
**specifically** [9] - 4:13, 33:13, 72:11, 82:10, 82:13, 82:16, 167:4, 184:7, 190:21
**speculate** [1] - 100:10
**spelled** [1] - 106:15
**spelling** [3] - 122:16, 142:20, 160:18
**split** [1] - 204:21
**spray** [1] - 42:16
**stable** [1] - 209:17
**Stacey** [1] - 180:3, 180:4
**staff** [5] - 46:19, 46:21, 115:2, 143:25, 144:3
**staffing** [2] - 162:14, 183:17
**stand** [2] - 159:24, 215:14
**standard** [10] - 103:25, 172:21, 173:4, 174:18, 175:1, 177:14, 178:3, 179:9, 206:14
**standardize** [1] - 176:9
**standards** [2] - 174:3, 175:4
**start** [17] - 12:2, 89:10, 90:19, 98:6, 105:5, 105:10, 110:2, 110:3, 122:21, 146:3, 163:24, 177:7, 186:14, 194:23, 197:21, 216:9, 218:11
**started** [12] - 113:10, 124:20, 149:20, 188:4, 191:21, 193:23, 194:21, 204:7, 204:23, 205:2, 205:6
**starting** [21] - 73:12, 73:14, 164:12, 178:9, 184:15, 188:1, 188:2, 188:7, 191:1, 193:16, 193:17, 193:23, 194:24, 200:12, 203:25, 204:3, 204:8, 206:9,

206:24, 206:25, 207:1
**starts** [1] - 17:3
**state** [6] - 17:11, 29:4, 62:24, 122:15, 142:19, 160:17
**statement** [5] - 8:24, 104:4, 104:6, 104:9, 213:24
**statements** [3] - 99:2, 104:6, 104:22
**STATES** [1] - 1:1
**States** [1] - 189:11
**stating** [1] - 6:15
**Station** [1] - 111:13
**statute** [1] - 17:8
**stay** [2] - 32:21, 212:14
**stenographer** [1] - 102:10
**stenographically** [1] - 1:22
**step** [7] - 59:25, 60:3, 114:13, 115:5, 115:18, 189:7, 189:8
**step-down** [1] - 189:8
**Stephen** [1] - 26:4
**stepped** [1] - 19:15
**Stevens** [1] - 43:16
**still** [19] - 47:22, 60:12, 71:5, 128:7, 128:12, 128:13, 128:16, 129:22, 157:25, 188:1, 190:22, 191:13, 191:14, 193:17, 194:1, 194:25, 205:13, 208:6, 210:22
**stipend** [29] - 108:20, 164:22, 164:23, 165:1, 165:12, 165:24, 169:4, 169:9, 169:12, 169:21, 170:2, 170:9, 170:21, 171:23, 172:10, 172:13, 187:18, 196:8, 200:7, 201:3, 201:5, 201:11, 201:13, 208:18, 208:20, 208:23, 209:6, 209:10, 209:19
**stipends** [14] - 142:6, 165:17, 208:17, 208:24, 209:8, 209:12, 209:14, 209:17, 209:20, 209:22, 209:23,

210:21, 211:9, 211:16
**stips** [1] - 90:11
**stipulated** [4] - 11:1, 98:22, 138:2, 163:16
**stipulation** [1] - 9:18
**stipulations** [3] - 90:1, 90:2, 121:8
**stool** [8] - 168:19, 168:20, 169:2, 171:14, 172:18, 178:22, 178:24, 187:10
**stop** [8] - 15:21, 30:25, 89:7, 89:9, 166:1, 211:1, 213:16, 215:8
**storage** [1] - 128:20
**store** [9] - 46:18, 46:22, 47:16, 47:23, 48:3, 48:11, 48:12, 49:13, 79:14
**stories** [1] - 110:13
**straight** [1] - 87:21
**Street** [4] - 1:8, 2:5, 63:4, 111:13
**STREET** [1] - 1:16
**stressful** [1] - 144:25
**stricken** [1] - 37:12
**strictest** [1] - 103:25
**strike** [16] - 31:7, 34:4, 34:5, 37:3, 37:7, 37:9, 50:18, 53:2, 53:7, 67:20, 72:10, 72:14, 83:2, 83:3, 87:23, 89:21
**strikes** [5] - 86:20, 87:2, 89:16, 89:19, 89:23
**strong** [1] - 212:12
**struck** [9] - 33:13, 53:5, 72:16, 87:7, 87:8, 92:1, 100:8, 100:10
**student** [15] - 24:24, 51:8, 51:10, 51:16, 57:25, 58:3, 58:15, 59:4, 59:13, 68:3, 68:4, 68:5, 68:6, 133:11, 204:24
**students** [7] - 47:5, 68:12, 90:5, 115:1, 162:15, 185:1, 185:2
**studied** [1] - 53:25
**Studies** [4] - 170:19, 171:2, 200:20, 201:1
**stuff** [6] - 9:5, 55:1, 58:11, 76:12, 90:9
**subject** [2] - 27:16, 81:22

