**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARILYN GAYE PIETY FOLEY,**<br>**Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **DREXEL UNIVERSITY,**<br>**Defendant.** | **NO.  22-1777** |

## MEMORANDUM OPINION

Plaintiff Marilyn Gaye Piety Foley, an academic philosopher, sued her employer, Defendant Drexel University for violations of the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d)(1).  The Court imposed liability on Drexel as a sanction for it disobeying orders of the Court but allowed a trial to establish whether Drexel's violation was willful and to determine damages.

At that trial, after the close of Piety Foley's case-in-chief, Drexel moved for Judgment as a Matter of Law, pursuant to Federal Rule of Civil Procedure 50(a), on the question of willfulness.  The Court denied Drexel's Motion.  After deliberations, the jury found that Drexel's violation of the Equal Pay Act was willful and, as instructed on the verdict sheet, selected male coworkers of Piety Foley's to be used as comparators for the sake of calculating damages.

Drexel now renews its Motion for Judgment as a Matter of Law on the question of willfulness and alternatively seeks a new trial, pursuant to Federal Rule of Civil Procedure 59, on "all issues" relating to the Equal Pay Act claim, including liability.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  Pretrial Motions and Orders

Piety Foley sued Drexel in 2022, alleging workplace discrimination in violation of state and federal law.  Only Piety Foley's Equal Pay Act claim survived pre-trial motions, and a jury trial was scheduled for September 23, 2024.

In the weeks before trial, Piety Foley filed an Omnibus Motion in Limine requesting, among other things, that Drexel be ordered to produce "verifiable pay documents" containing the salaries of her fellow professors in the Department of English and Philosophy.  Pl.'s Omnibus Mot. in Lim. 11, ECF No. 197.  Because damages under the Equal Pay Act are calculated by comparing the pay of the underpaid employee to the pay of better-compensated coworkers of the opposite sex, Piety Foley argued that it was crucial that she be provided with accurate and verifiable documents demonstrating what Piety Foley's male peers were paid.  *Id.*  The only documents containing pay data that Drexel had provided during discovery—four spreadsheets— were insufficient for the purpose of calculating damages, Piety Foley argued, because they were untrustworthy (*i.e.*, unsupported by verifiable pay documents, such as tax forms) and separately inadmissible as hearsay.  *Id.*

Without reaching the merits of Piety Foley's hearsay argument, the Court ordered on September 19, 2024—the Thursday before trial, and the day before the Final Pre-Trial conference—that, "[b]efore 12pm ET on September 20, 2024, Defendant shall provide Plaintiff and Plaintiff's counsel access to a Drexel University payroll database containing the historical salary information of all Professors in the Department of English and Philosophy from May 9,

---

[1] Because this Memorandum is written primarily for the benefit of the parties, only the events pertinent to the instant post-trial Motions are set forth here.  The facts underlying Piety Foley's lawsuit are recounted more fulsomely in *Piety Foley v. Drexel Univ.*, 2024 WL 3540445 (E.D. Pa. July 25, 2024).

2019 to the present." Order of Sept. 19, 2024, at 1, ECF No. 217.

The following day, a few hours before the Final Pre-Trial Conference, counsel for Piety

Foley sent the following email correspondence to the Court:

> Pursuant to the Court's Order (Doc 217) from yesterday, Drexel approached us about setting up a meeting today. We said we would prefer to meet in person, but were denied that and sent a link for a one-hour Zoom meeting at 11:00 today instead.
>
> At the beginning of today's meeting, I asked to go to the payroll database to view W-2s, and we were denied access to it. There was only an HR official at the meeting, not anyone from Payroll. The HR official said that she did not have access to the payroll database, but only a Payroll person would. She offered instead to show us another database that she purported has the same information as the payroll database. (We would have no way to determine if that is the case and cannot simply take Defendant's word for it.) She said that she did not know if the Payroll official with access was available. The official was not made available.
>
> I terminated the meeting explaining that we would take up the issue in our meeting with the Court today.

Pl.'s Resp. to Def's Mot. for Recons. Ex. 1, ECF No. 227.

At the Final Pre-Trial Conference, the Court emphasized to Drexel that, consistent with

the language of the September 19 Order, it needed to provide access to "a *payroll* database

containing the historical salary information" that Piety Foley sought, not a *Human Resources*

database that purported to contain the same information. *See* Hr'g Tr. 8:6-8, Sept. 23, 2024, ECF

No. 223 (the Court recounting on the record the directions it gave Drexel at the Final Pre-Trial

Conference). To crystallize the matter, the Court provided the parties with the following Order,

what was docketed later that day:

> **AND NOW**, this 20th day of September 2024,
>
> **WHEREAS** the Court ordered Defendant Drexel University to "provide Plaintiff and Plaintiff's counsel access to a Drexel University payroll database containing the historical salary

information of all Professors in the Department of English and Philosophy from May 9, 2019 to the present" (*see* ECF 217);

**WHEREAS** the Court received an email from Plaintiff's counsel indicating that Defendant Drexel University had provided limited access to a Human Resources database alleged to contain the same information;

**IT IS HEREBY ORDERED** that Defendant Drexel shall provide Plaintiff and Plaintiff's counsel access to official tax documents—specifically, Form W-2s—for all Professors in the Department of English and Philosophy from May 9, 2019 to the present so that Plaintiff may confirm that the Human Resources database contains accurate salary data;

**IT IS FUTHER ORDERED** that, if these tax documents reveal that the salary data contained in the Human Resources database are inaccurate, the tax documents may be included on Plaintiff's Exhibit List.[2]

Order of Sept. 20, 2024, ECF No. 219.  Although the Order did not specify a deadline for compliance, the Court instructed Drexel's counsel at the Final Pre-Trial Conference that access to the database should be granted forthwith.  In response to being provided with a copy of this Order, Drexel's counsel expressed concerns about sensitive personal information contained on Form W-2s, suggesting that redaction could allay those apprehensions.  The Court specifically instructed counsel not to redact any data.  *See* Hr'g Tr. 6:10-17 (The Court: "I had specifically said not [to redact].").

### B.  The 2024 Hearing and Drexel's Sanction

Three days later, on the morning of the Monday, September 23 trial date, Piety Foley's

---

[2] The Order also contained a footnote with the following text:

> This Court must weigh the non-party professors' "legitimate expectations of privacy regarding the precise amount of their incomes" against "[P]laintiff's need for the information, its materiality, and its relevance." *See De Masi v. Weiss*, 669 F.2d 114, 119-20 (3d Cir. 1982).  The disclosures ordered here strike a balance between ensuring Plaintiff has access to accurate salary data, which are central to its claim, and limiting any wider dissemination of such data.

counsel sent another email to the Court (copied to Drexel's counsel) concerning events that had

transpired over the weekend.  While the venire panel was being gathered, the parties were called

to order and the Court asked Piety Foley's counsel to read his email into the record.  Hr'g Tr.