**submit** [3] - 5:2, 5:7, 85:19
**subpoenaed** [1] - 12:15
**substant** [1] - 106:12
**substantially** [8] - 6:8, 95:15, 106:2, 106:4, 106:13, 107:6, 107:9, 108:8
**subtracting** [2] - 19:24, 19:25
**sucks** [1] - 62:3
**sued** [4] - 23:2, 55:5, 74:20, 74:25
**suggest** [1] - 65:19
**suing** [3] - 55:16, 74:24, 105:21
**Suite** [1] - 2:4
**summarize** [1] - 104:20
**summon** [1] - 22:19
**super** [1] - 53:17
**supervise** [10] - 38:25, 43:23, 44:24, 49:8, 49:13, 49:14, 71:15, 71:22, 71:25, 183:4
**supervised** [12] - 27:11, 38:22, 40:16, 41:6, 48:1, 59:17, 71:12, 74:9, 76:23, 79:7, 84:19, 84:22
**supervises** [1] - 71:18
**supervising** [6] - 39:4, 162:24, 179:16, 183:6, 195:6, 195:7
**supervisor** [6] - 44:1, 59:18, 59:25, 60:21, 63:10, 179:1
**supervisory** [2] - 41:1, 165:21
**supplement** [12] - 18:23, 19:11, 19:13, 19:19, 19:25, 20:1, 20:3, 20:6, 20:11, 20:22, 134:3, 141:16
**supplements** [14] - 18:3, 18:10, 18:17, 18:25, 19:7, 19:8, 20:4, 133:21, 137:19, 138:19, 138:24, 139:23, 140:7, 140:11
**supply** [2] - 85:1, 85:3
**supposed** [8] - 69:20, 97:10, 174:19, 175:16, 188:17, 191:5, 193:14, 198:12
**suppression** [2] - 45:11, 45:13

**surprising** [1] - 190:7
**surprisingly** [1] - 111:20
**suspicions** [1] - 99:7
**sustain** [1] - 128:4
**sustained** [1] - 100:3
**swear** [4] - 93:6, 122:9, 142:16, 160:15
**Swedesboro** [1] - 124:18
**sweeten** [1] - 212:24
**switch** [1] - 93:13, 94:2
**sworn** [6] - 22:17, 93:9, 93:24, 94:15, 142:17, 160:16
**sworn.)** [1] - 122:14
**system** [20] - 6:25, 7:1, 23:5, 23:7, 45:11, 95:20, 129:6, 132:3, 133:1, 133:10, 133:13, 133:14, 149:3, 154:8, 156:7
**systems** [2] - 132:1, 133:2

## T

**tackle** [1] - 113:22
**tags** [1] - 97:12
**talks** [2] - 61:10, 61:11
**tasked** [1] - 195:12
**taught** [6] - 36:10, 106:18, 180:10, 180:11, 183:13, 183:14
**teach** [31] - 35:10, 36:13, 38:4, 38:7, 51:12, 81:23, 111:24, 162:14, 168:10, 172:19, 173:10, 173:13, 173:14, 173:16, 173:21, 179:12, 179:18, 179:19, 179:23, 180:17, 180:19, 182:23, 182:25, 183:3, 183:21, 183:23, 184:3, 184:10, 197:24
**teacher** [16] - 26:22, 34:11, 34:13, 35:6, 35:9, 35:11, 37:10, 38:2, 38:3, 38:6, 38:11, 51:5, 51:16, 70:12, 81:15, 81:21
**teaches** [6] - 36:2,

81:25, 106:17, 114:3, 166:18, 184:8
**teaching** [31] - 51:9, 107:11, 107:19, 110:24, 115:8, 115:11, 115:16, 133:25, 134:1, 142:6, 168:12, 168:13, 168:16, 172:18, 175:10, 175:15, 175:20, 179:10, 180:14, 182:16, 182:19, 182:22, 183:11, 183:21, 184:5, 184:9, 185:25, 186:1, 187:15
**team** [10] - 3:15, 113:18, 196:25, 197:3, 197:13, 198:3, 198:12, 199:1, 199:3, 199:8
**team's** [1] - 113:19
**teams** [1] - 84:23
**teamwork** [1] - 23:11
**Technical** [1] - 120:13
**technical** [1] - 120:18
**technically** [1] - 44:13
**technologies** [1] - 32:3
**technology** [9] - 12:21, 32:2, 96:17, 111:14, 116:7, 120:2, 122:5, 144:9, 205:19
**telephone** [3] - 127:9, 147:8, 147:9
**television** [1] - 97:16
**temp** [1] - 31:24
**ten** [2] - 153:11, 153:12
**tenure** [22] - 51:19, 112:7, 116:8, 117:18, 164:2, 166:2, 177:12, 179:4, 179:5, 179:6, 183:8, 183:9, 183:11, 186:13, 194:22, 194:23, 200:1, 206:15
**tenured** [35] - 44:4, 44:13, 107:24, 161:2, 163:8, 164:2, 166:3, 166:5, 166:8, 166:12, 166:14, 166:15, 167:1, 167:18, 167:19, 167:21, 167:22, 168:4, 168:5, 168:15, 172:21,

172:22, 173:25, 174:4, 174:11, 176:20, 182:13, 182:24, 183:1, 184:18, 194:7, 202:18, 203:8, 203:11