3:1-8.  That email follows:

> Defendant and Attorney Greenspan continue to deny us access to review pay data in the databases to compare it with the unredacted W-2s in the databases to ensure that we have accurate salary data.
>
> After we left your Chambers Friday afternoon, we never received access to any Drexel pay database.  I e-mailed Attorney Greenspan at 5:40 pm asking about it, and she responded about 15 minutes later that she was still tracking down people and information.  I did not hear back from her.
>
> Saturday I still had not heard back so I e-mailed Attorney Greenspan at 10:41 Saturday morning.
>
> In response, at 11:37 am, Attorney Greenspan sent me PDFs of W-2s that were redacted contrary to Your Honor's explanation.
>
> We reviewed them and responded an hour later that that was not in compliance with the Court's order and that the Court had specifically told her that she and Drexel had to let us have access to unredacted W-2s in the database.  Attorney Greenspan responded at 2:55 pm that she was following the Court order.  (The Emails are attached.)
>
> Yesterday (Sunday) at 4:03 pm, Attorney Greenspan sent a document purporting to show all Department tenure line faculty salaries for 2019—present.
>
> I responded about 20 minutes later that this was not the database access we were expecting so we could compare the W-2s in the payroll database to pay information in other relevant databases.
>
> The emails and redacted W-2s are attached.

Def's Mot. for Recons. Ex. 13, ECF No. 225-17.

At the time of this hearing, although Drexel's counsel had not yet seen this email, she

acknowledged that its description of the weekend's events was "partially true."  Hr'g Tr. 4:17-

22.  The Court asked Drexel whether it had given Piety Foley and her counsel "access on Friday [September 20] to the database with the W-2s." *Id.* at 5:15-17.  Drexel's counsel responded that she and her client had not.  *Id.* at 5:25.  The Court asked the same question with regard to Saturday, September 21 and Sunday, September 22.  *Id.* at 6:1-8.  Again, Drexel's counsel answered that she and her client did not, on either of those days, give Piety Foley the database access as ordered.  *Id.*  Counsel explained that, instead, she sent copies of the relevant W-2s to Piety Foley's counsel, with "only Social Security numbers and address[es]" redacted.  *Id.* at 6:2, 6:1-13.  The Court reminded counsel that it had "specifically said not" to redact any information from any W-2s, with the understanding that if later "there was a determination that [the W-2s] were going to be produced in court, then the redactions could occur."  *Id.* at 6:14-17.  The Court concluded that, in acting as she had, Drexel's counsel had "disobeyed a court order several times th[at] weekend."  *Id.* at 6:19.

The Court proceeded to inform Drexel's counsel that it was considering a sanction, and asked counsel to "[p]ut on the record what [she] need[ed] to say" on the matter.  *Id.* at 6:21-25.  In the course of doing so, Drexel's counsel represented that she and her client were "unable" to provide the database access ordered by the Court.  *Id.* at 8:6-13.  The Court established that Drexel's corporate representative was present in the courtroom, and asked Drexel's counsel whether she would like to call her client to the "stand and tell [the Court] why they disobeyed a court order."  *Id.* at 8:19-25.  Drexel's counsel declined to call the corporate representative to the stand on the grounds that the representative was "not the witness" who could speak to the specific issues being discussed.  *Id*. at 9:1.

In light of these revelations, the Court asked Piety Foley's counsel to propose a sanction.  *Id.* at 9:9.  Counsel proposed as follows:

> I think that a proper sanction would be here that, first, we cannot
> proceed because we do not have verifiable, accurate pay data, and
> as your order stated on Friday, central to our claim [sic].  A sanction
> we think would be appropriate, Your Honor, would be for a
> judgment to be entered in our favor on liability and then a damages
> hearing ordered with discovery so that we may get this information
> so that the damages may be assessed using accurate pay information,
> which is central to the claim.  And finally, Your Honor, I think Ms.
> Greenspan [Drexel's counsel] and, in fact, the Tucker Firm
> [Drexel's counsel's employer] need to be disqualified because they
> have made themselves witnesses and we'll be needing to take their
> depositions in the damages discovery.

*Id.* at 9:11-23.  After Drexel's counsel responded, *id.* at 9:24-10:12, the Court granted the

sanction proposed in part, *id.* at 10:16.  Specifically, it imposed liability on Drexel for violating

the Equal Pay Act, with the questions of willfulness and damages to be determined at trial.  *Id.* at

10:16-19, 11:2-4.  The Court also granted Piety Foley a limited window to conduct additional

discovery pertinent to the issues to be tried.  *Id.* at 11:5-22.  Drexel moved for reconsideration

orally at the close of the hearing, arguing that, because it had given Piety Foley "all the

information [she] need[s] to proceed with trial" by sending her counsel redacted copies of the W-

2s in question, the imposition of liability against it was "not fair."  *Id.* at 12:4-13:7.  The Court

denied this motion, *id.* at 12:6, reiterating that Drexel and its counsel had "disobeyed two court

orders." *Id.* at 13:8-17.  Soon after the hearing, Drexel filed a written motion for reconsideration,

*see* Def.'s Mot. for Recons., ECF No. 225, which the Court denied, *see* Order of November 4,

2024, ECF No. 231.

### C.  The 2025 Trial and Jury Verdict

A three-day jury trial on the questions of willfulness and damages was conducted

between January 27 and January 29, 2025.  At the close of Piety Foley's case in chief, Drexel

moved for Judgment as a Matter of Law, under Federal Rule of Civil Procedure 50(a), on the

question of whether its violation of the Equal Pay Act was willful.  Trial Tr. vol. 2 at 44:8-10,

Jan. 28, 2025, ECF No. 263.  The Court denied Drexel's Motion.  *Id.* at 50:22.  The jury returned

a verdict finding that Drexel's violation was willful and determining that four of Piety Foley's

fellow professors should be used as comparators in determining her statutory damages under the

Equal Pay Act.[3]  Verdict Sheet, ECF No. 252.

After trial, the parties, based on their own calculations of the salaries of the four

comparators as compared to Piety Foley's salary, jointly stipulated that Piety Foley's statutory

damages under the Equal Pay Act amounted to $354,993.42.  *See* 29 U.S.C. § 216(b) ("Any

employer who violates the [Equal Pay Act] shall be liable to the employee or employees affected

in the amount of their un[der]paid [] wages . . . and in an additional equal amount as liquidated

damages."); 29 U.S.C. § 255(a) (providing recovery for three years' wage differential when

violation is determined to be willful).  Drexel requested pursuant to 29 U.S.C. § 260 that the

Court exercise its discretionary power to reduce the amount of damages.  29 U.S.C. § 260 ("[I]f

the employer shows to the satisfaction of the court that the act or omission giving rise to [an

Equal Pay Act] action was in good faith and that [the employer] had reasonable grounds for

believing that [their] act or omission was not a violation of the [Act], the court may, in its sound

discretion, award no liquidated damages or award any amount thereof not to exceed the amount

specified in section 216 of this title.").  The Court denied the request and entered judgment

against Drexel in the full amount of $354,993.42.  Order of Jan 31, 2025, ECF No. 261; *see also*

---

[3] Damages under the Equal Pay Act are calculated by comparing a prevailing plaintiff's salary to the salaries of comparators.  *See* 29 U.S.C. § 216(b).  Instead of asking the jurors to perform this calculation, the parties agreed to utilize a Special Verdict Form which asked the jurors to select one or more professors in Piety Foley's department whom the jury deemed "should be used as comparator(s) in determining [her] damages."  *See* Verdict Sheet, ECF No. 252.  The jury selected Professors Jacques Catudal, Abioseh Porter, Andrew Smith, and Scott Warnock as comparators.