**term** [8] - 55:6, 103:24, 166:19, 166:23, 166:24, 183:20

**terms** [8] - 18:5, 105:3, 113:25, 114:9, 166:20, 177:18, 178:12, 194:15

**testified** [5] - 77:2, 100:18, 137:17, 140:7, 191:11

**testifies** [2] - 100:16, 101:18

**testify** [4] - 12:19, 102:3, 113:21, 121:25

**testifying** [3] - 101:20, 102:18, 121:20

**testimony** [20] - 7:21, 8:7, 76:13, 98:21, 99:3, 100:7, 100:9, 101:10, 101:24, 102:5, 102:9, 102:10, 102:13, 103:20, 116:21, 117:1, 117:16, 134:24, 217:10

**testing** [1] - 52:21

**text** [4] - 97:1, 147:9, 218:11

**textbooks** [1] - 46:24

**texted** [1] - 148:10

**texting** [1] - 152:24

**THE** [861] - 1:1, 1:2, 1:11, 1:15, 2:2, 3:1, 3:2, 3:12, 3:19, 3:23, 4:1, 4:4, 4:7, 5:18, 8:18, 8:25, 9:5, 9:14, 9:23, 10:5, 10:15, 10:19, 11:1, 11:7, 11:21, 12:15, 12:22, 13:2, 13:4, 13:9, 13:12, 13:19, 14:4, 14:24, 15:1, 15:10, 15:21, 16:4, 16:8, 16:15, 16:19, 17:5, 17:8, 17:11, 17:15, 17:17, 18:2, 18:5, 18:11, 18:14, 19:4, 19:12, 19:23, 20:7, 20:14, 20:20, 21:3, 21:9, 21:21, 22:8,

22:10, 22:11, 22:12, 22:17, 22:18, 24:6, 24:7, 28:18, 30:21, 31:11, 31:12, 31:13, 31:16, 31:17, 31:18, 31:22, 31:24, 32:4, 32:6, 32:7, 32:11, 32:12, 32:15, 32:19, 32:23, 32:24, 33:2, 33:3, 33:7, 33:11, 33:17, 33:21, 34:4, 34:7, 34:9, 34:10, 34:12, 34:14, 34:15, 34:16, 34:18, 34:19, 34:22, 34:25, 35:1, 35:2, 35:3, 35:7, 35:8, 35:9, 35:10, 35:11, 35:13, 35:15, 35:16, 35:17, 35:18, 35:20, 35:21, 35:24, 36:2, 36:6, 36:8, 36:9, 36:10, 36:11, 36:12, 36:13, 36:14, 36:15, 36:16, 36:17, 36:19, 36:20, 36:23, 36:24, 37:2, 37:6, 37:17, 37:20, 37:22, 37:23, 37:24, 38:3, 38:4, 38:5, 38:7, 38:8, 38:10, 38:13, 38:14, 38:15, 38:16, 38:18, 38:19, 38:22, 38:24, 39:1, 39:2, 39:3, 39:5, 39:7, 39:9, 39:10, 39:13, 39:16, 39:19, 39:20, 39:21, 39:22, 39:23, 40:1, 40:2, 40:4, 40:6, 40:10, 40:12, 40:13, 40:15, 40:16, 40:18, 40:19, 40:20, 40:22, 40:23, 40:24, 40:25, 41:1, 41:4, 41:7, 41:9, 41:11, 41:12, 41:15, 41:16, 41:17, 41:22, 41:24, 42:2, 42:3, 42:4, 42:7, 42:8, 42:10, 42:12, 42:13, 42:14, 42:15, 42:18, 42:19, 42:20, 42:22, 42:24, 43:1, 43:2, 43:4, 43:5, 43:7, 43:9, 43:12, 43:15, 43:17, 43:18, 43:19, 43:22, 43:23, 43:25, 44:6, 44:7, 44:10, 44:11, 44:12, 44:13, 44:16, 44:18, 44:19, 44:21, 44:23, 44:25, 45:2, 45:4, 45:6, 45:7,

45:8, 45:9, 45:16, 45:17, 45:18, 45:19, 45:20, 45:21, 45:22, 45:24, 46:1, 46:3, 46:5, 46:10, 46:12, 46:13, 46:17, 46:22, 46:24, 46:25, 47:2, 47:3, 47:5, 47:8, 47:10, 47:11, 47:13, 47:15, 47:18, 47:19, 47:21, 47:24, 47:25, 48:2, 48:4, 48:5, 48:6, 48:8, 48:14, 48:16, 48:17, 48:19, 48:23, 48:25, 49:1, 49:2, 49:6, 49:10, 49:11, 49:15, 49:17, 49:18, 49:22, 49:25, 50:4, 50:6, 50:10, 50:11, 50:14, 50:23, 51:6, 51:7, 51:8, 51:10, 51:11, 51:12, 51:13, 51:15, 51:18, 51:21, 51:23, 52:2, 52:5, 52:8, 52:9, 52:12, 52:13, 52:14, 52:15, 52:16, 52:17, 52:18, 52:20, 52:21, 52:22, 52:24, 52:25, 53:5, 53:6, 53:7, 53:12, 53:14, 53:16, 53:18, 53:20, 53:21, 53:22, 53:23, 53:24, 54:1, 54:3, 54:4, 54:7, 54:8, 54:10, 54:13, 54:14, 54:15, 54:16, 54:19, 54:20, 54:21, 55:2, 55:4, 55:7, 55:9, 55:10, 55:11, 55:12, 55:14, 55:17, 55:19, 55:20, 55:22, 55:23, 55:25, 56:2, 56:5, 56:8, 56:10, 56:13, 56:14, 56:15, 56:17, 56:19, 56:21, 56:22, 56:23, 56:25, 57:3, 57:6, 57:8, 57:11, 57:16, 57:18, 57:19, 57:20, 57:21, 58:1, 58:4, 58:6, 58:9, 58:10, 58:13, 58:14, 58:16, 58:17, 58:19, 58:21, 58:22, 58:25, 59:1, 59:5, 59:8, 59:11, 59:15, 59:16, 59:18, 59:21, 59:23, 59:24, 60:2, 60:16, 60:19, 60:23, 61:1, 61:2, 61:6, 61:7, 61:9, 61:13, 61:21, 61:22,