## II.    RULE 59(A) MOTION FOR A NEW TRIAL

### A.  Legal Standard

Rule 59(a) provides that, after a jury trial, a court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Here, Drexel has moved for a new trial, arguing trial errors by the Court.[4] *Maylie v. Nat'l R.R. Passenger Corp.*, 791 F. Supp. 477, 480 (E.D. Pa. Apr. 15, 1992), *aff'd*, 983 F.2d 1051 (3d Cir. 1992) (recognizing "a significant error of law to the prejudice of the moving party" as grounds for a new trial under Rule 59(a)).

"The Court's inquiry in evaluating a motion for a new trial on the basis of trial error is twofold.  It must first determine whether an error was made in the course of trial, and then it must determine 'whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice.'"  *Price v. Trans Union, LLC*, 839 F. Supp.2d 785, 792 (E.D. Pa. 2012) (quoting *Farra v. Stanley-Bostitch, Inc.*, 838 F. Supp. 1021, 1026 (E.D. Pa. 1993)).  "The decision to grant or deny a new trial is confided almost entirely to the discretion of the district court," *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992), with such requests being disfavored, *see, e.g., Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).  Indeed, a district court should grant a new trial "only when . . . 'a miscarriage of justice would result if the verdict were to stand.'"  *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376,

---

[4] Drexel fashions its motion as one brought under Rules 59(a) and 59(e), the latter of which allows a district court to "to alter or amend a judgment."  Fed. R. Civ. P. 59(e).  This Rule exists "to make clear that the district court possesses the power to rectify its own mistakes in the period immediately following the entry of judgment."  *White v. New Hampshire Dep't of Emp. Sec.*, 455 U.S. 445, 450 (1982) (cleaned up).

Although Drexel disagrees with many decisions made by the Court during the jury trial, it does not argue that any of those decisions were "mistakes,"—*i.e.*, inadvertent slip-ups warranting summary repair—and does not otherwise identify a specific portion of the judgment it requests the Court to alter or amend.  Instead, as Drexel's briefing makes clear, the relief it seeks is "a new trial on all issues;" accordingly, the Rule 59 Motion will be analyzed under the rubric of Rule 59(a), not Rule 59(e).

386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)).

### B. Discussion

Drexel argues that the Court committed two errors of law before and during the jury trial in this matter.  First and foremost, Drexel asks the Court to vacate the sanction of liability and grant a new trial "on all issues" because "the Court's imposition of liability against Drexel on the Equal Pay Act is unsupported by evidence and erroneous."  Second, Drexel argues that it is entitled to a new trial because the Court admitted irrelevant evidence offered by Piety Foley and excluded relevant evidence offered by Drexel.  Each of these arguments is considered in turn.

### i. *Imposing Liability as a Sanction*

The Federal Rules of Civil Procedure provide that, where a party "fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders," including going so far as to "dismiss[] the action or proceeding in whole or in part . . . ." Fed. R. Civ. P. 37(b)(2).  Here, Drexel argues that the Court erred by imposing liability as a sanction without first holding an evidentiary hearing or weighing the factors set forth in *Poulis v. State Farm Fire and Caus. Co.*, 747 F.2d 863, 868 (3d Cir 1984).

As an initial matter, Drexel cites no authority for the proposition that a district court must hold an evidentiary hearing before sanctioning a party.  While it is indeed "imperative that the District Court have a full understanding of the surrounding facts and circumstances" before sanctioning a party, it is still permissible for a court to go as far as to "dismiss a case *sua sponte*" when it has "acquired knowledge of the facts it needs to make an informed decision," meaning that an evidentiary hearing is not required in each and every case.  *Briscoe v. Klaus*, 538 F.3d 252, 258 (3d Cir. 2008) (citing *Donnelly v. Johns-Manville Sales Corp.*, 677 F.2d 339, 341 (3d Cir. 1982)).

In this case, although the Court did not schedule a separate evidentiary hearing dedicated exclusively to Drexel's conduct, the Court nonetheless collected "the facts it need[ed] to make an informed decision" at the September 23, 2024 in court proceeding. *Id.* Counsel for Drexel was given an opportunity to address Piety Foley's allegations regarding the events of the preceding weekend before the Court determined that Drexel had not complied with its orders and entertained proposals for appropriate sanctions. *See* Hr'g Tr. 4:24-9:9. The Court also invited Drexel's counsel to call Drexel's corporate representative to the stand to explain more, but counsel demurred. *Id.* at 8:19-9:1. So, to whatever small extent the Court lacked knowledge of the finer details of the events in question, it was due to Drexel's reticence, not the Court's haste (as Drexel alleges).

As for the argument that the Court failed to properly weigh the *Poulis* factors, it must be noted that *Poulis* involved a District Court's dismissal of an offending party's claims in their entirety and with prejudice; it is not crystal clear, then, that the *Poulis* test would apply here, where Drexel was sanctioned only with the imposition of liability. However, a review of the *Poulis* factors shows that they support the Court's sanction.[5] Those factors are:

> (1) the extent of the party's personal responsibility;
>
> (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery;
>
> (3) a history of dilatoriness;
>
> (4) whether the conduct of the party or the attorney was willful or in bad faith;
>
> (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and

---

[5] Drexel made substantially the same arguments in its written Motion for Reconsideration of September 30, 2024, which Motion was denied. However, since no opinion was issued to accompany that ruling, the Court takes this opportunity to elucidate its reasoning, as requested by Drexel, in the terms of the *Poulis* factors.

(6) the meritoriousness of the claim or defense.

*Poulis*, 747 F.2d at 868.  "[N]o single *Poulis* factor is dispositive," *Ware v. Rodale Press, Inc.*,

322 F.3d 218, 222 (3d Cir. 2003), and not every factor needs to be satisfied in order justify a

sanction of default or dismissal, *see Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992)

("*Poulis* did not provide a magic formula . . . .").

        a.  *Poulis* Balancing

            *1. Responsibility*

The first *Poulis* factor considers whether Drexel "bears personal responsibility" for

violating the Court's orders, or whether the fault is counsel's alone.  *Adams v. Trs. of the N.J.*

*Brewery Employees' Pension Tr. Fund*, 29 F.3d 863, 873 (3d Cir. 1994); *see also id.* ("Although

a party may justly suffer dismissal because of his counsel's unexcused conduct, we have

increasingly emphasized visiting sanctions directly on the delinquent lawyer, rather than on a

client who is not actually at fault.") (cleaned up).  Here, Drexel argues that Piety Foley "failed to

adduce evidence that someone at Drexel even . . . knew of th[e] Court's instructions" regarding

access to a payroll database.  Conspicuously, Drexel does not argue that, as a matter of fact, it

did not know of the Court's instructions—it simply argues Piety Foley did not "establish who, on

behalf of Drexel, did what, when, how, or why."