61:23, 61:24, 62:3, 62:4, 62:13, 62:15, 62:16, 62:19, 62:20, 62:23, 63:6, 63:9, 63:18, 63:19, 63:21, 63:22, 64:5, 64:6, 64:8, 64:10, 64:18, 64:21, 64:22, 64:24, 65:2, 65:3, 65:13, 65:20, 65:23, 66:3, 66:4, 66:5, 66:6, 66:9, 66:10, 66:11, 66:12, 66:13, 66:15, 66:17, 66:18, 66:21, 66:22, 66:25, 67:4, 67:9, 67:11, 67:12, 67:13, 67:14, 67:16, 67:19, 67:23, 68:4, 68:5, 68:6, 68:7, 68:8, 68:10, 68:11, 68:12, 68:14, 68:16, 68:18, 68:19, 68:21, 68:23, 68:24, 69:2, 69:6, 69:7, 69:10, 69:11, 69:12, 69:14, 69:15, 69:25, 70:1, 70:3, 70:6, 70:7, 70:10, 70:13, 70:15, 70:16, 70:17, 70:18, 70:19, 70:21, 70:23, 71:1, 71:2, 71:3, 71:6, 71:8, 71:11, 71:12, 71:14, 71:16, 71:18, 71:20, 71:23, 72:1, 72:3, 72:5, 72:7, 72:16, 72:23, 72:24, 72:25, 73:3, 73:4, 73:5, 73:6, 73:8, 73:10, 73:11, 73:12, 73:14, 73:16, 73:19, 73:20, 73:23, 73:25, 74:1, 74:3, 74:6, 74:8, 74:11, 74:12, 74:14, 74:16, 74:19, 74:20, 74:22, 74:24, 75:1, 75:3, 75:4, 75:6, 75:7, 75:9, 75:11, 75:14, 75:16, 75:18, 75:20, 75:21, 75:22, 75:23, 75:24, 76:1, 76:2, 76:3, 76:4, 76:5, 76:7, 76:8, 76:9, 76:13, 76:14, 76:15, 76:17, 76:19, 76:22, 77:5, 77:7, 77:8, 77:9, 77:13, 77:14, 77:15, 77:23, 77:25, 78:1, 78:2, 78:4, 78:5, 78:6, 78:8, 78:9, 78:11, 78:12,

78:14, 78:15, 78:17, 78:18, 78:19, 78:20, 78:23, 78:24, 79:2, 79:3, 79:5, 79:8, 79:9, 79:11, 79:13, 79:15, 79:16, 79:17, 79:18, 79:19, 79:21, 79:23, 79:24, 80:1, 80:4, 80:5, 80:7, 80:8, 80:13, 80:15, 80:18, 80:19, 80:20, 80:21, 80:25, 81:2, 81:3, 81:5, 81:7, 81:11, 81:16, 81:17, 81:18, 81:22, 81:24, 82:1, 82:2, 82:3, 82:4, 82:8, 82:10, 82:11, 82:13, 82:18, 82:21, 82:22, 82:25, 83:4, 83:6, 83:9, 83:10, 83:11, 83:17, 83:18, 83:19, 83:21, 83:23, 83:25, 84:2, 84:4, 84:5, 84:8, 84:11, 84:16, 84:18, 84:20, 84:21, 84:22, 84:24, 84:25, 85:2, 85:3, 85:6, 85:8, 85:9, 85:12, 85:15, 85:16, 85:18, 85:21, 85:23, 85:25, 86:2, 86:7, 86:9, 86:10, 86:12, 86:14, 86:18, 86:19, 86:21, 86:24, 86:25, 87:8, 87:12, 87:15, 87:18, 88:2, 88:9, 89:12, 89:14, 89:20, 89:23, 89:25, 90:6, 90:14, 90:16, 90:25, 91:3, 91:9, 91:12, 91:15, 91:18, 91:21, 91:24, 92:2, 92:4, 92:6, 92:10, 92:12, 92:25, 93:2, 93:3, 93:6, 93:7, 93:10, 93:19, 93:22, 93:25, 94:7, 94:9, 94:11, 94:12, 94:14, 110:18, 112:23, 112:25, 118:25, 119:2, 119:8, 119:12, 119:18, 119:21, 119:24, 120:3, 120:5, 120:7, 120:8, 120:14, 120:17, 120:21, 120:22, 120:25, 121:3, 121:6, 121:9, 121:11, 122:9, 122:12, 122:15, 122:17, 127:18,