This argument falters for two reasons.  First, Drexel's contention that a plaintiff bears the

burden of producing evidence relevant to the *Poulis* analysis must fail for the simple reason that

Drexel has not offered any authorities to support it, in contravention of Local Rule of Civil

Procedure 7.1(c).  E.D. Pa. R. Civ. P. 7.1(c) ("Every motion not certified as uncontested, or not

governed by Local Civil Rule 26.1(g), shall be accompanied by a brief containing a concise

statement of the legal contentions *and authorities* relied upon in support of the motion.")

12

(emphasis added); *see also Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion . . . will be deemed waived." (citation omitted)).

Second, Drexel's argument fails because it is belied by the record. The declaration of Megan Weyler, Senior Vice President and Chief Human Resources Officer at Drexel, states plainly that, "[o]n the afternoon of September 19, 2024 [the Thursday before trial], I was made aware of a Court Order directing Drexel to provide Plaintiff and her counsel 'access to a Drexel University payroll database containing the historical salary information' of certain employees from May 9, 2019 to the present." Def's Mot. for Recons. Ex. 2 at ¶ 2, ECF No. 225-2. Weyler indicates further that she "worked with [Drexel's] in-house and outside counsel to identify which systems needed to be accessed" in order to comply with the Order. This demonstrates that not only was Drexel's Chief Human Resources Officer aware and on notice of the Order, so was its in-house counsel. *Id.* at ¶ 3. Later in the same declaration, Weyler states that, on September 20, 2024 (the Friday before trial), she "was made aware of another Court Order directing Drexel to provide access to the employees' W-2s."[6] *Id.* at ¶ 14.

Since Drexel was on notice of precisely what the Court ordered it to do—but did not do it—this is not "the sympathetic situation of an innocent client suffering" a sanction better suited for the "counsel whom it hired to represent it." *Adams*, 29 F.3d at 873 (citation omitted). Accordingly, the first *Poulis* factor supports imposing liability on Drexel. *See Sanford v. Bracewell LLP*, 2017 WL 2797869, at *8 (E.D. Pa. June 27, 2017) (finding plaintiffs personally responsible where "counsel conferred with [them] about the importance of making" court-

---

[6] Although the Court did not have access to this Declaration at the time it issued the sanction in question, the Declaration was provided as an exhibit to Drexel's written Motion for Reconsideration, *see* Exhibit 2, ECF No. 225-3, and the Court considered the representations contained therein when denying said Motion.

ordered disclosures).

## 2. Prejudice

The second *Poulis* factor considers "the prejudice to the adversary caused by" the
sanctioned party's behavior. *Poulis*, 747 F.2d at 868. "Prejudice" does not mean "irremediable
harm"—instead, "the burden imposed by impeding a party's ability to prepare effectively a full
and complete trial strategy is sufficiently prejudicial." *Ware*, 322 F.3d at 222. "Prejudice to the
adversary is a particularly important factor in the *Poulis* analysis, and evidence of 'true
prejudice . . . bear[s] substantial weight in support of a [sanction].'" *Hildebrand v. Allegheny
Cty.*, 923 F.3d 128, 134 (3d Cir. 2019) (quoting *Scarborough v. Eubanks*, 747 F.2d 871, 876 (3d
Cir. 1984)).

Here, Piety Foley's "ability to prepare effectively a full and complete trial strategy" was
burdened by Drexel's failure to grant access to a payroll database. To address concerns raised by
Piety Foley in her Motion in Limine regarding the accuracy of pay information Drexel had
previously provided, Pl.'s Omnibus Mot. in Lim. 11-14, ECF No. 197, the Court's September 19,
2024, Order required Drexel to provide access to a payroll database containing these data. *See*
ECF No. 217. As the Court explained at the Final Pre-Trial Conference held on September 20,
2024, the purpose of ordering this access was to satisfy both Piety Foley and the Court as to the
authenticity and accuracy of whatever pay data would eventually be offered to demonstrate pay
differentials at trial.[7] *See* Hr'g Tr. 7:2-5 (Drexel's counsel: "Your Honor, the directive from the
Court on Friday during the [Final Pretrial C]onference was to give [Piety Foley and her counsel]

---

[7] Although it is sometimes treated as an afterthought at trial, authenticity is no peccadillo; unauthenticated evidence
is not relevant, and irrelevant evidence is not admissible. *See* Fed. R. Evid. 901, Notes of Advisory Committee on
Proposed Rules ("Authentication and identification represent a special aspect of relevancy."); Fed. R. Evid.
402 ("Irrelevant evidence is not admissible.).

access so that they could verify that what's on the W-2 matches exactly what's on the salary information we provided.")  When Drexel failed to do so, it did not merely flout the technical language of the Court's September 19, 2024 Order—which ordered access to a "payroll database," not a "Human Resources" database—it also frustrated the purpose of that Order, which was to ensure that Piety Foley had documented proof of "all payments made to" her coworkers "as remuneration for [their] employment"—data for which a payroll database is the best source.  29 C.F.R. § 1620.10 (defining "wages" for purposes of the Equal Pay Act to include "all payments made to [or on behalf of] an employee as remuneration for employment").

After Drexel's failure to comply with the Court's September 19 Order, the Court issued its September 20 Order, which required that Drexel provide Piety Foley with "access to" the relevant W-2s.  *See* ECF No. 219.  The Court clarified at the Final Pre-Trial Conference that this Order was not intended to require anything different than the September 19 Order—*i.e.*, that Drexel would be required to give Piety Foley and her attorney "access to" a payroll database containing the W-2s in question.  *See* Hr'g Tr. 8:6-8 (The Court: "I specifically told you . . . [to] provide him access to the database . . . .").  As explained previously, Drexel did not do so; instead, its counsel emailed redacted versions of the W-2s to Piety Foley's counsel.

Drexel argues that Piety Foley was not prejudiced by this behavior because she "received, prior to trial, the documents she sought" in the form of ninety-five redacted W-2s.  Had it provided access to a database containing those documents as ordered, Drexel argues, "the only different information [she] would have seen would have been employee Social Security numbers and addresses, which are not probative of anything."  But this argument misrepresents the reason Piety Foley sought—and the Court ordered—access to a database containing those documents in the first place.  As explained above, the Court ordered Drexel to grant Piety Foley access to a

payroll database to ensure the accuracy and authenticity of the pay data it provided to her and, eventually, to a jury. Copies of redacted W-2s sent via email do not fit that bill; as the Court explained at the Final Pre-Trial Conference, Drexel needed to provide Piety Foley with guided access to the database so that she could verify the accuracy of the data *herself*. *Cf.* Fed. R. Evid. 1001(d) (defining an "original" document to include the document itself or an electronic "printout" only "*if it accurately reflects the information*"—the very issue in dispute between the parties here).