127:20, 127:22, 128:1, 131:11, 134:18, 134:20, 135:3, 135:5, 135:7, 135:10, 135:13, 135:15, 135:17, 135:23, 136:5, 136:11, 136:14, 136:18, 136:21, 137:2, 137:4, 137:11, 137:14, 137:25, 138:3, 142:10, 142:14, 142:16, 142:19, 142:22, 146:11, 150:7, 150:10, 150:12, 150:14, 150:16, 150:18, 150:20, 150:24, 151:2, 151:5, 151:7, 157:5, 158:5, 159:14, 159:23, 159:25, 160:1, 160:5, 160:7, 160:8, 160:11, 160:13, 160:14, 160:15, 160:17, 160:19, 160:20, 163:17, 163:19, 169:14, 211:1, 211:4, 213:16, 213:19, 213:20, 215:8, 215:11, 215:14, 215:16, 215:17, 216:12, 216:17, 216:19, 216:23, 217:6, 217:9, 217:12, 218:9
**themselves** [2] - 3:15, 144:18
**there'd** [1] - 176:23
**thereafter** [1] - 90:21
**therefore** [5] - 6:23, 23:23, 95:23, 115:16, 118:14
**thereof** [1] - 86:1
**thinking** [5] - 64:8, 125:11, 183:20, 183:21, 195:23
**thinks** [3] - 72:13, 99:18, 118:13
**thins** [1] - 210:20
**thousand** [2] - 115:2, 203:12
**thousands** [1] - 128:17
**three** [22] - 17:14, 64:7, 75:7, 75:8, 165:18, 168:11, 168:19, 168:20,

168:24, 169:2, 171:14, 172:17, 177:22, 178:22, 178:23, 179:10, 187:10, 193:11, 202:19, 203:8, 205:14, 207:4
**throughout** [3] - 8:10, 96:14, 108:12
**thumb** [1] - 105:1
**Thury** [3] - 26:10, 116:23, 187:5
**tightened** [1] - 210:22
**tightening** [2] - 210:16, 210:17
**Tik** [1] - 97:7
**timers** [1] - 183:9
**tip** [1] - 103:13
**title** [1] - 180:9
**titles** [1] - 117:20
**today** [6] - 12:19, 69:8, 89:3, 105:3, 117:9, 121:20, 142:25, 160:24, 188:10, 198:7
**today's** [1] - 212:17
**together** [5] - 11:5, 23:12, 102:21, 105:14, 179:16
**Tok** [1] - 97:7
**tomorrow** [7] - 93:1, 215:15, 216:9, 216:14, 216:21, 217:10, 218:9
**took** [10] - 19:19, 41:19, 63:3, 75:1, 117:11, 121:17, 156:21, 172:8, 185:12, 212:21
**tools** [3] - 96:17, 96:19, 97:25
**top** [8] - 108:19, 109:4, 157:22, 165:24, 167:14, 172:2, 191:24, 199:21
**total** [3] - 139:25, 140:17, 141:11
**touched** [1] - 100:17
**tough** [1] - 114:19
**toward** [3] - 93:14, 176:4, 181:10
**towards** [1] - 94:3
**Township** [1] - 35:17
**track** [6] - 164:2, 166:2, 179:6, 194:22, 194:23, 200:1
**tracked** [1] - 179:4
**trained** [3] - 28:24,

39:14, 85:21
**trainee** [1] - 73:20
**training** [22] - 28:19, 32:16, 32:22, 33:4, 33:14, 34:2, 41:13, 41:18, 41:19, 41:21, 41:22, 73:21, 79:11, 79:20, 79:22, 80:14, 85:13, 85:17, 85:18, 85:19, 85:25, 86:3
**trainings** [3] - 32:20, 32:24, 42:4
**transcript** [3] - 102:12, 151:12, 218:14
**transcription** [1] - 1:22
**transfer** [1] - 31:25
**treat** [3] - 27:25, 28:3, 100:3
**treated** [3] - 27:18, 27:22, 47:4
**treating** [1] - 109:21
**trial** [34] - 4:18, 5:3, 7:22, 8:10, 10:3, 10:9, 11:7, 11:9, 29:12, 55:3, 55:16, 74:15, 92:18, 94:24, 95:2, 95:11, 95:23, 96:6, 97:22, 98:7, 101:23, 102:11, 102:15, 102:21, 103:2, 104:3, 105:4, 111:10, 113:1, 113:7, 215:21, 215:25, 216:5, 216:7
**TRIAL** [1] - 1:5
**tried** [4] - 22:21, 108:13, 212:22, 212:24
**tries** [2] - 89:7, 215:22
**trio** [1] - 207:7
**trip** [3] - 130:10, 130:17, 131:8
**truck** [6] - 83:14, 83:17, 83:18, 83:19, 83:22, 83:23
**true** [11] - 98:24, 114:15, 151:22, 174:17, 181:6, 181:25, 190:3, 196:20, 213:4, 213:7, 213:8
**try** [16] - 45:24, 83:1, 96:9, 97:18, 98:2, 102:17, 139:4, 152:12, 176:8, 178:3, 181:19, 185:2, 211:15, 212:9, 216:15, 217:22