As Piety Foley's counsel explained in court on September 23, 2024, Drexel's conduct hampered her ability to "prepare effectively a full and complete trial" on her Equal Pay Act claim, *see* Hr'g Tr. 9:11-23; this is prejudice enough for the sake of *Poulis*. *See Ware*, 322 F.3d at 222-23 (finding prejudice where the adverse party "had to file two motions" to obtain data regarding damages calculations and eventually received such data "only one week before trial and without supporting documentation").

### 3. History of Dilatoriness

The third *Poulis* factor considers whether the offending party has "a history of dilatoriness." *Poulis*, 747 F.2d at 868. This factor is evaluated "in light of [the party's] behavior over the life of the case." *Adams*, 29 F.3d at 875 (citing *Dyotherm Corp. v. Turbo Machine Co.*, 392 F.2d 146 (3d Cir. 1968)). "Extensive or repeated delay or delinquency constitutes a history of dilatoriness," *id.*, but "conduct that occurs one or two times" does not, *Briscoe*, 538 F.3d at 261.

Drexel argues that, because the sanction at issue "was the first, and only, sanction it received," and because Drexel "was never compelled to produce comparator employees' W-2s" earlier in the case, its failure to provide access to a database containing those documents on two

occasions does not constitute a history of dilatoriness. Piety Foley counters by pointing to the hard-fought discovery battles that occurred throughout this case, arguing that Drexel's "obstructive" behavior during the discovery period, coupled with the conduct for which it was sanctioned, evidences a history of dilatory behavior.

Ultimately, this factor does not weigh in favor of a sanction of liability. The conduct underpinning this sanction took place over the course of four days and, although discovery was hard fought, Drexel did not have a track record of similarly egregious behavior earlier in this case. *See, e.g., Dyotherm Corp. v. Turbo Machine Co.*, 392 F.2d 146 (3d Cir. 1968) (overturning a sanction of dismissal where plaintiff's counsel's misbehavior in the days leading up to trial was mitigating by two-and-a-half years' worth of good behavior).

### 4. Willful or Bad Faith Conduct

The fourth *Poulis* factor considers whether the conduct at issue is "the type of willful or contumacious behavior that can be characterized as flagrant bad faith, such as failing to answer interrogatories for nearly a year and a half, demanding numerous extensions, ignoring admonitions by the court, and making false promises to correct delays." *Hildebrand*, 923 F.3d at 135 (internal quotation marks and citation omitted). "Courts find willfulness and bad faith where no reasonable excuse for the conduct in question exists." *Harrington v. All Am. Plazas, Inc.*, 2010 WL 2710573, at *3 (D.N.J. July 7, 2010) (citing *Ware*, 322 F.3d at 224).

Here, Drexel argues that it acted in good faith because it "produc[ed], in less than 24 hours, 95 pages of W-2s" and redacted only employees' "Social Security numbers and addresses" from those documents. But to characterize such conduct as laudable is at best misguided given the Court's two orders that Drexel meet with its adversary and provide her access to a database containing those documents—not to email her redacted versions whose

authenticity she could not verify. For the reasons explained above, given the circumstances here, the documents themselves are not an appropriate substitute for access to a database from which they were sourced since the documents' provenance and accuracy were in question. And as for the redactions, while concerns over privacy may be a "reasonable excuse" in another situation, such is not the case here where the Court had explicitly instructed Drexel *not* to perform those redactions, with the understanding that, if admitted at trial, those redactions could occur then. *Id.*

Drexel also argues that it did not act willfully or in bad faith because "[Piety Foley]'s counsel previously refused, unjustifiably, the very direct access to payroll information that th[e] Court sanctioned Drexel for not providing." This is a blatant mischaracterization of the record. Drexel offered Piety Foley's counsel access to a *Human Resources* database, not a *payroll* database, in contravention of the Court's Order of September 19, 2024.

Drexel violated two Court Orders, "ignor[ed] admonitions by the [C]ourt," and offered no reasonable excuse for why. *Hildebrand*, 923 F.3d at 135. Accordingly, this factor weighs in favor of imposing liability. *Cf. NHL v. Metro. Hockey Club*, 427 U.S. 639, 640 (1976) (finding "flagrant bad faith" where a party "failed to perform" in the manner ordered of it, "notwithstanding several admonitions by the Court" and "after being expressly directed to perform an act by a date certain").

### 5. *Alternative Sanctions*

The fifth *Poulis* factor considers the effectiveness of lesser, alternative sanctions. *Poulis*, 747 F.2d at 868. To be sure, the imposition of liability is not the only sanction available here. Alternative sanctions "include prohibiting the disobedient party from supporting his claims or from introducing designated matters into evidence, striking pleadings . . . in part, staying further proceedings until [an] order is obeyed, and treating as contempt of court the failure to obey any

18

order, and the payment of expenses." *Gabriel v. Terra*, 2023 WL 4377068, at *4 (E.D. Pa. July 6, 2023).

Drexel argues that, instead of imposing liability on it, the Court should have "given [Piety Foley] another opportunity to directly access the W-2s" and "awarded reasonable attorneys' fees and costs to [her] for any perceived delay." But "[w]here, as here, a party has willfully flouted the Court's order, lesser sanctions will not suffice." *Windish v. 3M Co.*, 2024 WL 1604012, at *8 (E.D. Pa. Apr. 12, 2024), *aff'd*, 2025 WL 572386 (3d Cir. Feb. 21, 2025) (citing *Hayes v. Nestor*, 2013 WL 5176703, at *5 (D.N.J. Sept. 12, 2013)). Drexel was ordered to give its adversary access to a payroll database once, and it did not. Drexel was ordered to do it a second time, and it did not. Instead, it did exactly what the Court warned it not to do—namely, turning over redacted copies of W-2s without giving Piety Foley a chance to witness those documents in real time on the database in which they were maintained. The Court had no confidence that Drexel, having willfully flouted its Orders, would see the light and deign to comply if given just one more opportunity. Accordingly, this factor weighs in favor of imposing liability.

### 6. *Meritorious Defenses*

The final *Poulis* factor considers "the meritoriousness of the claim or defense." *Poulis*, 747 F.2d at 868. A "defense will be deemed meritorious when the allegations of the pleadings, if established at trial . . . would constitute a complete defense." *Id.* at 869-70. However, "[w]here a plaintiff makes out a prima facie case, but the defendant raises a prima facie defense," the factor is neutral. *Adams*, 29 F.3d at 876 (citing *Poulis*, 747 F.2d at 870).

Here, Drexel raised a statutory affirmative defense to Piety Foley's Equal Pay Act claim: that any pay disparities between she and her male colleagues were due to "a seniority system; a merit system; a system that measures earnings by quantity or quality of production; or, a

differential based on any other factor other than sex." 29 U.S.C. § 206(d). "[I]f established at trial," any of these "would constitute a complete defense" to liability under the Equal Pay Act. *Poulis*, 747 F.2d at 869-70. However, Piety Foley's Equal Pay Act claim did survive Drexel's motion for summary judgment, where it raised precisely this defense—this means, *a fortiori*, that Piety Foley established a prima facie case that Drexel had violated the Equal Pay Act. Accordingly, the final *Poulis* factor is neutral. *See Adams*, 29 F.3d at 876 (citing *Poulis*, 747 F.2d at 870).