**trying** [12] - 8:25, 9:3, 12:4, 16:17, 61:3, 98:10, 106:8, 127:7, 142:7, 170:25, 181:3, 195:20
**Tucker** [2] - 25:6
**TUCKER** [1] - 2:2
**tuition** [3] - 59:6, 65:9, 65:11
**turn** [4] - 77:10, 120:9, 169:15
**turning** [1] - 216:23
**turns** [1] - 195:8
**two** [48] - 4:14, 4:22, 9:18, 9:19, 15:8, 17:6, 40:23, 41:6, 45:4, 50:14, 51:19, 53:9, 54:5, 56:3, 59:9, 61:24, 64:6, 65:23, 69:19, 73:18, 74:20, 77:3, 87:7, 100:13, 106:8, 110:12, 111:19, 114:18, 130:10, 138:7, 140:5, 140:10, 144:8, 167:4, 167:5, 167:13, 167:15, 167:17, 177:6, 178:4, 178:9, 184:13, 190:7, 196:9, 205:11, 212:20
**Two** [1] - 2:4
**type** [5] - 88:17, 97:20, 100:14, 100:23, 134:3
**types** [1] - 100:13

## U

**U.S** [1] - 1:8
**U.S.C** [1] - 95:6
**ultimately** [2] - 51:20, 158:23
**umbrella** [1] - 101:2
**unable** [2] - 138:9, 138:10
**uncle** [1] - 71:1
**uncomfortable** [1] - 63:3
**under** [15] - 6:9, 15:25, 77:21, 87:2, 87:10, 95:5, 95:16, 98:13, 99:25, 107:8, 151:21, 173:2, 173:6, 182:4, 215:15
**underline** [1] - 218:2
**underlined** [1] - 170:16

**underlining** [1] - 126:6
**underpaid** [1] - 72:12
**understandable** [2] - 194:11, 211:24
**understood** [7] - 7:5, 10:13, 10:14, 12:12, 31:8, 119:15, 189:15
**undertook** [1] - 152:17
**undisputed** [3] - 114:12, 115:20, 115:23
**uneditable** [1] - 156:19
**unfair** [1] - 48:7
**unfairly** [2] - 27:19, 27:22
**unfortunately** [1] - 10:10
**union** [6] - 49:21, 50:20, 82:15, 82:24, 82:25
**unionize** [1] - 48:9
**UNITED** [1] - 1:1
**United** [1] - 189:11
**universe** [1] - 214:22
**universities** [4] - 117:18, 189:3, 189:10, 191:9
**UNIVERSITY** [1] - 1:5
**university** [5] - 52:15, 161:23, 161:25, 190:3, 200:1
**University** [59] - 3:3, 3:14, 3:18, 3:21, 23:1, 23:2, 24:23, 27:1, 31:15, 32:5, 32:8, 36:7, 36:10, 36:11, 46:16, 46:18, 52:6, 53:11, 57:25, 68:3, 71:3, 71:9, 81:20, 105:22, 107:14, 111:6, 111:24, 113:16, 114:6, 114:7, 114:11, 114:18, 114:23, 115:16, 116:7, 134:22, 135:25, 137:6, 143:15, 162:16, 166:18, 167:6, 167:8, 167:14, 167:16, 174:5, 176:8, 176:18, 177:13, 177:20, 178:3, 179:21, 181:6, 181:18, 183:3, 192:17, 194:4, 209:4

**University-wide** [3] - 177:13, 178:3, 181:6
**unless** [4] - 24:13, 103:19, 184:12, 208:6
**unquote** [1] - 109:21
**unreachable** [1] - 145:23
**up** [140] - 14:17, 14:19, 14:20, 14:23, 14:24, 16:2, 17:23, 18:16, 24:4, 24:10, 24:15, 25:10, 29:18, 29:25, 30:16, 31:6, 32:12, 34:19, 35:21, 36:24, 37:1, 38:19, 40:2, 40:3, 40:4, 41:5, 41:19, 42:8, 42:10, 43:9, 44:19, 44:20, 46:13, 47:19, 47:20, 47:21, 49:11, 49:18, 50:11, 52:2, 54:8, 54:10, 55:23, 55:25, 57:1, 57:2, 57:3, 59:1, 59:19, 61:2, 61:4, 62:20, 63:13, 63:22, 64:2, 64:22, 64:24, 65:24, 66:22, 67:7, 68:25, 69:4, 70:7, 70:23, 71:4, 71:16, 72:5, 74:4, 74:6, 75:4, 76:15, 76:17, 78:24, 79:3, 79:9, 80:8, 81:3, 81:5, 81:13, 82:22, 82:23, 83:1, 83:4, 83:5, 84:5, 84:17, 85:9, 86:10, 86:12, 89:17, 109:23, 114:16, 115:5, 115:14, 116:17, 116:18, 117:10, 118:4, 118:24, 120:9, 120:10, 129:13, 133:1, 137:22, 140:21, 141:4, 142:14, 148:25, 155:23, 155:25, 156:8, 163:22, 164:15, 169:7, 170:4, 180:24, 181:22, 182:7, 185:18, 193:1, 193:7, 193:25, 194:2, 194:19, 195:13, 195:14, 199:17, 199:20, 205:8, 206:20, 207:13,