In sum, of the six *Poulis* factors, four strongly support imposing liability on Drexel. One factor—a history of dilatoriness—weighs against that sanction, and the last—the meritoriousness of Drexel's defenses—is neutral. Thus, the balance of the *Poulis* factors—especially the willfulness, prejudice, and responsibility factors—favors the sanction of imposing liability on Drexel for violating the Equal Pay Act. *Cf. Di Gregorio v. First Rediscount Corp.*, 506 F.2d 781, 788 (3d Cir. 1974) ("'[Dismissal as a sanction] must be tempered by the careful exercise of judicial discretion to assure that its imposition is merited. However, where one party has acted in willful and deliberate disregard of reasonable and necessary court orders and the efficient administration of justice, the application of even so stringent a sanction is fully justified and should not be disturbed.'" (quoting *Trans World Airlines, Inc. v. Hughes*, 332 F.2d 602, 614 (2d Cir. 1964))). Accordingly, to the extent Drexel argues that it is entitled to a new trial because the Court committed an error of law by misapplying the *Poulis* factors in its earlier rulings, Drexel's Rule 59(a) Motion will be denied.[8]

---

[8] Drexel also argues that the Court violated its Seventh Amendment right to a jury trial by imposing liability without "properly weigh[ing] the *Poulis* factors." *See* U.S. Const. Amend. VII. But, assuming they apply in this context, the *Poulis* factors support that sanction, and, thus, this argument fails as well.

b.  <u>Right to Procedural Due Process</u>

Drexel also argues that the imposition of liability violated its right to procedural due process.  The essentials of procedural due process are notice and an opportunity to be heard. *Stana v. Sch. Dist. of Philadelphia*, 775 F.2d 122, 127 (3d Cir. 1985) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).  In the context of Rule 37 sanctions, due process requires a court to "provide the party to be sanctioned with notice of and some opportunity to respond to the charges." *Jones v. Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1357 (3d Cir. 1990) (citations omitted).  Generally, "particularized notice is required to comport with due process." *Id.* at 1357.  However, a court may sanction a party without "explicit notice of the precise legal authority relied upon where the record indicates that the sanctioned party had notice of the sanctionable conduct and was aware of the factors the court [would] consider in deciding whether to impose sanctions." *Med. Tech. Assocs. II Inc. v. Rausch*, 2023 WL 8451222, at *3 (3d Cir. Dec. 6, 2023) (citing *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.*, 57 F.3d 1215, 1225-27 (3d Cir. 1995)).

Drexel contends that "[i]t is undisputed that neither Drexel nor its counsel received *any* notice that th[e] Court would be even entertaining a sanction, let alone the extreme sanction of [liability]."  But this is wrong—Drexel and its counsel knew, after the Final Pre-Trial Conference on September 20, 2024, that its actions leading up to that day had fallen short of what was ordered by the Court, and that it was expected to comply with all Court Orders moving forward. That the Court did not give Drexel notice of the precise nature of any sanctions it might impose nor provide "explicit notice of the precise legal authority relied upon" does not mean that Drexel, represented by counsel and a firm highly respected for their litigation capabilities, was in the dark about the consequences of disobeying two Court Orders. *Id.*

21

In any event, Drexel received notice—along with an opportunity to be heard—at the hearing on September 23, 2024. As described previously, the Court encouraged Drexel to respond point-by-point to the email Piety Foley's counsel sent to the Court that morning. Hr'g Tr. 4:24-6:19. After hearing Drexel's counsel on this topic, the Court explained that it was considering sanctions and gave Drexel's counsel another opportunity to be heard. *Id.* at 6:21-9:8. The Court also suggested that Drexel's counsel put its client's corporate representative on the stand so that even more information about the violation of the Court Orders could be elicited, but counsel declined. *Id.* at 8:19-9:1. The Court then asked Piety Foley's counsel to propose a sanction and gave Drexel's counsel yet *another* opportunity to respond. *Id.* at 9:9-10:12. Finally, after the sanction was imposed, the Court heard Drexel's oral Motion for Reconsideration. *Id.* at 12:4-13:7. What occurred at this hearing, coupled with the notice given to Drexel at the Final Pre-Trial Conference, are sufficient to satisfy procedural due process. *See, e.g., Windish*, 2025 WL 572386, at *2 ("The District Court satisfied due process by giving the parties fair warning, analyzing their arguments, and imposing a tough-but-reasonable sanction.").

## ii.    *Evidentiary Rulings*

Turning to Drexel's argument that the Court committed errors of law at trial by admitting "evidence concerning discovery disputes" between the parties, and by precluding Drexel from admitting evidence "about salaries of other female professors" in Piety Foley's department.

In determining whether to grant a new trial on the basis of supposedly erroneous evidentiary rulings, a court employs the same two-step inquiry governing other Rule 59(a) motions based on errors of law: it "must first determine whether an error was made in the course of trial, and then it must determine 'whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice.'" *Price*, 839 F. Supp.2d at 792 (quoting

*Farra*, 838 F. Supp. at 1026).  Here, Drexel has not shown that these evidentiary rulings were legally erroneous, or that declining to grant a new trial "'would be inconsistent with substantial justice.'"  *Id*.  Accordingly, Drexel's request for a new trial on evidence grounds will be denied.

Drexel raised concerns over the admissibility of evidence regarding the "discovery disputes" between the parties in its Motion in Limine filed before trial.  Specifically, Drexel sought to exclude five kinds of evidence that Piety Foley planned to introduce: (1) evidence that Drexel had designated pay information turned over in discovery as "Confidential" and "Attorneys' Eyes Only;" (2) evidence that Drexel did not provide pay information for the period beyond August 2023 until the eve of the 2024 trial; (3) inconsistent testimony from Drexel's corporate representative's Rule 30(b)(6) depositions regarding pay supplements for administrative roles; (4) the events surrounding Drexel's provision of the W-2s; and, (5) excerpts from a deposition transcript showing Drexel's counsel instructing Drexel's corporate representative not to answer certain questions.  *See* Def's Mot. in Lim. 1, ECF No. 240.

At the Final Pre-Trial Conference, reserving ruling on the motion, the Court explained to the parties that, as far as discovery disputes were concerned, it would not admit any evidence about what attorneys said at depositions or argued in briefs, nor any references to what the Court ordered in helping resolve these discovery disputes.  Instead, the parties would be limited to eliciting testimony about the bare facts underlying those disputes.  *See* Trial Tr. vol. 1 at 9:7-13, January 27, 2025, ECF No. 262 (Drexel's counsel discussing these instructions).  For example— if Piety Foley's counsel sought to elicit testimony about when certain pay information was turned over, he could reference the fact that a request for certain pay data was made but not satisfied until a later time, though he could not reference the fact that the parties sought the Court's help in resolving whether and how such data needed to be turned over.