208:18, 209:9, 209:22, 210:22
**update** [2] - 16:19, 48:21
**updates** [1] - 48:20
**uphold** [1] - 23:21
**upper** [1] - 189:3
**upper-level** [1] - 189:3
**ups** [1] - 60:9
**Urology** [1] - 32:10
**uses** [1] - 24:18
**utilizing** [1] - 1:22

**V**

**vacation** [8] - 12:16, 121:23, 124:13, 127:5, 129:17, 130:16, 145:21
**vacations** [1] - 131:5
**vaccine** [1] - 52:21
**vague** [1] - 153:24
**vagueness** [1] - 153:21
**Valley** [1] - 81:19
**valuable** [1] - 205:17
**VAN** [3] - 122:14, 122:17, 219:4
**Van** [5] - 26:12, 122:17, 135:10, 135:11, 142:11
**variations** [1] - 174:12
**varied** [1] - 209:20
**varies** [2] - 177:24, 189:9
**various** [3] - 7:15, 132:10, 208:17
**vary** [1] - 73:16
**vendor** [1] - 158:21
**vendors** [1] - 133:12
**verbally** [1] - 24:13
**verdict** [23] - 4:9, 5:1, 5:10, 12:11, 14:23, 14:24, 15:2, 17:24, 18:1, 18:9, 18:10, 18:11, 29:11, 29:15, 45:16, 63:1, 94:25, 98:18, 100:14, 103:14, 104:24, 118:4
**verify** [3] - 125:18, 133:7, 133:15
**version** [1] - 12:8
**versus** [2] - 3:3, 171:2
**via** [2] - 12:19, 152:6
**vice** [13] - 113:9, 114:6, 114:9, 117:10, 118:11, 189:4, 190:8, 191:23, 192:8,

192:20, 192:22, 213:6
**Vice** [1] - 122:21
**victim** [1] - 69:18
**videoconference** [1] - 120:13
**view** [9] - 18:7, 28:8, 33:5, 33:14, 133:8, 133:15, 143:12, 150:18
**views** [1] - 216:3
**violated** [7] - 95:12, 95:25, 96:4, 105:25, 109:2, 110:5, 116:16
**violating** [2] - 10:4, 108:8
**violation** [6] - 4:19, 23:3, 105:22, 108:4, 108:5, 108:15
**virtual** [1] - 124:5
**virtue** [1] - 165:4
**vision** [1] - 162:12
**visit** [1] - 97:11
**visiting** [2] - 112:4, 194:22
**vital** [1] - 23:5
**voir** [2] - 62:6, 92:20
**Volume** [1] - 150:13
**volumes** [1] - 150:14

**W**

**W-2** [7] - 126:7, 127:7, 136:23, 137:1, 144:25, 149:24, 156:8
**W-2s** [36] - 110:9, 125:14, 125:23, 126:2, 126:8, 126:24, 129:8, 136:9, 136:24, 137:2, 137:3, 144:6, 144:10, 144:17, 146:9, 146:16, 146:19, 148:2, 148:3, 148:21, 149:1, 149:3, 152:17, 154:8, 155:5, 155:7, 155:8, 156:18, 157:20, 157:22, 158:9, 158:17, 158:20, 159:5
**W-E-Y-L-E-R** [1] - 122:18
**wage** [2] - 73:12, 73:22
**wages** [7] - 49:4, 49:5, 73:9, 73:11, 73:14, 73:21, 73:24

**wait** [4] - 15:21, 170:15, 211:3, 213:16
**waiting** [2] - 89:21, 129:11
**waiver** [1] - 5:14
**walk** [1] - 89:4
**walked** [1] - 101:1
**walking** [2] - 89:6, 119:15
**walls** [2] - 55:1, 88:25
**wants** [1] - 43:6
**Warnock** [12] - 7:17, 26:11, 107:2, 117:3, 119:9, 119:10, 119:11, 167:21, 171:19, 184:20, 208:21, 209:5
**watch** [1] - 97:17
**water** [1] - 101:2
**wear** [1] - 97:11
**wearing** [1] - 101:1
**weather** [2] - 30:14, 30:18
**web** [1] - 133:1
**website** [2] - 97:3, 97:4
**websites** [1] - 97:24
**week** [4] - 22:22, 41:19, 105:15, 111:4
**week-long** [1] - 41:19
**weekend** [9] - 8:7, 131:2, 149:10, 149:14, 149:15, 149:18, 149:19, 149:20, 149:24
**weeks** [1] - 45:12
**weighing** [1] - 99:10
**weight** [6] - 99:12, 101:6, 101:8, 102:2, 102:5, 102:25
**Weinstein** [1] - 25:7
**WENDY** [1] - 1:11
**West** [1] - 45:10
**west** [1] - 45:10
**wet** [1] - 101:2
**WEYLER** [2] - 121:2, 121:5
**Weyler** [20] - 26:12, 120:4, 120:8, 120:9, 120:12, 121:1, 121:14, 121:16, 122:12, 122:18, 131:14, 137:17, 138:6, 146:17, 146:24, 147:17, 148:10, 150:21, 152:24, 153:3
**Weyler's** [2] - 154:21, 156:23