Drexel now argues that the Court went back on its word by allowing Piety Foley to "run wild at trial" by "introduc[ing] evidence of discovery disputes" themselves. This is a mischaracterization of what occurred at trial, where Piety Foley's counsel hewed closely to the Court's instructions. For example, when referencing the meeting to provide database access ordered by the Court in its September 19, 2024 Order, counsel referenced only the fact that the meeting took place, not the fact that the Court had ordered a meeting. *See, e.g.,* Trial Tr. vol. 1 123:15-24. In fact, the only time a Court Order was referenced during trial was when the Court—in an effort to clarify the testimony of Drexel employee Megan Weyler about whether she had been provided with a copy of the Order—questioned the witness directly. *See id.* at 134:18-137:11; *see also* Fed. R. Evid. 614(b) ("The court may examine a witness regardless of who calls the witness."); *United States v. Green*, 544 F.2d 138, 147 (3d Cir. 1976) (recognizing that "one gauge of the degree of proper court [questioning] is the complexity of the facts and the trial judge's long familiarity with them"). Consistent with the Court's previous directions at the Pre-Trial Conference, the Order itself was not admitted into evidence, nor was any reference made to disputes between the parties concerning the Order. Drexel cites nothing in the record to the contrary, referencing only the entirety of a thirty-seven-page range in the trial transcript—a range which contains the Court's direct line of questioning discussed above—and identifying no other instance where Court Orders or any other discovery disputes were discussed.

Drexel also argues that the Court erred in allowing Piety Foley's counsel to elicit testimony concerning the pay documents that Drexel provided during discovery, and to argue to the jury that the manner in which Drexel provided these documents suggested "concealment" of Drexel's knowledge of culpability. Drexel argues that the evidence about what documents Drexel turned over and when should have been excluded as "irrelevant and highly prejudicial."

This evidence was admitted for its relevance to the issue of willfulness.  Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401(a); *see also United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009) ("[E]vidence is irrelevant only when it[] has no tendency to prove a consequential fact." (citation omitted) (first alteration in original)).  This is a "low threshold" by all accounts.  *Forrest v. Parry*, 930 F.3d 93, 116 (3d Cir. 2019).  Willfulness, in turn, will be found where a party "either knew or showed reckless disregard" for whether its conduct violated the Equal Pay Act.  *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).

At trial, without referencing any actual discovery disputes themselves, Piety Foley elicited testimony from Roger Kurtz, Drexel's corporate representative, suggesting that, over several years of litigation in this case, Drexel turned over complete and verifiable pay data in dribs and drabs, and only after numerous requests for that information.  *See* Trial Tr. vol. 2 185:19-189-13 (Piety Foley's counsel summarizing this testimony in his closing argument).  The jury could have reasonably concluded that this evidence suggested willfulness because it is more probable that Drexel would have been so hesitant to provide a complete picture of its employees' salaries if it had willfully violated the Equal Pay Act and wanted to hide that violation (in order to avoid paying three years' backpay and additional liquidated damages) than it would have been had it acted without willfulness when setting the respective employees' salaries.  Because relevancy is such a "low threshold," this evidence was relevant to the question of willfulness.  *Forrest*, 930 F.3d at 116.  But even assuming *arguendo* that it was not, Drexel has not established that its admission is "inconsistent with substantial justice" such that a new trial is warranted under Rule 59.  *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 235 (3d Cir. 2001).  Indeed, as the discussion *infra* of Drexel's Rule 50(b) Motion shows, the jury had other, stronger

evidence upon which it could have concluded that Drexel willfully violated the Equal Pay Act.

The same goes for Drexel's argument that the Court erred in excluding evidence about the salaries of other female professors in Piety Foley's department. Drexel argues that "[t]he Court's preclusion of this evidence deprived Drexel of its ability to have the jury fully and fairly determine both [Piety Foley's] entitlement to damages as well as Plaintiff's willfulness claim." As an initial matter, Piety Foley *was* entitled to damages—this is precisely the effect of the sanction of liability. If an employer is liable for an Equal Pay Act violation, it means the employer did, in fact, pay an employee of one sex more than an employee of another sex for doing substantially the same work. *See* 29 U.S.C. 206(d)(1). In this regard, there was no question for the jury as to of Piety Foley's "entitlement to damages;" the liability sanction determined that she was entitled to them. *See* Trial Tr. vol. 1 at 6:2-10 (The Court: "[A]s I told you in the final pretrial, there was a liability determination. . . . What that means, if you look at the requirements for proving . . . the Equal Pay Act claim, you have to have an employee of the opposite sex [who was] paid differently for performing equal work of substantially equal skill effort and responsibility under similar working conditions. . . ."). The only question for the jury was *which* male employees, among those who were paid more than Piety Foley, should be deemed as proper comparators—an issue to which the salaries of other female professors is irrelevant.

Regarding the question of willfulness, Drexel argues that introducing the salaries of other female professors "would have allowed [it] to explain the discrepancies in salaries" to the jury in a way that would suggest it was not willful in setting salaries more generally. Perhaps so—conceivably, Drexel could have used the salary of a different female employee to exemplify the manner in which salaries are calculated, as it argues here that it would have done. But Drexel

already made that exact argument in the examination of other employees who took the stand at trial, like Kurtz and Piety Foley herself.  *See* Trial Tr. vol. 2 at 54:15-86:21 (Drexel's counsel eliciting testimony from Kurtz regarding the manner in which salaries are determined, using Kurtz himself and several other professors—including one female professor—as examples); *id.* at 97:15-112:18 (Drexel's counsel eliciting testimony from Piety Foley about how her salary was determined).  Introducing the salaries of other female professors into the picture would have wasted time, would have been redundant, and would have confused the jury, who were not being asked to determine whether they believe Drexel pays women fairly in general, but whether Drexel's already-determined violation of the Equal Pay Act was willful or not.[9]  *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.").  And even assuming *arguendo* that this ruling was erroneous, Drexel fails to demonstrate that this ruling was "inconsistent with substantial justice" such that a new trial on willfulness is required.  *Martin*, 240 F.3d at 235.  On the contrary, as discussed *infra* and further below, a reasonable jury could have found that Drexel acted willfully even if this evidence had been admitted.  For these reasons, Drexel's Motion for a New Trial on 59(a) will be denied in all respects.

## III.    RULE 50(B) MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.  Legal Standard

Federal Rule of Civil Procedure 50 permits a party to bring an initial motion for judgment

---

[9] This distinction between liability and willfulness also dooms Drexel's argument that the Court erred in requiring the jury to determine that there was at least one male comparator against whose salary Piety Foley's damages must be calculated.  The idea that there is, in fact, at least one male comparator is logically subsumed, *a fortiori*, in the Court's imposition of liability against Drexel.  If the Court had allowed the jurors to select no male comparators, that verdict would have the effect of gutting the sanction, as Drexel would be found not to have paid any male employees more than Piety Foley, and she would recover no damages.

as a matter of law during a jury trial on the grounds that no reasonable jury would have legally

sufficient evidence to find for the opposing party on a given issue.  Fed. R. Civ. P. 50(a)(1).  If

denied, the party may renew its motion after trial and include an alternative request for a new

trial.  Fed. R. Civ. P. 50(b).  On a renewed motion the trial court may enter judgment as a matter

of law notwithstanding a jury verdict for the opposing party, but "only if, as a matter of law, the

record is critically deficient of that minimum quantity of evidence from which a jury might

reasonably afford relief."  *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d

Cir. 2001) (citation and quotation omitted).  This is a "sparingly invoked remedy."  *Marra v.