**WhatsApp** [1] - 97:2
**whatsoever** [1] - 216:1
**white** [2] - 30:5, 36:5
**whole** [24] - 55:16, 55:17, 75:25, 150:25, 161:9, 161:23, 161:24, 161:25, 167:16, 176:8, 176:9, 176:15, 176:17, 176:18, 179:20, 181:18, 183:2, 184:1, 195:7, 196:24, 205:24, 209:18, 214:21, 214:22
**wide** [4] - 177:13, 178:3, 181:6, 183:25
**wife** [1] - 105:21
**willful** [25] - 7:10, 7:12, 14:14, 15:3, 15:4, 15:22, 16:2, 16:4, 16:6, 16:10, 16:21, 17:2, 17:9, 17:12, 17:22, 17:25, 22:8, 108:6, 111:3, 113:8, 116:20, 117:24, 118:2, 118:5, 118:22
**willfully** [3] - 95:25, 96:3, 116:17
**willfulness** [7] - 7:20, 7:22, 7:23, 14:11, 14:13, 21:7
**willing** [3] - 134:8, 134:14, 136:7
**Winters** [1] - 34:24
**wish** [8] - 5:22, 88:15, 89:11, 102:24, 160:22, 196:2, 196:3, 203:7
**WITNESS** [9] - 78:2, 122:17, 159:25, 160:14, 160:19, 211:4, 213:19, 215:16, 219:3
**witness** [35] - 8:8, 12:15, 74:15, 74:22, 75:18, 97:8, 100:11, 100:15, 100:16, 100:17, 100:18, 101:13, 101:14, 101:17, 101:18, 101:20, 101:22, 102:17, 105:10, 105:12, 109:22, 119:24, 119:25, 120:3, 121:11, 122:10, 135:5,

142:10, 142:12, 142:16, 142:22, 160:1, 160:15, 160:20
**witness's** [4] - 101:19, 101:23, 102:18
**witnessed** [1] - 27:21
**witnesses** [16] - 98:21, 101:12, 102:3, 102:4, 102:7, 102:8, 103:21, 104:11, 104:14, 109:19, 109:21, 109:24, 110:4, 110:12, 119:19, 119:22
**woman** [6] - 73:8, 201:18, 201:20, 201:25, 207:2, 208:8
**women** [38] - 23:17, 28:8, 44:24, 45:3, 49:16, 51:19, 72:2, 73:5, 73:6, 73:18, 76:24, 77:2, 77:3, 78:13, 78:18, 79:4, 80:2, 86:1, 112:13, 112:14, 113:12, 114:16, 115:21, 116:22, 176:12, 192:25, 201:15, 207:23, 207:25, 208:13, 208:14, 208:24, 209:23, 209:24, 210:9, 211:17, 211:21
**women's** [1] - 209:13
**wonder** [2] - 77:1, 111:8
**word** [1] - 166:17
**words** [3] - 96:5, 97:23, 121:1
**worker** [1] - 181:20
**workers** [2] - 46:20, 49:3
**workload** [11] - 172:21, 173:8, 174:24, 176:7, 176:10, 176:11, 176:14, 176:17, 176:19, 181:5, 181:6
**workplace** [2] - 28:11, 28:16
**works** [14] - 12:10, 32:7, 53:2, 58:4, 61:8, 61:17, 106:11, 112:13, 177:3, 194:1, 196:14, 196:15, 198:17, 198:24
**worry** [1] - 195:22

**worthy** [1] - 101:13
**wow** [1] - 189:25
**wrap** [3] - 6:12, 180:24, 206:19
**wrapping** [1] - 181:22
**write** [2] - 152:7, 205:21
**writers** [1] - 57:5
**Writing** [1] - 209:4
**writing** [8] - 18:21, 171:23, 172:4, 172:7, 172:13, 184:3, 208:22, 209:5
**written** [4] - 196:6, 197:9, 197:10, 198:14
**wrote** [1] - 101:22
**Wyndcroft** [1] - 38:8

# Y

**year** [12] - 59:9, 85:15, 85:16, 109:5, 112:6, 136:24, 172:23, 177:24, 179:8, 202:9, 203:21, 211:10
**yearly** [1] - 60:7
**years** [44] - 15:8, 17:6, 17:14, 19:20, 31:19, 36:16, 40:21, 42:16, 45:9, 64:7, 75:7, 75:8, 75:22, 112:18, 115:14, 115:15, 115:19, 116:24, 118:11, 139:20, 157:24, 172:7, 177:20, 177:22, 177:23, 179:25, 185:21, 186:15, 191:24, 192:1, 192:2, 192:3, 192:7, 193:3, 194:2, 194:15, 199:25, 202:1, 202:19, 202:24, 203:8, 209:5, 210:8
**yesterday** [1] - 90:3
**York** [1] - 56:13
**younger** [1] - 76:10
**your's** [1] - 88:4
**yourself** [1] - 30:7
**yourselves** [2] - 87:24, 96:9
**yup** [1] - 83:18
**Yusin** [3] - 26:13, 180:1, 209:13

# Z

**Zassick** [1] - 57:17
**zero** [1] - 177:22
**Zoom** [23] - 110:8, 119:25, 120:2, 121:20, 121:25, 124:2, 127:4, 128:23, 128:25, 129:19, 130:12, 132:23, 132:25, 136:11, 145:10, 147:5, 147:7, 147:13, 147:16, 147:19, 147:24, 148:7, 153:2
**zoom** [2] - 12:19, 12:20