Philadelphia Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citation and quotation omitted).

Judgment as a matter of law is proper "only if, viewing the evidence in the light most

favorable to the nonmovant and giving it the advantage of every fair and reasonable inference,

there is insufficient evidence from which a jury reasonably could find liability."  *LePage's, Inc.

v. 3M*, 324 F.3d 141, 145-46 (3d Cir. 2003) (citation and quotation omitted).  "The court may not

weigh evidence, determine the credibility of witnesses or substitute its version of the facts for

that of the jury," but rather may grant a Rule 50 motion only "if upon review of the record it can

be said as a matter of law that the verdict is not supported by legally sufficient evidence."

*Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 691-92 (3d Cir. 1993), *abrogated on

other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir.

2003).  For this reason, "[n]ormally, when the evidence is contradictory, [judgment as a matter of

law] is inappropriate."  *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 811 (3d

Cir. 1984) (citation omitted).

### B.  Discussion

Drexel argues that it is entitled to judgment as a matter of law on the issue of willfulness

"because [Piety Foley] failed to adduce sufficient evidence to support a finding" that it acted willfully. As described previously, willfulness will be found where a party "either knew or showed reckless disregard" for whether its conduct violated the Equal Pay Act. *Richland Shoe*, 486 U.S. at 133. Unreasonable or merely negligent conduct is not sufficient; a plaintiff must demonstrate that their employer either knew or was reckless with regard to whether its conduct violated the Equal Pay Act. *Id*. at 133-35. Willfulness may be properly demonstrated with circumstantial evidence, *Stone v. Troy Constr., LLC*, 935 F.3d 141, 150 n.12 (3d Cir. 2019), including actions taken after an employer is accused of violating the Act, *see, e.g., Sec'y United States Dep't of Lab. v. Mosluoglu, Inc.*, 2023 WL 5972044, at *4 (3d Cir. Sept. 14, 2023) (upholding District Court's finding of willfulness where, after the Department of Labor began investigating a restaurant, the owners "asked multiple employees to lie about the restaurant's overtime and tip contribution policies").

Piety Foley adduced sufficient evidence at trial to ground a finding by the jury that Drexel either knew its conduct violated the Equal Pay Act or recklessly disregarded the same. The strongest evidence of willfulness was the testimony of Dr. Roger Kurtz, Head of the Department of English and Philosophy and corporate representative of Drexel at trial. On direct examination by Piety Foley's counsel, Kurtz admitted that, when he first came to his post, he noticed the differences in salaries across the department and looked into why they might be so disparate. Trial Tr. vol. 1 at 195:17-25. Although he ultimately concluded that the salaries in his department "all made good sense" considering that the higher-paid professors had once held administrative posts while the lower-paid never had, *id*. at 194:10-196:14, Kurtz was unable to explain whether Drexel had a policy of letting administrators keep their administrative stipends after stepping back down to a standard faculty post—despite the fact that Kurtz had been asked

about this policy in his deposition as a Rule 30(b)(6) witness earlier in the case, as Piety Foley's counsel noted, *id.* at 188:8-191:15. A jury observing this testimony could easily conclude that Kurtz's conduct—auditing his department's salaries, noticing disparities, and settling for an answer unsupported by any internal policy that he was aware of—could constitute reckless disregard for the strictures of the Equal Pay Act. *See, e.g. EEOC v. Del. Dep't of Health & Soc. Servs.*, 865 F.2d 1408, 1419 (3d Cir. 1989) ("The jury could have drawn the inference . . . that [the] personnel director for the State of Delaware[] must have entertained a strong suspicion of an Equal Pay Act violation which, with the most cursory investigation, would have led to actual knowledge. An experienced, responsible official cannot consciously turn his head and choose to ignore such information. If he does, his actions meet the standard of willfulness set forth in *Richland Shoe*.").

Aside from Kurtz's testimony about his own investigation into pay differentials, Piety Foley elicited other testimony from Kurtz regarding the incompleteness of the pay information Drexel turned over to Piety Foley during discovery. This testimony suggested that the specific documents produced by Drexel at each stage in the litigation were keyed toward concealing the true extent of the pay differentials between Piety Foley and her male counterparts; for the reasons explained *supra* in subsection II.B.ii, such tactic could suggest to a reasonable jury that Drexel willfully violated the Equal Pay Act with respect to Piety Foley. *See* Trial Tr. vol. 1 at 185:19-189:13. Counsel also elicited testimony from Drexel employees Megan Weyler and Rose Flavin which suggested that Drexel and its attorneys potentially misrepresented their ability to provide Piety Foley with access to a payroll database as ordered in September of 2024—a time before the Court imposed liability on Drexel, and during which Drexel had an incentive to withhold pay information that might show the extent of its statutory violations. *Compare* Trial

Tr. vol. 1 at 125:22-128:23 (Megan Weyler, Chief Human Resources Officer at Drexel, testifying that she was unable to get in touch with Rose Flavin, Drexel's Executive Director of Payroll Operations, on September 20, 2024) *with id.* at 146:15-148:8 (Rose Flavin testifying that she was contacted by Megan Weyler on September 20, 2024, joined a Zoom meeting with her, and was available to provide access to a payroll database that day); *see also Mosluoglu, Inc.*, 2023 WL 5972044, at *4 (3d Cir. Sept. 14, 2023) (upholding District Court's finding of willfulness where, after the Department of Labor began investigating a restaurant, the owners "asked multiple employees to lie about the restaurant's overtime and tip contribution policies").

"[V]iewing the evidence in the light most favorable to [Piety Foley] and giving [her] the advantage of every fair and reasonable inference," the record contains sufficient evidence from which a jury could reasonably find that Drexel willfully violated the Equal Pay Act. *LePage's* 324 F.3d at 145-46. Accordingly, Drexel's Rule 50(b) Motion will be denied.[10]

An appropriate order follows.

BY THE COURT:

S/ WENDY BEETLESTONE

_____

**WENDY BEETLESTONE, J.**

---

[10] Drexel separately argues that "the jury's verdict on willfulness must be vacated because it was hopelessly tainted by [Piety Foley's] false narrative" that Drexel had been found to have violated the Equal Pay Act on the merits, not as a sanction. But the Court specifically stated in its opening and closing instructions to the jury that "prior to this trial, *the Court* determined that Drexel was liable for having violated the Equal Pay Act"—not that a jury had found it liable, or that its liability was based on an adjudication of the merits. Drexel's argument fails accordingly.